No. 23-13396

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners,*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,

*Intervenors.*

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-98290; File No. 4-698

## OPENING BRIEF OF PETITIONERS

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## CERTIFICATE OF INTERESTED PERSONS

1. **Altman, Jennifer G.**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

2. **American Securities Association**, Petitioner.

3. **ArentFox Schiff LLP**, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

4. **Barbero, Megan**, counsel for Respondent United States Securities and Exchange Commission.

5. **Borse Dubai Limited**, owner of more than 10% of Nasdaq, Inc.'s shares.

6. **BOX Exchange LLC**, member and participant of Consolidated Audit Trail, LLC.

7. **Boyle, Gregory**, Jenner & Block LLC, counsel for Intervenor Consolidated Audit Trail, LLC.

8. **Cboe BYX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

9. **Cboe BZX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

10. **Cboe C2 Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

11. **Cboe EDGA Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

12. **Cboe EDGX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

13. **Cboe Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

14. **Cboe Global Markets, Inc. (BATS: CBOE)**, direct or indirect parent company of Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

15. **Citadel Securities GP LLC**, parent company of Petitioner Citadel Securities LLC.

16. **Citadel Securities LLC**, Petitioner.

17. **Conley, Michael A.**, counsel for Respondent United States Securities and Exchange Commission.

18. **Connolly, J. Michael**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

19. **Consolidated Audit Trail, LLC**, Intervenor.

20. **Consovoy McCarthy PLLC**, counsel for Petitioner American Securities Association.

21. **Financial Industry Regulatory Authority, Inc.**, member and participant of Intervenor Consolidated Audit Trail, LLC.

22. **Francisco, Noel J.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

23. **Gershengorn, Ian Heath**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

24. **Greenwalt III, Paul E.**, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

25. **Hardin, Tracey A.**, counsel for Respondent United States Securities and Exchange Commission.

26. **Hoyt, Joshua T.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

27. **Intercontinental Exchange, Inc. (NYSE: ICE)**, indirect parent of NYSE Intervenors.

28. **International Securities Exchange Holdings, Inc.**, sole LLC member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

29. **Investor AB (Nasdaq Stockholm: INVEB)**, owner of more than 10% of Nasdaq, Inc.'s shares.

30. **Investors' Exchange, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

31. **Jenner & Block LLP**, counsel for Intervenor Consolidated Audit Trail, LLC.

32. **Jones Day**, counsel for Petitioner Citadel Securities LLC.

33. **Kastenberg, Stephen J.**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

34. **Katsiff, Timothy D.**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

35. **Kennedy, Jordan**, counsel for Respondent United States Securities and Exchange Commission.

36. **Lantieri III, Paul**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

37. **Long-Term Stock Exchange, Inc.**, member and participant of Intervenor Consolidated Audit Trail, LLC.

38. **Lucas, Brinton**, Jones Day, counsel for Petitioner Citadel Securities LLC.

39. **MacLean, Matthew J.**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

40. **Matro, Daniel E.**, counsel for Respondent United States Securities and Exchange Commission.

41. **MEMX LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

42. **Miami International Securities Exchange LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

43. **MIAX Emerald, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

44. **MIAX PEARL, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

45. **Molzberger, Michael**, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

46. **Nasdaq BX, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

47. **Nasdaq GEMX, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

48. **Nasdaq, Inc. (Nasdaq: NDAQ)**, sole owner of LLC interest in The Nasdaq Stock Market LLC and Nasdaq PHLX LLC and parent company of Nasdaq BX, Inc.

49. **Nasdaq ISE, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

50. **Nasdaq MRX, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

51. **Nasdaq PHLX LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

52. **New York Stock Exchange LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

53. **NYSE American LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

54. **NYSE Arca, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

55. **NYSE Chicago, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

56. **NYSE National, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

57. **Phillips, David**, Jones Day, counsel for Petitioner Citadel Securities LLC.

58. **Pillsbury Winthrop Shaw Pittman LLP**, counsel for NYSE Intervenors.

59. **Rabbitt, Brian C.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

60. **Roth, Yaakov M.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

61. **The Nasdaq Stock Market LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

62. **The Vanguard Group, Inc.**, owned 10% or more of Cboe Global Markets, Inc.'s common stock as of June 30, 2023.

63. **Thoma Bravo UGP, LLC**, owner of more than 10% of Nasdaq, Inc.'s shares.

64. **Unikowsky, Adam G.**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

65. **United States Securities and Exchange Commission**, Respondent.


Dated: February 8, 2024

/s/ *J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Respectfully submitted,

/s/ *Noel J. Francisco*
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in the ASA.

Petitioner Citadel Securities LLC is a wholly owned, indirect subsidiary of Citadel Securities GP LLC. Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

Dated: February 8, 2024

Respectfully submitted,

/s/ J. Michael Connolly
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

/s/ Noel J. Francisco
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## STATEMENT REGARDING ORAL ARGUMENT

This Court should hear oral argument. This case raises important questions about the validity of a significant order of the U.S. Securities and Exchange Commission (Commission or SEC) that threatens to impose billions of dollars in costs on the financial-services industry (and the investors it represents) to implement a massive, unprecedented government surveillance system that will collect personal information on every American who trades in the U.S. securities markets—all without the approval of, or any funding from, Congress. Oral argument would substantially assist this Court in addressing whether this order must be set aside as unlawful.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ C-1

CORPORATE DISCLOSURE STATEMENT ......................................................... C-6

STATEMENT REGARDING ORAL ARGUMENT ..................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................................... 5

STATEMENT OF THE ISSUES .......................................................................... 5

STATEMENT OF THE CASE ............................................................................. 6

STANDARD OF REVIEW ................................................................................. 12

SUMMARY OF THE ARGUMENT ................................................................... 12

ARGUMENT ................................................................................................... 13

I.      THE CAT EXCEEDS THE COMMISSION'S AUTHORITY ..................... 13

        A.      The SEC Lacked Authority To Create And Fund The CAT. ............... 14

        B.      The Commission's Defenses Of The CAT Fail. ................................ 24

II.     THE ORDER'S ALLOCATION OF COSTS VIOLATES BOTH
        THE EXCHANGE ACT AND THE APA ................................................. 32

        A.      Allowing All CAT Costs To Fall On Broker-Dealers Is Neither
                Equitable Nor Reasonable. ............................................................... 32

        B.      The Commission's Defenses Reveal Its Arbitrary Reasoning. .............. 36

III.    THE ORDER'S ECONOMIC ANALYSIS VIOLATES BOTH THE
        EXCHANGE ACT AND THE APA ......................................................... 39

        A.      The Commission Failed To Update Its 2016 Analysis. ...................... 40

        B.      The Commission Failed To Estimate Effects On Investors. ................ 44

CONCLUSION ................................................................................................. 49

CERTIFICATE OF COMPLIANCE ................................................................... 50

CERTIFICATE OF ELECTRONIC SUBMISSION .............................................. 51

CERTIFICATE OF SERVICE ........................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) .......................................................................... 16, 30

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ...................................................................................... 48

*\*Biden v. Nebraska,*
600 U.S. 481 (2023) ..................................................... 15, 16, 21, 22, 29, 30

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,*
781 F.3d 1271 (11th Cir. 2015) .................................................................. 36

*\*Bloomberg L.P. v. SEC,*
45 F.4th 462 (D.C. Cir. 2022) ..................................................................... 35

*BST Holdings, LLC v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ........................................................................ 22

*Business Roundtable v. SEC,*
905 F.2d 406 (D.C. Cir. 1990) ...................................................................... 6

*\*Business Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) ................................................... 40, 44, 45, 46

*Carpenter v. United States,*
138 S. Ct. 2206 (2018) ................................................................................ 27

*\*Chamber of Com. of U.S. v. SEC,*
412 F.3d 133 (D.C. Cir. 2005) .......................................................... 42, 44, 47

*\*Chamber of Com. of U.S. v. SEC,*
85 F.4th 760 (5th Cir. 2023) ............................................................... 39, 47

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ................................................................ 34

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ............................................................ 32, 36

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ............................................................ 15, 25

*FEC v. Cruz,*
   596 U.S. 289 (2022) ................................................................ 30

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010) ................................................................ 31

*Fulcrum Fin. Partners v. Meridian Leasing Corp.,*
   230 F.3d 1004 (7th Cir. 2000) ................................................. 33

*Hewitt v. Comm'r,*
   21 F.4th 1336 (11th Cir. 2021) .............................................. 38

*Indus. Union Dep't v. Am. Petroleum Inst.,*
   448 U.S. 607 (1980) ................................................................ 15

*King v. Burwell,*
   576 U.S. 473 (2015) ............................................................ 21, 25

*Mistretta v. United States,*
   488 U.S. 361 (1989) ................................................................ 15

*Morrison v. Olson,*
   487 U.S. 654 (1988) ................................................................ 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................................................. 45

*NFIB v. OSHA,*
   595 U.S. 109 (2022) ............................................................ 22, 25

*OPM v. Richmond,*
496 U.S. 414 (1990) ........................................................ 22, 24

*Portland Cement Ass'n v. EPA,*
665 F.3d 177 (D.C. Cir. 2011) ............................................ 41

*Printz v. United States,*
521 U.S. 898 (1997) ........................................................ 27

*Protect Our Communities Found. v. LaCounte,*
939 F.3d 1029 (9th Cir. 2019) ............................................ 37

*Sackett v. EPA,*
598 U.S. 651 (2023) ........................................................ 15

*SEC v. Chenery,*
318 U.S. 80 (1943) ........................................................ 37

*Stone & Webster Constr., Inc. v. U.S. Dep't of Lab.,*
684 F.3d 1127 (11th Cir. 2012) .......................................... 12

*U.S. Telecom Ass'n v. FCC,*
855 F.3d 381 (D.C. Cir. 2017) .......................................... 14

*Wayman v. Southard,*
23 U.S. 1 (1825) .......................................................... 14

*Weissman v. NASD,*
500 F.3d 1293 (11th Cir. 2007) (en banc) .............................. 6

*\*West Virginia v. EPA,*
597 U.S. 697 (2022) ................... 3, 14, 15, 16, 18, 21, 22, 25, 27, 29, 30, 31

*Zen Magnets, LLC v. CPSC,*
841 F.3d 1141 (10th Cir. 2016) ...................................... 41, 42

## Constitutional and Statutory Authorities

U.S. Const. Article I, § 1 .............................................. 14, 22

U.S. Const. Article I, § 9 .................................................................... 22, 23, 24, 34

5 U.S.C. § 706 ................................................ 4, 5, 12, 13, 32, 34, 36, 37, 39, 43

12 U.S.C. §§ 3401 *et seq.* ...................................................................... 20

15 U.S.C. § 78c ...................................................................................... 39

15 U.S.C. § 78f ................................................................................... 4, 37

15 U.S.C. § 78k-1 ..................................... 6, 7, 13, 16, 25, 26, 27, 30, 46

15 U.S.C. § 78o-3 ............................................................................. 32, 37

15 U.S.C. § 78q .................................................................................... 30

15 U.S.C. § 78u .................................................................................... 20

15 U.S.C. § 78y ...................................................................................... 5

15 U.S.C. § 78ee ................................................................................... 23

Securities Act Amendments of 1975,
      Pub. L. No. 94-29, 89 Stat. 97 ........................................................ 6

