No. 23-13396

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND
CITADEL SECURITIES, LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

THE NASDAQ STOCK MARKET, LLC, ET AL.,

*Intervenors*.

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-98290; File No. 4-968

## BRIEF FOR *AMICI CURIAE* ECONOMISTS JAMES OVERDAHL AND S.P. KOTHARI IN SUPPORT OF PETITIONERS AND VACATUR

Benjamin M. Flowers
  *Counsel of Record*
ASHBROOK BYRNE KRESGE LLC
PO Box 8248
Cincinnati, Ohio 45249
(513) 201-5775
bflowers@ashbrookbk.com

*Counsel for Amici Curiae James
Overdahl and S.P. Kothari*

*American Securities Association, et al. v. United States Securities and Exchange Commission, et al.*, No. 23-13396

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel represents *amici curiae* James Overdahl and S.P. Kothari.  Pursuant to Eleventh Circuit Rule 26.1-1 through 26.1-3 and Federal Rule of Appellate Procedure 26.1, the undersigned counsel hereby certifies that, to the best of his knowledge, the Certificate of Interested Persons set forth in the Opening Brief of Petitioners is complete and correct, subject to the following additions:

1. Ashbrook Byrne Kresge LLC, counsel for *amici curiae* James Overdahl and S.P. Kothari.

2. Flowers, Benjamin M., counsel for *amici curiae* James Overdahl and S.P. Kothari.

3. Kothari, S.P., *amicus curiae*

4. Modern Markets Initiative, Inc., sponsor of funding disclosed pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure.

5. Overdahl, James, *amicus curiae*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, the undersigned counsel certifies that the *amici curiae*—James Overdahl and S.P. Kothari—are individuals.  Thus, they have no parent corporations or stock. With respect to the other individuals and entities specifically named in this certificate, none has a parent corporation and no publicly held corporation owns 10 percent or more of their stock.

C-1 of 2

*American Securities Association, et al. v. United States Securities and Exchange Commission, et al.*, No. 23-13396

Dated:  February 13, 2024          */s/ Benjamin M. Flowers*
                                   Benjamin M. Flowers

                                   *Counsel for Amici Curiae James Overdahl and S.P. Kothari*

## TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ...............C-1

Table of Authorities ............................................................................................. ii

Statement of Issues .............................................................................................1

Statement of *Amici* Interest.................................................................................. 2

Introduction and Summary of Argument ..............................................................3

Argument............................................................................................................ 6

    I.   The role of the Commission and the development of the Consolidated
          Audit Trail. .............................................................................................7

         A.  The Commission must consider the likely impact of its exercise of
            regulatory authority on efficiency, competition, and capital
            formation. ........................................................................................7

         B.  The Commission determined in 2016 that the Consolidated Audit
            Trail would have positive economic effects based on data known at
            the time............................................................................................ 8

   II.  The challenged order rests on a flawed economic analysis. ........................10

         A.  The Commission failed to account for significant post-2016
            developments.................................................................................12

         B.  The Commission should have either updated its 2016 analysis or
            performed a new one.......................................................................18

Conclusion........................................................................................................ 21

Certificate of Compliance ................................................................................. 22

Certificate of Service.........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*,
  500 F.3d 1293 (11th Cir. 2007) (*en banc*) ...........................................7

*Zelaya v. United States*,
  781 F.3d 1315 (11th Cir. 2015)..........................................................3

## Statutes and Court Rules

15 U.S.C. §77b(b)...............................................................................8

15 U.S.C. §80a-2(c) .......................................................................3, 8

15 U.S.C. §80b-2(c) .......................................................................3, 8

*15 U.S.C. §78c(f) ........................................ 3, 6, 7, 8, 9, 12, 13, 16, 18

Fed. R. App. P. 29..............................................................................2

## Regulatory Authority

75 Fed. Reg. 32556 (June 8, 2010) .....................................................4, 8

81 Fed. Reg. 30614 (May 17, 2016)........................................................9

81 Fed. Reg. 84696 (Nov. 23, 2016). .........................4, 5, 9, 10, 14, 15, 17

88 Fed. Reg. 17086 (March 21, 2023)..............................................14, 16

*88 Fed. Reg. 62628 (Sept. 12, 2023).......1, 3, 4, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, 20