**OTHER AUTHORITIES**

17 C.F.R. § 242.608 ............................................................................. 36

17 C.F.R. § 242.613 ............................................................................. 39

63 Fed. Reg. 12559 (1998) ................................................................... 28

68 Fed. Reg. 47116 (2003) ................................................................... 28

70 Fed. Reg. 37496 (2005) ................................................................ 7, 26

75 Fed. Reg. 32556 (2010) ........................................................ 7, 17, 29, 30

77 Fed. Reg. 45722 (2012) ................................................ 7, 8, 17, 18, 28, 32

81 Fed. Reg. 30614 (2016) ................................................................ 8, 30

81 Fed. Reg. 84696 (2016) ...................................8, 9, 18, 21, 22, 32, 37, 40, 41, 43

82 Fed. Reg. 35005 (2017) .................................................................... 10

85 Fed. Reg. 16152 (2020) .................................................................... 18

85 Fed. Reg. 31322 (2020) .................................................................... 38

85 Fed. Reg. 83634 (2020) .................................................................... 28

86 Fed. Reg. 44142 (2021) .................................................................... 26

87 Fed. Reg. 42247 (2022) .................................................................... 28

88 Fed. Reg. 17086 (2023) .................................................................... 43

88 Fed. Reg. 62628 (2023) ..................... 2, 4, 5, 9-11, 13, 14, 16, 21, 23-31, 33-39, 41-47

CAT LLC 2023 Budget.......................................................................... 9

*Chair Gary Gensler's Statement on CAT Funding* (Sept. 6, 2023).................. 17, 18

SEC Chair Clayton, *Testimony on "Oversight of the U.S. Securities and Exchange Commission"* (Dec. 11, 2018) .............................................. 20

THE FEDERALIST No. 58 (J. Madison) ..................................................... 24

FINRA Cost-Shifting Filing (2024)............................................................ 3

FINRA Fee Filing (2024) ...................................................................... 10

H.R. 2039 (2021)................................................................................. 20

H.R. 4551 (2023)................................................................................. 20

H.R. 4785 (2018)................................................................................. 20

Letter from B. Becker to V. Countryman (May 22, 2023) ....................1, 16, 23

Letter from B. Becker to V. Countryman (July 28, 2023) ........................... 33

Letter from Citadel Securities to V. Countryman (July 14, 2023) ........9, 21, 41

Letter from Citadel Securities to V. Countryman (Aug. 22, 2023)................................ 47

Letter from M. Simon to V. Countryman (Sept. 6, 2022) ............................................... 10

Letter from Sen. Kennedy et al., to SEC Chair Clayton (July 24, 2019)....................... 20

P. Little, NCLA, *A Catastrophic Assault on Our Civil Liberties*
(Jan. 15, 2020)..................................................................................................... 19

D. Michaels, *SEC Discloses Edgar Corporate Filing System Was Hacked in
2016*, WALL ST. J. (Sept. 20, 2017) ......................................................................19-20

S. Rep. No. 75-1455 (1938) ........................................................................................... 6

S. Rep. No. 94-75 (1975) ............................................................................................... 6

Chair Mary L. Schapiro, *Opening Statement at SEC Open Meeting:
Consolidated Audit Trail* (July 11, 2012) ......................................................... 17

P. Schwartz & D. Solove, *The PII Problem: Privacy and A New Concept of
Personally Identifiable Information*, 86 N.Y.U. L. REV. 1814 (2011) ............... 18

*SEC Names Manisha Kimmel as Senior Policy Advisor to the Chairman on the
Consolidated Audit Trail* (Jan. 29, 2019) ......................................................... 28

SEC, *Statement of Hester M. Peirce in Response to Release No. 34-88890*, File
No. S7-13-19 (May 15, 2020) ............................................................................ 18

*Sen. Banking Comm. Oversight Hearing on Status of the Consolidated Audit Trail*
(Oct. 22, 2019)................................................................................................... 19

*Testimony of Michael J. Simon Before the U.S. Sen. Comm. on Banking, Housing,
and Urban Affairs* (Oct. 22, 2019)................................................................... 28

A. Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account Was
Hacked*, BLOOMBERG LAW (Jan. 11, 2024)....................................................... 20

USAspending ................................................................................................................. 22

# INTRODUCTION

This case concerns the operation and funding of an unprecedented government surveillance system that allows the SEC to directly track the confidential information and activities of every investor in the U.S. securities markets. Known as the Consolidated Audit Trail (CAT), this first-of-its-kind database collects and stores the trading history and personally identifiable information of all Americans who trade equities or options, including their names, addresses, birthyears, and market activities. It accumulates a staggering 500 billion records *per day.* As the CAT's proponents have boasted, "no other comparable system or database of this scale … and complexity exists anywhere in the world." Letter from B. Becker to V. Countryman 8-9 (May 22, 2023), https://perma.cc/UW4U-T73J (CAT Letter). Not surprisingly, this program's threats to privacy and civil liberties have set off alarm bells across the political spectrum, which have only grown louder as the public learns of the SEC's repeated failures to safeguard its own systems against foreign hackers. Incredibly, however, the Commission created this Big Brother regime *without any approval, direction, or appropriation from Congress.*

Building the CAT was always going to be very costly, and pervasive mismanagement has spiked those costs exponentially. As the SEC now admits, merely developing the CAT will require *over $1 billion* (more than 20 times its initial projections) and operating it will run $200 million or more every year (quintuple its original estimate and nearly 10% of the Commission's own annual budget). Yet Congress has never authorized or appropriated a dime for this massive new regime.

To gloss over its lack of statutory authority and circumvent the lack of appropriations, the SEC came up with a novel scheme. Even though the CAT is designed to facilitate the SEC's own enforcement activities by giving the agency a direct window into the market activities and personal information of millions of Americans, the SEC did not develop the CAT in-house. Instead, the SEC compelled the securities exchanges and Financial Industry Regulatory Authority (FINRA) to do so under the agency's close direction and supervision. And to address its billion-dollar funding conundrum, the SEC collaborated with the exchanges to offload the massive bill for this project to broker-dealers (and ultimately all American investors). The order under review, which the exchanges crafted and the SEC adopted without material changes, provides that the CAT will be funded through a new transaction tax on every share traded in the U.S. securities markets. 88 Fed. Reg. 62628 (2023) (Order).[1]

While the Commission nodded at its obligation under the Exchange Act to "equitabl[y]" allocate this transaction tax (innocuously dubbed a "fee" in the SEC's doublespeak) among the buying broker-dealer, the selling broker-dealer, and the exchange on which a trade is executed (or FINRA for off-exchange transactions), its so-called "allocation" is a transparent charade. The Order expressly provides that the exchanges and FINRA are free to turn around and pass their purported share of costs to the broker-dealers, which will ultimately burden investors and impose deadweight

---

[1] Citations to the Order refer to Volume 88 of the Federal Register.

costs on the market. Unsurprisingly, FINRA has already proposed to do just that. *See* FINRA Cost-Shifting Filing (2024), https://perma.cc/WT9G-PT63 (FINRA Cost-Shifting Filing). So although the Order pays lip service to equitably allocating fees between broker-dealers and exchanges as the Exchange Act requires, it permits the exchanges to saddle broker-dealers (and hence the markets generally) with *all* the costs of building and operating the CAT in perpetuity—right down to their legal expenses as intervenors in this litigation. And it does so even though broker-dealers and investors lack any tools to rein in the CAT's massive costs or participate in the governance of this new, all-seeing government behemoth. All the while, the SEC remains free to use and expand its new Orwellian apparatus unburdened by either the need to pay for its staggering costs or any direct accountability to Congress or the American people.

This Order, and the regime it implements, are unlawful for three main reasons.

*First*, the CAT itself—and thus the Order providing for its funding—exceeds the Commission's statutory authority. The SEC concedes there is no "express authorization for CAT by Congress," Order 62673, and that admission is fatal to the system's validity. An agency needs "'clear congressional authorization'" before it can make "'major policy decisions,'" especially where they involve the seizure of billions of dollars to address matters of vast public significance. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The Order operationalizes and funds an unprecedented, highly controversial, multibillion-dollar surveillance apparatus without anything resembling a stable statutory foundation, let alone an express one. For that fundamental reason alone, it must be set aside.

*Second*, even if the SEC could force the creation of the CAT itself, the Order funding it violates the Exchange Act, which requires "the *equitable allocation* of *reasonable* dues, fees, and other charges" among an exchange's members. §§ 78f(b)(4); 78o-3(b)(5) (emphases added).[2] As the SEC itself has previously recognized, it is neither "equitable" nor "reasonable" for broker-dealers (and their investor customers) to bear 100% of the costs of the CAT, yet that is precisely what its Order allows. This sham allocation defies the Exchange Act. And far from justifying this shakedown, the Order's defense of it— riddled with *non sequiturs* and other analytical blunders—independently flunks the Administrative Procedure Act (APA) several times over.

*Third*, the Order's economic analysis likewise runs afoul of the Exchange Act and the APA. The SEC admittedly relied on an outdated economic analysis from 2016 to justify the 2023 Order, even though by 2023 the CAT's costs were already five times greater than the stale 2016 estimates made before the CAT was even partly operational. Order 62655. Compounding this error, the SEC, in violation of statutory requirements, made no effort to estimate the amount of CAT costs that would ultimately be borne by investors or the economic effects that the Order, including those increased investor costs, would have on the market. Such slapdash analysis is never appropriate for a Commission action, let alone one that will foist the costs of a multibillion-dollar SEC surveillance system onto broker-dealers and American investors in perpetuity.

---

[2] Unless otherwise noted, all statutory citations refer to chapter 15 of the U.S. Code.

In short, the CAT itself is unlawful, and the Commission's Order funding it is deeply flawed in multiple independent respects. It should be set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under § 78y(a), which permits persons aggrieved by SEC orders issued under the Exchange Act to petition for review in the applicable Court of Appeals within 60 days of the order's entry. The SEC issued the order under review under the Exchange Act on September 6, 2023. Order 62629, 62686. Petitioners—the American Securities Association (ASA) and Citadel Securities LLC— filed a timely petition for review on October 17, 2023. Dkt. 1-2.

Petitioners are aggrieved by the Order, as it imposes the costs of creating and running the CAT on ASA's members and Citadel Securities. Iacovella Decl., Ex. A, ¶¶ 6-13; Berger Decl., Ex. B, ¶¶ 6-10. Venue is proper in this Circuit because "the principal place of business" of both petitioners is in Florida. § 78y(a)(1); Iacovella Decl. ¶ 5; Berger Decl. ¶ 4.

## STATEMENT OF THE ISSUES

**1.** Whether the Order should be set aside because the CAT and the Order exceed the Commission's statutory authority.

**2.** Whether the Order should be set aside because its sham allocation of CAT costs violates the Exchange Act and the APA.

**3.** Whether the Order should be set aside because its shoddy economic analysis violates the Exchange Act and the APA.

## STATEMENT OF THE CASE

**1.**     In the Exchange Act, "Congress established a system of regulation over the securities industry" that relies on "self-regulatory organizations" (SROs) "to conduct the day-to-day regulation and administration of the United States' stock markets." *Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc). With the SROs—today, the national securities exchanges and FINRA—serving as the frontline regulators, Congress tasked the SEC with "supervising the exercise of this self-regulatory power." S. Rep. No. 94-75, at 23 (1975). And it did so because a system of self-regulation was both more efficient and less costly. *See id.* at 22 (noting "sheer ineffectiveness of attempting to assure regulation directly through the government on a wide scale" (cleaned up)); S. Rep. No. 75-1455, at 3 (1938) (relying on SEC enforcement alone would require "a large increase in the expenditure of public funds").