## Other Authorities

Commissioner Mark T. Uyeda, *Statement on Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023), https://perma.cc/RZ75-2BH7 ...............................................................................12

Consolidated Audit Trail, LLC, *Cash Basis Budget* (Nov. 7, 2023),
    https://perma.cc/9FF3-KX2Z ............................................................................4

David A. Weisbach, *Line Drawing, Doctrine, and Efficiency in the Tax
    Law*, 84 Cornell L. Rev. 1627 (1999). ..............................................................19

Letter from CAT NMS Plan Operating Chair (July 28, 2023),
    https://tinyurl.com/CATltr. .............................................................................12

## STATEMENT OF ISSUES

This brief addresses the third issue raised by the petitioners' opening brief: Should this Court set aside the challenged order, *see* 88 Fed. Reg. 62628 (Sept. 12, 2023), based on the Securities and Exchange Commission's failure to conduct a proper economic analysis?

## STATEMENT OF *AMICI* INTEREST

James Overdahl and S.P. Kothari are both former Chief Economists for the United States Securities and Exchange Commission.[*] Dr. Overdahl is now a partner at Delta Strategy Group, where he provides economic advice and analysis in business, legal, and regulatory matters. Professor Kothari is now Gordon Y. Billard Professor of Accounting and Finance at MIT's Sloan School of Management. Dr. Overdahl and Professor Kothari are filing this brief to assist the Court in understanding the inadequacy of the challenged order's economic analysis.

---

[*] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E)(ii). Modern Markets Initiative, Inc.—but no other person or entity aside from the *amici curiae* and their counsel—contributed money intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E)(iii). All parties consented to the filing of this brief.

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Securities and Exchange Commission performs a technical role of immense personal significance to most every American.  Congress created the Commission to "regulate the securities markets."  *Zelaya v. United States*, 781 F.3d 1315, 1331 (11th Cir. 2015).  Its work can be esoteric.  But every worker whose retirement depends upon a pension or 401k has a strong interest in well-ordered, efficiently operating securities markets.  So does every parent investing her savings to pay for a child's college tuition.  So too does anyone whose paycheck depends on a publicly traded company's access to capital.  Well-ordered, efficiently operating markets are the sort of markets Congress intended for the Commission to promote.  We know this because federal law requires the Commission to "consider," before taking regulatory action, whether its planned course of conduct "will promote efficiency, competition, and capital formation."  15 U.S.C. §§78c(f); 77b(b); 80a-2(c); 80b-2(c).

This case concerns the Commission's failure to discharge that duty properly in connection with a recent order, which this brief calls the "challenged order."  88 Fed. Reg. 62628, 62628 (Sept. 12, 2023).  The challenged order imposes rules relating to the funding of the "Consolidated Audit Trail," or "CAT."  By way of background, the Consolidated Audit Trail is a system that tracks information about investors and activity (including orders, cancellations, modifications, and trade

3

executions) on securities markets; it is designed to enhance the Commission's surveillance and oversight capabilities. 75 Fed. Reg. 32556, 32563–64 ( June 8, 2010). In 2016, the Commission approved a plan to create the Consolidated Audit Trail after concluding that the plan would "generally promote[] competition," "improve … efficiency," and "have modest positive effects on capital formation." 81 Fed. Reg. 84696, 84882 (Nov. 23, 2016). But the 2016 order left an important issue unresolved: it left for "a later date" the question of how to pay for the Consolidated Audit Trail. 81 Fed. Reg. at 84795.

That later date came in 2023, when the Commission issued the challenged order. The order announces per-share transaction fees applicable to sales on American securities and options markets. *See* 88 Fed. Reg. at 62629–30. These "CAT fees" will fund the operation of the Consolidated Audit Trail. But the fees have a lot of catching up to do. When the Commission issued its 2016 order approving the plan to create the Consolidated Audit Trail, it anticipated the system would require between $37.5 million and $65 million in initial development costs and rely on an annual budget of $36.5 million to $55 million. 81 Fed. Reg. at 84801. But as of today, the still-incomplete Consolidated Audit Trail has already cost well over half a billion dollars and its estimated total expenditures in 2023 exceeded $191 million. Consolidated Audit Trail, LLC, *Cash Basis Budget* (Nov. 7, 2023), https://perma.cc/9FF3-KX2Z.