The various SROs operated separately until Congress passed the Securities Act Amendments of 1975. Pub. L. No. 94-29, § 7, 89 Stat. 97. Intended as "deregulatory legislation" designed "to break down the unnecessary regulatory restrictions which restrain competition," *Business Roundtable v. SEC*, 905 F.2d 406, 416 (D.C. Cir. 1990) (cleaned up), this new law told the SEC "to use its authority" under the Exchange Act "to facilitate the establishment of a national market system," § 78k-1(a)(2).

Although Congress did not define "national market system," it directed that this new provision be used "to carry out the objectives set forth" in § 78k-1(a)(1). *Id.* Those objectives uniformly focused on improving the efficiency of securities trades—for

example, "linking" securities "markets" via "communication and data processing facilities" to "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors," and aid "the best execution of [investors'] orders." § 78k-1(a)(1)(D). And to allow the SROs to work together in effectuating these objectives without fear of antitrust liability, Congress empowered the SEC "to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system." § 78k-1(a)(3)(B).

2.      Over the next three decades, the Commission used its authority under § 78k-1 to create a national market and make trades more efficient, culminating in a 2005 rule known as Regulation NMS. 70 Fed. Reg. 37496 (2005). Consistent with the contemplated purposes and historical uses of § 78k-1, this regulation connected disparate market actors to facilitate execution of investor orders. *See id.* at 37570, 37602.

Five years later, however, in 2010, the SEC repurposed § 78k-1 to attempt something very different: to compel the SROs to create a national *surveillance* system—instead of a national *market* system—by requiring them to develop "a consolidated audit trail" (or "order tracking system") that would supersede any audit trail already used by the SROs for their self-regulatory functions. Unlike these prior SRO audit trails, the CAT was designed to "aid *the Commission*," 75 Fed. Reg. 32556, 32564 (2010) (emphasis added), by giving it "unfettered access to the data in the central repository without being its owner," 77 Fed. Reg. 45722, 45775 (2012).

In other words, the SEC told the SROs to create a tool to help the Commission watch investors' every move. Finalized two years later, the rule called for an unprecedented surveillance system that would provide the SEC with data on all orders across all U.S. securities markets—with the SROs left to figure out how to build, fund, and run it. *Id.*

In 2015, the SROs (24 exchanges plus FINRA) heeded the SEC's diktat and submitted a plan that proposed a mechanism to gather, consolidate, and transmit trading information to the SEC for surveillance and enforcement purposes. 81 Fed. Reg. 30614, 30614-16 (2016). In parallel, they proposed the creation of a jointly owned limited liability company, CAT NMS, LLC, through which the SROs would operate this CAT system. *Id.* at 30616. Each SRO, known in CAT parlance as a "Participant," would own a share of the company and receive representation on its operating committee. *Id.* Broker-dealers and their investor customers, by contrast, would have no role in owning or governing the entity, nor would they have any meaningful input on the CAT's design, implementation, budget, costs, or funding.

In 2016, the Commission approved both the audit trail plan (CAT NMS Plan) and the establishment of the CAT company, which later became intervenor CAT LLC. 81 Fed. Reg. 84696 (2016). The 2016 order, however, still did not settle who would pay for the SEC's new tool. Instead, the SEC and the SROs punted, explaining that the precise "allocation" of costs between the "Participants" (the SROs) and the "Industry Members" (broker-dealers) would be worked out "at a later date." *Id.* at 84793, 84795.

**3.** In the meantime, the costs associated with the CAT's development and implementation spiraled beyond all expectations. First came the Thesys debacle. In 2017, the SROs awarded a small technology outfit, Thesys Technologies, the exclusive contract to build and maintain the CAT. *See* Letter from Citadel Securities to V. Countryman 8, 23, 31 (July 14, 2023), http://tinyurl.com/297sj3s4 (July Letter). But after two wasted years of scattered progress, many missed deadlines, and tens of millions of squandered dollars, the SROs ultimately fired Thesys. *See id.*

Then came the blown budgets. In approving the CAT NMS Plan in 2016, the Commission estimated that it would cost $37.5 to $65 million to build the CAT and then another $36.5 to $55 million to run it each year. 81 Fed. Reg. at 84801. The CAT's actual costs, however, have proven to be an order of magnitude greater than the SEC's pollyannish projections. By this years' end, the CAT will have blown through *$1 billion* dollars in development costs—20 times the SEC's prediction—and the system is *still not yet fully operational. See* July Letter 11; Order 62655. And, by 2023, the CAT's annual operating costs approached $200 million for a single calendar year. *See* CAT LLC 2023 Budget, https://perma.cc/36W2-CKJ5. All the while, the SEC has micromanaged the CAT's implementation and expanded the scope of data collected. In response, the SROs went so far as to repeatedly challenge in court the SEC's attempts to expand CAT's scope (and cost)—but ultimately settled those lawsuits with the SEC and pivoted to a joint defense against this challenge. *See* D.C. Cir. Nos. 21-1065, 21-1066, 22-1234.

**4.** With costs of the CAT ballooning ever larger, CAT LLC and the SROs that control it—all for-profit businesses that compete with broker-dealers (except FINRA)—had to find a way to recoup the costs they were incurring in the interim. The SEC "summarily abrogated" the CAT LLC's first funding proposal after questioning whether its proffered "allocation" was "reasonable, equitable, and not unfairly discriminatory." 82 Fed. Reg. 35005, 35013 (2017). The next three proposals were withdrawn when it became clear they would suffer a similar fate. *See, e.g.*, Letter from M. Simon to V. Countryman 1-2 (Sept. 6, 2022), https://perma.cc/68GL-63H8.

CAT LLC finally found traction, however, in 2023. That year, the SEC adopted without substantive change CAT LLC's fifth proposed funding model as an amendment to the CAT NMS Plan. Order 62628. That Order contemplates what is effectively a new transaction tax on every share traded in the U.S. equities and options markets. Separate taxes (in Commission-speak, "fees") will be applied (1) to reimburse CAT LLC for the nearly $1 billion spent to build the CAT (historical costs); and (2) to cover CAT LLC's budget each year in perpetuity. Order 62629-30. These taxes will be formally implemented through subsequent SRO filings, the first set of which the SROs recently filed to recoup some historical costs. *E.g.*, FINRA Fee Filing (2024), https://perma.cc/EAG5-A448 (FINRA Fee Filing).

In theory, the Order provides that the tax imposed on each executed trade will be split into thirds, with two thirds borne by broker-dealers (one-third by the buyer and one-third by the seller), and the remaining third payable by the SRO on which a trade

is executed (*i.e.*, the exchange, or FINRA for off-exchange transactions). Order 62629-30. The Order concedes, however, that because it permits the SROs to pass "their CAT fees onto their members in full," in the form of their own fees, broker-dealers and their investor customers could ultimately "effectively bear 100% of the CAT allocation." Order 62684 n.1135. Substantiating this prediction, FINRA filed a submission this year to pass its share of CAT fees onto broker-dealers. *See* FINRA Cost-Shifting Filing 5.

In adopting this so-called "allocation," the Commission acknowledged that the CAT's annual operating budget had grown to "five times the amount" of the SEC's 2016 prediction. Order 62655. The Commission nevertheless "decline[d]" to "update its economic analysis" from 2016 when assessing the Order's economic effects. Order 62676. Instead, the SEC asserted that it had "supplemented the analysis" with "additional information learned" since 2016, without describing what that information was or how it had informed the supplemental analysis (if at all). *Id.*

The SEC also declined to estimate the portion of CAT fees that would ultimately be borne by investors, even though that effect of the Order would "reduc[e] market efficiency." Order 62682. Instead, it asserted that even if broker-dealers "pass through CAT fees to their customers," those "customers also receive a benefit" in the form of "more effective oversight." Order 62682-83.

By settling the issue of who will fund the CAT, the Order essentially marks the culmination of the database's development. The only step left is for the SROs to file their funding submissions based on the Order, a process that has already begun.

## STANDARD OF REVIEW

This Court must "set aside" agency actions found to be "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2). It reviews an agency's legal conclusions *de novo*. *Stone & Webster Constr., Inc. v. U.S. Dep't of Lab.*, 684 F.3d 1127, 1132 (11th Cir. 2012).

## SUMMARY OF THE ARGUMENT

**I.**     The Court should vacate the Order. The CAT itself exceeds the Commission's statutory authority, so the Order funding this *ultra vires* enterprise must be set aside. Despite conceding that Congress never gave "express authorization for CAT," the Commission professes to find the power to create this massive surveillance apparatus in a general directive to facilitate a national market system. Even setting aside that this statute gave *no* authorization for the CAT, far more is required given the extraordinary nature of this unprecedented, multibillion-dollar surveillance tool, which, as confirmed by the SROs' multi-year litigation against the Commission, has in fact been designed by, and for, the SEC itself. Under the major questions doctrine, Congress must provide *clear* authorization before the Commission can override the Exchange Act's self-regulatory framework to surveil, collect, and store confidential personal information on hundreds of millions of American investors, and fund this database in a manner that renders it immune from congressional oversight via the appropriations process.

**II.** Even if the CAT itself were lawful, the Order's allocation scheme would violate the Exchange Act, which requires an "*equitable allocation* of *reasonable* dues, fees, and other charges." A regime that expressly permits 100% of the taxes funding the CAT to be "allocated" to broker-dealers and their customers is obviously neither equitable nor reasonable—as the SEC itself previously recognized. Indeed, it is not even an "allocation" in anything but name. And because the SEC's defenses of this framework are textbook instances of arbitrary reasoning, the Order flunks the APA, too.

**III.** The Order's economic analysis violates the Exchange Act and the APA as well. The Order fails to adequately analyze the economic effects of allocating CAT costs in this one-sided manner, choosing instead to rely on admittedly outdated figures from seven years earlier, before CAT was even operational at all. And the SEC makes no effort to estimate what portion of the CAT's astronomical costs will ultimately be borne by individual investors, or to consider the adverse effects the Order will predictably have on capital formation and market efficiency. This too requires vacatur.

## ARGUMENT

## I. THE CAT EXCEEDS THE COMMISSION'S AUTHORITY.

The SEC admits that Congress never gave it "express authorization for CAT." Order 62673. Instead, to justify this unprecedented surveillance tool, the Order relies primarily on a 1975 statute empowering it "to facilitate the establishment of a national market system," including by allowing the SROs "to act jointly … in planning, developing, operating, or regulating" that "system." § 78k-1(a)(2), (3)(B); *see* Order

62673. But this language was never meant to authorize a national surveillance apparatus like the CAT, much less allow the SEC to outsource such a project to the SROs while micromanaging its implementation to further its own enforcement purposes. And even if "ordinary principles of statutory construction" could support this repurposing of the text, Order 62673—which they do not—far more would be required before the SEC could dragoon the exchanges into creating a ten-figure market-surveillance tool. Under the major questions doctrine, only a clear statement from Congress could justify the extraordinary CAT (and hence the Order funding it). As the SEC admits, none exists.

### A.    The SEC Lacked Authority To Create And Fund The CAT.

**1.**    If an agency seeks to "'make major policy decisions'"—such as fashioning and funding a multibillion-dollar database tracking every American investor—it "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723. That simple rule—known as the major questions doctrine—rests on "two overlapping and reinforcing presumptions." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). *First*, the "separation of powers" presumes "against the delegation of major lawmaking authority from Congress to the Executive Branch." *Id.* Because the Constitution "vest[s]" "[a]ll legislative Powers" in "Congress," U.S. Const. art. I, § 1, "important subjects … must be entirely regulated by the legislature itself," even if executive officers may "fill up the details" on matters "of less interest," *Wayman v. Southard*, 23 U.S. 1, 43 (1825) (Marshall, C.J.). So when an agency claims Congress has given it "a 'sweeping

delegation'" to tackle a major policy issue, accepting that view could make the statute "unconstitutional." *Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality). In such cases, the major questions doctrine requires "narrow constructions" for "delegations that might otherwise be thought to be unconstitutional," *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989), and thereby prevents "the Executive" from "seizing the power of the Legislature," *Biden v. Nebraska*, 600 U.S. 481, 503 (2023).