The CAT fees are designed to fund this massive undertaking and are tied to the size of the annual operating budget.

Who will pay the CAT fees?  Preliminarily, the fees will be divided three ways, between the broker-dealer who buys the asset, the broker-dealer who sells it, and the "self-regulatory organization," such as a stock exchange, responsible for the sale.  *See* 88 Fed. Reg. at 62630.  But the self-regulatory organizations can, under the challenged order, pass their shares of the fees to the broker-dealers.  *Id.* at 62684 n.1135. And the costs may ultimately be passed through to investors.  *Id.* at 62682-83.  In the end, broker-dealers and their customers are likely to bear hundreds of millions of dollars annually in additional fees to support the operation of the Consolidated Audit Trail.

As this shows, much has changed since 2016.  Today, we know that the Consolidated Audit Trail is far more expensive than anticipated.  We also know that the program's immense cost will be paid with fees imposed each of the trillions of times annually a share is sold on a regulated market.  We know how the fees will be preliminarily allocated between broker-dealers and self-regulatory organizations.  And we know that self-regulatory organizations may pass through these fees so that they are ultimately borne by broker-dealers and investors.  These changes will raise the cost of participating in markets subject to CAT fees.  This may encourage some investors

5

to shift their investments to assets and markets not subject to CAT fees.  Rising costs may also affect the quantity or the quality of services provided by market intermediaries, with the upshot that some economically efficient transactions will cease to occur.

A sound economic analysis would account for these developments when assessing whether the challenged rule will "promote efficiency, competition, and capital formation."  15 U.S.C. §78c(f).  Yet the Commission "decline[d] to" "update its economic analysis" from 2016.  88 Fed. Reg. at 62676.  Further, it inadequately considered the economic effects of passing through CAT fees to investors.  That is not a sound approach to addressing the economic questions implicated by the challenged order and posed by 15 U.S.C. §78c(f).

## ARGUMENT

The petitioners' opening brief offers several independent arguments for vacating the challenged order.  The *amici* address (and take a position on) only the third.  Specifically, they address the Commission's failure to conduct a sound economic analysis before adopting the challenged order.

**I.     The role of the Commission and the development of the Consolidated Audit Trail.**

Understanding the flaws in the Commission's analysis requires some background on securities regulation and the Consolidated Audit Trail.  The *amici* begin there.

**A.     The Commission must consider the likely impact of its exercise of regulatory authority on efficiency, competition, and capital formation.**

The Securities Exchange Act of 1934 charges "private, self-regulatory organizations" with conducting "the day-to-day regulation and administration of the United States' stock markets." *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007) (*en banc*).  These self-regulatory organizations, often called "SROs," today consist of the national securities exchanges for equities and options—the New York Stock Exchange, Nasdaq, and CBOE, for example—along with the Financial Industry Regulatory Authority.

The name "self-regulatory organization" is perhaps misleading to those unacquainted with the securities industry.  These groups do not operate free from government oversight.  To the contrary, they operate "under the close supervision" of the Commission. *Weissman*, 500 F.3d at 1296.  That agency promulgates regulations and reviews self-regulatory organizations' rules.  15 U.S.C. §78c(f).

7

In fulfilling its important duties, the Commission must undertake a variety of congressionally imposed tasks. One is especially relevant here: the Commission is required to consider whether the exercise of its regulatory authority "will promote efficiency, competition, and capital formation." *Id.*; *accord* 15 U.S.C. §§77b(b); 80a-2(c); 80b-2(c).