*Second*, courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia*, 597 U.S. at 723. As a matter of legislative practice, "'Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). "That makes eminent sense in light of our constitutional structure," as one "would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'" *Nebraska*, 600 U.S. 515 (Barrett, J., concurring).

Thus, just as the federalism canon obligates an agency to identify "'exceedingly clear language'" before taking action that would disturb the *vertical* separation of powers between the federal government and the states, *Sackett v. EPA*, 598 U.S. 651, 679 (2023), the major questions doctrine demands the same when an agency's claimed authority could upend the *horizontal* separation of powers between the Legislature and the Executive. *See West Virginia*, 597 U.S. at 723 ("both separation of powers principles and a practical understanding of legislative intent" require "'clear congressional

15

authorization'" in this context). In practice, this means an agency must point to more than a merely "plausible textual basis for [its] action." *Id.* So before the EPA can adopt a plan "restructuring the Nation's overall mix of electricity generation," for instance, it must identify something better than a delegation to decide "the best system of emission reduction." *Id.* at 720. While that energy plan could "be described as a 'system' … capable of reducing emissions" "[a]s a matter of 'definitional possibilities,'" "[s]uch a vague statutory grant is not close to the sort of clear authorization required." *Id.* at 732.

**2.**     The SEC concedes there is no "express authorization for CAT by Congress," meaning the only remaining question is whether the CAT "implicate[s]" the "major questions doctrine." Order 62673. It plainly does. "[A]n initiative of this scope, cost, and political salience is not the type that Congress lightly delegates to an agency." *Nebraska*, 600 U.S. at 520 (Barrett, J., concurring).

**a.**     The "sheer scope of the '"[SEC]'s claimed authority'" under § 78k-1 sets off alarm bells. *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). "Since that provision's enactment" in 1975, it has never been used to create a surveillance tool, let alone one of "the size or scope" of the CAT. *Id.* Indeed, it is common ground that the CAT—which requires the routine daily reporting of 500 billion records from every exchange and broker-dealer—is unprecedented. CAT LLC itself rightly observes that "no other comparable system or database of this scale … and complexity exists anywhere in the world." CAT Letter 8-9. The SROs likewise proclaim that the CAT is the "first of its kind, both in substance and in scale." FINRA Fee Filing 121. And

16

multiple SEC Chairs have touted the system as conferring "unprecedented" power on the Commission to oversee Americans' trading activity. *Chair Gary Gensler's Statement on CAT Funding* (Sept. 6, 2023), http://tinyurl.com/2p96fz3v (Gensler Statement) (quoting Chair Mary L. Schapiro, *Opening Statement at SEC Open Meeting: Consolidated Audit Trail* (July 11, 2012), http://tinyurl.com/2v9hfchk (Schapiro Statement)).

This consensus is unsurprising. For one thing, the CAT is designed to allow "the Commission" to "*directly* access" this universe of sensitive "information in real time" without having to rely on the SROs that are nominally operating the system. 75 Fed. Reg. at 32567 (emphasis added). Before the CAT's creation, the SROs, consistent with the self-regulatory system established by Congress, implemented their own audit trails to enforce the securities laws, and the SEC lacked "direct access" to this data. 77 Fed. Reg. at 45729. At most, the SEC could make data "requests" to the SROs in connection with monitoring SRO enforcement of the securities laws. *Id.* The CAT, by contrast, allows the SEC—and through it, the entire federal government—to access the 500 billion trading records the system tracks each day "directly from a central repository" for use in its "oversight responsibilities" and "enforcement … activities," making it very much a *Commission* surveillance tool. 75 Fed. Reg. at 32557-58, 32595.

For another, the CAT marks a dramatic expansion of the *type* of data collected. While prior audit trails "never collected … the identity of the customers who originate orders," Schapiro Statement, the CAT ensures the Commission has at its fingertips every data point on the current and previous names, addresses, years of birth, and other

17

personally identifiable data of the hundreds of millions of Americans who own stock. *See* 85 Fed. Reg. 16152, 16152-56 (2020); 81 Fed. Reg. at 85032. And because "the combination of a ZIP code, birth date, and gender will be sufficient to identify 87%" of Americans, that data makes it easy to identify individuals and track their personal financial decisions. P. Schwartz & D. Solove, *The PII Problem: Privacy and A New Concept of Personally Identifiable Information*, 86 N.Y.U. L. REV. 1814, 1842 (2011).

On top of that, the CAT is the "first *comprehensive* audit trail." 77 Fed. Reg. at 45726 (emphasis added). Whereas earlier SRO-specific audit trails "varied in scope, format, completeness, accuracy, and accessibility," Gensler Statement, the CAT is designed to "collect and accurately identify—among other things—*every* order, cancellation, and trade execution for *all* exchange-listed equities and options across *all* U.S. markets." Schapiro Statement (emphases added).

**b.** The CAT's unprecedented scope has triggered "'an earnest and profound debate across the country,'" which only makes the SEC's "'claimed delegation all the more suspect.'" *West Virginia*, 597 U.S. at 732. As one SEC Commissioner warned, the CAT has significant implications for "liberty and privacy." SEC, *Statement of Hester M. Peirce in Response to Release No. 34-88890*, File No. S7-13-19 (May 15, 2020), http://tinyurl.com/2h928jw4. This database will house "voluminous amounts of personal and business confidential information … in a single place" that "will be accessible to thousands of people at the Commission and the SROs"—including the latter's contractors—"who will be able to watch investors' every move in real time." *Id.*;

*see Sen. Banking Comm. Oversight Hearing on Status of the Consolidated Audit Trail*, at 50:43 (Oct. 22, 2019), http://tinyurl.com/4f6apy9y (discussing contractor access). The CAT will thus "offer a window into a person's deepest thoughts and core values," as trades, "particularly when aggregated together," can reveal a person's "belief about how a company, industry, or nation will perform in the short- or long-term" or even support for, or opposition to, "carbon emissions, dictatorial regimes, alcohol, tobacco, guns, pornography, discrimination, poor treatment of workers, abortion … or any other of the many things about which people have strong feelings." Peirce, *supra*. Some individuals may boycott companies "associated with … the military," for instance, while others may express their views "by investing in companies that produce guns." *Id.* And the CAT lets the SEC track, collate, and study these choices over a person's lifetime.

Given such concerns, both liberal and conservative advocates have objected to the CAT's plan to collect and store data on every trade of hundreds of millions of individual Americans. Some like the NCLA worry the CAT gifted the government a dystopian surveillance tool it could wield against its citizens. *See, e.g.*, P. Little, NCLA, *A Catastrophic Assault on Our Civil Liberties* (Jan. 15, 2020), https://perma.cc/V4BG-EK2W. Others like the ACLU fear the widely-accessible database would be an irresistible target for hackers and other malign actors—concerns amply justified by the SEC's calamitous cybersecurity record. *See, e.g.*, Letter from R. Newman and K. Ruane, ACLU, to SEC Chair Clayton (Dec. 16, 2019), https://perma.cc/2V77-6ER7 (ACLU Letter); *cf.* D. Michaels, *SEC Discloses Edgar Corporate Filing System Was Hacked in 2016*,

WALL ST. J. (Sept. 20, 2017), https://perma.cc/82ZV-6K5L (hackers used stolen data from SEC to illegally trade). Indeed, a recent inspector-general review found the SEC remains woefully out of compliance with federal cybersecurity standards, making its networks dangerously susceptible to hackers—a problem vividly illustrated by the commandeering of the SEC's X (Twitter) account to spike the price of Bitcoin this year. *See* A. Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account Was Hacked*, BLOOMBERG LAW (Jan. 11, 2024), http://tinyurl.com/235tfh95.

The controversy around the SEC's vast database on Americans and lax security also generated a flurry of congressional activity. The CAT has been the subject of multiple committee hearings, proposed legislation, and direct objections by senators—including that the risks of exposing Americans' personal data to hackers "far outweighs any benefit to the SEC." Letter from Sen. Kennedy et al., to SEC Chair Clayton (July 24, 2019), https://perma.cc/FF8H-CKDG; *see, e.g.*, H.R. 4551 (2023); H.R. 2039 (2021); H.R. 4785 (2018); SEC Chair Clayton, *Testimony on "Oversight of the U.S. Securities and Exchange Commission"* (Dec. 11, 2018), http://tinyurl.com/9aa5829v (acknowledging "substantial concerns about the protection of investors' personally identifiable information"). And that backlash is anything but surprising, as Congress has elsewhere made clear that federal agencies lack *carte blanche* to rifle through Americans' financial information. *See* 12 U.S.C. §§ 3401 *et seq.*; 15 U.S.C. § 78u(h). The CAT, by contrast, stockpiles its daily catch of 500 billion trading records into a centralized database for uses left entirely to the bureaucratic imagination. No wonder Congress is up in arms.

**c.** The CAT's "'economic … significance'" further confirms the major question here. *King v. Burwell,* 576 U.S. 473, 485-86 (2015). The CAT's "economic impact" is "staggering," involving "billions of dollars of spending." *Nebraska*, 600 U.S. at 502, 505; *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) ("requir[ing] 'billions of dollars in spending' by private persons or entities" is a major policy choice).

In 2016, the SEC estimated the aggregate economic effect of the CAT—including both the fees to fund it and the compliance costs to operationalize it—would exceed "$2.4 billion in initial aggregate implementation costs and recurring annual costs of $1.7 billion." 81 Fed. Reg. at 84801. The majority of these costs, the SEC estimated, would be driven by "the data-reporting cost for broker-dealers," *id.,* consisting of $2.2 billion in initial costs and $1.5 billion in annual compliance costs, *id.* at 84860. And the SEC predicted the cost to build the CAT's central repository that stores, processes, and analyzes the trillions of records collected would range from $37.5 to $65 million, plus an annual operating budget running from $36.5 million to $55 million. *Id.*

In reality, however, the actual costs imposed by the CAT have proven to be far higher. By the end of 2024, the CAT will have burned through roughly $1 billion in start-up costs alone—*20 times* the SEC's initial estimate—even though the system is not even fully operational. *See* July Letter 11. And the annual price of simply maintaining the (still incomplete) CAT in 2023 was around $200 million—quintuple the SEC's projection and dwarfing the budgets of many federal agencies, from the International Trade Commission to the National Transportation Safety Board. *Id.* at 8; Order 62655;

*see* USAspending, https://perma.cc/KS9S-R3X5. And even these huge increases are paltry when compared to the massive compliance costs borne by broker-dealers to report all the data the CAT requires, which reach into the *billions* of dollars each year. 81 Fed. Reg. at 84860.

The CAT's economic effects thus easily eclipse those the Supreme Court has deemed sufficient to trigger the major questions doctrine. In *West Virginia*, for example, the Court rejected the EPA's assertion of authority that would have imposed "billions of dollars in compliance costs," 597 U.S. at 714—specifically, a total of "$5-$8 billion." *Id.* at 774 n.6 (Kagan, J., dissenting). In holding that OSHA's vaccine mandate required clear authorization from Congress, the Court similarly emphasized that it would impose "billions of dollars in unrecoverable compliance costs," *NFIB v. OSHA*, 595 U.S. 109, 120 (2022)—specifically, "nearly $3 billion." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). Under even the most conservative estimates, the costs of maintaining the CAT will quickly outstrip even those enormous sums.