**B.    The Commission determined in 2016 that the Consolidated Audit Trail would have positive economic effects based on data known at the time.**

In 2010, the Commission decided to exercise its supervisory power by creating the "Consolidated Audit Trail." More accurately, the Commission ordered the self-regulatory organizations to create this audit trail. The envisioned system would compile information about investors, securities positions, and securities transactions. And it would make that information available for the Commission's review. This, the Commission determined, could "aid" the agency "in fulfilling its statutory obligations to oversee SROs, monitor for the manipulation of security prices, and detect the use of manipulative or deceptive devices in the purchase or sale of a security, as well as to perform market reconstructions." 75 Fed. Reg. at 32564. The Commission further believed the Consolidated Audit Trail would fill "gaps" in then-existing audit tools, helping it "enforce compliance with … the federal securities laws, rules, and regulations." *Id.* at 35265.

8

About five years later, the self-regulatory organizations submitted a plan that proved acceptable to the Commission. 81 Fed. Reg. 30614 (May 17, 2016). They proposed creating a new, jointly owned limited liability company called "CAT NMS, LLC." *Id*. at 30616. The LLC would run the Consolidated Audit Trail. *Id*.

The Commission approved the plan creating the Consolidated Audit Trail and the LLC. 81 Fed. Reg. 84696. That "Plan Approval Order" explains the Commission's thought process. Relevant here, the order includes cost estimates. The Commission "believ[ed]" that the costs "to build the Central Repository" needed to get the Consolidated Audit Trail running would cost between $37.5 million and $65 million. *Id*. at 84854. The agency further predicted "annual operating costs rang[ing] from $36.5 million to $55 million." *Id*.

The Plan Approval Order goes on to assess the plan's effects on efficiency, competition, and capital formation, as required by 15 U.S.C. §78c(f). 81 Fed. Reg. at 84882–97. The order frankly acknowledged that the costs of operating the Consolidated Audit Trail would create problems for some. For example, "smaller competitors" in the trading-services market "could have implementation and ongoing costs of compliance that are disproportionate relative to their size." *Id*. at 84884. Still, the Commission determined that the plan "generally [would] promote competition, improve the efficiency of regulatory activities, promote market efficiency, and

have modest positive effects on capital formation." *Id*. at 84882.  One must remember, however, that the Commission made this determination against the backdrop of the projected costs.  It had no occasion to consider whether the approved plan would promote efficiency, competition, and capital formation if the Consolidated Audit Trail's operation turned out to be far more expensive than estimated.

The Plan Approval Order left a fundamental question unresolved:  how to pay for the Consolidated Audit Trail's operation.  The order envisioned "allocat[ing] costs between" self-regulatory organizations and broker-dealers.  *Id*. at 84795.  But it declined to "specify" the "particular percentage allocation of … costs" that each would bear.  *Id*. at 84795.  Those issues, the Commission explained, would be worked out "at a later date."  *Id*.

That "later date" came in 2023, when the Commission issued the challenged order.  *See* 88 Fed. Reg. at 62628.  To that order, this brief now turns.

## II.    The challenged order rests on a flawed economic analysis.

The Commission issued the challenged order to address the funding and allocation issues the Plan Approval Order left open.  The challenged order amends the Plan Approval Order "to implement a revised funding model … and to establish a fee schedule."  88 Fed. Reg. at 62628.  The amendments aim to pay for the Consolidated Audit Trail through per-share "fees" imposed on transactions occurring in American

equities and options markets. *Id.* at 62629–30. The fees cover both historical costs and prospective costs. *Id.* At least with respect to prospective costs, the fees are calculated with a formula that aims to assure coverage of the "reasonably budgeted CAT costs." *Id.* at 62650. Accordingly, the fees are subject to change—they will rise with the budget.

The challenged order additionally proposes a means of allocating these fees. The Commission announced that "CAT fees would be allocated one-third to the" responsible self-regulatory organization, "one-third to the" broker-dealer who buys the asset, and the remaining one-third to the broker-dealer who sells the asset. *Id.* at 62630. The Commission recognized, however, that self-regulatory organizations could "pass[] their CAT fees onto their members in full," in which case broker-dealers and those who invest with them would "bear 100% of the CAT allocation." *Id.* at 62684 n.1135. Broker-dealers, for their part, may pass the fees through to their customers. *Id.* at 62682.

The *amici* take no position on the wisdom of this approach to funding the Consolidated Audit Trail. They take issue, however, with the Commission's failure to properly consider the economic impacts of the challenged order. The remainder of this section focuses on that issue.