Beyond the tremendous costs imposed, the SEC's CAT project is particularly suspect because of *how* it is funded. The scheme the SEC cooked up here sidelines one of "Congress's most important authorities"—"its control of the purse." *Nebraska*, 600 U.S. at 505. Because the Appropriations Clause commands that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. Art. I, § 9, cl. 7, the Executive Branch "cannot touch" public funds unless "*expressly* authorized by act of Congress," *OPM v. Richmond*, 496 U.S. 414, 426 (1990)

(emphasis added; citation omitted). Consistent with this framework, Congress has *explicitly* permitted the Commission to recoup *appropriated* expenditures on its regulatory initiatives through fees, thereby keeping the SEC's budget (and its exactions on investors) under the watchful eye of the people's representatives. *See* § 78ee(a).

Yet rather than including CAT in its budget and obtaining an appropriation from Congress (subject to potential recoupment from regulated parties), the Commission outsourced the funding to the SROs so as to effectively immunize the SEC's gargantuan surveillance program from congressional appropriations or oversight. Through the Order, the Commission will bankroll the CAT via a transaction tax that the exchanges will impose on all broker-dealers—and, in turn, their investor customers. As a result of this taxation-by-proxy, Congress cannot exercise any substantive control over the CAT through the appropriations process. And because these costs will be borne largely, if not entirely, by broker-dealers and investors who lack any control over the implementation or operation of the CAT, no alternative fiscal check will exist either. *See* CAT Letter 5-7; Order 62576. These perverse incentives have allowed the SEC to continue to demand that the SROs further expand the CAT for its own enforcement purposes—ever more data, reported directly to the SEC, with custom-built search tools for SEC use—without any regard for the cost of this Commission project.

That turns the Appropriations Clause on its head. Under the SEC's scheme, "public funds will be spent" according to the "individual favor of Government agents"—the bureaucrats who concocted this surveillance regime—rather than "the

23

difficult judgments reached by Congress as to the common good." *Richmond*, 496 U.S. at 428. Moreover, neither the "people themselves" nor their representatives in Congress will be able to "refuse … the supplies requisite for the support of" the SEC's surveillance program. The FEDERALIST No. 58, at 394 (J. Madison).

Before the SEC can create a veritable shadow agency funded by a perpetual tax on all participants in the U.S. markets, it should at least be able to point to a clear statement from Congress, which all agree is missing here. If a purportedly "independent" agency like the SEC is permitted to fund its *own* pet projects through this type of outsourcing to SROs, Congress's hold over "the purse" will no longer be the "most compleat and effectual weapon" for defeating "the overgrown prerogatives of the other branches," but an empty formality that the SEC can ignore at its discretion. *Id.* And blessing the Appropriations Clause end-run here will only encourage more attempts—by both the Commission and its fellow federal agencies—to create insulated, sweeping programs with little more than a whiff of statutory text. Put simply, this CAT "comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

### B.    The Commission's Defenses Of The CAT Fail.

Given its concession that Congress did not provide "express authorization for CAT," the Commission is left to contend that this one-of-a-kind surveillance tool does not even *implicate* the major questions doctrine. Order 62673. In doing so, the SEC does not deny that the creation and funding of the CAT is a big deal. Instead, it offers three arguments why the doctrine nevertheless does not apply. All are meritless.

**1.** The SEC first claims its statutory basis for the CAT—principally, § 78k-1—is not "'ancillary[]' or 'modest.'" Order 62673. But even if so, agency invocations of major statutory provisions can trigger the major questions doctrine too. *See, e.g., NFIB*, 595 U.S. at 117 (general delegation of OSHA's rulemaking authority); *King*, 576 U.S. at 486 (provision "central to" the Affordable Care Act); *Brown & Williamson*, 529 U.S. at 160 (general delegation to FDA to regulate "drugs"). The question is not whether the *statutory power* is "modest" or "ancillary," but whether the *agency's use of that power* is.

In any event, the SEC distorts § 78k-1. While § 78k-1(a)(2) directs the SEC to "facilitate the establishment of a national market system," that sort of language "is not close to the sort of clear authorization required." *West Virginia*, 597 U.S. at 732. After all, "almost anything could constitute … a 'system'"—"shorn of all context, the word is an empty vessel." *Id.* Context makes clear that a "national market system" does not include the CAT. Rather, the SEC's power here may only be used "to carry out the objectives set forth in [§ 78k-1(a)(1)]." § 78k-1(a)(2). And those objectives are focused exclusively on facilitating "efficient and effective market operations," the "efficient execution of securities transactions," and the "linking" of "markets" to "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors," and aid "the best execution of [investors'] orders." § 78k-1(a)(1). Thus, the SEC's purview here is confined to measures that increase the efficiency of *how market actors interact and execute trades*, not ones that help *the SEC construct its own direct surveillance and enforcement apparatus* in a manner at odds with Congress's self-regulatory system.

25

The Commission also cites § 78k-1(a)(3), which allows it to require the SROs "to act jointly … in planning, developing, operating, or regulating a national market system." But that authority, too, is to be used "in furtherance of the directive in [§ 78k-1(a)(2)]." It is not a free-floating, omnibus power that allows the SEC to do whatever it wants provided it press-gangs the SROs into service. Rather, the Commission's authority under § 78k-1(a)(3) is cabined to enabling the SROs to facilitate the efficient interaction and execution of investor orders. Indeed, as the SEC itself has repeatedly emphasized, § 78k-1(a)(3) "simply enables joint action that might otherwise raise antitrust concerns." SEC Br. at 5, *Nasdaq Stock Market LLC v. SEC*, No. 21-1167 (D.C. Cir. ); *see id.* at 36-37; 86 Fed. Reg. 44142, 44157 n.242 (2021) (similar). Here, by contrast, the SEC is using the SROs as a conduit to enable the *Commission itself* to engage in direct surveillance outside the glare of congressional oversight. Section 78k-1 was never meant to serve as a blank check for the SEC to develop its own projects by proxy.

All this shows § 78k-1 does not authorize anything like the CAT under even "ordinary principles of statutory construction," Order 62673, let alone with the clarity required under the major questions doctrine. That is why the SEC has never before tried to wield this provision to implement any sort of Commission enforcement project. Regulation NMS, for instance, was implemented to directly advance the objectives set forth in § 78k-1(a)(1), and even it never so much as hinted at anything like a massive SEC surveillance system. *See* 70 Fed. Reg. 37496; *supra* at 7. That the SEC had previously "avoided use of th[e] highly attractive power" it now claims it had all along is "reason

to believe that the power was thought not to exist" in the first place. *Printz v. United States*, 521 U.S. 898, 905 (1997); *see West Virginia*, 597 U.S. at 725 ("'[T]he want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred.'").[3]

2.     The SEC also claims that the "collection of securities transaction data by the SROs and the Commission … has a long history." Order 62673. But the fact that the "SROs … had audit trails" before the CAT, Order 62672, provides no precedent for the SEC's revolutionary surveillance system, which is "the first of its kind, both in substance and in scale." FINRA Fee Filing 121. Quite the opposite. As noted above, the *scope* of the CAT is unprecedented in its sweep over the markets, the kind of data collected, and its complexity and cost. *See supra* at 16-18. Using these audit trails as precedent for the CAT would hence be akin to extending cases from the 1970s upholding the surveillance of "telephone numbers" to modern "cell-site records" that reveal "a detailed and comprehensive record of the person's movements." *Carpenter v. United States*, 138 S. Ct. 2206, 2216-17 (2018). That is a bridge too far. *Id.*

---

[3] While the Commission primarily relies on § 78k-1 as authority for the CAT, it briefly invokes a series of general provisions directing it to oversee the SROs and to issue regulations to maintain "fair and honest markets," "remove impediments to" the "mechanisms of a national market system for securities" and "provide for regulation and control of" transactions performed on exchanges and the over-the-counter market. *See* Order 62672-73 & n.958. The SEC understandably devotes little attention to these provisions, as they are even more nebulous than § 78k-1. If § 78k-1 does not justify the creation of the CAT, no other cited provision will either.

And even if the Commission made some "use[]" of SROs' audit trails in the past, Order 62672, the SROs implemented those to enforce their *own* rules against their *own* members, not to further the *SEC's* direct surveillance and enforcement capabilities. *See, e.g.*, 63 Fed. Reg. 12559, 12560 (1998) (adoption of system by FINRA's predecessor to enable that SRO to enforce its own rules); 68 Fed. Reg. 47116, 47118 (2003) (CBOE adopting system to "permit CBOE to conduct surveillance"). The CAT's *raison d'être*, by contrast, is to give "[t]he *Commission* … unfettered access to the data in the central repository without being its owner." 77 Fed. Reg. at 45775 (emphasis added).

Confirming the point, the Commission has micromanaged the CAT's design and implementation at every turn. SEC staff have attended "nearly all CAT meetings and calls," and the Commission even appointed a CAT czar to "overs[ee]" the system's "creation and implementation." *Testimony of Michael J. Simon Before the U.S. Sen. Comm. on Banking, Housing, and Urban Affairs* 10-11 (Oct. 22, 2019), http://tinyurl.com/2ycev7jh; *SEC Names Manisha Kimmel as Senior Policy Advisor to the Chairman on the Consolidated Audit Trail* (Jan. 29, 2019), http://tinyurl.com/44buza7z. The SEC has also butted heads with the SROs over granular details down to the time of day by which a data error must be corrected and how custom-built search tools for SEC staff should be designed. *See* 87 Fed. Reg. 42247, 42249 (2022); 85 Fed. Reg. 83634, 83634-35 (2020). And when the SEC insisted on "unreasonable and technologically unfeasible" features, the SROs repeatedly took the Commission to court. Mot. for Partial Stay of Order No. 34-90689, at 6 (Feb. 14, 2021), http://tinyurl.com/4c6zmzjc; *see supra* at 9.

This shift in the SROs' role—from frontline enforcer to Commission catspaw—is no small matter. As the SEC observes, the Exchange Act "formalized" the pre-existing practice of "[s]elf-regulation in the securities industry" because of the "sheer ineffectiveness of attempting to assure regulation directly through the government on a wide scale" Order 62672 & n.949 (cleaned up). By giving the SEC direct access to an all-encompassing audit trail designed for the SEC, the CAT departs from Congress' mandate by allowing the Commission—and with it, the entire federal government—to train its all-seeing eye directly on each individual who participates in the U.S. securities markets, all without any regard for the sensitivities, and costs, inherent in creating this trove of confidential information. And the CAT was designed precisely because the SEC was frustrated with the lack of data "readily available" to it from the SROs. 75 Fed. Reg. at 32557. The SRO-specific audit trails the Commission invokes are therefore *anti*-precedent.

**3.** Undaunted, the SEC insists that the CAT does not "fall[] outside its 'particular domain.'" Order 62673. Another red herring. Whether an "agency is operating entirely outside its usual domain" does not operate as "an on-off switch" for the major questions doctrine. *Nebraska*, 600 U.S. at 521 (Barrett, J., concurring); *see id.* at 504 (majority) (brushing off dissent's insistence that "student loans are in the Secretary's wheelhouse") (cleaned up). To the contrary, the Supreme Court "has never taken th[e] view" that "a mismatch between an agency's expertise and its challenged action … is necessary." *West Virginia*, 597 U.S. at 748 n.5 (Gorsuch, J., concurring).