**A.**    **The Commission failed to account for significant post-2016 developments.**

The Commission announced these amendments seven years after the Plan Approval Order. In that time, much had changed. For one thing, the Consolidated Audit Trail turned out to be far more expensive than originally anticipated. Recall that the Commission estimated that initial development of the Consolidated Audit Trail would cost between roughly $37.5 million and $65 million. Yet as of 2023, the system was still incomplete despite "more than $500 million" in expenditures "through the end of 2022." Letter from CAT NMS Plan Operating Committee Chair at 2 (July 28, 2023), https://tinyurl.com/CATltr. As for the annual "operating budget," it was "*five times* the amount estimated" in the Plan Approval Order. 88 Fed. Reg. at 62655 (emphasis added). And the trend is pointing upwards; in the three years leading up to 2023, operating costs jumped "73.2%, 27.3%, and 27.0%." Commissioner Mark T. Uyeda, *Statement on Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023), https://perma.cc/RZ75-2BH7. If this trend is not arrested, annual operating costs will exceed $1 billion in less than a decade.

When it came time to assess the challenged order's effects on "efficiency, competition, and capital formation," 15 U.S.C. §78c(f), one might have expected the Commission to "update its economic analysis" from the Plan Approval Order to account for the system's unexpected, significantly higher cost, 88 Fed. Reg. at 62676.

Similarly, one might have expected the Commission's analysis to account for the fact that the challenged order, for the first time, announced an allocation of CAT fees between broker-dealers and self-regulatory organizations—an allocation that could result in broker-dealers and their customers bearing all of the newly announced fees, equal to hundreds of millions of dollars annually. It might also have addressed the effects on efficiency, competition, and capital formation arising from the possibility that broker-dealers would pass these costs through to investors.

But that is not what happened. The Commission "decline[d]" to update the 2016 analysis. *Id*. The agency suggested that, because the original analysis "was conducted in the process of deciding whether to" issue the Plan Approval Order "and was appropriately based upon the information available to the Commission at the time it made that determination," the analysis needed no update. *Id*.

That makes little sense. As the Commission acknowledged, the Exchange Act tasked it with assessing the challenged order's "potential effects … on efficiency, competition, and capital formation." *Id*.; *accord* 15 U.S.C. §78c(f). The massive increase in cost, combined with the allocation decision and the decision to allow passthroughs, plainly bore on that assessment. *See below* 18–21. Perhaps sensing this, the Commission pledged to "supplement[] the analysis in the [Plan Approval Order] with additional information learned since the time of that order." 88 Fed. Reg. at

62676. More precisely, the agency pledged to conduct its analysis "against a baseline that recognizes that the [challenged order] replaces certain provisions of," and "provides detail not previously included in," the Plan Approval Order. *Id*.

The Commission failed to act on these promises. The challenged order nowhere "supplements" the prior analysis with an assessment of the ways in which the Consolidated Audit Trail's sky-high-and-rising costs may affect the 2016 analysis. At most, the agency dismissed the significance of the fees on the ground that the fees are "relatively small." *Id*. at 62682. But the size of these fees will grow with the operating budget—an issue the Commission fails to account for. Moreover, these fees will be imposed trillions of times annually and are projected to generate, every year, hundreds of millions of dollars in revenue. *See* 88 Fed. Reg. 17086, 17130 (March 21, 2023). The fees thus amount to a tax, on one industry, equal to hundreds of millions of dollars annually. Whether any such tax can fairly be described as "relatively small" is irrelevant for present purposes; whatever the answer, this qualitative description does not "supplement" the 2016 analysis in any meaningful way.

The Commission additionally failed to supplement the 2016 analysis to account for newly announced rules allocating CAT fees. The Commission seems to have concluded that the Plan Approval Order baked all possible allocations into its analysis when it left "for a later day," 81 Fed. Reg. at 84795, the question of how best

to allocate costs between broker-dealers and self-regulatory organizations. In other words, the Commission seems to have believed the relevant "baseline" already accounted for all possible allocations. For that reason, the Commission concluded that the challenged order's imposition of a *particular* allocation—one with pass-through rules allowing 100 percent of the cost to be borne by broker-dealers and investors— did not call for any adjustment of the earlier economic analysis. 88 Fed. Reg. at 62676; *see also id.* at 62682–83.