In any event, the CAT *does* fall outside the Commission's traditional domain in important respects. While the SEC has authority to ask the SROs to provide certain "records" upon request, § 78q(a)(1), the Commission's past exercise of this supervisory power has been "modest and narrow in scope," with nothing close to an all-encompassing system that collects and stores all records for the SEC's own surveillance and enforcement, *Nebraska*, 600 U.S. at 501; *see* 75 Fed. Reg. at 32557-61. The records demanded by the CAT also must now be *created* rather than *shared* because the system requires new data formats necessitating new technological architecture. *See* 81 Fed. Reg. at 30714-28.

And there is no reason to think the boundaries of the Commission's asserted domain will end with audit trails. Given "the breathtaking amount of authority" claimed here, "[i]t is hard to see what measures" the SEC's theory "would place outside [its] reach." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. According to the Commission, § 78k-1 authorizes the creation of the CAT because "the ability to surveil cross-market activity ha[s] become key to the ability of both the SROs and the Commission to perform many of their core regulatory functions." Order 62673. But this bootstrapped assertion—which the SEC apparently thinks is enough to disregard the Supreme Court—"does not so much *limit* the breadth of the Government's claimed authority as *reveal* it." *West Virginia*, 597 U.S. at 729; *see* Order 62673 n.974 (*contra*-citing *Nebraska*). In our constitutional system, an agency's ability to act turns on the authority Congress gave it, not the other way around. *See FEC v. Cruz*, 596 U.S. 289, 301 (2022) ("An agency, after

all, 'literally has no power to act'—including under its own regulations—unless and until Congress authorizes it to do so by statute.'").

Yet apparently, the SEC believes that so long as any measure will help it "perform many of [its] core regulatory functions" with respect to supervising the "national market system," it can force the SROs to adopt that tool and make investors pay for it, exempt from any congressional approval or oversight. Order 62673. This principle has no logical stopping point, for the SEC or any other agency. The CAT is therefore "a blueprint" for razing our "system of checks and balances" to the ground. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 500 (2010).

* * *

By virtually every metric—including both "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion"—the CAT qualifies as an "extraordinary case[]" warranting a clear statement from Congress. *West Virginia*, 597 U.S. at 721 (cleaned up). Because all agree none exists, the CAT exceeds the Commission's authority. And that remains true even under the "ordinary principles of statutory construction" the Commission invokes (but does not apply). Order 62673. Given that the CAT itself is *ultra vires*, the Order implementing and funding that regulatory misadventure must be set aside.

## II. THE ORDER'S ALLOCATION OF COSTS VIOLATES BOTH THE EXCHANGE ACT AND THE APA.

Even assuming the CAT's legality, the Commission's adoption of the funding scheme in the Order is independently unlawful. In allowing the SROs to shift up to 100% of the CAT's staggering costs onto the broker-dealers with whom they compete, the Order flouts the Exchange Act and the APA.

### A. Allowing All CAT Costs To Fall On Broker-Dealers Is Neither Equitable Nor Reasonable.

The Exchange Act permits only "the *equitable allocation* of *reasonable* dues, fees, and other charges" among the SROs' members. §§ 78o-3(b)(5); 78f(b)(4) (emphases added). And the APA likewise requires that any agency action be "reasonable" as well as "reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While defining whether a given allocation is "equitable" or "reasonable" may be hard in some cases, this is not one of them. The SEC has already explained what those terms require in this context, and the Order fails the Commission's own test.

**1.** In seeking to comply with the Exchange Act, the CAT NMS Plan recognized in 2016 that it had "to allocate costs among" SROs and broker-dealers "to establish a fee structure that is equitable." 81 Fed. Reg. at 85004; *see* 77 Fed. Reg. at 45795. On its face, the Order purports to adhere to that understanding, as it accepts that CAT LLC is "subject to the funding principles set forth in the [CAT NMS] Plan," which require "an 'allocation of the Company's related costs among'" those two groups "that is consistent with the Exchange Act'"—*i.e.*, one that is both "equitable" and

"reasonable." Order 62628. The Order then agrees the Plan "requires *both* Participants and Industry Members to fund the CAT," and claims this will be achieved by allocating two-thirds of the costs to broker-dealers ("Industry Members") and one-third to SROs ("Participants"). Order 62636 (footnotes omitted; emphasis added).

Yet the SEC expressly declined to require that the SROs actually bear their share. The Order in the next breath acknowledges the SROs can simply "pass[] their CAT fees onto their members in full" and thereby force broker-dealers (and, by extension, customers) to "effectively bear 100% of the CAT allocation." Order 62684 n.1135. But as a matter of basic logic, the "costs of CAT" cannot in any sense "be allocated … between" Participants and Industry Members, Order 62636, if the Participants (the SROs) do not have to actually bear any costs.

This problem is not theoretical. In its recent fee filing to recoup a portion of the historical CAT costs, FINRA, the largest of the SROs, has proposed to pass on *all of its share* to its broker-dealer members. *See* FINRA Cost-Shifting Filing 5. And as CAT LLC insists, any SRO that does not pass on its "share of the CAT fees" to its "members" now can do so in the future—including after this case is resolved. Letter from B. Becker to V. Countryman 9 (July 28, 2023), https://perma.cc/97XD-SVLS. As for-profit entities that compete with many broker-dealers, they will have every incentive to do so.

The Order's fee allocation is therefore not "equitable" on its own terms. In fact, it is not even an "allocation" at all. *See, e.g.*, *Fulcrum Fin. Partners v. Meridian Leasing Corp.*, 230 F.3d 1004, 1009 (7th Cir. 2000) ("'Allocation' is defined as 'the act of apportioning,'

and 'apportion' is defined in turn as 'to divide and assign in proportion' or 'to divide and distribute proportionately.'"). Moreover, the Order has effectively abandoned the Commission's *prior* commitment to allocating CAT costs between the SROs and broker-dealers without even acknowledging that it was doing so. But "[w]hen an agency changes its existing position, it … must at least 'display awareness that it is changing position.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (cleaned up). The SEC's "unexplained inconsistency in agency policy" thus only confirms that the Order must be vacated as "arbitrary and capricious." *Id.* at 222.

2. The Order's faux allocation is also *unreasonable*—and thus a violation of both the Exchange Act and the APA—because of the distorted incentives it creates. As noted above, the elegance of the Appropriations Clause is that it forces decisions about spending (and thus taxation) to be borne by elected legislators accountable to the people. That provides an inherent check on waste and abuse. By contrast, the failure to prohibit the SROs from passing through all of their CAT costs to broker-dealers (with whom they compete) magnifies the significant "risk," acknowledged by the Commission and evidenced by the CAT's ever-ballooning budget, that the SROs "might not have the incentive to seek efficient ways to achieve the regulatory objectives of the CAT," but could instead "inefficiently spend too much" without fear of paying for it. Order 62681. This is on top of the SEC already having little incentive to focus on cost control, given that it has outsourced the budget to the SROs and is entirely focused on collecting ever more data.

34

Ultimately, under the Order, the SROs are free to run-up the costs of the CAT, as they have done for the past eight years, safe in the knowledge they can pass them along. That perverse structure is a recipe for fees that are not "reasonable," particularly given the lack of any role in CAT LLC's management for broker-dealers or investors, as evidenced by the CAT's facially unreasonable $200-million annual budget.

For its part, the Commission has insisted the fee-filing process under Section 19(b) of the Exchange Act would "incentivize" the SROs "to control costs"— presumably because the SEC may review those costs at the time of such filings. Order 62636. Yet that *post hoc* review is insufficient, for if CAT costs "end[] up being unreasonably expensive, then the agency cannot protect market participants from footing the bill for it at the fees stage." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022). Even if the SEC can "suspend and disapprove [an SRO's] proposal at the fees stage," "the financial burden" from the CAT "will have already [been] incurred," and "[t]hat cost … must be paid by someone." *Id.* It was thus incumbent on the SEC to determine *now* whether its so-called "allocation" perpetuates a perverse structure likely to result in unreasonable costs. *See id.*

It will. The SROs' recent fee filings confirm as much, as they seek to recoup costs for hiring PR firms to "monitor[] comments made by market participants about CAT," and paying lawyers for (unsuccessfully) attempting to include unlawful limitation-of-liability provisions in the standard agreement with CAT reporters. FINRA Fee Filing 28, 36, 68-69. Accordingly, there is every reason to expect that the intervenor SROs will

even seek to recoup their litigation costs associated with defending the Order here. If the statutory requirement of an "equitable allocation" of "reasonable" fees is to have any teeth, the Order cannot stand.

### B.     The Commission's Defenses Reveal Its Arbitrary Reasoning.

The Commission offered four points in defense of its so-called "allocation," but none of them withstands scrutiny. And because the APA requires the SEC to "reasonably explain[]" its decision, *Prometheus*, 592 U.S. at 423, these failures independently require "the ordinary APA remedy" of vacatur, *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) (cleaned up).

*First*, the Commission maintained that it did not even have to consider whether the Order would result in an equitable allocation of reasonable fees. Instead, it claimed it needed only to determine whether the Order would satisfy one of its own regulations, Rule 608, by being "necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Act." 17 C.F.R. § 242.608(b)(2); *see* Order 62634 n.121.

That reasoning misunderstands the law. The Order cannot be "necessary" or "appropriate" for any of the grounds set forth in Rule 608, let alone for the "purposes of the Act," if it would empower the SROs to *violate* the requirements of the Exchange Act and the CAT NMS Plan. Those requirements—and the Commission's longstanding interpretation of them—include the equitable allocation of reasonable fees among

36

SROs and broker-dealers. 81 Fed. Reg. at 85004. And because agency action is invalid if it is "not in accordance with law," 5 U.S.C. § 706(2)(A), an agency may not "sanction[] unlawful conduct by third parties" either, *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019). If anything, then, the SEC's misunderstanding of the governing legal standards alone requires setting the Order aside. *See SEC v. Chenery*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law.").[4]

*Second*, the Commission claimed that "the Exchange Act expressly contemplates the ability" of the SROs "to recoup their costs to fulfill their statutory obligations under the [Act]." Order 62636. That is the first of several *non sequiturs* offered by the SEC. Even assuming the Exchange Act contemplates that SROs may generally recoup certain costs, that would not answer how they may do so for the CAT specifically—given the budget and governance issues at play—or whether any proposed allocation is equitable and reasonable as the Exchange Act and CAT NMS Plan require. And in any event, the provisions cited for this point cannot support the weight the SEC asks them to bear. They merely say that the SROs have the capacity to carry out the purposes of the Act and enforce their members' compliance. *See* §§ 78f(b)(1), 78o-3(b)(2); Order 62636

---

[4] That the CAT fees are formally implemented via supplementary filings (which can become immediately effective before the SEC reviews them) makes no difference. The Order *already* decided the allocation issue (wrongly) by rejecting any limits on SRO pass-throughs and *preemptively* announcing that "allocation" was lawful. Order 62637.

n.191. Nothing about those general grants of authority override the specific requirement of the Exchange Act to allocate costs between the SROs and broker-dealers in a reasonable and equitable manner. If they did, there would be little point in having "equitable funding principles" specified in the CAT NMS Plan in the first place.