That is another surprising conclusion. The Commission's earlier analysis did not consider any allocations, let alone all of them. That is what it meant when it said it was leaving these issues "for a later day." 81 Fed. Reg. at 84795. The relevant "baseline," therefore, does not account for allocations. By failing to reassess the 2016 economic model in light of the challenged order's allocation rules, the Commission ensured that those effects would be excluded from the analysis.

The Commission compounded its failure to adjust the 2016 economic analysis by refusing to analyze the economic significance of the prospect that "all CAT fees will ultimately be passed through to investors." 88 Fed. Reg. at 62683. True enough, the Commission cannot know the precise percentage or amount of passed-through fees. But it can make reasonable assumptions based on the value of the fees, the cost of passing them on, and the degree of price competition between broker-dealers.

15

(The concept of pass-throughs is hardly novel; the Commission's own budget is paid with "Section 31" fees, which are imposed on self-regulatory organizations but passed through to brokers and, eventually, investors. *See* 88 Fed. Reg. at 17108.) Using those assumptions, the Commission could at least assess the likely potential impacts from a range of reasonably foreseeable possibilities. *See also* Opening Br. of Petrs. ("Petrs' Br.") at 47 (addressing a method of approximating the number of pass-throughs by deducting the volume of proprietary trades from the volume of total trades).

The Commission's minimal engagement with comments addressing the effects on investors does not offer any such analysis.

The Commission first insisted that the possibility of pass-through has no bearing on "the allocation of CAT fees" between self-regulatory organizations and broker dealers. 88 Fed. Reg. at 62682. That is true. It is also irrelevant. As the petitioners correctly explain, *see* Petrs' Br. at 44–45, the pass-through option bears on the question whether the challenged order promotes efficiency, competition, and capital formation. Answering that statutorily mandated question, 15 U.S.C. §78c(f), thus requires considering the effects of pass-throughs to investors.

In the alternative, the Commission claimed that the possibility of pass-through to investors was already baked into the baseline. 88 Fed. Reg. at 62682. But that

16

argument fails because, as just addressed, the baseline did not include any allocation of fees, which is a necessary antecedent to pass-throughs.  To be sure, the Plan Approval Order noted that those fees might ultimately be passed through to investors.  But it did not analyze the likely degree of pass-through or the "dollar impact on investors." 81 Fed. Reg. at 84992; *see also id*. at 84863, 84893.  Nor did it consider the pass-through issue with post-2016 knowledge regarding the Consolidated Audit Trail's immense cost.

Finally, the Commission posited that the investors to whom funds are passed through may "receive a benefit from" the Consolidated Audit Trail.  88 Fed. Reg. at 62682–83.  Specifically, the Commission posited that, because the Consolidated Audit Trail allows "more effective oversight of market activity," it "could increase investor confidence, resulting in expanded investment opportunities and increased trading activity."  *Id*. at 62683.  This self-serving *ipse dixit* suggests *at most* that the Consolidated Audit Trail promotes efficiency, competition, and capital formation, which the Commission already found in 2016.  It does not engage with the question of how *the challenged order*, by permitting the CAT fees to be passed through to investors, affects efficiency, competition, and capital formation.  That latter question was the one properly before the Commission.  Yet, the Commission made no effort to determine the effects of these pass-throughs on investors.

17

**B.** **The Commission should have either updated its 2016 analysis or performed a new one.**

To summarize, the Exchange Act requires the Commission to "consider" the ways in which its actions will affect "efficiency, competition, and capital formation." 15 U.S.C. §78c(f). The Commission performed this analysis in 2016 when it issued the Plan Approval Order. But that original analysis did not account for—and it could not possibly have accounted for—not-yet-existent information. This means the Commission's economic analysis, in 2016, did not account for the Consolidated Audit Trail's unpredicted and then-unknown expense. Nor did it account for the not-yet-existent rules imposing per-share transaction fees—some of them keyed to the Consolidated Audit Trail's larger-than-expected-and-still-growing budget—under not-yet-existent rules governing fee allocation and allowing pass-throughs.