*Third*, the SEC asserted that the SROs could "pass on" costs "regardless of how" the Order "chose to set the initial allocation." Order 62636. But that is precisely why Citadel Securities "requested that the Commission prohibit exchanges from passing-on their CAT costs," *id.*, just as the SEC had done before. In 2020, the SEC imposed a set of accountability milestones that barred the SROs from passing on certain historical costs to broker-dealers unless CAT LLC met a set of implementation goals on a specific timeline. 85 Fed. Reg. 31322, 31331, 31348-49 (2020). Despite acknowledging Citadel Securities' request to take a similar approach here, Order 62632, the SEC never explained why it refused to use this available tool now. By "fail[ing] to respond to [this] significant comment," the Commission "violated the APA[]." *Hewitt v. Comm'r*, 21 F.4th 1336, 1353 (11th Cir. 2021).

*Finally*, the Commission mused that the problems created by a complete pass-through to broker-dealers would be mitigated by the fact that some broker-dealers "may be able" to recoup their increased costs from customers. Order 62636. But that is apples and oranges. The ability of some broker-dealers to recoup costs from *investors* says nothing about whether the initial allocation of CAT costs between the exchanges and the industry—*i.e.*, *the SROs and broker-dealers*—is equitable and reasonable.

Indeed, the Order itself later makes this point when addressing concerns that increased costs for investors will harm market efficiency. In the SEC's words, "the allocation of CAT fees for operating the CAT among Participants and Industry Members … does not address whether Industry Members pass through their CAT fees to their customers." Order 62682. "The SEC cannot have it both ways," *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023) (*Chamber II*), variously conflating and distinguishing these two distinct "allocation" questions to suit its interests.

\*     \*     \*

If the Commission wants to build its multi-billion-dollar surveillance system on the backs of the American investors it is surveilling, the Exchange Act makes clear that it at least owes them a good explanation why that arrangement is "reasonable" and "equitable." Yet far from providing one, the Order abandons the SEC's statutory obligation and pledged commitment to undertake an equitable allocation of CAT costs without even acknowledging it is doing so. That is an independent ground for vacatur.

## III. THE ORDER'S ECONOMIC ANALYSIS VIOLATES BOTH THE EXCHANGE ACT AND THE APA.

Compounding its flawed allocation scheme, the Order engages in deficient economic analysis. Under the Exchange Act, the Commission has a specific statutory duty to consider whether its regulatory acts "will promote efficiency, competition, and capital formation." § 78c(f); *see* 17 C.F.R. § 242.613(a)(5). This is "a unique obligation" borne by the SEC "to 'apprise itself … of the economic consequences of a proposed

regulation.'" *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). A failure "to determine" an order's "likely economic consequences" and "connect" them "to efficiency, competition, and capital formation" will thus render an order "arbitrary." *Id.*

A surveillance program like the CAT that imposes billions in costs in perpetuity will obviously have a substantial, adverse impact on efficiency, competition, and capital formation, creating deadweight loss and squeezing out new entrants and smaller participants in the market. *See* 81 Fed. Reg. at 84852-97 (assessing certain market effects). Yet the SEC failed to meaningfully evaluate the Order's likely economic effects, including by refusing to update its economic analysis from when it approved the CAT NMS Plan in 2016, even though the Order approves a material *amendment* to that Plan seven years later. The SEC must assess the cumulative impact of allocating the vast majority—if not all—of these CAT operating costs to broker-dealers (on top of the enormous CAT compliance costs they already must bear) as part of determining whether this "allocation" was appropriate under the Exchange Act. It failed to do so, and that compels vacatur a third time over.

### A. The Commission Failed To Update Its 2016 Analysis.

**1.** At least two major changes occurred between when the SEC issued the 2016 CAT NMS Plan and when it issued the Order in 2023. *First*, the costs of operating the CAT skyrocketed from that dated (and evidently flawed) economic analysis. As the SEC acknowledged, the "CAT operating budget … is now five times the amount estimated in the CAT NMS Plan Approval order," to the tune of nearly $200 million

annually. Order 62662. *Second*, the Order settled on an "allocation" that assigns at least two-thirds of the CAT costs to broker-dealers and lets the SROs pass-through the remainder to broker-dealers as well. Order 62629-30. While the CAT NMS Plan had contemplated in 2016 that the CAT costs would be allocated between the SROs and broker-dealers in some fashion, it did "not specify that [either] would bear any particular percentage allocation of the costs." 81 Fed. Reg. at 84795. Thus, in its 2016 economic analysis, the SEC did not assign broker-dealers any costs for implementing or operating CAT when assessing the total CAT-related costs they would bear and the concomitant economic effects. *See id.* Taken together, these two changes mean that broker-dealers, their customers, and the market will now be saddled with hundreds of millions of dollars annually (and growing) in additional deadweight costs. This new tax "will have dramatic effects on market efficiency, competition, and capital formation." July Letter 12.

Despite those significant changes, however, the SEC expressly "decline[d]" to "update its economic analysis" to account for the new information or facts on the ground. Order 62676. That was unlawful. Agencies must "'reexamine' their approaches 'if a significant factual predicate' changes." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). More specifically, if "there is a known and significant change or trend in the data underlying an agency decision, the agency must either take that change or trend into account, or explain why it relied solely on data pre-dating that change or trend." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1149 (10th Cir. 2016). Accordingly, the SEC could not carry out its specific "obligation to determine as best it can the

economic implications" of the Order, *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (*Chamber I*), without incorporating both the massive expansion of the CAT budget and the one-sided "allocation" approved in the Order. It failed to do so.

**2.** The Commission offered no meaningful defense of its refusal to update the 2016 economic analysis. It first asserted that its 2016 analysis "was conducted in the process of deciding whether to approve the original plan and was appropriately based upon the information available to the Commission at the time it made that determination." Order 62676. But that is another *non sequitur*. The issue facing the SEC when considering the Order was not whether the 2016 analysis was adequate *in 2016*, but whether it remained so *in 2023*, seven years later, after the landscape had changed dramatically. Yet rather than assess the economic effects of the 2023 Order, the SEC offered a "conclusory statement" failing "to explain *why* the [new data] was not relevant to its evaluation." *Zen Magnets*, 841 F.3d at 1150. Far from excusing the failure to update its economic analysis, the SEC's assertion shows why an update was necessary.

The SEC also remarked that it had "supplemented the analysis in the CAT NMS Plan Approval Order with additional information learned since the time of that order," such that the effects of CAT LLC's proposed amendment were "measured against a baseline that recognizes that the Proposed Amendment replaces certain provisions of the CAT NMS Plan and the Proposed Amendment also provides detail not previously included in the CAT NMS Plan." Order 62676. But neither the SEC's contrived "baseline" nor the proposed amendment provides the missing analysis. At the outset,

CAT LLC's proposed amendment says nothing about the CAT's ballooning operating costs or the potential economic effects of allocating such costs to broker-dealers and their customers. *See* 88 Fed. Reg. 17086 (2023). And the "baseline" established in the earlier CAT NMS Plan was that *broker-dealers were not allocated any costs for building or operating CAT at all* since this allocation question was to be addressed "at a later date." 81 Fed. Reg. at 84795.

Ignoring this inconvenient truth, the SEC created an imaginary "baseline" that was designed to minimize the economic effects of this Order. For example, the Commission asserted that because the CAT NMS Plan "did not specify the allocation" between the SROs and broker-dealers in 2016, "it *could have* skewed heavily toward" broker-dealers, meaning that this Order would actually *lower* broker-dealer costs and increase the SROs' "incentive to limit costs." Order 62678. That makes no sense. As the SEC admits, the original CAT NMS Plan "did not specify" a particular allocation between the SROs and broker-dealers, so the Commission cannot concoct an imaginary "baseline" that is somehow even *worse* for broker-dealers as part of an effort to avoid conducting a fulsome analysis of the economic effects of this Order. *Id.* And it is difficult to see how any other potential allocation could be *more* skewed against broker-dealers, as this Order lets the SROs pass on *all* of their costs. *Id.*

The Commission offered no other explanation for how it "supplemented" its 2016 analysis. And while "trust us" may be an acceptable answer in some contexts, agency decisionmaking under the APA is not one of them.

## B.    The Commission Failed To Estimate Effects On Investors.

The SEC also failed to reasonably assess the Order's likely economic effects with respect to one of the Order's most significant costs: the potential that CAT fees will ultimately be borne by "investors and retail investors in particular, thereby increasing transaction costs for investors and reducing market efficiency." Order 62682 (footnotes omitted). Despite acknowledging that CAT fees may be ultimately borne by investors, the Commission made no effort to provide any estimate of what percentage of the $1 billion in historical costs or over $200 million in annual prospective costs they would shoulder. *Id.* But to carry out its unique "obligation to determine as best it can the economic implications" of the Order, *Chamber I*, 412 F.3d at 143, the SEC had to adequately "quantify the certain costs or to explain why those costs could not be quantified," *Business Roundtable*, 647 F.3d at 1149. In failing to do either when it came to these costs, "the Commission violated its obligation." *Chamber I*, 412 F.3d at 144. And because imposing new costs on investors can plainly affect market efficiency, the SEC's failure to estimate these costs infected its economic analysis.

While the Commission offered several excuses for this deficiency, none carries the day. *First*, the SEC asserted that the Order "covers the allocation of CAT fees for operating the CAT among Participants and Industry Members and does not address whether Industry Members pass through their CAT fees to their customers." Order 62682. Yet another *non sequitur*. While it is certainly true that the ability of broker-dealers to recoup costs from investors does not bear on *the reasonableness of the allocation of costs*

44

*between the SROs and broker-dealers*, a point petitioners themselves made above, (*see supra* at 38-39), the costs borne by investors (both directly and indirectly) is critical to assessing *the effect of the Order on market efficiency*. The SEC cannot "inconsistently and opportunistically frame[]" its analysis. *Business Roundtable*, 647 F.3d at 1148-49.

*Second*, the Commission speculated that broker-dealers "*may* have" recouped their CAT fees from customers "under the Original Funding Model as well," so "any impact on market efficiency" under the Order "*may not* represent a change in the baseline." Order 62682 (emphases added). Again, this "baseline" is contrived because the CAT NMS Plan did not decide how much broker-dealers would be assessed to begin with, and so the SEC did not assess the potential economic impact of investors bearing CAT fees at all. *See supra* at 43. Now was the time to do that analysis.

Even if some amount of recoupment from investors was contemplated in the Original Funding Model (it was not), the magnitude of costs that may be recovered from investors under the Order is much higher in light of (i) the dramatic increase in the CAT's costs since 2016, and (ii) the Order's explicit contemplation that the SROs may pass through their *entire* portion of those costs as well. *See supra* at 40-41. Given those developments, merely guessing that the Order "may not represent a change in the baseline" is not enough. Rather, it is the SEC's burden to "justif[y]" any "changes [to] current policy," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983), and it cannot do so through sheer speculation. Still less can it use

such conjecture to meet its specific statutory obligation "to determine the likely economic consequences of" the Order. *Business Roundtable*, 647 F.3d at 1148.

*Third*, the Commission claimed investors will "benefit from the CAT" because it "provides more effective oversight of market activity, which could increase investor confidence, resulting in expanded investment opportunities." Order 62683. One more *non sequitur*. Even if investors benefit from *the CAT* in some abstract sense, that would not address how *saddling them with its costs* will affect efficiency, competition, and capital formation. In any event, this generic assertion cannot be sufficient. Presumably, the SEC *always* believes its regulatory actions will redound to the benefit of investors—indeed, it has a statutory obligation to protect their interests, *see, e.g.*, § 78k-1(a)(2)—but bureaucratic faith in more regulation is no substitute for reasoned decisionmaking.