These new developments are critically important to a sound economic analysis of the challenged order. First, they potentially affect the degree to which the challenged order will distort otherwise economically efficient outcomes. The fees the challenged order imposes and allocates can be analyzed as a tax (regardless of whether they legally qualify as a tax), as they represent a government-mandated charge that raises revenue to fund the operation of a government program. Taxes, depending on how they are imposed, can raise the cost of providing the services that broker-dealers and other market intermediaries offer. For example, as a tax increases

18

the price of providing a service, broker-dealers and other intermediaries may respond by changing the quantity or quality of services they offer.  At the margins, some intermediaries that would have provided services on a pre-tax basis may not do so once the impact of the tax is considered.  In economics, the welfare lost when these intermediaries refrain from providing services that they would have but for the tax is called a "deadweight loss."  David A. Weisbach, *Line Drawing, Doctrine, and Efficiency in the Tax Law*, 84 Cornell L. Rev. 1627, 1650 (1999).

A sound economic analysis would account for the size of the fees, the allocation, and the likelihood of pass-through, as all that is likely to affect the cost of securities transactions and thus the amount of deadweight loss.  It is of course possible that the deadweight loss is small—so small that the tax is "efficient," in the sense that it generates revenue without imposing a deadweight loss on the welfare of market participants.  But because this information post-dates 2016, none of it is accounted for in the 2016 analysis on which the Commission relied.

Relatedly, the markets regulated by the challenged order do not exist in a vacuum.  They exist within a global economy.  And the markets consist of highly liquid investments.  So, when American regulators impose costs on investing or trading in American markets, investors can refrain from investing or trading here or move their investments overseas.  Similarly, investors and broker-dealers can choose to focus

their investing on markets not subject to CAT fees—they can invest more heavily in real estate, for example.  If CAT fees are high enough, such strategic shifts may be cost-justified.  The 2016 analysis on which the Commission relied, however, could not have accounted for the ways in which the Consolidated Audit Trail's booming costs or the allocation and pass-through rules would deter investment in markets subject to CAT fees.  Despite briefly acknowledging the threat this poses to capital formation, *see* 88 Fed. Reg. at 62686, the Commission declined to update the economic analysis, ensuring the analysis did not account for these concerns.  It should have done so.

The Commission should also have engaged substantively with comments explaining that, "under" the challenged order, CAT fees "will ultimately be passed through to investors and retail investors in particular."  *Id*. at 62682.  That pass-through is a potentially significant concern.  If these costs are passed through to investors, as seems likely, that will raise the cost of investing in markets subject to CAT fees.  That may deter economically beneficial transactions, and it may spur investors to invest larger percentages of their wealth elsewhere.  What will be the effect on efficient market operations?  How much will be expended in the transaction costs required to pass through these funds?  To what degree will investors shift their strategies?  How will these potential effects impact companies that depend on

Commission-regulated markets for capital?  We do not know the answers to these questions because the Commission never asked them.

*    *    *

These are just a sampling of the concerns that the Commission failed to account for when it chose to rely on an outdated economic analysis and when it failed to consider the pass-through rules' likely effects on investors.  We appreciate that the Commission has a difficult job.  But its job is also important—too important to permit analytical corner cutting of the sort one finds in the challenged order.

## CONCLUSION

The *amici* support the request to vacate the challenged order.

> Benjamin M. Flowers
>   *Counsel of Record*
> ASHBROOK BYRNE KRESGE LLC
> PO Box 8248
> Cincinnati, Ohio 45249
> (513) 201-5775
> bflowers@ashbrookbk.com
>
> *Counsel for Amici Curiae James Overdahl and S.P. Kothari*

21

# CERTIFICATE OF COMPLIANCE

I certify, as required by Rule 32(g) of the Federal Rules of Appellate Procedure, that this document complies with the type-volume requirements of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this brief contains 4,290 words.

I further certify that this motion complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers

## CERTIFICATE OF SERVICE

I certify that on February 13, 2024, I filed this brief electronically with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Benjamin M. Flowers*