*Fourth*, the Commission brushed off the economic effects of CAT fees on the market because it expected the transaction tax would be "relatively small" when considered on a per-share basis. Order 62682. But that is like saying a billion-dollar tax is inconsequential because it is divided among all Americans. Each year sees *trillions* of shares traded, and the CAT's hefty aggregate price tag proves it is no small economic matter. Further, the Commission made no attempt to estimate the future trajectory of the CAT budget (and associated fees), despite its intimate knowledge of the system.

*Finally*, the Commission threw its hands in the air, claiming it "cannot determine in advance the extent to which Industry Members can or will pass-through their CAT fees to investors." Order 62637. Wrong again. The SEC acknowledged, and never

disputed, Citadel Securities' observation that "fees charged on proprietary trading" by broker-dealers—*i.e.*, the practice of trading with a broker-dealer's *own* money—by definition "cannot be passed through" directly to investors. Order 62685 n.1140. And as Citadel Securities explained, "[c]onducting an analysis" on the "volume" of "proprietary" trading "is eminently feasible from the CAT data" and "critical to accurately assessing how the CAT costs will be divided-up." *See* Letter from Citadel Securities to V. Countryman 3 (Aug. 22, 2023), http://tinyurl.com/5n6mfpj3. So at the very least, the Commission could have estimated the amount of CAT fees that would be assessed to proprietary trading, subtracted that amount from the total CAT fees for broker-dealers, and then evaluated the economic effects of the remaining CAT fees being borne by investors. It did not do even that.

None of this is to dispute that "uncertainty may limit what the Commission can do." *Chamber I*, 412 F.3d at 144. But that "does not excuse the Commission from its statutory obligation to do what it can to apprise itself … of the economic consequences of a proposed regulation." *Id.* Here, again, the SEC at least "could have estimated" the portion of CAT costs that would be borne by investors, which in turn "would be pertinent to its assessment of the effect the [order] would have upon efficiency." *Id.* In other words, this is not a case where a commenter asked the SEC to "create data that doesn't already exist." *Chamber II*, 85 F.4th at 776. Rather, it is one where the Commission chose to "ignore … already-existing data it did not want to consider"— "data that was either readily accessible to, or already in the possession of, the SEC." *Id.*

*     *     *

The Commission may have good reasons to prefer to keep the American people in the dark about the adverse impacts of its unprecedented effort to subject the national securities markets to an Orwellian surveillance regime. But willful blindness is not reasoned decisionmaking, especially for an agency tasked with accounting for the economic effects of its decision. Yet time and again, the SEC buried its head in the sand, choosing instead to rely on either stale data or no data at all and mutter incantations of bureaucratic *ipse dixit*. The APA and Exchange Act demand better, especially before the Commission can offload the costs of building and running an unparalleled surveillance database onto the very investors it has decided to track and tax. If the SEC no longer wishes to "play the sorcerer's apprentice" and to instead take on the role of "the sorcerer himself," it should at least provide something more than the mummeries here. *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).

# CONCLUSION

The Court should vacate the Order.

Dated: February 8, 2024

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner American
Securities Association*

*/s/ Noel J. Francisco*
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner Citadel
Securities LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,825 words excluding the portions exempted by Rule 32(f); and (2) the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in 14-point Garamond (a proportionally spaced typeface) using Microsoft Word.

Dated: February 8, 2024

_/s/ J. Michael Connolly_

*Counsel of Record for Petitioner American Securities Association*

Respectfully submitted,

_/s/ Noel J. Francisco_

*Counsel of Record for Petitioner Citadel Securities LLC*

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: February 8, 2024

Respectfully submitted,

/s/ J. Michael Connolly

/s/ Noel J. Francisco

Counsel of Record for Petitioner
American Securities Association

Counsel of Record for Petitioner Citadel
Securities LLC

## CERTIFICATE OF SERVICE

I certify that on February 8, 2024, the foregoing Brief was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: February 8, 2024

Respectfully submitted,

*/s/ J. Michael Connolly*

*/s/ Noel J. Francisco*

*Counsel of Record for Petitioner*
*American Securities Association*

*Counsel of Record for Petitioner Citadel*
*Securities LLC*

EXHIBIT A

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION
and CITADEL SECURITIES LLC,

*Petitioners*,

v.

Case No. 23-13396

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

*Respondent*,

THE NASDAQ STOCK MARKET, LLC,
NASDAQ BX, INC., NASDAQ GEMX,
LLC, NASDAQ ISE, LLC, NASDAQ
MRX, LLC, ET AL.,

*Intervenors.*

## DECLARATION OF CHRISTOPHER IACOVELLA

I, Christopher Iacovella, pursuant to 28 U.S.C. §1746, declare as follows under penalty of perjury:

1.      My name is Christopher Iacovella. I am over 18 years old. I make this declaration based on personal knowledge and belief. If called as a witness, I could and would testify competently thereto.

2.      I am the Chief Executive Officer of the American Securities Association ("ASA"). I have served in that position since July of 2018.

1

**American Securities Association, Its Mission, and Its Members**

3.     Founded in 2016, ASA is a nonprofit trade association of small and regional financial services companies, including broker-dealers and investment advisers. ASA's members help individuals create and preserve wealth through their investments. ASA's members also provide Main Street businesses and others with access to needed capital. In short, ASA's members are at the core of job creation, wealth preservation, and increasing prosperity.

4.     ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. ASA believes that fair, efficient, and competitively balanced capital markets are necessary to protect investors, create financial independence, stimulate job creation, and create prosperity. ASA zealously opposes burdensome regulations that harm regional financial services firms, small businesses, and retail investors.

5.     Through direct advocacy, strategic communications, litigation, and grassroots political outreach, ASA advances the business, market, regulatory, and legislative interests of its members. ASA regularly brings litigation and files amicus briefs to protect the interests of its members. *See, e.g.*, *American Securities Association v. Department of Labor*, No. 22-cv-330, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023). ASA has a geographically diverse membership base that spans every region of the United States. ASA's principal place of business is in Tampa, Florida.

6.     Stephens Inc. is a member of ASA. Stephens Inc. is a privately held, independent financial services firm. Founded in 1933, Stephens Inc. serves a broad

client base that includes individual investors, corporations, state and local governments, financial institutions, and institutional investors.

7. Stephens Inc. is a broker-dealer that is registered with the U.S. Securities & Exchange Commission. In addition to being a registered broker-dealer, Stephens Inc. is also a member of the Financial Industry Regulatory Authority (FINRA) and other U.S. registered national securities exchanges, including the New York Stock Exchange and the Nasdaq Stock Market.

8. As a broker-dealer, Stephens Inc. regularly buys and sells publicly traded stocks on U.S. securities exchanges and over-the-counter on its own behalf and on behalf of retail and institutional clients.

### The CAT Funding Order's Effects on ASA's Members

9. On September 6, 2023, the SEC issued an order governing the funding of the Consolidated Audit Trail (CAT). 88 Fed. Reg. 62628 (Order).

10. The Order provides that the CAT will be funded through a new direct monetary payment to an entity known as CAT LLC for each trade in a listed security executed in the U.S. securities markets. Specifically, each executed trade will trigger the assessment of a fee payable in part by the executing broker for the buyer, the executing broker for the seller, and the exchange on which the trade is executed (or FINRA for trades executed over the counter). *See* Order 62629-30.

11. Under the Order, ASA's broker-dealer members—including Stephens Inc.—will be required to pay at least one-third of the fee imposed on each executed share, and at least two-thirds of the fee any time they are executing on behalf of both

the buyer and the seller. The Order also authorizes the exchanges and FINRA to pass 100% of their costs—including their one-third share of the fee for each executed share—onto their member broker-dealers, including ASA's members. *See* Order 62684 n.1135, 62637-38, 62666. In fact, FINRA has already sought to pass all of its costs onto its member firms, including ASA's members. *See* FINRA Cost-Shifting Filing, https://perma.cc/WT9G-PT63. Under the Order, all of the exchanges can do the same at any time. *See* Order 62684 n.1135, 62637-38, 62666.

12. The effect of these costs on Stephens Inc. and other broker-dealer members of ASA will be substantial. ASA's members, including Stephens Inc., execute a significant volume of trades each year. To recoup their historical costs for CAT, the fee the exchanges and FINRA propose to assess per executed trade is $0.000015. *See, e.g.*, FINRA Fee Filing, at 3, https://perma.cc/EAG5-A448. The CAT costs to be paid by broker-dealers like Stephens Inc. will cover periods long before and after 2023. As required by the Order, these CAT costs will be payable in perpetuity, and may increase each year. ASA's members, including Stephens Inc., thus will be subject to even greater costs in future years as a result of the Order.

13. Stephens Inc. is not alone. The Order will impose the same costs and burdens on many of ASA's other members, which are also subject to the Order's requirements.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on February ___7___, 2024, in Tampa, Florida

_____
Christopher Iacovella

EXHIBIT B

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION
and CITADEL SECURITIES LLC,

*Petitioners,*

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

*Respondent,*

THE NASDAQ STOCK MARKET, LLC,
NASDAQ BX, INC., NASDAQ GEMX, LLC,
NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET
AL.,

*Intervenors.*

Case No. 23-13396

## DECLARATION OF STEPHEN JOHN BERGER

1.   My name is Stephen John Berger. I am a Managing Director and the Global Head of Government & Regulatory Policy at Citadel Securities LLC (Citadel Securities). I have served in that position since 2011.

2.   I am over 18 years old. This Declaration is based upon my personal knowledge and belief and/or upon my review of business records of Citadel Securities. If called as a witness, I could and would testify competently thereto.

### Citadel Securities

3.   Citadel Securities is broker-dealer that has been registered with the U.S. Securities & Exchange Commission (SEC) since 2002. In addition to being a

registered broker-dealer, Citadel Securities is also a member of the Financial Industry Regulatory Authority (FINRA) and all U.S. registered national securities exchanges.

4. Citadel Securities' officers direct, control, and coordinate the company's activities from its headquarters and principal place of business, which is located at 200 S. Biscayne Blvd., Miami, Florida 33131.

5. As a broker-dealer, Citadel Securities regularly buys and sells publicly traded stocks both on U.S. securities exchanges and over-the-counter on its own behalf and on behalf of retail and institutional clients.

### The CAT Funding Order's Effects on Citadel Securities

6. On September 6, 2023, the SEC issued an order setting forth the funding of the Consolidated Audit Trail (CAT). 88 Fed. Reg. 62628 (Order).

7. The Order provides that the CAT will be funded through a new transaction tax on every executed share in the U.S. equities and options markets which will be paid to an entity known as CAT LLC. *See* Order 62629-30.

8. Under the Order, Citadel Securities will be required to pay the fee imposed on each executed share where Citadel Securities is considered to be the executing broker. The Order also authorizes the exchanges and FINRA to pass 100% of their costs relating to the CAT onto their member broker-dealers, including Citadel Securities. *See* Order 62684 n.1135, 62637-38, 62666. In fact, FINRA has already sought to pass all of its costs onto its member firms, including Citadel Securities. *See*

FINRA Cost-Shifting Filing, https://perma.cc/WT9G-PT63. Under the Order, all of the exchanges can do the same at any time. *See* Order 62684 n.1135, 62637-38, 62666.

9.     The effect of these costs on Citadel Securities and other broker-dealers will be substantial, given the millions of dollars in historical CAT costs incurred thus far. *See* Order 62662. In addition, the millions of dollars in CAT costs to be paid by broker-dealers like Citadel Securities going forward will be payable in perpetuity, and may increase each year. *See id.*

10.    CAT fees will make the execution of trades more expensive. Each executed trade will result in additional costs payable by buying and selling executing broker-dealers, including Citadel Securities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 8, 2024.

_____

Stephen John Berger