**No. 23-13396**

---

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,

*Intervenors*.

---

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-98290; File No. 4-698

---

## APPENDIX
## VOLUME 1

---

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## INDEX OF APPENDIX

**Tab #**

### Volume 1

Certified List Describing the Record in Proceedings Before the
  Securities and Exchange Commission (Nov. 27, 2023) (A1-A6)...............................A

Letter from Christopher A. Iacovella, CEO, American Securities
  Association to Vanessa A. Countryman, Secretary, Securities
  and Exchange Commission (Feb. 23, 2023) (A7-A8) ...................................................B

Notice of Filing of Amendment to the National Market System
  Plan Governing the Consolidated Audit Trail, Securities
  Exchange Act Release No. 34-97151 (Mar. 15, 2023),
  published at 88 Fed. Reg. 17086 (Mar. 21, 2023) (A9-A64).......................................C

Letter from Ellen Greene, Managing Director, SIFMA et al. to
  Vanessa A. Countryman, Secretary, Securities and Exchange
  Commission (May 2, 2023) (A65-A75) ..........................................................................D

Letter from Brandon Becker, CAT NMS Plan Operating
  Committee Chair to Vanessa A. Countryman, Secretary,
  Securities and Exchange Commission (May 18, 2023)
  (A76-A89) .......................................................................................................................E

Letter from Ellen Greene, Managing Director, SIFMA et al. to
  Vanessa A. Countryman, Secretary, Securities and Exchange
  Commission (June 5, 2023) (A90-A99)..........................................................................F

Letter from Stephen J. Berger, Global Head of Government &
  Regulatory Policy, Citadel Securities to Vanessa A.
  Countryman, Secretary, Securities and Exchange Commission
  (July 14, 2023) (A100-A134)..........................................................................................G

Letter from Brandon Becker, CAT NMS Plan Operating
  Committee Chair to Vanessa A. Countryman, Secretary,
  Securities and Exchange Commission (July 28, 2023)
  (A135-170) .......................................................................................................................H

Letter from Joseph Corcoran, Associate General Counsel, SIFMA
    et al. to Vanessa A. Countryman, Secretary, Securities and
    Exchange Commission (July 31, 2023) (A171-A196) .................................................. I

Letter from Stephen J. Berger, Global Head of Government &
    Regulatory Policy, Citadel Securities to Vanessa A.
    Countryman, Secretary, Securities and Exchange Commission
    (Aug. 22, 2023) (A197-A204) ....................................................................................... J

#### **Volume 2**

Order Approving an Amendment to the National Market System
    Plan Governing the Consolidated Audit Trail, Securities
    Exchange Act Release No. 34-98290 (Sept. 6, 2023), published
    at 88 Fed. Reg. 62628 (Sept. 12, 2023) (A205-A263) .................................................. K

Certificate of Service

# Tab A

Certified List Describing the Record in Proceedings Before the Securities and Exchange Commission (Nov. 27, 2023)

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

AMERICAN SECURITIES ASSOCIATION and
CITADEL SECURITIES LLC,

*Petitioners*,

v.                                                    No. 23-13396

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

*Respondent*.

---

**CERTIFIED LIST DESCRIBING
THE RECORD IN PROCEEDINGS
<u>BEFORE THE SECURITIES AND EXCHANGE COMMISSION</u>**

Pursuant to Section 25(a)(2) of the Securities Exchange Act of 1934, 15 U.S.C.

78y(a)(2), and Federal Rule of Appellate Procedure 17, the Securities and Exchange

Commission certifies that the items listed below constitute the record upon which the

order under review in this Court was entered, with the exception of materials that are

publicly available such as statutes, rules, judicial decisions, Commission orders and

releases, books, treatises, and other similar materials.[1]

---

[1] The order under review took into account certain comments received in connection
with prior Commission filings: Securities Exchange Act Release No. 96394 (Nov. 28,
2022), published at 87 Fed. Reg. 74,183 (Dec. 2, 2022); Securities Exchange Act
Release No. 94984 (May 25, 2022), published at 87 Fed. Reg. 33,226 (June 1, 2022).
Those comments are either cited in the order or incorporated by reference in
comments listed below, and are publicly available at https://www.sec.gov/
comments/4-698/4-698-a.htm.

1

**A1**

| Doc. No. | Description |
|---|---|
| 1. | Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Securities Exchange Act Release No. 97151 (Mar. 15, 2023), published at 88 Fed. Reg. 17,086 (Mar. 21, 2023). |

Comment Letters (all letters available at https://www.sec.gov/comments/4-698/4-698-a.htm#comments2)

| | |
|---|---|
| 2. | Timothy Miller, Chief Operating Officer, DASH Financial Technologies LLC, Apr. 11, 2023. |
| 3. | Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, Financial Industry Regulatory Authority, Inc., Apr. 11, 2023. |
| 4. | Ellen Greene, Managing Director, Equities & Options Market Structure, and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, May 2, 2023. |
| 5. | Brandon Becker, CAT NMS Plan Operating Committee Chair, May 18, 2023. |
| 6. | Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, Financial Industry Regulatory Authority, Inc., May 25, 2023. |
| 7. | Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, June 5, 2023. |
| 8. | Brandon Becker, CAT NMS Plan Operating Committee Chair, June 15, 2023. |
| 9. | Kirsten Wegner, Chief Executive Officer, Modern Markets Initiative, July 13, 2023. |
| 10. | Douglas A. Cifu, Chief Executive Officer, Virtu Financial, July 13, 2023. |
| 11. | Timothy Miller, Chief Operating Officer, DASH Financial Technologies LLC, July 13, 2023. |

**A2**

| Doc. No. | Description |
|---|---|
| 12. | Ellen Greene, Managing Director, Equities & Options Market Structure, and Joseph P. Corcoran, Managing Director, Associate General Counsel, SIFMA, July 13, 2023. |
| 13. | Joanna Mallers, Secretary, FIA Principal Traders Group, July 14, 2023. |
| 14. | Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, July 14, 2023. |
| 15. | Brandon Becker, CAT NMS Plan Operating Committee Chair, July 28, 2023. |
| 16. | Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA; Ellen Greene, Managing Director, Equities & Options Market Structure, SIFMA; and Howard Meyerson, Managing Director, Financial Information Forum, July 31, 2023. |
| 17. | Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, Aug. 22, 2023. |
| 18. | Lindsey Weber Keljo, SIFMA Asset Management Group, Sept. 5, 2023. |

Meetings with SEC Officials (https://www.sec.gov/comments/4-698/4-698-a.htm#meetings1)

| | |
|---|---|
| 19. | Memorandum from the Office of Commissioner Caroline Crenshaw regarding a March 2, 2023, meeting with representatives of FINRA. |
| 20. | Memorandum from the Office of Commissioner Hester M. Peirce regarding a March 21, 2023, meeting with representatives of CAT LLC. |
| 21. | Memorandum from the Office of Commissioner Mark T. Uyeda regarding an April 17, 2023, meeting with representatives of the Leadership Team of the Consolidated Audit Trail LLC, dated Apr. 18, 2023. |
| 22. | Memorandum from the Office of Commissioner Caroline Crenshaw regarding a May 2, 2023, meeting with representatives of the Consolidated Audit Trail LLC. |

**A3**

| Doc. No. | Description |
|---|---|
| 23. | Memorandum from the Office of Commissioner Hester M. Peirce regarding a May 30, 2023, meeting with representatives of SIFMA. |
| 24. | Memorandum from the Division of Trading and Markets regarding a June 1, 2023, meeting with representatives of the Securities Industry and Financial Markets Association, dated June 1, 2023. |
| 25. | Memorandum from the Office of Commissioner Caroline Crenshaw regarding a June 5, 2023, meeting with representatives of SIFMA. |
| 26. | Memorandum from the Office of the Chair regarding a June 28, 2023, meeting with representatives of the CAT Operating Committee, dated July 10, 2023. |
| 27. | Memorandum from the Office of the Chair regarding a July 6, 2023, meeting with representatives of the CAT Operating Committee, dated July 10, 2023. |
| 28. | Memorandum from the Office of the Chair regarding a July 20, 2023, meeting with Modern Markets Initiative, dated July 20, 2023. |
| 29. | Memorandum from the Office of Commissioner Mark T. Uyeda regarding a July 24, 2023, meeting with representatives of Hudson River Trading, LLC, dated July 25, 2023. |
| 30. | Memorandum from the Office of Commissioner Hester M. Peirce regarding a July 25, 2023, meeting with representatives of the Futures Industry Association Principal Traders Group. |
| 31. | Memorandum from the Office of Commissioner Mark T. Uyeda regarding a July 27, 2023, meeting with the Leadership Team of the Consolidated Audit Trail LLC, dated July 27, 2023. |
| 32. | Memorandum from the Office of Commissioner Hester M. Peirce regarding an August 1, 2023, meeting with representatives of the Consolidated Audit Trail Leadership Team. |
| 33. | Memorandum from the Office of Commissioner Mark T. Uyeda regarding an August 28, 2023, meeting with representatives of SIFMA, dated Aug. 28, 2023. |

**A4**

| Doc. No. | Description |
|---|---|
| 34. | Memorandum from the Office of the Chair regarding an August 31, 2023, meeting with the CAT Operating Committee, dated Aug. 31, 2023. |
| 35. | Memorandum from the Office of the Chair regarding a September 5, 2023, meeting with Citadel Securities, dated Sept. 5, 2023. |

Additional Materials

| | |
|---|---|
| 36. | Order Instituting Proceedings to Determine Whether to Approve or Disapprove an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Securities Exchange Act Release No. 97750 (June 16, 2023), published at 88 Fed. Reg. 41,142 (June 23, 2023). |
| 37. | Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Securities Exchange Act Release No. 98290 (Sept. 6, 2023), published at 88 Fed. Reg. 62,628 (Sept. 12, 2023). |

For the Commission, by its Secretary, pursuant to delegated authority.

/s/ J. Matthew DeLesDernier
J. Matthew DeLesDernier
Deputy Secretary

Dated:  November 27, 2023

**A5**

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2023, I electronically filed the foregoing

Certified List Describing the Record in Proceedings Before the Securities and

Exchange Commission using the Court's CM/ECF system, which will send notice to

all the parties.

/s/ Daniel E. Matro
Daniel E. Matro
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040

Dated:  November 27, 2023

**A6**

# Tab B

Letter from Christopher A. Iacovella, CEO, American Securities Association to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (Feb. 23, 2023)

# american securities association
## America's Voice for Main Street's Investors

February 23, 2023

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

> **Re: Notice of Filing of Amendment to the National Market System Plan Governing The Consolidated Audit Trail (File No. 4-698)**

Dear Ms. Countryman:

The American Securities Association (ASA)[1] submits these comments in response to the proposed Executed Share Model under the Consolidated Audit Trail (CAT) that has been submitted by the self-regulatory organizations (SROs).

The ASA urges the Securities and Exchange Commission (SEC) to reject the proposed plan regarding the Executed Share Model and to facilitate further discussions between the SROs and the brokerage industry to establish a fairer and more reasonable alternative to determining cost allocations under the CAT. The ASA echoes many of the same concerns and observations contained in the January 12th, 2023 comment letter from the Securities Industry and Financial Markets Association (SIFMA).[2]

Over the last several years, the ASA has regularly engaged with the SEC, SROs, Congress, and industry members regarding investor protection and other issues that have arisen as the CAT has been developed.  Our top concern remains that the CAT is still anticipated to collect and store the personally identifiable information (PII) of every retail investor, which will make millions of Americans subject to identity theft and other invasions of their privacy. We continue to call on the SEC to remove the collection of *any* PII under the CAT to protect investors and maintain the credibility of this market surveillance system as it endeavors to finalize a rule this year.

The ASA is alarmed that – over ten years into the CAT project – the CAT participant exchanges are proposing to impose a substantial portion of the costs for operating the CAT on broker-dealers. The proposed Executed Share Model would allocate two-thirds of CAT operating costs

---

[1] The ASA is a trade association that represents the retail and institutional capital markets interests of regional financial services firms who provide Main Street businesses with access to capital and advise hardworking Americans how to create and preserve wealth. The ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. This mission advances financial independence, stimulates job creation, and increases prosperity. The ASA has a geographically diverse membership of almost one hundred members that spans the Heartland, Southwest, Southeast, Atlantic, and Pacific Northwest regions of the United States.

[2] https://www.sec.gov/comments/4-698/4698-20154753-322976.pdf


**American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C.  20004


**AmericanSecurities.org**
@amersecurities


202.621.1784

**A7**

**american securities association**
America's Voice for Main Street's Investors

on brokers and one-third to participating exchanges. And when the allocation to FINRA is included that cost to the industry is over 80%.

The justification for this proposed imbalance, according to the exchanges, is that brokers' business models increase trading activity and complexity, and that since there are more brokers than exchanges, brokers should bear a higher proportion of costs. These justifications are thin and not grounded in any type of substantive data or evidence. The CAT was set up to manage institutional messaging traffic, but the exchanges themselves are creating more traffic through an increase in order messages which directly results in incremental maintenance costs. The cost-sharing structure exchanges have proposed is out of line and the SEC should not allow exchanges to impose costs on brokers when it is the exchanges who are responsible for additional costs.

The Exchange Act requires that rules promulgated by exchanges provide, amongst other things, for the "equitable allocation of reasonable dues, fees, and other charges." [3] The proposed Executed Share Model is neither equitable, nor reasonable. This fact provides the SEC with a strong legal basis to reject the model as proposed and direct CAT participants to develop a more sustainable and equitable system of cost allocation.

Firms not registered with the SEC as broker-dealers – yet are still responsible for a large portion of daily trading volume in the equity markets – would also get a free ride from this proposed plan while small and mid-size customer-facing brokers will bear an unfair and heavy cost burden.

Put simply, the proposed Executed Share Model is discriminatory against broker-dealers and their customers and will only raise costs for investors while making the CAT no more effective as a regulatory tool for the SEC.

Given these concerns, the ASA urges the SEC to reject the proposed Executed Share Model. The ASA looks forward to being a resource to SEC commissioners and staff regarding this topic.

Sincerely,

*Christopher A. Iacovella*

Christopher A. Iacovella
Chief Executive Officer
American Securities Association

---

[3] Sec. 6 of Securities Exchange Act

 **American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

 **AmericanSecurities.org**
@amersecurities

 202.621.1784

A8

# Tab C

Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Securities Exchange Act Release No. 34-97151 (Mar. 15, 2023), published at 88 Fed. Reg. 17086 (Mar. 21, 2023)

## SECURITIES AND EXCHANGE COMMISSION

[Release No. 34–97151; File No. 4–698]

**Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail**

### I. Introduction

On March 13, 2023, the Consolidated Audit Trail, LLC ("CAT LLC"), on behalf of the following parties to the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan" or "Plan"): [1] BOX Exchange LLC; Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc., Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX, LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc. (collectively, the "Participants," "self-regulatory organizations," or "SROs") filed with the Securities and Exchange Commission ("SEC" or "Commission") pursuant to section 11A(a)(3) of the Securities Exchange Act of 1934 ("Exchange Act"),[2] and Rule 608 thereunder,[3] a proposed amendment to the CAT NMS Plan to implement a revised funding model (the "Funding Proposal") for the consolidated audit trail ("CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[4] *Exhibit A,* attached hereto, contains proposed revisions to Articles I and XI of the CAT NMS Plan as well as proposed Appendix B to the Plan containing the fee schedule. *Exhibit B,* attached hereto, contains a comparison of the Funding Proposal to the executed share funding proposal filed by CAT LLC on May 13, 2022,[5] as amended in two partial amendments,[6] and later withdrawn on March 1, 2023.[7] In addition, CAT LLC provided an example of how a Historical CAT Assessment would be calculated pursuant to the Funding Proposal, for illustrative purposes only, as attached hereto as *Exhibit C.* The Commission is publishing this notice to solicit comments from interested persons on the amendment.[8]

### II. Description of the Plan

Set forth in this Section II is an executive summary of the Funding Proposal, along with information required by Rule 608(a) under the Exchange Act,[9] and a description of the proposed revisions to the CAT NMS Plan, substantially as prepared and submitted by the Participants to the Commission.[10]

#### *Executive Summary*

CAT LLC proposes to replace the funding model set forth in Article XI of the CAT NMS Plan (the "Original Funding Model") with the Funding Proposal. The Original Funding Model involves a bifurcated approach, where costs associated with building and operating the CAT would be borne by (1) Industry Members (other than alternative trading systems ("ATSs") that execute transactions in Eligible Securities ("Execution Venue ATSs")) through fixed tiered fees based on message traffic for Eligible Securities, and (2) Participants and Industry Members that are Execution Venue ATSs for Eligible Securities through fixed tiered fees based on market share. In contrast, the Funding Proposal would charge fees based on executed share volume of transactions in Eligible Securities rather than based on market share and message traffic.

Under the Funding Proposal, CAT LLC proposes to establish two categories of CAT fees. The first category of CAT fees would be fees ("CAT Fees") payable by Participants and Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs"). The CAT Fee for each transaction would be calculated by multiplying the executed equivalent shares in the transaction by one-third and the applicable "Fee Rate." The Funding Proposal would describe in detail each aspect relevant to the CAT Fees, including a description of the Prospective CAT Costs, the calculation of the Fee Rate, the definition of "CAT Executing Broker," the fee filings made pursuant to section 19(b) of the Exchange Act for CAT Fees, and information available related to CAT Fees, both publicly and upon request.

The second category of CAT fees would be fees ("Historical CAT Assessments") to be payable by Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs previously paid by the Participants ("Past CAT Costs"). The Historical CAT Assessment for each transaction would be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and the applicable "Historical Fee Rate." Like with the CAT Fees related to Prospective CAT Costs, the Funding Proposal would describe in detail each aspect relevant to Historical CAT Assessments, including a description of Historical CAT Costs, the calculation of the Historical Fee Rate, the definition of "CAT Executing Broker," the fee filings made pursuant to section 19(b) of the Exchange Act for Historical CAT Assessments, and information available related to Historical CAT Assessments, both publicly and upon request.

The Participants separately intend to file rule filings under section 19(b) of the Exchange Act and Rule 19b–4(f)(2) thereunder to establish the CAT Fees and Historical CAT Assessments to be charged to Industry Members based on the Funding Proposal set forth in the CAT NMS Plan.

CAT LLC has gone through an extensive process of evaluating and seeking comment on various funding models since the inception of CAT. In addition to the variety of alternative models considered by CAT LLC (as described in Section A.10 of this filing), the proposed CAT funding model has been subject to substantial public review and comment via the proposed amendment to the CAT NMS Plan published by the SEC on May 25, 2022

---

[1] The CAT NMS Plan is a national market system plan approved by the Commission pursuant to Section 11A of the Exchange Act and the rules and regulations thereunder. *See* Securities Exchange Act Release No. 79318 (November 15, 2016), 81 FR 84696 (November 23, 2016).

[2] 15 U.S.C. 78k–1(a)(3).

[3] 17 CFR 242.608.

[4] *See* Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission, dated March 13, 2023 ("Transmittal Letter").

[5] *See* Securities Exchange Act Release No. 94984 (May 25, 2022), 87 FR 33226 (June 1, 2022).

Comments received can be found on the Commission's website at *https://www.sec.gov/comments/4-698/4-698-a.htm.*

[6] *See* Securities Exchange Act Release No. 96394 (Nov. 28, 2022), 87 FR 74183 (Dec. 2, 2022). Comments received can be found on the Commission's website at *https://www.sec.gov/comments/4-698/4-698-a.htm. See also* Letter from Michael Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Feb. 15, 2023).

[7] *See* Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Mar. 1, 2023).

[8] 17 CFR 242.608.

[9] *See* 17 CFR 242.608(a).

[10] *See* Transmittal Letter, *supra* note 4. Unless otherwise defined herein, capitalized terms used herein are defined as set forth in the CAT NMS Plan.

(the ''2022 Funding Proposal''),[11] the subsequent order instituting proceedings related to the 2022 Funding Proposal [12] and two partial amendments regarding the 2022 Funding Proposal.[13] Thirteen comment letters were submitted in response to the 2022 Funding Proposal, as amended, and CAT LLC submitted three detailed responses to comments.[14] CAT LLC withdrew the 2022 Funding Proposal on March 1, 2023.[15] Subject to certain minor revisions, the Funding Proposal set forth herein is the same proposal as the 2022 Funding Proposal, as amended in the two partial amendments. The minor changes made to the 2022 Funding Proposal are noted in this filing, and separately identified in *Exhibit B* to this filing.

The Funding Proposal would provide reasonable fees that are equitably allocated, not unfairly discriminatory, and do not impose an undue burden on competition, in that the proposal reflects a reasonable effort to allocate costs based on the extent to which different CAT Reporters participate in and benefit from the equities and options markets. Moreover, the Funding Proposal would be consistent with past fee structures that have been approved by the Commission. It also is transparent, would be relatively easy to calculate and administer, and is designed not to have an impact on market activity because it is neutral as to the location and manner of execution. The Exchange Act does not require CAT LLC to demonstrate that the Funding Proposal is *superior to any other potential proposal.* Instead, CAT LLC must demonstrate that the Funding Proposal is *consistent with the Exchange Act and the rules and regulations thereunder.* CAT LLC believes that the Funding Proposal satisfies the requirements of the

---

[11] Securities Exchange Act Rel. No. 94984 (May 25, 2022), 87 FR 33226 (June 1, 2022) (''2022 Funding Proposal Release'').

[12] Securities Exchange Act Rel. No. 95634 (Aug. 30, 2022), 87 FR 54558 (Sept. 6, 2022).

[13] Securities Exchange Act Rel. No. 96394 (Nov. 28, 2022), 87 FR 74183 (Dec. 2, 2022) (''Partial Amendment I''), and Letter from Michael Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Feb. 15, 2023) (''February 2023 Proposed Partial Amendment'').

[14] Letter from Michael Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Aug. 16, 2022); Letter from Michael Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Nov. 15, 2022); and February 2023 Proposed Partial Amendment.

[15] Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Mar. 1, 2023).

Exchange Act and should be approved by the Commission.

*Requirements Pursuant to Rule 608(a)*

A. Description of the Proposed Amendments to the CAT NMS Plan

CAT LLC describes in detail the Funding Proposal in this Section A:

• *Definition of CAT Executing Broker:* CAT LLC describes the definition of a ''CAT Executing Broker'' in Section A.1 of this filing.

• *CAT Budget:* Budgeted CAT costs are described in Section A.2 of this filing.

• *CAT Fees related to Prospective CAT Costs:* CAT LLC discusses CAT Fees related to Prospective CAT Costs in Section A.3 of this filing.

• *Historical CAT Assessments:* CAT LLC discusses Historical CAT Assessments related to Historical CAT Costs in Section A.4 of this filing.

• *CAT Fee Schedule for Participants:* To implement the CAT fees to be paid by the Participants under the Funding Proposal, CAT LLC proposes to add a fee schedule, entitled ''Consolidated Audit Trail Funding Fees,'' to Appendix B of the CAT NMS Plan. This fee schedule is discussed in Section A.5 of this filing.

• *Additional Changes from Original Funding Model:* CAT LLC discusses additional proposed revisions to Article XI of the CAT NMS Plan to implement the change from the Original Funding Model to the Funding Proposal in Section A.6 of this filing.

• *Billing and Collection of CAT Fees:* The billing and collection of CAT fees are discussed in Section A.7 of this filing.

• *Illustrative Example of Funding Proposal:* CAT LLC provides an illustrative example of how a Historical CAT Assessment would be calculated pursuant to the Funding Proposal in Section A.8 of this filing. The illustrative example is set forth in detail in *Exhibit C* to this filing.

• *Advantages of and Support for Funding Proposal:* CAT LLC proposes to adopt the Funding Proposal as it provides a variety of advantages over the Original Funding Model. CAT LLC discusses the advantages of the Funding Proposal in Section A.9 of this filing.

• *Alternative Funding Models Considered:* CAT LLC discusses the advantages and disadvantages of a variety of alternative funding models to the Funding Proposal in Section A.10 of this filing.

• *Satisfaction of Exchange Act and CAT NMS Plan Requirements:* CAT LLC discusses how the Funding Proposal satisfies each of the funding principles

and other requirements of the CAT NMS Plan, as proposed to be revised herein, as well as the applicable requirements of the Exchange Act in Section A.11 of this filing.

1. Definition of CAT Executing Broker

Under the Funding Proposal, each Industry Member that is a CAT Executing Broker for the buyer in a transaction in Eligible Securities (''CAT Executing Broker for the Buyer'' or ''CEBB'') and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities (''CAT Executing Broker for the Seller'' or ''CEBS'') would be required to pay CAT Fees and Historical CAT Assessments. Accordingly, CAT LLC proposes to add a definition of the term ''CAT Executing Broker'' to Section 1.1 of the CAT NMS Plan. CAT LLC would define ''CAT Executing Broker'' to mean:

(a) with respect to a transaction in an Eligible Security that is executed on an exchange, the Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.

Under the Participant Technical Specifications, for transactions occurring on a Participant exchange, there is a field for the exchange to report the market participant identifier (''MPID'') of ''the member firm that is responsible for the order on this side of the trade.'' [16] The Industry Members

---

[16] *See* Section 4.7 (Order Trade Event) and Section 5.2.5.1 (Simple Option Trade Event: Side Details) of the CAT Reporting Technical Specifications for Plan Participants, Version 4.1.0–r17 (Feb. 21, 2023), *https://www.catnmsplan.com/*

Continued

identified in these fields for the transaction reports would be the CAT Executing Brokers for transactions executed on an exchange. Specifically, the following fields of the Participant Technical Specifications would indicate the CAT Executing Brokers for the transactions executed on an exchange.

## EQUITY ORDER TRADE (EOT) [17]

| No. | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 12.*n*.8/13.*n*.8 ..... | member ...................................... | Member Alias ............ | The identifier for the member firm that is responsible for the order on this side of the trade.<br>Not required if there is no order for the side as indicated by the NOBUYID/NOSELLID instruction.<br>This must be provided if orderID is provided. | C |

## OPTION TRADE (OT) [18]

| No. | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 16.*n*.13/17.*n*.13 | member ...................................... | Member Alias ............ | The identifier for the member firm that is responsible for the order. | R |

FINRA is required to report to the CAT transactions in Eligible Securities reported to a FINRA trade reporting facility (*i.e.,* the FINRA Trade Reporting Facilities (''TRF''), Over-the Counter Reporting Facility (''ORF'') and Alternative Display Facility (''ADF'')).[19] Under the Participant Technical Specifications, for such transactions reported to a FINRA trade reporting facility, FINRA is required to report the MPID of the executing party as well as the MPID of the contra-side executing party. The Industry Members identified in these two fields for the transaction reports would be the CAT Executing Brokers for over-the-counter transactions. Specifically, the following fields of the Participant Technical Specifications will indicate the CAT Executing Brokers for the transactions executed otherwise than on an exchange.

## TRF/ORF/ADF TRANSACTION DATA EVENT (TRF) [20]

| No. | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 26 ...................... | reportingExecutingMpid .............. | Member Alias ............ | MPID of the executing party .......................................... | R |
| 28 ...................... | contraExecutingMpid .................. | Member Alias ............ | MPID of the contra-side executing party ....................... | C |

Note that a CAT Executing Broker in over-the-counter transactions identified on the TRF/ORF/ADF Transaction Data Event is determined based on the tape or media report, that is, a trade report that is submitted to a FINRA trade reporting facility and reported to and publicly disseminated by the appropriate exclusive Securities Information Processor. A CAT Executing Broker for over-the-counter transactions is *not* determined based on a non-tape report (*e.g.,* a regulatory report or a clearing report), which are not publicly disseminated.[21]

Therefore, with respect to transactions on an exchange and over-the-counter transactions, CAT LLC would use transaction reports reported to the CAT by FINRA or the exchanges to identify the transaction for purposes of calculating the CAT fees as well as the CAT Executing Broker for each transaction for purposes of calculating the CAT fees. Accordingly, all data used to calculate the fees under the Funding Proposal would be CAT Data, and, therefore, it would be available through the CAT for calculating CAT fees. FINRA CAT would be responsible for calculating the CAT fees and submitting invoices to the CAT Executing Brokers based on this CAT Data. Moreover, defining a ''CAT Executing Broker'' in this way is a simpler analytical approach than other potential approaches for defining the relevant executing broker, such as identifying the originating broker for the order via an evaluation of CAT linkages.[22]

CAT LLC proposes to make use of the defined term ''CAT Executing Broker'' in Proposed Section 11.3 in describing the Funding Proposal. CAT LLC believes the proposed definition of CAT Executing Broker and the use of the defined term in Article XI would set forth clearly when and in what situations an Industry Member would be considered a CAT Executing Broker for purposes of the Funding Proposal.

a. Treatment of ATSs

The Funding Proposal would describe how CAT fees would be assessed with

*sites/default/files/2023-02/02.21.2023-CAT-Reporting-Technical-Specifications-for-Participants-4.1.0-r17.pdf.*

[17] *See* Table 23, Section 4.7 (Order Trade Event) of the CAT Reporting Technical Specifications for Plan Participants, Version 4.1.0–r17 (Feb. 21, 2023), *https://www.catnmsplan.com/sites/default/files/2023-02/02.21.2023-CAT-Reporting-Technical-Specifications-for-Participants-4.1.0-r17.pdf.*

[18] *See* Table 51, Section 5.2.5.1 (Simple Option Trade Event) of the CAT Reporting Technical Specifications for Plan Participants (Feb. 21, 2023).

[19] *See* Section 6.1 of the CAT Reporting Technical Specifications for Plan Participants (Feb. 21, 2023).

[20] *See* Table 61, Section 6.1 (TRF/ORF/ADF Transaction Data Event) of the CAT Reporting Technical Specifications for Plan Participants (Feb. 21, 2023).

[21] There is an exception to this statement for away-from-market trades. These are non-media trades reported to the TRF with an ''SRO Required Modifier Code'' of ''R''.

[22] Each CAT Executing Broker could determine, but would not be required, to pass their CAT fees through to their clients, who, in turn, could pass their CAT fees to their clients, until the fee is imposed on the ultimate participant in the transaction.

regard to transactions executed on ATSs, including clarification as to which party to an ATS transaction would be treated as the CAT Executing Broker for purposes of the Funding Proposal. The definition of a "CAT Executing Broker" as proposed above would determine the CAT Executing Brokers for transactions executed on an ATS. Specifically, if an ATS is identified as the executing party and/or the contra-side executing party in the TRF/ORF/ADF Transaction Data Event, then the ATS would be a CAT Executing Broker for purposes of the Funding Proposal. If the ATS is identified as the executing party for the buyer in such transaction reports, then the ATS would be the CAT Executing Broker for the Buyer, and if the ATS is identified as the executing party for the seller in such transaction reports, then the ATS would be the CAT Executing Broker for the Seller. An ATS also could be identified as both the CAT Executing Broker for the Buyer and the CAT Executing Broker for the Seller. ATSs would determine the executing party and the contra-side executing party reported to FINRA's equity trading facilities in accordance with the transaction reporting requirements for FINRA's equity trading facilities.

b. Treatment of Fractional Shares

The Funding Proposal also would address how transactions in fractional shares would be treated. As described above, CAT fees would be charged based on the Equity Order Trade Events, Options Trade Events and the ADF/ORF/TRF Transaction Data Events in the Participant Technical Specifications. None of these transaction reports provide for fractional quantities; the transaction reports must reflect whole shares/contracts. Therefore, under the Funding Proposal, CAT fees would be calculated without reference to fractional shares or fractional share components of executed orders.[23]

c. Non-Industry Members on Transaction Reports

The Funding Proposal also would address how transactions that involve a non-Industry Member would be treated under the Funding Proposal (e.g., for internalized trades or trades with a non-FINRA member). The FINRA trade reporting requirements state that "[w]hen reporting a trade with a broker-dealer that is not a FINRA member, the non-member should not be identified on

the trade report as the contra party to the trade." [24] Accordingly, when the transaction in these cases is reported to CAT via the TRF/ORF/ADF Transaction Data Event, the field for the reportingExecutingMpid would be populated with the MPID of the executing broker and the field for the contraExecutingMpid would be blank or null. As noted above, the reportingExecutingMpid is a required field (include key = 'R') that must be entered on all CAT reports, but the contraExecutingMpid field is conditional; it does not need to be populated, specifically to account for cases like those at issue here (e.g., transactions with a non-FINRA member). Therefore, in those scenarios where the contraExecutingMpid is blank, the FINRA member identified in the reportingExecutingMpid field would be treated as the CAT Executing Broker for both the buy-side and the sell-side of the transaction, that is, as the CEBS and CEBB.

In addition, under the FINRA trade reporting requirements, there is a limited exception to the general rule about not reporting a non-member as the contra party to the trade. Specifically, pursuant to FINRA Trade Reporting FAQ 202.1, "[t]here is a limited exception where a Canadian non-member firm uses the FINRA/NASDAQ TRF or ORF for purposes of comparing trades pursuant to a valid Non-Member Addendum to the NASDAQ Services Agreement. In that instance, however, the Canadian non-member must appear on the trade report as the contra party to the trade and not as the reporting party. For any trade report on which a Canadian non-member appears as a party to the trade, the FINRA member must appear as the reporting party." In this case involving the Canadian non-member firm exception, the executing broker identified in the reportingExecutingMpid field would be billed for both sides of the transaction.

CAT LLC proposes to include language in the definition of "CAT Executing Broker" to address these scenarios. Specifically, CAT LLC proposes to state the following in the definition of "CAT Executing Broker: "in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT

Executing Broker for the Buyer and for the Seller."

d. Cancellations and Corrections

The Funding Proposal also would provide for cancellations and corrections. CAT LLC expects to determine CAT fees based on the transaction reports for a month as of a particular day. To the extent that changes are made to the transaction reports on or before the day the CAT fees are determined for the given month, the changes will be reflected in the monthly bill. To the extent that changes are made to the transaction reports after the day the CAT fees are determined for that month, subsequent bills will reflect any changes via debits or credits, as applicable. As CAT LLC is required under the CAT NMS Plan to adopt policies, procedures, and practices regarding the billing and collection of fees,[25] CAT LLC will establish specific policies and procedures regarding the treatment of such adjustments as those related to cancellations and corrections. Furthermore, CAT LLC will inform Industry Members and other market participants of these policies and procedures via FAQs, CAT Alerts and/or other appropriate methods.

2. CAT Budget

Section 11.1(a) of the CAT NMS Plan describes the requirement for the Operating Committee to approve an operating budget for CAT LLC on an annual basis. It requires the budget to "include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." CAT LLC proposes to provide additional detail regarding the CAT LLC operating budget by adding proposed subparagraphs (i) and (ii) to Section 11.1(a) of the CAT NMS Plan. Such detailed information would provide Participants, Industry Members and other interested parties with a clear understanding of the CAT budget, and, in turn, the calculation of the CAT Fees.

a. Budgeted CAT Costs

CAT LLC proposes to add subparagraph (i) to Section 11.1(a) of the CAT NMS Plan to provide additional clarity regarding the costs to be included in the CAT budget. This proposed provision would list the types of CAT costs to be included in the budget. Specifically, Proposed Section

---

[23] To the extent that FINRA's equity transaction reporting facilities or the exchanges report transactions in fractional shares in the future, then the calculation of CAT fees would reflect fractional shares as well.

[24] FINRA Trade Reporting FAQ 202.1.

[25] Section 11.1(d) of the CAT NMS Plan.

11.1(a)(i) of the CAT NMS Plan would state that ''[w]ithout limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve, and such other categories as reasonably determined by the Operating Committee to be included in the budget.''

Because technology costs account for more than 90% of CAT costs, CAT LLC proposes to provide more granular information about such costs. Specifically, CAT LLC proposes to require the inclusion of five subcategories of technology costs in the budget: (1) cloud hosting services, (2) operating fees, (3) Customer and Account Information System (''CAIS'') operating fees, (4) change request fees, and (5) capitalized developed technology costs. Breaking out technology costs in this manner is consistent with how such costs are broken out in the CAT budgets available on the CAT website.[26] CAT LLC currently does not propose to require the disclosure of additional subcategories of cost information, such as a further breakdown of the category of cloud hosting services into production costs, including linker costs and storage costs. However, CAT LLC will consider the need to provide additional cost disclosure going forward.

Furthermore, CAT LLC has determined not to provide more detailed subcategories for the other cost categories (that is, legal, consulting, insurance, professional and administration, and public relations costs) at this time. Breaking out these costs into further subcategories would establish new subcategories that are not set forth in the budgets. In addition, these costs in the aggregate represent less than seven percent (7%) of total CAT costs, with professional and administration costs and public relations costs, in particular, each representing less than one percent (1%) of overall CAT costs. Therefore, CAT LLC does not believe that these costs warrant additional subcategory disclosure. CAT LLC further notes that it is not considered a best practice to publicly disclose detailed legal or insurance information, which is particularly sensitive. Nevertheless,

CAT LLC notes that the CAT NMS Plan requires that detailed cost information be made available to the Commission upon request, and detailed information on CAT costs and operations is regularly made available to the Commission staff and the Advisory Committee on a confidential basis.

CAT LLC also intends to determine costs for the operating budget for the CAT in a reasonable manner. Accordingly, CAT LLC proposes to amend Section 11.1(a) of the CAT NMS Plan to refer to a ''reasonable'' operating budget for CAT LLC.[27] Specifically, the first sentence of Section 11.1(a) of the CAT NMS Plan would be revised to read: ''On an annual basis the Operating Committee shall approve a reasonable operating budget for the Company.'' In addition, CAT LLC proposes to include the term ''reasonably'' in proposed paragraph (a)(i) of Section 11.1 of the CAT NMS Plan. Specifically, CAT proposes to introduce the term ''reasonably'' to the following proposed provision of the CAT NMS Plan: ''Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.''

Finally, CAT LLC proposes to amend Section 11.1(b) of the CAT NMS Plan. Currently, Section 11.1(b) of the CAT NMS Plan states that:

Subject to Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants. The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as ''Consolidated Audit Trail Funding Fees.''

CAT LLC proposes to amend Section 11.1(b) to include a reference to Section 11.1 as well as Section 11.2 in the ''subject to'' clause at the beginning of the provision.[28] CAT LLC believes this

reference is relevant because Section 11.1 sets forth requirements related to the budget, and the budget is used in calculating CAT Fees.

b. Reserve

Section 11.1(a) of the CAT NMS Plan states that the budget shall include ''the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company.'' In addition, Proposed Section 11.1(a)(i) of the CAT NMS Plan would state that the budgeted CAT costs shall include a reserve. Section 11.1(c) of the CAT NMS Plan states that ''[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.'' CAT LLC proposes to add subparagraph (ii) to Section 11.1(a) of the CAT NMS Plan to provide additional details regarding the size and use of the reserve.

To provide additional clarity regarding the size of the reserve, CAT LLC proposes to add proposed paragraph (ii) to Section 11.1(a) of the CAT NMS Plan to set forth the parameters for the size of the reserve. An analysis of budgeted CAT costs and actual CAT costs for 2020, 2021 and the first nine months of 2022 demonstrates that actual CAT costs were approximately 20% higher than budgeted amounts over this period on a cumulative average basis. Based on the magnitude of historical budget to actual variances as well as the difficulty in accurately predicting various variable CAT costs, CAT LLC believes that a 25% reserve would appear to be reasonable. Accordingly, Proposed Section 11.1(a)(ii) of the CAT NMS Plan would state that ''[f]or the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget.'' CAT LLC also intends to include a reserve in the CAT budget that is reasonably necessary to allow the CAT LLC to maintain a reserve of not more than 25% of the annual budget. Accordingly, CAT LLC proposes to include the term ''reasonably'' in this sentence. Moreover, CAT LLC would calculate the reserve based on the amount of the budget other than the reserve, as the reserve is intended to provide funds for CAT LLC to pay its bills if necessary. Accordingly, Proposed Section 11.1(a)(ii) of the CAT NMS Plan would state that ''[f]or the avoidance of doubt, the calculation of the amount of the reserve would

---

[26] The CAT LLC budgets are available on the CAT website at *https://www.catnmsplan.com/cat-financial-and-operating-budget.*

[27] As highlighted in *Exhibit B,* this proposed revision of Section 11.1(a) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[28] As highlighted in *Exhibit B,* this proposed revision to Section 11.1(b) of the CAT NMS Plan

was not included in the proposed revisions related to the 2022 Funding Proposal.

**Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices **17091**

exclude the amount of the reserve from the budget.'' [29]

CAT LLC also believes that it is reasonable to base the reserve on a percentage of the budget. First, CAT LLC believes that setting the reserve at 25% of the budget is appropriate in light of the timeline for the collection of CAT fees.[30] Many of CAT LLC's bills must be paid on a monthly basis. However, CAT fees will be collected approximately three months after the activity on which a CAT fee is based—that is, 25% of the year. For example, activity in January would be subject to a bill in February, which would be required to be paid within 30 days,[31] which would be in March. Accordingly, the reserve would be available to address the funding needs related to the delay in CAT LLC's receipt of the CAT fees.

Second, CAT LLC has established a number of measures for establishing a reasonable budget for the CAT, thereby providing a reasonable starting point for the reserve calculation. For example, the CAT NMS Plan would require the budget to be ''reasonable.'' [32] The Fee Rate established at the beginning of the year would be adjusted mid-year to address changes in the actual or budgeted costs or changes in the actual or projected executed equivalent share volume. CAT LLC has established a variety of cost management measures, as discussed in detail in Section A.9.bb of this filing, and has and would provide substantial cost transparency as discussed in detail in Section A.9.l of this filing. The CAT fee filings pursuant to section 19(b) of the Exchange Act would provide a description how the budget is reconciled to the collected fees.

CAT LLC proposes to provide additional clarification regarding the collection of the reserve by providing additional information as to how budget surpluses would be treated for purposes of the reserve. CAT LLC proposes to clarify how CAT fees collected in excess of CAT costs, including the reserve, would be used. Specifically, proposed subparagraph (ii) of Section 11.1(a) of the CAT NMS Plan would state that ''[t]o the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus will be used to offset future

fees.'' In addition, CAT LLC further proposes to state in Proposed Section 11.1(a)(ii) of the CAT NMS Plan that ''[f]or the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget).''

The following examples explain the circumstances under which a reserve would be included in the budget:

(1) Suppose that the Operating Committee had approved a budget of $100 million for CAT costs for Year X, and a reserve of $25 million, for a total budget of $125 million for Year X. Suppose that CAT Fees of $125 million were collected during Year X, and that actual CAT costs for Year X were $100 million. Therefore, CAT ended Year X with $25 million in reserve. Suppose further that the Operating Committee had approved a budget of $100 million for CAT costs and a reserve of $25 million, for a total budget of $125 million for Year X+1. Because CAT LLC had collected $25 million in excess of costs for the reserve in Year X, and the excess was not necessary to cover additional costs in Year X, CAT LLC would not include any additional amount in the budget for a reserve for Year X+1. CAT LLC would use the excess fees collected for the reserve.

(2) Suppose that the Operating Committee had approved a budget of $100 million for CAT costs for Year Y, and a reserve of $25 million, for a total budget of $125 million for Year Y. Suppose that CAT Fees of $110 million were collected during Year Y, and that actual CAT costs for Year Y were $100 million. Therefore, CAT ended Year Y with $10 million in reserve. Suppose further that the Operating Committee had approved a budget of $100 million for CAT costs, and a reserve of $25 million, for a total budget of $125 million for Year Y+1. Because CAT LLC had collected $10 million in excess of costs for the reserve in Year Y, and the entire reserve was not necessary to cover additional costs in Year Y, CAT LLC would only need to collect an additional $15 million for the reserve in Year Y+1, not $25 million.

c. Publicly Available Budgets

CAT LLC publicly provides the annual operating budget for the Company as well as updates to the budget that occur during the year.[33]

This publicly available budget information describes in detail the budget for the Company. For example, among other things, the budget provides specific budgeted technology costs (including cloud hosting services, operating fees, CAIS operating fees and change request fees) and general and administrative costs (including legal, consulting, insurance, professional and administration, and public relations). The Company provides such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible to CAT Reporters and others.

3. CAT Fees Related to Prospective CAT Costs

CAT LLC proposes to describe CAT Fees related to Prospective CAT Costs in Section 11.3(a) of the CAT NMS Plan. Proposed Section 11.3(a) of the CAT NMS Plan would describe that the CAT Fees related to Prospective CAT Costs apply to both Participants and Industry Members, the manner of calculating the Fee Rate for CAT Fees, the description of the calculation of the Participant CAT Fees, a description of the calculation of the Industry Member CAT Fees, a description of the fee filings under section 19(b) of the Exchange Act for Industry Member CAT Fees, and details regarding the calculation of the CAT Fees that are available upon request or publicly available. The following describes Proposed Section 11.3(a) of the CAT NMS Plan in detail.

a. Introductory Statement

CAT LLC proposes to revise Section 11.3(a) of the CAT NMS Plan to address CAT Fees related to Prospective CAT Costs for both Participants and Industry Members. Accordingly, CAT LLC proposes to revise the introductory statement in Proposed Section 11.3(a) of the CAT NMS Plan to state that ''[t]he Operating Committee will establish fees (''CAT Fees'') to be payable by Participants and Industry Members with regard to CAT costs not previously paid by the Participants (''Prospective CAT Costs'') as follows:''.

b. Fee Rate for CAT Fees

CAT LLC proposes to describe the timing and method for calculating the Fee Rate for the CAT Fees related to Prospective CAT Costs in Proposed

---

[29] As highlighted in *Exhibit B,* this proposed revision to Section 11.1(a)(ii) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[30] For a discussion of the billing and collection of CAT fees, *see* Section A.7 of this filing.

[31] *See* Sections 3.7(b) and 11.4 of the CAT NMS Plan.

[32] *See* Proposed Section 11.1(a) of the CAT NMS Plan.

[33] To address potential changes related to the CAT during the year, the Operating Committee may adjust the budgeted CAT costs for the year as it reasonably deems appropriate for the prudent operation of the Company. For example, the Operating Committee may determine that an

adjustment to the budget is necessary if actual costs during the year are more or less than the budget, or if unanticipated expenditures are necessary. To the extent that the Operating Committee adjusts the budgeted CAT costs during the year and determines to adjust the Fee Rate, the adjusted budgeted CAT costs would be used in calculating the new Fee Rate for the remaining months of the year.

**17092** **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

Section 11.3(a)(i) of the CAT NMS Plan, and to provide additional detail regarding the Fee Rate in that provision. Proposed Section 11.3(a)(i) of the CAT NMS Plan would state that CAT Fees related to Prospective CAT Costs would be calculated twice a year. Specifically, this proposed provision would state that "[t]he Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows." CAT LLC recognizes the need to align CAT Fees with CAT costs. Requiring the adjustment of the Fee Rate both at the beginning of the year and once mid-year in response to changes in the budgeted or actual costs or projected or actual total executed equivalent share volume during the year would likely lead to the greater alignment of CAT Fees and CAT costs, thereby potentially avoiding the collection of CAT Fees in excess of CAT costs or CAT Fees that are insufficient to cover CAT costs. Accordingly, CAT LLC proposes to require both an annual and a mid-year adjustment of the Fee Rate for the CAT Fee.

### i. General

CAT LLC proposes to provide details regarding the calculation of the Fee Rate for the CAT Fees in Proposed Section 11.3(a)(i) of the CAT NMS Plan. The detail provided in Proposed Section 11.3(a)(i) of the CAT NMS Plan would include a description of the calculation of the Fee Rate at the beginning of the year and during the year, the counting method for executed equivalent shares, the budgeted CAT costs, and the projected total executed equivalent share volume of transactions in Eligible Securities for the relevant period. Each of these aspects of the CAT Fees are discussed in more detail below.

### A. Annual Calculation of Fee Rate

Proposed Section 11.3(a)(i)(A)(I) of the CAT NMS Plan would describe the annual calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged Industry Members calculated using the Fee Rate. This proposed provision also would state that Participants and Industry Members would be required to pay such CAT Fees once the CAT Fees are in effect with regard to Industry Members. Specifically, this proposed provision would state:

For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year. Once the Operating

Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that the annual calculation of CAT Fees would be performed using reasonably budgeted CAT costs and reasonably projected total executed equivalent share volume.[34] Accordingly, CAT LLC proposes to use the term "reasonably" twice in the following sentence: "For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year."

### B. Mid-Year Calculation of Fee Rate

Proposed Section 11.3(a)(i)(A)(II) of the CAT NMS Plan describes the mandatory mid-year calculation of a new Fee Rate. This proposed provision would describe the mid-year calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged Industry Members calculated using the Fee Rate. This proposed provision also would state that Participants and Industry Members would be required to pay such CAT Fees once the CAT Fees are in effect with regard to Industry Members. Specifically, this proposed provision would state:

During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year. Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that CAT Fees would be calculated during the

year using reasonably budgeted CAT costs and reasonably projected total executed equivalent share volume.[35] Accordingly, CAT LLC proposes to use the term "reasonably" twice in the following sentence: "During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year."

### C. Continuing CAT Fee

CAT LLC also proposes to add Section 11.3(a)(i)(A)(III) to the CAT NMS Plan to clarify that CAT Fees related to Prospective CAT Costs do not sunset automatically; such CAT Fees would remain in place until new CAT Fees are in place with a new Fee Rate. The Funding Proposal is designed to collect CAT fees continuously so as to provide uninterrupted revenue to pay CAT bills. Specifically, this proposed provision would state:

For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in this paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with section 19(b) of the Exchange Act.

### D. Commencement of CAT Fee

CAT LLC believes that it would be appropriate to commence the first CAT Fee either at the beginning of the year or during the year (due to, for example, mid-year approval of the CAT Fee by the SEC), whichever is closest to the time that such a CAT Fee could become effective, so as to seek prompt recovery of CAT costs. If the CAT Fee were to commence during the year, the first CAT Fee would be calculated in the same way that a mid-year CAT Fee would be calculated. To clarify this approach, CAT LLC proposes to add Proposed Section 11.3(a)(i)(A)(IV) to the CAT NMS Plan. This provision would state that "[f]or the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the CAT Fee would be calculated as described in paragraph (II) of this Section."

---

[34] As highlighted in *Exhibit B,* this proposed revision to add the term "reasonably" before "projected total executed equivalent share volume" in Proposed Section 11.3(a)(i)(A)(I) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[35] As highlighted in *Exhibit B,* this proposed revision to add the term "reasonably" before "projected total executed equivalent share volume" in Proposed Section 11.3(a)(i)(A)(II) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

ii. Executed Equivalent Shares

CAT LLC proposes to describe in Proposed Section 11.3(a)(i)(B) of the CAT NMS Plan how executed equivalent shares would be counted for purposes of calculating CAT Fees. Under the Funding Proposal, a CAT Fee would be charged with regard to each transaction in Eligible Securities as reported in CAT Data. As set forth in Section 1.1 of the CAT NMS Plan, ''Eligible Securities'' are defined to include all NMS Securities and all OTC Equity Securities. Section 1.1 of the CAT NMS Plan, in turn, defines an ''NMS Security'' as ''any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in Listed Options.'' In addition, Section 1.1 of the CAT NMS Plan defines an ''OTC Equity Security'' as ''any equity security, other than an NMS Security, subject to prompt last sale reporting rules of a registered national securities association and reported to one of such association's equity trade reporting facilities.'' A CAT Fee would be imposed with regard to transactions in Eligible Securities in the CAT Data regardless of whether the trade is executed on an exchange or otherwise than on an exchange.

The Funding Proposal uses the concept of executed equivalent shares as the transactions subject to a CAT Fee involve NMS Stocks, Listed Options and OTC Equity Securities, each of which have different trading characteristics.

*NMS Stocks.* Under the Funding Proposal, each executed share for a transaction in NMS Stocks would be counted as one executed equivalent share. Accordingly, Proposed Section 11.3(a)(i)(B)(I) of the CAT NMS Plan would state that ''[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: (I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share.''

*Listed Options.* Recognizing that Listed Options trade in contracts rather than shares, each executed contract for a transaction in Listed Options will be counted using the contract multiplier applicable to the specific Listed Option in the relevant transaction. Typically, a Listed Option contract represents 100 shares; however, it may also represent another designated number of shares. Accordingly, Proposed Section 11.3(a)(i)(B)(II) of the CAT NMS Plan

would state that ''[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: . . . (II) each executed contract for a transaction in Listed Options will be counted based on the multiplier applicable to the specific Listed Option (*i.e.,* 100 executed equivalent shares or such other applicable multiplier).''

*OTC Equity Securities.* Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating CAT Fees. Many OTC Equity Securities are priced at less than one dollar—and a significant number are priced at less than one penny—per share and low-priced shares tend to trade in larger quantities. Accordingly, a disproportionately large number of shares are involved in transactions involving OTC Equity Securities versus NMS Stocks.[36] Because the Funding Proposal would calculate CAT Fees based on executed share volume, CAT Reporters trading OTC Equity Securities would likely be subject to higher fees than their market activity may warrant. To address this potential concern, the Funding Proposal would count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares. Accordingly, Proposed Section 11.3(a)(i)(B)(III) of the CAT NMS Plan would state that ''[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: . . . (III) each executed share for a transaction in OTC Equity Securities shall be counted as 0.01 executed equivalent share.''

The discount to 1% was selected based on a reasoned analysis of a variety of different metrics for comparing the markets for OTC Equity Securities and NMS Stocks, rather than a simple calculation. For example, using 2021 data, the Operating Committee calculated the following metrics: (1) the ratio of total notional dollar value traded for OTC Equity Securities to OTC Equity Securities and NMS Stocks was 0.051%; (2) the ratio of total trades in OTC Equity Securities to total trades in OTC Equity Securities and NMS Stocks

was 0.90%; and (3) the ratio of average share price per trade of OTC Equity Securities to average share price per trade for OTC Equity Securities and NMS Stocks was 0.065%. In recognition of the fact that these calculations involve averages and for ease of application, the Operating Committee determined to round these metrics to 1%.

In calculating CAT Fees, CAT LLC intends for executed equivalent shares in a transaction in Eligible Securities to be reasonably counted. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the following sentence in Proposed Section 11.3(a)(i)(B) of the CAT NMS Plan: ''For purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows:''.

iii. Budgeted CAT Costs

The calculation of the Fee Rate for CAT Fees related to Prospective CAT Costs requires the determination of the budgeted CAT costs for the year or other relevant period. Proposed Section 11.3(a)(i)(C) of the CAT NMS Plan would describe the budgeted CAT costs for calculating CAT Fees. It would state the following:

The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.

As discussed above, CAT LLC also proposes to provide additional details regarding what is included in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan in proposed paragraphs (i) and (ii) of Section 11.1(a) of the CAT NMS Plan.

Moreover, CAT LLC proposes to clarify that CAT Fees must be calculated using reasonably budgeted CAT costs.[37] Accordingly, CAT proposes to include the terms ''reasonably'' and ''reasonable'' the following sentence: ''The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and

---

[36] For example, based on data from 2021, (1) the average price per executed share of OTC Equity Securities was $0.072 and the average price per executed share for NMS Stocks was $49.51; and (2) the average trade size for OTC Equity Securities was 63,474 and the average trade size for NMS Stocks was 166 shares. Trades in OTC Equity Securities accounted for 77% of the number of all equity shares traded, but only 0.51% of the notional value of all equity shares traded.

[37] As highlighted in *Exhibit B,* this proposed revision to add the term ''reasonable'' before ''fees, cost and expenses'' in Proposed Section 11.3(a)(i)(C) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.''

iv. Projected Total Executed Equivalent Share Volume

The calculation of the Fee Rate for CAT Fees also requires the determination of the projected total executed equivalent share volume of transactions in Eligible Securities for each relevant period. Each year, the Operating Committee would determine this projection based on the total executed equivalent share volume of transactions in Eligible Securities from the prior twelve months. Therefore, Proposed Section 11.3(a)(i)(D) of the CAT NMS Plan would state that ''[t]he Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each relevant period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.'' CAT LLC determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to avoid short term fluctuations while providing data close in time to the upcoming relevant period. In addition, CAT LLC proposes to allow the Operating Committee to base its projection on the prior twelve months, but to use it discretion to analyze the likely volume for the upcoming year. As set forth in Proposed Section 11.3(a)(iii)(B), Participants will be required to provide a description of the calculation of the projection in their fee filings pursuant to section 19(b) of the Exchange Act. Furthermore, CAT LLC intends to calculate the CAT Fees based on a reasonable determination of the projected total executed equivalent share volume of transactions in Eligible Securities. Accordingly, CAT LLC propose to include the term ''reasonably'' in the Proposed Section 11.3(a)(i)(D) of the CAT NMS Plan to indicate that the Operating Committee will ''reasonably determine the projected total executed equivalent share volume.''

c. Participant CAT Fees for Prospective CAT Costs

CAT LLC proposes to describe the Participant CAT Fees related to Prospective CAT Costs in Proposed Section 11.3(a)(ii) of the CAT NMS Plan. Proposed Section 11.3(a)(ii) of the CAT NMS Plan would have two paragraphs

(A) and (B), where paragraph (A) would describe the CAT Fee obligation for Participants and paragraph (B) would clarify that Participants would only be required to pay CAT Fees when Industry Members are required to pay CAT Fees.

i. CAT Fee Obligation of the Participants

CAT LLC proposes to add paragraph (A) to Proposed Section 11.3(a)(ii) of the CAT NMS Plan to describe the CAT Fee obligation of the Participants. Specifically, proposed paragraph (A) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan would state the following:

Each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data. The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate determined pursuant to paragraph (a)(i) of this Section 11.3.

CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the following sentence: ''[t]he CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.''

ii. Effectiveness of Participant CAT Fees

CAT LLC also proposes to include proposed paragraph (B) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan to clarify that Participants would only be required to pay CAT Fees when Industry Members are required to pay CAT Fees. Under the Funding Proposal, CAT Fees are designed to cover 100% of CAT costs by allocating costs between and among Participants and Industry Members. However, the CAT Fees charged to Participants are implemented via a different process than CAT Fees charged to Industry Members. CAT Fees charged to Participants are implemented via an approval of the CAT Fees by the Operating Committee in accordance with the requirements of the CAT NMS Plan. In contrast, CAT Fees charged to Industry Members may only become effective in accordance with the requirements of section 19(b) of the

Exchange Act. Accordingly, proposed paragraph (B) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan would state that ''[e]ach Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with section 19(b) of the Exchange Act.'' CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the phrase ''the Fee Rate reasonably determined'' in this provision.

d. Industry Member CAT Fees for Prospective CAT Costs

CAT LLC proposes to describe the Industry Member CAT Fees related to Prospective CAT Costs in Proposed Section 11.3(a)(iii) of the CAT NMS Plan. Proposed Section 11.3(a)(iii) of the CAT NMS Plan would have three paragraphs, (A), (B) and (C), where paragraph (A) would describe the CAT Fee obligation for Industry Members, paragraph (B) would described the required content of the fee filings required to be filed pursuant to section 19(b) of the Exchange Act regarding the CAT Fees for Industry Members, and paragraph (C) would clarify that Participants would not make CAT fee filings regarding CAT Fees until the Financial Accountability Milestone related to Period 4 as described in Section 11.6 of the CAT NMS Plan has been satisfied.

i. Industry Member CAT Fee Obligation

CAT LLC proposes to describe the CAT Fees related to Prospective CAT Costs that would be charged to Industry Members in Proposed Section 11.3(a)(iii)(A) of the CAT NMS Plan. Accordingly, Proposed Section 11.3(a)(iii)(A) of the CAT NMS Plan would state the following:

Each Industry Member that is the CAT Executing broker for the buyer in a transaction in Eligible Securities (''CAT Executing Broker for the Buyer'' or ''CEBB'') and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities (''CAT Executing Broker for the Seller'' or ''CEBS'') will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data. The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction

by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.

CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the phrase ''the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3'' in this provision.

ii. Fee Filings Under Section 19(b) of the Exchange Act for Industry Member CAT Fees

CAT LLC proposes to describe the information that Participants would be required to include in their fee filings to be made pursuant to section 19(b) of the Exchange and Rule 19b–4 thereunder for Industry Member CAT Fees in proposed paragraph (B) of Proposed Section 11.3(a)(iii) of the CAT NMS Plan.[38] Specifically, such filings would be required to include with regard to the CAT Fee: (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget and the reason for changes in each such line item from the prior CAT Fee filing;[39] (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. This detail would describe how the Fee Rate is calculated, and explain how the budget used in the calculation is reconciled to the collected fees. Such detailed information would provide Industry Members and other

interested parties with a clear understanding of the calculation of the CAT Fees and their relationship to CAT costs.[40]

In addition, CAT LLC proposes to clarify that the budgeted CAT costs described in the fee filings must provide sufficient detail to demonstrate that the CAT budget used in calculating the CAT Fees is reasonable and appropriate. Therefore, CAT LLC proposes to add the following sentence to Proposed Section 11.3(a)(iii)(B) of the CAT NMS Plan: ''The information provided in this Section would be provided with sufficient detail to demonstrate that the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.''

iii. Financial Accountability Milestone

CAT LLC recognizes that the collection of CAT Fees from Industry Members is subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones. Accordingly, CAT LLC proposes to clarify that Participants will not make fee filings pursuant to Section 19(b) of the Exchange Act regarding CAT Fees until the Financial Accountability Milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan has been satisfied. Specifically, CAT LLC proposes to add proposed paragraph (C) to Proposed Section 11.3(a)(iii) to the CAT NMS Plan to address the Financial Accountability Milestone. This provision would state that ''[n]o Participant will make a filing with the SEC pursuant to section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.''

e. CAT Fee Details

CAT LLC proposes to provide Participants and CAT Executing Brokers with details regarding the calculation of their CAT Fees upon request. Specifically, CAT LLC proposes to add Proposed Section 11.3(a)(iv)(A) to the CAT NMS Plan to describe this disclosure. This provision would state that ''[d]etails regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker. At a minimum, such details would include each Participant or CAT Executing Broker's executed equivalent share volume and

corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.''[41] Such information would provide Participants and CAT Executing Brokers with the ability to understand the details regarding the calculation of their CAT Fees.

In addition, CAT LLC proposes to make certain aggregate statistics regarding the CAT Fees publicly available. Specifically, CAT LLC proposes to add Proposed Section 11.3(a)(iv)(B) to the CAT NMS Plan to describe this public disclosure. This provision would state that ''[f]or each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.''[42]

4. Historical CAT Assessment

CAT LLC proposes to describe Historical CAT Assessments related to Historical CAT Costs in Proposed Section 11.3(b) of the CAT NMS Plan. Proposed Section 11.3(b) of the CAT NMS Plan would describe that Historical CAT Assessments apply only to Industry Members (not to Participants), the manner of calculating the Historical Fee Rate for the Historical CAT Assessment, a description of the calculation of the Industry Member CAT Fees, a description of the fee filings under section 19(b) of the Exchange Act for Historical CAT Assessments, and details regarding the calculation of the Historical CAT Assessments that are available upon request or publicly available. The following describes in detail Section 11.3(b) of the CAT NMS Plan.

a. Introductory Statement

CAT LLC proposes to revise Section 11.3(b) of the CAT NMS Plan to address Historical CAT Assessments related to Historical CAT Costs to be charged to Industry Members. Accordingly, CAT LLC proposes to revise the introductory

---

[38] CAT LLC expects the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act with regard to CAT Fees to be filed pursuant to Section 19(b)(3)(A) of the Exchange Act and Rule 19b–f(f)(2) thereunder. In accordance with Section 19(b)(3)(A) of the Exchange Act and Rule 19b–4(f)(2) thereunder, such fee filings would be effective upon filing.

[39] CAT LLC intends to include any other categories as reasonably determined by the Operation Committee. Accordingly, this provision refers to ''such other categories as reasonably determined by the Operating Committee to be included in the budget.''

[40] As a practical matter, the fee filing would provide the exact fee per executed equivalent share to be paid for the CAT Fees, by multiplying the Fee Rate by one-third and describing the relevant number of decimal places for the fee.

[41] As highlighted in *Exhibit B,* this second sentence in Proposed Section 11.3(a)(iv)(A) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[42] As highlighted in *Exhibit B,* Proposed Section 11.3(a)(iv)(B) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

**17096**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

statement in Proposed Section 11.3(b) of the CAT NMS Plan to state that "[t]he Operating Committee will establish one or more fees (each a "Historical CAT Assessment") to be payable by Industry Members with regard to CAT costs previously paid by the Participants ("Past CAT Costs") as follows:".[43] With the reference to "one or more" Historical CAT Fees, this provision also clarifies that there may be one or more Historical CAT Assessments.

b. Calculation of Historical Fee Rate

CAT LLC proposes to provide details regarding the calculation of the Historical CAT Assessment in Proposed Section 11.3(b)(i) of the CAT NMS Plan. These details would include a description of the calculation of the Historical Fee Rate, the counting method for executed equivalent shares, the Historical CAT Costs, the Historical Recovery Period, and the projected total executed equivalent share volume of transactions in Eligible Securities for the Historical Recovery Period.

i. General

Proposed paragraph (a) of Proposed Section 11.3(b)(i) of the CAT NMS Plan would describe the calculation of the Historical Fee Rate for each Historical CAT Assessment and the requirement for Participants to file a fee filing for each Historical CAT Assessment. This proposed provision also would state that Industry Members would be required to pay each Historical CAT Assessment once such Historical CAT Assessment is in effect in accordance with section 19(b) of the Exchange Act. Specifically, this proposed provision would state that:

The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for each Historical CAT Assessment. Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to section 19(b) of the Exchange Act such Historical CAT Assessment to be charged Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in

accordance with section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that the calculation of each Historical Fee Rate would be performed using reasonably projected total executed equivalent share volume.[44] Accordingly, CAT LLC proposes to use the term "reasonably" to the describe "projected total executed equivalent share volume" in this provision.

ii. Executed Equivalent Shares

The Historical CAT Assessment would be calculated based on the same executed equivalent share calculation as CAT Fees related to Prospective CAT Costs. Accordingly, Proposed Section 11.3(b)(i)(B) of the CAT NMS Plan would make it clear that the calculation is the same for both types of fees. Specifically, Proposed Section 11.3(b)(i)(B) of the CAT NMS Plan would state that "[f]or purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3."

iii. Historical CAT Costs

The calculation of the Historical CAT Assessment depends upon the determination of the Historical CAT Costs. Proposed Section 11.3(b)(i)(C) of the CAT NMS Plan would describe the Historical CAT Costs for calculating Historical CAT Assessments. The Operating Committee will reasonably determine the Past CAT Costs sought to be recovered through the Historical CAT Assessment. CAT LLC proposes to make this approach clear in the language of the CAT NMS Plan by adding Proposed Section 11.3(b)(i)(C) of the CAT NMS Plan, which would state that "[t]he Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee."[45]

CAT LLC proposes to further clarify the amount to be collected via the Historical CAT Assessments in Proposed Section 11.3(b)(i)(C) of the

CAT NMS Plan. Specifically, CAT LLC proposes to add the clarifying statement that "[e]ach Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment." This statement reiterates the requirement set forth in Proposed Section 11.3(b)(iii)(A) of the CAT NMS Plan regarding the calculation of the Historical CAT Assessment, which requires the multiplication of the number of executed equivalent shares in the transaction by *one-third* and by the Historical Fee Rate. Each CEBS and CEBB pays one-third, and, therefore, two-thirds of the Historical CAT Costs would be collected from CAT Executing Brokers.

CAT LLC also proposes to add the term "reasonably" to the following sentence in Section 11.1(c) of the CAT NMS Plan before the word "incurred": "In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees) *reasonably* incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT."[46] The addition of the term "reasonably" would require such fees, costs and expenses to be reasonable.

iv. Historical Recovery Period

The calculation of the Historical CAT Assessment also depends upon the determination of the Historical Recovery Period. As the total amount of the Historical CAT Costs have not yet been determined because the CAT fee model has not yet been approved and CAT LLC continues to incur costs, CAT LLC has not determined the specific recovery period for any particular Historical CAT Assessment. Based on CAT costs incurred to date, however, CAT LLC believes that the Historical Recovery Period should not be less than 24 months or more than five years. In analyzing the potential Historical Recovery Periods, CAT LLC sought to weigh the need for a reasonable Historical Fee Rate that spreads the Historical CAT Costs over an appropriate amount of time and the need to repay the loan notes to the Participants in a timely fashion. CAT LLC analyzed potential recovery periods using the Historical CAT Costs through 2022 and the total executed equivalent

---

[43] Note that there may be one or more Historical CAT Assessments, depending upon the timing of any approval of the amendment to the CAT NMS Plan and the completion of the Financial Accountability Milestones. For a discussion of the Financial Accountability Milestones, *see* Section 11.6 of the CAT NMS Plan.

[44] As highlighted in *Exhibit B,* this proposed revision to add the term "reasonably" before "projected total executed equivalent share volume" in Proposed Section 11.3(b)(i)(A) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[45] As highlighted in *Exhibit B,* this proposed revision to add the term "reasonably" before "excluded" in Proposed Section 11.3(b)(i)(C) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[46] As highlighted in *Exhibit B,* this proposed revision to Section 11.1(c) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

share volume of transactions in Eligible Securities for 2021 to calculate the projected total executed equivalent share volume of transactions. Based on the variables in this analysis, CAT LLC determined that the Historical Fee Rate calculated using a Historical Recovery Period of two to five years would establish a reasonable Historical Fee Rate even if Industry Members were required to pay a Historical CAT Assessment and the ongoing CAT Fee at the same time. CAT LLC notes, however, that the actual Historical CAT Assessment would be calculated using up-to-date Historical CAT Costs and executed equivalent share volume.

Proposed Section 11.3(b)(i)(D)(I) of the CAT NMS Plan would describe the Historical Recovery Period used in calculating the Historical Fee Rate. This proposed provision would state that "[t]he length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment." [47] This proposed provision, however, would state that "no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years." As discussed below, the Historical Recovery Period is used to calculate the Historical Fee Rate. The actual recovery period may be longer or shorter than the Historical Recovery Period depending on the actual executed equivalent share volumes during the time that the Historical CAT Assessment is in effect. Any Historical CAT Assessment would remain in effect until the relevant Historical CAT Costs are recovered, whether that time is shorter or longer than the Historical Recovery Period used in calculating the Historical Fee Rate.

Proposed Section 11.3(b)(i)(D)(II) of the CAT NMS Plan would describe the length of the time that the Historical CAT Assessment would be in effect, which may be greater than or less than the Historical Recovery Period, depending on the amount of the Historical CAT Assessments collected based on the actual volume during the time that the Historical Assessment is in effect. Any Historical CAT Assessment would remain in effect until the relevant Historical CAT Costs are collected, whether that time is shorter or longer than the Historical Recovery Period used in calculating the Historical Fee

Rate. Accordingly, this provision states that "[n]otwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected."

### v. Projected Total Executed Equivalent Share Volume

The Historical Fee Rate for a Historical CAT Assessment would be calculated by using the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for such Historical CAT Assessment. CAT LLC proposes to clarify the manner of calculating the projected total executed equivalent share volume for each Historical CAT Assessment in Proposed Section 11.3(b)(i)(E) to the CAT NMS Plan. CAT LLC proposes to state in this provision that the projection will be determined based on transactions in Eligible Securities for the prior twelve months. Accordingly, Proposed Section 11.3(b)(i)(E) of the CAT NMS Plan would state that "[t]he Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months." As with the calculation of the projections for CAT Fees, CAT LLC determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to avoid short term fluctuations while providing data close in time to the upcoming relevant period. In addition, CAT LLC proposes to allow the Operating Committee to base its projection on the prior twelve months, but to use its discretion to analyze the likely volume for the upcoming year. As set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan, Participants will be required to provide a description of the calculation of the projection in their fee filings pursuant to section 19(b) of the Exchange Act for Historical CAT Assessments. As noted, this provision would require the Operating Committee to "reasonably" determine the projected total executed equivalent share volume.

### c. Past CAT Costs and Participants

Proposed Section 11.3(b)(ii) of the CAT NMS Plan would clarify that the Participants would not be required to pay the Historical CAT Assessment as

the Participants previously have paid all Past CAT Costs. It would state that, "[b]ecause Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment." In addition, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would clarify that the Historical CAT fees collected from Industry Members would be allocated to Participants for repayment of the outstanding loan notes of the Participants to the Company on a pro rata basis; such fees would not be allocated to Participants based on the executed equivalent share volume of transactions in Eligible Securities. Specifically, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would state that "[i]n lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans." Furthermore, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would emphasize that "[t]he Historical CAT Assessment is designed to recover two-thirds of the Historical CAT Costs." [48]

### d. Historical CAT Assessment for Industry Members

CAT LLC proposes to describe the Historical CAT Assessment for Industry Members in Proposed Section 11.3(b)(iii) of the CAT NMS Plan. Proposed Section 11.3(b)(iii) of the CAT NMS Plan would have two paragraphs, (A) and (B), where paragraph (A) would describe the Historical CAT Assessment for Industry Member, and paragraph (B) would describe the fee filings required to be filed pursuant to section 19(b) of the Exchange Act regarding the Historical CAT Assessments.

---

[47] This provision would require that the Historical Recovery Period be "reasonably" established by the Operating Committee.

[48] As highlighted in *Exhibit B,* the sentence "In lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans" has been revised from the 2022 Funding Proposal. CAT LLC proposes to revise the phrase "cancellation of the loans made by the Company" to "cancellation of the loans made to the Company" as the loans were made to the Company, not by the Company. In addition, CAT LLC proposes to revise the sentence to clarify that Participants will remain responsible via the loan cancellations for one-third of Historical CAT Costs as well as 100% of certain other Past CAT Costs (*e.g.,* the Excluded Costs discussed below).

**17098**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

i. Industry Member Obligation for Historical CAT Assessment

CAT LLC proposes to describe the Historical CAT Assessment charged to Industry Members in Proposed Section 11.3(b)(iii)(A) of the CAT NMS Plan. Specifically, this proposed paragraph would state that:

Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.

As noted, this provision would require the Operating Committee to ''reasonably'' determine the Historical Fee Rate pursuant to Proposed Section 11.3(b)(i) of the CAT NMS Plan.

ii. Historical CAT Assessment Fee Filings

CAT LLC proposes to provide additional details regarding the fee filings to be filed by the Participants regarding each Historical CAT Assessment pursuant to section 19(b) of the Exchange Act in Proposed Section 11.3(b)(iii)(B) of the CAT NMS Plan.[49] Specifically, this provision would describe that fee filings would be required for each Historical CAT Assessment, the content of such fee filings, and the effect of the Financial Accountability Milestones described in Section 11.6 of the CAT NMS Plan on the fee filings.

A. Number of Fee Filings for Historical CAT Assessments

CAT LLC proposes to clarify how many fee filings pursuant to section 19(b) of the Exchange Act Participants would be required to make with regard to Historical CAT Assessments. CAT LLC proposes to clarify that each Participant will be required to file a fee filing pursuant to section 19(b) of the Exchange Act to describe each Historical CAT Assessment. Accordingly, CAT LLC proposes to describe this requirement in Proposed Section 11.3(b)(iii)(B)(I) of the CAT NMS Plan, which would state that ''Participants will be required to file

with the SEC pursuant to section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.''

B. Content of Fee Filings for Historical CAT Assessments

CAT LLC proposes to provide additional detail as to the information that Participants would be required to include in their fee filings to be made pursuant to section 19(b) of the Exchange and Rule 19b–4(f)(2) for Historical CAT Assessments in proposed paragraph (b)(iii)(B)(II) of Proposed Section 11.3 of the CAT NMS Plan. The proposed paragraph sets forth the information about the Historical CAT Assessments that should be included in the fee filings required to be made by the Participants pursuant to section 19(b) of the Exchange Act. Specifically, such filings would be required to include: (A) the Historical Fee Rate; (B) a brief description of the amount and type of Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. Such detailed information would provide Industry Members and other interested parties with a clear understanding of the calculation of each Historical CAT Assessment and its relationship to Historical CAT Costs.[50]

In addition, CAT LLC proposes to clarify that the Historical CAT Costs described in the fee filings must provide sufficient detail to demonstrate that such costs are reasonable and appropriate. Therefore, CAT LLC proposes to add the following sentence to Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan: ''The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.''

C. Financial Accountability Milestones

CAT LLC recognizes that the collection of Historical CAT Assessments from Industry Members is

subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones. Accordingly, CAT LLC proposes to clarify that Participants will not make CAT fee filings pursuant to section 19(b) of the Exchange Act regarding a Historical CAT Assessment until any applicable Financial Accountability Milestone has been satisfied. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iii)(B)(III) to the CAT NMS Plan. This provision would state that ''[n]o Participant will make a filing with the SEC pursuant to section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.''

e. Historical CAT Assessment Details

CAT LLC proposes to provide CAT Executing Brokers with details regarding the calculation of their Historical CAT Assessments upon request. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iv)(A) to the CAT NMS Plan, which would state that ''[d]etails regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.''[51] Such information would provide CAT Executing Brokers with the ability to understand the details regarding the calculation of their Historical CAT Assessments.

In addition, CAT LLC proposes to make certain aggregate statistics regarding Historical CAT Assessments publicly available. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iv)(B) to the CAT NMS Plan. This provision would state that ''[f]or each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side

---

[49] CAT LLC expects the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act with regard to Historical CAT Assessments to be filed pursuant to Section 19(b)(3)(A) of the Exchange Act. In accordance with Section 19(b)(3)(A) of the Exchange Act, fee filings made pursuant to Section 19(b)(3)(A) of the Exchange Act would be effective upon filing.

[50] As a practical matter, the fee filing would provide the exact fee per executed equivalent share to be paid for the Historical CAT Assessment, by multiplying the Historical Fee Rate by one-third and describing the relevant number of decimal places for the fee.

[51] As highlighted in *Exhibit B*, the second sentence of Proposed Section 11.3(b)(iv)(A) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

transactions and sell-side transactions.'' [52]

### 5. CAT Fee Schedule for Participants

To implement the Participant CAT fees, CAT LLC proposes to add a fee schedule, entitled ''Consolidated Audit Trail Funding Fees,'' to Appendix B of the CAT NMS Plan. Proposed paragraph (a) of the fee schedule would describe the CAT Fees to be paid by the Participants under the Funding Proposal. Specifically, paragraph (a) of the Participant fee schedule would state that ''[e]ach Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.''

### 6. Additional Changes From Original Funding Model

CAT LLC proposes certain revisions to Article XI of the CAT NMS Plan to implement the Funding Proposal. CAT LLC proposes to make the following changes to the CAT NMS Plan in addition to the proposed changes to the CAT NMS Plan discussed above.

### a. Elimination of Definition of ''Execution Venue''

Section 1.1 of the CAT NMS Plan defines the term ''Execution Venue'' to mean ''a Participant or an alternative trading system ('ATS') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).'' Currently, the term ''Execution Venue'' is used in Sections 11.2 and 11.3 of the CAT NMS Plan to describe how CAT costs would be allocated among CAT Reporters under the Original Funding Model. The Original Funding Model would have imposed fees based on market share to CAT Reporters that are Execution Venues, including ATSs, and fees based on message traffic for Industry Members' non-ATS activities. In contrast, the Funding Proposal would impose fees based on the executed equivalent shares of transactions in Eligible Securities for three categories of CAT Reporters: Participants, CEBBs and CEBSs. Accordingly, as the concept for an ''Execution Venue'' would not be relevant for the Funding Proposal, CAT LLC proposes to delete this term and its definition from Section 1.1 of the CAT NMS Plan.

### b. Use of Executed Equivalent Share Volume Under Funding Proposal

The Original Funding Model set forth in the CAT NMS Plan requires Participants and Execution Venue ATSs to pay CAT fees based on market share and Industry Members (other than Execution Venue ATSs) to pay CAT fees based on message traffic. The CAT NMS Plan also describes how the market share-based fee would be calculated for Participants and other Execution Venue ATSs and how the message traffic-based fee would be calculated for Industry Members (other than Execution Venue ATSs). CAT LLC proposes to amend the CAT NMS Plan to require Participants, CEBBs and CEBSs to pay CAT fees based on the number of executed equivalent shares in a transaction in Eligible Securities, rather than based on market share and message traffic. Accordingly, the Operating Committee proposes to amend Section 11.2(b) and (c) and Section 11.3(a) and (b) of the CAT NMS Plan to reflect the proposed use of the number of executed equivalent shares in transactions in Eligible Securities in calculating CAT fees.

Section 11.2(b) of the CAT NMS Plan states that ''[i]n establishing the funding of the Company, the Operating Committee shall seek . . . (b) to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT and distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations.'' CAT LLC proposes to delete the requirement to take into account ''distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations.'' This requirement related to using message traffic and market share in the calculation of CAT fees, as message traffic and market share were metrics related to the impact of a CAT Reporter on the Company's resources and operations. With the proposed move to the use of the executed equivalent shares metric instead of message traffic and market share, the requirement is no longer relevant.

Section 11.2(c) of the CAT NMS Plan states that ''[i]n establishing the funding of the Company, the Operating Committee shall seek . . . (c) to establish a tiered fee structure in which the fees charged to: (i) CAT Reporters that are Execution Venues, including

ATSs, are based upon the level of market share; (ii) Industry Members' non-ATS activities are based upon message traffic.'' CAT LLC proposes to delete subparagraphs (i) and (ii) and replace these subparagraphs with the requirement that the fee structure in which the fees charged to ''Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities.'' [53]

In addition, CAT LLC proposes to amend the CAT funding principles to clarify that CAT Fees and the Historical CAT Assessments are intended to be cost-based fees—that is, the fees are designed to recover the cost of the creation, implementation and operation of the CAT. CAT LLC proposes to amend the funding principle set forth in Section 11.2(c) by making a specific reference to the costs of the CAT. With this proposed change, Proposed Section 11.2(c) would state that ''[i]n establishing the funding of the Company, the Operating Committee shall seek: . . . to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT.''

Section 11.3(a) of the CAT NMS Plan provides additional detail regarding the market share-based fees to be paid by Participants and Execution Venue ATSs under the Original Funding Model. Specifically, Section 11.3(a) of the CAT NMS Plan states:

(a) The Operating Committee will establish fixed fees to be payable by Execution Venues as provided in this Section 11.3(a):

(i) Each Execution Venue that: (A) executes transactions; or (B) in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange, in NMS Stocks or OTC Equity Securities will pay a fixed fee depending on the market share of that Execution Venue in NMS Stocks and OTC Equity Securities, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share. For these purposes, market share for Execution Venues that execute transactions will be calculated by share volume, and market share for a national securities association that has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities will be calculated based on share volume of trades reported, provided, however, that the share volume reported to such national securities association by an Execution Venue shall not

---

[52] As highlighted in *Exhibit B*, Section 11.3(b)(iv)(B) of the CAT NMS Plan was not included in the proposed revisions related to the 2022 Funding Proposal.

[53] As discussed in the next section, the Operating Committee also proposes to delete the reference to a ''tiered'' fee structure.

**17100**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

be included in the calculation of such national security association's market share.

(ii) Each Execution Venue that executes transactions in Listed Options will pay a fixed fee depending on the Listed Options market share of that Execution Venue, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share. For these purposes, market share will be calculated by contract volume.

CAT LLC proposes to delete Section 11.3(a) of the CAT NMS Plan and replace this paragraph with a description of the CAT Fees related to Prospective CAT Costs, as described above.

Section 11.3(b) of the CAT NMS Plan provides additional detail regarding the message traffic-based CAT fees to be paid by Industry Members (other than Execution Venue ATSs) under the Original Funding Model. Specifically, Section 11.3(b) of the CAT NMS Plan states:

The Operating Committee will establish fixed fees to be payable by Industry Members, based on the message traffic generated by such Industry Member, with the Operating Committee establishing at least five and no more than nine tiers of fixed fees, based on message traffic. For the avoidance of doubt, the fixed fees payable by Industry Members pursuant to this paragraph shall, in addition to any other applicable message traffic, include message traffic generated by: (i) an ATS that does not execute orders that is sponsored by such Industry Member; and (ii) routing orders to and from any ATS sponsored by such Industry Member.

CAT LLC proposes to delete Section 11.3(b) of the CAT NMS Plan and replace this paragraph with a description of the Historical CAT Assessments, as described above.

c. Elimination of Tiered Fees

CAT LLC proposes to eliminate the use of tiered fees that were included in the Original Funding Model. Instead, under the Funding Proposal, each Participant, CEBB or CEBS would pay a fee based solely on its transactions in Eligible Securities. The Operating Committee therefore proposes to amend Sections 11.1(d), 11.2(c), 11.3(a) and 11.3(b) of the CAT NMS Plan to eliminate tiered fees and related concepts.

Utilizing a tiered fee structure, by its nature, would create certain inequities among the CAT fees paid by CAT Reporters. For example, two CAT Reporters with comparable executed equivalent share volume may pay notably different fees if one falls in a higher tier and the other falls within a lower tier. Correspondingly, a tiered fee structure generally would reduce fees

for CAT Reporters with higher executed share volume in one tier, while increasing fees for Industry Members with lower executed share volume in the same tier, as compared to a non-tiered fee. Furthermore, CAT Reporters in lower tiers potentially pay more than they would without the use of tiers. While tiering appropriately exists in various other self-regulatory fee programs, CAT LLC proposes to eliminate the tiering concept for the Funding Proposal.

By charging each Participant, CEBB and CEBS a CAT fee directly based on its own executed equivalent share volume, rather than charging a tiered fee, the Funding Proposal would result in a CAT fee being tied more directly to the CAT Reporter's executed share volume. In contrast, with a tiered fee, CAT Reporters with different levels of executed equivalent share volume that are placed in the same tier would all pay the same CAT fee, thereby limiting the correlation between a CAT Reporter's activity and its CAT fee.

The proposed non-tiering approach is simpler and more objective to administer than the tiering approach. With a tiering approach, the number of tiers for Participants, CEBBs and CEBSs, the boundaries for each tier and the fees assigned to each tier must be established. In the absence of clear groupings of CAT Reporters, selecting the number of, boundaries for, and the fees associated with each tier would be subject to some level of subjectivity. Furthermore, the establishment of tiers would need to be continually reassessed based on changes in the executed equivalent share volume of transactions in Eligible Securities, thereby requiring regular subjective assessments. Accordingly, the removal of tiering from the Funding Proposal eliminates a variety of subjective analyses and judgments from the model and simplifies the determination of CAT fees.

Section 11.1(d) of the CAT NMS Plan states that "[c]onsistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, assignment of tiers, resolution of disputes, billing and collection of fees, and other related matters." With the elimination of tiered fees, the reference to the "assignment of tiers" would no longer be relevant for the Funding Proposal. Therefore, CAT LLC proposes to delete the reference to "assignment of tiers" from Section 11.1(d).

Section 11.1(d) of the CAT NMS Plan also states that:

For the avoidance of doubt, as part of its regular review of fees for the CAT, the Operating Committee shall have the right to change the tier assigned to any particular Person in accordance with fee schedules previously filed with the Commission that are reasonable, equitable and not unfairly discriminatory and subject to public notice and comment, pursuant to this Article XI. Any such changes will be effective upon reasonable notice to such Person.

As noted above, unlike the Original Funding Model, the Funding Proposal would not utilize tiered fees. Accordingly, these two sentences would not be applicable to the Funding Proposal. Therefore, CAT LLC proposes to delete these two sentences from Section 11.1(d) of the CAT NMS Plan.

CAT LLC proposes to delete reference to "tiered" fees from Section 11.2(c) of the CAT NMS Plan. Section 11.2(c) of the CAT NMS Plan states that "[i]n establishing the funding of the Company, the Operating Committee shall seek: . . . (c) to establish a tiered fee structure . . ." CAT LLC propose to delete the word "tiered" from this provision as the CAT fees would not be tiered under the Funding Proposal.

CAT LLC also proposes to delete paragraph (iii) of Section 11.2(c) of the CAT NMS Plan. Paragraph (iii) of Section 11.2(c) of the CAT NMS Plan states that the Operating Committee shall seek to establish a tiered fee structure in which fees charged to:

the CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) be generally comparable (where for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members).

Under the Original Funding Model, the comparability provision was an important factor in determining the tiers for Industry Members and Execution Venues. In determining the tiers, the Operating Committee sought to establish comparable fees among the CAT Reporters with the most Reportable Events.[54] Under the Funding Proposal, however, the comparability provision is no longer necessary, as a tiered fee structure would not be used for Industry Members or Participants.

As discussed above, the Operating Committee proposes to replace the language in Sections 11.3(a) and (b) of the CAT NMS Plan with language implementing the Funding Proposal. These proposed changes would remove the references to tiers in Sections 11.3(a)(i) and (ii) and 11.3(b) of the CAT

[54] See, e.g., Securities Exchange Act Rel. No. 82451 (Jan. 5, 2018), 83 FR 1399, 1406–07 (Jan. 11, 2018) ("2018 Fee Proposal Release").

NMS Plan, along with the other proposed changes. Specifically, Section 11.3(a)(i) of the CAT NMS Plan states that the Operating Committee, when establishing fees for Execution Venues for NMS Stocks and OTC Equity Securities, will establish ''at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share.'' Similarly, Section 11.3(a)(ii) of the CAT NMS Plan states that the Operating Committee, when establishing fees for Execution Venues that execute transactions in Listed Options, will establish ''at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share.'' Section 11.3(b) of the CAT NMS Plan states that the Operating Committee, when establishing fees to be payable by Industry Members, will establish ''at least five and no more than nine tiers of fixed fees, based on message traffic.'' CAT LLC proposes to delete each of these references to tiers from the CAT NMS Plan.

d. No Fixed Fees

As discussed above, CAT LLC proposes to replace the language in Sections 11.3(a) and (b) of the CAT NMS Plan with language implementing the Funding Proposal. These proposed changes also would remove the references to ''fixed fees'' in Sections 11.3(a), 11.3(a)(i), 11.3(a)(ii) and 11.3(b) and replaced them with references to ''fees.'' Under the Funding Proposal, the CAT fees to be paid by Participants, CEBBs and CEBSs will vary in accordance with their executed equivalent share volume of transactions in Eligible Securities, although the Fee Rate will be fixed for a relevant period. Therefore, the concept of a fixed fee— that is, a fee that does not vary depending on circumstances—is not relevant under the Funding Proposal.

7. Billing and Collection of CAT Fees

Consistent with Section 11.1(d) of the CAT NMS Plan, CAT LLC will adopt policies, procedures and practices regarding the billing and collection of fees. In addition, pursuant to Section 11.4 of the CAT NMS Plan, CAT LLC will establish a system for the collection of CAT fees from Participants and Industry Members. As set forth in Section 11.4 of the CAT NMS Plan, each Participant would be required to pay its CAT fees authorized under the CAT NMS Plan as required by Section 3.7(b) of the CAT NMS Plan.[55] Section 3.7(b)

of the CAT NMS Plan provides the following:

Each Participant shall pay all fees or other amounts required to be paid under this Agreement within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated) (the ''Payment Date''). The Participant shall pay interest on the outstanding balance from the Payment Date until such fee or amount is paid at a per annum rate equal to the lesser of: (i) the Prime Rate plus 300 basis points; or (ii) the maximum rate permitted by applicable law. If any such remaining outstanding balance is not paid within thirty (30) days after the Payment Date, the Participants shall file an amendment to this Agreement requesting the termination of the participation in the Company of such Participant, and its right to any Company Interest, with the SEC. Such amendment shall be effective only when it is approved by the SEC in accordance with SEC Rule 608 or otherwise becomes effective pursuant to SEC Rule 608.

Section 11.4 of the CAT NMS Plan also addresses the payment of CAT fees by Industry Members. Section 11.4 of the CAT NMS Plan states:

Participants shall require each Industry Member to pay all applicable fees authorized under this Article XI within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated). If an Industry Member fails to pay any such fee when due (as determined in accordance with the preceding sentence), such Industry Member shall pay interest on the outstanding balance from such due date until such fee is paid at a per annum rate equal to the lesser of: (a) the Prime Rate plus 300 basis points; or (b) the maximum rate permitted by applicable law.

8. Illustrative Example of the Funding Proposal

CAT LLC has prepared an example of how a Historical CAT Assessment would be calculated pursuant to the Funding Proposal for illustrative purposes only. The illustrative example is set forth in *Exhibit C* to this filing. Note that the calculation of any actual Historical CAT Assessment for Historical CAT Costs would differ from this example in various ways, as described in more detail in *Exhibit C.*

9. Advantages of and Support for the Funding Proposal

CAT LLC proposes to adopt the Funding Proposal as it provides a variety of advantages over the Original

Funding Model. CAT LLC discusses these advantages in this section of the filing.

a. Comparable to Existing Fee Precedent

The Funding Proposal would operate in a manner similar to other funding models employed by the SEC and the Participants, including the SEC's Section 31 fees, FINRA's trading activity fee (''FINRA TAF'') and the options regulatory fee (''ORF'') utilized by options exchanges. The SEC previously has determined that the Participants' sales value fees related to Section 31, the FINRA TAF and the ORF are consistent with the Exchange Act.

i. Section 31 Fees

Pursuant to section 31 of the Exchange Act, a national securities exchange must pay the Commission a fee based on the aggregate dollar amount of sales of securities transacted on the exchange, and a national securities association must pay the Commission a fee based on the aggregate dollar amount of sales of securities transacted by or through any member of the association otherwise than on a national securities exchange (collectively, ''covered sales''). The SEC calculates the amount of section 31 fees due from each exchange or FINRA by multiplying the aggregate dollar amount of its covered sales by the fee rate set by the Commission in a procedure set forth in section 31(j) of the Exchange Act. These fees are designed to recover the costs related to the government's supervision and regulation of the securities markets and securities professionals. Section 31 requires the SEC to make annual and, in some cases, mid-year adjustments to the fee rate. These adjustments are necessary to make the SEC's total collection of transaction fees in a given year as close as possible to the amount of the regular appropriation to the Commission by Congress for that fiscal year.

To recover the costs of their section 31 fee obligations, each of the national securities exchanges and FINRA have adopted, and the SEC has approved, rules assessing a regulatory transaction fee on their members, the amount of which is set in accordance with section 31 of the Exchange Act.[56] Broker-dealers, in turn, often impose fees on their customers that provide the funds to pay the fees owed to the exchanges and FINRA.

Like the well-known, longstanding and accepted section 31-related fee model, the Funding Proposal would use

---

[55] Participants and CAT Executing Brokers would be responsible for a fee each month in which they

are a CAT Reporter. If a Participant or CAT Executing Broker ceases to the meet the definition of a CAT Reporter during a month, the Participant or CAT Executing Broker would still be responsible for CAT fees associated with its transactions during that month.

[56] *See, e.g.,* Section 3 of Schedule A of FINRA's By-Laws.

**17102**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

a predetermined fee rate for the calculation of the fees, seek to recover designated regulatory costs (as CAT provides a solely regulatory function), and allow for the adjustment of the fee rate during the year to seek to match regulatory costs with fees collected. The Funding Proposal, however, would impose fees based on executed equivalent share volume rather than the sales values of certain transactions. Despite the different calculation metric, the Funding Proposal is similar to a model well known, long accepted and justified under the Exchange Act the purpose of which is also to cover costs associated with the regulation of securities markets and securities professionals.

ii. FINRA Trading Activity Fee

The transaction-based fees charged under the Funding Proposal also would be similar to FINRA's transaction-based trading activity fee,[57] which was modeled on the Commission's section 31 fee.[58] Although the FINRA TAF is designed to cover a subset of the costs of FINRA services (*e.g.,* costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities) rather than all of FINRA's costs like the CAT, the transaction-based calculation of the FINRA TAF and the proposed CAT fees are similar. With the FINRA TAF, FINRA members on the sell-side of a transaction are required to pay a per share fee for each sale of covered securities, which includes exchange registered securities, equity securities traded otherwise than on an exchange, security futures, TRACE-Eligible Securities and municipal securities, subject to certain exceptions. In approving the FINRA TAF, the SEC stated that the implementation of the FINRA TAF ''is consistent with section 15A(b)(5) of the Act, in that the proposal is reasonably designed to recover NASD costs related to regulation and oversight of its members.'' [59] The SEC further stated that ''[t]he Commission recognizes the difficulties inherent in restructuring the NASD's regulatory fees, and believes that the NASD has done so in a manner that is fair and reasonable.'' [60] The CAT fees calculated under the Funding Proposal would be similar to the FINRA TAF in that they

would be transaction-based fees intended to provide funding for regulatory costs.

iii. Options Regulatory Fee

The fees charged under the Funding Proposal also would be similar to the ORF charged by the options exchanges.[61] The ORF is a per contract fee charged by an options exchange for certain options transactions to options members of the relevant exchange. The ORF is collected indirectly from exchange members through their clearing firms by the Options Clearing Corporation on behalf of the Exchange. Revenue generated from the ORF is designed to recover a material portion of an options exchange's regulatory costs related to the supervision and regulation of its members' options business, including performing routine surveillance, investigations, examinations and financial monitoring as well as policy, rulemaking, interpretive, and enforcement activities. Exchange members generally pass-through the ORF to their customers in the same manner that firms pass-through to their customers the fees charged by self-regulatory organizations (''SROs'') to help the SROs meet their obligations under section 31 of the Exchange Act.[62] The CAT fees calculated under the Funding Proposal would be similar to the ORF in that they would be transaction-based fees intended to provide funding for regulatory costs.

b. Fee Metric: Executed Equivalent Share Volume

CAT LLC proposes to use the executed equivalent share volume of transactions in Eligible Securities as the means for allocating CAT costs among Participants and Industry Members. The use of executed equivalent share volume would replace the use of message traffic for allocating costs among Industry Members and the use of market share for allocating costs among Participants as set forth in the Original Funding Model. The use of executed equivalent share volume is a reasonable and equitable method for allocating costs for a variety of reasons, and CAT LLC believes it improves upon the use of message traffic.

The proposed use of CAT-reported message traffic as set forth in the Original Funding Model raised a variety of issues for allocating CAT costs. First, based on a subsequent study of cost

drivers for the CAT, it was determined that message traffic may be a factor in the CAT costs, but it is not the primary factor. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (*e.g.,* linker) and storage costs.[63] The data processing and storage costs are related to the level of message traffic, but such costs also relate to other factors. The data processing and storage costs also are directly related to the complexity of the reporting requirements for the market activity. For example, in light of the complexity of market activity, the CAT's order reporting and linkage scenarios document for Industry Members is over 800 pages in length, addressing nearly 200 scenarios.[64] The processing and storage of such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs. The data processing and storage costs also are driven by the stringent performance, timelines and operational requirements for processing CAT Data. For example, the CAT NMS Plan requires that CAT order events be processed within established timeframes to ensure data can be made available to Participants' regulatory staff and the SEC in a timely manner. Accordingly, a CAT Reporter's message traffic may be a factor, but not a primary factor, in terms of the costs of the CAT.

Second, in general, Industry Member revenue, including revenue derived from fees Industry Members charge their clients, is often driven by transactions. Because message traffic is separate from whether or not a transaction occurs, fees based on message traffic may not correlate with common revenue or fee models. As a result, CAT fees based on message traffic could impose an outsized adverse financial impact on certain Industry Members.

Third, imposing CAT fees on each CAT Reporter based on its message traffic may have an adverse effect on competition, liquidity or other aspects of market structure, and may increase model complexity. For example, the number of messages for any given order, whether or not ultimately executed, could vary depending on how a given order is processed, leading to a lack of predictability on the applicable cost to

---

[57] Section 1 of Schedule A of FINRA's By-Laws.

[58] *See* Securities Exchange Act Rel. No. 46416 (Aug. 23, 2002), 67 FR 55901 (Aug. 30, 2002).

[59] Securities Exchange Act Rel. No. 47946 (May 30, 2003), 68 FR 34021, 34023 (June 6, 2003) (''TAF Release'').

[60] *Id.*

[61] *See, e.g.,* Cboe Fee Schedule, MIAX Fee Schedule, and NYSE Arca Fee Schedule.

[62] *See, e.g.,* Securities Exchange Act Rel. No. 58817 (Oct. 20, 2008), 73 FR 63744, 63745 (Oct. 27, 2008).

[63] For a detailed discussion of cost drivers of the CAT, *see* CAT LLC Webinar, CAT Costs (Sept. 21, 2021), *https://www.catnmsplan.com/events/cat-costs-september-21-2021.*

[64] CAT Industry Member Reporting Scenarios, Version 4.10 (Oct. 21, 2022), *https://www.catnmsplan.com/sites/default/files/2022-10/10.21.22_Industry_Member_Tech_Specs_Reporting_Scenarios_v4.10_CLEAN.pdf.*

process any given order or executions for broker-dealers or non-broker-dealer customers.[65] As one example, discussed in the context of the previously proposed funding models,[66] market makers in Eligible Securities may have very high levels of message traffic due to their quoting obligations. Such high levels of message traffic may lead to outsized fees for market makers in comparison to their transaction activity, thereby placing an excessive financial burden on market makers. This, in turn, may lead to a decrease in the number of market makers, resulting in a decrease in liquidity and a reduction in market quality. To address this effect on market makers, CAT LLC proposed to discount the fees that market makers would need to pay. However, such a discount adds complexity to the message traffic approach, as the model must determine when a discount is necessary and how much the discount should be.

The use of executed equivalent share volume to allocate CAT costs addresses each of these concerns. The fees are not divorced from transactions, the traditional source of revenue for Industry Members; fees based on executed equivalent share volume would not adversely impact certain market participants to the detriment of the markets, and the model is simple to understand and implement. Moreover, in addition to these benefits, the executed equivalent share volume is related to, but not precisely linked to, the CAT Reporter's burden on the CAT. In light of the many inter-related cost drivers of the CAT (*e.g.,* storage, message traffic, processing), determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. Accordingly, CAT LLC has determined that trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters. This conclusion is consistent with the SEC's prior recognition of the use of transaction volume in setting regulatory fees. For example, in approving the FINRA TAF, the SEC recognized that transaction volume was closely enough connected to FINRA's regulatory responsibilities to satisfy the statutory standard in the Exchange Act.[67]

c. CAT Executing Brokers

i. Charging CAT Executing Brokers

CAT LLC proposes to charge CAT fees to CAT Executing Brokers. CAT LLC believes that such an approach is consistent with the requirements of the Exchange Act for a variety of reasons, including the following reasons.

First, the proposal to charge executing brokers is broadly supported by the industry.[68] For example, SIFMA has supported charging executing brokers, and continues to support charging executing brokers, rather than clearing brokers.[69] In one of its comment letters on the 2022 Funding Proposal, SIFMA stated that ''we support the Participants' decision to allocate CAT costs to executing brokers rather than clearing brokers.''[70]

Second, the proposal to rely on executing brokers, rather than clearing brokers, was proposed in direct response to comments raised by SIFMA and other commenters on the 2022 Funding Proposal regarding the cost burden that clearing firms may experience if clearing brokers were charged CAT fees.[71] As noted by commenters, imposing the fee payment obligation on clearing brokers, rather than on executing brokers more generally, potentially may impose a significant financial burden on clearing firms if the fees imposed on clearing firms are not passed through to their clients.

Third, charging the CEBBs and CEBSs would reflect the executing role the CEBB and CEBS have in each transaction. Such a fee model is currently used and well-known in the securities markets. For example, SRO members regularly pay transaction-based fees. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes.

Fourth, charging CEBBs and CEBSs is in line with the use of transaction

reports from the exchanges and FINRA's equity trading reporting facilities for calculating the CAT fees. The CEBBs and CEBSs are identified on the transaction reports, thereby streamlining the CAT collection process.

Fifth, CAT LLC does not believe that the proposal would burden CAT Executing Brokers. The CEBBs and CEBSs could determine, but would not be required, to pass their CAT fees through to their clients, who, in turn, could pass their CAT fees to their clients, until the fee is imposed on the ultimate participant in the transaction. With such a pass-through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to their transactions. It is common practice in the industry for broker-dealers to pass transaction-based fees through to their clients, and CAT fees would introduce no unique issues for passing the CAT fee on to clients.

Finally, the proposal to charge CAT Executing Brokers CAT fees as set forth in the Funding Proposal only addresses the party responsible for the payment of the CAT fee. As an administrative matter regarding the method of payment, each CAT Executing Broker may seek to enter into a bilateral arrangement with its clearing broker for the clearing broker to collect and pass-through the CAT fees as it does in other contexts.

ii. Effect on Net Capital of CAT Executing Brokers

CAT fees do not raise new or different issues for CAT Executing Brokers with respect to net capital requirements than other transaction-based fees charged to executing brokers. CAT fees will be billed on a monthly basis, and Section 11.4 of the CAT NMS Plan states that ''Participants shall require each Industry Member to pay all applicable fees authorized under this Article XI within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated).'' With respect to net capital requirements, CAT Executing Brokers may determine whether to establish arrangements with their brokerage clients to account for costs incurred by the CAT Executing Broker on the client's behalf, including setting the terms under which they must be repaid by their broker-dealer clients such that receivables need not extend beyond 30 days.

---

[65] The predictability of fees is discussed further below in Section A.9.u of this filing.

[66] *See* 2018 Fee Proposal Release.

[67] TAF Release at 34024.

[68] *See* Partial Amendment I at 74185; February 2023 Proposed Partial Amendment at 5.

[69] *See* Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, SIFMA, to Vanessa Countryman, Secretary, SEC (Dec. 14, 2022) (''December 2022 SIFMA Letter'') at 2; Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, SIFMA, to Vanessa Countryman, Secretary, SEC (Oct. 7, 2022) at 4–5.

[70] Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Jan. 12, 2023) at 7. *See also* December 2022 SIFMA Letter at 2 (''[W]e support changing the payment obligation to executing brokers.'').

[71] *See* Partial Amendment I at 74185; February 2023 Proposed Partial Amendment at 5.

**17104**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

## d. Cost Allocation

### i. One-Third/One-Third/One-Third Allocation of Prospective CAT Costs Between CEBS, CEBB and Participant

When calculating the CAT Fees related to Prospective CAT Costs under the Funding Proposal, CAT LLC proposes to allocate one-third of Prospective CAT Costs to Participants, one-third of Prospective CAT Costs to CEBSs and one-third of Prospective CAT Costs to CEBBs. CAT LLC believes that this proposed allocation satisfies the requirements of the Exchange Act and Rule 608 of Regulation NMS under the Exchange Act.

The proposed ⅓, ⅓, ⅓ allocation of Prospective CAT Costs recognizes the three primary roles in each transaction: the buyer, the seller and the market regulator, and assigns an equal one-third share of the fee per transaction to each of these three roles. The Exchange Act itself recognizes the importance of these three roles in a transaction by imposing registration and other regulatory obligations on the broker-dealers and regulator involved in a transaction. This allocation is similar to the approach taken with the FINRA TAF, ORF and section 31 sales value fees, and also recognizes the role of the market regulator and the buyer in the transaction as well as the seller.

Furthermore, the allocation of two-thirds of the CAT costs to Industry Members and only one-third to Participants recognizes that a substantial portion of CAT costs originates from Industry Members. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (*e.g.,* linker) and storage costs. The data processing and storage costs are related to message traffic and the complexity of the reporting requirements for CAT, which, in turn, are determined by market activity. Industry Members are responsible for originating trading activity that necessitates message traffic to the CAT, and the complexity of Industry Members' chosen business models contributes substantially to the costs of the CAT.

One of the factors driving CAT costs is the complexity of the Industry Members' CAT reporting requirements, which are driven by the inherent complexity of Industry Members' chosen business models. For example, in light of the complexity of market activity, the CAT's reporting scenarios document for Industry Members is over 800 pages in length, addressing almost 200 scenarios, including, for example, scenarios related to representative orders, internal routing, order modification, order cancellation, ATS scenarios, OTC scenarios, foreign scenarios, child orders, proprietary orders, fractional shares, stop and conditional orders, RFQs, floor activity and more.[72] The processing and storage of such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs. In contrast, the Participants do not originate market activity or orders or otherwise bring this level of complexity to the markets. As a result, the technical specifications for the Participants are far less complex than for Industry Members. For example, the technical specifications for Participants have 13 reporting events for stock exchanges compared to 36 equity reporting events in the technical specifications for Industry Members, and the technical specifications for Participants have 14 reporting events for options exchanges compared to 43 reporting options events in the technical specifications for Industry Members.[73] Since the complexity of Industry Members' chosen business models contribute substantially to the costs of the CAT, it is reasonable and equitable to require that Industry Members pay a substantial portion of those costs.

Participant activity does not impact CAT costs in the same way that Industry Member activity impacts CAT costs. The analysis regarding the complexity of Industry Member activity is based on the effects of the business models *on the costs of the CAT,* not on the complexity of the market generally. The complexity of Industry Member activity adds significantly to the cost of the CAT in a way that Participant activity does not.

Moreover, allocating a greater percentage of the CAT costs to Participants would raise fairness issues in light of the greater financial resources of Industry Members. There are only 25 Participants and approximately 1,100 Industry Members.[74] Moreover, based upon an analysis of available CAT Reporter revenue, Participants only represented approximately 4% of the total CAT Reporter revenue while Industry Members represented 96% of the total CAT Reporter revenue.[75] In addition, various individual Industry Members have revenue in excess of some or all of the Participants. Accordingly, CAT LLC determined that allocating a higher percentage of the total CAT costs to the Participants was not a fair and equitable approach.

Finally, CAT LLC analyzed a variety of alternative allocations of CAT costs and continues to support the proposed one-third, one-third, one-third allocation as consistent with the requirements of the Exchange Act and the CAT NMS Plan. Alternative allocations considered by CAT LLC are discussed in detail below in Section A.10 of this filing.

### ii. ⅓, ⅓ Allocation for Historical CAT Assessment

Under the Funding Proposal, the CEBS and the CEBB would each pay one-third of the fee obligation for each transaction related to Historical CAT Costs. Because the Participants have already paid for Past CAT Costs via loans to CAT LLC, the Participants would not be required to pay any Historical CAT Assessment. As stated in Proposed Section 11.3(b)(ii) of the CAT NMS Plan, "[i]n lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans." Furthermore, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would emphasize that "[t]he Historical CAT Assessment is designed to recover two-thirds of the Historical CAT Costs." Like with the allocation of Prospective CAT Costs discussed above, CAT LLC believes that the proposed allocation of the Historical CAT Costs is consistent with the requirements of the Exchange Act and the CAT NMS Plan,

---

[72] CAT Industry Member Reporting Scenarios, Version 4.10 (Oct. 21, 2022), *https://www.catnmsplan.com/sites/default/files/2022-10/10.21.22_Industry_Member_Tech_Specs_Reporting_Scenarios_v4.10_CLEAN.pdf.*

[73] *Compare* CAT Reporting Technical Specifications for Plan Participants, Version 4.1.0-r17 (Feb. 21, 2023), *https://www.catnmsplan.com/sites/default/files/2023-02/02.21.2023-CAT-Reporting-Technical-Specifications-for-Participants-4.1.0-r17.pdf, with* CAT Reporting Technical Specifications for Industry Members, Version 4.0.0 r18 (Dec. 16, 2022), *https://www.catnmsplan.com/sites/default/files/2022-12/12.16.2022_CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.0.0r18_CLEAN.pdf.*

[74] An average of 1,124 unique CAT Reporters sent transaction data to the CAT from July 1, 2022 to August 8, 2022.

[75] *See* Securities Exchange Act Rel. No. 91555 (Apr. 14, 2021), 86 FR 21050, 20155 (Apr. 21, 2021) ("2021 Fee Proposal Release"). Industry Member revenue was calculated based on the total revenue reported in the Industry Member's FOCUS reports. Participant revenue was calculated based on revenue information provided in Form 1 amendments and/or publicly reported figures. Participants are not required to file uniform FOCUS-type reports regarding revenue like Industry Members. Accordingly, the revenue calculation for Participants is not as straightforward as for Industry Members.

### iii. Internal Cost of Compliance by Industry Members

CAT LLC does not propose to take into consideration the internal costs incurred by Industry Members in complying with CAT requirements in determining how to allocate costs between Industry Members and Participants. There is no precedent for regulatory fees to be determined based on the cost of compliance of the regulated entity. Regulatory fees are intended to cover the regulatory costs of the entity providing the regulation. In the case of the CAT, the Funding Proposal is intended to charge fees to pay for the direct costs of the CAT, not for ancillary compliance costs of Industry Members.[76] Moreover, as a practical matter, accurately determining an Industry Member's compliance costs, without recordkeeping requirements and appropriate standards to determine expenses accurately, would be infeasible.

Likewise, the substantial internal compliance costs of the Participants are not taken into consideration in the Funding Proposal. Each Participant incurs its own internal costs to comply with the requirements of the CAT NMS Plan, including, among other things, updating its systems for CAT reporting. Additionally, Participants have expended countless internal hours on the creation, implementation and operation of the CAT. These costs are not included in the cost allocation under the Funding Proposal.

### iv. Alternative Approach Based on Individualized CAT Reporter Cost to CAT

CAT LLC has determined not to propose a funding approach for the CAT in which a CAT Reporter's fees would be based on each CAT Reporter's exact cost burden on the CAT. In light of the many inter-related cost drivers of the CAT (*e.g.,* storage, message traffic, processing), determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. Moreover, trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters. CAT LLC emphasizes that the Exchange Act requires CAT fees to be fair, reasonable and equitably allocated, and CAT LLC believes that the use of executed

equivalent share volume satisfies these requirements. The Exchange Act does not require each CAT Reporter's fees to be a proxy for that CAT Reporter's cost burden on the CAT, let alone an exact proxy.

### A. Difficulty in Determining Individual CAT Reporter Costs Due to Inter-Related Cost Drivers

CAT LLC has analyzed the cost drivers for the CAT, and has concluded that determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. The computation of a specific CAT Reporter's burden on the CAT is complicated by the many inter-related factors that contribute to CAT costs, including message traffic, data processing, storage, the complexity of reporting requirements, reporting timelines, infrastructure, connectivity and more. The use of executed equivalent share volume as the metric for the funding model is an improvement over the message traffic model. CAT LLC analyzed the cost drivers of CAT and determined that, although message traffic is one factor in CAT costs, it is not the primary factor. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (*e.g.,* linker) and storage costs. Compute costs represent more than half of all technology costs. While such costs are related in part to message traffic, they are driven by the stringent performance timelines, data complexity and operational requirements in the CAT NMS Plan. The Plan requires that order events be processed, corrected, and made available to regulatory users within established timeframes, including a four-hour window for initial linkage processing. For this reason, among other issues with the message traffic model and other considerations discussed herein, CAT LLC determined to shift its focus to the new metric of executed equivalent share volume from the message traffic and market share metrics set forth in the CAT NMS Plan as approved.

### B. Trading Activity as Reasonable Proxy for Cost Burden

CAT LLC determined that trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters. CAT LLC analyzed reasonable metrics for determining CAT fees, and determined that, although executed equivalent share volume is not an exact proxy for the cost burden (nor need it be), trading activity provides a reasonable proxy for cost

burden on the CAT. Increased trading activity impacts message traffic, data processing, storage and other factors, and thus necessarily correlates with increased cost burden on the CAT. Moreover, Industry Member activity in the market generally is engaged in for the purpose of effecting transactions, and, as a result, it is common for Participants to use transaction-based fees. Therefore, executed share volume is an appropriate metric for allocating CAT costs among CAT Reporters.

This conclusion is consistent with the SEC's prior recognition of the use of transaction volume in setting regulatory fees. For example, in approving FINRA's TAF, the SEC recognized that transaction volume was closely enough connected to FINRA's broad regulatory responsibilities to satisfy the statutory standard in the Exchange Act.[77] FINRA proposed a transaction-based TAF to fund its member regulatory activities in a variety of areas such as ''sales practices, routine examinations, financial and operational reviews, new member applications, enforcement * * * . . . wherever such member activity occurs.'' [78] The SEC noted that ''[a]ssessing fees in relation to transactions correlates to heightened NASD responsibilities regarding firms that engage in the trading,'' but the fees were not an exact proxy for the costs of such regulatory responsibilities.[79] The SEC noted this lack of a precise correlation:

In most cases, the NASD has direct responsibility to oversee the firm's dealing with the public in effecting the transactions; the NASD may also have responsibility to oversee the impact of the trading on the firm's financial condition. In most cases, where responsibility for certain member activities has been allocated to other SROs, the NASD retains responsibility for other member functions.[80]

Nevertheless, the SEC concluded that ''while trading activity is not wholly correlated to the full range of NASD responsibility for members in all instances, the Commission believes that they are closely enough connected to satisfy the statutory standard.'' [81] CAT LLC believes that this same logic is applicable to the Funding Proposal.

### v. Alternative Approach: 50–50 Allocation Between Industry Members and Participant Exchanges

CAT LLC has considered and rejected allocating 50% of CAT costs to the

---

[76] *See* CAT NMS Plan Approval Order at 84795, n.1749 (''The Participants stated that the funding model provides a framework for the recovery of the costs to create, develop and maintain the CAT, and is not meant to address the cost of compliance for Industry Members and Participants with the reporting requirements of Rule 613.'').

[77] TAF Release at 34023.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* at 34024.

**17106**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

Participants and 50% to Industry Members under the Funding Proposal. Although a 50–50 allocation between Industry Members and Participants would provide a mathematically equal split between two groups, it would not provide an equitable allocation between and among Industry Members and Participants. Such an allocation raises fairness issues as Industry Members have far greater financial resources than the Participants, and the complexity of Industry Members' chosen business models contribute substantially to the costs of the CAT.

e. Fee Pass-Throughs

i. General

CAT LLC acknowledges that CAT Executing Brokers may choose to pass the CAT fees through to their clients, who, in turn, may pass their CAT fees through to their clients, until the fees are imposed on the account that executed the transaction. Although the Funding Proposal does not require such fee pass-throughs, CAT LLC continues to support the concept of the potential pass-through of fees for various reasons.

First, the SEC specifically contemplated and accepted the concept of cost pass-throughs from Participants to their members when it adopted Rule 613:

> There also would be costs associated with establishing and operating the central repository that will be jointly owned by the plan sponsors. The Commission believes it is important to understand how the plan sponsors plan to allocate such costs among themselves to help inform the Commission's decision regarding the possible economic or competitive impact of the NMS plan amongst the SROs. In addition, although the plan sponsors likely would initially incur the costs to establish and fund the central repository directly, *they may seek to recover some or all of these costs from their members.* If the plan sponsors seek to recover costs from their members, the Commission believes that it is important to understand the plan sponsors' plans to allocate costs between themselves and their members, to help inform the Commission's decision regarding the possible economic or competitive impact of the NMS plan.[82]

Second, CAT LLC does not take a position on whether Industry Members, in turn, should pass CAT fees on to their clients. However, in adopting the CAT NMS Plan, the Commission specifically contemplated and accepted that "broker-dealers may seek to pass on to investors their costs to build and maintain the CAT, which may include their own costs and any costs passed on

to them by Participants," noting that the "extent to which these costs are passed on to investors depends on the materiality of the costs and the ease with which investors can substitute away from any given broker-dealer."[83]

Third, CAT LLC notes that the use of pass-through fees is a commonly accepted practice that has been approved by the SEC in the securities markets in some cases. For example, the practice of passing through fees to broker-dealers and their customers is used in the context of section 31 fees. Section 31 of the Exchange Act places obligations only on national securities exchanges, national securities associations, and the Commission. National securities exchanges and national securities associations must pay certain fees and assessments to the Commission. The Commission is required by section 31 of the Exchange Act to collect such fees and assessments. Section 31 of the Exchange Act, however, does not address the manner or extent to which covered SROs may seek to recover the costs of their section 31 obligations from their members. Nor does section 31 of the Exchange Act address the manner or extent to which members of covered SROs may seek to pass any such charges on to their customers. However, as the SEC noted, "[i]n practice, the covered SROs obtain the funds for these fees and assessments by assessing charges on their members, and the members in turn pass these charges to their customers."[84] Likewise, in adopting the CAT NMS Plan, the Commission explained that under section 31, "Participants are required to pay transaction fees and assessments to the Commission," that "Participants, in turn, may collect their section 31 fees and assessments from their broker-dealer members," and, that "broker-dealers may pass on regulatory charges that support Participant supervision, such as with respect to section 31 fees."[85]

Indeed, the language of certain exchange rules regarding section 31 specifically describe the pass-through process related to section 31 fees.[86] For

example, NYSE Arca Rule 2.18.01 states the following:

> Pursuant to Rule 2.18, the Exchange makes an assessment on ETP Holders that the Exchange uses to pay fees owing to the SEC in accordance with section 31 of the Exchange Act ("the Rule 2.18 assessment"). The section 31 fees payable by the Exchange to the SEC is determined based on the aggregate dollar amount of "covered sales," as defined by SEC Rule 31, effected on the Exchange by or through any ETP Holder. ETP Holders, in some cases, have passed along the Rule 2.18 assessment on a trade-by-trade basis to their customers or correspondent firms."

The pass-through concept also is applied in the context of other SRO regulatory fees applicable to the SROs' members. For example, "it is regular practice among some clearing and trading firms to 'pass through' the TAF to the underlying firm executing the trade. Further, FINRA understands that the executing firms commonly pass the TAF directly on to their customers. Typically, TAF fees are reflected on the confirmation statement received by customers."[87] Similarly, the pass-through process is used for ORFs as well. ORFs are collected indirectly from members through their clearing firms by OCC on behalf of the respective options exchange. As noted in rule filings related to ORFs, "[t]he Exchange expects that [members] will pass through the ORF to their customers in the same manner that firms pass-through to their customers the fees charged by Self-Regulatory Organizations ('SROs') to help the SROs meet their obligations under section 31 of the Exchange Act."[88]

Fourth, commenters on prior CAT funding proposals have commented in favor of a model similar to the section 31 fees in which the fee could be passed through to Industry Members and ultimate customers.[89] For example, one commenter noted the benefits of a

---

[82] *See generally* Securities Exchange Act Rel. No. 67457 (Jul. 18, 2012), 77 FR 45722, 45795 (Aug. 1, 2012) ("Rule 613 Adopting Release") (emphasis added).

[83] CAT NMS Plan Approval Order at 84992.

[84] Securities Exchange Act Rel. No. 49928 (June 28, 2004), 69 FR 41060, 41072 (July 7, 2004). *See also* SEC, Section 31 Transaction Fees, Fast Answers, *https://www.sec.gov/fast-answers/answerssec31htm.html* (noting that the "[t]he SROs have adopted rules that require their broker-dealer members to pay a share of these fees. Broker-dealers, in turn, impose fees on their customers that provide the funds to pay the fees owed to their SROs.)"

[85] CAT NMS Plan Approval Order at 84992.

[86] *See, e.g.,* NYSE American Rule 393.01; and NYSE Rule 440H.03.

[87] Securities Exchange Act Rel. No. 90176 (Oct. 14, 2020), 85 FR 66592, 66603 (Oct. 20, 2020).

[88] Securities Exchange Act Rel. No. 67596 (Aug. 6, 2012), 77 FR 47902, 47903 (Aug. 10, 2012). *See also* Securities Exchange Act Rel. No. 61133 (Dec. 9, 2009), 74 FR 66715, 66716 (Dec. 16, 2009) (noting that "[t]he Exchange expects that member firms will pass-through the ORF to their customers in the same manner that firms pass-through to their customers the fees charged by SROs to help the SROs meet their obligation under Section 31 of the Exchange Act"); Securities Exchange Act Rel. No. 83878 (Aug. 17, 2018), 83 FR 42715, 42717 (Aug. 23, 2018) (noting that "by collecting the ORF in this manner Members and non-Members could more easily pass-through the ORF to their customers").

[89] *See, e.g.,* Letter from Michael Blaugrund, Chief Operating Officer, NYSE, to Vanessa Countryman, Secretary, SEC (May 10, 2021) at 3; Letter from Andrew Stevens, General Counsel, IMC Chicago, LLC, to Vanessa Countryman, Secretary, SEC (May 20, 2021) at 3.

model similar to the section 31 fees, arguing that "[i]t would also provide transparency into the fees which seek to recoup costs and a vehicle to pass-thru fees to the ultimate beneficiary of each trade." [90] Another commenter similarly advocated for a section 31-type model, noting that "SROs already have a well-established model for recouping their section 31 fees by passing them through to their members." [91]

Finally, the proposed pass-through process for CAT fees, like the pass-through process for other regulatory fees, recognizes the reality that regulatory costs incurred to maintain and enhance the quality of the markets will necessarily increase costs for all market participants, including the ultimate investor. Even if such pass-throughs were limited or prohibited, CAT costs would be distributed in other ways. A member of the Advisory Committee for the CAT and the former Chief Economist of the Commission, emphasized that "[b]ecause the markets for exchange, dealing, and brokerage services are all highly competitive in the long run, any fees imposed on any of these groups will ultimately pass through to the retail and institutional traders who use the markets." [92] This commenter reasoned that:

In highly competitive markets, prices reflect the costs of doing business in the long run. If those costs rise, they ultimately pass through to the customers. For example, if the Participants (primarily exchanges) were required to fund CAT NMS fully, they will raise their fees (or fail to lower them when costs are falling) to recover their funding costs. And if brokers' business models require that they pay exchange fees on behalf of their clients, the brokers will raise their commission rates to the customers. And if their business models require zero commissions, brokers will provide fewer services or charge more for non-transaction services to cover their increased costs. [93]

ii. Effect of Allocation on Fee Pass-Throughs

CAT LLC determined not to allocate all CAT costs to Participants under the Funding Proposal. Under the Funding Proposal, CEBBs would be allocated one-third of the CAT costs, CEBSs would be allocated one-third of the CAT costs and Participants would be allocated one-third of the CAT costs. Under the Funding Proposal, Industry Members may determine to pass their CAT fees on to their clients at their discretion. Participants also may determine to pass their CAT fees on to their members, or to pay the CAT fees charged to the Participant through other means. If Participants were to determine to pass CAT fees on to their members, they may choose to adopt a CAT-specific fee that directly passes the CAT fee through to their members, in whole or in part, or they may choose to increase other fees charged to members (*e.g.,* transaction fees). Participants would need to file any such fee proposals with the SEC in accordance with section 19(b) of the Exchange Act.

If all CAT costs were allocated to Participants, however, Participants would have the same options for covering the costs of the CAT fees. They may choose to adopt a CAT-specific fee that directly passes through the CAT fee through to their members, in whole or in part, or they may choose to increase other fees charged to members (*e.g.,* transaction fees). Participants would need to file any such fee proposals with the SEC in accordance with section 19(b) of the Exchange Act. For any fee charged to Industry Members, Industry Members may determine to pass their CAT fees on to their clients at their discretion, as with the CAT fees under the Funding Proposal.

f. FINRA Fee

Under the Funding Proposal, for each transaction in Eligible Securities based on CAT Data, the CEBS, the CEBB and the applicable Participant for the transaction each would pay a CAT Fee calculated by multiplying the number of executed equivalent shares in the transaction and the applicable Fee Rate and dividing the product by three. The applicable Participant for the transaction would be the national securities exchange on which the transaction was executed, or FINRA for each transaction executed otherwise than on an exchange. CAT LLC believes that the proposed CAT fees for FINRA are consistent with the Exchange Act and the CAT NMS Plan. CAT LLC does not believe that the assessment of a CAT fee on FINRA in the same manner as other Participants would result in a burden on competition for FINRA or for Industry Members engaging in activity otherwise than on an exchange.

The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are self-regulatory organizations that have the same regulatory obligations under the Exchange Act, regardless of whether they operate as a for-profit or not-for-profit entity. Their usage of CAT Data, either directly or indirectly through regulatory services agreements, would be for the same regulatory purposes in accordance with those obligations. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants.

In addition, the size of FINRA's fee is calculated based on the activity in the over-the-counter market, which is substantial. For example, the executed equivalent share volume for over-the-counter trades in Eligible Securities in 2021 was 1,361,484,729,008 out of a total volume of 3,963,697,612,395 executed equivalent shares for trades in Eligible Securities. [94] Accordingly, approximately 34% of the executed equivalent share volume in Eligible Securities took place in the over-the-counter market.

Moreover, FINRA and the exchanges should not be evaluated differently based upon the potential for any particular Participant to pass its CAT fees onto its members through regulatory, trading or other fees. Each Participant will need to determine for itself how it will obtain the funds to pay for its CAT fees. Because each Participant, not just FINRA, is using CAT Data to satisfy the same self-regulatory obligations, each Participant may determine to charge their members fees to fund their share of the CAT fees, and the Exchange Act specifically permits self-regulatory organizations to do so, provided the fee filing requirements of the Exchange Act are satisfied. Indeed, in approving the CAT NMS Plan, the SEC stated that "the Exchange Act specifically permits the Participants to charge members fees to fund their self-regulatory obligations." [95]

Furthermore, FINRA and the exchanges should not be evaluated differently based upon the potential for a particular Participant to recoup its fees through revenue-generating activity other than fees imposed on its members. FINRA, just like the exchange Participants, has revenue sources other than membership fees. For example, FINRA generates significant revenues via regulatory services agreements with

---

[90] Letter from James Toes, President and CEO, and Andre D'Amore, Chairman of the Board, Securities Trader Association, to Vanessa Countryman, Secretary, SEC (June 10, 2021) at 4.

[91] Letter from Joanna Mallers, Secretary, FIA Principal Traders Group, to Vanessa Countryman, Secretary, SEC (May 12, 2021) at 4.

[92] Letter from Larry Harris, Fred V. Keenan Chair in Finance, USC Marshal School of Business, to Vanessa Countryman, Secretary, SEC (June 21, 2022) ("Harris Letter") at 2.

[93] *Id.*

[94] These figures for executed equivalent share volume for 2021 are set forth in the illustrative example in the notice of the 2022 Funding Proposal. *See* 2022 Funding Proposal Release at 33246.

[95] CAT NMS Plan Approval Order at 84794.

the exchanges, among other sources.[96] These sources, too, may be used to pay CAT fees, and, if they are used, it would not lead to an increase in fees for Industry Members, but rather the exchange Participants. Any review of how the Participants obtain their funds to pay CAT fees is beyond the scope of the CAT fee filing.

The issues raised regarding the possibility of passing FINRA's allocation to Industry Members also fail to recognize the basic fact that Industry Members themselves face the same issue that they raise with regard to FINRA. Industry Members may determine to pass their CAT fees through to their customers, just as they may do with section 31-related fees and other fees. Accordingly, the two-thirds allocation of CAT costs to Industry Members may be entirely passed through to investors, thereby alleviating Industry Members of any burden of funding the CAT. As one commenter on the 2022 Funding Proposal, a former member of the Advisory Committee for the CAT and the former Chief Economist of the Commission, noted, ''[b]ecause the markets for exchange, dealing, and brokerage services are all highly competitive in the long run, any fees imposed on any of these groups will ultimately pass through to the retail and institutional traders who use the markets.'' [97]

Finally, CAT LLC does not believe that FINRA should not be treated as a market center for CAT funding purposes merely because FINRA is not treated as a market center for governance purposes under the National Market System Plan Regarding Consolidated Equity Market Data (''CT Plan''). Although the CT Plan and the CAT Plan are both national market system plans, their purpose and implementation are different. The CAT NMS Plan, as approved by the Commission, explicitly contemplates charging fees to all Participants, including FINRA. For example, Section 11.1(b) of the CAT NMS Plan states that ''[s]ubject to Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay.'' [98] In addition, the purpose of the CAT is solely for regulatory purposes; it provides a regulatory system to facilitate the performance of the self-regulatory obligations of all the Participants, including the exchanges and FINRA. In contrast, the CT Plan governs the public

dissemination of real-time consolidated equity market data for NMS stocks.

### g. Impact on Options Versus Equities

CAT LLC believes that the Funding Proposal provides for a fair, reasonable and equitable treatment of the equities and options markets. CAT LLC does not believe that the Funding Proposal would burden inappropriately efficiency, competition or capital formation in how it treats equities and options. As a preliminary matter, unlike other previously proposed fee models,[99] the Funding Proposal does not allocate costs between the equities and options markets; instead, the fee attributable to a transaction in an equity or option security depends on equivalent executed share volume. In addition, the use of equivalent executed share volume is designed to normalize options and equities in the calculation of fees, and to recognize and address the different trading characteristics of different types of securities. Recognizing that Listed Options trade in contracts rather than shares, the Funding Proposal would count executed equivalent share volume differently for Listed Options. Specifically, each executed contract for a transaction in Listed Options would be counted based on the multiplier applicable to the specific Listed Option contract in the relevant transaction (*e.g.,* 100 executed equivalent shares or such other applicable equivalency).

### h. Sell-Side and Buy-Side

CAT LLC proposes to charge both the buy-side and sell-side of a transaction in Eligible Securities a CAT fee. The proposal to charge both the buy-side and the sell-side of a transaction is consistent with other types of fees charged to both the buyer and the seller that are common in the industry. As such, CAT LLC believes that the proposal would comply with the requirements of the Exchange Act. For example, the ORF, a fee common to the options exchanges, is one example of a regulatory fee charged to both the buy-side and sell-side of the transaction. For example, the MIAX fee schedule lists the options regulatory fee as applying ''per executed contract side.'' [100] Similarly, under its pricing schedule, Nasdaq PHLX charges an options regulatory fee ''per contract side.'' [101] As set forth in its fee schedule, CBOE EDGX also charges an options regulatory fee to each side of the contract.[102] In

addition, the industry is familiar with transaction-based fees charged to both the buyer and the seller by the exchanges and FINRA.[103]

### i. Fee Rate Changes Twice per Year for CAT Fees Related to Prospective CAT Costs

CAT LLC proposes to require the calculation of the Fee Rate for CAT Fees related to Prospective CAT Costs twice a year. CAT LLC believes that the proposal to adjust the Fee Rate twice a year, once at the beginning of the year and once during the year, appropriately balances the need to coordinate the Fee Rate with potential changes in the costs and projections with the cost and effort to the industry related to more frequent fee changes.

CAT LLC believes its proposal is in keeping with views expressed by the industry in other contexts regarding the appropriate frequency of regulatory rate changes. For example, in the ORF context, the industry requested that rate changes be limited to twice per year. SIFMA stated in a comment letter on one of the ORF fee proposals that ''[r]ates should only be changed two times per year to reduce operational complexity and reduce risk.'' [104] The exchanges with ORF fees noted that the possibility for fee rate changes only twice per year would also ''better enable [their members] to properly account for ORF charges among their customers.'' [105] In light of these views on the frequency of the rate changes, exchanges with an ORF have limited the fee rate changes to twice a year.[106]

### j. Plan Amendment Process for Fee Rate Changes

Under the Funding Proposal, once any Fee Rate has been established by a majority vote of the Operating Committee in accordance with the Funding Proposal set forth in the CAT NMS Plan,[107] each Participant would be required to pay the applicable CAT Fee

---

[96] *See* 2021 FINRA Annual Financial Report at 43.

[97] Harris Letter at 2.

[98] *See also* Sections 11.2 and 11.3 of the CAT NMS Plan.

[99] *See, e.g.,* 2018 Fee Proposal Release at 1400.

[100] MIAX Options Exchange, Fee Schedule, as of Mar. 3, 2023.

[101] Nasdaq PHLX Rules, Options 7, Section 6(D).

[102] Cboe EDGX Fee Schedule, effective Mar. 1, 2023.

[103] *See, e.g.,* NYSE Price List 2023 for fees charged to both sides.

[104] *See, e.g.,* Letter from Ellen Greene, Managing Director, SIFMA to Vanessa Countryman, Secretary, SEC, re: SIFMA Comment Letter on the Options Regulatory Fee Filings by SR–EMERALD–2019–01 (Apr. 10, 2019) at 5, *https://www.sifma.org/wp-content/uploads/2019/04/MIAX-Emerald-ORF.pdf.*

[105] *See, e.g.,* Securities Exchange Act Rel. 93667 (Oct. 15, 2021).

[106] *See, e.g.,* Cboe BZX Fee Schedule (''The Exchange may only increase or decrease the ORF semi-annually''); MIAX Fee Schedule (The Exchange may only increase or decrease the ORF semi-annually); and BOX Fee Schedule (''The Exchange may only increase or decrease the ORF semi-annually'').

[107] Participants would be required to pay the CAT Fee once the CAT Fee is in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

calculated in accordance with the requirements set forth in the CAT NMS Plan (subject to the requirement for the Industry Member CAT Fee to be in effect). CAT LLC does not plan to submit an amendment to the CAT NMS Plan each time that the Fee Rate for the CAT Fee is established or adjusted because of the length of time and burden required to amend the CAT NMS Plan for each adjustment to the Fee Rate. Moreover, CAT LLC believes that it is unnecessary to file a new separate amendment for the Participant CAT Fees each time a new Fee Rate is approved because the CAT NMS Plan would set forth in detail the manner in which the CAT fees are established and the inputs for calculating the specific CAT Fees would be published on the CAT website and included in the Participant fee filings under section 19(b) of the Exchange Act for Industry Member CAT fees. Therefore, the amendments to the Plan for a fee rate change would be redundant and impractical in terms of timing.

CAT LLC proposes to amend the CAT NMS Plan to describe in detail how CAT Fees would be calculated, including the formula for the calculation and the methods for determining the inputs for the calculation (*i.e.,* the budget, projected executed equivalent share volume, executed equivalent shares per transaction). As such, the Participants would be required to calculate the Fee Rate and the related CAT Fees using the proposed formula; this process would be mandatory, including the mid-year Fee Rate change. Moreover, the budgetary and projection inputs to the calculation would be public, including in public fee filings pursuant to section 19(b) of the Exchange. Accordingly, CAT LLC does not believe that a Plan amendment would be necessary each time a new Fee Rate is calculated in accordance with the Plan.

The CAT NMS Plan would require each Participant to pay the proposed CAT Fees determined in accordance with the Funding Proposal. Proposed Section 11.3(a)(ii)(A) sets forth the requirement for Participants to pay the CAT fees. It states that "[e]ach Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data," and that "[e]ach Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data." It further states that "[t]he CAT Fee for

each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3." In addition, proposed paragraph (a) of the Participant fee schedule would state that "[e]ach Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in the prior month."

The Participants would be required to follow the requirements set forth in the CAT NMS Plan for establishing and calculating CAT Fees and requiring the payment of the CAT Fees as both a regulatory and contractual matter. Rule 613(h)(1) of Regulation NMS under the Exchange Act states that "[e]ach national securities exchange and national securities association shall comply with the provisions of the national market system plan approved by the Commission," that is, the CAT NMS Plan. Rule 613(h)(2) of Regulation NMS under the Exchange Act states that "[a]ny failure by a national securities exchange or national securities association to comply with the provisions of the national market system plan approved by the Commission shall be considered a violation of this section." Similarly, Rule 608(c) of Regulation NMS under the Exchange Act states that "[e]ach self-regulatory organization shall comply with the terms of any effective national market system plan of which it is a sponsor or a participant." Section 3.11 of the CAT NMS Plan reiterates this requirement, stating that "[e]ach Participant shall comply with . . . the provisions of SEC Rule 613 and of this Agreement, as applicable, to the Participant." In addition, each Participant is a signatory to the CAT NMS Plan as a member of the limited liability company. Accordingly, a failure to comply with the requirements of the CAT NMS Plan related to the CAT fees would be a violation of the regulatory obligation to comply with the CAT NMS Plan and a breach of contractual requirements of the CAT NMS Plan.

k. Executed Equivalent Shares for NMS Stocks, Listed Options and OTC Equity Securities

The Funding Proposal uses the concept of executed equivalent shares as the metric for calculating CAT fees for transactions in NMS Stocks, Listed Options and OTC Equity Securities, each of which have different trading

characteristics. Under the Funding Proposal, each executed share for a transaction in NMS Stocks would be counted as one executed equivalent share, each executed contract for a transaction in Listed Options would be counted using the contract multiplier applicable to the specific Listed Option in the relevant transaction, and each executed share for a transaction in OTC Equity Securities would be counted as 0.01 executed equivalent shares. CAT LLC believes that the proposed counting methods for each category of security are appropriate, as discussed in detail above in Section A.3.b.ii of this filing.

l. Cost Transparency

i. Cost Transparency and Level of Detail of CAT Costs

CAT LLC provides substantial cost transparency for Past CAT Costs and Prospective CAT Costs, including transparency above and beyond what is required under the CAT NMS Plan, and more than other national market system plans. Such transparency would include cost descriptions in the fee filings made pursuant to section 19(b) of the Exchange Act and Rule 19b-4(f)(2) thereunder, as well as the public availability of CAT financial and budget information.

CAT LLC proposes to require substantial transparency for CAT costs in the fee filings to be made pursuant to section 19(b) of the Exchange Act. For example, Proposed Section 11.3(a)(iii)(B) of the CAT NMS Plan would require such filings for CAT Fees to include, among other things, the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget and the reason for changes in each such line item from the prior CAT Fee filing; and a discussion of how the budget is reconciled to the collected fees. Similarly, Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan would require such filings for Historical CAT Assessments to include, among other things, a brief description of the amount and type of Historical CAT Costs, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees,

**17110** **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs.

CAT LLC provides substantial additional financial information regarding the operation of the CAT as required by the CAT NMS Plan. For example, CAT LLC currently makes detailed financial information about the CAT publicly available. Section 9.2(a) of the CAT NMS Plan requires CAT LLC to maintain a system of accounting established and administered in accordance with GAAP and requires ''all financial statements or information that may be supplied to the Participants shall be prepared in accordance with GAAP (except that unaudited statements shall be subject to year-end adjustments and need not include footnotes).'' Section 9.2(a) of the CAT NMS Plan also requires the Company to prepare and provide to each Participant ''as soon as practicable after the end of each Fiscal Year, a balance sheet, income statement, statement of cash flows and statement of changes in equity for, or as of the end of, such year, audited by an independent public accounting firm.'' The CAT NMS Plan requires that this audited balance sheet, income statement, statement of cash flows and statement of changes in equity be made publicly available. Among other things, these financial statements provide operating expenses, including technology, legal, consulting, insurance, professional and administration and public relations costs. CAT LLC also maintains a dedicated web page on the CAT NMS Plan website that consolidates its annual financial statements in a public and readily accessible place.[108] The Company's annual financial statements from inception in 2017 through 2021 are currently available on the CAT website.

In addition to providing financial information required under the CAT NMS Plan and otherwise, CAT LLC also has voluntarily determined to provide more financial transparency to the public regarding its costs. For example, CAT LLC publicly provides its annual operating budget as well as periodically provides updates to the budget that occur during the year. CAT LLC includes such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible to the public, like the CAT financial statements. CAT LLC also has held webinars providing additional

detail about CAT costs and about potential alternative funding models for the CAT, and commenters submitted questions and comments on the webinars.[109]

ii. Composition and Transparency of Past CAT Costs

CAT LLC also provides detailed disclosures regarding Past CAT Costs. The Historical Fee Rate for the Historical CAT Assessment would be calculated based on actual past costs incurred by the CAT (except for certain costs that CAT LLC has determined to exclude from the calculation), rather than budgeted costs. The actual costs for prior to 2022 are set forth in detail in the audited financial statements for the Company and its predecessor CAT NMS, LLC, which are available on the CAT website.[110] In addition, the following describes in detail the Historical CAT Costs for prior to 2022. These Historical CAT Costs figures are being provided in this filing for transparency purposes only. The Participants expect to describe these costs in the relevant fee filings that the Participants submit pursuant to section 19(b) under the Exchange Act and Rule 19b–4(f)(2) thereunder regarding Historical CAT Assessments.

A. Historical CAT Costs Incurred Prior to June 22, 2020 (*i.e.,* Pre-FAM Costs)

The Participants expect to propose that Historical CAT Costs would include costs incurred by CAT prior to June 22, 2020 and already funded by the Participants, excluding Excluded Costs (described further below). The Participants expect to propose that the Historical CAT Costs would include costs for the period prior to June 22, 2020 of $143,919,521. The Participants expect to propose that Participants would remain responsible for one-third of this cost (which they have previously paid), and Industry Members would be responsible for the remaining two-thirds, with CEBBs paying one-third ($47,973,174) and CEBSs paying one-third ($47,973,174). The following table breaks down the Historical CAT Costs for the period prior to June 22, 2020 into the categories set forth in Proposed

Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating expense | Historical CAT costs for period prior to June 22, 2020 |
| --- | --- |
| Capitalized Developed Technology Costs and Transition Fee * .. | $71,475,941 |
| *Technology Costs:* | 33,568,579 |
| Cloud Hosting Services ....................... | 10,268,840 |
| Operating Fees ......... | 21,085,485 |
| CAIS Operating Fees | 2,072,908 |
| Change Request Fees ...................... | 141,346 |
| Legal ............................ | 19,674,463 |
| Consulting ................... | 17,013,414 |
| Insurance ..................... | 880,419 |
| Professional and administration ..................... | 1,082,036 |
| Public relations ............ | 224,669 |
| Total Operating Expenses .................. | 143,919,521 |

\* The non-cash amortization of these capitalized developed technology costs of $2,115,545 incurred during the period prior to June 22, 2020 have been appropriately excluded from the above table.

B. CAT Costs Incurred in Period 1

The Participants expect to propose that Historical CAT Costs would include costs incurred by CAT and already funded by Participants during FAM Period 1, which covers the period from June 22, 2020–July 31, 2020. The Participants expect to propose that the Historical CAT Costs for Period 1 are $6,377,343. The Participants expect to propose that Participants would remain responsible for one-third of this cost (which they have previously paid) ($2,125,781), and Industry Members would be responsible for the remaining two-thirds, with CEBBs paying one-third ($2,125,781) and CEBSs paying one-third ($2,125,781). The following table breaks down the Historical CAT Costs for Period 1 into the categories set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating expense | Historical CAT costs for period 1 |
| --- | --- |
| Capitalized Developed Technology Costs * ... | $1,684,870 |
| *Technology Costs:* | 3,996,800 |
| Cloud Hosting Services ....................... | 2,642,122 |
| Operating Fees ......... | 1,099,680 |
| CAIS Operating Fees | 254,998 |
| Change Request Fees ...................... | ............................... |
| Legal ............................ | 481,687 |
| Consulting ................... | 137,209 |
| Insurance ..................... | ............................... |
| Professional and administration .................... | 69,077 |

---

[108] *See* CAT Audited Financial Statements, *https://www.catnmsplan.com/audited-financial statements.*

[109] *See, e.g.,* CAT LLC Webinar, CAT Costs (Sept. 21, 2021), *https://www.catnmsplan.com/events/ catcostsseptember-21-2021;* CAT LLC Webinar, CAT Funding (Sept. 22, 2021), *https:// www.catnmsplan.com/events/catfundingseptember-22-2021;* and CAT LLC Webinar, CAT Funding (Apr. 6, 2022), *https://www.catnmsplan.com/ events/cat-funding.*

[110] The audited financial statements for CAT NMS, LLC and Consolidated Audit Trail, LLC are available at *https://www.catnmsplan.com/audited-financial-statements.*

| Operating expense | Historical CAT costs for period 1 |
|---|---|
| Public relations ............. | 7,700 |
| Total Operating Expenses ................... | 6,377,343 |

\* The non-cash amortization of these capitalized developed technology costs of $362,121 incurred during Period 1 have been appropriately excluded from the above table.

C. CAT Costs Incurred in Period 2

The Participants expect to propose that Historical CAT Costs would include costs incurred by CAT and already funded by Participants during FAM Period 2, which covers the period from August 1, 2020–December 31, 2020. The Participants expect to propose that the Historical CAT Costs for Period 2 are $42,976,478. The Participants expect to propose that Participants would remain responsible for one-third of this cost (which they have previously paid) ($14,325,493), and Industry Members would be responsible for the remaining two-thirds, with CEBBs paying one-third ($14,325,492.70) and CEBSs paying one-third ($14,325,492.70). The following table breaks down the Historical CAT Costs for Period 2 into the categories set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating expense | Historical CAT costs for period 2 |
|---|---|
| Capitalized Developed Technology Costs \* ... | $6,761,094 |
| *Technology Costs:* | 31,460,033 |
| Cloud Hosting Services ........................ | 20,709,212 |
| Operating Fees ......... | 9,108,700 |
| CAIS Operating Fees | 1,590,298 |
| Change Request Fees ........................ | 51,823 |
| Legal ............................. | 2,766,644 |
| Consulting .................... | 532,146 |
| Insurance ...................... | 976,098 |
| Professional and administration ...................... | 438,523 |
| Public relations ............. | 41,940 |
| Total Operating Expenses ................... | 42,976,478 |

\* The non-cash amortization of these capitalized developed technology costs of $1,892,505 incurred during Period 2 have been appropriately excluded from the above table.

D. CAT Costs Incurred in Period 3

The Participants expect to propose that Historical CAT Costs would include costs incurred by CAT and already funded by Participants during FAM Period 3, which covers the period from January 1, 2021–December 31, 2021.

The Participants expect to propose that the Historical CAT Costs for Period 3 are $144,415,268. The Participants expect to propose that Participants would remain responsible for one-third of this cost (which they have previously paid) ($48,238,423), and Industry Members would be responsible for the remaining two-thirds, with CEBBs paying one-third ($48,238,423) and CEBSs paying one-third ($48,238,423). The following table breaks down the Historical CAT Costs for Period 3 into the categories set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating expense | Historical CAT costs for period 3 |
|---|---|
| Capitalized Developed Technology Costs \* ... | $10,763,372 |
| *Technology Costs:* | 123,639,402 |
| Cloud Hosting Services ........................ | 94,574,759 |
| Operating Fees ......... | 23,106,091 |
| CAIS Operating Fees | 5,562,383 |
| Change Request Fees ........................ | 396,169 |
| Legal ............................. | 6,333,248 |
| Consulting .................... | 1,408,209 |
| Insurance ...................... | 1,582,714 |
| Professional and administration ...................... | 595,923 |
| Public relations ............. | 92,400 |
| Total Operating Expenses ................... | 144,415,268 |

\* The non-cash amortization of these capitalized developed technology costs of $5,108,044 incurred during Period 3 have been appropriately excluded from the above table.

E. Excluded Costs

The Participants expect to propose that Historical CAT Costs would not include two categories of CAT costs ("Excluded Costs"): (1) $48,874,937, which are all CAT costs incurred from November 15, 2017 through November 15, 2018, and (2) $14,749,362 of costs related to the termination of the relationship with the Initial Plan Processor. The Participants expect to propose that the Participants would remain responsible for 100% of these costs, which total $63,624,299. CAT LLC believes that the exclusions of these costs addresses concerns previously expressed by commenters about costs incurred related to the period of the operation of the Initial Plan Processor.

First, the Participants expect to propose that Historical CAT Costs would exclude all CAT costs incurred from November 15, 2017 through November 15, 2018. CAT LLC determined to exclude all costs during this one-year period from fees charged to Industry Members due to the delay in

the start of reporting to the CAT. The Participants expect to propose that these costs are $48,874,937. The Participants expect to propose that the Participants would remain responsible for 100% of this $48,874,937 in costs. The following table breaks down these costs into the categories set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating expense | Excluded costs for November 15, 2017–November 15, 2018 |
|---|---|
| Capitalized Developed Technology Costs ..... | $37,852,083 |
| *Technology Costs:* | |
| Cloud Hosting Services ...................... | |
| Operating Fees ......... | |
| CAIS Operating Fees | |
| Change Request Fees ...................... | |
| Legal ............................ | 6,143,278 |
| Consulting .................... | 4,452,106 |
| Insurance ...................... | |
| Professional and administration ..................... | 340,145 |
| Public relations ............. | 87,325 |
| Total Operating Expenses ................... | 48,874,937 |

Second, the Participants expect to propose that Historical CAT Costs would not include $14,749,362 of costs related to the conclusion of the relationship with the Initial Plan Processor. The Participants expect to propose that Participants would remain responsible for 100% of the $14,749,362 of these costs.

Accordingly, the Participants expect to propose that Historical CAT Costs would exclude a total of $63,624,299 of prior CAT costs, and the Participants would remain responsible for 100% of these costs.

iii. Alternative Transparency Proposals

CAT LLC believes that its proposed methods of cost transparency will provide Industry Members and other interested parties with detailed information about the CAT and the CAT fees. CAT LLC does not believe that additional transparency measures, such as a mechanism to allow for the review of budget information prior to a fee filing, or an independent cost review mechanism, are necessary or appropriate.

A. Budget Disclosure Prior to Fee Filings

CAT LLC does not believe that it is necessary to add a requirement to the CAT NMS Plan to provide Industry Members and other members of the public with an opportunity to review the budget that would be included in

the SRO fee filings prior to such filings. CAT LLC is currently providing CAT budget information to the public on a continuing basis. CAT LLC publicly provides the annual operating budget for the CAT LLC as well as regular updates to the budget that occur during the year. This budget information is readily accessible to the public on a dedicated web page on the CAT NMS Plan. CAT LLC does not just provide the annual budget, or the mid-year budget, the two budgets that would be necessary for the fee filings; it also provides other updates each year. Accordingly, Industry Members and other members of the public will have the opportunity to review regular updates of the budget more often than is necessary for the fee filings. Such transparency would allow Industry Members and other members of the public to understand the budget and changes thereto throughout the year. Moreover, the fee filing process under section 19(b) of the Exchange Act provides the public with the opportunity to review the budgeted CAT costs that CAT LLC would seek to recover via the CAT Fees.

B. Independent Cost Review Mechanism

CAT LLC also does not believe that it would be necessary or appropriate to include an independent review mechanism for the cost of proposed CAT expenditures. First, as a preliminary matter, unlike the Commission, CAT LLC is not a governmental entity, with a responsibility to the taxpaying public. It is a private entity subject to the regulatory requirements of the Exchange Act. Second, such a budget review process is unnecessary as any CAT fees proposed to be established pursuant to the CAT NMS Plan are already subject to the existing, well-established review practices under Rule 608 of Regulation NMS under the Exchange Act and section 19(b) of the Exchange Act and Rule 19b–4 thereunder. Under those provisions, CAT fees must be filed with the SEC, thereby providing transparency and an opportunity for comment by the public, and may only be implemented if they satisfy the requirements of the Exchange Act. Third, the SEC has the ability to request budget and financial information from CAT LLC to the extent that it believes that such additional information is necessary for it to evaluate any CAT fee proposals.

m. Allocation of Past CAT Costs to Participants: Pro Rata Versus Use of Funding Proposal

The Participants have been responsible for all costs related to the CAT to date, and Industry Members have not paid any of the costs to date. Accordingly, under the Funding Proposal, the Participants would not be required to pay a CAT fee related to Past CAT Costs in addition to prior payments. The two-thirds of the Historical CAT Costs collected from Industry Members would be allocated to the Participants pro rata, based on the outstanding amounts due under the notes to the Participants for repayment of outstanding loan notes to the Company. The one-third of Historical CAT Costs that are not allocated to Industry Members would not be allocated to the Participants pursuant to the Funding Proposal based on executed equivalent shares. Instead, such Historical CAT Costs would be allocated to the Participants pro rata based on the outstanding amounts due under the notes (as discussed further below in Section A.9.n of this filing). CAT LLC entered into the loans with the Participants pursuant to its authority under the CAT NMS Plan as approved by the SEC to pay for CAT costs, and, as such, the loans and their repayment terms are consistent with the Exchange Act and Rule 608 of Regulation NMS. The terms of the loans do not need to satisfy the requirements of the funding model set forth in Article XI of the CAT NMS Plan.

Section 3.9 of the CAT NMS Plan states that "[i]f the Company requires additional funds to carry out its purposes, to conduct its business, to meet its obligations, or to make any expenditure authorized by this Agreement, the Company may borrow funds from such one or more of the Participants, or from such third party lender(s), and on such terms and conditions, as may be approved by a Supermajority Vote of the Operating Committee." As the Company—CAT LLC—did not have a source of revenue to fund its activities without a funding model approved by the SEC, CAT LLC determined to borrow funds from the Participants on terms approved by a Supermajority Vote of the Operating Committee. After this vote, CAT LLC entered into loan agreements with the Participants to cover CAT costs. The terms of the loan agreements dictate that repayment of the notes will be pro rata, based on the outstanding amounts loaned to CAT LLC. Accordingly, CAT LLC is obligated by contract, approved in accordance with the terms of the CAT NMS Plan, to repay the notes pro rata, not by another method.

Moreover, Section 3.8 of the CAT NMS Plan states that "[e]xcept as may be determined by the unanimous vote of all the Participants or as may be required by applicable law, no Participant shall be obligated to contribute capital or make loans to the Company." The Participants voluntarily have agreed to provide loans to CAT LLC under the agreed upon terms to fund the CAT until a funding model is approved. Without a unanimous vote of the Participants, however, CAT LLC cannot require the Participants to make a new loan to CAT LLC. Accordingly, without the agreement of the Participants, the loans must be repaid in accordance with their terms.

n. Sufficient Detail Regarding Pro Rata Allocation of Past CAT Costs to Participants

Further with regard to the pro rata allocation of Past CAT Costs, the manner in which the loans are repaid are governed by the loan agreements between CAT LLC and the Participants, as approved by CAT LLC. The following provides additional detail as to the allocation of Past CAT Costs to Participants in accordance with the loans to CAT LLC.

Pending SEC approval of CAT fees to fund the CAT, the Participants voluntarily determined to fund the development and operation of the CAT through quarterly loans to CAT LLC. The Participants determined to use the market share, tier-based funding model applicable to Execution Venues described in the proposed amendment to the CAT NMS Plan submitted to the SEC on December 11, 2017 (without including ATSs as Equity Execution Venues) to allocate loan amounts among Participants ("Tiered Market Share Proposal").[111] As described in that proposal, each Equity Execution Venue is placed in one of four tiers of fixed fees based on market share, and each Options Execution Venue is placed in one of two tiers of fixed fees based on market share. Equity Execution Venue market share is determined by calculating each Equity Execution Venue's proportion of the total volume of NMS Stock and OTC Equity shares reported by all Equity Execution Venues during the relevant time period. For purposes of calculating market share, the OTC Equity Securities market share of Execution Venue ATSs trading OTC Equity Securities as well as the market share of the FINRA OTC reporting facility are discounted. Similarly, market share for Options Execution Venues is determined by calculating each Options Execution Venue's proportion of the total volume of Listed Options contracts reported by all Options Execution Venues during the relevant time period. The tiers are

_____

[111] *See* 2018 Fee Proposal Release.

refreshed on a quarterly basis in accordance with the Tiered Market Share Proposal.

Each of the Participants voluntarily have loaned CAT LLC funds in amounts in accordance with the Tiered Market Share Proposal to cover Past CAT Costs. Accordingly, under the Funding Proposal, the Participants propose to be reimbursed for two-thirds of the Historical CAT Costs pro rata based on the outstanding amounts loaned to CAT LLC pursuant to the Tiered Market Share Proposal, as this is what is required under the loan contract between CAT LLC and the Participants. Correspondingly, for the remaining one-third of the Historical CAT Costs that are not reimbursed via the Historical CAT Assessment, the Participants propose to remain responsible for the amounts loaned to CAT LLC pursuant to the Tiered Market Share Proposal. The Participants' one-third share of the Historical CAT Costs would be paid by the cancellation of the loans on a pro rata basis. In addition, for any Past CAT Costs that are excluded from Historical CAT Costs, the Participants propose to remain responsible for the amounts loaned to CAT LLC pursuant to the Tiered Market Share Proposal as well. These excluded costs also would be paid by cancellation of the loans on a pro rata basis.

o. Past CAT Costs: Collected From Current Versus Past Industry Members and Use of Prior Month's Transactions

CAT LLC believes that Historical CAT Assessments are appropriately assessed to current Industry Members based on current market activity. CAT LLC does not believe that Historical CAT Assessments should be charged to Industry Members that were active at the time when the Past CAT Costs were incurred and based on trading activity from the time when the Past CAT Costs were incurred.

CAT LLC believes that it is appropriate to collect the Historical CAT Assessments from current Industry Members based on current market activity because current market participants are the beneficiaries of the regulatory value provided by the CAT to the securities markets. The SEC has emphasized that the CAT provides a benefit to all market participants,[112] and, therefore, current Industry Members are benefitting from the efforts to create and operate the CAT.

In addition, the approach recognizes the many practical difficulties of imposing fees retroactively on Industry Members' market activity from the past,

sometimes years in the past as the relevant recovery period extends to 2012. For example, one of the practical difficulties may include the fact that some Industry Members that would be subject to such a retroactive fee may no longer be in business or no longer registered as a broker-dealer that is subject to the jurisdiction of the Participants or SEC. Indeed, this is likely to be a substantial issue. For example, in the SEC's approval order of the CAT NMS Plan, the SEC used an estimate of 1,800 broker-dealers subject to CAT reporting for its cost estimates.[113] However, the number of current Industry Members has greatly diminished from these early estimates to approximately 1,100.[114] Therefore, at least approximately 40% of the broker-dealers that may have been subject to CAT reporting in 2012 are no longer CAT Reporters.

Another practical issue involves the difficulty of accurately determining the transactions in Eligible Securities of the Industry Member for the past decade that would be subject to CAT fees. Because the recovery period for Past CAT Costs spans a period in which the CAT was not in existence yet, as well as periods in which CAT reporting was being phased in, the CAT may not have any record of relevant transactions from earlier periods, and it may not have a complete record of the relevant transactions for later periods. The SEC anticipated the recovery of CAT fees after such costs were incurred, as it contemplated the recovery of CAT costs for the creation of the CAT as well as its implementation and maintenance.[115]

Moreover, imposing retroactive fees for past market activity could raise fairness issues. For example, because the fee would be retroactive, market participants could not have taken into consideration the CAT fee when they decided to enter into the transactions in the past. In addition, given the passage of time, past CAT Reporters, particularly small CAT Reporters, may not be in a position to pay a fee related to earlier market activity.[116]

In addition, CAT LLC notes that the SEC has approved similar funding practices with regard to new Participants for the CAT as well as new participants for other national market system plans. In each case, the new participant is required to pay a fee to join the plan, and the fee is based on past costs for creating, implementing and maintaining the plan at issue.[117] As a result, a new participant would be required to pay a fee for costs incurred in the past by the relevant plan. For example, Section 3.3 of the CAT NMS Plan states that, to become a new Participant to the CAT NMS Plan, the applicant must:

pay a fee to the Company in an amount determined by a Majority Vote of the Operating Committee as fairly and reasonably compensating the Company and the Participants for costs incurred in creating, implementing, and maintaining the CAT, including such costs incurred in evaluating and selecting the Initial Plan Processor and any subsequent Plan Processor and for costs the Company incurs in providing for the prospective Participant's participants in the Company, including after consideration of the factors identified in Section 3.3(b) (the ''Participation Fee'').

As this provision indicates, new CAT Participants are required to contribute to paying for costs incurred since the inception of the CAT. Indeed, the costs related to evaluating and selecting the Initial Plan Processor were incurred in 2017 and before.[118] For example, a CAT Participant applicant in 2023 may be required to pay a fee that reflects CAT costs incurred years ago. Similarly, the Funding Proposal would require current Industry Members to pay a share of CAT costs from years ago.

p. Budgeted Versus Incurred Costs

Under the Funding Proposal, the budgeted CAT costs set forth in the annual operating budget would be used to determine the Fee Rate for CAT Fees related to Prospective CAT Costs. The budgeted CAT costs would comprise estimated fees, costs and expenses to be reasonably incurred by the Company for the development, implementation and operation of the CAT during the year,

---

[112] *See generally* Rule 613 Adopting Release.

[113] CAT NMS Plan Approval Order at 84862.

[114] An average of 1,124 unique CAT Reporters sent transaction data to the CAT from July 1, 2022 to August 8, 2022.

[115] *See, e.g.,* Rule 613(a)(1)(vii)(D) of Regulation NMS under the Exchange Act.

[116] CAT LLC notes, however, that there has been substantial continuity in the largest Industry Members over time. For the illustrative example, the top 10 firms in terms of equivalent executed shares in December 2022 are allocated more than half (52%) of the total Industry Member CAT costs; eight of those 10 firms were also ranked in the top 10 throughout 2021. The remaining two were ranked 14th and 15th, respectively. Similarly, of the top 30 firms in December 2022 (representing an

allocation of 82% of the total Industry Member CAT costs), all but three ranked in the top 30 throughout 2021. The three exceptions were ranked at 31, 33 and 40 in 2021. Furthermore, of the top 10 firms by CAT record volume year to date in 2023, 7 were also top 10 reporters by message volume in 2020. The other three rose from ranks 17, 18, and 35. Of the top 30 firms by CAT record volume year to date in 2023, 25 were in the top 30 reporters of 2020.

[117] *See, e.g.,* Section III(b) of the CTA Plan; Section VIII of the UTP Plan.

[118] Letter from Participants, to Brent J. Fields, Secretary, SEC re: Selection of Plan Processor for the National Market System Plan Governing Consolidated Audit Trail (Jan. 18, 2017).

which would include costs for the Plan Processor, insurance, and third-party support, as well as an operational reserve. CAT LLC does not propose to use costs already incurred in calculating the CAT Fees.

CAT LLC believes that using budgeted CAT costs, rather than CAT costs already incurred, is critical to "build[ing] financial stability to support the Company as a going concern." [119] Using budgeted CAT costs to determine the Fee Rate would allow CAT LLC to collect fees before bills become payable. If, however, CAT Fees are only collected after bills become payable, then the Participants would be required to continue to fund 100% of CAT costs to pay the bills as they come due. Making the Participants responsible for all of the CAT costs upfront, rather than one-third of the CAT costs, would change the proposed model in a significant manner.

Requiring the calculation of the Fee Rate based on incurred CAT costs, rather than budgeted CAT costs would only be necessary if budgeted and incurred CAT costs were likely to diverge. However, the Funding Proposal has been designed to address this concern. As proposed, CAT LLC would be required to calculate the Fee Rate each year based upon the budget for the upcoming year, and to adjust the fee rate mid-year to reflect changes in the budgeted or actual CAT costs or the projected or actual executed equivalent share volume. Accordingly, CAT LLC would be required to adjust CAT Fees twice a year to ensure that they are closely aligned with CAT costs. Moreover, when establishing the annual budget or its mid-year adjustment, CAT LLC would adjust the budget to reflect any surplus or deficit in CAT Fees collected during the prior period.

In addition, the CAT NMS Plan requires that the Company operate on a "break-even" basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits. To ensure that the Participants' operation of the CAT will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." In addition, CAT LLC proposes to limit the size of the reserve to not more than 25% of the annual budget. To the extent that collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget,

such surplus shall be used to offset future fees.[120] Furthermore, CAT LLC is set up as a business league to mitigate concerns that CAT LLC's earnings could be used to benefit individual Participants.[121]

q. Continuous Fees Versus Sunsetting Fees

CAT LLC does not propose to require the proposed CAT Fees related to Prospective CAT Costs to sunset automatically; instead, a CAT Fee would continue until a new CAT Fee is in place in accordance with the requirements of the CAT NMS Plan and section 19(b) of the Exchange Act. CAT LLC believes that it is critical that a CAT Fee remain in place at all times. Accordingly, CAT LLC proposes to add Section 11.3(a)(i)(A)(III) of the CAT NMS Plan to clarify that CAT Fees related to Prospective CAT Costs do not sunset automatically; such CAT Fees would remain in place until new CAT Fees with a new Fee Rate is in effect.

The financial viability of the CAT would be put at risk without a constant source of revenue. CAT LLC pays various bills, including technology bills, on a monthly basis. Accordingly, even short delays in the implementation of new CAT Fees after the sunsetting of a prior CAT Fee may have a deleterious effect on the operation of the CAT. Indeed, adopting sunsetting fees would contradict the funding principle of seeking to "build financial stability to support the Company as a going concern." [122]

Moreover, CAT LLC does not believe that a sunsetting requirement is necessary to ensure that the CAT Fees are closely coordinated with Prospective CAT costs. CAT LLC has proposed a comprehensive, multi-pronged approach to ensure that the CAT Fees are closely tied to CAT costs. First, CAT LLC will be required to calculate the Fee Rates for the CAT Fees based on budgeted CAT costs. In addition, CAT LLC will be required to calculate the Fee Rate twice a year to determine whether the Fee Rate has changed due to changes in the budgeted or actual costs or actual

or projected executed equivalent share volume, and to make a fee filing twice a year to reflect this calculation. Accordingly, the Fee Rate would be required to be updated twice a year, thereby ensuring the CAT Fees are closely tied to CAT costs.

Second, the CAT NMS Plan requires that the Company operate on a "break-even" basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits. To ensure that the Participants' operation of the CAT will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." Moreover, CAT LLC proposes to amend the CAT NMS Plan to limit the reserve to no more than 25% of the annual budget and to clarify that CAT fees collected in excess of the CAT costs, including the reserve, will be used to offset future fees.[123]

Third, CAT LLC proposes to amend the CAT NMS Plan to require Participants to provide significant details in their fee filings regarding Industry Member CAT Fees. Proposed paragraph (a)(iii)(B) of Section 11.3 of the CAT NMS Plan would state that, "[w]hen the Participants file with the SEC pursuant to section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3," such filings would be required to include (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or

---

[119] Section 11.2(f) of the CAT NMS Plan.

[120] *See* Proposed 11.1(a)(ii) of the CAT NMS Plan.

[121] To qualify as a business league under Section 501(c)(6) of the Internal Revenue Code, an organization must "not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual." As the SEC stated when approving the CAT NMS Plan, "the Commission believes that the Company's application for Section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the Company's earnings could be used to benefit individual Participants." CAT NMS Plan Approval Order at 84793.

[122] Section 11.2(f) of the CAT NMS Plan.

[123] *See* Proposed Section 11.1(a)(i) and (ii) of the CAT NMS Plan.

remainder of the year, as applicable), and a description of the calculation of the projection. This detail would describe how the Fee Rate was calculated and explain how the budget used in the calculation is reconciled to the collected fees. Such detailed information would provide Industry Members and other interested parties with a clear understanding of the calculation of the CAT fees and their relationship to CAT costs.

r. Conflicts of Interest

CAT LLC believes that the current process for developing the CAT funding model appropriately addresses potential conflicts of interest related to CAT fees. The CAT NMS Plan, as approved by the SEC, adopts various measures to protect against potential conflicts issues raised by the Participants' fee-setting authority, including, but not limited to, the fee filing requirements under the Exchange Act and operating the CAT on a break-even basis. CAT LLC believes that these and other measures address potential conflicts of interest related to CAT fees.

s. Effect on Efficiency, Competition or Capital Formation

CAT LLC believes that the Funding Proposal would have a positive impact on efficiency, competition and capital formation. The Funding Proposal is designed to provide a predictable revenue stream sufficient to cover CAT costs each year. In doing so, the Funding Proposal would be designed to maintain the CAT as a going concern financially. By providing for the financial viability of the CAT, the Funding Proposal would allow the CAT to provide its intended benefits. For example, the CAT is intended to provide significant improvements in efficiency related to how regulatory data is collected and used. In addition, by providing enhanced regulatory oversight and surveillance, the CAT could result in improvements in market efficiency by deterring violative activity. Similarly, the CAT is intended improve capital formation by improving investor confidence in the market due to enhancements in surveillance.

In addition, the Funding Proposal would not impose an inappropriate burden on competition. The Funding Proposal would operate in a manner similar to the funding models employed by the SEC and the Participants related to section 31 of the Exchange Act, the FINRA TAF and the ORF. These fees are long-standing and have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on the competition that is not necessary or

appropriate under the Exchange Act. In addition, the Funding Proposal avoids potentially burdensome fees for market makers or other market participants based on message traffic. Furthermore, the Funding Proposal addresses the specific trading characteristics of Listed Options and OTC Equity Securities to avoid adverse effects of the trading of those instruments. For example, the Funding Proposal includes the discounting of transactions involving OTC Equity Shares which, given the volume of shares typically involved in such securities transactions, otherwise may result in disproportionate fees to market participants engaging in transaction in these securities.

The Funding Proposal also would not unfairly burden FINRA or any of the exchanges. The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are self-regulatory organizations that have the same regulatory responsibilities under the Exchange Act. Their usage of CAT Data will be for the same regulatory purposes. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants.

CAT LLC does not believe that this proposal would unfairly burden CEBBs and CEBSs. Such a transaction-based fee is a type of fee that is currently used and well-known in the securities markets. For example, SRO members regularly pay transaction-based fees. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes. Moreover, the CEBBs and CEBSs could determine, but would not be required, to pass their CAT fees through to their customers, who, in turn, could pass their CAT fees to their customers, until the fee is imposed on the ultimate participant in the transaction. With such a pass through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to their transactions.

t. Straightforward Approach

One advantage of the Funding Proposal is that the approach is simple, straightforward and easy to understand. Using the predetermined Fee Rate or Historical Fee Rate, CAT LLC would calculate CAT fees by multiplying the number of executed equivalent shares in each Participant, CEBB or CEBS's transactions in Eligible Securities by the Fee Rate or Historical Fee Rate (as applicable) and one-third. The values

necessary for the calculation are readily available. The Fee Rates and Historical Fee Rates would be publicly available, and Participants, CEBBs and CEBSs have easy access to their transaction data. Moreover, the two adjustments—one for Listed Options and one for OTC Equity Securities—are similarly straightforward calculations. The Funding Proposal does not include other complexities, such as tiered fees, minimum or maximum fees, excluded types of Eligible Securities or excluded transactions in Eligible Securities.

u. Predictable Fees

The Funding Proposal also provides CAT Reporters with predictable CAT fees. Because the fee rates would be established in advance, Participants, CEBBs and CEBSs can calculate the CAT fee that applies to each transaction when it occurs. Accordingly, CAT Reporters with a CAT fee obligation may easily estimate and validate their applicable fees based on their own trading data. In addition, to the extent any CAT fees are passed on to customers, such customers also can calculate the applicable CAT fee for each transaction.

The predictability of CAT fees under the Funding Proposal improves upon the lack of fee predictability in the Original Funding Model and other message traffic-based models.[124] For example, with potential message traffic models,[125] CAT Reporters would not know the actual per message rate until after the end of the relevant reporting period for which they were assessed the fee and also could not determine in advance the number of messages that may be associated with a given order or the total number of messages, thereby making it difficult for a CAT Reporter to predict a CAT fee related to its market activity. In addition, this lack of predictability related to message-based fees also could complicate efforts by Industry Members to estimate, explain and directly pass message-based fees back to customers, particularly if no trade has occurred.

v. Administrative Ease

The Funding Proposal also would allow for "ease of billing and other administrative functions."[126] As discussed above, the Funding Proposal relies upon a basic calculation using

---

[124] *See* Securities Exchange Act Rel. No. 92451 (July 20, 2021), 86 FR 40114, 40122 (July 26, 2021) ("2021 Fee Proposal OIP").

[125] Potential message traffic models, including the 2018 Fee Proposal and 2021 Fee Proposal, and the message traffic only model, are discussed further below in Section A.10 of this filing.

[126] Section 11.2(d) of the CAT NMS Plan.

predetermined fee rate, thereby making the fee determination a straightforward process. In addition, the CAT fees will be collected in a manner similar to the collection process that Industry Members are already accustomed, thereby further reducing the administrative burden on the industry.

w. Equal Treatment of Trading Venues

The Funding Proposal also has the benefit of treating transactions in Eligible Securities equally regardless of the trading venue. The Fee Rate or Historical Fee Rate would be the same regardless of whether a trade was executed on an exchange or in the OTC market, or how the trade ultimately occurred more generally (*e.g.,* in a manner that generated more message traffic). As a result, it would not favor or unfairly burden any one type of trading venue or method.

x. Equitable Treatment of Different Eligible Securities

The Funding Proposal also recognizes and addresses the different trading characteristics of different types of securities. Recognizing that Listed Options trade in contracts rather than shares, the Funding Proposal would count executed equivalent share volume differently for Listed Options. Specifically, each executed contract for a transaction in Listed Options would be counted based on the multiplier applicable to the specific Listed Option contract in the relevant transaction (*e.g.,* 100 executed equivalent shares or such other applicable equivalency). Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating the CAT fees. Specifically, each executed share for a transaction in OTC Equity Securities would be counted as 0.01 executed equivalent shares. As a result, the Funding Proposal would not favor or unfairly burden any one type of product or product type.

y. Contributions by Both Industry Members and Participants

The Funding Proposal would require both Participants and Industry Members to contribute to the funding of the CAT. To date, the Participants have paid the full cost of the creation, implementation and maintenance of the CAT since 2012, pending Commission approval of a fee model. The continued funding of the CAT solely by the Participants was and is not contemplated by the CAT NMS Plan, nor is it a financially sustainable approach. As noted by the SEC, the CAT

"substantially enhance[s] the ability of the SROs and the Commission to oversee today's securities markets," [127] thereby benefiting all market participants. The Funding Proposal would require both Participants and Industry Members to contribute to the cost of the CAT, as contemplated by Rule 613 and the CAT NMS Plan.

Rule 613(a)(1)(vii)(D) specifically contemplates Industry Members contributing to the payment of CAT costs. Specifically, this provision requires the CAT NMS Plan to address "[h]ow the plan sponsors propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of such estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors." In approving Rule 613, the SEC noted that "although the plan sponsors likely would initially incur the costs to establish and fund the central repository directly, they may seek to recover some or all of these costs from their members." [128]

In addition, as approved by the SEC, the CAT NMS Plan specifically contemplates CAT fees to be paid by both Industry Members and Participants. Section 11.1(b) of the CAT NMS Plan states that "the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by the Participants." [129] The Commission stated in approving the CAT NMS Plan the following:

The Commission believes that the proposed funding model reflects a reasonable exercise of the Participants' funding authority to recover the Participants' costs related to the CAT. The CAT is a regulatory facility jointly owned by the Participants and, as noted above, the Exchange Act specifically permits the Participants to charge members fees to fund their self-regulatory obligations. The Commission further believes that the proposed funding model is designed to impose fees reasonably related to the Participants' self-regulatory obligations because the fees would be directly associated with the costs of establishing and maintaining the CAT, and not unrelated SRO services.[130]

Likewise, the Commission stated that "the Participants are permitted to recoup their regulatory costs under the Exchange Act through the collection of

fees from their members, as long as such fees are reasonable, equitably allocated and not unfairly discriminatory, and otherwise are consistent with Exchange Act standards," [131] and noted that "Rule 613(a)(1)(vii)(D) requires the Participants to discuss in the CAT NMS Plan how they propose to fund the creation, implementation and maintenance of the CAT, including the proposed allocation of estimated costs among the Participants, and *between the Participants and Industry Members.*" [132]

In its amendments to the CAT NMS Plan regarding financial accountability, the SEC reaffirmed the ability for the Participants to charge Industry Members a CAT fee. Specifically, the SEC noted that the amendments were not intended to change the basic funding structure for the CAT, which may include fees established by the Operating Committee, and implemented by the Participants, to recover from Industry Members the costs and expenses incurred by the Participants in connection with the development and implementation of the CAT.[133]

z. Use of CAT Data

CAT Data would be used to calculate the CAT fees under the Funding Proposal. CAT Data would be used to identify each transaction in Eligible Securities for which a CAT fee would be collected. Specifically, CAT fees will be charged with regard to trades reported to CAT by FINRA via the ADF/ORF/TRF and by the exchanges. In addition, the same transaction data in the CAT Data would be used in the calculation of the projected total executed equivalent share volume for the Fee Rate. Furthermore, the transaction data in the CAT Data provides the identity of the relevant CAT Executing Brokers for each transaction for purposes of the CAT fees. Using CAT Data for the CAT fee calculations provides administrative efficiency, as the data will be accessible via the CAT.

aa. Twelve Month Look Back for Projected Volume

The calculation of the Fee Rate and the Historical Fee Rate requires the determination of the projected total executed equivalent share volume of transactions in Eligible Securities for the year. CAT LLC proposes to determine this projection based on the total executed equivalent share volume of transactions in Eligible Securities from the prior twelve months. CAT LLC

[127] Rule 613 Adopting Release at 45726.
[128] *Id.* at 45795.
[129] *See also* Sections 11.1(c), 11.2(c), and 11.3(a) and (b) of the CAT NMS Plan.
[130] CAT NMS Plan Approval Order at 84794.

[131] *Id.* at 84795.
[132] *Id.* at 84797 (emphasis added).
[133] Securities Exchange Act Rel. No. 88890 (May 15, 2020), 85 FR 31322, 31329 (May 22, 2020).

determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to avoid short term fluctuations while providing data close in time to the calculation of the Fee Rate or Historical Fee Rate. In addition, using twelve months, rather a period less than a year, would address the issue of potential seasonality. For example, if the projection were based on a period shorter than one year, the projection could be based on a period that typically has lighter trading volume than the other half of the year, thereby causing the projection to be too low.

bb. Cost Discipline Mechanisms

The reasonableness of the Funding Proposal and the fees calculated under the Funding Proposal are supported by key cost discipline mechanisms for the CAT—a cost-based funding structure, cost transparency, cost management efforts and oversight. Together, these mechanisms help ensure the ongoing reasonableness of the CAT's costs and the level of fees assessed to support those costs.

First, the CAT NMS Plan requires that the Company operate on a ''break-even'' basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits.[134] To ensure that the Participants' operation of the CAT will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that ''[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.'' In addition, as set forth in Article VIII of the CAT NMS Plan, the Company ''intends to operate in a manner such that it qualifies as a 'business league' within the meaning of section 501(c)(6) of the [Internal Revenue] Code.'' To qualify as a business league, an organization must ''not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual.''[135] As the SEC stated when approving the CAT NMS Plan, ''the Commission believes that the Company's application for section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the Company's earnings could be

used to benefit individual Participants.''[136] The Internal Revenue Service has determined that the Company is exempt from federal income tax under section 501(c)(6) of the Internal Revenue Code.

Second, the CAT's commitment to reasonable funding in support of its regulatory obligations is further reinforced by the transparency it has committed to provide on an ongoing basis regarding its financial performance. The Company currently makes detailed financial information about the CAT publicly available. Section 9.2(a) of the CAT NMS Plan requires the Operating Committee to maintain a system of accounting established and administered in accordance with GAAP and requires ''all financial statements or information that may be supplied to the Participants shall be prepared in accordance with GAAP (except that unaudited statements shall be subject to year-end adjustments and need not include footnotes).'' Section 9.2(a) of the CAT NMS Plan also requires the Company to prepare and provide to each Participant ''as soon as practicable after the end of each Fiscal Year, a balance sheet, income statement, statement of cash flows and statement of changes in equity for, or as of the end of, such year, audited by an independent public accounting firm.'' The CAT NMS Plan requires that this audited balance sheet, income statement, statement of cash flows and statement of changes in equity be made publicly available. Among other things, these financial statements provide operating expenses, including technology, legal, consulting, insurance, professional and administration and public relations costs. The Company also maintains a dedicated web page on the CAT NMS Plan website that consolidates its annual financial statements in a public and readily accessible place.[137]

In addition, the Company publicly provides the annual operating budget for the Company as well as periodically provides updates to the budget that occur during the year. The Company includes such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible, like the CAT financial statements.

CAT LLC also has held webinars providing additional detail about CAT costs and about potential alternative

funding models for the CAT.[138] In addition, CAT LLC plans to offer additional webinars on cost and funding for the industry as appropriate going forward. Collectively, these reports and other efforts provide extensive and comprehensive information regarding the CAT's operations with respect to its budgets, revenues, costs, and financial reserves, among other information.

Third, CAT LLC regularly engages in and oversees efforts to reduce CAT costs responsibly while appropriately funding its regulatory obligations. CAT LLC's efforts to manage its expenses responsibly include oversight of the CAT's annual budget, including technology and other expenditures and initiatives. This oversight is informed by key CAT working groups, such as the Technology Working Group, Regulatory Working Group and Interpretive Working Group, each of which brings varied expertise to issues of responsible cost management. In particular, the Operating Committee currently utilizes a Cost Management Working Group to analyze opportunities to manage CAT costs responsibly. In addition, the Plan Processor regularly reviews options to lower compute and storage needs and works with CAT technology providers to provide services in a cost-effective manner. These collective efforts have led to a variety of technological changes to reduce costs.

Fourth, the CAT's funding and operations are subject to the oversight of the Commission. The CAT is extensively supervised by the Commission, including regular and continuous attendance at Operating Committee, Subcommittee and working group meetings. In addition, CAT fees as well as cost management efforts that require an amendment of the CAT NMS Plan are subject to review by the Commission's Division of Trading and Markets, as well as public comment.

10. Alternative Models Considered

CAT LLC has determined to propose the Funding Proposal to fund the CAT for the reasons discussed above. In reaching this conclusion, CAT LLC considered the advantages and disadvantages of a variety of possible alternative funding and cost allocation models for the CAT in detail. After analyzing the various alternatives and considering comments on the

---

[134] CAT NMS Plan Approval Order at 84792.
[135] 26 U.S.C. 501(c)(6).

[136] CAT NMS Plan Approval Order at 84793.
[137] *See* CAT Audited Financial Statements, *https://www.catnmsplan.com/audited-financial-statements.*

[138] *See, e.g.,* CAT LLC Webinar CAT Costs (Sept. 21, 2021), *https://www.catnmsplan.com/events/cat-costs-september-21-2021;* CAT LLC Webinar, CAT Funding (Sept. 22, 2021), *https://www.catnmsplan.com/events/cat-funding-september-22-2021;* and CAT LLC Webinar, CAT Funding (Apr. 6, 2022), *https://www.catnmsplan.com/events/cat-funding.*

previously proposed models, CAT LLC determined that, although various funding models may be reasonable and appropriate, the Funding Proposal provides a variety of advantages in comparison to the alternatives, and satisfies the requirements of the Exchange Act, including providing for an equitable allocation of reasonable fees among CAT Reporters, not being designed to permit unfair discrimination among CAT Reporters and not imposing any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

a. 2018 Fee Proposal

CAT LLC previously filed a fee proposal in line with the CAT NMS Plan—the 2018 Fee Proposal.[139] Under that model, CAT LLC, among other things, proposed a 75%–25% allocation of CAT costs between Execution Venues (which included Participants and Execution Venue ATSs) and Industry Members (other than Execution Venue ATSs), and required Execution Venues to pay fees based on market share, and Industry Members (other than Execution Venue ATSs) to pay fees based on CAT message traffic.[140]

Each Industry Member (other than Execution Venue ATSs) would be placed into one of seven tiers of fixed fees, based on CAT message traffic in Eligible Securities. Options Market Maker and equity market maker quotes would be discounted when calculating message traffic.

CAT LLC determined to allocate 67% of Execution Venue costs recovered to Equity Execution Venues and 33% to Options Execution Venues. Each Equity Execution Venue would be placed in one of four tiers of fixed fees based on market share, and each Options Execution Venue would be placed in one of two tiers of fixed fees based on market share. Equity Execution Venue market share would be determined by calculating each Equity Execution Venue's proportion of the total volume of NMS Stock and OTC Equity shares reported by all Equity Execution Venues during the relevant time period. For purposes of calculating market share, the OTC Equity Securities market share of Execution Venue ATSs trading OTC Equity Securities as well as the market share of the FINRA OTC reporting facility would be discounted. Similarly, market share for Options Execution Venues would be determined by calculating each Options Execution Venue's proportion of the total volume of Listed Options contracts reported by all Options Execution Venues during the relevant time period.

The 2018 Fee Proposal was a very complex model with many interrelated parts, including allocation percentages, discounts for certain market behavior, and multiple tiered fees, and the complexity raised concerns from the Commission regarding its use as the CAT funding model. In addition, in response to the proposal, the industry provided a number of other comments related to the proposal, including comments regarding the proposed allocation of CAT costs between Participants and Industry Members, and the ability of certain market segments to afford the proposed CAT fee.[141]

b. 2021 Fee Proposal

In response to the comments on the 2018 Fee Proposal, CAT LLC determined to revise various aspects of the proposed model, thereby developing the 2021 Fee Proposal.[142] The 2021 Fee Proposal would have continued to require many of the same elements as the 2018 model, including the bifurcated funding approach, and the use of market share and message traffic for allocating costs, as required by the current CAT NMS Plan. The 2021 Fee Proposal, however, proposed to revise the model in certain ways, including (1) dividing the CAT costs between Participants and Industry Members, rather than between Execution Venues and Industry Members (other than Execution Venue ATSs); (2) eliminating the use of tiers in calculating CAT fees for Participants and Industry Members; (3) adopting certain minimum and maximum CAT fees for Industry Members and Participants; (4) revising the allocation between Equity Execution Venues and Options to be 60%–40%; and (5) excluding, rather than discounting, market share in OTC Equity Shares from the calculation of market share for FINRA.

Although the revisions of the 2021 Fee Proposal addressed certain comments on the prior 2018 Fee Proposal, commenters continued to raise issues regarding the proposal. For example, commenters provided feedback regarding the 75%–25% cost allocation between Industry Members and Participants, the 60%–40% cost allocation between Equity Participants and Options Participants, the use of market share and message traffic for allocating costs among Participants and Industry Members, respectively, and the proposed minimum and maximum fees. Noting these and other issues, the SEC determined to institute proceedings to determine whether to disapprove the 2021 Fee Proposal or to approve the proposal with any changes or subject to any conditions the SEC deemed necessary or appropriate after considering public comment.[143] Ultimately, the Operating Committee determined to withdraw the 2021 Fee Proposal.[144]

c. Revenue Funding Model

CAT LLC also considered a model in which all CAT Reporters, including both Industry Members and Participants, would pay fees based solely on revenue. The concept underlying this proposal is that CAT costs would be borne by CAT Reporters based on their ability to pay. Under this model, Industry Member revenue would be calculated based on revenue reported in FOCUS reports, and Participant revenue would be calculated based on revenue information in Form 1 amendments and other publicly reported figures.

CAT LLC did not select this model for various reasons. Under this approach, Participants as a group would only pay approximately 4% of the total CAT costs. Given their role as SROs and their use of the CAT, CAT LLC did not believe that such a small allocation of the CAT costs to the Participants was appropriate. Using revenue also raised a variety of practical issues. For example, questions were raised as to what revenue was appropriate to include in the calculation of revenue for Industry Members. The gross revenue set forth on FOCUS reports was proposed, as it was similar to an existing FINRA regulatory

---

[139] For a description of the 2018 Fee Proposal, *see* 2018 Fee Proposal Release. CAT LLC later withdrew this proposed amendment. Securities Exchange Act Rel. No. 82892 (Mar. 16, 2018), 83 FR 12633 (Mar. 22, 2018).

[140] In developing the 2018 Fee Proposal, CAT LLC considered many variations of different aspects of that model. For example, CAT LLC evaluated different cost allocations between Industry Members (other than Execution Venue ATSs) and Execution Venues, including 80%–20%, 75%–25%, 70%–30% and 65%–35% allocations, and different cost allocations between Equity and Options Execution Venues. CAT LLC also considered different discounts for equities and options market makers, different numbers of tiers of Industry Members and Execution Venues, different fee levels for each tier, and other aspects of the model.

[141] For a discussion of comments made regarding the Original Funding Model and the 2018 Fee Proposal, *see generally* 2018 Fee Proposal Release.

[142] *See* 2021 Fee Proposal Release.

[143] *See* 2021 Fee Proposal OIP. *See also* Securities Exchange Act Rel. No. 93227 (Oct. 1, 2021), 86 FR 55900 (Oct. 7, 2021).

[144] Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Dec. 8, 2021).

fee.[145] However, questions were raised as to whether revenue unrelated to NMS Securities or OTC Equity Securities, or otherwise unrelated to the CAT, should be included for calculation of the CAT fee. Eliminating revenue unrelated to CAT-related activity would have been difficult or impossible. In addition, the lack of a uniform approach to calculating revenue for the Participants could raise inequities in the collection of a CAT fee.

To address the issues regarding the 96%–4% allocation and the calculation of the Participant revenue in the straight revenue model described above, CAT LLC considered an alternative version of the revenue model in which the CAT costs would be allocated between Industry Members and Participants based on a set percentage (*e.g.,* 75%–25%) and the Industry Member allocation would be allocated among Industry Members based on revenue and the Participant allocation would be allocated among Participants based on market share. However, this alternative revenue model failed to address the issues regarding the appropriate revenue calculations for Industry Members.

### d. Message Traffic Only Model

CAT LLC considered a funding model in which CAT costs were allocated across all CAT Reporters—both Industry Members and Participants—based on message traffic in the CAT. Specifically, CAT LLC considered eliminating the concepts of a Participant allocation and an Industry Member allocation entirely, and treating Participants and Industry Members the same under the model. The use of message traffic, however, raised issues regarding the predictability of fees. It also introduced complexity to the model, as discounts were necessary for certain types of activity to avoid fees that may adversely impact market making activity and other market activity.

### e. Alternative Allocation for the Funding Proposal

The Operating Committee also discussed an alternative funding model that would calculate fees in a manner similar to the Funding Proposal, but would allocate the fee to one Industry Member, the CEBS, rather than allocating one-third of the fees each to the CEBS, the CEBB and the applicable Participant. This allocation would more closely parallel the existing section 31 fee allocation structure that is already in place. This alternative allocation would

eliminate complexity from the fee process, including the process of allocating fees among Industry Members and Participants that are likely to be passed through to the ultimate investors, and would provide for a more transparent funding process for investors. Instead of using this approach, CAT LLC determined to allocate costs among the main participants in a transaction and allow those participants to determine whether and how to recover the costs.

### f. Sales Value Model

CAT LLC also considered a funding model in which fees would be calculated based on transaction sales values, similar to the method used in the section 31/sales value fee programs. Under this model, the per sales value fee rate would be calculated by dividing the annual CAT budget by the projected annual total industry transaction sales values. The fee would be calculated by multiplying the sales value fee rate by a given trade's sales value. The CEBB, the CEBS and the relevant Participant would each be assessed one-third of the fee, or, in the alternative, the CEBS would be assessed two-thirds of the fee and the relevant Participants would be assessed one-third of the fee. The same rate would apply to all transactions equally, regardless of the type of product in the trade (*i.e.,* NMS Stocks, Listed Options or OTC Equity Securities). Based on an analysis of 2021 data, CAT LLC observed that the sales value model could potentially impose a disproportionate share of the CAT costs on Participants and Industry Members trading NMS Stocks versus Listed Options. In comparison, also based on an analysis of 2021 data, CAT LLC observed that the Funding Proposal would impose an equitable allocation of fees among Participants and Industry Members trading NMS Stocks and Listed Options, as well as OTC Equity Securities.

### g. Other Models

CAT LLC also considered other possible funding models. For example, CAT LLC considered allocating the CAT costs equally among each of the Participants, and then permitting each Participant to charge its own members as it deems appropriate. CAT LLC determined that such an approach raised a variety of issues, including the likely inconsistency of the ensuing charges, potential for lack of transparency, and the impracticality of multiple SROs submitting invoices for CAT charges. CAT LLC also discussed the advantages and disadvantages of various alternative models during the

development of the CAT NMS Plan, such as a cost allocation based on a strict pro-rata distribution, regardless of the type or size of the CAT Reporters.[146]

### 11. Satisfaction of Exchange Act and CAT NMS Plan Requirements

The Funding Proposal offers a variety of benefits over the Original Funding Model and satisfies each of the funding principles and other requirements of the CAT NMS Plan, as proposed to be revised herein, as well as the applicable requirements of the Exchange Act for the reasons discussed below and for the reasons discussed in more detail above.

### a. Funding Principle: Section 11.2(a) of the CAT NMS Plan

The Funding Proposal satisfies the funding principles set forth in Section 11.2(a) of the CAT NMS Plan. Section 11.2(a) of the CAT NMS Plan requires the Operating Committee, in establishing the funding of the Company, to seek "to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company."

First, by adopting a CAT-specific fee tied directly to CAT costs, CAT LLC would be fully transparent regarding the costs of the CAT and how those costs would be allocated among CAT Reporters. The CAT fees would be designed solely to cover CAT costs, and no other regulatory costs. In contrast, charging a general regulatory fee, which might otherwise be used to cover CAT costs as well as other regulatory costs, would be less transparent than the selected approach of charging a fee designated to cover CAT-related costs only. Such a general regulatory fee could cover a variety of regulatory costs without differentiating those costs related to the CAT.

Second, the Funding Proposal would provide a predictable revenue stream for the Company. The Funding Proposal is designed to collect the annual CAT costs each year, thereby providing for a predictable revenue stream. In addition, to address the possibility of some variability in the collected CAT fees, an unexpected increase in costs or variations from the budgeted costs or projected executed equivalent share volume of transactions in Eligible Securities, the CAT costs covered by the Funding Proposal would include an operational reserve. The operational reserve could be used in the event that

---

[145] *See* paragraphs (c) and (d) of Section 1 of Schedule A of FINRA's By-Laws regarding FINRA's annual Gross Income Assessment.

[146] For a discussion of alternatives considered in the drafting of the CAT NMS Plan, *see* Appendix C of the CAT NMS Plan at C–88–C–89.

**17120** **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

the total CAT fees collected differ from the actual CAT costs. Moreover, the Funding Proposal includes a method for adjusting the calculation of the Fee Rate during the year if there are changes in the projected total volume of transactions in Eligible Securities or the CAT costs.

Third, the Funding Proposal provides for a revenue stream for the Company that is aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company. The total CAT fees to be collected from CAT Reporters are designed to cover the CAT costs. Any surpluses collected would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits.[147]

b. Funding Principle: Section 11.2(b) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(b) of the CAT NMS Plan, as proposed to be amended herein, which would require the Operating Committee to seek ''to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT.'' As discussed in detail above, the Funding Proposal establishes an allocation of CAT costs among Participants and Industry Members that is consistent with the Exchange Act. In addition, the Funding Proposal provides for an equitable allocation of reasonable dues, is not unfairly discriminatory and does not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act. In addition, the Funding Proposal takes into account the timeline for implementation of the CAT. The CAT fees are designed to cover the CAT costs for each relevant period.

c. Funding Principle: Section 11.2(c) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(c) of the CAT NMS Plan, as proposed to be modified herein. Section 11.2(c), as proposed to be modified herein, requires the Operating Committee to seek ''to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT.'' The Funding Proposal requires Participants and Industry Members to pay fees based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT, as described above.

d. Funding Principle: Section 11.2(d) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(d) of the CAT NMS Plan, which requires the Operating Committee to seek ''to provide for ease of billing and other administrative functions.'' The Funding Proposal satisfies this principle in several ways. The Funding Proposal is modeled after the existing section 31-related fee programs, with which the Participants and Industry Members have a longstanding familiarity. The Funding Proposal relies upon a basic calculation using a predetermined fee rate along with an Industry Member or Participant's executed equivalent share volume, thereby making the fee determination a straightforward process.

Furthermore, the Funding Proposal provides CAT Reporters with predictable CAT fees. Because the Fee Rate is established in advance for a relevant time period, Participants, CEBBs and CEBSs know the CAT fee that applies to each transaction when it occurs. Accordingly, Participants, CEBBs and CEBSs are able to easily estimate and validate their applicable fees based on their own trading data. In addition, to the extent any CAT fees are passed on to customers, the customers, too, can calculate the applicable CAT fee for each transaction.

e. Funding Principle: Section 11.2(e) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(e) of the CAT NMS Plan, which requires the Operating Committee to seek ''to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality.'' The Funding Proposal would operate in a manner similar to the funding models employed by the SEC and the Participants related to section 31 of the Exchange Act, the FINRA TAF and the ORF. These fees are long-standing, and have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on competition that is not necessary or appropriate under the Exchange Act. In addition, the Funding Proposal avoids potentially burdensome fees for market makers or other market participants based on message traffic. Furthermore, the Funding Proposal addresses the specific trading characteristics of Listed Options and OTC Equity Securities to avoid adverse effects of the trading of those instruments. For example, the Funding Proposal includes the discounting of transactions involving OTC Equity Shares which, given the volume of shares typically involved in such securities transactions, otherwise may result in disproportionate fees to market participants transaction these securities.

The Funding Proposal also would not unfairly burden FINRA or any of the exchanges. The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are SROs that have the same regulatory responsibilities under the Exchange Act. Their usage of CAT Data will be for the same regulatory purposes. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants.

The Funding Proposal also would not unfairly burden CAT Executing Brokers. CAT LLC determined to charge CEBBs and CEBSs because such a fee collection model is currently used and well-known in the securities markets. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes. Moreover, the CEBBs and CEBSs would be permitted, but not required, to pass their CAT fees through to their customers, who, in turn, could pass their CAT fees to their customers, until the fee is imposed on the ultimate participant in the transaction. With such a pass through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to the transactions that they clear.

f. Funding Principle: Section 11.2(f) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(f) of the CAT NMS Plan, which requires the Operating Committee to seek ''to build financial stability to support the Company as a going concern.'' CAT LLC believes that the Funding Proposal is structured to collect sufficient funds to pay for the cost of the CAT going forward. In addition, the Funding Proposal would collect an operational reserve for the CAT. This operational reserve is intended to address potential shortfalls in collected CAT fees versus actual CAT costs. Moreover, the Funding Proposal includes a requirement to adjust the Fee Rate during the year in order to address any changes in the projected or actual total volume of transactions in Eligible

---

[147] CAT NMS Plan Approval Order at 84792.

Securities or the budgeted or actual CAT costs. Furthermore, the Funding Proposal is designed to collect CAT fees continuously so as to provide uninterrupted revenue to pay CAT bills; the CAT Fees related to Prospective CAT Costs are not designed to sunset.

g. Section 11.1(c) of the CAT NMS Plan

The Funding Proposal would satisfy the requirements in Section 11.1(c) of the CAT NMS Plan, as proposed to be modified herein. Section 11.1(c) of the CAT NMS Plan states that "[t]o fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs." The CAT fees are designed to cover the CAT costs for a relevant period. As such, on a going forward basis, they are designed to be imposed close in time to when costs are incurred. In addition, the Historical CAT Assessments are designed to "take into account fees, costs and expenses (including legal and consulting fees and expenses) reasonably incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members."

Section 11.1(c) of the CAT NMS Plan also requires that "[a]ny surplus of the Company's resources over its expenses shall be treated as an operational reserve to offset future fees." The Company would operate on a "break-even" basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would not be distributed to the Participants as profits. In addition, as set forth in Article VIII of the CAT NMS Plan, the Company "intends to operate in a manner such that it qualifies as a 'business league' within the meaning of section 501(c)(6) of the [Internal Revenue] Code." To qualify as a business league, an organization must "not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual." [148] As the SEC stated when approving the CAT NMS Plan, "the Commission believes that the Company's application for section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns

that the Company's earnings could be used to benefit individual Participants." [149] The Internal Revenue Service has determined that the Company is exempt from federal income tax under section 501(c)(6) of the Internal Revenue Code.

h. Equitable Allocation of Reasonable Fees

The proposed CAT fees provide for the "equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities necessary or appropriate in furtherance of the purposes of this chapter," [150] as required by the Exchange Act. CAT LLC believes that the CAT fees equitably allocate CAT costs between and among Participants and Industry Members. For the reasons discussed above, CAT LLC believes that the allocation of one-third of the CAT costs each to Participants, CEBBs and CEBSs in the Funding Proposal as well as the use of the total equivalent share volume of transactions in Eligible Securities for allocating costs provide for an equitable allocation of CAT costs among CAT Reporters.

CAT LLC also believes that the Funding Proposal would provide for reasonable fees. The transaction-based fees contemplated by the Funding Proposal are a reasonable fee structure. The SROs have a long history of charging transaction-based fees, as transactions are the intended economic goal of the securities markets. In addition to the transaction-based regulatory fees discussed above (e.g., the SROs' section 31-related fees, the FINRA TAF and the ORF), the SROs charge a variety of other types of transaction fees to fund their operations.[151] Indeed, each of the SROs collect transaction-based fees from their members.[152] In each case, the transaction-based fees charged by SROs have been subject to the fee filing process and found to satisfy the requirements of the Exchange Act. Not only is the type of fee reasonable, but the level of the fee is reasonable as well. Although the exact Fee Rate or Historical Fee Rate to be paid for any particular period will be determined at a later date, the illustrative example provides a per-transaction fee rate that

is not excessive in comparison to existing transaction fee rates.

i. No Unfair Discrimination

The Funding Proposal is "not designed to permit unfair discrimination between customers, issuers, brokers, or dealers," [153] as required by the Exchange Act. In addition, the Funding Proposal does not unfairly discriminate between Industry Members and Participants, among Industry Members or among Participants. Both Participants and Industry Members would contribute to the cost of the CAT; Participants alone would no longer be required to shoulder the cost burden of the CAT without the contribution of Industry Members. In addition, both Participants and Industry Members would pay a fee based on the executed equivalent share volume of their transactions in Eligible Securities; the type of metric would not vary based on whether the CAT Reporter is an Industry Member or Participant.

Furthermore, the Fee Rate or Historical Fee Rate would be the same regardless of the type of venue a trade was executed on, or how the trade ultimately occurred more generally (e.g., in a manner that generated more message traffic). In addition, the Funding Proposal recognizes the different trading characteristics of Listed Options and OTC Equity Securities as compared to NMS Stocks. The Funding Proposal recognizes that Listed Options trade in contracts rather than shares, and, therefore, counts the executed equivalent shares for Listed Options accordingly. Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating the CAT fees. As a result, the Funding Proposal would not favor or unfairly burden any one type of trading venue, product or product type.

With the elimination of tiers, fees for Industry Members and Participants are directly related to their executed equivalent share volume of their transactions. With tiers, the relationship between a CAT Reporter's share volume and the CAT fee would not have been as direct.

j. No Burden on Competition

The Funding Proposal does "not impose any burden on competition not necessary or appropriate in furtherance

---

[148] 26 U.S.C. 501(c)(6).

[149] CAT NMS Plan Approval Order at 84793.

[150] Sections 6(b)(4) and 15A(b)(5) of the Exchange Act.

[151] The SEC has noted that SRO transaction fees account for a significant portion of SRO revenue. Securities Exchange Act Rel. No. 50700 (Nov. 18, 2004), 69 FR 71256, 71271 (Dec. 8, 2004).

[152] See, e.g., NYSE Price List; Nasdaq Price List.

[153] Sections 6(b)(5) and 15A(b)(6) of the Exchange Act.

of the purposes of this chapter,'' [154] as required by the Exchange Act, and it fairly and equitably allocates costs among CAT Reporters. The Funding Proposal would operate in a manner similar to the funding model employed by the SEC and the Participants related to section 31 of the Exchange Act as well as the FINRA TAF [155] and the ORF rules, and these long-standing fees to cover regulatory costs have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on the competition that is not necessary or appropriate under the Exchange Act. Furthermore, the Funding Proposal does not impose a burden on competition for the reasons set forth above, including in Sections A.9.s and A.11.e of this filing above.

**B. Governing or Constituent Documents**

Not applicable.

**C. Implementation of Amendment**

CAT LLC is filing this proposed amendment pursuant to Rule 608(b)(1) of Regulation NMS under the Exchange Act.[156]

**D. Development and Implementation Phases**

The Participants expect to implement the proposed CAT fees upon approval by the SEC, subject to applicable requirements for the implementation of the CAT fees, including the requirements of section 19(b) of the Exchange Act with regard to Industry Member CAT Fees, the satisfaction of applicable Financial Accountability Milestones as set forth in Section 11.6 of the CAT NMS Plan, and the implementation of the billing and collection system for the CAT fees.

**E. Analysis of Impact on Competition**

CAT LLC does not believe that the proposed amendment would result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. CAT LLC notes that the proposed amendment implements provisions of the CAT NMS Plan approved by the Commission, subject to proposed revisions to the CAT NMS Plan

---

[154] Sections 6(b)(8) and 15A(b)(9) of the Exchange Act.

[155] Although the FINRA TAF is designed to cover a subset of the costs of FINRA services (*e.g.,* costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities) rather than all of FINRA's costs like the CAT, the transaction-based calculation of the FINRA TAF and the proposed CAT fees are similar.

[156] 17 CFR 242.608(b)(1).

described above, and is designed to assist the Participants in meeting their regulatory obligations pursuant to the CAT NMS Plan. Because all Participants are subject to the Funding Proposal set forth in the proposed amendment, this is not a competitive filing that raises competition issues between and among the Participants. Furthermore, for the reasons discussed above, including in Sections A.11.e and A.11.j of this filing above, CAT LLC does not believe that the Funding Proposal would result in any burden on competition that is not necessary or appropriate in furtherance of the purpose of the Exchange Act.

**F. Written Understanding or Agreements Relating to Interpretation of, or Participation in, Plan**

Not applicable.

**G. Approval by Plan Sponsors in Accordance With Plan**

Section 12.3 of the CAT NMS Plan states that, subject to certain exceptions, the CAT NMS Plan may be amended from time to time only by a written amendment, authorized by the affirmative vote of not less than two-thirds of all of the Participants, that has been approved by the SEC pursuant to Rule 608 of Regulation NMS under the Exchange Act or has otherwise become effective under Rule 608 of Regulation NMS under the Exchange Act. In addition, Section 4.3(a)(vi) of the Plan requires the Operating Committee, by Majority Vote, to authorize action to determine the appropriate funding-related policies, procedures and practices-consistent with Article XI. The Operating Committee has satisfied both of these requirements. In addition, the Funding Proposal was discussed and voted on during the Operating Committee meetings.

**H. Description of Operation of Facility Contemplated by the Proposed Amendment**

Not applicable.

**I. Terms and Conditions of Access**

Not applicable.

**J. Method of Determination and Imposition, and Amount of, Fees and Charges**

Section A of this filing describes in detail how CAT LLC developed the Funding Proposal for the CAT.

**K. Method and Frequency of Processor Evaluation**

Not applicable.

**L. Dispute Resolution**

Section 11.5 of the CAT NMS Plan addresses the resolution of disputes

regarding CAT fees charged to Participants and Industry Members. Specifically, Section 11.5 of the CAT NMS Plan states that:

[d]isputes with respect to fees the Company charges Participants pursuant to Article XI of the CAT NMS Plan shall be determined by the Operating Committee or a Subcommittee designated by the Operating Committee. Decisions by the Operating Committee or such designated Subcommittee on such matters shall be binding on Participants, without prejudice to the rights of any Participant to seek redress from the SEC pursuant to Rule 608 of Regulation NMS under the Exchange Act or in any other appropriate forum.

In addition, the Participants adopted rules to establish the procedures for resolving potential disputes related to CAT fees charged to Industry Members.[157]

**III. Solicitation of Comments**

Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the amendment is consistent with the Exchange Act. Comments may be submitted by any of the following methods:

*Electronic Comments*

• Use the Commission's internet comment form (*http://www.sec.gov/rules/sro.shtml*); or
• Send an email to *rule-comments@sec.gov.* Please include File Number 4–698 on the subject line.

*Paper Comments*

• Send paper comments to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number 4–698. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed plan amendment that are filed with the Commission, and all written communications relating to the amendment between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing and printing in the Commission's Public Reference Room,

---

[157] *See* Securities Exchange Act Rel. No. 81500 (Aug. 30, 2017), 82 FR 42143 (Sept. 6, 2017).

100 F Street NE, Washington, DC 20549, on official business days between the hours of 10:00 a.m. and 3:00 p.m. Copies of such filing also will be available for inspection and copying at the Participants' offices. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number 4–698 and should be submitted on or before April 11, 2023.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[158]

Dated: March 15, 2023.

**Sherry R. Haywood,**
*Assistant Secretary.*

## EXHIBIT A

### Proposed Revisions to CAT NMS Plan

Additions *italicized*; deletions [bracketed]

\*    \*    \*    \*    \*

### Article I

### Definitions

\*    \*    \*    \*    \*

''*CAT Executing Broker*'' means (a) *with respect to a transaction in an Eligible Security that is executed on an exchange, the Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF*

---

[158] 17 CFR 200.30–3(a)(85).

*transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.*

\*    \*    \*    \*    \*

[''Execution Venue'' means a Participant or an alternative trading system (''ATS'') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).]

\*    \*    \*    \*    \*

### Article XI

### Funding of the Company

Section 11.1. Funding Authority.
(a) On an annual basis the Operating Committee shall approve [an] *a reasonable* operating budget for the Company. The budget shall include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company.

*(i) Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.*

*(ii) For the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget. To the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees. For the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget). For the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget.*

(b) Subject to *Section 11.1 and* Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants

shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants. The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as ''Consolidated Audit Trail Funding Fees.''

(c) To fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs. In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) *reasonably* incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members. Any surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.

(d) Consistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, [assignment of tiers,] resolution of disputes, billing and collection of fees, and other related matters. [For the avoidance of doubt, as part of its regular review of fees for the CAT, the Operating Committee shall have the right to change the tier assigned to any particular Person in accordance with fee schedules previously filed with the Commission that are reasonable, equitable and not unfairly discriminatory and subject to public notice and comment, pursuant to this Article XI. Any such changes will be effective upon reasonable notice to such Person.]

Section 11.2. Funding Principles. In establishing the funding of the Company, the Operating Committee shall seek:

(a) to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company;

(b) to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT [and

distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations];

(c) to establish a [tiered] fee structure in which the fees charged to [: (i)] *Participants and* [CAT Reporters that are Execution Venues, including ATSs, are based upon the level of market share; (ii)] Industry Members[' non-ATS activities] are based upon *the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT* [message traffic; and (iii) the CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) are generally comparable (where, for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members)].

(d) to provide for ease of billing and other administrative functions;

(e) to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality; and

(f) to build financial stability to support the Company as a going concern.

Section 11.3. Recovery.

(a) *Prospective CAT Costs.* The Operating Committee will establish [fixed] fees *("CAT Fees")* to be payable by [Execution Venues] *Participants and Industry Members with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs")* as *follows* [provided in this Section 11.3(a)]:

(i) *Fee Rate. The Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows.*

*(A) General.*

*(I) For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year. Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(II) During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year. Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(III) For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(IV) For the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the first CAT Fee would be calculated as described in paragraph (II) of this Section.*

*(B) Executed Equivalent Shares. For purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows:*

*(I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share;*

*(II) each executed contract for a transaction in Listed Options will be counted based on the multiplier applicable to the specific Listed Option (i.e., 100 executed equivalent shares or such other applicable multiplier); and*

*(III) each executed share for a transaction in OTC Equity Securities shall be counted as 0.01 executed equivalent share.*

*(C) Budgeted CAT Costs. The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted*

*during the year by the Operating Committee.*

*(D) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each relevant period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.*

*(ii) Participant CAT Fees.*

*(A) CAT Fee Obligation. Each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data. The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.*

*(B) Effectiveness. Each Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(iii) Industry Member CAT Fees.*

*(A) CAT Fee Obligation. Each Industry Member that is the CAT Executing Broker for the buyer in a transaction in Eligible Securities ("CAT Executing Broker for the Buyer" or "CEBB") and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities ("CAT Executing Broker for the Seller" or "CEBS") will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data. The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.*

*(B) Content of Fee Filings. When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry*

*Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3, such filings shall set forth (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.*

*(C) No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.*

*(iv) CAT Fee Details.*

*(A) Details regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker. At a minimum, such details would include each Participant or CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

*(B) For each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

[(i) Each Execution Venue that: (A) executes transactions; or (B) in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange, in NMS Stocks or OTC Equity Securities will pay a fixed fee depending on the market share of that Execution Venue in NMS Stocks and OTC Equity Securities, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share. For these purposes, market share for Execution Venues that execute transactions will be calculated by share volume, and market share for a national securities association that has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities will be calculated based on share volume of trades reported, provided, however, that the share volume reported to such national securities association by an Execution Venue shall not be included in the calculation of such national security association's market share.]

[(ii) Each Execution Venue that executes transactions in Listed Options will pay a fixed fee depending on the Listed Options market share of that Execution Venue, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share. For these purposes, market share will be calculated by contract volume.]

(b) *Past CAT Costs.* The Operating Committee will establish [fixed] *one or more fees (each a "Historical CAT Assessment")* to be payable by Industry Members *with regard to CAT costs previously paid by the Participants ("Past CAT Costs") as follows:* [, based on the message traffic generated by such Industry Member, with the Operating Committee establishing at least five and no more than nine tiers of fixed fees, based on message traffic. For the avoidance of doubt, the fixed fees payable by Industry Members pursuant to this paragraph shall, in addition to any other applicable message traffic, include message traffic generated by: (i) an ATS that does not execute orders that is sponsored by such Industry Member; and (ii) routing orders to and from any ATS sponsored by such Industry Member.]

(i) *Calculation of Historical Fee Rates.*

*(A) General. The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for each Historical CAT Assessment. Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act such Historical CAT Assessment to be charged to Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.*

*(B) Executed Equivalent Shares. For purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3.*

*(C) Historical CAT Costs. The Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee. Each Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment.*

*(D) Historical Recovery Period.*

*(I) The length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment; provided, however, no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years.*

*(II) Notwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected.*

*(E) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for Historical Recovery Period. The Operating Committee shall reasonably determine the projected total executed*

**17126**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.

*(ii) Past CAT Costs and Participants.* Because Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment. In lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans. Historical CAT Assessments are designed to recover two-thirds of the Historical CAT Costs.

(iii) *Historical CAT Assessment for Industry Members.*

*(A)* Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.

*(B) Historical CAT Assessment Fee Filings.*

*(I)* Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.

*(II)* When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act a Historical CAT Assessment calculated using the Historical Fee Rate that the Operating Committee approved in accordance with paragraph (b) of this Section 11.3, such filing shall set forth (A) the Historical Fee Rate; (B) a brief description of the amount and type of the Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. The information provided in

this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.

*(III)* No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.

*(iv) Historical CAT Assessment Details.*

*(A)* Details regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.

*(B)* For each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.

(c) The Operating Committee may establish any other fees ancillary to the operation of the CAT that it reasonably determines appropriate, including fees: (i) for the late or inaccurate reporting of information to the CAT; (ii) for correcting submitted information; and (iii) based on access and use of the CAT for regulatory and oversight purposes (and not including any reporting obligations).

(d) The Company shall make publicly available a schedule of effective fees and charges adopted pursuant to this Agreement as in effect from time to time. The Operating Committee shall review such fee schedule on at least an annual basis and shall make any changes to such fee schedule that it deems appropriate. The Operating Committee is authorized to review such fee schedule on a more regular basis, but shall not make any changes on more than a semiannual basis unless, pursuant to a Supermajority Vote, the Operating Committee concludes that such change is necessary for the adequate funding of the Company.

\*    \*    \*    \*    \*

*APPENDIX B*

*Fee Schedule*

*Consolidated Audit Trail Funding Fees for Participants*

*(a) CAT Fee.* Each Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.

\*    \*    \*    \*    \*

## EXHIBIT B

**Proposed Revisions to CAT NMS Plan as Proposed To Be Revised in the February 2023 Proposed Partial Amendment**

Additions *italicized;* deletions [bracketed]

\*    \*    \*    \*    \*

## Article I

## Definitions

\*    \*    \*    \*    \*

''CAT Executing Broker'' means (a) with respect to a transaction in an Eligible Security that is executed on an exchange, the Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.

\*    \*    \*    \*    \*

## Article XI

## Funding of the Company

Section 11.1. Funding Authority.

(a) On an annual basis the Operating Committee shall approve *[an] a reasonable* operating budget for the Company. The budget shall include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company.

(i) Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.

(ii) For the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget. To the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees. For the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget). *For the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget.*

(b) Subject to *Section 11.1 and Section 11.2,* the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants. The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as "Consolidated Audit Trail Funding Fees."

(c) To fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs. In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) *reasonably* incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members. Any surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.

(d) Consistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, resolution of disputes, billing and collection of fees, and other related matters.

Section 11.2. Funding Principles. In establishing the funding of the Company, the Operating Committee shall seek:

(a) to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company;

(b) to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT;

(c) to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT.

(d) to provide for ease of billing and other administrative functions;

(e) to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality; and

(f) to build financial stability to support the Company as a going concern.

Section 11.3. Recovery.

(a) Prospective CAT Costs. The Operating Committee will establish fees ("CAT Fees") to be payable by Participants and Industry Members with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs") as follows:

(i) Fee Rate. The Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows:

(A) General.

(I) For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the *reasonably* projected total executed equivalent share volume of all transactions in Eligible Securities for the year. Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

(II) During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the *reasonably* projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year. Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

(III) For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

(IV) For the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the first CAT Fee would be calculated as described in paragraph (II) of this Section.

(B) Executed Equivalent Shares. For purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows:

(I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share;

(II) each executed contract for a transaction in Listed Options will be counted based on the multiplier applicable to the specific Listed Option (*i.e.,* 100 executed equivalent shares or such other applicable multiplier); and

(III) each executed share for a transaction in OTC Equity Securities shall be counted as 0.01 executed equivalent share.

(C) Budgeted CAT Costs. The budgeted CAT costs for the year shall be comprised of all *reasonable* fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.

(D) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each relevant period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.

(ii) Participant CAT Fees.

(A) CAT Fee Obligation. Each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data. The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.

(B) Effectiveness. Each Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

(iii) Industry Member CAT Fees.

(A) CAT Fee Obligation. Each Industry Member that is the CAT Executing Broker for the buyer in a transaction in Eligible Securities (''CAT Executing Broker for the Buyer'' or

''CEBB'') and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities (''CAT Executing Broker for the Seller'' or ''CEBS'') will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data. The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.

(B) Content of Fee Filings. When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3, such filings shall set forth (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.

(C) No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.

(iv) CAT Fee Details.

*(A)* Details regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker. *At a minimum, such details would include each Participant*

*or CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

*(B) For each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

(b) Past CAT Costs. The Operating Committee will establish one or more fees (each a ''Historical CAT Assessment'') to be payable by Industry Members with regard to CAT costs previously paid by the Participants (''Past CAT Costs'') as follows:

(i) Calculation of Historical Fee Rates.

(A) General. The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the *reasonably* projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for each Historical CAT Assessment. Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act such Historical CAT Assessment to be charged to Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.

(B) Executed Equivalent Shares. For purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3.

(C) Historical CAT Costs. The Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs *reasonably* excluded from Historical CAT Costs by the Operating Committee. Each Historical CAT Assessment will seek to

recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment.

(D) Historical Recovery Period.

(I) The length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment; provided, however, no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years.

(II) Notwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected.

(E) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for Historical Recovery Period. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.

(ii) Past CAT Costs and Participants. Because Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment. In lieu of a Historical CAT Assessment, the Participants' one-third share of [Past] *Historical* CAT Costs *and such other additional Past CAT Costs as reasonably determined by the Operating Committee* will be paid by the cancellation of loans made *to* [by] the Company on a pro rata basis based on the outstanding loan amounts due under the loans. Historical CAT Assessments are designed to recover two-thirds of the Historical CAT Costs.

(iii) Historical CAT Assessment for Industry Members.

(A) Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.

(B) Historical CAT Assessment Fee Filings.

(I) Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.

(II) When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act a Historical CAT Assessment calculated using the Historical Fee Rate that the Operating Committee approved in accordance with paragraph (b) of this Section 11.3, such filing shall set forth (A) the Historical Fee Rate; (B) a brief description of the amount and type of the Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.

(III) No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.

(iv) Historical CAT Assessment Details.

*(A)* Details regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. *At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

*(B) For each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-*

*side transactions and sell-side transactions.*

(c) The Operating Committee may establish any other fees ancillary to the operation of the CAT that it reasonably determines appropriate, including fees: (i) for the late or inaccurate reporting of information to the CAT; (ii) for correcting submitted information; and (iii) based on access and use of the CAT for regulatory and oversight purposes (and not including any reporting obligations).

(d) The Company shall make publicly available a schedule of effective fees and charges adopted pursuant to this Agreement as in effect from time to time. The Operating Committee shall review such fee schedule on at least an annual basis and shall make any changes to such fee schedule that it deems appropriate. The Operating Committee is authorized to review such fee schedule on a more regular basis, but shall not make any changes on more than a semiannual basis unless, pursuant to a Supermajority Vote, the Operating Committee concludes that such change is necessary for the adequate funding of the Company.

\*　　\*　　\*　　\*　　\*

APPENDIX B

Fee Schedule

Consolidated Audit Trail Funding Fees for Participants

(a) CAT Fee. Each Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.

\*　　\*　　\*　　\*　　\*

**EXHIBIT C**

**CAT Fee Example for Illustrative Purposes Only**

The following sets forth an example of a Historical CAT Assessment calculated under the Funding Proposal for illustrative purposes only. The example sets forth the Historical CAT Assessment that each CAT Executing Broker would pay related to CAT costs from prior to 2022 based on each CAT Executing Broker's transactions in December 2022. The first chart, entitled "Calculation of Historical CAT Assessment," describes how the example fees are calculated. The second chart, entitled "Aggregate Executed Equivalent Share Volume and Corresponding Aggregate Fee for December 2022 for Certain Categories," sets forth the aggregated amounts of

executed equivalent share volume and corresponding fee for December 2022 for the categories set forth in Proposed Section 11.3(b)(iv) of the CAT NMS Plan, which include (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions. The third chart, entitled ''Historical CAT Assessment for Each CAT Executing Broker,'' sets forth the example fees each CAT Executing Broker would pay based on its transactions in Eligible Securities in December 2022 in accordance with the parameters of the example.

Note that *Exhibit C* only provides an illustrative example of how the Funding Proposal would operate for informational purposes; the calculation of the actual Historical CAT Assessment for CAT costs from prior to 2022 would differ from this example in various ways. For example, the illustrative example calculates the Historical Fee Rate using the projected total executed equivalent share transactions in Eligible Securities for 2023–2024, rather than the projected executed equivalent share volume for the actual Historical Recovery Period, the dates of which will be determined upon approval of the Funding Proposal. In addition, the illustrative example calculates the Historical CAT Assessment based on a CEBB and CEBS's trading activity from December 2022, rather than trading activity during a relevant month in which the Historical CAT Assessment would be in effect. Moreover, the illustrative example, among other things, calculates the executed equivalent shares for each executed contract for a transaction in Listed Options using a 100 executed equivalent share multiplier, instead of the specific multiplier applicable to each Listed Option; it uses a simple projection calculation of doubling the total executed equivalent share volume for 2022 (rather than a projection that considers volume growth and other relevant factors); and it may include cancelled trades or trades that were later corrected.[159]

CALCULATION OF HISTORICAL CAT ASSESSMENT

| Item | Value | Calculation | Proposed plan provision |
|---|---|---|---|
| Actual Total Executed Equivalent Share Volume of Transactions in Eligible Securities for 2022. | 4,039,821,841,560.31 Executed Equivalent Shares. | Calculated using actual transactions in Eligible Securities for 2022. | Proposed Sections 11.3(a)(i)(B) and 11.3(b)(i)(B). |
| Historical Recovery Period .................... | 2 years .................................................. | Length between 2 and 5 years as determined by Operating Committee. | Proposed Section 11.3(b)(i)(D)(I). |
| Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for 2023–2024. | 8,079,643,683,120.62 Executed Equivalent Shares. | 2*4,039,821,841,560.31 Executed Equivalent Shares (Actual Executed Equivalent Share Volume of Transactions in Eligible Securities for 2022 multiplied by two). | Proposed Section 11.3(b)(i)(E). |
| Historical CAT Costs for Pre-2022 ........ | $337,688,610 ........................................ | $401,312,909–$63,624,299 (Past CAT Costs for pre-2022 minus CAT Costs excluded from Past CAT Costs for pre-2022). | Proposed Section 11.3(b)(i)(C). |
| Historical Fee Rate ............................... | $0.0000417950 per Executed Equivalent Share. | $337,688,610/8,079,643,683,120.62 (Historical CAT Costs for pre-2022 divided by Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for 2023–2024). | Proposed Section 11.3(b)(i)(A). |
| Historical CAT Assessment for CAT Executing Brokers for pre-2022 Historical CAT Costs for December 2022. | See ''Historical Fee Assessment for Each CAT Executing Broker'' chart below. | Executed Equivalent Share Volume of Transactions in Eligible Securities for December 2022 for each CAT Executing Broker multiplied by Historical Fee Rate multiplied by one-third.[160] | Proposed Section 11.3(b)(iii)(A). |
| Total Amount to be Collected via Historical CAT Assessment for pre-2022 Historical CAT Costs. | $225,125,740 ........................................ | 2/3 * $337,688,610 (Two-thirds of Historical CAT Costs). | Proposed Sections 11.3(b)(i)(C) and 11.3(b)(iii)(A). |

AGGREGATE EXECUTED EQUIVALENT SHARE VOLUME AND CORRESPONDING AGGREGATE FEE FOR DECEMBER 2022 FOR CERTAIN CATEGORIES

| Category of transaction | Aggregate executed equivalent share volume for December 2022 | Aggregate historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| Listed Options ............................................................................................................ | 171,596,408,600.00 | 2,390,623.27 |
| NMS Stocks ................................................................................................................ | 455,096,327,128.00 | 6,340,248.50 |
| OTC Equity Securities ................................................................................................ | 2,835,446,929.62 | 39,502.49 |
| Buy-Side Transactions ............................................................................................... | 314,765,626,228.81 | 4,385,208.51 |
| Sell-Side Transactions ............................................................................................... | 314,762,556,428.81 | 4,385,165.75 |

[159] Section A.1.d of this filing discusses how cancellations and corrections would be addressed under the Funding Proposal.

[160] Because the Historical Fee Rate is multiplied by one-third in calculating the Historical CAT Assessment for the example, CAT Executing Brokers would pay $0.00001393167 per executed equivalent share (that is, $0.0000417950 per executed equivalent share multiplied by one-third).

AGGREGATE EXECUTED EQUIVALENT SHARE VOLUME AND CORRESPONDING AGGREGATE FEE FOR DECEMBER 2022 FOR CERTAIN CATEGORIES—Continued

| Category of transaction | Aggregate executed equivalent share volume for December 2022 | Aggregate historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| Executed on BOX | 11,476,557,600 | 159,887.53 |
| Executed on Cboe BYX | 5,010,889,784 | 69,810.03 |
| Executed on Cboe BZX | 28,387,794,900 | 395,489.18 |
| Executed on Cboe EDGA | 5,987,423,230 | 83,414.76 |
| Executed on Cboe EDGX | 35,456,933,206 | 493,974.03 |
| Executed on Cboe C2 | 7,093,009,200 | 98,817.41 |
| Executed on Cboe | 31,832,709,200 | 443,482.57 |
| Executed on IEX | 10,534,111,236 | 146,757.68 |
| Executed on LTSE | 14,709,130 | 204.92 |
| Executed on MEMX | 13,471,198,984 | 187,676.20 |
| Executed on MIAX | 9,473,736,600 | 131,984.90 |
| Executed on MIAX Emerald | 4,451,989,200 | 62,023.61 |
| Executed on MIAX PEARL | 13,382,643,690 | 186,442.48 |
| Executed on Nasdaq BX | 7,033,829,520 | 97,992.94 |
| Executed on Nasdaq GEMX | 2,750,988,600 | 38,325.85 |
| Executed on Nasdaq ISE | 8,771,296,800 | 122,198.75 |
| Executed on Nasdaq MRX | 2,373,050,600 | 33,060.54 |
| Executed on Nasdaq PHLX | 22,234,997,366 | 309,770.48 |
| Executed on Nasdaq | 84,953,835,448 | 1,183,548.17 |
| Executed on NYSE | 46,589,923,124 | 649,075.09 |
| Executed on NYSE American | 12,939,380,646 | 180,267.09 |
| Executed on NYSE Arca | 57,732,682,568 | 804,312.26 |
| Executed on NYSE Chicago | 1,851,452,536 | 25,793.81 |
| Executed on NYSE National | 2,482,827,634 | 34,589.92 |
| Executed Otherwise than on an Exchange | 203,240,211,856 | 2,831,474.07 |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 1 | 86,112,198,133.20 | 1,199,686.09 |
| 2 | 38,481,541,952.55 | 536,111.86 |
| 3 | 38,393,700,002.03 | 534,888.08 |
| 4 | 38,459,064,211.23 | 535,798.71 |
| 5 | 27,384,672,407.15 | 381,514.02 |
| 6 | 23,625,876,388.24 | 329,147.74 |
| 7 | 22,953,981,909.23 | 319,787.13 |
| 8 | 17,620,665,100.45 | 245,485.16 |
| 9 | 17,628,940,532.54 | 245,600.45 |
| 10 | 20,031,215,101.53 | 279,068.13 |
| 11 | 16,301,270,280.00 | 227,103.80 |
| 12 | 19,404,461,254.15 | 270,336.41 |
| 13 | 11,441,178,404.00 | 159,394.64 |
| 14 | 12,179,858,717.98 | 169,685.68 |
| 15 | 12,076,770,928.00 | 168,249.50 |
| 16 | 11,623,298,048.64 | 161,931.87 |
| 17 | 9,955,221,266.53 | 138,692.78 |
| 18 | 10,285,573,046.70 | 143,295.13 |
| 19 | 10,481,313,179.31 | 146,022.12 |
| 20 | 9,456,042,067.81 | 131,738.39 |
| 21 | 7,969,275,763.65 | 111,025.26 |
| 22 | 5,853,036,941.30 | 81,542.54 |
| 23 | 9,044,202,748.00 | 126,000.78 |
| 24 | 8,129,937,025.67 | 113,263.54 |
| 25 | 9,466,559,704.00 | 131,884.92 |
| 26 | 8,098,701,385.00 | 112,828.38 |
| 27 | 6,220,173,476.92 | 86,657.36 |
| 28 | 4,940,607,300.00 | 68,830.87 |
| 29 | 5,496,193,202.99 | 76,571.11 |
| 30 | 4,183,004,192.80 | 58,276.20 |
| 31 | 3,748,760,073.00 | 52,226.46 |
| 32 | 3,930,225,757.70 | 54,754.58 |
| 33 | 2,926,196,700.00 | 40,766.79 |
| 34 | 4,040,159,976.45 | 56,286.15 |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 35 | 2,462,962,342.00 | 34,313.16 |
| 36 | 3,255,347,005.69 | 45,352.40 |
| 37 | 1,795,144,783.11 | 25,009.35 |
| 38 | 1,533,939,983.00 | 21,370.33 |
| 39 | 2,462,084,862.71 | 34,300.94 |
| 40 | 2,226,415,053.41 | 31,017.66 |
| 41 | 1,847,364,910.34 | 25,736.86 |
| 42 | 2,416,691,618.00 | 33,668.53 |
| 43 | 1,232,981,799.00 | 17,177.49 |
| 44 | 2,181,268,648.12 | 30,388.70 |
| 45 | 2,131,136,467.07 | 29,690.27 |
| 46 | 1,099,857,600.00 | 15,322.85 |
| 47 | 1,469,689,428.23 | 20,475.22 |
| 48 | 2,168,992,900.00 | 30,217.68 |
| 49 | 1,496,908,444.00 | 20,854.42 |
| 50 | 1,534,294,028.00 | 21,375.27 |
| 51 | 65,606,592.00 | 914.01 |
| 52 | 1,735,293,007.06 | 24,175.52 |
| 53 | 1,307,878,500.00 | 18,220.92 |
| 54 | 1,178,185,898.26 | 16,414.09 |
| 55 | 1,430,077,857.02 | 19,923.36 |
| 56 | 1,151,205,287.63 | 16,038.20 |
| 57 | 1,409,986,241.50 | 19,643.45 |
| 58 | 1,103,808,027.33 | 15,377.88 |
| 59 | 1,029,656,664.02 | 14,344.83 |
| 60 | 857,333,700.00 | 11,944.08 |
| 61 | 961,305,300.00 | 13,392.58 |
| 62 | 1,867,947,700.00 | 26,023.62 |
| 63 | 1,039,246,045.38 | 14,478.43 |
| 64 | 1,101,469,802.00 | 15,345.31 |
| 65 | 562,430,300.00 | 7,835.59 |
| 66 | 733,501,357.00 | 10,218.89 |
| 67 | 877,224,476.00 | 12,221.20 |
| 68. | | |
| 69 | 829,161,852.00 | 11,551.60 |
| 70 | 966,607,368.00 | 13,466.45 |
| 71 | 821,501,400.00 | 11,444.88 |
| 72 | 677,405,637.00 | 9,437.39 |
| 73 | 1,015,740,702.00 | 14,150.96 |
| 74 | 522,418,991.27 | 7,278.17 |
| 75 | 989,301,187.72 | 13,782.61 |
| 76 | 773,642,309.00 | 10,778.12 |
| 77. | | |
| 78 | 590,057,809.16 | 8,220.49 |
| 79 | 737,007,679.37 | 10,267.74 |
| 80 | 536,705,303.00 | 7,477.20 |
| 81 | 767,854,826.21 | 10,697.49 |
| 82 | 635,942,409.58 | 8,859.74 |
| 83 | 864,089,556.95 | 12,038.20 |
| 84 | 620,860,189.00 | 8,649.61 |
| 85 | 700,713,844.00 | 9,762.11 |
| 86 | 727,102,431.00 | 10,129.75 |
| 87 | 556,678,644.00 | 7,755.46 |
| 88 | 581,059,177.09 | 8,095.12 |
| 89 | 559,881,462.22 | 7,800.08 |
| 90 | 483,502,237.48 | 6,735.99 |
| 91 | 413,725,788.00 | 5,763.89 |
| 92 | 610,245,108.09 | 8,501.73 |
| 93 | 405,594,302.00 | 5,650.60 |
| 94 | 353,080,033.04 | 4,918.99 |
| 95 | 550,986,110.00 | 7,676.15 |
| 96 | 522,200,254.96 | 7,275.12 |
| 97 | 452,909,875.00 | 6,309.79 |
| 98 | 314,934,600.00 | 4,387.56 |
| 99 | 1,172,981,298.00 | 16,341.58 |
| 100 | 418,591,392.71 | 5,831.67 |
| 101 | 56,226,707.15 | 783.33 |
| 102 | 444,528,797.00 | 6,193.03 |

Federal Register / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices **17133**

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 103 | 243,033,674.00 | 3,385.86 |
| 104 | 826,825,093.31 | 11,519.05 |
| 105 | 363,355,742.00 | 5,062.15 |
| 106 | 319,206,742.76 | 4,447.08 |
| 107 | 234,606,209.64 | 3,268.45 |
| 108 | 714,493,322.00 | 9,954.08 |
| 109 | 313,455,910.25 | 4,366.96 |
| 110 | 1,031,910,466.00 | 14,376.23 |
| 111 | 258,090,705.06 | 3,595.63 |
| 112 | 472,580,692.79 | 6,583.83 |
| 113 | 431,793,880.31 | 6,015.61 |
| 114 | 337,914,803.56 | 4,707.72 |
| 115 | 339,736,815.43 | 4,733.10 |
| 116 | 909,158,616.00 | 12,666.09 |
| 117 | 290,642,115.00 | 4,049.13 |
| 118 | 347,421,063.79 | 4,840.15 |
| 119 | 350,667,538.15 | 4,885.38 |
| 120 | 318,322,800.00 | 4,434.77 |
| 121 | 263,757,425.20 | 3,674.58 |
| 122. | | |
| 123 | 375,530,471.00 | 5,231.76 |
| 124 | 53,557,200.00 | 746.14 |
| 125. | | |
| 126 | 283,825,411.16 | 3,954.16 |
| 127 | 143,392,400.00 | 1,997.69 |
| 128 | 217,718,090.88 | 3,033.17 |
| 129 | 165,915,140.89 | 2,311.47 |
| 130 | 457,613,070.46 | 6,375.31 |
| 131 | 251,132,793.81 | 3,498.70 |
| 132 | 219,112,442.00 | 3,052.60 |
| 133 | 43,938,745.15 | 612.14 |
| 134 | 330,967,497.01 | 4,610.93 |
| 135 | 188,838,809.00 | 2,630.84 |
| 136 | 227,575,404.47 | 3,170.50 |
| 137 | 206,478,844.94 | 2,876.59 |
| 138. | | |
| 139 | 292,467,800.00 | 4,074.56 |
| 140 | 165,645,008.32 | 2,307.71 |
| 141 | 214,739,622.63 | 2,991.68 |
| 142 | 185,617,991.19 | 2,585.97 |
| 143 | 165,469,188.00 | 2,305.26 |
| 144 | 5,019,600.00 | 69.93 |
| 145 | 956,355,049.08 | 13,323.62 |
| 146 | 64,960,719.00 | 905.01 |
| 147 | 289,141,549.00 | 4,028.22 |
| 148 | 147,498,787.28 | 2,054.90 |
| 149 | 158,995,017.79 | 2,215.06 |
| 150 | 122,676,294.48 | 1,709.08 |
| 151 | 136,312,675.96 | 1,899.06 |
| 152 | 27,284,757.00 | 380.12 |
| 153 | 352,462,000.00 | 4,910.38 |
| 154 | 126,212,114.45 | 1,758.34 |
| 155. | | |
| 156 | 128,125,560.32 | 1,785.00 |
| 157 | 60,988,464.36 | 849.67 |
| 158 | 131,730,011.56 | 1,835.22 |
| 159 | 74,526,683.59 | 1,038.28 |
| 160 | 147,853,117.00 | 2,059.84 |
| 161 | 113,883,427.93 | 1,586.59 |
| 162. | | |
| 163 | 116,699,318.87 | 1,625.82 |
| 164 | 129,812,902.58 | 1,808.51 |
| 165 | 106,768,335.00 | 1,487.46 |
| 166 | 140,139,530.00 | 1,952.38 |
| 167 | 82,905,120.00 | 1,155.01 |
| 168 | 99,813,775.33 | 1,390.57 |
| 169 | 61,257,698.00 | 853.42 |
| 170 | 265,568,648.00 | 3,699.81 |

**17134**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
| --- | --- | --- |
| 171 | 98,014,634.68 | 1,365.51 |
| 172 | 95,296,632.53 | 1,327.64 |
| 173 | 52,272,295.77 | 728.24 |
| 174 | 38,307,460.47 | 533.69 |
| 175 | 84,787,219.45 | 1,181.23 |
| 176 | 79,498,966.79 | 1,107.55 |
| 177 | 55,374,006.21 | 771.45 |
| 178 | 156,404,961.23 | 2,178.98 |
| 179 | 60,642,356.86 | 844.85 |
| 180 | 118,133,629.00 | 1,645.80 |
| 181 | 76,062,700.00 | 1,059.68 |
| 182 | 248,176,128.68 | 3,457.51 |
| 183 | 79,008,100.00 | 1,100.71 |
| 184 | 85,278,937.00 | 1,188.08 |
| 185 | 70,228,707.00 | 978.40 |
| 186 | 62,833,390.18 | 875.37 |
| 187 | 41,480,726.45 | 577.90 |
| 188 | 176,929,414.00 | 2,464.92 |
| 189 | 29,253,925.81 | 407.56 |
| 190 | 105,263,657.06 | 1,466.50 |
| 191 | 77,787,800.00 | 1,083.71 |
| 192 | 68,984,712.00 | 961.07 |
| 193 | 61,335,825.68 | 854.51 |
| 194 | 67,297,274.77 | 937.56 |
| 195 | 51,129,783.08 | 712.32 |
| 196. | | |
| 197 | 68,089,568.19 | 948.60 |
| 198 | 40,730,576.79 | 567.44 |
| 199 | 39,525,291.39 | 550.65 |
| 200 | 91,093,000.00 | 1,269.08 |
| 201 | 57,676,030.00 | 803.52 |
| 202 | 6,831,789.24 | 95.18 |
| 203 | 316,923,604.92 | 4,415.27 |
| 204 | 56,604,000.00 | 788.59 |
| 205 | 33,836,692.76 | 471.40 |
| 206 | 3,686,360.00 | 51.36 |
| 207 | 87,223,619.59 | 1,215.17 |
| 208 | 22,659,425.86 | 315.68 |
| 209 | 36,155,445.78 | 503.71 |
| 210 | 27,633,449.00 | 384.98 |
| 211 | 3,789,049.10 | 52.79 |
| 212. | | |
| 213. | | |
| 214 | 11,802,608.52 | 164.43 |
| 215 | 39,707,587.00 | 553.19 |
| 216 | 69,601,570.00 | 969.67 |
| 217 | 26,765,942.82 | 372.89 |
| 218 | 32,246,115.00 | 449.24 |
| 219 | 5,604,885.00 | 78.09 |
| 220 | 15,282,378.75 | 212.91 |
| 221 | 21,777,071.28 | 303.39 |
| 222 | 19,782,551.00 | 275.60 |
| 223 | 25,665,436.26 | 357.56 |
| 224 | 24,403,825.19 | 339.99 |
| 225 | 69,596,229.05 | 969.59 |
| 226 | 15,677,771.93 | 218.42 |
| 227 | 25,267,934.00 | 352.02 |
| 228 | 22,258,692.00 | 310.10 |
| 229 | 10,262,505.79 | 142.97 |
| 230. | | |
| 231 | 18,989,070.64 | 264.55 |
| 232 | 14,408,226.00 | 200.73 |
| 233 | 18,945,600.00 | 263.94 |
| 234 | 13,376,162.82 | 186.35 |
| 235 | 20,807,919.37 | 289.89 |
| 236 | 17,593,056.07 | 245.10 |
| 237 | 15,126,721.74 | 210.74 |
| 238 | 13,674,994.00 | 190.52 |

**Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices **17135**

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 239 | 6,144,297.00 | 85.60 |
| 240 | 14,525,850.31 | 202.37 |
| 241 | 38,208,766.82 | 532.31 |
| 242 | 14,895,098.80 | 207.51 |
| 243 | 11,078,635.00 | 154.34 |
| 244 | 10,226,692.01 | 142.47 |
| 245 | 11,521,371.11 | 160.51 |
| 246 | 11,162,808.43 | 155.52 |
| 247 | 18,083,706.64 | 251.94 |
| 248 | 15,739,833.71 | 219.28 |
| 249 | 9,587,210.86 | 133.57 |
| 250 | 18,980,980.00 | 264.44 |
| 251 | 5,974,342.18 | 83.23 |
| 252 | 18,009,063.00 | 250.90 |
| 253 | 12,371,171.00 | 172.35 |
| 254 | 16,961,858.62 | 236.31 |
| 255 | 12,751,377.12 | 177.65 |
| 256 | 7,665,867.62 | 106.80 |
| 257 | 14,798,978.38 | 206.17 |
| 258 | 11,422,776.00 | 159.14 |
| 259 | 9,486,103.23 | 132.16 |
| 260 | 18,142,315.00 | 252.75 |
| 261 | 13,643,800.00 | 190.08 |
| 262. | | |
| 263 | 21,333,324.60 | 297.21 |
| 264 | 14,024,523.06 | 195.38 |
| 265 | 9,609,378.96 | 133.87 |
| 266 | 3,764,664.51 | 52.45 |
| 267 | 9,263,917.20 | 129.06 |
| 268 | 13,514,542.97 | 188.28 |
| 269 | 7,063,688.49 | 98.41 |
| 270 | 9,204,383.57 | 128.23 |
| 271. | | |
| 272 | 4,165,675.24 | 58.03 |
| 273 | 8,795,482.50 | 122.54 |
| 274. | | |
| 275 | 7,151,874.00 | 99.64 |
| 276 | 2,656,709.93 | 37.01 |
| 277. | | |
| 278 | 11,041,371.25 | 153.82 |
| 279 | 9,618,241.51 | 134.00 |
| 280 | 10,409,870.33 | 145.03 |
| 281 | 2,381,247.97 | 33.17 |
| 282 | 79,562,536.00 | 1,108.44 |
| 283 | 5,028,862.00 | 70.06 |
| 284 | 3,583,471.00 | 49.92 |
| 285 | 6,047,686.70 | 84.25 |
| 286 | 10,121,031.10 | 141.00 |
| 287. | | |
| 288 | 4,562,944.01 | 63.57 |
| 289 | 1,995,032.12 | 27.79 |
| 290 | 3,603,016.17 | 50.20 |
| 291 | 49,058,772.00 | 683.47 |
| 292 | 5,326,788.04 | 74.21 |
| 293 | 5,199,894.30 | 72.44 |
| 294. | | |
| 295 | 7,396,224.93 | 103.04 |
| 296 | 8,377,144.03 | 116.71 |
| 297 | 10,426,990.00 | 145.27 |
| 298 | 4,328,332.63 | 60.30 |
| 299. | | |
| 300 | 22,059,594.00 | 307.33 |
| 301 | 2,719,871.36 | 37.89 |
| 302. | | |
| 303 | 9,336,370.70 | 130.07 |
| 304 | 8,250,582.32 | 114.94 |
| 305 | 11,309,704.54 | 157.56 |
| 306 | 2,825,954.04 | 39.37 |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER[161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 307 | 3,015,453.22 | 42.01 |
| 308 | 2,985,881.79 | 41.60 |
| 309 | 3,550,440.79 | 49.46 |
| 310 | 3,796,542.00 | 52.89 |
| 311 | 681,600.00 | 9.50 |
| 312 | 6,701,908.00 | 93.37 |
| 313 | 7,515,141.47 | 104.70 |
| 314 | 1,813,867.00 | 25.27 |
| 315 | 25,693,200.00 | 357.95 |
| 316 | 8,571,418.81 | 119.41 |
| 317 | 4,618,323.00 | 64.34 |
| 318 | 2,871,231.32 | 40.00 |
| 319 | 1,312,921.00 | 18.29 |
| 320 | 3,167,425.85 | 44.13 |
| 321 | 101,019.48 | 1.41 |
| 322 | 3,859,688.00 | 53.77 |
| 323 | 4,632,446.85 | 64.54 |
| 324. | | |
| 325 | 2,755,282.00 | 38.39 |
| 326 | 3,449,977.69 | 48.06 |
| 327 | 2,682,536.34 | 37.37 |
| 328 | 6,303,034.00 | 87.81 |
| 329 | 1,464,170.44 | 20.40 |
| 330 | 2,405,671.00 | 33.51 |
| 331 | 3,837,456.05 | 53.46 |
| 332 | 2,098,139.00 | 29.23 |
| 333 | 927,380.00 | 12.92 |
| 334. | | |
| 335 | 453,254.09 | 6.31 |
| 336 | 8,591,832.75 | 119.70 |
| 337 | 3,385,354.11 | 47.16 |
| 338. | | |
| 339 | 1,634,758.00 | 22.77 |
| 340 | 935,226.00 | 13.03 |
| 341 | 823,172.38 | 11.47 |
| 342 | 7,230,086.55 | 100.73 |
| 343 | 2,994,432.00 | 41.72 |
| 344 | 5,133,362.77 | 71.52 |
| 345. | | |
| 346 | 1,744,000.00 | 24.30 |
| 347. | | |
| 348 | 5,993,119.17 | 83.49 |
| 349. | | |
| 350 | 652,857.00 | 9.10 |
| 351 | 424,927.00 | 5.92 |
| 352 | 953,388.28 | 13.28 |
| 353. | | |
| 354 | 2,291,065.00 | 31.92 |
| 355 | 3,155,865.00 | 43.97 |
| 356 | 374,015.00 | 5.21 |
| 357 | 1,665,732.44 | 23.21 |
| 358 | 128,500.00 | 1.79 |
| 359 | 401,400.00 | 5.59 |
| 360 | 830,021.00 | 11.56 |
| 361 | 910,747.00 | 12.69 |
| 362 | 1,232,435.70 | 17.17 |
| 363 | 14,888,100.00 | 207.42 |
| 364 | 1,702,250.00 | 23.72 |
| 365 | 3,676,612.12 | 51.22 |
| 366 | 919,741.00 | 12.81 |
| 367 | 3,712,051.51 | 51.72 |
| 368 | 635,368.00 | 8.85 |
| 369 | 447,894.00 | 6.24 |
| 370 | 2,272,345.00 | 31.66 |
| 371 | 1,374,837.10 | 19.15 |
| 372 | 1,552,729.36 | 21.63 |
| 373 | 2,180,116.97 | 30.37 |
| 374. | | |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 375 | 798,527.92 | 11.12 |
| 376. | | |
| 377 | 1,399,199.54 | 19.49 |
| 378 | 4,536,762.00 | 63.20 |
| 379 | 1,061,788.00 | 14.79 |
| 380 | 2,827,862.97 | 39.40 |
| 381 | 1,053,097.00 | 14.67 |
| 382 | 939,300.00 | 13.09 |
| 383 | 254.00 | 0.00 |
| 384 | 1,088,114.00 | 15.16 |
| 385 | 773,060.00 | 10.77 |
| 386 | 387,116.56 | 5.39 |
| 387 | 873,812.55 | 12.17 |
| 388 | 665,749.00 | 9.27 |
| 389 | 795,558.50 | 11.08 |
| 390 | 2,597,253.00 | 36.18 |
| 391 | 948,046.00 | 13.21 |
| 392 | 1,107,547.00 | 15.43 |
| 393 | 3,654,035.00 | 50.91 |
| 394 | 521,279.00 | 7.26 |
| 395 | 410,769.00 | 5.72 |
| 396 | 2,622,813.00 | 36.54 |
| 397 | 554,541.44 | 7.73 |
| 398 | 179,200.00 | 2.50 |
| 399 | 841,840.24 | 11.73 |
| 400 | 523,709.00 | 7.30 |
| 401. | | |
| 402. | | |
| 403 | 462,520.50 | 6.44 |
| 404 | 379,314.02 | 5.28 |
| 405 | 217,857.00 | 3.04 |
| 406 | 513,184.27 | 7.15 |
| 407 | 130,200.00 | 1.81 |
| 408 | 480,937.70 | 6.70 |
| 409 | 658,680.86 | 9.18 |
| 410 | 1,230,112.99 | 17.14 |
| 411 | 5,625,111.00 | 78.37 |
| 412 | 620,200.00 | 8.64 |
| 413 | 3,879,491.00 | 54.05 |
| 414 | 852,915.67 | 11.88 |
| 415 | 468,524.00 | 6.53 |
| 416 | 338,139.73 | 4.71 |
| 417 | 86,853.84 | 1.21 |
| 418 | 382,210.00 | 5.32 |
| 419. | | |
| 420 | 183,173.25 | 2.55 |
| 421 | 655,954.75 | 9.14 |
| 422 | 165,639.00 | 2.31 |
| 423. | | |
| 424 | 84,016.00 | 1.17 |
| 425. | | |
| 426 | 220,899.00 | 3.08 |
| 427. | | |
| 428. | | |
| 429 | 38,100.00 | 0.53 |
| 430 | 78,640.00 | 1.10 |
| 431 | 212,985.00 | 2.97 |
| 432 | 79,334.00 | 1.11 |
| 433. | | |
| 434 | 22,991.02 | 0.32 |
| 435 | 8,120.00 | 0.11 |
| 436 | 44,988.45 | 0.63 |
| 437 | 81,718.00 | 1.14 |
| 438 | 91,513.00 | 1.27 |
| 439 | 234,239.00 | 3.26 |
| 440 | 509,039.50 | 7.09 |
| 441. | | |
| 442 | 28,633.00 | 0.40 |

**17138**   **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 443. | | |
| 444 | 7,497.00 | 0.10 |
| 445 | 69,548.86 | 0.97 |
| 446 | 1,243,936.05 | 17.33 |
| 447 | 111,283.00 | 1.55 |
| 448. | | |
| 449 | 435,740.00 | 6.07 |
| 450. | | |
| 451 | 1,907,630.00 | 26.58 |
| 452. | | |
| 453 | 94,505.19 | 1.32 |
| 454 | 500,187.00 | 6.97 |
| 455 | 189,004.00 | 2.63 |
| 456. | | |
| 457 | 5,154.00 | 0.07 |
| 458. | | |
| 459. | | |
| 460. | | |
| 461 | 426.90 | 0.01 |
| 462 | 1,065.00 | 0.01 |
| 463 | 150,058.61 | 2.09 |
| 464 | 282,990.00 | 3.94 |
| 465 | 16,625.00 | 0.23 |
| 466. | | |
| 467. | | |
| 468 | 139,267.00 | 1.94 |
| 469 | 49,367.91 | 0.69 |
| 470 | 330,964.00 | 4.61 |
| 471 | 6,532.00 | 0.09 |
| 472. | | |
| 473. | | |
| 474 | 9.00 | 0.00 |
| 475 | 34,000.00 | 0.47 |
| 476 | 15,708.00 | 0.22 |
| 477 | 14,355.00 | 0.20 |
| 478 | 151,323.00 | 2.11 |
| 479 | 6,090.28 | 0.08 |
| 480 | 67,340.20 | 0.94 |
| 481 | 16,356.00 | 0.23 |
| 482 | 37.00 | 0.00 |
| 483 | 94,762.08 | 1.32 |
| 484 | 16,191.00 | 0.23 |
| 485 | 30,000.00 | 0.42 |
| 486 | 17,679.82 | 0.25 |
| 487 | 3,762.52 | 0.05 |
| 488. | | |
| 489 | 111,812.00 | 1.56 |
| 490. | | |
| 491 | 30,513.00 | 0.43 |
| 492 | 86,676.00 | 1.21 |
| 493. | | |
| 494 | 500.00 | 0.01 |
| 495 | 98,319.74 | 1.37 |
| 496 | 36,465.84 | 0.51 |
| 497 | 20,653.01 | 0.29 |
| 498 | 29,603.84 | 0.41 |
| 499. | | |
| 500 | 4,165.29 | 0.06 |
| 501 | 7,100.00 | 0.10 |
| 502. | | |
| 503. | | |
| 504 | 5,582.00 | 0.08 |
| 505. | | |
| 506 | 38,770.00 | 0.54 |
| 507 | 18,855.43 | 0.26 |
| 508. | | |
| 509 | 9,817.02 | 0.14 |
| 510 | 900.00 | 0.01 |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 511 | 4,472.75 | 0.06 |
| 512 | 266.00 | 0.00 |
| 513 | 5,298.16 | 0.07 |
| 514. | | |
| 515 | 169.00 | 0.00 |
| 516. | | |
| 517 | 4,646.78 | 0.06 |
| 518 | 4,646.78 | 0.06 |
| 519 | 6,417.00 | 0.09 |
| 520 | 257.00 | 0.00 |
| 521 | 13,387.78 | 0.19 |
| 522 | 1,313.00 | 0.02 |
| 523. | | |
| 524 | 23,714.00 | 0.33 |
| 525 | 4,488.00 | 0.06 |
| 526 | 2,787.00 | 0.04 |
| 527 | 1,200.00 | 0.02 |
| 528. | | |
| 529 | 1,947.72 | 0.03 |
| 530 | 2,360.20 | 0.03 |
| 531 | 200.00 | 0.00 |
| 532 | 15,261.00 | 0.21 |
| 533 | 267.00 | 0.00 |
| 534. | | |
| 535 | 2.00 | 0.00 |
| 536. | | |
| 537 | 1,895.46 | 0.03 |
| 538 | 1,369.04 | 0.02 |
| 539 | 1,047.00 | 0.01 |
| 540 | 1,507.00 | 0.02 |
| 541. | | |
| 542 | 2,183.01 | 0.03 |
| 543 | 973.00 | 0.01 |
| 544. | | |
| 545 | 760.01 | 0.01 |
| 546 | 2,774.00 | 0.04 |
| 547 | 45.00 | 0.00 |
| 548 | 747.00 | 0.01 |
| 549. | | |
| 550 | 799.00 | 0.01 |
| 551 | 257.00 | 0.00 |
| 552 | 207.00 | 0.00 |
| 553. | | |
| 554 | 6.00 | 0.00 |
| 555. | | |
| 556 | 402.00 | 0.01 |
| 557. | | |
| 558. | | |
| 559 | 164.00 | 0.00 |
| 560. | | |
| 561. | | |
| 562. | | |
| 563. | | |
| 564. | | |
| 565 | 118.00 | 0.00 |
| 566 | 5.00 | 0.00 |
| 567. | | |
| 568 | 68.00 | 0.00 |
| 569 | 75.00 | 0.00 |
| 570 | 15.00 | 0.00 |
| 571 | 34.00 | 0.00 |
| 572. | | |
| 573 | 9.00 | 0.00 |
| 574. | | |
| 575 | 85.00 | 0.00 |
| 576 | 75.00 | 0.00 |
| 577. | | |
| 578. | | |

**17140**    **Federal Register** / Vol. 88, No. 54 / Tuesday, March 21, 2023 / Notices

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 579 | 54.00 | 0.00 |
| 580 | 26.00 | 0.00 |
| 581 | 34.00 | 0.00 |
| 582 | 423.55 | 0.01 |
| 583 | 6.00 | 0.00 |
| 584. | | |
| 585 | 91.00 | 0.00 |
| 586 | 43.00 | 0.00 |
| 587. | | |
| 588 | 25.00 | 0.00 |
| 589. | | |
| 590 | 16.00 | 0.00 |
| 591 | 20.00 | 0.00 |
| 592 | 31.00 | 0.00 |
| 593. | | |
| 594 | 25.00 | 0.00 |
| 595. | | |
| 596 | 29.00 | 0.00 |
| 597 | 22.00 | 0.00 |
| 598. | | |
| 599. | | |
| 600 | 3.00 | 0.00 |
| 601 | 26.00 | 0.00 |
| 602. | | |
| 603. | | |
| 604 | 55.02 | 0.00 |
| 605 | 20.00 | 0.00 |
| 606. | | |
| 607 | 18.00 | 0.00 |
| 608. | | |
| 609. | | |
| 610 | 18.00 | 0.00 |
| 611. | | |
| 612 | 27.00 | 0.00 |
| 613. | | |
| 614. | | |
| 615 | 14.00 | 0.00 |
| 616 | 8.00 | 0.00 |
| 617 | 18.00 | 0.00 |
| 618. | | |
| 619. | | |
| 620. | | |
| 621. | | |
| 622 | 16.00 | 0.00 |
| 623 | 3.00 | 0.00 |
| 624 | 1.00 | 0.00 |
| 625 | 7.00 | 0.00 |
| 626. | | |
| 627 | 6.00 | 0.00 |
| 628. | | |
| 629 | 8.00 | 0.00 |
| 630 | 11.00 | 0.00 |
| 631 | 9.00 | 0.00 |
| 632. | | |
| 633 | 2.26 | 0.00 |
| 634 | 10.00 | 0.00 |
| 635. | | |
| 636 | 8.00 | 0.00 |
| 637 | 2.00 | 0.00 |
| 638. | | |
| 639 | 4.00 | 0.00 |
| 640 | 15.00 | 0.00 |
| 641. | | |
| 642. | | |
| 643 | 6.00 | 0.00 |
| 644 | 1.00 | 0.00 |
| 645. | | |
| 646 | 2.00 | 0.00 |

HISTORICAL FEE ASSESSMENT FOR EACH CAT EXECUTING BROKER [161]—Continued

| CAT executing broker | Executed equivalent share volume of transactions in eligible securities for December 2022 | Historical CAT assessment for December 2022 (in dollars) |
|---|---|---|
| 647 ........................................................................................................ | 1.00 | 0.00 |
| 648 ........................................................................................................ | 2.00 | 0.00 |
| 649 ........................................................................................................ | 3.00 | 0.00 |
| 650. | | |
| 651. | | |
| 652. | | |
| 653. | | |
| 654. | | |
| 655 ........................................................................................................ | 4.00 | 0.00 |
| 656 ........................................................................................................ | 5.00 | 0.00 |
| 657. | | |
| 658. | | |
| 659 ........................................................................................................ | 1.00 | 0.00 |
| 660. | | |
| 661 ........................................................................................................ | 3.00 | 0.00 |
| 662 ........................................................................................................ | 8.00 | 0.00 |
| 663. | | |
| 664. | | |
| 665. | | |
| 666. | | |
| 667. | | |
| 668. | | |
| 669. | | |
| 670. | | |
| 671. | | |
| 672 ........................................................................................................ | 1.00 | 0.00 |
| 673. | | |
| 674. | | |
| 675. | | |
| 676. | | |
| 677. | | |
| 678. | | |
| 679 ........................................................................................................ | 1.00 | 0.00 |
| 680. | | |
| 681. | | |
| 682. | | |
| 683. | | |

[FR Doc. 2023–05690 Filed 3–20–23; 8:45 am]

**BILLING CODE 8011–01–P**

[161] CAT LLC recognizes that an Industry Member's knowledge of its own fees in the illustrative example would be helpful in analyzing the Funding Proposal. Accordingly, if a CAT Executing Broker is interested in learning which anonymized CAT Executing Broker in the illustrative example represents its volume and fees, the CAT Executing Broker may contact the FINRA CAT Helpdesk by email at *help@finracat.com.* Accordingly, subject to verification of the identity of the requesting party as an authorized representative of the relevant Industry Member, the Helpdesk will provide the authorized representative of the CAT Executing Broker with the number of the applicable anonymized CAT Executing Broker in *Exhibit C.* In addition, upon request, the Helpdesk also will provide the CAT Executing Broker with a breakdown of its executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions. CAT LLC notes that the calculations provided in the table may reflect minor variations due to rounding.

# Tab D

Letter from Ellen Greene, Managing Director, SIFMA et al. to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (May 2, 2023)



*Invested in America*

May 2, 2023

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

> **Re:** ***Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail; File No. 4-698***

Dear Ms. Countryman:

The Securities Industry and Financial Markets Association ("SIFMA")[1] respectfully submits this comment letter to the U.S. Securities and Exchange Commission (the "Commission") in response to the proposal by the self-regulatory organizations ("SROs) to establish a revised funding model ("Funding Proposal") [2] for the consolidated audit trail ("CAT") and to establish a fee schedule in accordance with the Funding Proposal. The Funding Proposal replaces and is virtually identical to the prior "Executed Share Model" that was withdrawn by the SROs on March 1, 2023.[3] As such, SIFMA continues to have the same concerns with the Funding Proposal that we had with the Executed Share Model, and accordingly, our prior comments on the Executed Share Model apply equally to the Funding Proposal. [4] As set forth below and stated previously regarding the Executed Share Model, the Commission should disapprove the Funding Proposal because the SROs as the CAT NMS Plan Participants ("Participants") have not demonstrated that the Funding Proposal meets the relevant standards governing SRO fees under the Securities Exchange Act of 1934 ("Exchange Act").

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

[2] See Release No. 34-97151 (March 15, 2023), 88 FR 17086 (March 21, 2023). Capitalized terms not otherwise defined in this letter have the same meanings as they do in the CAT NMS Plan and/or the Funding Proposal.

[3] See Release No. 34-97212 (March 28, 2023), 88 FR 19693 (April 3, 2023).

[4] See (https://www.sec.gov/comments/4-698/4698-20132695-303187.pdf) ("June 2022 Comment Letter"), (https://www.sec.gov/comments/4-698/4698-20145239-310561.pdf) ("October 2022 Comment Letter"), (https://www.sec.gov/comments/4-698/4698-20152795-320485.pdf) ("December 2022 Comment Letter"), and (https://www.sec.gov/comments/4-698/4698-20154753-322976.pdf) ("January 2023 Comment Letter").

While SIFMA staff appreciated meeting with the Participants on April 14, 2023 to share our concerns with the proposed definition of "executing broker" in the Funding Proposal, we continue to be disappointed with the SROs' overall lack of consultation and collaboration with SIFMA and its members on other critical aspects of the Funding Proposal. As we have stated previously, we recognize and accept that Industry Members will be responsible for a portion of CAT costs. Nonetheless, we continue to believe that the process followed by the SROs in connection with establishing the Executed Share Model, as well as the Funding Proposal, has been significantly flawed. In submitting the Funding Proposal, the SROs have continued to follow a problematic path of not meaningfully soliciting industry input on a viable CAT funding model.

We also find it extremely noteworthy that the Financial Industry Regulatory Authority, Inc. ("FINRA"), the not-for-profit self-regulator for the entire brokerage industry, submitted a comment letter on the Funding Proposal urging the Commission to disapprove it.[5] In its letter, FINRA asserts that the proposal "fails to adequately address concerns that have been previously raised both by FINRA and industry members regarding, among other things, the inequitable allocation to FINRA of a disproportionate share of the total CAT costs to be borne by the [SROs], the reasonableness and fairness of such an approach, and the impact it would have on FINRA and FINRA members."[6] As the Commission knows, FINRA is funded by Industry Members. As we have stated previously, this Industry Member funding of FINRA should be taken into account in determining whether the proposed allocation of CAT costs between Participants and Industry Members under the Funding Proposal is fair and reasonable. More importantly, it should lead the Commission to disapprove the proposal because it would cause Industry Members to pay not only for their proposed share of CAT costs, but also for FINRA's share of CAT costs, leading Industry Members to pay in excess of 80% of total CAT cost under the proposal. In addition, as FINRA notes in its comment letter, the Participants' treatment of FINRA under the proposal is manifestly unfair, as the Participants are proposing to assess FINRA approximately 34% of the Participants' share of CAT costs. Consistent with our discussion below, we support the points raised by FINRA in its comment letter regarding the proposal's inequitable allocation of fees and its conclusion that the Commission disapprove it.[7]

We further request that if and when a CAT funding model is approved, that Industry Members be given ample time to implement any necessary changes to systems and processes for them to be able to capture their portion of CAT costs. We would suggest a minimum of a year for such an implementation period, but as noted, are happy to further discuss this and other issues related to CAT funding directly with the SROs.

---

[5] See (https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf) ("FINRA Comment Letter").

[6] Id.

[7] To be clear, our support of the FINRA Comment Letter relates to points regarding the inequitable allocation of fees and its conclusion that the Commission disapprove the proposal, and not to certain other suggestions such as the one to create a CAT funding model based on the Section 31 fee model.

## I.    Executive Summary

As noted, SIFMA continues to have the same concerns with the Funding Proposal that we had with the Executed Share Model.  Therefore, all of our prior comments on the Executed Share Model continue to apply to the Funding Proposal.  These include our objections to the way in which the Participants propose to handle and allocate Historical CAT Costs, which we continue to believe is inconsistent with the Exchange Act fee standards.[8]  We are focusing in this letter on certain of our prior comments that need to be further elaborated in light of the Funding Proposal. We believe for the reasons set forth below, as well as in our prior comment letters, that the Commission should disapprove the Funding Proposal as the Participants have not met their burden under the Exchange Act of demonstrating that the proposal (1) provides "for the equitable allocation of reasonable dues, fees, and other charges," (2) is "not designed to permit unfair discrimination between customers, issuers, brokers or dealers," and (3) does not "impose any burden on competition not necessary or appropriate in furtherance of the purposes" of the Exchange Act. Specifically, we believe that:

- The definition of "executing broker" in the proposal leads to the inequitable allocation of fees;

- The Participants' decision to allocate two-thirds of CAT costs to Industry Members – and in excess of 80% if Industry Member funding of FINRA is considered - is unfair and unreasonable, as well as arbitrary, because the Participants are equally responsible for the complexity of the trading activity in the equity and options markets, complexity that could exponentially increase if the Commission moves forward with its equity auction and new minimum pricing increment proposals;[9] and

- CAT continues to need an independent cost review mechanism to help ensure that future CAT Fees are fair and reasonable and to ensure that controls are put into place to guard against unchecked spending.

We address each of these points in more detail below.

## II.    Discussion

### A.    The Definition of "executing broker" in the Funding Proposal Leads to the Inequitable Allocation of Fees

As noted in the Funding Proposal, SIFMA supported the switch in the Executed Share Model from proposing to assess the Industry Member portion of CAT Fees on clearing brokers to proposing to assess this portion of CAT Fees on executing brokers.  We supported this switch

---

[8] See SIFMA's June 2022 Comment Letter, October 2022 Comment Letter, and January 2023 Comment Letter.  Our prior comments also highlight, among other things, the problems with the Participants' decision to provide for a reserve of not more than 25% of the CAT budget as part of the budget.

[9] See Release No. 34-96495 (December 14, 2022), 88 FR 128 (January 3, 2023) (Order Competition Rule); Release No. 34-96494 (December 14, 2022), 87 FR 80266 (December 29, 2022) (Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders).

because the Participants' initial decision to allocate CAT Fees to clearing brokers would have led to unfair burdens on them and could have resulted in them shouldering the burden of CAT costs in scenarios in which they could not determine which clearing client was responsible for the costs. In connection with making this recommendation, we noted in our January 2023 Comment Letter that the Participants needed to provide significantly more detail on who would be defined as an "executing broker" under the proposal, as the term is used in a variety of contexts in the industry and is sometimes applied to various brokers who have a role in the lifespan of a single order. In response, the Participants now are proposing to define "executing broker" in effectively the same way as parties to trade reports are identified under the SROs' rules. We believe that this proposed definition continues to suffer from the same problems as the Participants' prior proposal to allocate CAT Fees to clearing brokers, and accordingly, would lead to the inequitable allocation of the CAT Fees among Industry Members.

Under the proposed definition, the Participants would use CAT transaction reports submitted by the exchanges and FINRA to identify the transaction for purposes of calculating the amount of CAT Fees. These reports also will be used to identify the CAT Executing Broker for the Buyer and the CAT Executing Broker for the Seller for purposes of allocating such CAT Fees between the buying and selling firms in the transaction. Thus, under the definition, the exchange or FINRA member representing the buyer and the exchange or FINRA member representing the seller in a transaction each would be charged one-third of the total CAT Fees for the transaction. The remaining one-third of the CAT Fees would be charged to the exchange on which the transaction was executed, or to FINRA if the trade was executed over-the-counter ("OTC"). Further, for OTC transactions, the proposal provides that if one of the parties is not a FINRA member, then the FINRA member on the other side of the transaction would be responsible for two-thirds of the CAT Fees for the transaction.

The Participants also propose to use the same reporting paradigm for transactions executed on an alternative trading system ("ATS"). Specifically, if an ATS is identified as the executing party and/or the contra-side executing party in the TRF/ORF/ADF Transaction Data Event, then the ATS would be a CAT Executing Broker for purposes of the Funding Proposal. If the ATS is identified as the executing party for the buyer in such transaction reports, then the ATS would be the CAT Executing Broker for the Buyer, and if the ATS is identified as the executing party for the seller in such transaction reports, then the ATS would be the CAT Executing Broker for the Seller. An ATS also could be both the CAT Executing Broker for the Buyer and the CAT Executing Broker for the Seller under the proposal.

In assessing any funding model, it is important to recognize that CAT operates on a cost-recovery basis and that such costs are a direct result of the total number of messages that CAT Reporters (both Participants and Industry Members) send to CAT, the costs of processing and linking such messages, and the costs to CAT of providing tools and mechanisms to the SEC and SROs to analyze the CAT data. Though SIFMA agrees with the SROs' decision to move away from the original proposal that would have assessed fees based solely on message traffic, that method did at least ensure that all CAT Reporters contributed to the overall funding of CAT.

In an apparent effort to simplify the billing methodology, the Participants now are proposing to assess CAT Fees on the buying and selling Industry Member in a transaction. Similar to the problem with the Participants' prior proposal to assess CAT Fees on clearing

4

brokers, such an approach would result in the inequitable allocation of the fees to just a subset of Industry Members, as opposed to all CAT Reporters. This would occur because the "executing brokers" under the proposal are often the last broker in the chain of many brokers that originate, handle, and process the order before it reaches the executing broker.

Any analysis of a funding model that charges only a subset of brokers-dealers needs to evaluate whether there is an expectation that such firms would pass on costs to others, or whether they would absorb them, and to what extent this has any negative impacts on competition. In other words, like clearing brokers under the prior proposal, the Participants would place executing brokers in the position of having to collect the Industry Member portion of CAT Fees on behalf of the Participants, causing the executing brokers to incur expenses that other Industry Members would not incur.

For example, in the common situation of an introducing broker sending an order to another broker for execution, that other broker would be considered the executing broker under the proposal and therefore be assessed the CAT Fee for one side of the trade. Similarly, in the common situation in which an order consolidator is used in a transaction to be executed on an exchange, the order consolidator would be treated as the executing broker in the transaction and be assessed the CAT Fee for at least one side of the trade. The Funding Proposal creates similar issues for transactions executed on an ATS, where for a variety of reasons the ATS may be structured so that it reports one or both sides of a trade to CAT and the tape.

In scenarios such as these, Industry Members executing trades on behalf of introducing brokers, as well as ones acting as order consolidators and ATSs, would be responsible for CAT Fees on transactions that did not originate with them. Moreover, firms such as these often are not set up to track and pass through fees to the client firms that sent them the orders that resulted in executions. Thus, under the proposal, they would be faced with either paying the fee on behalf of their clients or developing software and processes to collect such fees from their clients. Like the problems clearing brokers faced under Participants' prior proposal, Industry Members defined as executing brokers under the Funding Proposal would be subject to unfair burdens and could shoulder CAT costs in scenarios in which they could not determine which client firm was responsible for creating the CAT costs by initiating the transaction.

Subject to further data and analysis by the Participants, including projected fees for each Industry Member similar to what the Participants provided in Exhibit C of the Funding Proposal, we preliminarily believe the most reasonable way to allocate CAT costs among Industry Members is to treat the Industry Member that originated the order as being the "executing broker" and therefore the one responsible for CAT Fees. In the alternative, the proposal could be modified to specify that the "originating broker" would be billed the CAT Fee, with the originating broker being defined as the broker-dealer that first reported to CAT an associated order that resulted in the transaction (e.g., "MENO" or "MONO" events under the CAT Reporting Technical Specifications for Industry Members). Such an approach would be more consistent with our understanding of the approach taken under prior CAT funding proposals based on message traffic, which while problematic for many reasons, did subject all Industry Members that brought activity to the market to CAT Fees. In contrast, under the Funding Proposal, only a subset of such Industry Members would be responsible for CAT costs, resulting in an unfair allocation of CAT Fees.

5

**A69**

Under this contemplated approach, Participants would assess CAT Fees on the Industry Member that originated the ultimately executed order, whether the firms did so on behalf of a client or on behalf of itself as a principal.  Based on our review of the latest CAT technical specifications, the Industry Member who originates a new principal order or the Industry Member who initially receives and routes a customer order for execution on an agency basis would be directly assessed CAT Fees.  While the Participants suggest that this approach involves more steps than the approach set forth in the proposal because it would require CAT to link transactions back to the Industry Member on either side that originated the order, we believe it could be simpler because CAT could start with new order events (e.g., MENO or MONO events) and then look for any Execution or Fulfillment that is directly associated with that event.  Even if this approach involves linking transactions, we understand that CAT has already been set up to do this for regulatory purposes, so it would appear to be relatively easy to accommodate this approach.

Of course, we very much would welcome further discussion and dialogue with the Participants on the definition of executing broker (as well as other aspects of the Funding Proposal).  As noted, SIFMA staff appreciated meeting with the Participants on April 14, 2023 to discuss the executing broker definition.  We continue to believe that the best way to achieve a viable CAT funding model is through a dialogue between the Participants and the Industry Members.

**B.        The Participants' Decision to Allocate Two-Thirds of CAT Costs to Industry Members is Inconsistent with the Exchange Act Fee Standards and Arbitrary**

As set forth in our prior comments on the Executed Share Model, we continue to believe that the Participants' have not met their burden under the Exchange Act of demonstrating that allocating two-thirds of CAT costs to Industry Members – and in excess of 80% if Industry Member funding is appropriately considered - is consistent with the Exchange Act fee standards and not otherwise arbitrary.[10] The Participant Exchanges' position that such an allocation satisfies these standards largely is based on their assertion that the complexity and costs in CAT primarily are driven by the complexity of Industry Members' business models.[11]  In support of this view, the Participant Exchanges note that the Industry Members' reporting scenarios document is more complicated than the Participants' reporting scenarios document, pointing out

---

[10] As discussed in our prior comment letters on the Executed Share Model and noted in the FINRA Comment Letter, Industry Members' allocation of total CAT costs would be even higher than two-thirds if Industry Member funding of FINRA is considered.  As we have argued, the Commission should take into account such Industry Member funding of FINRA in connection with determining whether the proposed allocation between Participants and Industry Member satisfies the Exchange Act fee standards.

[11] We have previously commented on the Participants' responsibility for creating the unnecessarily complex Industry Member technical reporting specifications and the need for Industry Member input to make them more workable. In addition, we note that we use the reference "Participant Exchanges" in certain parts of this letter rather than "Participants," as it is clear that the large exchange groups are dictating the CAT funding model decisions based on the CAT NMS Plan voting structure.  The FINRA Comment letter makes this abundantly clear.  FINRA's letter also highlights a point we made in our prior comment letters about the manifest unfairness of the Participants Exchanges choosing to treat FINRA in different ways in the CAT NMS Plan and the CT Plan based on the outcome that is most financially beneficial to the exchanges.

6

**A70**

that the Industry Members' document includes multiple reporting scenarios including ones for "stop and conditional orders" and "floor activity."[12]

In making this argument, however, the Participant Exchanges fail to acknowledge that certain of these reporting scenarios have been developed to address order types and activities established and governed by exchange rules, and that attributing any CAT complexity and costs associated with them to Industry Members is wholly inappropriate. In this regard, the Participant Exchanges provide no analysis of how their business decisions, such as creating 32 (and counting) equity and option exchanges, as well as different order types and fee structures for each of these exchanges, have led to complexity in how Industry Members route orders. Instead, they assert in the Funding Proposal that much of the order routing complexity in today's market is caused by Industry Members, without any further analysis of how their own rules and business decisions might be the cause of such complexity.

For instance, equity and options exchanges families have established maker-taker fee structures on certain of their exchanges to attract order flow. Under this structure, an exchange pays a per-share rebate to their members to encourage them to place resting liquidity-providing orders. If an execution occurs, the liquidity providing "maker" receives a rebate from the exchange, the "taker" that executes against that resting order pays a fee to the exchange, and the exchange's fee is the difference between the taker fee and the maker rebate in a transaction. This fee structure in turn has led to routing strategies designed to optimize the fees and rebates. These routing strategies, and the complexity and cost they create in CAT, are a direct result of the exchanges' business decisions to establish these and other types of exchange fee structures. Yet, the Participants provide no analysis in the Funding Proposal of how these and other business decisions have led to complexity and costs in CAT.

In seeking to allocate two-thirds of the CAT costs to Industry Members, the Participant Exchanges also argue that there are more Industry Members than Participants and that the Industry Members receive more in revenue than the Participants.[13] As we have noted, neither one of these assertions is relevant to demonstrating that the proposed allocation of CAT costs is fair and reasonable. In making these assertions, the Participant Exchanges are essentially arguing that CAT costs should be allocated based on the ability to pay rather than responsibility for generating cost. Such a position is completely inconsistent with the Participant Exchanges' proposed approach described above of allocating CAT costs based on approximate responsibility for generating them. It also is inconsistent with the historical CAT decision to allocate costs to the parties responsible for generating them.[14]

As we have previously stated, we continue to believe that assigning 50% of CAT costs to the Participant Exchanges and 50% to Industry Members is a more fair and reasonable way to allocate CAT costs than what is proposed in the Funding Proposal. The Participants admit in the

---

[12] See Funding Proposal at 17104.

[13] Id. Rather than using other measures, we also understand that the Participants used FOCUS reports for determining Industry Member revenue, which contain broker-dealers' unaudited financial and operational information that is used by the Commission and SROs to monitor and supervise the firms.

[14] See generally Section 11.2 of the CAT NMS Plan.

7

A71

Funding Proposal that it is not possible to precisely allocate CAT costs to the parties directly responsible for generating them.[15]  They nonetheless also have asserted that Industry Members are responsible for much of the complexity and costs in CAT, and therefore it is fair and reasonable to allocate two-thirds of CAT costs to them.  For the reasons set forth above and previously, and absent direct data to the contrary, we believe that it is just as reasonable to assert that the Participant Exchanges are equally responsible for the complexity and costs in CAT.

Therefore, absent a reliable way to directly allocate CAT costs to the parties responsible for generating them, assigning 50% of CAT costs to the Participant Exchanges and 50% to Industry Members would provide for an equal sharing of CAT costs between Participant Exchanges and Industry Members.  Such an allocation would be justifiable under the Exchange Act because it treats Participant Exchanges and Industry Members the same from a cost allocation perspective based on their approximate responsibility for generating CAT costs, thus satisfying the fair and reasonable and other Exchange Act fee standards.  As we have noted previously, under such an approach, FINRA could be assessed a nominal regulatory user fee to access CAT Data to perform its regulatory role.  Treating FINRA differently from the Participant Exchanges would be justifiable under the Exchange Act fee standards because it is a non-profit and it conducts the vast majority of the self-regulatory activity for the brokerage industry.

Related to the allocation of CAT costs between Participants and Industry Members, the Participants also mistakenly suggest several times in the Funding Proposal that ultimately, CAT costs are going to be passed on to investors.  Such an assertion is inaccurate because it is almost certain that there will be scenarios faced by Industry Members in which they will not be able to figure out who was responsible for generating certain Historical CAT Costs.  More importantly, such an assertion appears to be designed to minimize the Participants' obligation to allocate CAT Fees consistent with the Exchange Act fee standards and for the Commission to make a finding that they did so.  Losing sight of these standards could result in the inequitable allocation of CAT Fees based on the mistaken belief that the costs will just be passed along to investors anyway.  Consistent with its statutory mandate, the Commission ultimately must find that the methodology and allocation under the Funding Proposal is consistent with the Exchange Act fee standards, regardless of how directly affected parties might ultimately choose to address their portion of the CAT Fees.

C.    **CAT Continues to Need an Independent Cost Review Mechanism to Help Ensure that Future CAT Fees are Fair and Reasonable and to Ensure that Controls are Put into Place to Guard against Unchecked Spending**

We continue to have significant concerns about the lack of an independent cost control mechanism for the CAT budget that would help ensure that future CAT Fees are fair and reasonable and that would help guard against unchecked spending.  Under the Funding Proposal, the Participants still are not planning to include a mechanism for the public to review and provide input on the development of the annual CAT budget prior to it being finalized.  Rather, the only opportunity that Industry Members and other members of the public would have to review the budget would be when the individual SROs file fee changes to collect fees to fund the current CAT budget, well after the CAT budget is agreed to and approved by the Participants.

---

[15] See Funding Proposal at 17103.

As we have noted previously, a post-hoc review of the CAT budget is not an effective mechanism to help ensure that future CAT Fees are fair and reasonable.

On this point, the Participants' proposed approach contains numerous problems that would make it ineffective. As we understand it, the Participants through the CAT Operating Committee would agree to a CAT budget and CAT Fee prior to the beginning of the year and then would also conduct a mid-year review to determine if the CAT Fee needs to be adjusted based on whether there was an over or under collection as compared with actual CAT expenditures for the year up until that point. In either situation, after the budget is established / CAT Fee is adjusted, each Participants would then file rule changes to collect the CAT Fee. It would be at this point that the Commission would determine whether the CAT Fee is fair and reasonable and otherwise consistent with the Exchange Act fee standards.

Based on the practical challenges of sending the CAT Operating Committee back to the drawing board to modify the CAT budget, it seems highly unlikely that the Commission would determine that a proposed CAT Fee does not meet the Exchange Act fee standards and thus require the Participants to modify the budget. If such a situation were to occur, it would involve more steps than a simple SRO fee filing that needed to be withdrawn and modified. Based on our understanding, it would require all of the Participants to meet again through the Operating Committee to agree on modifying the CAT budget, as the budget would first need to be modified prior to determining the new CAT Fee as the fee is based on the CAT budget. It would then involve each Participant creating and submitting new fee filings to implement the modified CAT Fee. Given these logistical hurdles and the potential time involved, it seems implausible that the Commission would send the Participants back to the drawing board under such a process.

It seems even more implausible that the Commission would send the Participants back to the drawing board given the regulatory value of CAT data and the CAT system to the Commission. The Commission has indicated throughout the development of CAT that the CAT data is critical for the Commission to conduct its oversight functions. As a practical matter, this means that if Commission staff in the Division of Enforcement or Inspections wants the CAT to have functionality to make certain regulatory or surveillance functions easier, it is highly likely that this functionality will be added given that the Commission and its staff directly regulate and oversee the SROs as the developers and operators of the CAT system.

One could imagine a scenario in which staff in the Division of Enforcement or Examinations requests that the CAT have certain functionality, even if it is more cost effective for the staff to collect the information in another way, and the Participants reluctantly agreeing to include development costs for it in the proposed CAT budget because the Participants are directly regulated by the Commission. One could also imagine a scenario in which CAT data is used to support a Commission rulemaking, like the recent equity market structure proposals directed by the Chair, and how difficult it would be for the SROs to tell the Commission that the use of such data is exceedingly expensive or not cost-effective because the data could be obtained elsewhere at less cost. Given these dynamics, it is highly unlikely that the Commission would ever reject a CAT fee filing. Moreover, as these scenarios demonstrate, the Commission is directly conflicted in its role as the user and beneficiary of the CAT system for regulatory

**A73**

functions and its role as the reviewer of the CAT budget and fee filings, a conflict that is only heightened due to a lack of a Commission funding obligation for CAT.

Given these factors, we continue to strongly believe that the CAT needs an independent review mechanism of proposed CAT expenditures to help ensure that the process fosters appropriate and cost-effective CAT spending, consistent with the Exchange Act. While we appreciate the changes in the Funding Proposal to provide greater transparency regarding the CAT Fee setting process and CAT costs, the approach continues to be flawed because it provides no mechanism for the public to review the proposed CAT budget prior to it being implemented. In our January 2023 Comment Letter, we suggested a process by which there would be a public vetting of the CAT budget prior to its approval by the CAT Operating Committee. This was one suggestion, but we continue to remain open to discussing other approaches with the Participants that are designed to provide an independent review mechanism of CAT spending choices. Such an independent review mechanism is critical given the practical problems with the Participants' proposed approach and the Commission's conflicted role as a beneficiary of the CAT regulatory data and reviewer of the CAT budget and fee filings. Given these considerations, we also reiterate our request that the Participants' proposed budget include as a separate line-item projected usage costs and system change costs related to the Commission's use and design of the CAT system.

*          *          *

SIFMA greatly appreciates the opportunity to comment on the Funding Proposal. For the reasons discussed above, as well as in our prior comment letters on the Executed Share Model, we strongly urge the Commission to disapprove the proposed model. If you have any questions or require additional information, please do not hesitate to contact us by calling Ellen Greene at (212) 313-1287 or Joe Corcoran at (202) 962-7383.

Sincerely,

Ellen Greene
Managing Director
Equities & Options Market Structure

Joseph Corcoran
Managing Director, Associate General Counsel
SIFMA

10

A74

Cc:     The Hon. Gary Gensler, Chair
        The Hon. Hester M. Peirce, Commissioner
        The Hon. Caroline A. Crenshaw, Commissioner
        The Hon. Mark T. Uyeda, Commissioner
        The Hon. Jaime Lizarraga, Commissioner
        Mr. Haoxiang Zhu, Director, Division of Trading and Markets

11

**A75**

# Tab E

Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (May 18, 2023)

**VIA EMAIL (rule-comments@sec.gov)**

May 18, 2023

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

Re:   File Number 4-698 – Notice of Filing of Amendment to the National Market
      System Plan Governing the Consolidated Audit Trail regarding CAT Funding
      Model

Dear Ms. Countryman:

On March 13, 2023, the Consolidated Audit Trail, LLC ("CAT LLC" or "Company"), on behalf of the Participants[1] in the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan" or "Plan"), filed with the Securities and Exchange Commission ("SEC" or "Commission") a proposed amendment to the CAT NMS Plan.[2]  The SEC published the proposed amendment for comment on March 15, 2023.[3]  The proposal would amend the CAT NMS Plan[4] to implement a revised funding model ("Funding Proposal") for the consolidated audit trail ("CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[5]  Commenters have submitted three comment letters in response to the Proposing Release.[6]  CAT LLC submits this letter to respond to topics raised in those comment letters, including (i) charging CAT fees to CAT Executing Brokers, (ii) the allocation of CAT costs among Industry Members and Participants, (iii) cost transparency, (iv) the implementation process for CAT fees, (v) collaboration with the industry regarding CAT fees, and (vi) CAT costs for 2022.  CAT LLC notes that the responses set forth in this letter

---

[1]       The twenty-five Participants of the CAT NMS Plan are:  BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc. ("FINRA"), Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc. and NYSE National, Inc.

[2]       Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC (Mar. 13, 2023).

[3]       Securities Exchange Act Rel. No. 97151 (Mar 15, 2023), 88 Fed. Reg. 17086 (Mar. 21, 2023) ("Proposing Release").

[4]       The Limited Liability Company Agreement of Consolidated Audit Trail, LLC is the CAT NMS Plan.

[5]       Unless otherwise defined herein, capitalized terms are defined as set forth in the CAT NMS Plan and the Proposing Release.

[6]       *See* Letter from Timothy Miller, Chief Operating Officer, DASH Financial Technologies LLC, to Vanessa Countryman, Secretary, SEC (Apr. 11, 2023) ("DASH Letter"); Letter from Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, FINRA, to Vanessa Countryman, Secretary, SEC (Apr. 11, 2023) ("FINRA Letter"); and Letter from Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (May 2, 2023) ("SIFMA Letter").  The comment letters submitted in response to the Proposing Release are available at https://www.sec.gov/comments/4-698/4-698-a.htm.

Ms. Vanessa Countryman
May 18, 2023
Page 2

represent the consensus of the Participants, but that all Participants may not fully agree with each response set forth in this letter.

To date, the significant economic costs of building and operating the CAT—more than $500 million through the end of 2022 and growing[7]—have been borne entirely by the Participants.  Over the past seven years, CAT LLC has gone through an extensive process of evaluating and seeking comment on various funding models.  The Funding Proposal is now the fourth fee model proposal under consideration by the Commission.  The continued funding of the CAT solely by the Participants was and is not contemplated by the CAT NMS Plan or Rule 613,[8] nor is it a financially sustainable approach.  The Funding Proposal provides for an equitable allocation of reasonable dues, is not unfairly discriminatory and does not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act, and should be approved by the Commission.

I.      **Charging CAT Fees to CAT Executing Brokers**

   A.      **Support for Charging CAT Executing Brokers**

SIFMA argues in its comment letter that the proposed "definition of 'executing broker' in the proposal leads to the inequitable allocation of fees,"[9] and that CAT LLC has not engaged in a meaningful discussion with the industry regarding the Funding Proposal.  However, CAT LLC has carefully considered the industry's comments on the Funding Proposal and the prior funding proposals and specifically proposed charging executing brokers in direct response to SIFMA's prior recommendation to use executing brokers.  Indeed, SIFMA has consistently recommended charging executing brokers until its most recent comment letters:

- In its October 2022 comment letter, SIFMA stated that "the Executed Share Model takes a step backwards from the prior CAT funding model by changing the collection model process, switching it from the executing broker to the clearing broker."[10]  In response, CAT LLC adopted SIFMA's recommendation to impose the payment obligation on the executing broker, rather than the clearing broker.[11]

- In its December 2022 comment letter, SIFMA stated that "we support changing the payment obligation to executing brokers."[12]  However, SIFMA further argued that,

---

[7]      The costs prior to 2022 are set forth in detail in the Proposing Release.  Proposing Release at 17110-11.  The costs for 2022 are set forth in Section VI of this letter.

[8]      *See* Rule 613(a)(1)(vii)(D) of Regulation NMS under the Exchange Act.

[9]      SIFMA Letter at 3.

[10]      Letter from Ellen Greene, Managing Director, Equities & Options Market Structure, and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Oct. 7, 2022) ("October 2022 SIFMA Letter") at 5.

[11]      *See* Letter from Mike Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, SEC (Nov. 15, 2022).

[12]      *See* Letter from Ellen Greene, Managing Director, Equities & Options Market Structure, and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Dec. 14, 2022) at 2.

Ms. Vanessa Countryman
May 18, 2023
Page 3

because CAT LLC had adopted SIFMA's recommendation, CAT LLC should be required "to withdraw the currently-pending proposed amendment and refile the proposed change as a completely new amendment to the NMS plan under Rule 608,"[13] which would restart the 300-day period for consideration under Rule 608(b)(2)(ii).  SIFMA argued that, absent such a delay, Industry Members and the public would be deprived of "the opportunity to fully consider and meaningful comment on the contemplated change"[14] SIFMA itself had recommended.

SIFMA now argues that the Funding Proposal should be modified to charge "originating brokers," in lieu of the executing broker.  Because SIFMA previously argued that CAT LLC's decision to adopt SIFMA's own proposal to use executing brokers should trigger a new 300-day comment period, CAT LLC fears that SIFMA's recent objection to its own proposal to use executing brokers is an attempt to delay further the approval of a funding model and the resultant payment of CAT fees by its members, rather than a concern about the merits of charging executing brokers.[15]

### B.    Charging a Subset of Industry Members

SIFMA also criticizes the proposal to charge executing brokers because the fee would be charged to a subset of Industry Members and, as a result, that subset of Industry Members would incur expenses that other Industry Members would not incur.[16]  CAT LLC continues to believe that charging CAT Executing Brokers would satisfy the requirements of the Exchange Act.

As a preliminary matter, charging a subset of broker-dealers a fee is appropriate under the Exchange Act.  The SEC has regularly approved fees that are charged to some, but not all, broker-dealers.  For example, any regulatory fee that is charged based on a transaction is charged to the broker-dealer(s) involved with the transaction; it is not charged to other broker-dealers that are involved in the origination, routing or other market activity related to the order.  For example, FINRA's trading activity fee is assessed to a subset of FINRA members – that is, it is assessed on the sell side of member transactions.[17]  Similarly, the options exchanges charge options regulatory fees per executed contract side, and, for both options and equities, Section 31-related fees are charged to the sell-side in a transaction.[18]  In each such case, the SEC determined that the fee was in compliance with the Exchange Act.

Moreover, charging all Industry Members a CAT fee would raise similar issues raised by the message traffic model set forth in the CAT NMS Plan.  Under that model, all Industry Members submitting order and transaction data to the CAT would have been charged a CAT fee,

---

[13]      *Id.*
[14]      *Id*.
[15]      CAT LLC discusses issues with charging originating brokers below in Section I(C) of this letter.  CAT LLC also previously addressed this comment in its prior response to comments.  Letter from Mike Simon, CAT NMS Plan Operating Committee Chair Emeritus, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 6.
[16]      SIFMA Letter at 5.
[17]      Section 1 of Schedule A of FINRA Bylaws.
[18]      *See, e.g*., MIAX Options Exchange, Fee Schedule, as of February 1, 2023; Nasdaq PHLX Rules, Options 7, Section 6(D); and Cboe EDGX Fee Schedule, effective April 28, 2023.

Ms. Vanessa Countryman
May 18, 2023
Page 4

regardless of their role related to the order (*e.g.*, origination, routing, execution) and regardless of whether a transaction occurred.  CAT LLC changed course from the original message traffic model for the following reasons, among others:

> in general, Industry Member revenue, including revenue derived from fees Industry Members charge their clients, is often driven by transactions.  Because the message traffic is separate from whether or not a transaction occurs, fees based on message traffic may not correlate with common revenue or fee models.  As a result, CAT fees based on message traffic could impose an outsized adverse financial impact on certain Industry Members.[19]

Charging a CAT fee to all Industry Members, as SIFMA proposes, would raise this same issue.

CAT LLC recognizes that, under the proposal to charge CAT Executing Brokers, the CAT Executing Broker, but not other Industry Members involved in a given order lifecycle, would be required to pay the CAT fees, and that Industry Members that sought to recoup such fees would have to develop processes to collect such fees from their clients.  CAT LLC does not believe that this regulatory requirement differs from the effect of other types of regulatory fees, such as the FINRA trading activity fee, the options regulatory fee and Section 31-related sales value pass-through fees.  In each such case, a subset of broker-dealers is required to pay a transaction-based regulatory fee, and those broker-dealers seeking to recover such fees from other broker-dealers or non-broker-dealers have established processes with regard to the pass-through of such fees.

### C.    SIFMA's Proposed Alternative Approach:  Charging Originating Brokers

SIFMA now recommends charging CAT fees to originating brokers instead of CAT Executing Brokers.  Under this proposal, SIFMA would define "originating broker" as "the broker-dealer that first reported to CAT an associated order that resulted in the transaction (*e.g.*, "MENO" or "MONO" events under the CAT Reporting Technical Specifications for Industry Members)."[20]  For the reasons discussed below, as well as those in the Proposing Release, CAT LLC continues to support charging CAT Executing Brokers.

### 1.    Subset of Industry Members

Despite criticizing the Funding Proposal as "unfair" because it would charge a subset of Industry Members – executing brokers – a CAT fee (as discussed above), SIFMA nevertheless proposes to do the same thing by advocating that CAT LLC charge a different subset of Industry Members – "originating brokers."[21]  Contrary to SIFMA's assertion, the proposal to charge originating brokers would not "subject all Industry Members that brought activity to the market

---

[19]    Securities Exchange Act Rel. No. 94984 (May 25, 2022), 87 Fed. Reg. 33226, 33232 (June 1, 2022).
[20]    SIFMA Letter at 5.
[21]    *Id.* at 5.

Ms. Vanessa Countryman
May 18, 2023
Page 5

to CAT Fees."[22]  For example, such an approach would not include Industry Members involved in the routing or execution that were not also originating brokers.  Indeed, some of the largest Industry Members are not involved in the origination of orders or originate few orders in relation to their overall activity.  Moreover, under SIFMA's proposal, the subset of Industry Members charged CAT fees – the originating brokers – would establish processes for paying the CAT fees, and, if they so choose, to pass-through the fees to their clients, similar to CAT Executing Brokers.

### 2.    Implementation Issues

SIFMA argues that charging originating brokers a CAT fee would be simpler and easier to implement than the proposed use of the CAT Executing Broker.[23]  However, there are already several existing examples of transaction-based fees being assessed to executing brokers as opposed to the originating broker.  In addition, based on a deep understanding of the CAT System and an analysis of alternative approaches, CAT LLC disagrees with this conclusion.  Charging the originating Industry Member would be difficult to implement and increase the costs of implementing CAT fees, whereas charging CAT Executing Brokers is simple, straightforward and in line with existing fee and business models.

An implementation of CAT fees that charges the originating broker on an executed trade introduces far more complexity than one that charges the CAT Executing Broker.  For any given trade (buy or sell), there is only one CAT Executing Broker to which shares can be allocated.[24] As such, charging the CAT Executing Broker is simple and straightforward, and leverages a one-to-one relationship between billable events (trades) and billable parties.  In contrast, there may be many originating brokers associated with a single trade event.  Shares cannot be simply allocated to originating brokers in a one-to-one manner.  Each trade must be broken down on a pro-rata basis, accounting for one or more layers of aggregation, disaggregation, and representation of the underlying orders.  SIFMA's suggestion of a model that begins the funding analysis with new order events (*e.g.*, MENO or MONO events) and then looks for any execution or fulfillment that is directly associated with that event[25] does not reduce or mitigate the complexity associated with aggregation.  Furthermore, SIFMA's recommendation is at odds with the design of the CAT System, from which the billable activity is sourced.  While CAT is indeed designed to capture and unwind complex aggregation scenarios, the data and linkages are structured to facilitate regulatory use, and not a billing mechanism that assesses fees on a distinct set of executed trades; it is not simply a matter of using existing CAT linkages, as SIFMA proposes.  Finally, charging originating brokers implicates issues related to lifecycle linkage rates, which are very high, but not 100%, as well as issues related to corrections, cancellations and allocations.

As noted, charging CAT Executing Brokers is not novel, would avoid these complications, would provide for an equitable allocation of reasonable dues, is not unfairly

---

22    *Id.* at 5.
23    *Id.* at 6.
24    For a description of the relevant specific fields, *see* Proposing Release at 17088.
25    SIFMA Letter at 6.

Ms. Vanessa Countryman
May 18, 2023
Page 6

discriminatory and does not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act.

## II.    Allocation of CAT Costs

### A.    Allocation of CAT Costs to Industry Members

Under the Funding Proposal, the three main parties to each transaction – the CAT Executing Broker for the Buyer ("CEBB"), the CAT Executing Broker for the Seller ("CEBS"), and the related Participant where the transaction occurred or was reported – would each pay an equal amount per executed equivalent share.  SIFMA objects to the resulting allocation of CAT costs to Industry Members (*i.e.*, one third to CEBBs and one-third to CEBSs, for a total of two-thirds to Industry Members), asserting that CAT LLC's arguments in favor of the allocation, including arguments related to the complexity and of Industry Member CAT activity and the number and financial resources of Industry Members, do not support the proposed allocation.[26] As discussed below, CAT LLC continues to believe that the proposed allocation of CAT costs among Industry Members and Participants associated with each transaction satisfies the requirements of the Exchange Act for these and other reasons as discussed in detail in the Proposing Release.

### 1.    Complexity

CAT LLC believes that Industry Members' chosen business models and their resulting trading activity are substantial drivers of CAT costs, and that, accordingly, it is reasonable to allocate a portion of the CAT cost to Industry Members (*i.e.*, one third to CEBBs and one-third to CEBSs, for a total of two-thirds to Industry Members), among other reasons.  SIFMA, however, argues that Participant activity is similarly complex, and, therefore, Industry Member complexity should not be a basis for the two-thirds allocation to Industry Members. [27]  This argument fails to recognize that the analysis is based on the effects of the business models *on the costs of the CAT*, not on the complexity of the market generally.  The complexity of Industry Member activity adds significantly to the cost of the CAT in a way that Participant activity does not.  Moreover, a Participant would also pay the same amount as each CEBB and CEBS for each transaction.[28]

The complexity and diversity of Industry Members' chosen business models and order handling practices contributes substantially to the costs of the CAT.  For example, in light of the complexity of Industry Member market activity, the CAT's technical documentation must

---

[26]    *Id*. at 3, 6-8.

[27]    *Id*. at 6-7.

[28]    For comparison, for example, under the Section 31-related fee programs, the exchanges and FINRA are assessed fees by the SEC on sell-side transactions, which fees are then, in turn, passed-through 100% via sales value fee programs of each of the exchanges and FINRA to their members for the same sell-side transactions (*i.e.*, sell-side broker-dealers pay 100% of the fee under the current structures).  It would seem to be very difficult to reconcile how the allocation under that funding model, which has been in operation for a significant period time, is fair and reasonable and consistent with the requirements of the Exchange Act but the allocation under the Funding Proposal would not be.

Ms. Vanessa Countryman
May 18, 2023
Page 7

address hundreds of scenarios for Industry Members, including, for example, scenarios related to representative orders, internal routing, order modification, order cancellation, ATS scenarios, OTC scenarios, foreign scenarios, child orders, proprietary orders, fractional shares, stop and conditional orders, RFQs, floor activity and more. The processing and storage of data related to such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs. In contrast, the Participants do not originate market activity or orders or otherwise bring this level of complexity to CAT reporting. Although there are unique trading features across the different exchanges, such exchange features are not nearly as diverse as the ways in which Industry Members execute trades.

### 2.    Ability to Pay

SIFMA objects to CAT LLC taking into consideration the Participants ability to pay CAT fees in proposing the 1/3, 1/3, 1/3 allocation.[29] Yet, the Exchange Act specifically requires such fees to be fair and reasonable. Accordingly, CAT LLC believes that fairness issues require the Participants to consider the greater financial resources of Industry Members as one factor in creating a funding model. There are only 25 Participants and approximately 1100 Industry Members, and the Participants represent approximately 4% of the total CAT Reporter revenue while Industry Members represent 96% of the total CAT Reporter revenue. Moreover, SIFMA's position is at odds with its own comments asserting that an Industry Member's ability to pay is an important consideration in the context of CAT fees. For example, SIFMA previously objected to prior CAT funding model proposals, arguing that the proposed CAT fees "would create a significant burden on smaller ATSs,"[30] or on market makers.[31]

### 3.    Allocation Based on Cost

SIFMA also objects to the proposed allocation of CAT costs because it "is inconsistent with the historical CAT decision to allocate costs to the parties responsible for generating them."[32] In making this statement, SIFMA references Section 11.2 of the CAT NMS Plan. Neither Section 11.2 of the CAT NMS Plan nor other sections of the CAT NMS Plan require CAT LLC to allocate CAT costs "to the parties responsible for generating them." Nevertheless, as discussed in the Proposing Release, the Funding Proposal incorporates the concept of the cost burden on the CAT in at least two ways. First, as discussed above, the allocation of CAT costs contemplates the effect of Industry Member activity on the cost of the CAT. Second, because trading activity provides a reasonable proxy for cost burden on the CAT, trading activity is an appropriate metric for allocating CAT costs among CAT Reporters. Moreover, there are several examples of other trading activity-based fees, so the model being contemplated is not novel or unique.

---

[29]    *Id*. at 7.
[30]    Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, and Ellen Greene, Managing Director, Financial Services Operations, SIFMA, to Brent J. Fields, Secretary, SEC (June 6, 2017) at 4.
[31]    *See, e.g.,* Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, SIFMA, to Brent J. Fields, Secretary, SEC (July 28, 2017) at 4-6.
[32]    SIFMA Letter at 7.

Ms. Vanessa Countryman
May 18, 2023
Page 8

### 4.    SIFMA's Alternative Proposal:  50/50 Allocation

SIFMA recommends an alternative funding proposal which would allocate 50% of CAT costs to Participant exchanges and 50% of CAT costs to Industry Members, with FINRA assessed a nominal regulatory user fee to access CAT Data.[33]  SIFMA did not offer a reasoned basis for why a 50-50 allocation would satisfy the standards set forth in the Exchange Act.  SIFMA merely states that a mathematically equal split between the two groups would satisfy the Exchange Act requirements for fair and equitable fees.  CAT LLC has previously considered and rejected a 50-50 allocation because, among other things, it would not provide a fair and equitable allocation between and among Industry Members and Participants.  The proposed 50-50 allocation raises fairness issues as there are a far greater number of Industry Members than Participants, and Industry Members as a group have far greater financial resources than the Participants.  In establishing fair and equitable fees under the Exchange Act, the Participants must consider the regulated entities ability to pay the fees.  The proposed 50-50 allocation also fails to take into consideration the fact that the complexity of Industry Members' chosen business models contributes substantially to the costs of the CAT.  Ultimately, CAT LLC also believes that the question before the Commission is whether the particular allocation and overall model being proposed is fair and equitable, not whether there may be other allocations or models that would also be fair and equitable.  In that regard and for the reasons discussed in the Proposing Release and in this letter, we believe that the allocation and overall model being proposed is fair and equitable.

CAT LLC also disagrees with SIFMA's proposal to charge FINRA only a nominal regulatory fee.[34]  There is no basis to distinguish FINRA from the exchanges in this context or suggest that a transaction fee should not be assessed to FINRA.  The proposed transaction-based CAT fee is purposely agnostic as to the location of where a trade occurs, whether on or off exchange.  An intent of this design is to avoid influencing whether or where any trading activity would take place.  In addition, FINRA, like the exchanges, may choose to seek to pass its fee through to its members.  Moreover, FINRA is no different from the exchanges in terms of its regulatory obligations with regard to the CAT.  Indeed, Section 31 fees clearly demonstrate that there is no need to treat FINRA differently from the exchanges with regard to a transaction-based regulatory fee.  Section 31 fees are charged in the same manner to both the exchange and FINRA.  The proposed CAT fees would be no different.  CAT LLC further discusses the CAT fees to be charged to the Participants in the next section.

### B.    Allocation of CAT Costs to Participants

The Funding Proposal would allocate a one-third portion of CAT costs to Participants – whether an exchange or FINRA – based on executed equivalent shares.  In its comment letter on the Funding Proposal, FINRA objects to FINRA's proposed obligation to pay a CAT fee based on over-the-counter transactions, raises issues with the fact that costs allocated to FINRA under the Funding Proposal will be passed on to its members, thereby increasing its members share of

---

[33]    *Id.* at 7-8.
[34]    *Id*. at 8.

Ms. Vanessa Countryman
May 18, 2023
Page 9

CAT costs, and confirms that it plans to file a rule filing to pass to its members the CAT fees that would be charged to FINRA.  FINRA also discusses a Section 31-style approach for the CAT funding model, noting that it believes that a Section 31 fee approach may satisfy the requirements of the Exchange Act.[35]  CAT LLC notes that the very aspects of the Funding Proposal that FINRA objects to are comparable in its Section 31 fee proposal.  For both the Funding Proposal and Section 31 fee approach:

- Similar to how an exchange would be obligated to pay a transaction fee based on transactions occurring on that exchange, FINRA would be obligated to pay a transaction fee based on transactions in the over-the-counter market; and

- Similar to how an exchange would be able to determine to pass the fee onto its members, FINRA would be able to determine to pass the fee on to its members.

Accordingly, if the Section 31 approach would comply with the Exchange Act, then the Funding Proposal would as well.  Here, very similar to the Section 31 approach, CAT LLC is simply seeking to assess fees to CEBBs, CEBSs and Participants.  CEBBs and CEBSs could determine whether to pass such fees onto their clients.  Likewise, each of the Participants (*i.e.*, exchanges and FINRA) could determine to pass fees onto their members (through their respective fee schedules) and those members, in turn, could determine to pass those fees onto their clients as well.

### C.    Fee Pass-Throughs for Historical CAT Assessments

CAT LLC again would like to correct a persistent misunderstanding by SIFMA regarding how the Historical CAT Assessment operates.[36]  Contrary to the assertions in SIFMA's comment letter as well as prior SIFMA comment letters,[37] the Historical CAT Assessment would be assessed based on current market activity, not past market activity.[38]  Specifically, the fee rate would be calculated based on Historical CAT Costs, but the fee rate would be applied to current market transactions.  Accordingly, the process of assessing fees for the Historical CAT Assessment would be exactly the same as with CAT Fees related to Prospective CAT Costs, and could be accordingly passed through in the same manner if a CEBB or CEBS so chooses.  As a result, in each case, the relevant data would be available to pass an Historical CAT Assessment though in the same manner as with Prospective CAT Fees, if a CAT Executing Broker chose to do so.  Moreover, CAT LLC would provide CAT Executing Brokers with details regarding their CAT fees to assist with this process.

---

[35]    *See* FINRA Letter at 5.
[36]    CAT LLC previously corrected this misunderstanding in an amendment to the prior funding proposal. Securities Exchange Act Rel. No. 96394 (Nov. 28, 2022), 87 Fed. Reg. 74183, 74185, n.15 (Dec. 2, 2022).
[37]    *See* SIFMA Letter at 8; October 2022 SIFMA Letter at 4-5.
[38]    For a description of the proposal for charging the Historical CAT Assessment, *see* Proposing Release at 17095-99.

Ms. Vanessa Countryman
May 18, 2023
Page 10

## III.    Cost Transparency

### A.    Independent Cost Review Mechanism

SIFMA recommended the adoption of "an independent cost review mechanism to help ensure that future CAT Fees are fair and reasonable and to ensure that controls are put into place to guard against unchecked spending."[39]  CAT LLC does not believe that such an independent cost review mechanism process is necessary or appropriate including for the following reasons:

- Such a budget review process would go beyond what is required or contemplated by Rule 613 or the Plan, and is unnecessary as any CAT fees proposed to be established pursuant to the CAT NMS Plan are already subject to the existing, well-established review practices under Rule 608 of Regulation NMS and Section 19(b) of the Exchange Act as applicable.  Under those provisions, CAT fees must be filed with the SEC, thereby providing transparency and an opportunity for comment by the public, and may only be implemented if they satisfy the requirements of the Exchange Act.  Moreover, the SEC has the ability to request budget and financial information from CAT LLC to the extent that it believes that such additional information is necessary for it to evaluate any CAT fee proposals.

- In addition to the fee filing process under the Exchange Act, CAT LLC provides significant cost transparency through the public disclosure of its quarterly budget information and financials.

- The Participants are required to comply with the regulatory requirements to implement the CAT and to oversee their members.  They do not have discretion with regard to such compliance with CAT requirements.  As such, the Participants cannot have their compliance with regulatory requirements subject to a third-party that does not have the same regulatory obligations.

- The Commission's ability to oversee the securities markets could be undermined if the funding of the CAT is subject to a third-party that does not have the same regulatory obligations.

- CAT LLC is engaged actively in cost discipline efforts, including through a designated cost management working group and through other efforts.[40]

### B.    Budget Disclosure Prior to Fee Filings

SIFMA commented that the Participants "are not planning to include a mechanism for the public to review and provide input on the development of the annual CAT budget prior to it

---

[39]      SIFMA Letter at 3.
[40]      For a discussion of CAT LLC's cost management efforts, *see* Proposing Release at 17117.

Ms. Vanessa Countryman
May 18, 2023
Page 11

being finalized"[41] and that "a post-hoc review of the CAT budget is not an effective mechanism to help ensure that future CAT Fees are fair and reasonable."[42]  This statement is inaccurate. CAT LLC is currently providing and will continue to provide such budget information to the public on an ongoing basis.  CAT LLC publicly provides the annual operating budget for the CAT LLC as well as quarterly updates to the budget that occur during the year.  This budget information is readily accessible to the public on a dedicated web page on the CAT NMS Plan. CAT LLC does not just provide the annual budget, or the mid-year budget, the two budgets that would be necessary for the fee filings; it also provides two other quarterly updates each year. Accordingly, Industry Members and other members of the public will have the opportunity to review regular updates of the budget more often than is necessary for the fee filings.  Such transparency would allow Industry Members and other members of the public to understand the budget and changes thereto throughout the year.

## C.    Budget Line Item for SEC Costs

SIFMA also commented about CAT LLC funding usage costs and system change costs related to the Commission's use and design of the CAT system, given the SEC's "conflicted role as a beneficiary of the CAT regulatory data and reviewer of the CAT budget and fee filings,"[43] and that this conflict "is only heightened due to a lack of a Commission funding obligation for CAT."[44]  As a result, SIFMA recommends that "the Participants' proposed budget include as a separate line-item projected usage costs and system change costs related to the Commission's use and design of the CAT system."[45]  However, all costs related to the functionality and use of the CAT ultimately relate to the Commission's adoption of Rule 613, which imposed on the Participants the obligation to create, implement, and maintain the CAT.  Total CAT costs are currently reflected in the CAT budget.  Accordingly, CAT LLC believes breaking out SEC-specific CAT costs would be difficult to implement as a practical matter.  Moreover, such a requirement would not be useful as a practical matter as the Participants are required to implement Plan requirements as set forth in the Plan, and CAT LLC does not currently have the authority to impose a funding obligation on the Commission.[46]

## IV.    Implementation of CAT Fees

### A.    Billing Process for CAT Fees

DASH commented about the billing and collection process for the Funding Proposal, arguing that clearing firms, not CAT Executing Brokers, are best suited to operational issues

---

[41]    *Id.* at 8.
[42]    *Id.* at 9.
[43]    *Id.* at 10.
[44]    *Id.*
[45]    *Id.*
[46]    Section 11.3 of the CAT NMS Plan permits CAT LLC to impose fees "based on access and use of the CAT for regulatory and oversight purposes"; however, "the Commission interprets the provisions in the Plan relating to the collection of fees as applying only to Participants and Industry Members, and thus the Commission would not be subject to such fees."  Exchange Act Release No. 79318 (November 15, 2016), 81 Fed. Reg. 84696 (November 23, 2016) at 84711 n.313, 84798-7 n.1815.

Ms. Vanessa Countryman
May 18, 2023
Page 12

associated with the collection of CAT fees.[47]  Under the Funding Proposal, CAT LLC proposes to charge CAT fees to CAT Executing Brokers.  As a result, CAT Executing Brokers have the obligation to pay such fees under the Funding Proposal.  The Funding Proposal, however, does not prescribe any particular process for the payment of such fees, that is, whether the CAT Executing Broker itself pays the CAT fees, or a clearing firm, or other third party, would pay such CAT fees on behalf of the CAT Executing Broker.

### B.    Timing of Commencement of CAT Fees

SIFMA requested that CAT LLC provide Industry Members sufficient time to implement any necessary changes to systems and processes related to the payment of CAT fees, suggesting a minimum of one year for such implementation.[48]  Given the significant delays in implementing a CAT funding model to date and the critical importance of commencing charging CAT fees, the Participants intend to commence the collection of CAT fees as expeditiously as possible.  As noted in the Proposing Release, the Participants expect to implement the proposed CAT fees upon approval by the SEC, subject to applicable requirements for the implementation of the CAT fees, including the requirements of Section 19(b) of the Exchange Act with regard to Industry Member CAT Fees, the satisfaction of applicable Financial Accountability Milestones as set forth in Section 11.6 of the CAT NMS Plan, and the implementation of the billing and collection system for the CAT fees.  Contrary to SIFMA's assertion, the practical implementation of a transaction-based fee by Industry Members does not require a year's worth of effort, and would introduce another unwarranted delay in charging Industry Member CAT fees.  Indeed, as noted in the illustrative example in the Proposing Release, many of the Industry Members would receive small bills that would not need extensive new processes to pay.[49]

### V.    Collaboration with Industry

SIFMA and DASH recommend further dialogue with the industry regarding CAT fees.[50] CAT LLC has engaged with the industry on the CAT funding model in a variety of ways over the last seven years as it has explored different approaches to CAT fees.  CAT LLC has discussed funding model issues with the CAT Advisory Committee, which includes wide representation from the industry, analyzed and responded to the many comment letters submitted in response to multiple CAT fee proposals filed with the SEC, and held industry-wide webinars on funding issues.  CAT LLC and its Participants have discussed funding model issues with industry associations, like SIFMA and Financial Information Forum, as well as individual Industry Members.  CAT LLC has welcomed and continues to welcome such input from the industry on the critical issue of CAT funding, but a decision on an initial funding model is overdue and needs to be made.  CAT LLC believes that the Funding Proposal complies with the Exchange Act and should be approved by the Commission without further delay.

---

[47]    DASH Letter at 1.
[48]    SIFMA Letter at 2.
[49]    Proposing Release at 17129-41.
[50]    SIFMA Letter at 6; DASH Letter at 2.

Ms. Vanessa Countryman
May 18, 2023
Page 13

## VI.    CAT Costs for 2022

In the Funding Proposal, CAT LLC provides CAT cost information through 2021. FINRA requests that CAT LLC provide CAT cost data for 2022.[51]  As a result, CAT LLC is providing the following update to the existing cost information as described in the Proposing Release to describe the CAT costs for 2022.  The following table breaks down the CAT costs for 2022 into the categories set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan.

| Operating Expense | Historical CAT Costs for 2022* |
|---|---|
| Capitalized Developed Technology Costs | $6,719,585 |
| *Technology Costs:* | $164,332,692 |
| Cloud Hosting Services | $129,627,775 |
| Operating Fees | $25,365,883 |
| CAIS Operating Fees | $9,231,034 |
| Change Request Fees | $108,000 |
| Legal | $5,750,375 |
| Consulting | $1,672,806 |
| Insurance | $1,898,827 |
| Professional and administration | $640,609 |
| Public relations | $92,400 |
| **Total Operating Expenses** | $181,107,294 |

* The non-cash amortization of capitalized developed technology costs of $5,274,009 incurred during 2022 have been appropriately excluded from the above table.

## VII.    Conclusion

The Funding Proposal provides for an equitable allocation of reasonable dues, is not unfairly discriminatory and does not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act.  The continued funding of the CAT solely by the Participants was and is not contemplated by the CAT NMS Plan, nor is it a financially sustainable approach.  Moreover, the Funding Proposal would be consistent with past fee structures that have been approved by the Commission.  It also is transparent, would be relatively easy to calculate and administer, and is designed to not have an impact on market activity because it is neutral as to the location and manner of execution.  CAT LLC has gone through an extensive process of evaluating and seeking comment on various funding models since the inception of CAT.  As the Commission is aware, the Exchange Act does not require CAT LLC to demonstrate that the Funding Proposal is superior to any other potential proposal.  Instead, CAT LLC must demonstrate that the Funding Proposal is consistent with the Exchange Act and the

---

[51]      FINRA Letter at 4-5.

Ms. Vanessa Countryman
May 18, 2023
Page 14


rules and regulations thereunder.  CAT LLC believes that the Funding Proposal satisfies the requirements of the Exchange Act and should be approved by the Commission.


Respectfully submitted,

*/s/ Brandon Becker*

Brandon Becker
CAT NMS Plan Operating Committee Chair


cc:     The Hon. Gary Gensler, Chair
The Hon. Hester M. Peirce, Commissioner
The Hon. Caroline A. Crenshaw, Commissioner
The Hon. Mark T. Uyeda, Commissioner
The Hon. Jaime Lizárraga, Commissioner
Mr. Hugh Beck, Senior Advisor for Regulatory Reporting
Mr. Haoxiang Zhu, Director, Division of Trading and Markets
Mr. David S. Shillman, Associate Director, Division of Trading and Markets
Mr. David Hsu, Assistant Director, Division of Trading and Markets
Mr. Mark Donohue, Senior Policy Advisor, Division of Trading and Markets
Ms. Erika Berg, Special Counsel, Division of Trading and Markets
CAT NMS Plan Participants

# Tab F

Letter from Ellen Greene, Managing Director, SIFMA et al. to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (June 5, 2023)



June 5, 2023

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

> **Re:** **_Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail; File No. 4-698_**

Dear Ms. Countryman:

In discussions during the week of May 30, 2023, the U.S. Securities and Exchange Commission (the "Commission") invited the Securities Industry and Financial Markets Association ("SIFMA")[1] to submit a comment letter to the Commission in further response to the proposal by the self-regulatory organizations ("SROs") to establish a funding model ("Funding Proposal") for the consolidated audit trail ("CAT").[2]  SIFMA thus submits this letter.

For the reasons set forth in our prior comment letters,[3] including those regarding the SROs' immediately prior Executed Share Model,[4] the Commission should disapprove the Funding Proposal because the SROs, as CAT NMS Plan Participants ("Participants"), have not demonstrated that the Funding Proposal meets the required standards under the Securities Exchange Act of 1934 ("Exchange Act").  In particular, the Participants have not demonstrated that the proposal:  (1) provides "for the equitable allocation of reasonable dues, fees, and other charges," (2) is "not designed to permit unfair discrimination between customers, issuers, brokers or dealers," and (3) does not "impose any burden on competition not necessary or

---

[1]  SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

[2] See Release No. 34-97151 (March 15, 2023), 88 FR 17086 (March 21, 2023).  Capitalized terms not otherwise defined in this letter have the same meanings as they do in the CAT NMS Plan and/or the Funding Proposal.

[3] See (https://www.sec.gov/comments/4-698/4698-20132695-303187.pdf) ("June 2022 Comment Letter"), (https://www.sec.gov/comments/4-698/4698-20145239-310561.pdf) ("October 2022 Comment Letter"), (https://www.sec.gov/comments/4-698/4698-20152795-320485.pdf) ("December 2022 Comment Letter"), (https://www.sec.gov/comments/4-698/4698-20154753-322976.pdf) ("January 2023 Comment Letter"); and (https://www.sec.gov/comments/4-698/4698-182799-335422.pdf) ("May 2023 Comment Letter".

[4] The Funding Proposal replaces and is virtually identical to the prior "Executed Share Model" that was withdrawn by the SROs on March 1, 2023.  See Release No. 34-97212 (March 28, 2023), 88 FR 19693 (April 3, 2023).

appropriate in furtherance of the purposes" of the Exchange Act.[5]  The Proposal, moreover, strays far beyond the CAT plan the Commission contemplated in 2012 and 2016 and raises significant constitutional issues.

While we would typically let our prior comments speak for themselves, the CAT Operating Committee in a recent letter ("CAT Response Letter") has misrepresented and disregarded the positions we took in those comments,[6] particularly with respect to the Proposal's central definition of an "executing broker" that we address in more detail below.[7]  Unfortunately, in their haste to get the Commission to approve the Funding Proposal, and the Commission's similar zeal to do so as evidenced by the recent announcement of an open meeting on June 7, 2023 to vote on the Proposal,[8] we note that the CAT Operating Committee has not meaningfully addressed many points in our comment letters (nor the questions raised by the Commission in its Order Instituting Proceedings for the immediately prior funding proposal).[9]  These include our significant concerns about the allocation of CAT costs between Participants and Industry Members, the lack of any type of cost review or cost control mechanism,[10] and the inability of firms defined as "executing brokers" to transfer fees to those who may be more appropriate to bear certain historical CAT costs in the first place.  The Funding Proposal continues to be replete with conclusory statements regarding its satisfaction of core Exchange Act requirements that remain unsupported by the record.[11]  The Commission has also failed to address the significant data security concerns associated with mandating this massive surveillance database, even though it has previously acknowledged the legitimacy of these concerns,[12] and even though the Commission's ability to secure its systems continues to be drawn into question.[13]

---

[5] See, e.g., Sections 6 and 15A of the Exchange Act.

[6] See (https://www.sec.gov/comments/4-698/4698-191099-378422.pdf).

[7] The CAT Operating Committee has also misrepresented positions taken by FINRA in its comment letter on the Funding Proposal.  See (https://www.sec.gov/comments/4-698/4698-194699-386902.pdf).

[8] See (https://www.sec.gov/os/sunshine-act-notices/sunshine-act-notice-open-060723).

[9] See (https://www.sec.gov/rules/sro/nms/2022/34-95634.pdf).

[10] SIFMA has repeatedly stressed the need for an independent cost oversight function, whereby the annual budget can be reviewed and approved, given the past missteps.  To reasonably ensure the Funding Proposal provides "for the equitable allocation of reasonable dues, fees and other charges" and is "not designed to permit unfair discrimination between customers, issuers, brokers or dealers" this independent body to oversee CAT costs must include industry representatives.  This body should be responsible for determining an annual operating budget, and unplanned overages should not be passed along to Industry Members.  See, e.g., (https://www.waterstechnology.com/regulation/4152906/cats-tale-how-thesys-the-sros-and-the-sec-mishandled-the-consolidated-audit-trail).

[11]  For example, the Funding Proposal broadly claims that allocating a greater percentage of CAT costs to Participants "would raise fairness issues" because there "are only 25 Participants and approximately 1,100 Members."  88 FR 17104.  The Funding Proposal, however, completely fails to analyze how CAT costs will distributed across the 1,100 Members, which could pose significant fairness and competition concerns.  Additionally, the Funding Proposal broadly asserts "a substantial portion of CAT costs originates from Industry Members."  Id.  It then concedes that "costs are dominated by technology costs," all of which the Participants (and the Commission) had sole responsibility for designing, building, and implementing.

[12] See (https://www.sec.gov/news/public-statement/clayton-kimmel-redfearn-nms-cat-2020-08-21).

[13] See (https://www.sec.gov/files/Eval-of-the-EDGAR-Systems-Governance-and-Incident-Handling-Processes.pdf; https://www.sec.gov/news/statement/second-commission-statement-relating-certain-administrative-adjudications).

2

A91

We express the industry's significant surprise, that after the Commission rejected or orchestrated the withdrawal of, at least four prior attempts by the CAT Operating Committee to implement a CAT funding model that allocates the vast majority of CAT costs to industry firms, it now appears as though the Commission is rushing forward to approve the latest proposal without taking advantage of the allotted time under the Exchange Act for careful consideration. Given the magnitude of the costs that are proposed to be passed-on to the industry, the potential grave impacts on market efficiency, competition, and capital formation, and the significant concerns expressed in the administrative record, we are extremely surprised that the Commission is not, at a minimum, instituting proceedings to consider this filing more thoroughly. As noted above, the latest Funding Proposal fails to adequately respond to concerns raised in the administrative record and key questions raised by the Commission in its Order Instituting Proceedings for the prior proposed funding model (which remain equally relevant).

We are also troubled that the Commission appears to be prematurely moving forward with this Proposal at the same time it is considering a massive re-write of the rules governing the structure of the equity and options markets (many of which may impact liquidity and competition in these markets),[14] as well as numerous other proposals as part of an aggressive regulatory agenda that will collectively impose significant costs on industry members.[15] The unequitable distribution of CAT costs contemplated by the Funding Proposal will exacerbate these problems, harming the functioning of U.S. securities markets. The Commission cannot determine whether the proposed distribution of CAT costs will be equitable without assessing the distribution of costs and benefits under the Commission's other pending proposals, many of which appear slanted in favor of the SROs.

Key unanswered questions in the record include how it could be consistent with the Exchange Act to allocate approximately 80% of total CAT costs to the industry (taking into account the proposed allocation to FINRA, which is expected to be passed on to industry firms), when the industry has absolutely no role in the governance, oversight, or design of CAT and obtains no tangible benefits from its operation (indeed, the industry has not even been permitted to obtain or review CAT data used in the context of Commission regulatory initiatives).[16] Instead of benefiting the industry, the CAT system is being used to surveil and fine industry members, which generates additional revenue for the Commission (and the SROs) but is not used to defray the costs of operating CAT. Therefore, CAT can accurately be characterized as a revenue generating Commission system that the industry is being obligated to fund.

---

[14] See Release No. 34-96495 (December 14, 2022), 88 FR 128 (January 3, 2023) (Order Competition Rule); Release No. 34-96494 (December 14, 2022), 87 FR 80266 (December 29, 2022) (Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders); Release No. 34-96496 (December 14, 2022), 88 FR 5440 (January 27, 2023).

[15] See (https://www.sifma.org/resources/news/the-secs-current-far-ranging-aggressive-rulemaking-agenda-will-raise-regulatory-uncertainty-and-risks-unintended-negative-consequences/).

[16] See SIFMA FOIA Request Re: Information Regarding the Data Relied upon by the Commission in Proposing Certain Commission Rulemaking Related to Market Structure dated Feb. 8, 2023.

**A92**

The record details that current CAT costs include approximately $350 million in historical costs that are proposed to be allocated to a small group of executing broker firms based on current market volumes. The CAT Operating Committee has failed to explain why allocating these significant costs to this group of firms is consistent with the Exchange Act (or how it may affect market liquidity and competition), taking into account that the allocation is being made based on current market share (and therefore bears no relation to the firms and/or activities that may have contributed to these historical costs) and that there appears to be little ability for these firms to pass-on historical costs to anyone else.

In addition, the record details that current CAT costs include annual operating costs of approximately $240 million, which represents more than 10% of the Commission's 2023 budget request to Congress.[17] We note that the CAT annual budget increased over 30% just in the last year, and the industry has no role in the governance, oversight, or approval of this budget. Approving a proposal that would allocate 80% of these costs to the industry in perpetuity, with no mechanism to control or limit the budget, directly threatens efficiency, competition, and capital formation in U.S. securities markets. The CAT Operating Committee has not explained why such an approach is consistent with the Exchange Act, including the Commission's guidance on SRO filings relating to fees,[18] in particular when the Commission has previously acknowledged that "the SROs have potential conflicts of interest with respect to allocating costs related to the CAT Plan because both SRO participants and Industry Members are responsible for paying fees related to the CAT Plan; however, the CAT Operating Committee, whose voting participants are all SROs, decides how these fees should be split."[19]

Finally, we also briefly discuss below another issue regarding the Funding Proposal's approach of assessing CAT Fees through fee filings submitted by each exchange under Rule 19b-4. As a preliminary matter, we believe that this proposed process is inconsistent with Rule 608 of Regulation NMS, which now requires NMS plan fee changes to go through a notice and comment process and to be approved by the Commission prior to becoming effective. This inconsistency calls into question the entire process for establishing and assessing CAT Fees under the CAT NMS Plan and Funding Proposal.

We recognize the frustration the SROs are experiencing in connection with their failure to obtain approval for a CAT funding model. But that is due in large part to their lack of engagement and collaboration with the industry on establishing a viable funding model. As indicated in our May 2023 Comment Letter, it is also due in large part to the SROs' inability to directly manage the CAT, which has now effectively become a Commission system. We continue to emphasize Industry Members' willingness to work with the Commission and the SROs to develop a CAT funding model. Nonetheless, we continue to be placed in the position of having to respond to formal proposals by the CAT Operating Committee through the notice and comment process for NMS Plan amendments, rather than through a dialogue in which consensus is sought prior to filing formal proposals with the Commission. This has led to the inefficient and drawn-out process we have been facing time and time again over the last several years.

---

[17] See (https://www.sec.gov/files/fy-2023-congressional-budget-justification-annual-performance-plan_final.pdf).

[18] See (https://www.sec.gov/tm/staff-guidance-sro-rule-filings-fees).

[19] See Release No. 34-89618 (August 19, 2020), 85 FR 65470 (October 15, 2020).

4

**A93**

Accordingly, we again call on the SROs to engage in meaningful dialogue and collaboration with the industry prior to submitting formal a CAT funding model with the Commission.  As evidenced by the significant delays, we believe such a process would lead to a better outcome for all interested parties.

**I.**     **The CAT Operating Committee Mischaracterizes SIFMA's Position on Executing Brokers**

The CAT Operating Committee begins the CAT Response Letter by noting SIFMA's recommendation in our May 2023 Comment Letter that the SROs withdraw the latest funding proposal in order to allow the industry to fully consider and meaningfully respond to the changes that are being put forward, including the scope of firms that will be assessed the extremely significant CAT costs.  The CAT Operating Committee then asserts that we have switched our position on assessing firms designated as "executing brokers" in an attempt to further delay the adoption of a CAT funding model.

However, the CAT Operating Committee has significantly mischaracterized our position on the approach of assessing CAT Fees to firms designated as "executing brokers."  This is especially disappointing as we conveyed our position reflected in our May 2023 Comment Letter in a meeting with representatives of the CAT Operating Committee on April 14, 2023.  In our December 2022 Comment Letter, we noted that the SROs have yet to "provide any definition on who would be treated as an 'executing broker' in a transaction" and that "[a] clear definition is critical for Industry Members to understand when and in what situations they would be assessed costs under the New Executed Share Model."  We also noted that, "[t]he term 'executing broker' is used in a variety of contexts in the industry and is sometimes applied to various brokers who have a role in the lifespan of a single order."  We made these points again in our January 2023 Comment Letter, and further stated that SIFMA understood the concept of an executing broker to "generally refer to the Industry Member **initiating the order**." (emphasis added)

The CAT Operating Committee only provided a definition of who they considered to be an "executing broker" in the most recent Funding Proposal, filed in March 2023.[20]  This finally allowed SIFMA and other industry members to more fully understand which firms would be assessed CAT Fees under the proposal.  After thoughtful consideration of the proposal, we provided for the first time detailed comments setting forth our concerns with the proposed definition of "executing broker" in our May 2023 Comment Letter, in which we noted, among other things, the undue burdens placed on the firms designated as executing brokers by the CAT Operating Committee under the proposed definition, the challenges these firms would face in allocating historical CAT costs, and our preliminary recommendation that the definition be changed to refer to the broker that originated the order (subject to further data and analysis).

---

[20] They first included a definition of "executing broker" in a February 15, 2023 amendment to the Executed Share Model that the SROs subsequently withdrew, perhaps in response to concerns about not providing the public with a meaningful opportunity to comment on the proposed definition in light of the impending final date by which the Commission would need to act on the Executed Share Model (i.e., 300 days after the Executed Share Model was noticed in the Federal Register, which would have fallen on or about March 28, 2023 and which was a little over a month after which the CAT Operating Committee had actually provided a definition of who would be an executing broker under the proposal).

5

**A94**

Rather than engaging in a thoughtful approach in response to this recommendation, the CAT Operating Committee resorted to mischaracterizing our position. It seems clear that the CAT Operating Committee is doing so to press the Commission to rush to a decision on their Funding Proposal, which apparently is working.

## II.    The Commission Should Not Rush a Decision on the Funding Proposal

The Proposal strays far beyond the CAT plan the Commission contemplated in 2012 and 2016 and raises significant constitutional issues. The Commission should send the proposal back to the drawing board, not rush ahead with an approval.

### A.    Rule 613 and the CAT NMS Plan do not Support the Proposal

The Commission adopted Rule 613 to create the CAT in 2012.[21] The Commission contemplated prompt action.[22] But it's now been more than a decade, and the CAT structure is *still* not finalized. The 2012 rule and the 2016 approval of the CAT NMS Plan are so outdated and so unconnected to the current system, that they no longer support the CAT, as it currently stands. The Commission should go back to the drawing board. After a decade of errors, mismanagement, and hundreds of millions of dollars wasted, the Commission should take the lessons learned and come up with a structure that might actually work.[23]

By their own terms, Rule 613 and the 2016 CAT NMS Plan no longer supports the CAT. The CAT NMS Plan, for example, contemplates that data will be available to the SEC on a T+5 basis,[24] but the Commission (including its Staff) have insisted on structural changes to ensure that certain data be made available to the SEC at specific times, so they can start using CAT *before* the T+5 deadline. Similarly, Rule 613, for example, contemplates the reporting of every "material" term of an "order."[25] But, again, the Commission has insisted that CAT be expanded, so that it covers not only the material terms of each order, but also the general parameters (so-called port-level settings) that are collectively applied to all orders sent to a given port on an exchange. Theses settings are not handled on an order-by-order basis and are generally not communicated as part of the FIX message transmitting an order. Rule 613 also requires the reporting of specific events[26] and provides that the events must be "linked" to their "originating order,"[27] but, again, over time, the Commission has greatly expanded CAT's scope, requiring the reporting of events that are not linked to particular orders and that are not CAT-reportable events. While Rule 613, for instance, contemplates the reporting of the cancellation of an

---

[21] 17 C.F.R. § 242.613.

[22] See id. § 242.613(a)(1) (requiring filing of a plan within 270 days).

[23] See, e.g., (https://www.waterstechnology.com/regulation/4152906/cats-tale-how-thesys-the-sros-and-the-sec-mishandled-the-consolidated-audit-trail).

[24] CAT NMS Plan, Appendix C, at 15.

[25] 17 C.F.R. § 242.613(c)(7)(i)(F).

[26] See id. § 242.613(c)(1).

[27] See id. § 242.613(e)(1).

6

order,[28] the Commission has insisted that messages acknowledging the receipt of a cancel-request—precursor messages that may (or may not) lead to the cancellation of an order—be reported as well.  The Commission has also expanded CAT to include OTC equities and request-for-quotes.  We understand that many of these material decisions regarding the scope of information reported, reporting specifications, and system specifications changed from what was approved in the Commission's formal rulemakings through bilateral discussions between the Commission and Participants.  These decisions have significantly increased CAT costs, the vast majority of which the Participants have now proposed to allocate to Industry Members, who have had no voice and little transparency throughout the building of the system (in all of its permutations).  Given all these changes, Rule 613 and the 2016 CAT NMS Plan no longer supports CAT as it currently stands, a view apparently shared by even the SROs who are supposed to be in charge of operating the system.[29]

The Commission cannot just ignore the rules and orders that are still on the books to approve a Funding Proposal for a system that is not consistent with Commission Rule 613 and the CAT NMS Plan.  Doing so constitutes clearly arbitrary and capricious action.  Rather than barreling ahead to approve a plan that is no longer supported by even the Commission's own precedent, the Commission should return to the drawing board.

###    B.    The Funding Proposal Raises Significant Constitutional Issues

In our system of separated powers and checks and balances, the Commission does not have the unilateral authority to spend hundreds of millions of dollars to create one of the largest surveillance databases ever constructed.  The CAT system tracks every equity and option trade and order, by every account, at every broker-dealer, by every investor.  This "comprehensive surveillance tool" presents a serious risk "to Americans' liberty and privacy,"[30] and, under our system of government, if the Commission wants to build such a database, the Commission needs to receive an appropriation from Congress, not end run the Constitution's separation of powers by forcing the SROs to raise and spend money for the Commission's purposes.

As the Fifth Circuit recently explained, the "separation of" the spending power (the power over the "purse") and the executive power (the power over the "sword") was the Framers' "strongest rejoinder to … fears of a tyrannical" executive branch.[31]  The Framers "viewed Congress's exclusive 'power over the purse' as an indispensable check on 'the overgrown prerogatives of the'" executive branch.[32]

---

[28] See id. § 242.613(c)(1).

[29] See Petition for Review, USCA Case No. 21-1065; Petition for Review, USCA Case No. 21-1066.

[30] See "Statement of Hester M. Peirce in Response to Release No. 34-88890, File No. S7-13-19" (May 15, 2020).

[31] Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB, 51 F.4th 616, 636 (5th Cir. 2022), cert. granted, 143 S. Ct. 978 (2023).

[32] Id. (quoting The Federalist No. 58 (J. Madison)).

The proposal here would sever this "vital" check.[33]  Law enforcement is an executive prerogative.[34]  And the CAT is a law enforcement tool.[35]  The Commission's extensive involvement in the design and implementation of the system, as detailed above, clearly demonstrates that, regardless of how it was originally conceived, CAT is a Commission system used for enforcement.  The funds to build it, therefore, must be approved by the people's elected representatives in Congress.  The Constitution does not permit the Commission to fund its *own* enforcement apparatus through the backdoor—to require the SROs to raise and spend hundreds of millions of dollars to build a new law enforcement tool for the Commission.[36]  The Constitution's separation of powers cannot be evaded that easily.

If the Commission thinks the CAT is needed to serve its enforcement agenda, then it must provide for the database with public funds approved by Congress in the appropriations process.  Indeed, if Congress *were* to appropriate money to build a massive, extremely intrusive surveillance tool, one would "expect Congress to speak clearly,"[37] not bury such an "[e]xtraordinary" action in "modest words," "vague terms," or "subtle device[s]."[38]  Yet that is exactly what the proposal here is based on.  In Section 11A of the Exchange Act, Congress authorized the Commission to "require self-regulatory organizations to act jointly with respect to matters as to which they share authority."[39]  Requiring regulated entities to act jointly is a far cry from requiring them to pay for a government resource.[40]  Congress does not "typically use [such] oblique or elliptical language" to authorize an agency to spend, directly or indirectly, hundreds of millions of dollars on a project that potentially endangers the liberty and privacy of every American.[41]  For that type of funding, the Commission must go back to Congress and seek an explicit appropriation.[42]

For similar reasons, the expropriation of these funds from private parties—especially the imposition of retroactive liability for monies spent that the private parties had no control over— for public purposes poses a Takings problem.[43]

---

[33] CFPB v. All Am. Check Cashing, Inc., 33 F.4th 218, 231 (5th Cir. 2022) (Jones, J., concurring).

[34] See, e.g., John Thomas Capital Mgmt. Grp. LLC, 2020 WL 5291417, at *25 & n.166 (SEC Sept. 4, 2020).

[35] See, e.g., Consolidated Audit Trail, 77 FR 45,722, 45,731 (Aug. 1, 2012).

[36] Cf. SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1358 n.* (2018) (questioning an agency's "power to do indirectly what it cannot do directly").

[37] West Virginia v. EPA, 142 S. Ct. 2587, 2605 (2022).

[38] Id. at 2609.

[39] 15 U.S.C. § 78k-1(a)(3)(B).

[40] Cf. Loper Bright Enters., Inc. v. Raimondo, 45 F.4th 359, 373 (D.C. Cir. 2022) (Walker, J., dissenting) (authorization to require fishermen to carry federal inspectors does not include the requirement to "force the fishermen to pay the wages of [the] federally mandated monitors").

[41] West Virginia, 142 S. Ct. at 2609.

[42] See 15 U.S.C. § 78k-1(a)(3)(C) (authorizing the Commission "to make recommendations to the Congress" about ways to "modif[y]" the "scheme of self-regulation provided for in [the Exchange Act]").

[43] Cf. Monongahela Nav. Co. v. United States, 148 U.S. 312, 325 (1893) (the Takings Clause "prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he

8

**A97**

The Commission should not rush through an approval now, with such serious constitutional issues at stake.

### C.    The Funding Proposal Likely Violates Rule 608 of Regulation NMS

After further considering the flawed process to establish and assess CAT Fees under the proposed Funding Model that we have addressed in our prior comment letters, we preliminarily believe that the CAT NMS Plan, and the CAT Operating Committee's proposal to assess CAT fees directly on Industry Members through Rule 19b-4 filings, run afoul of the requirements of Rule 608 of Regulation NMS.  Rule 608 of Regulation NMS was adopted pursuant to Section 11A of the Exchange Act.  Among other things, that provision provides protection for SROs engaged in collective activity, including fee setting, that might otherwise run afoul of other laws.  Absent this protection, SROs could be exposed to potential liability for engaging in such collective activity.

In 2020, the Commission amended Rule 608 to specifically require that fee changes made pursuant to NMS Plans be subject to a notice and comment process and specific Commission approval prior to becoming effective.[44]  Prior to this change, changes to fees assessed under NMS Plans were immediately effective under Rule 608(b)(3)(i).  Moreover, the Commission's amendments to Rule 608 specifically contemplate that CAT fees would be subject to Rule 608 of NMS, stating for instance that:

> The Fee Exception has been available for NMS plans that charge or intend to charge fees. Currently, these are: (i) the NMS plans that govern the facilities through which registered securities information processors ("SIPs") collect, consolidate, and distribute real-time market information (also known as "core data"); and (ii) the plan that governs the consolidated audit trail ("CAT").

Accordingly, we believe that the entire process for establishing and assessing CAT Fees under the Funding Proposal could potentially run afoul of Rule 608 of Regulation NMS.[45]  Ironically, the Commission amended Rule 608 to remove the effective upon filing fee provision in response to concerns about the SROs being able to change market data fees under the SIPs without a meaningful review opportunity.   Yet, such a process is exactly what the Commission is considering approving here with regard to CAT Fees.  Given the infirmities with the process for establishing and assessing CAT Fees under the Funding Proposal, it appears that the CAT Operating Committee needs to go back to the drawing board and establish a new process consistent with Rule 608.  It would also mean that the Commission could not find that the Funding Proposal is consistent with the Exchange Act.

---

surrenders to the public something more and different from that which is exacted from other members of the public").

[44] See supra note 19.

[45] While the Commission-approved CAT NMS Plan contemplates fee filings under Section 19(b) of the Exchange Act, the plan is silent on whether these filings would need to be made after the CAT Operating Committee first obtained approval to assess such fees under Rule 608 of Regulation NMS.

9

*     *     *

SIFMA greatly appreciates the opportunity to comment on the Funding Proposal.  For the reasons discussed above, as well as in our prior comment letters on the Executed Share Model, we strongly urge the Commission to disapprove the proposed model.  If you have any questions or require additional information, please do not hesitate to contact us by calling Ellen Greene at (212) 313-1287 or Joe Corcoran at (202) 962-7383.

Sincerely,

Ellen Greene
Managing Director
Equities & Options Market Structure

Joseph Corcoran
Managing Director, Associate General Counsel
SIFMA

Cc:    The Hon. Gary Gensler, Chair
        The Hon. Hester M. Peirce, Commissioner
        The Hon. Caroline A. Crenshaw, Commissioner
        The Hon. Mark T. Uyeda, Commissioner
        The Hon. Jaime Lizarraga, Commissioner
        Mr. Haoxiang Zhu, Director, Division of Trading and Markets

10

**A99**

# Tab G

Letter from Stephen J. Berger, Global Head of Government & Regulatory Policy, Citadel Securities to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (July 14, 2023)

**CITADEL** | Securities

July 14, 2023

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:    2023 CAT Funding Proposal (File No. 4-698)**

We appreciate the opportunity to provide comments to the Securities and Exchange Commission (the "Commission") on the CAT Operating Committee's proposal to offload the costs of the Consolidated Audit Trail ("CAT") to the industry (the "2023 Funding Proposal").[1] The 2023 Funding Proposal determines how over *a billion dollars* of CAT costs would be allocated by the end of 2024, and establishes the framework pursuant to which many more billions will be allocated in perpetuity. This extremely important filing is glaringly inconsistent with the Securities Exchange Act of 1934 (the "Exchange Act") – including Section 6(b)(4) (*requiring the equitable allocation of reasonable fees*), Section 6(b)(5) (*requiring that exchange rules protect investors and the public interest and not permit unfair discrimination*), and Section 6(b)(8) (*requiring that exchange rules do not unduly burden competition*). As a result, this filing must be disapproved.

Instead, we provide a comprehensive set of constructive recommendations in Section IV of this letter that solve for these material shortcomings and that should underpin a new CAT funding proposal. These recommendations are summarized on page 3 and are designed to:

(1) Achieve a more equitable cost allocation;

(2) Reduce overall operating costs; and

(3) Improve governance and budget transparency.

As it stands, the 2023 Funding Proposal does not equitably allocate fees as required by Section 6(b)(4) of the Exchange Act, as the proposed allocation methodology is only a façade. Despite purporting to allocate the costs to build and operate CAT among Industry Members,[2] FINRA, and the exchanges, the filing in fact seeks to offload *all* of these costs to Industry Members. In particular, in addition to the industry's explicit allocation, the filing acknowledges that FINRA's portion will be passed-on to Industry Members and specifically contemplates that exchanges may also pass-on their purported allocation. This means that the firms governing CAT would not be bearing any of the associated costs, distorting incentives and hindering the prioritization of critical cost-control measures.

Even the explicit allocation to Industry Members of 67% of the total costs to build and operate CAT does not represent an equitable allocation of reasonable fees as required by the Exchange

---

[1] 88 Fed. Reg. 17086 (Mar. 21, 2023), available at: https://www.govinfo.gov/content/pkg/FR-2023-03-21/pdf/2023-05690.pdf (the "2023 Funding Proposal").

[2] The 2023 Funding Proposal defines "Industry Member" as "a member of a national securities exchange or a member of a national securities association." 2023 Funding Proposal at FN 11.

**A100**

Act.  In fact, there is little explanation as to how the CAT Operating Committee arrived at this figure.  For example, there is no suggestion that Industry Members somehow receive 67% of the benefits from CAT, given that it is a system specifically designed for regulators to more effectively conduct market surveillance.  In addition, the magnitude and trajectory of total costs cannot be considered reasonable, particularly since Industry Members are already bearing *nearly all* of the total CAT-related costs as a result of implementing the associated reporting requirements.

Meanwhile, annual CAT operating costs continue to dramatically increase each year – at a rate of up to 40% – and are now approximately 5 times more than initial Commission estimates.  Based on the average annual increase, the CAT operating budget alone will be more than $1 billion per year by 2030, representing nearly 50% of the Commission's entire current budget.  And other Commission proposals could further increase these figures significantly – for example, the recent Regulation SCI proposal would *double the overall CAT budget* if adopted.[3]

Despite being allocated these massive costs, Industry Members lack even a single representative on the CAT Operating Committee and, therefore, cannot vote on the design, implementation, or funding of CAT.  In addition, astonishingly little transparency is provided regarding the origin of, or the key drivers for, these spiraling costs, with the CAT Operating Committee simply pointing to the broad expense categories contained in financial statements.  This lack of transparency prevents the Commission from concluding that the proposed allocation is reasonable as required by the Exchange Act and raises concerns that clearly inappropriate expenses will also be allocated to Industry Members, such as expenses relating to the CAT Operating Committee's ongoing litigation with the Commission and expenses that the CAT NMS Plan expressly prohibits the CAT Operating Committee from recovering due to missed implementation deadlines.  It is clearly inequitable to compel Industry Members to provide a blank check to fund these spiraling costs in perpetuity, without any governance role or any plan to contain overall costs.

A similar lack of detail plagues the CAT Operating Committee's feeble attempt to assess the impact of the 2023 Funding Proposal on market efficiency, competition, and capital formation as required by Sections 6(b)(5) and 6(b)(8) of the Exchange Act.  In particular, the 2023 Funding Proposal will impose a new significant and rapidly increasing trading expense on all investors in U.S. equities and options markets, negatively impacting overall liquidity and efficiency in violation of Section 6(b)(5) of the Exchange Act.  In addition, the proposal to allocate costs *among* Industry Members based on executed share volume disproportionately impacts market makers (as 20 firms will bear the vast majority of total costs) and retail investors (given their share of trading activity in sub-dollar NMS stocks that dramatically increases executed share volume) in violation of Section 6(b)(8) of the Exchange Act.  By failing to even attempt to analyze these impacts on market functioning and competition, the CAT Operating Committee has not met its burden to demonstrate that the 2023 Funding Proposal is consistent with the Exchange Act.

Urgent action is required to reverse the current trajectory – the current filing should be rejected and a new proposal should incorporate the constructive recommendations set forth herein.

---

[3] Letter from the CAT Operating Committee Chair (June 21, 2023) at 2, available at: https://www.sec.gov/comments/s7-07-23/s70723-208299-421042.pdf.

**A101**

**Constructive Recommendations For A New CAT Funding Proposal**

### A. Achieving A More Equitable CAT Cost Allocation

**(i)  Prospective Costs**

1. Any allocation of costs to Industry Members should leverage the "originating broker" model in order to allocate costs to the party originating an order.

2. Allocation split:

   - In no event should Industry Members be allocated more than 50% of ongoing CAT costs (including any allocation to FINRA).

   - Prohibit the exchanges from passing-on (directly or indirectly) their portion of CAT costs.

   - Consider allocating a portion of costs to the Commission to align incentives.

3. Allocation methodology:

   - Disperse costs more evenly across Industry Members.

   - Ensure specific market segments are not subject to an inequitable allocation (e.g. retail).

**(ii)  Historical Costs**

Industry Members should not bear historical costs.

**(iii)  Other Allocation Suggestions**

1. Exchanges should be responsible for any costs over the approved budget.

2. Exclude costs for matters/functionality/change requests specific to the SROs or Commission.

### B. Key CAT Enhancements

**(i)  Reducing Overall CAT Operating Costs**

1. Cease from making further changes to the CAT at this time.  The CAT Operating Committee should file an updated NMS Plan to reflect the current *status quo*.

2. Identify technical requirements that should be modified to materially reduce costs without sacrificing key benefits (e.g. moving certain timelines to T+2 from T+1).

3. Further streamline the CAT submission process (e.g. implementing further data validation)

**(ii)  Improving CAT Governance and Budget Transparency**

*Independent Cost Review Mechanisms*

1. An independent expert committee should review the CAT budget on an annual basis (including assessing whether current cost levels and third-party arrangements are reasonable).

2. The Commission should formally approve the CAT budget on an annual basis.

3. All CAT operating budgets should remain published on the CAT website.

*Advance Notice of Material Changes to the CAT System and Related Costs*

Any material change should require an NMS Plan amendment, including a cost-benefit analysis.

*Fairer Voting Rights*

1. Allocate voting rights similar to the NMS Plan for consolidated equity market data.

2. All actions relating to funding should require authorization by a Supermajority vote.

3. Provide Industry Members with voting representation commensurate with any costs allocated.

*Data Security*

Finalize the data security plan amendments to address CAT-related data security concerns.

Page 3 of 35

**Table of Contents**

I.  **The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs** ........................................................................................... **5**

   A.  The CAT Governance Structure is Deeply Flawed ................................. 5

   B.  CAT Costs Have Spiraled Out of Control ............................................. 7

   C.  The CAT Operating Committee Has Repeatedly Attempted to Allocate CAT Costs in an Unlawful Manner ............................................................................. 9

II.  **The 2023 Funding Proposal Is Not Permitted by the Exchange Act** .............................. **11**

   A.  The 2023 Funding Proposal Does Not Contain Sufficient Detail for the Commission to Perform the Required Economic Analysis ............................................. 11

      (i)  The Commission Must Perform a Thorough Economic Analysis .............................. 12

      (ii)  The 2023 Funding Proposal Does Not Provide Sufficient Detail for the Commission to Conduct the Required Economic Analysis ............................................. 13

      (iii)  The 2023 Funding Proposal is the Critical Filing Requiring a Thorough Economic Analysis........................................................................................ 15

   B.  The Proposed Allocation Methodology is Inconsistent with the Exchange Act ................. 16

      (i)  Allocating 67% of CAT Costs to Industry Members Based on Share Volume is Inconsistent with the Exchange Act........................................................ 16

      (ii)  Industry Members Will Also Pay the 11% of CAT Costs Allocated to FINRA ........ 21

      (iii)  Industry Members May Also Pay the 22% of CAT Costs Allocated to Exchanges... 22

   C.  The Types of Costs Proposed to be Allocated to Industry Members are Inconsistent with the Exchange Act ........................................................................... 23

      (i)  The Historical Costs are Clearly Excessive and Inconsistent with the 2016 CAT NMS Plan ................................................................................... 23

      (ii)  The Trajectory of Annual Operating Expenses Is Unconstrained .............................. 26

III. **The 2023 Funding Proposal is Unconstitutional** ............................................ **28**

IV. **The Commission Must Consider Reasonable Alternatives** ................................... **30**

## I.    The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs

In 2012, the Commission finalized Rule 613 (*Consolidated Audit Trail*)[4] requiring that the national securities exchanges and FINRA file a national market system plan ("NMS Plan") to create, implement, and maintain a consolidated audit trail.  While this Commission rule set forth certain requirements for the CAT, the exchanges and FINRA were given significant flexibility to determine the governance framework and implementation plan.[5]  Unfortunately, this delegation of responsibility by the Commission has resulted in spiraling costs, with the annual CAT budget now approximately *5 times* more than the Commission's original estimate in 2016 (and rising).

Rather than providing adequate transparency regarding the key drivers of these spiraling costs and soliciting input on concrete recommendations to contain the CAT budget, the 2023 Funding Proposal appears myopically focused on offloading all of these costs to Industry Members.  As detailed in Section II below, even the costs purportedly allocated to exchanges may, nonetheless, be passed-on to Industry Members, with the filing stating that "each Participant may determine to charge their members fees to fund their share of the CAT fees."[6]  A funding model that allocates essentially all of the spiraling costs to build and operate CAT to firms that are not represented on the CAT Operating Committee distorts incentives and hinders the prioritization of critical cost-control measures, as the firms governing CAT are not bearing the associated costs.

Experience has shown that the model the Commission contemplated more than a decade ago is simply not working.[7]  With all the changes and cost overruns, the Commission today is confronted with a CAT structure that is unrecognizable compared to one contemplated in 2012.  It is time for the Commission to revisit the assumptions upon which it relied when approving the CAT NMS Plan, many of which have proven grossly inaccurate, such as overall cost estimates, the failure to retire duplicative systems, the impracticality of technical requirements, the lack of effective governance, and no processes to consider the ever-expanding requests to add more data.

### A.  The CAT Governance Structure is Deeply Flawed

The CAT is currently governed by an Operating Committee, which is composed of representatives from FINRA and the 24 securities exchanges.[8]  Each of the 25 members of the CAT Operating Committee receive one vote, and many decisions are taken by simple majority,

---

[4] 77 Fed. Reg. 45722 (Aug. 1, 2012), available at: https://www.govinfo.gov/content/pkg/FR-2012-08-01/pdf/2012-17918.pdf ("Rule 613").

[5] *See, e.g.,* Rule 613 at 45725.

[6] 2023 Funding Proposal at 17107.

[7] *Cf. Sierra Club v. EPA*, 671 F.3d 955, 965 (9th Cir. 2012) (overturning as arbitrary and capricious an agency's action for failing to consider newer "data [that] told a different story than that told by the earlier data").

[8] *See, e.g.,* 81 Fed. Reg. 84696 (Nov. 23, 2016) at 84701, available at: https://www.govinfo.gov/content/pkg/FR-2016-11-23/pdf/2016-27919.pdf ("2016 CAT NMS Plan"); and Testimony of Michael J. Simon, Operating Committee Chairman Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (Oct. 22, 2019) at 3-4, available at: https://www.banking.senate.gov/imo/media/doc/Simon%20Testimony%2010-22-19.pdf ("Simon Testimony").

**Section I. The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs**

including with respect to funding-related matters. Exchange groups with multiple affiliated exchanges have significant influence under this voting structure, with two exchange groups allocated six votes each and another exchange group allocated five votes.[9] In other words, three exchange groups alone can dictate many CAT-related decisions, including with respect to funding.

The Commission also has an important role in the current governance structure. Commission staff attend "nearly all CAT meetings and calls," and "have played an important role in discussions related to the development of the CAT,"[10] including by interpreting what is required by Commission Rule 613 and the 2016 CAT NMS Plan. However, the Commission has not regularly assessed whether the costs resulting from a specific interpretation of Rule 613 or the 2016 CAT NMS Plan outweigh any associated benefits.

The 2023 Funding Proposal exposes the inherent flaws in this governance structure. *First*, the current governance structure enables a small group of exchanges to dictate how CAT costs are allocated, including to competitor firms, creating an inherent conflict of interest.[11] Industry Members lack even a single representative on the CAT Operating Committee and, therefore, cannot vote on the design, implementation, or funding of CAT. While there is a separate Advisory Committee that contains industry representation, its recommendations are non-binding and thus can be (and have been) completely ignored by the CAT Operating Committee. For example, the Advisory Committee did not support the 2023 Funding Proposal.[12] This flawed governance structure leads to the current proposal, which allocates essentially all of the truly staggering CAT-related costs to Industry Members, insulating the firms actually governing CAT from bearing any of the associated costs.

*Second*, the current governance structure allows the CAT Operating Committee to provide only minimal information regarding the CAT costs that are proposed to be allocated to Industry Members via the 2023 Funding Proposal. In particular, the CAT Operating Committee publishes audited financial statements[13] and an annual "financial and operating budget."[14] These disclosures group CAT operating expenses into several broad categories,[15] but fail to provide any detail

---

[9] *See* March 2023 Funding Proposal at 17131.

[10] Simon Testimony at 6.

[11] The Commission has specifically acknowledged this conflict of interest. See 85 Fed. Reg. 65470 (Oct. 15, 2020) at 65482, available at: https://www.govinfo.gov/content/pkg/FR-2020-10-15/pdf/2020-18572.pdf ("the SROs have potential conflicts of interest with respect to allocating costs related to the CAT Plan").

[12] 87 Fed. Reg. 54558 (Sept. 6, 2022) at FN 336, available at: https://www.govinfo.gov/content/pkg/FR-2022-09-06/pdf/2022-19111.pdf.

[13] *See* https://www.catnmsplan.com/audited-financial-statements.

[14] *See* https://www.catnmsplan.com/cat-financial-and-operating-budget. This document only appears to be provided for the current and immediately prior fiscal year. In addition, the annual budget has not proven to accurately predict actual costs. According to the 2023 Funding Proposal, "[a]n analysis of budgeted CAT costs and actual CAT costs for 2020, 2021 and the first nine months of 2022 demonstrates that actual CAT costs were approximately 20% higher than budgeted amounts over this period on a cumulative average basis." 2023 Funding Proposal at 17090.

[15] The "Statement of Activities" in the audited financial statements groups CAT operating expenses into the following categories: (1) technology costs, (2) legal, (3) amortization of developed technology, (4) consulting, (5) insurance, (6) professional and administration, and (7) public relations. Technology costs are further divided into (i)

**Section I. The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs**

regarding the origin of, or the key drivers for, these costs. For example, there is no information regarding the specific legal or technological requirements that are proving particularly responsible for the significant increases in overall costs, nor the various technical design alternatives that were considered before implementing these requirements. As a result, market participants are unable to assess whether the total CAT costs are reasonable and are limited in their ability to put forward constructive alternatives designed to achieve significant cost savings. Instead, they are expected to rely on the CAT Operating Committee to contain the overall budget, even though the members of the CAT Operating Committee will be largely insulated from these spiraling costs.

*Third*, though CAT is operated by the securities exchanges and FINRA pursuant to an NMS Plan, there have nevertheless been many ad-hoc discussions between the CAT Operating Committee and the Commission regarding what is required by the NMS Plan without adequate notice to Industry Members or due consideration of the costs and benefits associated with such interpretations. Remarkably, the CAT Operating Committee and the Commission have strongly disagreed on the scope of the 2016 CAT NMS Plan,[16] leading to unresolved litigation that could further increase overall CAT costs, including the significant implementation costs already being borne by Industry Members in order to comply with CAT reporting requirements.[17] The current governance structure does not require that the CAT Operating Committee and the Commission jointly assess whether the costs resulting from a specific interpretation of the 2016 CAT NMS Plan outweigh any associated benefits (in which case amending the 2016 CAT NMS Plan would appear to be the appropriate course of action). Once again, a funding model that allocates essentially all CAT-related costs to firms that are neither represented in these discussions nor the ongoing litigation between the CAT Operating Committee and the Commission only serves to further marginalize cost-related considerations.

### B. CAT Costs Have Spiraled Out of Control

It is indisputable that CAT costs have spiraled completely out of control under the current governance structure. When approving the 2016 CAT NMS Plan, the Commission estimated that it would cost $37.5 million to $65 million to build CAT and that annual operating costs would range from $36.5 million to $55 million.[18] These estimates were directly based on information provided by members of the CAT Operating Committee, which touted that "the expected Plan Processor costs are less than originally proposed."[19] In subsequent filings made in 2017 and 2018, members of the CAT Operating Committee continued to estimate that annual CAT costs would be

---

cloud hosting services, (ii) milestone fees, (iii) operating fees, (iv) data service fees, and (v) change request fees. The "financial and operating budget" uses these same categories.

[16] *See, e.g.,* 88 Fed. Reg. 33655 (May 24, 2023), available at: https://www.govinfo.gov/content/pkg/FR-2023-05-24/pdf/2023-11031.pdf.

[17] We note that the CAT Operating Committee has redacted its estimates regarding the impact of these interpretative disputes on overall CAT costs, leaving the industry unable to fully assess the potential ramifications of this litigation. *See, e.g.,* "Motion for Partial Stay of Order 34-90688," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-688-order.pdf and "Motion for Partial Stay of Order 34-90689," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-689-order.pdf.

[18] 2016 CAT NMS Plan at 84801.

[19] https://www.sec.gov/comments/4-698/4698-33.pdf.

**Section I. The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs**

approximately $50 million.[20]  Now, just five years later, annual operating expenses for CAT are at least $234 million.[21]  This stands in stark contrast to a world where the underlying costs of data management systems have steadily declined.  For example, hard drive cost per gigabyte continues to decrease year-over-year.[22]

Critical missteps began almost immediately.  When selecting the entity to build and operate CAT in 2017, members of the CAT Operating Committee awarded the contract to a firm that could not deliver.  After this engagement "did not progress in a satisfactory manner,"[23] the CAT Operating Committee effectively started-over two years later by selecting FINRA to build and operate CAT in Q2 of 2019.  This misstep resulted in significant implementation delays[24] and more than $100 million in wasted expenditures.[25]

However, replacing the entity responsible for building and operating CAT was only the beginning of spiraling costs.  The chart below sets forth annual CAT costs once FINRA was selected to build and operate CAT (beginning with 2020, the first full year of FINRA's tenure):

| Year | Annual CAT Costs | Change From Prior Year |
|---|---|---|
| 2020 | 103M[26] | |
| 2021 | 144M[27] | **+40%** |
| 2022 | 179M[28] | **+24%** |
| 2023 | 234M[29] | **+31%** |

[20] Release No. 34-80930 (July 14, 2017) at 30, available at: https://www.sec.gov/rules/sro/nms/2017/34-80930.pdf ("2017 Funding Proposal") and Release No. 34-82451 (Jan. 5, 2018) at 32, available at: https://www.sec.gov/rules/sro/nms/2018/34-82451.pdf ("2018 Funding Proposal").

[21] Based on the CAT operating budget for 2023.  https://www.catnmsplan.com/sites/default/files/2023-03/03.28.23-CAT-Q1-2023-Budget.pdf. Actual costs for 2023 are likely to be significantly higher, as costs typically exceed the estimated budget by an average of 20%. 2023 Funding Proposal at 17090.

[22] *See, e.g.,* https://www.backblaze.com/blog/hard-drive-cost-per-gigabyte/.

[23] Simon Testimony at 5.

[24] According to Chair Clayton at the time, "the development and implementation process remains slow and cumbersome due largely to what I believe are project governance and project management issues experienced by the SROs." Testimony of Chairman Jay Clayton Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs (Dec. 11, 2018), available at: https://www.sec.gov/news/testimony/testimony-oversight-us-securities-and-exchange-commission-0.

[25] *See* Letter from Tower Research Capital (May 12, 2021) at 8, available at: https://www.sec.gov/comments/4-698/4698-8793895-237841.pdf ("Tower Letter").

[26] Based on the difference in "Total Liabilities" between 2019 and 2020 from the published CAT financial statements.

[27] Operating expenses for Period 3.  *See* 2023 Funding Proposal at 17111.

[28] *See* https://www.catnmsplan.com/sites/default/files/2022-11/11.14.22-CAT-Q4-2022-Budget.pdf. Actual costs for 2022 are likely to be significantly higher, as costs typically exceed the estimated budget by an average of 20%. 2023 Funding Proposal at 17090.

[29] *See* https://www.catnmsplan.com/sites/default/files/2023-03/03.28.23-CAT-Q1-2023-Budget.pdf. Actual costs for 2023 are likely to be significantly higher, as costs typically exceed the estimated budget by an average of 20%. 2023 Funding Proposal at 17090.

**Section I. The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs**

Not only are total costs continuing to dramatically increase each year (at a rate of up to 40%), the CAT Operating Committee appears unable to exert sufficient control over costs to even allow the setting of an accurate annual budget.  According to the 2023 Funding Proposal, "[a]n analysis of budgeted CAT costs and actual CAT costs for 2020, 2021 and the first nine months of 2022 demonstrates that actual CAT costs were approximately 20% higher than budgeted amounts over this period on a cumulative average basis."[30]

### C.  The CAT Operating Committee Has Repeatedly Attempted to Allocate CAT Costs in an Unlawful Manner

Rather than providing adequate transparency regarding the key drivers of the spiraling CAT costs and putting forward concrete recommendations to contain the CAT budget, there appears to be a myopic focus on offloading all of these costs to Industry Members.  As detailed in the chart below, the 2023 Funding Proposal represents the fifth unlawful attempt by the CAT Operating Committee to allocate massive CAT costs to Industry Members:

| Year | Metric Used to Allocate Costs to Industry Members | % of Costs Allocated to Exchanges | Result |
|------|---------------------------------------------------|-----------------------------------|--------|
| 2017[31] | Message Traffic | 11.65%[32] | Withdrawn |
| 2018[33] | Message Traffic | 14.5%[34] | Withdrawn |
| 2021[35] | Message Traffic | 22%[36] | Withdrawn |
| 2022[37] | Volume (by shares) | 22%[38] | Withdrawn |
| 2023 | Volume (by shares) | 22%[39] | [?] |

This summary of funding proposals highlights a few points.  *First*, rather than engaging the industry in constructive dialogue, the CAT Operating Committee continues to file funding

---

[30] 2023 Funding Proposal at 17090.

[31] 2017 Funding Proposal, *supra* note 20.

[32] Calculated by determining the exchanges' share of total costs allocated to equity execution venues and options execution venues.  *See* 2017 Funding Proposal at 34-35 and Appendix B.

[33] 2018 Funding Proposal, *supra* note 20.

[34] Calculated by determining the exchanges' share of total costs allocated to equity execution venues and options execution venues.  *See* 2018 Funding Proposal at 36-38 and Appendix B.

[35] Release No. 34-91555 (Apr. 14, 2021), available at: https://www.sec.gov/rules/sro/nms/2021/34-91555.pdf ("2021 Funding Proposal").

[36] *See* Letter from NYSE (May 10, 2021) at 4, available at: https://www.sec.gov/comments/4-698/4698-8779961-237701.pdf ("2021 NYSE Letter").

[37] Release No. 34-94984 (May 25, 2022), available at: https://www.sec.gov/rules/sro/nms/2022/34-94984.pdf ("2022 Funding Proposal").

[38] Calculated by subtracting FINRA's estimated allocation of 11% of total costs from the 33% allocated to members of the CAT Operating Committee.  *See* Letter from FINRA (April 11, 2023) at 3, available at: https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf and 2021 NYSE Letter at 4.

[39] *Id.*

**Section I. The 2023 Funding Proposal is an Outgrowth of Governance Failures and Spiraling Costs**

proposals that are blatantly inconsistent with the Exchange Act (see Section II below), leading to their eventual withdrawal.[40]

*Second*, despite the dramatic increase in overall costs, the exchange members appear unwilling to bear more than 22% of total costs (and, as detailed below, continue to reserve the right to pass-through even these costs to Industry Members). It is notable that, even after significantly restructuring the proposed funding approach to allocate costs to Industry Members based on volume (by shares) instead of message traffic, the share of costs purportedly allocated to exchanges remained exactly the same.

*Third*, members of the CAT Operating Committee have failed to articulate a coherent position on how to allocate costs to Industry Members fairly and equitably, and instead appear more focused on ensuring that their own costs are minimized (or eliminated). For example, after initially stating that "charging broker-dealers based on message traffic is the **most equitable** means for establishing fees (emphasis added),"[41] the members of the CAT Operating Committee now concede that "imposing CAT fees on each CAT Reporter based on its message traffic may have an adverse effect on competition, liquidity or other aspects of market structure."[42] As detailed in Section II below, the 2023 Funding Proposal fails to explain why allocating the same percentage of total costs to Industry Members[43] using a different metric – executed share volume – should be considered equitable as required by Section 6(b)(4) of the Exchange Act, particularly in light of the inaccurate statements made by the CAT Operating Committee regarding the equitability of prior proposals.

---

[40] *See, e.g.,* Simon Testimony at 11 ("the Participants withdrew their rule changes when it became clear that the SEC was going to disapprove those fees").

[41] Letter from the CAT NMS Plan Participants (June 29, 2017) at 6, available at: https://www.sec.gov/comments/sr-batsbyx-2017-11/batsbyx201711-1832632-154584.pdf ("2017 CAT Response Letter").

[42] 2023 Funding Proposal at 17102.

[43] Includes the costs allocated to FINRA, which FINRA has explicitly stated will be allocated to Industry Members (as detailed below).

## II.   The 2023 Funding Proposal Is Not Permitted by the Exchange Act

The 2023 Funding Proposal contemplates the following allocation of CAT costs:

| Time Period | Industry Members[44] | FINRA[45] | Exchanges[46] | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M[47] |
| Period 4 (2022-23)[48] | 276.5M | 45.5M | 91M | 413M[49] |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M[50] |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M[51] |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

### A.   The 2023 Funding Proposal Does Not Contain Sufficient Detail for the Commission to Perform the Required Economic Analysis

As shown above, this filing determines how over *a billion dollars* of CAT costs would be allocated by the end of 2024, and establishes the framework pursuant to which many more billions in costs will be allocated in perpetuity.  Before approving such a filing, the Commission is required to carefully assess the potential impact on market efficiency, competition, and capital formation under Sections 6(b)(4), 6(b)(5), and 6(b)(8) of the Exchange Act and Commission Rules 608 and 613(a)(5).  The 2023 Funding Proposal does not provide the Commission with the information necessary to conduct such an analysis.

---

[44] Industry Members are explicitly allocated 2/3 of costs under the 2023 Funding Proposal.

[45] FINRA is allocated approximately 11% of costs under the 2023 Funding Proposal.  *See supra* note 38.  As detailed below, FINRA has explicitly stated these costs will be allocated to Industry Members.

[46] Exchanges are allocated approximately 22% of costs under the 2023 Funding Proposal.  As detailed below, it appears these costs may also be allocated to Industry Members.

[47] 2023 Funding Proposal at 17130.

[48] Assumes full implementation of CAT is not achieved until 2024.  As detailed below, the 2023 Funding Proposal contemplates "Period 4" costs being assessed via another "Historical CAT Assessment."  2023 Funding Proposal at FN 43.

[49] Based on the CAT operating budget for 2022 and 2023.  Actual costs for 2022 and 2023 are likely to be significantly higher, as costs typically exceed the estimated budget by an average of 20% according to the CAT Operating Committee.  *See supra* notes 28 and 29.

[50] Based on the CAT operating budget for 2023.  Actual costs for 2024 are likely to be significantly higher, as actual 2023 costs typically exceed the estimated budget by an average of 20% and actual 2024 costs are likely to be approximately 32% above 2023 levels (based on the average annual increase under the current Plan Processor).

[51] Not incorporated in the current CAT operating budget for 2023, so calculated by multiplying the current 2023 budget by 25%.  Actual reserve costs are likely to be significantly higher, as the actual 2024 budget is likely to be significantly higher.  *See id.*

### (i)    The Commission Must Perform a Thorough Economic Analysis

In connection with considering the impact of the 2023 Funding Proposal on market efficiency, competition, and capital formation, the Commission must update the economic analysis contained in the 2016 CAT NMS Plan.

*First*, the Commission must update its estimates of the costs to build and operate CAT using the actual costs incurred. These costs have proven to be many multiples of the Commission's initial estimates in 2016.[52] Given the dramatic year-over-year increases that continue to occur (see Section I.B above), the Commission's economic analysis should also project average annual increases in the CAT operating budget going forward. Based on the observed average annual increase of 32% over the last 3 years, the CAT operating budget would be more than $1 billion per year by 2030, representing nearly 50% of the Commission's entire current budget.[53] This trajectory does not even take into account the impact of other Commission proposals on the overall CAT budget. For example, the CAT Operating Committee has indicated that the Commission's recent Regulation SCI proposal would *double the overall CAT budget* if adopted.[54]

*Second*, the Commission must update its analysis of the CAT-related costs that are proposed to be borne by Industry Members. Since the 2016 CAT NMS Plan did not set forth a funding model,[55] the Commission did not consider the implications of allocating the costs to build and operate CAT to Industry Members.[56] As detailed in Section II.B below, the 2023 Funding Model provides that at least 78% (and likely up to 100%) of these costs will be allocated to Industry Members, with a small group of broker-dealers responsible for the vast majority of these costs.[57] This proposed allocation will have dramatic effects on market efficiency, competition, and capital formation.

*Third*, the Commission must update its analysis of the implementation costs borne by broker-dealers to comply with CAT reporting requirements. The 2016 figures grossly underestimated implementation costs for larger broker-dealers, in particular, by incorrectly assuming that significant savings would be realized through the retirement of other reporting systems, such as

---

[52] When approving the 2016 CAT NMS Plan, the Commission estimated that it would cost $37.5 million to $65 million to build CAT and that annual operating costs would range from $36.5 million to $55 million. 2016 CAT NMS Plan at 84801.

[53] *See* https://www.sec.gov/files/fy-2024-congressional-budget-justification_final-3-10.pdf at 13.

[54] *Supra* note 3. Several of the Commission's recent equity market structure proposals would also be expected to increase the CAT budget as a result of increasing overall message traffic.

[55] *See, e.g.,* 2016 CAT NMS Plan at 84881 ("Fees to pay for the maintenance and operation of the Central Repository will be allocated via the funding model, and the current allocation of fees between broker-dealers and exchanges has not been determined.").

[56] *See, e.g.,* 2016 CAT NMS Plan at 84864 (broker-dealers are not assigned any costs associated with building or operating CAT).

[57] In addition, Industry Members may be required to fund historical costs and ongoing costs at the same time. *See* 2023 Funding Proposal at 17097 ("even if Industry Members were required to pay a Historical CAT Assessment and the ongoing CAT Fee at the same time.").

the Electronic Blue Sheet system (which has not transpired).[58]  The Commission must obtain data regarding actual broker-dealer implementation costs as part of assessing the overall impact of allocating significant additional costs to broker-dealers via the 2023 Funding Proposal.

### (ii)    The 2023 Funding Proposal Does Not Provide Sufficient Detail for the Commission to Conduct the Required Economic Analysis

As detailed in 2019 staff guidance,[59] the Commission must carefully scrutinize filings from exchanges and FINRA that impose fees on industry members to ensure that these fee filings are consistent with the Exchange Act.  Taking into consideration that the 2023 Funding Proposal determines how over *a billion dollars* of CAT costs would be allocated by the end of 2024, and establishes the framework pursuant to which many more billions in costs will be allocated in perpetuity, it is clear that the CAT Operating Committee has not met its burden to demonstrate that the proposed allocation of fees is consistent with the Exchange Act.

The 2023 Funding Proposal provides the following level of detail regarding CAT costs (we note this chart covers 2021 – the most recently published audited financials):[60]

| Operating Expense | Historical CAT Costs for Period 3 |
|---|---|
| Capitalized Developed Technology Costs* | $10,763,372 |
| *Technology Costs:* | $123,639,402 |
|     Cloud Hosting Services | $94,574,759 |
|     Operating Fees | $23,106,091 |
|     CAIS Operating Fees | $5,562,383 |
|     Change Request Fees | $396,169 |
| Legal | $6,333,248 |
| Consulting | $1,408,209 |
| Insurance | $1,582,714 |
| Professional and administration | $595,923 |
| Public relations | $92,400 |
| **Total Operating Expenses** | **$144,415,268** |

\* The non-cash amortization of these capitalized developed technology costs of $5,108,044 incurred during Period 3 have been appropriately excluded from the above table.

According to the CAT Operating Committee, this level of detail provides "substantial cost transparency" and a level of transparency that is "above and beyond what is required under the CAT NMS Plan."[61]  These statements reveal a startling disconnect with reality.

---

[58] *See* 2016 CAT NMS Plan at 84862.

[59] Staff Guidance on SRO Rule Filings Relating to Fees (May 2019), available at: https://www.sec.gov/tm/staff-guidance-sro-rule-filings-fees.

[60] The table is copied from the 2023 Funding Proposal at 17111.

[61] 2023 Funding Proposal at 17109.

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

In practice, the CAT Operating Committee has resisted cost transparency at every turn. Repeated requests for more detailed breakdowns of the broad expense categories above, including the technology costs that "account for more than 90% of CAT costs,"[62] have been flatly refused.[63] Similarly, there is no attempt to provide any detail regarding the origin of, or the key drivers for, these massive costs, such as explaining the specific legal or technological requirements that are proving particularly responsible for the significant increases in overall costs, and the various technical design alternatives that were considered before implementing these requirements. Instead of providing this critical cost transparency, the CAT Operating Committee has pointed market participants to "public webinars providing additional detail about CAT costs."[64]

The overall lack of cost transparency has been documented by the Commission as it has considered prior funding proposals from the CAT Operating Committee, such as in the 32 detailed questions included in its Order Instituting Proceedings on the 2022 Funding Proposal.[65] Instead of responding to these questions, the CAT Operating Committee simply withdrew the 2022 Funding Proposal and refiled an almost identical 2023 Funding Proposal[66] while asserting that "[a]dditional public cost transparency is not necessary for the SEC to evaluate the proposal under the Exchange Act" and that the Commission should specifically request "additional financial information about CAT LLC to the extent necessary."[67]

These statements appear to ignore that under the Commission's Rules of Practice,[68] the burden to demonstrate that a NMS plan filing is consistent with the Exchange Act is on the plan participants that make the filing. In addition, Rule 613 requires the members of the CAT Operating Committee to: "(1) provide an estimate of the costs associated with creating, implementing, and maintaining the consolidated audit trail under the terms of the NMS plan submitted to the

---

[62] 2023 Funding Proposal at 17090.

[63] *See, e.g.,* 2023 Funding Proposal at 17090 ("CAT LLC currently does not propose to require the disclosure of additional subcategories of cost information, such as a further breakdown of the category of cloud hosting services into production costs, including linker costs and storage costs.") and Letter from the CAT Operating Committee Chair (Aug. 16, 2022) at 18, available at: https://www.sec.gov/comments/4-698/4698-20136270-307325.pdf ("2022 CAT Response Letter") ("Despite the substantial disclosures about CAT finances, commenters request detailed information about all costs necessary to operate the CAT, which is not necessary to evaluate a fee proposal.").

[64] 2022 CAT Response Letter at 32.

[65] Release No. 34-95634 (Aug. 30, 2022), available at: https://www.sec.gov/rules/sro/nms/2022/34-95634.pdf ("2022 OIP").

[66] *See* Letter from the CAT Operating Committee Chair (June 15, 2023) at 2, available at: https://www.sec.gov/comments/4-698/4698-206179-414982.pdf. We note that, in withdrawing the 2022 Funding Proposal and refiling an almost identical proposal, comment letters submitted in response to the 2022 Funding Proposal appear to have been removed from consideration (*see* Release No. 34-97750 (June 16, 2023), available at: https://www.sec.gov/rules/sro/nms/2023/34-97750.pdf). The Commission should ensure a procedural gimmick does not negate consideration of comments made regarding the substance of the 2023 Funding Proposal. These comments build on the comments that have already been submitted in File No. 4-698; the Commission must grapple with all of the comments in the file, including comments that the Commission's website identifies as "Older." See https://www.sec.gov/comments/4-698/4-698-a.htm.

[67] 2022 CAT Response Letter at 18-19.

[68] Rule 700(b)(3)(ii).

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

Commission for its consideration; (2) discuss the costs, benefits, and rationale for the choices made in developing the NMS plan submitted; and (3) provide their own analysis of the submitted NMS plan's potential impact on competition, efficiency and capital formation."[69]  Given the massive increase in costs since the Commission's most recent estimate in 2016, and the commercial significance of this proposed amendment to the 2016 CAT NMS Plan, the Commission should require the members of the CAT Operating Committee to update the analysis required by Rule 613.  In any event, the lack of transparency provided by the CAT Operating Committee prevents the Commission from concluding that the proposed allocation methodology is reasonable as required by the Exchange Act.

> **(iii)    The 2023 Funding Proposal is the Critical Filing Requiring a Thorough Economic Analysis**

In the event the 2023 Funding Proposal were approved, the exchanges and FINRA would make an additional filing to set forth the billing process and fee schedule for Industry Members.  However, this does not relieve the Commission of conducting the thorough economic analysis required by the Exchange Act and the 2016 CAT NMS Plan.

*First*, the 2023 Funding Proposal contemplates that such additional filing would be effective upon filing pursuant to Rule 19b-4.[70]  This means that Industry Members would immediately be assessed fees, even if the filing was later suspended by the Commission.  We note that this approach appears inconsistent with recent Commission rulemaking designed to ensure that fee filings relating to an NMS Plan (specifically including the CAT NMS Plan) can no longer be effective upon filing.[71]

*Second*, even if such additional filing was submitted as an amendment to the CAT NMS Plan, the fundamental issues are being decided in this filing, as the allocation methodology represents the single most important commercial issue.  Once the Commission approves a methodology for allocating CAT costs, the CAT Operating Committee would simply apply that approved methodology to the costs incurred during a specific time period.  However, the methodology presented in the 2023 Funding Proposal is inconsistent with the Exchange Act for a multitude of reasons (as detailed below), including (a) the clearly excessive percentage of total costs proposed to be allocated to Industry Members in aggregate and (b) the unfair method for allocating costs *among* Industry Members.  The allocation methodology will have a direct and negative impact on market efficiency, competition, and capital formation, and the Commission must comprehensively assess those impacts before approving this filing.

This further underscores the fact that the Commission cannot ignore the glaring deficiencies in the 2023 Funding Proposal, which is the operative vehicle for allocating a truly staggering sum of costs to Industry Members.

---

[69] Release No. 34-77724 (Apr. 27, 2016) at 183, available at: https://www.sec.gov/rules/sro/nms/2016/34-77724.pdf.

[70] 2023 Funding Proposal at FN 38.

[71] *See* 85 Fed. Reg. 65470 (Oct. 15, 2020), available at: https://www.govinfo.gov/content/pkg/FR-2020-10-15/pdf/2020-18572.pdf.

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

### B. The Proposed Allocation Methodology is Inconsistent with the Exchange Act

The 2023 Funding Proposal can be summed-up by the following: Industry Members will have to pay 100% of the costs, representing at least a billion in expenses through 2024, and many more billions in the future.

The 2023 Funding Proposal explicitly allocates 67% of CAT costs to Industry Members. In addition to this explicit allocation, the 2023 Funding Proposal is clear that the 11% allocation to FINRA will be passed-on to Industry Members and the 22% allocation to exchanges may also be passed-on to Industry Members (at the discretion of each exchange). This farcical outcome renders the proposed allocation methodology meaningless, and distorts incentives and hinders the prioritization of critical cost-control measures, as the firms governing CAT are not bearing the associated costs.

The proposed allocation methodology is put forward without any serious consideration of the effects on market efficiency, competition, and capital formation. Inconvenient facts are simply ignored, such as that Industry Members are already bearing *nearly all* CAT-related costs due to the associated implementation costs and that a small group of 20 firms will be responsible for nearly 75% of the billions in additional costs to be allocated to Industry Members under this proposal. The 2023 Funding Proposal cannot be considered to equitably allocate reasonable fees as required by Section 6(b)(4) of the Exchange Act, and will harm market efficiency, competition, and capital formation in a manner inconsistent with Sections 6(b)(5) and 6(b)(8) of the Exchange Act.

**(i)    Allocating 67% of CAT Costs to Industry Members Based on Share Volume is Inconsistent with the Exchange Act**

| Time Period | Industry Members | FINRA | Exchanges | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M |
| Period 4 (2022-23) | 276.5M | 45.5M | 91M | 413M |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

The 2023 Funding Proposal explicitly allocates 67% of the costs to build and operate CAT to Industry Members, representing at least $700 million in expenses through 2024, and many more billions in the future. In doing so, the CAT Operating Committee fails to address two critical issues.

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

1. <u>Allocating 67% of Costs to Industry Members Is Not Equitable or Rational</u>

The 2023 Funding Proposal does not demonstrate that it is equitable (as required by Section 6(b)(4) of the Exchange Act) or even rational (as required by the Administrative Procedure Act) to explicitly allocate 67% of CAT costs to Industry Members. In fact, there is little explanation as to how the CAT Operating Committee arrived at this figure.[72] For example, there is no suggestion that Industry Members somehow receive 67% of the benefits from CAT, given that it is a system specifically designed for regulators to more effectively conduct market surveillance.[73]

Instead, the CAT Operating Committee makes two main arguments as to why they believe it is appropriate to allocate costs in this manner. *First*, the 2023 Funding Proposal asserts that, since there are many more Industry Members than members of the CAT Operating Committee, Industry Members have "greater financial resources" and therefore should be allocated most of the costs.[74] This line of argument is deeply flawed. As detailed below, the overwhelming majority of Industry Members will pay little to no CAT costs under the 2023 Funding Proposal, even though CAT is designed to facilitate market-wide surveillance across all market participants. Instead, a small group of 20 firms will be responsible for nearly 75% of the total costs allocated to Industry Members. Notably, this outcome is effectively the opposite of what the CAT Operating Committee claims – its members actually outnumber the Industry Members who ultimately will bear most of the costs. The 2023 Funding Proposal fails to explain why it is equitable to allocate approximately 50% of total CAT costs to 20 Industry Members,[75] while only allocating 22% to 24 exchanges.

Furthermore, by facilitating market surveillance and enforcement activities, CAT is a revenue generator for the exchanges. Moreover, Industry Members *already* provide the exchanges a substantial amount of funding for regulatory matters, including through membership fees, registration fees, market data fees, and other regulatory fees. Those fees must be factored into any equitable or rational allocation of CAT costs.

*Second*, the 2023 Funding Proposal asserts that Industry Members should be considered responsible for CAT costs since they "originate market activity" that must be reported to CAT and have adopted business models that "bring [a] level of complexity to the markets."[76] Aside from appearing to penalize Industry Members simply for fostering liquid and efficient securities markets that facilitate capital formation in accordance with the Commission's mission and benefit the exchanges, this line of argument appears to contradict other statements from the CAT Operating

---

[72] *Cf. Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (finding that a "30%" limit was arbitrary and capricious because the agency could not "satisfactor[ily]" explain why it picked that level)

[73] *See, e.g.,* Release No. 34-97530 (May 19, 2023) at 1, available at: https://www.sec.gov/rules/exorders/2023/34-97530.pdf ("2023 Exemptive Order") ("The goal of Rule 613 was to create a modernized audit trail system that would provide regulators with timely access to a comprehensive set of trading data, thus enabling regulators to more efficiently and effectively analyze and reconstruct market events, monitor market behavior, conduct market analysis to support regulatory decisions, and perform surveillance, investigation, and enforcement activities.").

[74] 2023 Funding Proposal at 17104.

[75] *See* Exhibit C of the 2023 Funding Proposal.

[76] 2023 Funding Proposal at 17104.

Committee that suggest the "stringent performance, timelines and operational requirements for processing CAT Data" are significant drivers of overall CAT costs.[77]  In this regard, it is notable that one of the members of the CAT Operating Committee – with intimate knowledge of the CAT budget and expenses – has indicated that the 2023 Funding Proposal does not "transparently or accurately present information regarding the true sources of cost burdens on the CAT." [78]  Furthermore, the CAT Operating Committee's arguments about general market "complexity" would appear to suggest that costs should be more evenly dispersed across Industry Members, instead of being concentrated among a small group of broker-dealers based on volume (by shares).

When taking into account other existing CAT-related costs, such as the implementation costs incurred by Industry Members, it is even clearer that the proposed allocation is not equitable.  In 2016, the Commission estimated that broker-dealers would incur approximately 90% of total CAT-related costs, even if they were not allocated *any* costs for building and operating CAT.[79]  In addition, these Commission figures grossly underestimated implementation costs for larger broker-dealers, in particular, by incorrectly assuming that significant savings would be realized through the retirement of other reporting systems, such as the Electronic Blue Sheet system (which has not transpired).[80]  As a result, Industry Members are already bearing *nearly all* of the total CAT-related costs, at a rate much higher than the Commission estimated in its approval of the 2016 CAT NMS Plan.

The CAT Operating Committee has argued that these implementation costs are not relevant for purposes of the 2023 Funding Proposal, asserting that "[t]here is no precedent for regulatory fees to be determined based on the cost of compliance of the regulated entity."[81]  However, this argument misses the point – the CAT Operating Committee has not shown that allocating billions of dollars in additional costs to Industry Members is equitable and will not negatively impact market efficiency, competition, and capital formation in light of the fact that Industry Members *are already* bearing billions of dollars in CAT-related costs.  In this regard, it is notable that Rule 613 specifically requires consideration of "the costs to members of the plan sponsors, initially and on an ongoing basis, for reporting the data required by the national market system plan" and members of the CAT Operating Committee have previously acknowledged that their decisions regarding how to structure and implement CAT have "a financial impact on the broker-dealers' costs of compliance."[82]  Assessing whether the 2023 Funding Proposal is equitable requires taking into account the allocation of all CAT-related costs, including those already allocated to Industry Members as a result of decisions taken by the CAT Operating Committee in implementing the NMS Plan (without any industry voting representation).

---

[77] 2023 Funding Proposal at 17102.

[78] Letter from FINRA (May 25, 2023) at 4, available at: https://www.sec.gov/comments/4-698/4698-194699-386902.pdf.

[79] 2016 CAT NMS Plan at 84864.

[80] *See* 2016 CAT NMS Plan at 84862.

[81] 2022 CAT Response Letter at 9.  See also 2023 Funding Proposal at 17105.

[82] Letter from Bats Exchange, et al. (Sept. 23, 2016) at FN 30, available at: https://www.sec.gov/comments/4-698/4698-32.pdf ("2016 CAT Response Letter").

2. <u>Allocating Costs Among Industry Members Based On Share Volume Is Inconsistent with the Exchange Act</u>

The 2023 Funding Proposal allocates the costs among Industry Members based on executed volume (by shares). In doing so, the filing asserts that "trading activity provides a reasonable proxy for cost burden on the CAT."[83] However, there is no evidence to substantiate that assertion. Indeed, members of the CAT Operating Committee have also noted other significant drivers of overall CAT costs, such as "message traffic"[84] and the "stringent performance, timelines and operational requirements for processing CAT Data."[85] In addition, one member of the CAT Operating Committee has indicated that, in fact, equities trading volume creates "a relatively low burden on CAT, from a cost-generation perspective, compared to other cost drivers, such as options activity."[86]

Allocating costs based on volume (by shares) leads to several problematic outcomes that are inconsistent with Sections 6(b)(5) and 6(b)(8) of the Exchange Act. *First*, these massive costs would be largely allocated to an extremely small group of broker-dealers, thereby unduly burdening competition. The 2023 Funding Proposal indicates that the top 10 (20) Industry Members would be allocated more than 50% (70%) of total industry costs.[87] There is no consideration of the potential impacts on market competition, efficiency, and liquidity resulting from allocating these costs to such a small group of broker-dealers, particularly since CAT is designed to facilitate market-wide surveillance across all market participants. For example, the section of the 2023 Funding Proposal that purports to analyze the "Impact on Competition" is one paragraph in length and completely silent on this critical point.[88] This omission is particularly glaring given that the CAT Operating Committee now acknowledges that prior funding proposals based on message traffic "could impose an outsized adverse financial impact on certain Industry Members."[89] It is arbitrary for the CAT Operating Committee to recognize this deficiency in past proposals, but yet replicate that error in the current proposal.

The potential for some of these costs to be passed-on by broker-dealers to other market participants does not alleviate the concern. The 2023 Funding Proposal misleadingly suggests that "the two-thirds allocation of CAT costs to Industry Members may be entirely passed through to investors, thereby alleviating Industry Members of any burden of funding the CAT."[90] This

---

[83] 2023 Funding Proposal at 17103.

[84] 2016 CAT Response Letter at 23.

[85] 2023 Funding Proposal at 17102.

[86] Letter from FINRA (Apr. 11, 2023) at FN 23, available at: https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf ("2023 FINRA Letter").

[87] *See* 2023 Funding Proposal at FN 116 and Exhibit C. We note there is also no analysis of the aggregate impact on affiliated entities, which deviates from the approved 2016 CAT NMS Plan requirement to take into account "affiliations between or among CAT Reporters." Section 11.2(c) of the 2016 CAT NMS Plan.

[88] 2023 Funding Proposal at 17122.

[89] 2023 Funding Proposal at 17102.

[90] 2023 Funding Proposal at 17108. *See also* 2023 Funding Proposal at 17103 ("CAT LLC does not believe that the proposal would burden CAT Executing Brokers.").

shockingly inaccurate statement completely ignores the fact that many of the largest broker-dealers will be allocated CAT fees based on their proprietary trading activity (including on-exchange market making), and, therefore, these fees cannot be "passed through to investors." In addition, for those transactions where a broker-dealer may be theoretically able to pass-through the fee to another market participant, there is no consideration of the costs associated with requiring the entire industry to build completely new systems to facilitate such an arrangement nor the expected impact to market volumes (and in particular retail investors) of instituting a new trading expense. The CAT Operating Committee has also stubbornly resisted industry suggestions to allocate fees to the "originating broker" rather than the "executing broker" in order to attempt to streamline the process and more accurately allocate costs to the party originating an order.[91]

*Second*, allocating costs based on volume (by shares) results in arbitrary and unfair outcomes that discriminate against certain market participants. Commenters have noted, for example, that a "100-share transaction in a $2 stock would impose the same fee obligation as a 100-share transaction in a $2,000 stock, despite the 1,000-fold difference in principal value and associated risk transferred."[92] In addition, the 2023 Funding Proposal makes significant adjustments to OTC Equities volumes due to the large number of shares transacted in sub-dollar securities,[93] but no similar adjustment is made for sub-dollar trading activity in NMS stocks.[94] In turn, a fractional share transaction is rounded-up to 1 share, in effect overstating this trading volume. Both of these aspects of the 2023 Funding Proposal discriminate against Industry Members handling retail orders, given the amount of retail activity in sub-dollar stocks and fractional share trading. For example, data shows that approximately 33% of total retail NMS stock trading activity is now in sub-dollar NMS stocks. Once again, the 2023 Funding Proposal does not explain why volume by shares was chosen instead of another metric (such as notional) nor attempt to assess the impact of these inequitable outcomes on specific Industry Members, retail investors, or overall market competition, efficiency, and liquidity.

---

[91] Letter from the CAT Operating Committee Chair (May 18, 2023) at 3, available at: https://www.sec.gov/comments/4-698/4698-191099-378422.pdf.

[92] Letter from Larry Harris (June 21, 2022) at 11, available at: https://www.sec.gov/comments/4-698/4698-20132692-303181.pdf ("Harris Letter").

[93] 2023 Funding Proposal at 17093 ("the Funding Proposal would count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares.").

[94] *See also* Harris Letter at 12 ("Charging fees 100 times smaller for identical-sized transactions for OTC and NMS stocks that trade at the same price unfairly subsidizes the OTC market.").

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

**(ii)    Industry Members Will Also Pay the 11% of CAT Costs Allocated to FINRA**

| Time Period | Industry Members | FINRA | Exchanges | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M |
| Period 4 (2022-23) | 276.5M | 45.5M | 91M | 413M |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

The 2023 Funding Proposal allocates 11% of the costs to build and operate CAT to FINRA, representing at least $115 million in expenses through 2024.  FINRA has clearly indicated that, if this approach is approved, all of these costs will be passed-on to Industry Members.[95]  As a result, at least 78% of the costs to build and operate CAT will be allocated to Industry Members in practice, representing over $800 million in expenses through 2024.

This additional allocation of costs to Industry Members only exacerbates the concerns detailed above, including the inconsistencies with Sections 6(b)(4), 6(b)(5), and 6(b)(8) of the Exchange Act.  In addition, it brings the total industry allocation to the same percentage (78%) set forth in the unlawful 2021 Funding Proposal.[96]  While the CAT Operating Committee now concedes that the 2021 Funding Proposal "may have an adverse effect on competition, liquidity or other aspects of market structure,"[97] it fails to explain why allocating the same percentage of total costs to Industry Members using a different metric – executed share volume – would not be expected to result in similar negative consequences.  Finally, in contrast to suggestions that the 2023 Funding Proposal is "neutral as to the location and manner of execution,"[98] counterparties to off-exchange transactions would be assessed higher fees than on-exchange transactions (if the CAT fee assessed to an exchange is not separately passed-on to Industry Members as discussed below).

---

[95] *See* 2023 FINRA Letter at 7 ("If the Funding Model is approved by the Commission, FINRA intends to file a rule change to increase member fees simultaneous with the filing of any proposed rule change to effectuate the Funding Model.").

[96] *See* 2021 NYSE Letter at 4.

[97] 2023 Funding Proposal at 17102.

[98] 2023 Funding Proposal at 17087.

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

(iii)    **Industry Members May Also Pay the 22% of CAT Costs Allocated to Exchanges**

| Time Period | Industry Members | FINRA | Exchanges | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M |
| Period 4 (2022-23) | 276.5M | 45.5M | 91M | 413M |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

The 2023 Funding Proposal allocates 22% of the costs to build and operate CAT to the exchanges, representing at least $230 million in expenses through 2024. However, despite this purported allocation, the 2023 Funding Proposal suggests that these costs may, nonetheless, be passed-on to Industry Members, stating "each Participant may determine to charge their members fees to fund their share of the CAT fees."[99]

This would be a farcical outcome that renders the proposed allocation methodology meaningless, as Industry Members would be responsible for 100% of the CAT costs, representing at least a billion in expenses through 2024, and many more billions in the future. It would also distort incentives and hinder the prioritization of critical cost-control measures, as the firms governing CAT are not bearing any of the associated costs. It simply cannot be consistent with the requirement to equitably allocate reasonable fees under Section 6(b)(4) of the Exchange Act. As such, it is absolutely critical that the Commission prohibit the exchanges from passing-on (directly or indirectly) their portion of CAT costs to market participants.

---

[99] 2023 Funding Proposal at 17107.

### C. The Types of Costs Proposed to be Allocated to Industry Members are Inconsistent with the Exchange Act

The 2023 Funding Proposal simply groups CAT expenses into broad categories, raising significant questions about the specific types of historical costs that are proposed to be allocated to Industry Members, and the future trajectory of the overall budget. Exchange Act Sections 6(b)(4), 6(b)(5), and 6(b)(8) do not permit this private entity to require Industry Members to provide them with a blank check to fund their costs in perpetuity, as doing so does not represent an equitable allocation of reasonable fees and greatly harms market competition, efficiency, and liquidity.

### (i) The Historical Costs are Clearly Excessive and Inconsistent with the 2016 CAT NMS Plan

| Time Period | Industry Members | FINRA | Exchanges | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M |
| Period 4 (2022-23) | 276.5M | 45.5M | 91M | 413M |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

The 2023 Funding Proposal seeks to allocate hundreds of millions in historical costs to Industry Members through several charts that simply group expenses into broad categories. This lack of cost transparency raises numerous questions regarding the types of costs that are being allocated to Industry Members. Examples include:

- Are Industry Members being allocated any costs relating to when Thesys was the Plan Processor?[100] If so, why? Furthermore, did the original reporting framework designed by Thesys constrain FINRA's design decisions and result in inefficient outcomes?

- Are Industry Members being allocated costs relating to the ongoing litigation between the CAT Operating Committee and the Commission? If so, how does that impact overall governance incentives regarding the implementation and interpretation of the NMS Plan?

---

[100] We note the 2023 Funding Proposal excludes $64 million in costs related to the failed engagement of Thesys, but estimated costs incurred prior to FINRA's tenure are much higher. In addition, FINRA was not formally engaged until Q2 of 2019. *See* Tower Letter at 8.

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

- Are Industry Members being allocated costs relating to the repeated filing of funding models that are not consistent with the Exchange Act?  If so, how does that impact incentives to engage in constructive dialogue with the industry?

These types of questions can only be addressed through the CAT Operating Committee providing a much greater level of cost transparency and prevents the Commission from concluding that the proposed allocation is reasonable as required by Section 6(b)(4) of the Exchange Act.

The proposed allocation of historical costs also raises unique considerations when assessing the impact on Industry Members and overall market efficiency, competition, and capital formation. For example, in contrast to assertions from the CAT Operating Committee,[101] there does not appear to be a clear mechanism to pass-on these costs to other market participants (given that they relate to historical costs rather than current trading activity).  Instead, it is simply an unlawful trading expense that a small group of Industry Members will have to bear.

In addition to these issues, the Proposal inadequately addresses the "Period 4" expenses under the Financial Accountability Milestones contained in the current CAT NMS Plan.  As set forth in the CAT NMS Plan, the CAT Operating Committee cannot recover expenses from Industry Members that were incurred between (a) December 31, 2021 and (b) the date on which full implementation of the CAT NMS Plan requirements is achieved ("Period 4") until such full implementation occurs.[102]  In addition, if such full implementation occurs after December 30, 2022, there are restrictions in terms of the proportion of expenses that the CAT Operating Committee can recover for Period 4.  Given that this deadline has passed and it is now more than 180 days after December 30, 2022, the CAT NMS Plan provides that the CAT Operating Committee can only recover a maximum of 25% of the expenses incurred in Period 4.  If full implementation does not occur before September 27, 2023, then the CAT NMS Plan provides that the CAT Operating Committee cannot recover any of the expenses incurred in Period 4.

However, the 2023 Funding Proposal and recent actions by the CAT Operating Committee and the Commission have introduced significant uncertainty.  *First,* the 2023 Funding Proposal specifically contemplates that the costs incurred during Period 4 may be allocated to Industry Members via additional assessments.[103]  *Second*, the CAT Operating Committee has requested exemptive relief to extend the deadline for full implementation until August 31, 2024 (thereby allowing all of the Period 4 expenses to be allocated to Industry Members under the 2023 Funding

---

[101] 2023 Funding Proposal at 17108.

[102] 85 FR 31322 (May 22, 2020) at 31348, available at:
https://www.federalregister.gov/documents/2020/05/22/2020-10963/amendments-to-the-national-market-system-plan-governing-the-consolidated-audit-trail.

[103] 2023 Funding Proposal at FN 43 ("Note that there may be one or more Historical CAT Assessments, depending upon the timing of any approval of the amendment to the CAT NMS Plan and the completion of the Financial Accountability Milestones.").

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

Proposal).[104]  *Third*, the Commission has reserved judgment on whether the relevant provisions of the CAT NMS Plan will be enforced as written.[105]

The issue is highly relevant to the Commission's analysis of the 2023 Funding Proposal, as Period 4 will likely account for more than $400 million in expenses,[106] all of which may be allocated to Industry Members under this filing if the Commission does not enforce the terms of the current CAT NMS Plan.  In our view, there are three alternatives for the Commission in the context of analyzing the 2023 Funding Proposal:

1.  Clearly state that the relevant financial accountability provisions of the CAT NMS Plan will be enforced as written and permit the CAT Operating Committee to allocate Period 4 expenses only to the extent permitted under those financial accountability provisions under Section 11.3(b) of the CAT NMS Plan (as amended by the 2023 Funding Proposal).  This means that Period 4 expenses would be reduced by at least 75% for purposes of assessing the potential impacts on market efficiency, competition, and capital formation of allocating these costs to Industry Members (and by 100% if full implementation does not occur before September 27, 2023).[107]

2.  Defer judgment regarding whether the relevant financial accountability provisions of the CAT NMS Plan will be enforced as written, but provide that Period 4 expenses cannot be allocated to Industry Members under the 2023 Funding Proposal.  This means expressly carving-out Period 4 expenses from Section 11.3(b) of the CAT NMS Plan (as amended by the 2023 Funding Proposal), and requiring an entirely new CAT NMS Plan Amendment that is specific to Period 4.

3.  Defer judgment regarding whether the relevant financial accountability provisions of the CAT NMS Plan will be enforced as written and permit the CAT Operating Committee to allocate Period 4 expenses under Section 11.3(b) of the CAT NMS Plan (as amended by the 2023 Funding Proposal), in which case the Commission should analyze the potential impacts on market efficiency, competition, and capital formation assuming that all of these Period 4 costs will be allocated to Industry Members.[108]

---

[104] CAT Exemptive Request (May 22, 2023), available at: https://catnmsplan.com/sites/default/files/2023-06/05.22.23-Exemption-Request-Regarding-FAM-4.pdf ("CAT Exemptive Request").

[105] 2023 Exemptive Order at FN 24 ("the Commission makes no determinations regarding the Participants' compliance or non-compliance with the conditions set forth in the prior orders or the potential impact of such compliance or non-compliance on the Participants' ability to meet the Financial Accountability Milestones set forth in Section 1.1 of the CAT NMS Plan or the potential application of fee reduction provisions set forth in Section 11.6 of the CAT NMS Plan").  *See also* 2022 OIP at FN 440

[106] Assumes full implementation of CAT is not achieved until 2024.  *See* CAT Exemptive Request at 9.

[107] Note this assumes the relevant costs could not be passed-on to Industry Members in other ways, such as the exchanges are reserving the right to do for the share of costs purportedly allocated to them under this filing.

[108] If Period 4 expenses can be allocated under Section 11.3(b) of the CAT NMS Plan (as amended by the 2023 Funding Proposal), then this filing is a proposal "related to the imposition of CAT fees on broker-dealers." *See* 2023 Exemptive Order at FN 24.

**A124**

**Section II. The 2023 Funding Proposal Is Not Permitted by the Exchange Act**

As we detailed above in Section II.A(iii), the Commission cannot delay this analysis until a subsequent filing setting forth the billing process is made, as once the Commission approves a methodology for allocating CAT costs (including Period 4), the CAT Operating Committee would simply apply that approved methodology to the costs incurred during a specific time period.

### (ii)    The Trajectory of Annual Operating Expenses Is Unconstrained

| Time Period | Industry Members | FINRA | Exchanges | Total |
|---|---|---|---|---|
| Historical Costs | | | | |
| Pre-2022 | 226.5M | 37M | 74.5M | 338M |
| Period 4 (2022-23) | 276.5M | 45.5M | 91M | 413M |
| | | | | |
| Annual Operating Expenses | | | | |
| Current Budget (2024) | 157M | 25.5M | 51.5M | 234M |
| 25% Reserve (2024) | 39.5M | 6.5M | 13M | 59M |
| | | | | |
| In perpetuity (2025- ) | 67% | 11% | 22% | [?] |
| | | | | |
| **Total** (through 2024) | 699.5M | 114.5M | 230M | **1.04B** |

The 2023 Funding Proposal also does not provide sufficient information regarding the specific drivers of the enormous cost increases witnessed in recent years or estimates regarding the future cost trajectory, further preventing the Commission from concluding that the proposed allocation is reasonable as required by Section 6(b)(4) of the Exchange Act.  Indeed, the CAT Operating Committee's acknowledgment that actual expenses typically exceed budgeted amounts by approximately 20%[109] and data showing that overall CAT expenses have increased by an average of 32% each year under the current Plan Processor[110] cause significant concern about the future trajectory.[111]  In addition, the CAT Operating Committee has indicated that other Commission proposals may significantly increase future CAT budgets.  For example, the CAT Operating Committee has indicated that the Commission's recent Regulation SCI proposal would *double the overall CAT budget* if adopted.[112]

Rather than taking steps to allay these concerns, the 2023 Funding Proposal suggests these overages will continue by requiring Industry Members to fund an additional 25% reserve above budgeted amounts each year.[113]  In addition, the ongoing ad-hoc discussions (and litigation) between the CAT Operating Committee and the Commission regarding the scope of the 2016 CAT NMS Plan raise the specter of significant additional costs resulting from CAT implementation

---

[109] 2023 Funding Proposal at 17090.

[110] *See* Section I.B above.

[111] Based on the average annual increase of 32% over the last 3 years, the CAT operating budget would be more than $1 billion per year by 2030.

[112] *Supra* note 3.  Several of the Commission's recent equity market structure proposals would also be expected to increase the CAT budget as a result of increasing overall message traffic.

[113] 2023 Funding Proposal at 17090.

changes.[114]  The 2023 Funding Proposal offers no overall constraint on costs and, once a single CAT fee filing is approved, it will automatically continue in perpetuity until it is replaced by another one approved by the Commission.[115]

The overall lack of cost discipline and transparency is why the frequent comparisons to other types of fees, such as Section 31 fees, the FINRA trading activity fee ("TAF"), and the options regulatory fee ("ORF"), are misplaced.[116]  Even if the industry was able to develop the infrastructure necessary to pass-on certain of the CAT costs in a manner similar to these other regulatory fees, the total magnitude of CAT fees appears completely unconstrained and entirely out of the industry's control.  In contrast, Section 31 fees are based on an annual budget set by Congress.  FINRA has sought to avoid constant TAF increases, even leaving the TAF rate unchanged for a decade (2012-2022).  And the ORF is only applied to customer transactions, ensuring all of these fees can be passed-on (in contrast to the significant CAT fees proposed to be assessed on market making activity).

There is no precedent for the CAT fees that are proposed to be allocated to Industry Members in perpetuity under the 2023 Funding Proposal.  As the CAT Operating Committee has repeatedly stressed, "CAT LLC is not a governmental entity, with a responsibility to the taxpaying public."[117]  While that may be true, the Exchange Act does not permit this private entity to require Industry Members to provide them with a blank check to fund all of their costs in perpetuity, negatively impacting participants in U.S. securities markets (including retail investors) and harming overall market efficiency, competition, and capital formation.  The 2023 Funding Proposal must be rejected.

---

[114] We note that the CAT Operating Committee has redacted its estimates regarding the impact of these interpretative disputes on overall CAT costs, leaving the industry unable to fully assess the potential ramifications of this litigation.  *See, e.g.,* "Motion for Partial Stay of Order 34-90688," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-688-order.pdf and "Motion for Partial Stay of Order 34-90689," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-689-order.pdf.

[115] 2023 Funding Proposal at 17114 ("it is critical that a CAT Fee remain in place at all times.").

[116] *See* 2023 Funding Proposal at 17087.

[117] 2022 CAT Response Letter at 21.

## III.    The 2023 Funding Proposal is Unconstitutional

The 2023 Funding Proposal purports to allocate over a billion dollars of CAT costs to Industry Members by the end of 2024, and establishes the framework pursuant to which many more billions in costs will be allocated to Industry Members in perpetuity.  As another commenter has detailed (in an argument which we incorporate by reference here),[118] the U.S. Constitution simply does not allow the members of the CAT Operating Committee, acting on behalf of the Commission, to compel Industry Members to pay for a law enforcement tool designed specifically for the Commission's use that has not been authorized by Congress.

Under the Constitution's Appropriations Clause and our government's separation of powers, funding for such a project, concerning core Executive Branch functions, must be appropriated by Congress, not acquired through the backdoor by requiring Industry Members to pay for the Commission's enforcement tool.[119]  Here, Congress has not appropriated funding for anything even resembling what the Commission contemplates.  Nor does the statute confer the authority to impose such a mandate.  Authorizing the Commission to require exchanges to "act jointly"[120] or to facilitate the development of a national market system[121] is a far cry from authorizing the Commission to use the exchanges to establish an incredibly expensive, multi-billion dollar enforcement tool.  For that type of funding, the Commission must go back to Congress and seek an explicit appropriation.  Likewise, Section 11A's terms would have to be amended before the Commission could use a provision intended to facilitate a national market system as a means to burden market participants with the cost of a new enforcement program.

It is clear that CAT is a law enforcement tool for the Commission to employ in pursuit of its governmental functions.[122]  As the Chair of the CAT Operating Committee noted, "the Commission conceived of and ultimately mandated the CAT System to more effectively and efficiently conduct cross-market supervision of trading activity."[123]  Commission staff attend

---

[118] Letter from SIFMA (June 5, 2023) at 7-8, available at: https://www.sec.gov/comments/4-698/4698-199319-399182.pdf.  Others have raised additional Constitutional concerns (*see* https://www.cato.org/commentary/sec-starting-massive-database-every-stock-trade and "Statement of Hester M. Peirce in Response to Release No. 34-88890, File No. S7-13-19" (May 15, 2020), available at: https://www.sec.gov/news/public-statement/peirce-statement-response-release-34-88890-051520).

[119] *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 2023 WL 4239254, at *23 (U.S. June 29, 2023) ("'[W]hat cannot be done directly cannot be done indirectly.'  The Constitution deals with substance, not shadows ….").

[120] 15 U.S.C. § 78k-1(a)(3)(B).

[121] *Id.* § 78k-1(a)(2), (3).

[122] *See, e.g.,* https://www.sec.gov/litigation/litreleases/2022/lr25595.htm.

[123] Simon Testimony at 2.  *See also* 2023 Exemptive Order ("The goal of Rule 613 was to create a modernized audit trail system that would **provide regulators** with timely access to a comprehensive set of trading data, thus enabling regulators to more efficiently and effectively analyze and reconstruct market events, monitor market behavior, conduct market analysis to support regulatory decisions, and perform surveillance, investigation, and enforcement activities.")(emphasis added).  We note that the industry does not even have access to any CAT data (even an anonymized subset).  *See, e.g.,* SIFMA FOIA Request (Feb. 8, 2023), available at: https://www.sifma.org/wp-content/uploads/2023/02/Information-Regarding-the-Data-Relied-upon-by-the-Commission-in-Proposing-Certain-Commission-Rulemaking-Related-to-Market-Structure.pdf.

"nearly all CAT meetings and calls,"[124] and "have played an important role in discussions related to the development of the CAT." [125]  Furthermore, recent orders issued by the Commission, and the litigation initiated by members of the CAT Operating Committee, make clear that, although it is structured as an NMS Plan, the Commission often dictates the scope and technical requirements of the CAT system.[126]

It is important to note that, if approved, this filing is the first one that allocates specific costs relating to the building and operating of CAT to Industry Members, thereby creating a concrete harm.  In approving Rule 613 in 2012, the Commission made clear that it was not specifying key details regarding the creation, implementation, and maintenance of CAT.[127]  As a result, Rule 613 does not set forth how CAT costs would be allocated and the Commission explicitly deferred "its economic analysis of the actual creation, implementation, and maintenance of a consolidated audit trail itself until such time as it may approve the NMS plan submitted to the Commission for its consideration."[128]

In turn, the NMS Plan approved by the Commission in 2016 also omits key details regarding how CAT costs would be allocated.  In its economic analysis of the 2016 CAT NMS Plan, the Commission made clear that the CAT funding model "has not yet been finalized"[129] and "the Funding Model will be filed with the Commission and subject to public comment."[130]  As a result, the Commission's economic analysis did not allocate to Industry Members <u>any</u> costs to build and operate CAT.[131]  Moreover, the costs contemplated by the 2023 Funding Proposal are not even in the ballpark of the costs contemplated in either 2012 or 2016.

The 2023 Funding Proposal provides the details that were lacking in Rule 613 and the 2016 CAT NMS Plan regarding concrete costs to the industry relating to the building and operating of CAT.  Those details involve Industry Members providing the CAT Operating Committee with a blank check to fund 100% of costs in perpetuity for a law enforcement tool designed specifically for the Commission that has not been authorized by Congress.  The 2023 Funding Proposal is unconstitutional.

---

[124] Simon Testimony at 6.

[125] *Id.*

[126] *See, e.g.,* Release No. 34-90688 (Dec. 16, 2020), available at: https://www.sec.gov/rules/exorders/2020/34-90688.pdf; Release No. 34-95234 (July 8, 2022), available at: https://www.sec.gov/rules/exorders/2022/34-95234.pdf; 2023 Exemptive Order; "Motion for Partial Stay of Order 34-90688," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-688-order.pdf and "Motion for Partial Stay of Order 34-90689," available at: https://www.sec.gov/rules/other/2022/34-95235-motion-for-stay-of-689-order.pdf.

[127] *See, e.g.,* Rule 613 at 45802.

[128] Rule 613 at 45802.

[129] 2016 CAT NMS Plan at 84804.

[130] 2016 CAT NMS Plan at 84881.

[131] *See* Table 5 at 2016 CAT NMS Plan at 84864.

## IV.  **The Commission Must Consider Reasonable Alternatives**

As detailed above, the 2023 Funding Proposal is inconsistent with the Exchange Act and must be rejected by the Commission similar to the prior four funding proposals.  It is clear that allowing the CAT Operating Committee to continue to unilaterally file funding proposals that do not reflect input from either the Commission or the industry is not constructive.  As such, we urge the Commission to take urgent action to safeguard overall market efficiency, competition, and capital formation.  Below, we set forth several suggestions for consideration designed to address issues identified above.

### A.  Achieving A More Equitable Cost Allocation

The methodology for allocating costs between industry members and the SROs is the single most important commercial element of the funding proposals.  In our view, the members of the CAT Operating Committee have not adequately taken into consideration the enormous implementation costs already borne by Industry Members.

### (i)  Prospective Costs

Any allocation of costs to Industry Members should be done pursuant to the "originating broker" model put forward by SIFMA in order to attempt to streamline the process and more accurately allocate costs to the party originating an order (instead of the "executing broker" model contained in this filing).[132]

Taking into account the considerations discussed in Section II above, including (i) the lack of industry voting representation in CAT governance and (ii) the fact that Industry Members are already bearing nearly all of the total CAT-related costs,[133] in no event should Industry Members be allocated more than 50% of ongoing CAT costs (including any allocation to FINRA).

In addition, the exchanges should be expressly prohibited from passing-on (directly or indirectly) their portion of CAT costs to market participants.  For example, exchanges should not be permitted to circumvent the access fee cap under Regulation NMS by introducing new transaction-based fees in order to recoup their portion of CAT costs.

The allocation methodology should also be improved to ensure that (a) a small group of firms are not disproportionately bearing costs given that CAT is designed to facilitate market-wide surveillance across all market participants and (b) specific market segments, such as retail trading activity in NMS stocks, are not subject to an inequitable allocation.  A more thoughtful approach could include: (I) minimum and maximum fee levels, (II) appropriate calibrations for liquidity provision, (III) a volume component based on notional (instead of executed shares), and (IV) consideration of additional metrics that could achieve a more equitable outcome (e.g. broker-dealer capital).  In addition, the approach of separately bucketing exchanges and Industry Members before allocating a pre-determined percentage of total costs appears to result in more arbitrary

---

[132] *See* Letter from SIFMA (June 5, 2023) at 5, available at: https://www.sec.gov/comments/4-698/4698-199319-399182.pdf ("the broker that originated the order" should be assessed any CAT fee).

[133] 2016 CAT NMS Plan at 84864 (estimating that broker-dealers would incur approximately 90% of total CAT-related costs).

outcomes than simply applying a consistent methodology to both exchanges and Industry Members.

> **Recommendations:**
>
> - Any allocation of costs to Industry Members should leverage the "originating broker" model.
> - Allocation split:
>     - In no event should Industry Members be allocated more than 50% of ongoing CAT costs (including any allocation to FINRA).
>     - Prohibit the exchanges from passing-on (directly or indirectly) their portion of CAT costs.
>     - Consider allocating a portion of costs to the Commission to align incentives.
> - Allocation methodology:
>     - Disperse costs more evenly across Industry Members.
>     - Ensure specific market segments are not subject to an inequitable allocation (e.g. retail).

### (ii)    Historical Costs

In our view, it is inequitable to allocate *any* historical costs to Industry Members for several reasons. *First*, Industry Members are already bearing *nearly all* of the total CAT-related costs. For years, industry members have faced a near-constant barrage of changing technical specifications that have frequently and materially changed through the various implementation phases.[134]  In 2016, the Commission estimated that broker-dealers would incur approximately 90% of total CAT-related costs, even if they were not allocated *any* costs for building and operating CAT.[135]  Updating these estimates would show that this figure materially underestimates the total costs already being borne by broker-dealers.

*Second,* the historical bucket of costs contains many that are simply inappropriate to allocate to Industry Members.  For example, the industry should not be paying any costs related to Thesys' stint as Plan Processor (including costs related to transitioning a project of this size and complexity to a new plan processor), nor should the industry be funding the CAT Operating Committee's litigation against the Commission or the various prior unlawful funding proposals.

*Third,* as noted above, the CAT NMS Plan specifies that the CAT Operating Committee can only recover a maximum of 25% of the expenses incurred in Period 4.  If full implementation does not occur before September 27, 2023, then the CAT NMS Plan provides that the CAT Operating Committee cannot recover any of the expenses incurred in Period 4.

---

[134]  We note that there have been significantly more changes to the industry member technical specifications than to the participant specifications.  *Compare* https://www.catnmsplan.com/specifications/participants and https://www.catnmsplan.com/specifications/im.

[135] 2016 CAT NMS Plan at 84864.

*Fourth,* it appears challenging for the CAT Operating Committee to allocate historical costs in a way that is directly tied to historical activity, which makes it more difficult for Industry Members to pass-on these costs to other market participants.

*Finally*, as another commenter has explained, it is manifestly inequitable to "force the Industry Members to pick up the historical costs for a mismanaged project over which they had no control or decision-making authority."[136]

> **Recommendation:**  Industry Members should not bear historical costs.

### (iii)   Other Allocation Suggestions

To further incentivize cost control, the exchanges should be responsible for any costs over the approved budget.

In addition, Industry Members should not be allocated costs for matters that primarily benefit the CAT Operating Committee or the SROs, such as costs related to ongoing litigation or filings that are inconsistent with the Exchange Act.  Industry Members should also not be allocated costs relating to how data is presented to, and used by, regulatory Staff at the SROs or the Commission.  Finally, any change requests relating to CAT that do not involve specific NMS Plan requirements should be allocated directly to the requestor, including the Commission.  For example, change requests related to the graphical user interface, application programming interface, or similar should be charged directly to the requesting party.

> **Recommendations:**
> - Exchanges should be responsible for any costs over the approved budget.
> - Exclude costs for matters/functionality/change requests specific to the SROs or Commission.

### B.  Key CAT Enhancements

In order to address the spiraling costs associated with operating CAT, any funding proposal should be coupled with structural enhancements designed to improve overall CAT governance and implementation.

### (i)    Reducing Overall CAT Operating Costs

The CAT Operating Committee and the Commission should cease making any further changes to the CAT at this time in order to stabilize operating costs.  We understand that there are several changes that are currently subject to exemptive relief that are slated for development, including (i) interim order IDs; (ii) assignment of new CAT IDs for post T+5 error corrections; (iii) linkages

---

[136] Letter from Virtu Financial (June 22, 2022) at 4, https://www.sec.gov/comments/4-698/4698-20132715-303206.pdf.

of customer and representative orders; (iv) port-level settings; (v) lifecycle linkages; and (vi) a one-minute query requirement.  Additional requirements arguably outside the scope of the approved NMS Plan, such as the reporting of non-actionable RFQ responses and the collection and reporting of price negotiations done via verbal and unstructured communications, continue to be promulgated by Commission staff.    We understand that many of these items will result in significant additional implementation costs that outweigh any benefit (and, therefore, the NMS Plan should be amended to clarify these are not required).

In addition, the CAT Operating Committee should work with the Commission and the industry to identify technical requirements that should be modified through an NMS Plan amendment to materially reduce costs without sacrificing key benefits of the CAT system (e.g. moving certain timelines to T+2 from T+1).

Finally, concrete steps should be taken to streamline the CAT submission process, thereby minimizing reporting errors and reducing industry implementation costs.  For example, additional data validations and reporting guidance should be implemented.

---

**Recommendations:**

- Cease from making further changes to the CAT at this time.  The CAT Operating Committee should file an updated NMS Plan to reflect the current *status quo*.

- Identify technical requirements that should be modified to materially reduce costs without sacrificing key benefits (e.g. moving certain timelines to T+2 from T+1).

- Further streamline the CAT submission process (e.g. implementing further data validation).

---

### (ii)    Improving CAT Governance and Budget Transparency

#### 1.  Independent Cost Review Mechanisms

The CAT Operating Committee has provided only minimal information regarding the CAT costs that are proposed to be allocated to Industry Members.  Given the spiraling costs and the exchanges' proposal to pass-on most (if not all) of CAT-related costs to Industry Members, additional independent reviews are warranted, both by an independent expert committee and by the Commission.  The independent expert committee should assess whether current cost levels and third-party arrangements are reasonable, as well as whether any additional cost-control measures are warranted.

---

**Recommendations:**

- An independent expert committee should review the CAT budget on an annual basis (including assessing whether current cost levels and third-party arrangements are reasonable).

- The Commission should formally approve the CAT budget on an annual basis.

---

Page 33 of 35

**A132**

- All CAT operating budgets should remain published on the CAT website.[137]

### 2. Advance Notice of Material Changes to the CAT System and Related Costs

Though CAT is operated by the securities exchanges and FINRA pursuant to an NMS Plan, there have nevertheless been many ad-hoc discussions between the CAT Operating Committee and the Commission regarding what is required by the NMS Plan without adequate notice to Industry Members or due consideration of the costs and benefits associated with such interpretations. Going forward, any material change to the CAT system, related technology contracts, or implementation scope should require the filing of an NMS Plan amendment. Any amendment should articulate why a change is necessary and include a robust cost-benefit analysis. This process should ensure that industry members are afforded with all material information and an opportunity to comment.

> **Recommendation:** Any material change should require an NMS Plan amendment, including a cost-benefit analysis.

### 3. Fairer Voting Rights

As detailed above, exchange groups with multiple affiliated exchanges have significant influence under the current voting structure. At a minimum, the Commission should take similar measures with respect to CAT governance as it did regarding the governance of consolidated equity market data.[138] Specifically, voting rights should be allocated so that each exchange group and national securities association has one vote on the operating committee, with a second vote provided if the exchange group or national securities association has a market center or centers that trade more than 15 percent of consolidated equity and options market share. Furthermore, all actions by the CAT Operating Committee relating to funding should require authorization by a Supermajority vote.

More fundamentally, the Commission should address the fact that Industry Members lack even a single representative on the CAT Operating Committee, even though Industry Members are expected to bear a significant portion of overall CAT costs. Logic would dictate that Industry Members should have voting representation commensurate with any costs allocated to them. To the extent appropriate industry representation cannot be achieved through the NMS Plan governance process, it further exposes that an NMS Plan is not the appropriate vehicle to govern CAT.

> **Recommendations:**
> - Allocate voting rights similar to the NMS Plan for consolidated equity market data.
> - All actions relating to funding should require authorization by a Supermajority vote.

---

[137] Note that, at the moment, only the current and immediately prior annual budget appear to be available.

[138] Order Directing the Exchanges and the Financial Industry Regulatory Authority To Submit a New National Market System Plan Regarding Consolidated Equity Market Data, 85 Fed. Reg. 28702 (May 13, 2020).

- Provide Industry Members with voting representation commensurate with any costs allocated.

4. Data Security

The Commission should prioritize addressing the significant data security concerns associated with the CAT. Plan amendments designed to enhance data security were proposed in 2020, but have still not been finalized.[139]

**Recommendation:** Finalize the data security plan amendments to address CAT-related data security concerns.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

Respectfully,

/s/ Stephen John Berger

Managing Director

Global Head of Government & Regulatory Policy

---

[139] Proposed Amendments to the National Market System Plan Governing the Consolidated Audit Trail To Enhance Data Security, 85 Fed. Reg. 65990 (Oct. 16, 2020).

Page 35 of 35

A134

# Tab H

Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (July 28, 2023)

**VIA EMAIL (rule-comments@sec.gov)**

July 28, 2023

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

> Re:    <u>File Number 4-698 – Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail regarding CAT Funding Model</u>

Dear Ms. Countryman:

      On March 13, 2023, the Consolidated Audit Trail, LLC ("CAT LLC" or "Company"), on behalf of the Participants[1] in the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan" or "Plan"), filed with the Securities and Exchange Commission ("SEC" or "Commission") a proposed amendment to the CAT NMS Plan.[2]  The SEC published the proposed amendment for comment on March 15, 2023.[3]  The proposal would amend the CAT NMS Plan[4] to implement a revised funding model ("Funding Proposal") for the consolidated audit trail ("CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[5]  Commenters submitted three comment letters in response to the Proposing Release,[6] and on May 18, 2023, CAT LLC submitted a letter responding to the topics raised in those comment letters, including (i) charging CAT fees to CAT Executing Brokers, (ii) the allocation of CAT costs among Industry Members and Participants, (iii) cost transparency, (iv) the implementation process for CAT fees, (v) collaboration with the industry regarding CAT fees, and (vi) CAT costs for 2022.[7]  SIFMA and FINRA submitted second comment letters on the Funding Proposal on June 5, 2023 and May 25, 2023,

---

[1]     The twenty-five Participants of the CAT NMS Plan are:  BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc. ("FINRA"), Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc. and NYSE National, Inc.

[2]     Letter from Brandon Becker, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Mar. 13, 2023).

[3]     Securities Exchange Act Release No. 97151 (Mar 15, 2023), 88 Fed. Reg. 17086 (Mar. 21, 2023) ("Proposing Release").

[4]     The Limited Liability Company Agreement of Consolidated Audit Trail, LLC is the CAT NMS Plan.

[5]     Unless otherwise defined herein, capitalized terms are defined as set forth in the CAT NMS Plan and the Proposing Release.

[6]     *See* Letters to Vanessa Countryman, Secretary, SEC from Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, FINRA (Apr. 11, 2023) ("FINRA Letter I"); Timothy Miller, Chief Operating Officer, DASH Financial Technologies LLC (Apr. 11, 2023) ("DASH Letter I"); Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA (May 2, 2023) ("SIFMA Letter I").  The comment letters submitted in response to the Proposing Release are available at https://www.sec.gov/comments/4-698/4-698-a.htm.

[7]     Letter from Brandon Becker, Chair, CAT Operating Committee, to Vanessa Countryman, Secretary, SEC (May 18, 2023) ("First Response to Comments").

Ms. Vanessa Countryman
July 28, 2023
Page 2

respectively.[8]  On June 16, 2023, the SEC instituted proceedings to determine whether to approve or disapprove the Funding Proposal ("OIP").[9]  Six additional comment letters were submitted in response to the OIP.[10]  CAT LLC submits this letter to respond to the topics raised in the comment letters to date.  CAT LLC notes that the responses set forth in this letter represent the consensus of the Participants, but that all Participants may not fully agree with each response set forth in this letter.

        To date, the significant economic costs of building and operating the CAT—more than $500 million through the end of 2022 and growing—have been borne entirely by the Participants.  Over the past seven years, CAT LLC has gone through an extensive process of evaluating and seeking comment on various funding models.  The Funding Proposal is now the fourth fee model proposal under consideration by the Commission and, given its similarity to the immediately preceding funding proposal, effectively has been subject to public comment for more than 400 days.

        The record is robust and a Commission vote on the Funding Proposal is clearly appropriate at this stage.  The continued funding of the CAT solely by the Participants was and is not contemplated by the CAT NMS Plan or Rule 613, nor is it a financially sustainable approach.  The Funding Proposal provides for an equitable allocation of reasonable dues, is not unfairly discriminatory and does not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act.  The Funding Proposal should be approved by the Commission without further delay.

## I.    Allocation of CAT Fees to CAT Executing Brokers

        Under the Funding Proposal, CAT Fees would be assessed on a given transaction to the CAT Executing Broker for the Buyer ("CEBB"), the CAT Executing Broker for the Seller ("CEBS"), and the associated Participant.  Several commenters continue to argue that CAT fees should be allocated to the Industry Member originating the order (the "originating broker"),

---

[8]      *See* Letters to Vanessa Countryman, Secretary, SEC from Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA (June 5, 2023) ("SIFMA Letter II"); Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, FINRA, to Vanessa Countryman, Secretary, SEC (May 25, 2023) ("FINRA Letter II").

[9]      Securities Exchange Act Release No. 97750 (June 16, 2023), 88 Fed. Reg. 41142 (June 23, 2023) ("Order Instituting Proceedings").

[10]     *See* Letters to Vanessa Countryman, Secretary, SEC from Douglas A. Cifu, Chief Executive Officer, Virtu Financial (July 13, 2023) ("Virtu Letter"); Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA (July 13, 2023) ("SIFMA Letter III"); Timothy Miller, Chief Operating Officer, DASH Financial Technologies LLC (July 13, 2023) ("DASH Letter II); Kirsten Wegner, Chief Executive Officer, Modern Markets Initiative (July 13, 2023) ("MMI Letter"); Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities (July 14, 2023) ("Citadel Letter"); Joanna Mallers, Secretary, FIA Principal Traders Group (July 14, 2023) ("FIA Letter").  CAT LLC notes that several of these letters include comments that are beyond the scope of the proposed amendment and that may not be addressed in this response.

Ms. Vanessa Countryman
July 28, 2023
Page 3

rather than the CAT Executing Broker as defined in the Funding Proposal.[11]  Another commenter argues that clearing firms, not CAT Executing Brokers, are best suited to handle operational issues associated with the collection of CAT fees.[12]

CAT LLC previously responded to these proposals at length in its First Response to Comments.[13]  For the reasons discussed below, as well as those in the Proposing Release, CAT LLC continues to support charging CAT Executing Brokers over the "originating broker" proposal.  In particular, based on a deep understanding of the CAT System and an analysis of alternative approaches, CAT LLC disagrees with the assertion that charging "originating brokers" a CAT fee would be simpler and easier to implement than the proposed use of the CAT Executing Broker.  As previously described, charging the "originating broker" would be difficult to implement and increase the costs of implementing CAT fees, whereas charging CAT Executing Brokers is simple, straightforward and in line with existing fee and business models, and the concept is not new or novel.[14]  In addition, as previously described, an allocation to the "originating broker" as SIFMA now recommends would not include Industry Members involved in the routing or execution of orders that were not also originating brokers.[15]  Some of the largest Industry Members are not involved in the origination of orders or originate few orders in relation to their overall market activity.  Moreover, under SIFMA's proposal, "originating brokers" would need to establish processes for paying CAT fees and, if they so choose, to pass-through the fees to their clients, similar to CAT Executing Brokers.  For these reasons, CAT LLC continues to support charging CAT Executing Brokers.

As previously described in the First Response to Comments, under the Funding Proposal, CAT LLC proposes to charge CAT fees to CAT Executing Brokers.  As a result, CAT Executing Brokers have the obligation to pay such fees under the Funding Proposal.  The Funding Proposal, however, does not prescribe any particular process for the payment of such fees, that is, whether the CAT Executing Broker itself pays the CAT fees, or a clearing firm, or other third party, would pay such CAT fees on behalf of the CAT Executing Broker.[16]

A.    Compatibility with CAT System

As described in the Proposing Release, one of CAT LLC's objectives is to establish a funding model that is "simple to understand and implement."[17]  Contrary to SIFMA's assertions, identifying the "originating broker" on an executed trade based on an evaluation of CAT

---

[11]    *See* Citadel Letter at 30; SIFMA Letter II at 5; Virtu Letter at 4-6.  Specifically, SIFMA would define the "originating broker" as "the broker-dealer that first reported to CAT an associated order that resulted in the transaction (e.g., 'MENO' or 'MONO' events under the CAT Reporting Technical Specifications for Industry Members)."  SIFMA Letter I at 5.

[12]    DASH Letter II at 1-2.

[13]    First Response to Comments at 2-6; 11-12.  *See also* Letter from Mike Simon, CAT NMS Plan Operating Committee Chair Emeritus, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 6.

[14]    First Response to Comments at 4-5.

[15]    *Id.*

[16]    *Id.* at 11-12.

[17]    Proposing Release at 17103.

Ms. Vanessa Countryman
July 28, 2023
Page 4

linkages and allocating CAT costs to that "originating broker" introduces far more complexity than one that charges the CAT Executing Broker.

Under the Funding Proposal, for any given trade (buy or sell), the CAT Executing Broker can be readily, consistently and accurately identified.[18]  As such, charging the CAT Executing Broker is simple and straightforward, and leverages a one-to-one relationship between billable events (trades) and billable parties.  This information is readily identifiable in CAT trade records as the broker's identity is a required field in the relevant trade records.

In contrast, SIFMA's most recent proposal to charge the "originating broker" presents several challenges to consistently and accurately assessing CAT fees.  The first challenge is the dependency on linkages reported to CAT to identify the originating broker(s) for each executed trade.  While CAT linkage rates are generally very high, they are not 100% accurate, and there will always be trades for which CAT is unable to accurately identify and bill the originating broker(s) (for example, in the case of a disconnected OMS/EMS where linkage is not possible).[19] In addition to creating challenges relating to consistently and accurately assessing CAT fees, this dependency on linkages may create the wrong financial incentives by associating linkage errors with the avoidance of CAT fees.  Another significant challenge involves the aggregation and disaggregation of orders from multiple originating brokers that occurs during certain workflows. For example, an executing broker may receive multiple orders from multiple introducing brokers, aggregate those orders into a single aggregated order, then route multiple child orders to various venues where they receive executions at various prices.  This aggregation/disaggregation complexity not only introduces dependency on accurate linkages reported by Industry Members, which as noted above are not 100% accurate, but also requires CAT to determine how many shares of any given executed trade subject to the CAT fee should be allocated to each introducing broker participating in the execution.  Each trade must be analyzed in conjunction with other CAT order events (e.g., Order Fulfillment, Allocation events) to determine how much of any given execution was allocated to a particular introducing broker.  Such analysis introduces complex programming to the billing process.  While CAT is indeed designed to capture and unwind complex aggregation scenarios, the data and linkages are structured to facilitate regulatory use, not as a billing mechanism to assess fees on a distinct set of executed trades; it is not simply a matter of using existing CAT linkages.  In contrast to the "originating broker" model, the CAT Executing Broker model does not introduce these dependencies and allows for consistent and accurate identification of each CAT Executing Broker and the executed share quantity to be billed to each CAT Executing Broker.

---

[18]    For a description of the relevant specific fields, *see* Proposing Release at 17088.
[19]    The Commission has noted that the CAT is unable "to create lifecycles in certain representative order scenarios where Industry Members do not have a systematic or direct link between their order management systems and execution management systems," and that this "breaks order event lifecycles, because regulatory users would not be able to recreate these parts of the order event lifecycles on their own."  *See* Securities Exchange Act Release No. 95234 (July 8, 2022), 87 Fed. Reg. 42247, 42256 (July 14, 2022).

Ms. Vanessa Countryman
July 28, 2023
Page 5

###### B. Ease of Payment/Pass-Through for Industry Members

CAT LLC understands that it proposes to introduce a new transaction-based fee to the industry. Any funding model will involve some administrative cost on Industry Members to determine whether and, if so, how they might choose to pass through fees to their clients. Although charging a transaction-based fee is not new or novel for the industry, like any new transaction fee, CAT fees will naturally require the industry to understand the fee and to adopt processes regarding the CAT Fee, which may include passing through some comparable fee to others if they choose to do so. The Plan Processor is building a billing warehouse that will contain every trade, and plans to make available trade-by-trade data to CAT Executing Brokers for each CAT bill upon request. Such data may assist CAT Executing Brokers with identifying and validating the applicable trades for each CAT bill. In addition, the Plan Processor is developing a detailed training program to assist CAT Executing Brokers to understand their CAT bills. Again, this approach of assessing a transaction-based fee to an executing broker and an executing broker making some decision on whether and how to pass through any portion of the associated cost to its clients is not new or novel.

In addition, commenters have raised questions about how the Funding Proposal could create difficulties in reconciling the amount that the CAT Executing Broker would be required to pay per transactions with the amount that may be passed on to their clients. The Funding Proposal only places a payment obligation on CAT Executing Brokers. The Funding Proposal does not address whether or the manner or extent to which CAT Executing Brokers may seek to pass any such CAT costs on to their customers. Accordingly, CAT Executing Brokers have discretion as to whether and the manner and extent to which they pass on their CAT costs, if at all. For example, a CAT Executing Broker could round up its fees to the nearest cent, or decide to charge for, or not charge for, certain transactions, or assess a specific fee or incorporate the costs into other fee programs. Indeed, this type of discretion has been recognized for almost 20 years and is regularly exercised by broker-dealers that have determined to pass through fees to their customers related to the sales value fees they are assessed by national securities exchanges and associations for their Section 31 fee obligations to the SEC.[20]

## II. Allocation of CAT Costs to Industry Members

Several commenters reiterate prior objections to the proposed allocation of CAT costs between Industry Members and Participants (*i.e.*, one-third to the CAT Executing Broker for the Buyer, one-third to the CAT Executing Broker for the Seller, and one-third to the Participant associated with each transaction).[21]

---

[20]    *See, e.g.*, Securities Exchange Act Release No. 49928 (June 28, 2004), 69 Fed. Reg. 41060, 41072 (July 7, 2004) (noting that broker-dealers may "over-collect" Section 31-related fees charged to their clients due to rounding practices, and double-counting with regard to certain transactions).
[21]    Citadel Letter at 16-22; FIA Letter at 2-3; SIFMA Letter II at 2-3; Virtu Letter at 4.

Ms. Vanessa Countryman
July 28, 2023
Page 6

CAT LLC has previously responded to these objections several times, including in the First Response to Comments,[22] the Proposing Release,[23] and each of the prior responses to comments.[24] CAT LLC continues to believe that the proposed allocation of CAT costs among Industry Members and Participants associated with each transaction satisfies the requirements of the Exchange Act for the reasons below and other reasons discussed in detail in the Proposing Release.

### A. Justifications for Proposed Allocation

### 1. Complexity and Diversity of Industry Member Activity

As previously described, CAT LLC believes that Industry Members' chosen business models and their resulting trading activity are substantial drivers of CAT costs, and that, accordingly, it is reasonable to allocate a portion of the CAT cost to Industry Members (*i.e.*, one-third to CEBBs and one-third to CEBS, for a total of two-thirds to Industry Members), among other reasons.[25] SIFMA, however, argues that Participant activity is similarly complex, and, therefore, Industry Member complexity should not be a basis for the two-thirds allocation to Industry Members.[26] This argument fails to recognize that the analysis is based on the effects of the business models *on the costs of the CAT*, not on the complexity of the market generally.

In its second comment letter, SIFMA concedes that Industry Members have implemented complex order "routing strategies designed to optimize exchange fees and rebates," but argues that the complexity and costs imposed on CAT by these business decisions are in fact attributable to "the exchanges' business decisions to establish these and other types of exchange fee structures."[27] SIFMA provides no analysis to demonstrate a causal connection between exchange fee structures and CAT costs. CAT LLC believes that Industry Members are solely responsible for their own business decisions, which CAT LLC had no role in designing or implementing, and a substantial portion of CAT costs originate directly from these business decisions. The complexity of Industry Member activity adds significantly to the cost of the CAT in a way that Participant activity does not. Moreover, a Participant would also pay the same amount as each CEBB and CEBS for each transaction.[28]

---

[22]  First Response to Comments at 6-8.
[23]  Proposing Release at 17104-6.
[24]  *See, e.g.*, Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Nov. 15, 2022) at 26-30 ("Response to OIP").
[25]  *See, e.g.*, First Response to Comments at 6-8; Proposing Release at 17104-06; Response to OIP at 26-30.
[26]  SIFMA Letter I at 6-7.
[27]  SIFMA Letter I at 7.
[28]  For comparison, under the Section 31 of the Exchange Act, the exchanges and FINRA are assessed fees by the SEC on sell-side transactions; in turn, in accordance with SRO rules, these fees are passed-through 100% via sales value fee programs of each of the exchanges and FINRA to their members for the same sell-side transactions (*i.e.*, sell-side broker-dealers pay 100% of the fee under the current structures). It would seem to be very difficult to reconcile how the allocation under that funding model, which has been in operation for a significant period time, is fair and reasonable and consistent with the requirements of the Exchange Act but the allocation under the Funding Proposal would not be.

**A140**

Ms. Vanessa Countryman
July 28, 2023
Page 7

The complexity and diversity of Industry Members' chosen business models and order handling practices contributes substantially to the costs of the CAT.

- <u>Diverse Industry Member Market Activity</u>.  In light of the complexity of Industry Member market activity, the CAT's technical documentation must address hundreds of scenarios for Industry Members, including, for example, scenarios related to representative orders, internal routing, order modification, order cancellation, ATS scenarios, OTC scenarios, foreign scenarios, child orders, proprietary orders, fractional shares, stop and conditional orders, RFQs, floor activity and more.  For example, in light of the complexity of Industry Member market activity, the CAT's order reporting and linkage scenarios document for Industry Members is over 800 pages in length, addressing nearly 200 scenarios.[29]  The processing and storage of data related to such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs.  In contrast, Participants do not bring this level of complexity to the markets.

- <u>Late Data and Corrections</u>.  Industry Members have far more late data and corrections than Participants.  The linker costs related to late data and corrections are significant.

- <u>Customers</u>.  Unlike Participants, Industry Members have customers (as such term is defined in Rule 613(j)(3)).  Customers lead to CAT costs related to FDIDs, CCIDs and CAIS, as well as varied investment strategies required by customers.

In contrast, the Participants do not originate market activity or orders or otherwise bring this level of complexity to CAT reporting.  Although there are unique trading features across the different exchanges, such exchange features are not nearly as diverse as the ways in which Industry Members execute trades.

### 2.    Ability to Pay

SIFMA continues to object to CAT LLC taking into consideration the Participants ability to pay CAT fees in proposing the 1/3, 1/3, 1/3 allocation.[30]  Yet, the Exchange Act specifically requires such fees to be fair and reasonable.  Accordingly, CAT LLC believes that fairness issues require the Participants to consider the greater financial resources of Industry Members as one factor in creating a funding model.  There are only 25 Participants and approximately 1100 Industry Members, and the Participants represent approximately 4% of the total CAT Reporter revenue while Industry Members represent 96% of the total CAT Reporter revenue.  Moreover, SIFMA's position is at odds with its own comments asserting that an Industry Member's ability to pay is an important consideration in the context of CAT fees.  For example, SIFMA

---

[29]    *See* CAT Industry Member Reporting Scenarios v.4.10 (Oct. 21, 2022), https://catnmsplan.com/sites/default/files/2022-10/10.21.22_Industry_Member_Tech_Specs_Reporting_Scenarios_v4.10_CLEAN.pdf.

[30]    SIFMA Letter I at 7.

**A141**

Ms. Vanessa Countryman
July 28, 2023
Page 8

previously objected to prior CAT funding model proposals, arguing that the proposed CAT fees "would create a significant burden on smaller ATSs,"[31] or on market makers.[32]

### 3.    Allocation Based on Cost

SIFMA also continues to object to the proposed allocation of CAT costs because it "is inconsistent with the historical CAT decision to allocate costs to the parties responsible for generating them."[33] In making this statement, SIFMA references Section 11.2 of the CAT NMS Plan. Neither Section 11.2 of the CAT NMS Plan nor other sections of the CAT NMS Plan require CAT LLC to allocate CAT costs "to the parties responsible for generating them." Nevertheless, as discussed in the Proposing Release, the Funding Proposal incorporates the concept of the cost burden on the CAT in at least two ways. First, as discussed above, the allocation of CAT costs contemplates the effect of Industry Member activity on the cost of the CAT. Second, because trading activity provides a reasonable proxy for cost burden on the CAT, trading activity is an appropriate metric for allocating CAT costs among CAT Reporters. Moreover, there are several examples of other trading activity-based fees, so the model being contemplated is not novel or unique.

### B.    Pass-Through of CAT Costs

### 1.    Pass-Through by Industry Members to Their Customers

Several commenters mistakenly assert that, to the extent each Participant may determine to pass-through their CAT-related costs to Industry Members, then Industry Members would bear 100% of CAT costs.[34]

CAT LLC has previously addressed this argument at length.[35] Specifically, these comments fail to recognize the basic fact that Industry Members may determine to pass their CAT fees through to their own customers, just as they do with Section 31-related fees and other fees.[36] It is common practice in the industry for broker-dealers to pass transaction-based fees through to their clients. Accordingly, the two-thirds allocation of CAT costs to Industry Members may be entirely passed through to investors, thereby alleviating Industry Members of any burden of funding the CAT. In this regard, a former member of the Advisory Committee for the CAT and the former Chief Economist of the Commission has previously argued, "[b]ecause the markets for exchange, dealing, and brokerage services are all highly competitive in the long

---

[31]    Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, and Ellen Greene, Managing Director, Financial Services Operations, SIFMA, to Brent J. Fields, Secretary, SEC (June 6, 2017) at 4.

[32]    *See, e.g.,* Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, SIFMA, to Brent J. Fields, Secretary, SEC (July 28, 2017) at 4-6.

[33]    SIFMA Letter I at 7.

[34]    Citadel Letter at 16, 22; FIA Letter at 2.

[35]    *See, e.g.*, Proposing Release at 17103, 17106-07; First Response to Comments at 4; Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 26.

[36]    *See supra* note 20 (noting that broker-dealers not only pass-through but often over-collect these fees from customers).

Ms. Vanessa Countryman
July 28, 2023
Page 9

run, any fees imposed on any of these groups will ultimately pass through to the retail and institutional traders who use the markets."[37]

## 2.    Pass-Through by Participants to Industry Members

Relatedly, several commenters argue that the Participants should be prohibited from passing-on any portion of CAT costs, directly or indirectly, to their members.[38]

As previously discussed,[39] each Participant may determine to charge their members fees to fund their share of the CAT fees, and the Exchange Act specifically permits self-regulatory organizations to do so, provided the fee filing requirements of the Exchange Act are satisfied. Indeed, in approving the CAT NMS Plan, the Commission explained that "the Exchange Act specifically permits the Participants to charge members fees to fund their self-regulatory obligations."[40]  Any review of whether and how each Participant will obtain the funds to pay CAT fees is beyond the scope of the Funding Proposal.

CAT LLC notes that while CAT Executing Brokers have discretion as to whether and the manner and extent to which they pass on their CAT fees, if at all, the Participants must submit fee filings demonstrating that any proposed fee is consistent with the Exchange Act.

## 3.    Need for Industry Members to Develop Cost-Recovery Processes

Finally, one commenter asserts that executing brokers do not currently have systems and processes in place to recover costs from their client firms and might choose to absorb those fees themselves or exit the business altogether due the technological and administrative investment necessary to develop such a cost-recovery process.[41]

CAT LLC has previously addressed this argument, as well.[42]  Although charging a transaction-based fee is not new or novel for the industry, CAT LLC recognizes that certain Industry Members that choose to pass-through CAT fees will have to develop processes to collect such fees from their clients.  Nevertheless, CAT LLC does not believe that CAT fees differ from the effect of other fees, including regulatory-related fees, such as the FINRA trading activity fee ("TAF"), the options regulatory fee ("ORF") and Section 31-related sales value pass-through fees.  In each such case, a subset of broker-dealers is required to pay a transaction-based regulatory fee, and those broker-dealers seeking to recover such fees from other broker-dealers or non-broker-dealers have established processes with regard to the pass-through of such fees.

---

[37]    Letter from Larry Harris, Fred V. Keenan Chair in Finance, USC Marshal School of Business, to Vanessa Countryman, Secretary, SEC (June 21, 2022).
[38]    Citadel Letter at 3, 22, 30; FIA Letter at 2-3.
[39]    *See, e.g.*, Proposing Release at 17107; Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Aug. 16, 2022).
[40]    Securities Exchange Act Release No. 79318 (Nov. 15, 2016), 81 Fed. Reg. 84696, 84794 (Nov. 23, 2016) ("CAT NMS Plan Approval Order").
[41]    Virtu Letter at 5.
[42]    *See, e.g.*, Proposing Release at 17106-07; First Response to Comments at 4.

A143

Ms. Vanessa Countryman
July 28, 2023
Page 10

As described above, the Plan Processor will provide trade-by-trade data to CAT Executing Brokers for each CAT bill and is developing a detailed training program to assist CAT Executing Brokers to understand their CAT bills.  CAT LLC reiterates that CAT Executing Brokers have full discretion as to whether and the manner and extent to which they pass on their CAT fees, if at all.  For example, a CAT Executing Broker could round up its fees to the nearest cent, or decide to charge for, or not charge for, certain transactions, or assess a specific fee or incorporate the costs into other fee programs.[43]

C.    **Alternative Allocation Proposal:  50-50 Allocation**

One commenter recommended allocating no more than 50% of CAT costs to Industry Members (including any allocation to FINRA).[44]  This commenter did not offer a reasoned basis for why a 50-50 allocation would satisfy the standards set forth in the Exchange Act.  The commenter merely proposes to provide a mathematically equal split between two groups without further justification, while simultaneously arguing that allocating any CAT costs to Industry Members raises constitutional concerns.[45]

Notwithstanding the absence of any reasoned basis for a 50-50 allocation, CAT LLC has previously responded to this allocation proposal at length.[46]  CAT LLC has previously considered and rejected a 50-50 allocation because, among other things, it would not provide an equitable allocation between and among Industry Members and Participants.  Such an allocation raises fairness issues as Industry Members have far greater financial resources than the Participants, and the complexity of Industry Members' chosen business models contribute substantially to the costs of the CAT, as described above.

D.    **Alternative Allocation Proposal:  Allocation Based on Benefits Received from the CAT**

One commenter suggests an alternative allocation method in which CAT costs should be allocated between Participants and Industry Members based on who receives the benefits from CAT, objecting to the proposed allocation on the basis that "there is no suggestion that Industry Members somehow receive 67% of the benefits from CAT."[47]  Another commenter argues that it is inappropriate to impose responsibility for funding the CAT "on industry members that do not stand to benefit from it."[48]

CAT LLC disagrees with this proposal because it is not appropriate or practical to allocate costs based on who benefits from the CAT.  The CAT is designed to benefit the national

---

[43]    *See, e.g*., Securities Exchange Act Release No. 49928 (June 28, 2004), 69 Fed. Reg. 41060, 41072 (July 7, 2004) (noting that broker-dealers may "over-collect" Section 31-related fees charged to their clients due to rounding practices, and double-counting with regard to certain transactions).
[44]    Citadel Letter at 31.
[45]    Citadel Letter at 28-29.
[46]    *See, e.g.,* Funding Proposal at 17106; Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 28.
[47]    Citadel Letter at 17.
[48]    Virtu Letter at 2.

Ms. Vanessa Countryman
July 28, 2023
Page 11

market system and all market participants. The Participants are not the only beneficiaries of the CAT because they, as regulators, make use of the data for surveillance and oversight. The SEC has repeatedly indicated that the CAT is critical for the protection of investors and to support fair and efficient capital markets—which directly benefits Industry Members.[49] Likewise, in adopting the CAT NMS Plan, the Commission explained that "[t]he CAT is expected to provide a more resilient audit trail system that may benefit broker-dealers," that "more effective oversight of market activity may increase investor confidence and help expand the investment opportunity set through increased listings," and that "broker-dealers may experience less burden, to the extent that data provided to the Central Repository reduces the number of direct requests by regulators for their surveillance, examination and enforcement programs."[50] Additionally, it is impractical to determine a model that allocates a measurable amount of benefit that each market participant receives from the CAT. Accordingly, CAT LLC disagrees with the assertion that Industry Members do not directly benefit from the CAT.

### E.    Alternative Methodologies Considered

One commenter states that the allocation methodology should "be improved to ensure that (a) a small group of firms are not disproportionately bearing costs given that CAT is designed to facilitate market-wide surveillance across all market participants and (b) specific market segments, such as retail trading activity in NMS stocks, are not subject to an inequitable allocation."[51] Without providing sufficient detail or explanation, this commenter generally asserts that "[a] more thoughtful approach could include: (I) minimum and maximum fee levels, (II) appropriate calibrations for liquidity provision, (III) a volume component based on notional (instead of executed shares), and (IV) consideration of additional metrics that could achieve a more equitable outcome (e.g. broker-dealer capital)."[52] This commenter does not offer an explanation for how these general suggestions would fit into any funding model, nor offer a reasoned basis for why a funding model incorporating these suggestions would satisfy the standards set forth in the Exchange Act.

As previously described at length, over the past seven years, CAT LLC has considered the advantages and disadvantages of a variety of possible alternative funding and cost allocation models for the CAT in detail.[53] After analyzing the various alternatives and considering comments on the previously proposed models, CAT LLC determined that, although various funding models may be reasonable and appropriate, the Executed Share Model provides a variety of advantages in comparison to the alternatives, and satisfies the requirements of the Exchange Act, including providing for an equitable allocation of reasonable fees among CAT Reporters, not being designed to permit unfair discrimination among CAT Reporters and not imposing any

---

[49]    *See, e.g.*, CAT NMS Plan Approval Order at 84727 ("The Commission believes that improved regulatory efforts [facilitated by the CAT] will strengthen the integrity and efficiency of the markets, which will enhance investor protection and increase capital formation.").
[50]    CAT NMS Plan Approval Order at 84993.
[51]    Citadel Letter at 30.
[52]    *Id.*
[53]    *See, e.g.*, Proposing Release at 17117-19; Appendix C of the CAT NMS Plan at C-88-C-89.

Ms. Vanessa Countryman
July 28, 2023
Page 12

burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

### F.    Other Allocation Suggestions

#### 1.    Costs Exceeding the Approved Budget

One commenter asserts that "the exchanges should be responsible for any costs over the approved budget."[54]

CAT LLC does not believe this commenter's proposal would result in a fair and reasonable allocation under the Exchange Act. As described above, Industry Member trading activity, which is outside of the Participants' control, contributes significantly to the costs of the CAT. To the extent unexpected increases in trading volumes result in costs exceeding the approved budget, it would not be fair and equitable for the Participants to shoulder those costs alone. Relatedly, this proposal would create the wrong incentives by encouraging the Participants to base the budget on the most conservative projections for future Industry Member data volumes, so as not to be left solely responsible for any costs exceeding that budget.

As previously discussed, the Funding Proposal is designed to satisfy the funding principle set forth in Section 11.2(f) of the CAT NMS Plan, which requires the Operating Committee to seek "to build financial stability to support the Company as a going concern."[55] The Funding Proposal includes a requirement to adjust the Fee Rate During the year in order to address any changes in the projected or actual total volume of transactions in Eligible Securities or the budgeted or actual CAT costs. In addition, the Funding Proposal would collect an operational reserve for CAT, which is intended to address potential shortfalls in collected CAT fees versus actual CAT costs.

#### 2.    Costs That "Primarily Benefit" the Participants

In addition, one commenter recommends that "Industry Members should not be allocated costs for matters that primarily benefit the CAT Operating Committee or the SROs, such as costs related to ongoing litigation or filings that are inconsistent with the Exchange Act."[56]

CAT LLC has previously addressed similar comments.[57] CAT LLC does not believe it is reasonable or practical to attempt to parse CAT costs by who "primarily benefits" from those costs. Notably, this commenter further argues that "by facilitating market surveillance and enforcement activities, CAT is a revenue generator for the exchanges," implying that this commenter believes that *all* CAT costs primarily benefit the Participants.[58] Another commenter

---

[54]    Citadel Letter at 32.
[55]    Proposing Release at 17120-21.
[56]    Citadel Letter at 32.
[57]    Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Aug. 16, 2022) at 8.
[58]    Citadel Letter at 17.

**A146**

Ms. Vanessa Countryman
July 28, 2023
Page 13

states that the industry "obtains no tangible benefit from its operation."[59]  As previously described, CAT LLC strongly disagrees with the contention that the Participants and the Commission are the only beneficiaries of the CAT because they, as regulators, make use of CAT data for surveillance and oversight.  The Commission has repeatedly explained that the CAT is critical for the protection of investors and to support fair and efficient capital markets,[60] and it is impractical to attempt to allocate costs based on who "primarily benefits" from them.

### 3.    Existing Regulatory Fees

Finally, one commenter argues that "Industry Members *already* provide the exchanges a substantial amount of funding for regulatory matters," and that "[t]hose fees must be factored into any equitable or rational allocation of CAT costs."[61]  This commenter further asserts that, "by facilitating market surveillance and enforcement activities, CAT is a revenue generator for the exchanges."[62]  Another commenter argues that Industry Members "already provide the Plan Participants with a very substantial level of funding through membership fees, registration and licensing fees, dedicated regulatory fees and options regulatory fees."[63]

The Commission previously addressed similar comments when it approved the CAT NMS Plan.  At that time, the Commission recognized that "[t]he Participants currently collect certain regulatory and other fees, dues and assessments from their members to fund their SRO responsibilities in market and member regulation," but explained that "the proposed funding model reflects a reasonable exercise of the Participants' funding authority to recover the Participants' costs related to the CAT" specifically.[64]  Moreover, the Commission noted that "adopting CAT-specific fees would provide greater transparency for market participants than a general regulatory fee."[65]  To this end, the Funding Proposal is designed to impose fees directly associated with the costs of establishing and maintaining the CAT, and not unrelated SRO services.

CAT LLC also disagrees with the commenter's characterization of enforcement activity as simply a "revenue generator for the exchanges."  As an initial matter, CAT LLC notes that the Company is set up as a business league within the meaning of Section 501(c)(6) of the Internal Revenue Code.[66]  More broadly, the Participants have a statutory obligation to regulate the securities markets.  To this end, a primary and routine objective of the Commission and the SROs is to obtain restitution for investors and to deter future misconduct through enforcement

---

[59]    Virtu Letter at 4.
[60]    *See, e.g.*, CAT NMS Plan Approval Order at 84727 ("The Commission believes that improved regulatory efforts [facilitated by the CAT] will strengthen the integrity and efficiency of the markets, which will enhance investor protection and increase capital formation.").
[61]    Citadel Letter at 17.
[62]    *Id.*
[63]    Virtu Letter at 2.
[64]    CAT NMS Plan Approval Order at 84794.
[65]    *Id.*
[66]    *See generally* Proposing Release at 17121.  As the SEC stated when approving the CAT NMS Plan, "the Commission believes that the Company's application for section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the Company's earnings could be used to benefit individual Participants."  CAT NMS Plan Approval Order at 84793.

A147

Ms. Vanessa Countryman
July 28, 2023
Page 14

activity, not to generate revenue.  As the Commission has explained, improved regulatory efforts through the use of CAT data "will strengthen the integrity and efficiency of the markets, which will enhance investor protection and increase capital formation," thereby benefitting all market participants.[67]  Accordingly, CAT LLC disagrees with the characterization of regulatory use of the CAT as a mere "revenue generator" for the Participants.

### 4.    Allocation of CAT Costs "In Perpetuity"

One commenter argues that "[t]here is no precedent for the CAT fees that are proposed to be allocated to Industry Members in perpetuity under the 2023 Funding Model," and that the Exchange Act does not permit CAT LLC "to require Industry Members to provide them with a blank check to fund all of their costs in perpetuity."[68]

These comments appear to reflect a misunderstanding of the basic mechanics of the Funding Proposal.  Contrary to the assertion that Industry Members will fund "all" CAT costs, the Funding Proposal allocates one-third of CAT costs to Participants, one-third to CEBBs, and one-third to CEBSs.  Additionally, the Funding Proposal does not provide for CAT fees to be adopted "in perpetuity."  As described in the Proposing Release, at the beginning of each year, the Operating Committee will calculate a new Fee Rate based on reasonably budgeted CAT costs for the year and reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year.[69]  This Fee Rate would be adjusted mid-year to address changes in the actual or budgeted costs or changes in the actual or projected executed equivalent share volume.  Fee filings will be filed with the Commission under Rule 19b-4, thereby providing transparency and an opportunity for comment by the public, and such fees may only be implemented if they satisfy the requirements of the Exchange Act.[70]

More generally, the Funding Proposal will operate in a manner similar to other funding models employed by the SEC and the Participants, including the SEC's Section 31 fees and SROs' related sales value fees, FINRA's TAF, and the ORF utilized by options exchanges.  The SEC previously has determined that the Participants' sales value fees related to Section 31, the FINRA TAF and the ORF are consistent with the Exchange Act, and these fees do not have a built-in sunset provision.

Finally, as previously described, CAT LLC reiterates that these comments fail to recognize the basic fact that Industry Members may determine to pass their CAT fees through to their own customers, just as they do with Section 31-related sales value fees and other fees.

---

[67]    CAT NMS Plan Approval Order at 84727.
[68]    Citadel Letter at 27.
[69]    Proposing Release at 17092.
[70]    As described in the Proposing Release, the Participants separately intend to file rule filings under section 19(b) of the Exchange Act and Rule 19b-4(f)(2) thereunder to establish the CAT Fees and Historical CAT Assessments to be charged to Industry Members based on the Funding Proposal.  *See* Proposing Release at 17086.

Ms. Vanessa Countryman
July 28, 2023
Page 15

### III.    Historical CAT Costs

#### A.    Industry Member Contributions to Historical CAT Costs

Several commenters reiterate prior objections to Industry Members contributing any Historical CAT Costs.[71]  To date, Historical CAT Costs (which total more than $500 million through the end of 2022) have been borne entirely by the Participants.  SIFMA mistakenly asserts that historical costs would be borne by "a small group" of broker-dealers and questions whether "the allocation of significant historical costs to a small group of executing broker firms based on current market volume is consistent with the Exchange Act."[72]

CAT LLC has previously addressed these comments at length.[73]  In summary:

- The CAT NMS Plan, as approved by the Commission, specifically contemplates Industry Members contributing to the costs of the CAT.[74]

- Contrary to commenters' mistaken assertion that these costs would be allocated to a small group of broker-dealers, almost 700 of the 1100 Industry Members would have an obligation to contribute to Historical CAT Costs (per the illustrative example in the filing), not just a few CAT Executing Brokers.

- The fees vary in accordance with the market activity of the CAT Executing Brokers.  Accordingly, certain CAT Executing Brokers will have large bills for very significant market activity.  This only serves to emphasize the fairness of the proposal; Industry Members with significant market activity will have larger bills.

- We note that, based on requests by Industry Members that CAT LLC provide detailed data regarding their assessed fees, it appears that some CAT Executing Brokers may determine to pass these fees on, relieving them of any obligation with regard to CAT fees at all (other than the process of passing on the fees).

CAT LLC would also like to correct any misunderstanding that Historical CAT Costs would be allocated to Industry Members as a single lump sum.  As described further below and in the Proposing Release, the Historical Recovery Period will be no less than 24 months and no more than five years.[75]  In analyzing the potential Historical Recovery Periods, CAT LLC sought to weigh the need for a reasonable Historical Fee Rate that spreads the Historical CAT Costs

---

[71]    FIA Letter at 3-4; SIFMA Letter II at 4; Virtu Letter at 4.

[72]    SIFMA Letter II at 4.  *See also* Virtu Letter at 4.

[73]    Proposing Release at 17095-99; Letter from Mike Simon, CAT NMS Plan Operating Committee Chair Emeritus, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 21-23.

[74]    *See* Section 11.2(b) of the CAT NMS Plan (requiring the Operating Committee to seek "to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act").

[75]    Proposing Release at 17096-97.

Ms. Vanessa Countryman
July 28, 2023
Page 16

over an appropriate amount of time and the need to repay the loan notes to the Participants in a timely fashion.

### B.    Internal Cost of Compliance by Industry Members

One commenter mistakenly asserts that "Industry Members are already bearing nearly all of the total CAT-related costs."[76]  This commenter appears to conflate the internal compliance costs incurred by Industry Members to comply with CAT reporting requirements with the direct costs of the CAT, which are the subject of the Funding Proposal.

In fact, the Participants have funded 100% of the build, operation and other costs related to CAT to date, pending Commission approval of a fee model.  Industry Members have not paid any of those costs to date.  The Funding Proposal is intended to charge fees to pay for the direct costs of the CAT, not for the ancillary compliance costs of Industry Members or Participants.[77] Industry Members would incur compliance costs regardless of a funding model (and can choose to pass those compliance costs through to their customers as with any other costs).  Indeed, the Participants have also incurred their own substantial internal compliance costs, which are not taken into consideration and thus are not included in the direct costs of the CAT covered by the Funding Proposal.  As previously discussed, there is no precedent for regulatory fees to be determined based on the cost of compliance of the regulated entity.[78]

### C.    Pass-Throughs for Historical CAT Assessments

As previously discussed at length, the Historical CAT Assessment would be assessed based on current market activity, not past market activity.[79]  Specifically, the fee rate would be calculated based on Historical CAT Costs, but the fee rate would be applied to current market transactions.[80]  SIFMA mistakenly asserts that "there appears to be little ability for [executing broker] firms to pass-on historical costs to anyone else."[81]  In fact, the process of assessing fees for the Historical CAT Assessment would be exactly the same as with CAT Fees related to Prospective CAT Costs, and could be accordingly passed through in the same manner if a CEBB or CEBS so chooses.  As a result, in each case, the relevant data would be available to pass an Historical CAT Assessment though in the same manner as with Prospective CAT Fees, if a CAT

---

[76]    Citadel Letter at 31.

[77]    *See* CAT NMS Plan Approval Order at 84795 n.1749 ("The Participants stated that the funding model provides a framework for the recovery of the costs to create, develop and maintain the CAT, and is not meant to address the cost of compliance for Industry Members and Participants with the reporting requirements of Rule 613.").

[78]    *See, e.g.*, Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 29.

[79]    For a description of the proposal for charging the Historical CAT Assessment, *see* Proposing Release at 17095-99.  *See also* First Response to Comments at 9 (correcting SIFMA's misunderstanding that Historical CAT Costs would be based on past market activity); Securities Exchange Act Release No. 96394 (Nov. 28, 2022), 87 Fed. Reg. 74183, 74185, n.15 (Dec. 2, 2022).

[80]    Note that CAT LLC addressed SIFMA's comments regarding charging current Industry Member's based on current market activity in detail in the Proposing Release, rather than charging Industry Member's based on market activity at the time the certain historical costs were incurred.  Proposing Release at 17113.

[81]    SIFMA Letter II at 4.

A150

Ms. Vanessa Countryman
July 28, 2023
Page 17

Executing Broker chose to do so.  Moreover, CAT LLC would provide CAT Executing Brokers with details regarding their CAT fees to assist with this process.

### D.    Magnitude of Historical CAT Costs and Fees

#### 1.    Magnitude of Historical CAT Costs

CAT LLC believes it would be helpful to provide a comparison of Historical CAT Costs to Prospective CAT Costs.  CAT costs incurred during 2022 were $181,107,294.  CAT LLC currently estimates that CAT costs for 2023 will be higher than 2022 costs, subject to potential additional cost management measures.  The Historical CAT Costs through 2022 (except for certain Excluded Costs[82]) are $518,795,904:

- Historical CAT Costs Incurred Prior to June 22, 2020 (i.e., Pre-FAM Costs): $143,919,521
- CAT Costs Incurred in Period 1 (June 22, 2020 – July 31, 2020): $6,377,343
- CAT Costs Incurred in Period 2 (August 1, 2020 – December 31, 2020): $42,976,478
- CAT Costs Incurred in Period 3 (January 1, 2021 – December 31, 2021): $144,415,268
- CAT Costs Incurred in 2022: $181,107,294

By way of comparison, Historical CAT Costs through 2022 ($518 million) are approximately 2.2 times the 2023 CAT budget ($233 million).  Stated differently, the 2023 CAT budget ($233 million) is approximately 45% of total Historical CAT Costs through 2022 ($518 million).

#### 2.    Historical Recovery Period

CAT LLC proposes to establish a Historical Recovery Period of no less than 24 months or more than five years.  In the Proposing Release, CAT LLC noted that, "[i]n analyzing the potential Historical Recovery Periods, CAT LLC sought to weigh the need for a reasonable Historical Fee Rate that spreads the Historical CAT Costs over an appropriate amount of time and the need to repay the loan notes to the Participants in a timely fashion."  CAT LLC determined to propose a range of two to five years as the amount of Historical CAT Costs had not yet been determined; they would increase as more time passed prior to an approval of the funding model.  In setting this range, among other factors, CAT LLC considered the amount of the Historical CAT Costs in comparison to the Prospective CAT Costs.  Currently, Historical CAT Costs are a little less than approximately three times annual Prospective CAT Costs.  Accordingly, CAT LLC believes that it would potentially be appropriate to spread the Historical CAT Costs over a time period of a little less than three years, a time period which is within the two to five year range for the Historical Recovery Period.  The exact Historical Recovery Period,

---

[82]    The Participants expect to propose that Historical CAT Costs would not include two categories of CAT costs ("Excluded Costs"): (1) $48,874,937, which are all CAT costs incurred from November 15, 2017 through November 15, 2018, and (2) $14,749,362 of costs related to the termination of the relationship with the Initial Plan Processor. The Participants expect to propose that the Participants would remain responsible for 100% of these costs, which total $63,624,299.  *See* Proposing Release at 17110.

Ms. Vanessa Countryman
July 28, 2023
Page 18

however, would be determined in the context of the rule filing pursuant to Section 19(b) of the Exchange Act and Rule 19b-4 thereunder.

### 3.    Magnitude of Historical Fee Rate

Although the actual Historical Fee Rates will be established via Participant rule filings pursuant to Section 19(b) and Rule 19b-4 thereunder, CAT LLC expects to propose a fee rate or rates per executed equivalent share that are comparable to or smaller than other transaction-based fees. Described below are two illustrative examples in which CEBBs and CEBSs would be charged less than 1/1000 of a penny per executed equivalent share.

In the Proposing Release, CAT LLC provided an illustrative example of potential fee rate per executed equivalent share that CAT Executing Brokers could pay with regard to Historical CAT Costs. The illustrative example was calculated based on the Historical CAT Costs for prior to 2022 (excluding certain Excluded Costs), which totaled $337,688,610. In the calculation, CAT LLC used a Historical Recovery Period of two years, and projected the total executed equivalent share volume of transactions in Eligible Securities for two years based on the actual total executed equivalent share volume of transactions in eligible securities for 2022. With these assumptions as described in the Proposing Release, the Historical Fee Rate was $0.0000417950 per executed equivalent share. Because the Historical Fee Rate is multiplied by one-third in calculating the Historical CAT Assessment, each CEBB and CEBS would pay $0.00001393167 per executed equivalent share (that is, $0.0000417950 per executed equivalent share multiplied by one-third).

CAT LLC believes that it would be helpful to provide another illustrative example of a fee rate per executed equivalent share that CAT Executing Brokers could pay with regard to Historical CAT Costs. This example is calculated based on the Historical CAT Costs for prior to 2023 (excluding certain Excluded Costs), which total $518,795,904. In this calculation, CAT LLC uses a Historical Recovery Period of three years, and projected the total executed equivalent share volume of transactions in Eligible Securities for three years based on the actual total executed equivalent share volume of transactions in eligible securities for 2022. With these assumptions, the Historical Fee Rate would be $0.0000428068 per executed equivalent share (which is calculated by dividing $518,795,904 by three times the actual executed equivalent share volume of transactions in eligible securities for 2022).[83] Because the Historical Fee Rate is multiplied by one-third in calculating the Historical CAT Assessment, each CEBB and CEBS would pay $0.0000142689 per executed equivalent share (that is, $0.0000428068 per executed equivalent share multiplied by one-third).

Currently, broker-dealers are charged a variety of non-CAT related transaction-based fees that are higher than these proposed CAT fees. For example, Nasdaq charges various transaction-based equities fees, ranging from $0.0005 per share to $0.0030.[84] Cboe charges an options

---

[83]    This Historical Fee Rate is calculated by dividing $518,795,904 by three times the actual executed equivalent share volume of transactions in eligible securities for 2022 (or 3 times 4,039,821,841,560.31).

[84]    Nasdaq BX U.S. Equities Pricing (http://www.nasdaqtrader.com/trader.aspx?id=bx_pricing).

Ms. Vanessa Countryman
July 28, 2023
Page 19

regulatory fee that is $0.0017 per contract,[85] and NYSE American charges an options regulatory fee of $0.0055.[86]

### E.    Excluded Costs

One commenter argues that it is inappropriate for Industry Members to bear any costs related to the engagement of Thesys CAT, LLC, the prior Plan Processor.[87]  Another commenter questions whether Industry Members are being allocated any costs relating to the prior Plan Processor.[88]

As clearly described in the Funding Proposal, Historical CAT Costs would not include two categories of CAT costs relating to the prior Plan Processor ("Excluded Costs"): (1) $48,874,937, which are all CAT costs incurred from November 15, 2017 through November 15, 2018, and (2) $14,749,362 of costs related to the termination of the relationship with the Initial Plan Processor.  The Participants expect to propose that the Participants would remain responsible for 100% of these costs, which total $63,624,299.[89]

## IV.    Governance and Cost Management

### A.    Independent Cost Review Mechanism

Several commenters reiterate prior comments recommending the adoption of an "independent cost review mechanism" to oversee CAT costs.[90]  Specifically, SIFMA asserts that "this independent body to oversee CAT costs must include industry representatives" and such body "should be responsible for determining an annual operating budget."[91]

CAT LLC previously responded at length to this proposal in its First Response to Comments,[92] and its other response to comments.[93]  As previously noted, CAT LLC does not believe an independent cost review mechanism process is necessary or appropriate including for the following reasons:

- Such a budget review process would go beyond what is required or contemplated by Rule 613 or the Plan, and is unnecessary as any CAT fees proposed to be established pursuant to the CAT NMS Plan are already subject to the existing, well-established review

---

[85]    Cboe Exchange Fee Schedule (June 1, 2023) (https://cdn.cboe.com/resources/membership/Cboe_FeeSchedule.pdf).
[86]    NYSE American Options Fee Schedule (June 1, 2023) (https://www.nyse.com/publicdocs/nyse/markets/american-options/NYSE_American_Options_Fee_Schedule.pdf).
[87]    FIA Letter at 4.
[88]    Citadel Letter at 23, 31.
[89]    *See* Proposing Release at 17110.
[90]    Citadel Letter at 33; FIA Letter at 5; MMI Letter at 2; SIFMA Letter II at 2; Virtu Letter at 4.
[91]    SIFMA Letter II at 2 n.10.  *See Nasdaq Stock Market LLC, et al v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) (holding that Section 11A of the Exchange Act does not permit non-SROs to participate in NMS plan governance).
[92]    First Response to Comments at 8.
[93]    *See, e.g.,* Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Feb. 15, 2023) at 29-30.

Ms. Vanessa Countryman
July 28, 2023
Page 20

practices under Rule 608 of Regulation NMS and Section 19(b) of the Exchange Act as applicable. Under those provisions, changes to the CAT funding model must be filed with the SEC via Plan amendment, thereby providing transparency and an opportunity for comment by the public, and CAT fees for Industry Members may only be implemented if they are later filed with the SEC by the Participants and satisfy the requirements of the Exchange Act. Accordingly, Industry Members will have ample opportunity to comment on proposed Plan amendments and fee filings. Moreover, the SEC has the ability to request budget and financial information from CAT LLC to the extent that it believes that such additional information is necessary for it to evaluate any CAT fee proposals.

- In addition to the fee filing process under the Exchange Act, CAT LLC provides significant cost transparency through the public disclosure of its quarterly budget information and financials.

- Providing a third-party with control over the annual budget could impermissibly restrict the Participants from discharging their regulatory obligations. The Participants are required to comply with the regulatory requirements to implement the CAT and to oversee their members. They do not have discretion with regard to such compliance with CAT requirements. As such, the Participants cannot have their compliance with regulatory requirements subject to a third-party that does not have the same regulatory obligations.

- The Commission's ability to oversee the securities markets could be undermined if the funding of the CAT is subject to a third-party that does not have the same regulatory obligations.

- CAT LLC is engaged actively in cost discipline efforts, including through a designated cost management working group and through other efforts.[94]

### B.    Commission Approval of the CAT Budget

One commenter recommended that the Commission should formally approve the CAT budget on an annual basis.[95]

As previously noted, CAT LLC does not believe that such an approval process is necessary or appropriate.[96] First, as a preliminary matter, CAT LLC is not a governmental entity; it is a private entity subject to the regulatory requirements of the Exchange Act. Second, such a budget review process is unnecessary as any CAT fees proposed to be established pursuant to the CAT NMS Plan are already subject to the existing, well-established review

---

[94]    For a discussion of CAT LLC's cost management efforts, *see* Proposing Release at 17117.
[95]    Citadel Letter at 33.
[96]    *See, e.g.*, Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Aug. 16, 2022).

A154

Ms. Vanessa Countryman
July 28, 2023
Page 21

practices under Rule 608 of Regulation NMS and Section 19(b) of the Exchange Act and Rule 19b-4 thereunder.  Under those provisions, CAT fees must be filed with the SEC, thereby providing transparency and an opportunity for comment by the public, and may only be implemented if they satisfy the requirements of the Exchange Act.  Third, the SEC has the ability to request budget and financial information from CAT LLC to the extent that it believes that such additional information is necessary for it to evaluate any CAT fee proposals.

### C.     CAT Governance Structure

#### 1.     Industry Member Representation

Several commenters reiterate prior objections relating to the lack of industry voting member representation on the CAT LLC Operating Committee.  One commenter asserts that "the CAT Operating Committee should be reconfigured, with Industry Members comprising the percentage of the Committee equivalent to whatever cost allocation percentage is eventually allocated to them."[97]  Another commenter argues that "Industry Members should have voting representation commensurate with any costs allocated to them."[98]  Similarly, another commenter argues that "the representation of Industry Members on the CAT Operating Committee should be proportionate to the financial obligation of funding the CAT."[99]

CAT LLC does not believe these proposals are consistent with the Exchange Act.[100] More generally, allowing Industry Members to control CAT LLC as the commenters suggest could adversely affect the regulatory objectives of the CAT.  Unlike the Participants, Industry Members have no statutory obligation to protect investors or to act in the public interest, nor do they have any regulatory obligation to operate the CAT System in a manner that is consistent with the Rule 613 and the CAT NMS Plan.  The current governance structure provides Industry Members with the ability to provide meaningful input on CAT matters through the Advisory Committee and it does not compromise the key regulatory and oversight responsibilities related to the CAT, including the SEC and SRO oversight of Industry Members.  Moreover, Industry Members have ample opportunity for comment on proposed Plan amendments and fee filings, thereby obviating the need for a voting presence on the Operating Committee.

#### 2.     Participant Voting Structure of the Operating Committee

One commenter argues that "voting rights should be allocated so that each exchange group and national securities association has one vote on the operating committee, with a second vote provided if the exchange group or national securities association has a market center or centers that trade more than 15 percent of consolidated equity and options market share," similar to the NMS Plan for consolidated equity market data.[101]  As previously noted, CAT LLC

---

97      FIA Letter at 4.
98      Citadel Letter at 34.
99      MMI Letter at 2.
100     *See Nasdaq Stock Market LLC, et al v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) (holding that Section 11A of the Exchange Act does not permit non-SROs to participate in NMS plan governance).
101     Citadel Letter at 34.

Ms. Vanessa Countryman
July 28, 2023
Page 22

believes that comments relating to the voting structure of the Operating Committee are beyond the scope of the establishment of the funding model.[102]

This commenter further argues that "all actions by the CAT Operating Committee relating to funding should require authorization by a Supermajority vote."[103] CAT LLC disagrees with this proposal because arguably every Operating Committee action directly or indirectly relates to CAT costs, and imposing a Supermajority requirement on all Operating Committee actions has the potential to undermine effective and efficient governance.[104]

### D.    Cost Management Efforts

Several commenters raise concerns with increasing CAT operating costs.[105] CAT LLC has made cost management of the CAT a top priority, and has sought to reduce costs that are within its control without adversely affecting the regulatory goals of the CAT in a variety of ways. CAT LLC utilizes a Cost Management Working Group, populated by senior members of the Participants, to identify, evaluate and seek to address cost management needs, through a number of different methods.

CAT LLC emphasizes, however, that both Rule 613 and the CAT NMS Plan impose significant regulatory obligations on the Participants regarding how to design, build, and operate the CAT System.[106] To the extent CAT LLC and the Participants fail to comply with Rule 613 or the CAT NMS Plan, the Commission could seek to compel compliance by bringing enforcement actions. In furtherance of these regulatory obligations imposed by the Commission, CAT's single largest cost driver is the processing and storage of CAT data on the cloud. Cloud costs represent approximately 75% of all CAT costs. When the Commission adopted the CAT NMS Plan in 2016, it estimated that the CAT would need to receive 58 billion records per day, that the cost to build the CAT would range from $37.5 million to $65 million, and that annual operating costs for the CAT would range from $36.5 million to $55 million. As of the fourth quarter of 2022, the CAT System receives, processes and loads an average of 418 billion records per day, with a record single-day peak of 613 billion records. That is 7-10 times the original estimated daily record count for the CAT. As a result, the 2023 CAT budget is approximately $233 million, with CAT cloud costs alone budgeted for approximately $176 million. The 2024 CAT budget is likely to be comparable or higher, notwithstanding cost savings measures.

---

[102]    *See, e.g.*, Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Aug. 16, 2022) at 33.

[103]    Citadel Letter at 34.

[104]    *See* CAT NMS Plan Approval Order at 84845 (explaining that "voting thresholds that result in Operating Committee decision-making that balances the ability of minority members to have alternative views considered with the need to move forward when appropriate to implement needed policies can promote achievement of the Plan's benefits in an efficient manner").

[105]    Citadel Letter at 7-9; MMI Letter at 1; SIFMA Letter II at 4; Virtu Letter at 4.

[106]    "By statute, the Commission is the regulator of the Participants, and the Commission will oversee and enforce their compliance with the Plan." CAT NMS Plan Approval Order at 84764. *See also* Letter from Brett Redfearn, Director, Division of Trading and Markets, to Michael J. Simon, Chair, CAT NMS Plan Operating Committee (May 1, 2018), https://www.sec.gov/comments/s7-13-19/s71319-6090109-191884.pdf (warning the Participants that "the requirements of the CAT NMS Plan cannot be interpreted away").

Ms. Vanessa Countryman
July 28, 2023
Page 23

### 1.    Technological Cost Management Efforts within CAT LLC's Control

CAT LLC and the Plan Processor continue to actively pursue cost savings measures that are within their control and have identified savings related to compute and storage costs as well as to system architecture and process improvements, among others.  But stringent CAT NMS Plan requirements enforceable by the Commission do not allow for any material flexibility in cloud architecture design choices, processing timelines (*e.g.*, the use of non-peak processing windows), or lower-cost storage tiers.  As a result, CAT LLC is limited in the types of technological cost management efforts it may undertake without Commission action.  Nevertheless, within these significant regulatory constraints, CAT LLC, through the Plan Processor, have proactively managed costs within a cloud design that supports compliance with the Plan requirements.

For example, CAT LLC and the Plan Processor's continuous efforts to refine and optimize cloud resource usage has, since 2022, resulted in over $32 million in savings achieved as of May 2023 and will total a projected $93 million in savings by end of 2024 even while data volumes have grown by over 80% since 2021.  Examples of the types of cost savings efforts have included:

- Use of cost-effective storage tiers that are compliant with the CAT NMS Plan;

- Effectively using multiple server types and software;

- Spot versus on-demand pricing alternatives for lower time sensitive workloads;

- Entering into a three-year compute savings plan that will reduce compute fees by $8-9 million annually based on current volumes;

- Negotiating further discounts to storage rates;

- On-going implementation of significant performance improvements that reduce compute time and improve reliability;

- Automatically adding and removing severs as demand requires (auto scaling); and

- Alternative methods for addressing late data.

CAT LLC and the Plan Processor, in consultation with technology experts from the Participants, will continue to regularly review the compute and storage options that may be used to lower compute and storage needs and that would be consistent with current CAT NMS Plan requirements, including such options as reservations, spot instances, lower cost storage services and data archival policies as well as software architecture and performance improvements.

**A157**

Ms. Vanessa Countryman
July 28, 2023
Page 24

### 2. Plan Amendment, Exemptive Requests and Other Cost Management Efforts Subject to Commission Action

As a regulatory matter, the Participants are required to comply with the strict CAT NMS Plan requirements.  As a result, many additional cost savings measures require Commission action to permit their implementation, through amendments to the Plan, exemptive relief, no-action relief, or other Commission action.  CAT LLC has submitted a variety of requests to the Commission to reduce CAT costs, and has identified additional changes that could significantly lower costs, but that would require either exemptive relief or a Plan amendment before such cost-saving measures could proceed.  In each such case, CAT LLC does not believe that such action would adversely affect the regulatory goals of the CAT.  For example:

- Retention of Industry Test Data.  CAT LLC requested exemptive relief from Rule 17a-1 and certain provisions of the CAT NMS Plan relating to the retention of Industry Test Data.  Such relief is estimated to provide approximately $1 million per year in savings.[107]

- 2X Load Testing.  CAT LLC requested no-action relief regarding 2X load testing for the CAT System.  Such relief is estimated to provide approximately $1 - $1.25 million per year in savings.[108]

- Verbal Floor and Upstairs Activity.  The SEC previously granted CAT LLC's exemptive request for a temporary exemption from the requirement to report certain verbal floor and upstairs activity to the CAT.  CAT LLC has requested an extension of this relief through 2026, noting the prohibitive costs of reporting such verbal activity.[109]

In addition, certain Participants have filed suit in the D.C. Circuit challenging the Commission's interpretation of certain Plan requirements, which such Participants believe would impose tens of millions of dollars in additional costs, as well as present technological obstacles and regulatory disadvantages.[110]  The relevant Participants and the SEC have been engaged in good faith discussions to resolve these issues, including issues related to additional cost savings.

Rather than proceed with building out the CAT System to conform to the Commission's interpretation of certain Plan requirements, the Participants believe that instead, the following

---

[107]     Letter from Brandon Becker, Chair, CAT NMS Plan, Operating Committee, to Vanessa Countryman, Secretary, SEC (June 2, 2023), https://www.catnmsplan.com/sites/default/files/2023-06/06.02.23-Exemptive-Request-Test-Data-Retention.pdf.

[108]     Letter from Brandon Becker, Chair, CAT NMS Plan Operating Committee, to Emily Westerberg Russell, Chief Counsel, Division of Trading and Markets, SEC (June 6, 2023), https://www.catnmsplan.com/sites/default/files/2023-06/06.06.23-No-Action-Request-for-2X-Load-Testing.pdf.

[109]     Letter from Brandon Becker, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Mar. 31, 2023), https://www.catnmsplan.com/sites/default/files/2023-03/03.31.23-CAT-Exemption-Request-Verbal-Floor-and-Upstairs-Activity.pdf .

[110]     See Petition for Review, USCA Case No. 22-1234.  The litigation covers a variety of CAT issues that bear directly on CAT costs, including (1) online query tool response times and concurrency testing; (2) incorporation of post T+5 corrections into existing lifecycles; (3) CAT Order ID assignment by T+1 noon; (4) order handling instructions communicated via port level settings; and (5) reporting and linkage of Participant rejects.

Ms. Vanessa Countryman
July 28, 2023
Page 25

changes, if approved by the Commission, would result in significant cost savings without negatively impacting the regulatory goals of the CAT:

- Single Pass Options Quotes. Assembling options quote lifecycles only once, with the final CAT Order ID delivered by T+2 at 8 a.m. ET instead of T+5 at 8 a.m. ET, is estimated to save $5.4 million per year. To facilitate these cost savings, CAT LLC intends to seek an exemption from the Commission's requirement that the Participants deliver an interim CAT Order ID by T+1 at 9 p.m. ET for options quotes. The Participants have identified additional methods to streamline the processing of options quotes that could provide an additional annual savings of $3 million or more.

- Eliminate Interim CAT Order ID and Deliver Final CAT Order ID by T+3. Amending the CAT NMS Plan to revise the linkage timeline by clarifying that the Plan does not require assignment of an interim CAT Order ID and by providing a final CAT Order ID by T+3 at 8 a.m. ET, as opposed to T+5 at 8 a.m. ET, is estimated to save $4.4 million per year.[111]

- Linker in Industry Test Environment. Amending the CAT NMS Plan to reduce the number of days that linker is run in Industry Prod Mirror Test environment (CPTM) to two consecutive days/week (intrafirm linkage will run daily, interfirm linkage will run two consecutive days/week) is estimated to save $700,000 per year.

- Exchange Rejections. Amending the CAT NMS Plan to clarify that exchanges are not required to report exchange rejections is estimated to save $500,000 per year. The Participants note that a requirement to link exchange rejections to Industry Member data would further increase the scope and costs of operating the CAT.

One commenter recommends that CAT LLC work with the Commission to identify technical requirements that should be modified through a CAT NMS Plan amendment to materially reduce costs without sacrificing key benefits of the CAT system.[112] CAT LLC and the Plan Processor continue to identify and have raised with the Commission staff other potential, more fundamental changes to the CAT NMS Plan that would limit costs without compromising the regulatory goals of the CAT. Such fundamental changes, which would require Commission action to implement, could include, but are not limited to, the following:

- Relax one or more CAT processing and repair deadlines;

- Reduce the production and storage of copies of data required to support the Plan;

- Reduce the scope of certain required order events that may be of limited value to regulators;

---

[111] This cost savings estimate assumes the single pass options quotes proposal described in the preceding bullet is completed prior to implementation.

[112] Citadel Letter at 33.

A159

Ms. Vanessa Countryman
July 28, 2023
Page 26

- Eliminate requirements for six years of online access;

- Relax online query tool response times; and

- Eliminate requirements for seldom used regulator functionality.

### E.    Cost Management Incentives

One commenter questioned whether the Participants would have any incentive to ensure CAT costs are aggressively managed when most of the costs are being passed on to Industry Members.[113]  CAT LLC strongly disagrees with the suggestion that the Participants would not be incentivized to control CAT costs if they are only responsible for one-third of the CAT costs going forward.  CAT LLC has had a strong focus on cost management while the Participants have had the responsibility for paying 100% of the CAT costs, and will continue to have a strong focus on cost management if they are responsible for one-third of the CAT costs.  Paying $78 million per year versus $233 million per year (based on the 2023 budget) would still provide Participants with a significant incentive to keep costs at an appropriate level.  In either scenario, the costs are substantial and will continue to receive critical review by the Participants as they have to date.

### F.    Publication of CAT Budget

One commenter recommends that all CAT operating budgets should remain published on the CAT website, and notes that only the current and immediately prior annual budget appear to be available.[114]

CAT LLC notes that the Company's annual financial statements from its inception in 2017 are available on the CAT website.[115]  As noted by the commenter, CAT LLC voluntarily publishes its annual operating budget (as well as updates to the budget that occur during the year).[116]  In response to this comment, CAT LLC intends that prior CAT operating budgets will remain available on the CAT website.

## V.    Collaboration with Industry

Several commenters mistakenly assert that CAT LLC has failed to collaborate with the industry in establishing a funding model for the CAT.[117]  CAT LLC has engaged with the industry regarding the Funding Proposal in good faith over the last seven years as it has explored

---

[113]    FIA Letter at 4-5.
[114]    Citadel Letter at 34.
[115]    *See* CAT Audited Financial Statements, https:// www.catnmsplan.com/audited-financialstatements.
[116]    *See* CAT Financial and Operating Budget, https://www.catnmsplan.com/cat-financial-and-operating-budget.
[117]    MMI Letter at 2; SIFMA Letter II at 4.

**A160**

Ms. Vanessa Countryman
July 28, 2023
Page 27

different approaches to the funding of CAT. CAT LLC has discussed funding model issues with the CAT Advisory Committee, which includes wide representation from the industry, and held industry-wide webinars on funding issues. CAT LLC and its Participants also have discussed funding model issues with industry associations, like SIFMA and Financial Information Forum, as well as individual Industry Members.

Similarly, SIFMA asserts that CAT LLC has failed to respond to its prior comments regarding the issues it raised with regard to the amount of CAT costs allocated to Industry Members.[118] Contrary to this assertion, CAT LLC responded at length to these comments in its First Response to Comments.[119] Indeed, CAT LLC has responded to these comments a number of times, including in the Funding Proposal,[120] and each of the prior responses to comments.[121] While CAT LLC recognizes that SIFMA disagrees with the proposed sharing of CAT costs between Industry Members and Participants, CAT LLC's determination not to adopt SIFMA's viewpoint does not mean that CAT LLC has not considered or responded to SIFMA's comments.

CAT LLC has analyzed more than 50 comment letters submitted in response to multiple CAT fee proposals filed with the SEC, and provided more than 10 responses to those comment letters. In response to industry input, CAT LLC repeatedly incorporated the ideas provided by the industry into revised versions of the model, including, for example:

- Charging the executing broker instead of the clearing broker;[122]

- Providing illustrative examples and background data related thereto for Industry Members;[123]

- Providing discounts to market makers (in a prior proposal);[124]

- Providing special treatment for OTC transactions versus other Eligible Securities (in a prior proposal);[125]

- Treating ATSs as Industry Members rather than Participants (in a prior proposal);[126] and

- Eliminating the concept of fee tiers (in a prior proposal).[127]

---

[118]    SIFMA Letter II at 2.
[119]    First Response to Comments at 6-8.
[120]    Proposing Release at 17104-06.
[121]    *See, e.g.*, Response to OIP at 26-30.
[122]    Response to OIP at 5-6.
[123]    *See, e.g.*, Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (May 5, 2021).
[124]    Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Mar. 31, 2021) at 16-20.
[125]    *Id*. at 26-27.
[126]    *Id*. at 7-10.
[127]    *Id*. at 13-14.

Ms. Vanessa Countryman
July 28, 2023
Page 28

CAT LLC has repeatedly sought the views of SIFMA and other industry participants on specific aspects of the model.  Responses to these requests for feedback makes clear that SIFMA members often have differing views on the best approach to particular aspects of the funding model, including, for example, whether to base industry member fees based on message traffic or based on executed share volume, or whether costs should be allocated to the executing broker or the originating broker.[128]

Determining not to accept all suggestions and proposals from the industry does not mean that CAT LLC has not engaged in good faith discussions with the industry.  It means that not all industry proposals have the same merit or are consistent with each other.

Completely contrary to SIFMA's suggestion that Commission would be "rushing" to approve the current funding model, the current model results from years of modifications that have been made in significant part in response to industry comments to earlier versions.  The process that has resulted in the current proposal reflects an extraordinary degree of deliberation and revision in response to feedback.  Moreover, and as discussed below, commenters have had more than 400 days to comment on the substance of the current proposal (which differs very little from the immediately preceding funding model that was published for comment).  It simply is inaccurate to say that the Commission review process has been rushed.

## VI.    Operation of CAT in Compliance with the CAT NMS Plan and Rule 613

SIFMA argues that Rule 613 and the 2016 CAT NMS Plan are outdated and no longer reflect the current operation of the CAT.  As examples, SIFMA mentions the current requirements to provide data prior to T+5, as well as the expansion of CAT to cover port-level settings and messages acknowledging the receipt of a cancel request.  SIFMA states that it understands that many of these material decisions regarding the scope of information reported, reporting specifications, and system specifications changed from what was approved in the Commission's formal rulemakings through bilateral discussions between the Commission and Participants.  SIFMA argues that these decisions have significantly increased CAT costs.  As a result, SIFMA states that the Commission cannot "approve a Funding Proposal for a system that is not consistent with Commission Rule 613 and the CAT NMS Plan."[129]

The CAT has been implemented in accordance with the requirements of Rule 613 and the CAT NMS Plan.  The Funding Proposal seeks to recover costs reasonably incurred in the creation, implementation and maintenance of the CAT.  The CAT NMS Plan specifically permits the recovery of such costs.  Moreover, Rule 613 and the CAT NMS Plan specifically contemplate that there may be various approaches to funding of the CAT, which is why the amendment to implement the funding model is subject to approval after notice and comment.

---

[128]    *See* First Response to Comments at 2-3 (summarizing SIFMA's previous statements expressing support for allocating costs to the executing broker).

[129]    SIFMA Letter II at 7.

Ms. Vanessa Countryman
July 28, 2023
Page 29

### A.    Commission Interpretations of the CAT NMS Plan

Relatedly, several commenters challenge the Commission's interpretation of various requirements of the CAT NMS Plan unrelated to the establishment of a funding model (*e.g.*, interim order IDs, assignment of new CAT Order IDs for post-T+5 error corrections, linkages of customer and representative orders, port-level settings, lifecycle linkages, query response times, non-actionable RFQ responses, collection and reporting of price negotiations done via verbal and unstructured communications) and the costs and benefits associated with such interpretations.[130] One commenter argues that the Operating Committee and the Commission should "cease making any further changes to the CAT at this time," arguing that "[a]dditional requirements arguably outside the scope of the approved NMS Plan . . . continue to be promulgated by Commission staff."[131]  Another commenter asserts that "informal reinterpretations" of the CAT NMS Plan by the Commission are a major driver of CAT costs.[132]

CAT LLC believes that this rule proposal is not the appropriate forum to resolve these interpretive questions.  As a general matter, CAT LLC notes that the Commission has enforcement authority to compel compliance with Rule 613 and the CAT NMS Plan.  CAT LLC notes that certain Participants have petitions for judicial review with respect to certain Commission interpretations of CAT NMS Plan requirements, including with respect to several of the items noted by commenters.  To the extent Industry Members disagree with the Commission's interpretation of certain reporting requirements under the CAT NMS Plan, they are similarly free to seek exemptive relief from the Commission or pursue their own legal challenges.

As for changes to the Plan, NMS plans are not intended to be static and the Participants are following the plan amendment process specifically required under Rule 608, where applicable.  Those provisions are designed to allow for proposed changes to NMS plans, including the extensive public notice and comment period that have been afforded with respect to the current proposals.

Relatedly, one commenter asserts that "any material change to the CAT system, related technology contracts, or implementation scope should require the filing of an NMS Plan amendment," including a cost-benefit analysis.[133]

CAT LLC agrees that any material change to the CAT system would require an amendment to the CAT NMS Plan.  CAT LLC reiterates, however, that the Commission may have a different view from this commenter and/or the Participants regarding what functionality is currently required by the CAT NMS Plan.  The Commission has repeatedly warned the Participants that it "will oversee and enforce [the Participants'] compliance with the Plan,"[134]

---

130      Citadel Letter at 32-34; FIA Letter at 3, 5; MMI Letter at 4.
131      Citadel Letter at 33.
132      FIA Letter at 5.
133      Citadel Letter at 34.
134      CAT NMS Plan Approval Order at 84764.

Ms. Vanessa Countryman
July 28, 2023
Page 30

and that "the requirements of the CAT NMS Plan cannot be interpreted away."[135]  CAT LLC disagrees that any material change to a technology contract that would not require a change to the CAT NMS Plan would require an amendment to the CAT NMS Plan, as the Plan currently contemplates that the Operating Committee may enter into, modify or terminate any Material Contract.[136]

> ### B.    Effect of Financial Accountability Milestones

One commenter asserts that the Funding Proposal "inadequately addresses the 'Period 4' expenses under the Financial Accountability Milestones contained in the current CAT NMS Plan."[137]

CAT LLC recognizes that the collection of CAT Fees and Historical CAT Assessments from Industry Members are subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones.  As previously described at length, Participants will not make CAT fee filings until they believe that any applicable Financial Accountability Milestone has been satisfied.  The Commission has not made a determination regarding the Participants' compliance or non-compliance with the Financial Accountability Milestones.

## VII.    Procedural Requirements of Rule 608

SIFMA argues that the CAT NMS Plan, and the CAT Operating Committee's proposal to assess CAT fees directly on Industry Members through Rule 19b-4 filings likely violates the requirements of Rule 608 of Regulation NMS.[138]  In so arguing, SIFMA notes that the Commission amended Rule 608 in 2020 to specifically require that fee changes made pursuant to NMS Plans be subject to a notice and comment process and specific Commission approval prior to becoming effective.  CAT LLC disagrees with this argument and believes that the Funding Proposal complies with Rule 608 of Regulation NMS.

The CAT NMS Plan, as approved by the Commission, requires any Industry Member CAT fees to be filed pursuant to Section 19(b) of the Exchange Act.[139]  Fee filings submitted by Participants pursuant to Section 19(b) of the Exchange Act would be required to be assessed consistent with the requirements of the CAT NMS Plan.  Section 19(b) of the Exchange Act, in turn, permits fees to become effective upon filing.[140]  Unlike the filing process under Rule 608,

---

[135]    Letter from Brett Redfearn, Director, Division of Trading and Markets, to Michael J. Simon, Chair, CAT NMS Plan Operating Committee (May 1, 2018), https://www.sec.gov/comments/s7-13-19/s71319-6090109-191884.pdf.

[136]    *See* Section 4.3 of the CAT NMS Plan.

[137]    Citadel Letter at 24.

[138]    SIFMA Letter II at 9.

[139]    *See* Section 11.1(b) of the CAT NMS Plan.  The Commission has previously explained that the Participants have the discretion to "choose to submit the proposed fee schedule to the Commission as individual SROs pursuant to Rule 19b–4 under the Exchange Act or jointly as Participants to an NMS plan pursuant to Rule 608 of Regulation NMS."  CAT NMS Plan Approval Order at 84793 n.1709.  The Commission further noted that if the Participants individually file the proposed fee schedule pursuant to Section 19(b)(3)(A)(ii) of the Act, "the proposed fee filings will be eligible for immediate effectiveness."  *Id.*

[140]    Section 19(b)(3)(A) of the Exchange Act.

Ms. Vanessa Countryman
July 28, 2023
Page 31

the filing process under Section 19(b) was not amended by the Commission to eliminate the effective upon filing process for fees.  Accordingly, the Participants may submit fee filings related to the CAT or otherwise for fees to be effective upon filing.

CAT LLC notes that the methodology for determining Participant CAT fees is proposed to be established via the amendment of the CAT NMS Plan, which has been filed in accordance with Rule 608 and has been subject to the extensive public notice and comment process described above.  Accordingly, such fees would be adopted in accordance with the requirements of Rule 608.  While Industry Member CAT fees will be filed pursuant to Rule 19b-4, such Rule 19b-4 filings will be based on the overall funding model, which must be approved under Rule 608.  In other words, any Industry Member CAT fees will have been subject to the same extensive notice and comment process as Participant CAT fees and must satisfy the requirements of the Exchange Act.

## VIII.  Constitutional Issues

SIFMA newly argues that requiring Industry Members to contribute to CAT costs raises constitutional issues.[141]  Specifically, SIFMA states that the Commission's extensive involvement in the design and implementation of the system demonstrates that the CAT is a Commission system used for enforcement, and therefore, the funds to build it must be approved by Congress.  SIFMA further states that the Constitution does not permit the Commission to fund its own enforcement apparatus through the backdoor—to require the SROs to raise and spend hundreds of millions of dollars to build a new law enforcement tool for the Commission.  SIFMA states that Section 11A of the Exchange Act requires regulated entities to act jointly; it does not require them to pay for a government resource.  Although SIFMA's prior comments recognized that Industry Member contributions to the CAT are "justifiable under the Exchange Act,"[142] SIFMA now states that "the expropriation of these funds from private parties— especially the imposition of retroactive liability for monies spent that the private parties had no control over—for public purposes poses a Takings problem."[143]  Other commenters reiterate SIFMA's newly-found constitutional arguments.[144]

CAT LLC believes that SIFMA's constitutional arguments are directed primarily at the Commission.  However, CAT LLC notes that SIFMA has not previously challenged the constitutionality of Rule 613 or the CAT NMS Plan.  When Rule 613 was proposed in 2010,

---

[141]     SIFMA Letter II at 7-9.

[142]     Letter from Ellen Greene, Managing Director, Equities & Options Market Structure and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC at 5 (June 22, 2022) at 5 ("June 2022 SIFMA Letter"), https://www.sec.gov/comments/4-698/4698-20132695-303187.pdf.

[143]     SIFMA Letter II at 8.

[144]     Citadel Letter at 28-29; FIA Letter at 3; Virtu Letter at 2.  Relatedly, one commenter recommended allocating a portion of CAT costs to the Commission.  Citadel Letter at 31.  The Commission is not a party to the CAT NMS Plan and not subject to Rule 608 of Regulation NMS or Section 19(b) of the Exchange Act.  Similarly, one commenter suggests that the CAT should be reconstituted as a Commission database subject to congressional oversight, and another commenter suggests that an NMS Plan is not the appropriate vehicle to govern CAT.  MMI Letter at 2; Citadel Letter at 34.  CAT LLC believes that these comments are outside the scope of the establishment of the funding model.

Ms. Vanessa Countryman
July 28, 2023
Page 32

SIFMA called the CAT an "important regulatory initiative"[145] and stated that it "fully supports the SEC's objective of providing timely access to a robust, cross-market audit trail for NMS securities and ultimately other securities."[146]

CAT LLC believes that the fact that this additional argument is being raised at this late date suggests that SIFMA's primary objective is to delay the approval of any mechanism that would require the industry to contribute to the funding of the CAT. SIFMA has long made clear that its fundamental concern with the CAT is not a constitutional concern but rather a financial one. It has long argued that Industry Members should not have any obligation to contribute to the funding of the CAT.

- SIFMA argued as early as 2016 that "SIFMA cannot at this time support any SRO fee for the CAT."[147]

- In June 2017, SIFMA reiterated its position on CAT funding, stating that "the Plan Participants have no justification for imposing a CAT fee at all."[148]

- In October 2019, SIFMA reiterated that "the SROs have never provided a financial justification for imposing a CAT fee at all."[149]

Nevertheless, in June 2022, SIFMA changed course, specifically arguing that a 50%-50% allocation would be "justifiable under the Exchange Act."[150] Similarly, as recently as May 2023, SIFMA argued that "we recognize and accept that Industry Members will be responsible for a portion of CAT costs,"[151] and reiterated its belief that "assigning 50% of CAT costs to the Participant Exchanges and 50% to Industry Members is a more fair and reasonable way to allocate CAT costs than what is proposed in the Funding Proposal."[152] In neither instance did SIFMA provide a substantive rationale for why its proposed allocation was fair and reasonable, but SIFMA nevertheless expressly recognized that the concept of an industry contribution is "justifiable under the Exchange Act".

CAT LLC notes that at no time over the past year that the Funding Proposal has been under consideration did SIFMA previously raise the argument that *any* contribution by broker-

---

[145] Letter James T. McHale, Managing Director and Associate General Counsel, SIFMA, to David Shillman, Associate Director, Division of Trading and Markets, SEC (Jan. 12, 2011) at 1, https://www.sec.gov/comments/s7-11-10/s71110-83.pdf.

[146] *Id*.

[147] Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, and Ellen Greene, Managing Director, Equities & Options Market Structure, SIFMA, to Brent J. Fields, Secretary, SEC (July 18, 2016) at 14, https://www.sec.gov/comments/4-698/4698-11.pdf.

[148] Letter from Theodore R. Lazo, Managing Director and Associate General Counsel, SIFMA, to Brent J. Fields, Secretary, SEC (June 6, 2017) at 2, https://www.sifma.org/wp-content/uploads/2017/06/SIFMA-Submits-Comments-to-the-SEC-on-CAT-NMS-Plan-Fee-Filings-for-Industry-Members.pdf.

[149] Letter from Theodore R. Lazo, Managing Director and Associate General Counsel and Ellen Greene, Managing Director, SIFMA, to Vanessa Countryman, Secretary, SEC (Oct. 28, 2019) at 2, https://www.sec.gov/comments/s7-13-19/s71319-6366765-195937.pdf.

[150] June 2022 SIFMA Letter at 5.

[151] SIFMA Letter I at 2.

[152] *Id*.

**A166**

Ms. Vanessa Countryman
July 28, 2023
Page 33

dealers to CAT costs poses a constitutional takings problem. SIFMA's strategic decision to inundate the Commission with these arguments—which directly contradict its prior statements that industry contributions are "justifiable under the Exchange Act"—just two days before a scheduled SEC Open Meeting to consider the Funding Proposal suggests their ultimate strategy is to delay the Commission's review and approval of any funding model that would require the industry to contribute to the funding of the CAT. The Commission should not allow SIFMA to continue to delay its consideration of the Funding Proposal by strategically introducing comments that could have been made months or years ago.

In adopting Rule 613, the Commission imposed significant obligations on the Participants. The Participants have created, implemented and maintained the CAT in accordance with Rule 613 and the CAT NMS Plan approved by the SEC, spending hundreds of millions of dollars to do so, in reliance on the Commission's longstanding assurances that Industry Members would contribute to funding such efforts, as contemplated by Rule 613 and the CAT NMS Plan.[153] Therefore, regardless of how the constitutional argument is resolved, the Participants must be able to recover the hundreds of millions of dollars they have invested in CAT as a result of being required to comply with the SEC's rule, whether under the Funding Proposal or otherwise.

## IX.    Data Security Issues

Several commenters argue that the Commission should prioritize data security concerns associated with the CAT.[154] For example, SIFMA asserts that "[t]he Commission has also failed to address the significant data security concerns associated with mandating this massive surveillance database, even though it has previously acknowledged the legitimacy of these concerns, and even though the Commission's ability to secure its systems continues to be drawn into question."[155]

Like with the constitutionality arguments, CAT LLC notes that the decision to adopt Rule 613 is under the SEC's purview. CAT security is of paramount importance, and the CAT System is protected by a comprehensive information security program required by the CAT NMS Plan and overseen by a dedicated CISO, as well as via SEC oversight, through its general supervision of SROs as well as more targeted mechanisms, such Regulation SCI. However, general security concerns regarding the CAT should not be used to prevent appropriate funding of the CAT. Indeed, appropriate funding will only be advantageous in ensuring the security of CAT Data.

---

[153]    *See* Section 11.1(b) of the CAT NMS Plan. *See also* Rule 613(a)(1)(vii)(D) of Regulation NMS under the Exchange Act.
[154]    Citadel Letter at 35; SIFMA Letter II at 2; Virtu Letter at 4.
[155]    SIFMA Letter II at 2.

Ms. Vanessa Countryman
July 28, 2023
Page 34

## X.     SEC Market Structure Proposals

Several commenters raise issues regarding the SEC moving forward with the Funding Proposal at the same time it is considering many additional market structure rule proposals.[156] CAT LLC does not believe that the SEC's consideration of other market structure proposals should be an impediment to making a decision on the Funding Proposal. The SEC should consider how any such market structure proposals are likely to affect CAT or would be affected by CAT if adopted. However, such considerations should not prevent the SEC from ensuring the appropriate funding of the CAT. They are separate decisions.

## XI.    Trading Activity as a Reasonable Cost Proxy

FINRA's second comment letter raises issues with proposed method for calculating CAT fees because "TRF volume contributes to only a very small percentage of annual CAT compute and storage costs"[157] but "FINRA would be assessed 34% of total CAT costs to be borne amongst the 25 Participants, and more than all options exchanges combined."[158] CAT LLC continues to believe that the Funding Proposal provides for an appropriate approach for allocating CAT costs among CAT Reporters.

FINRA's comments focus on whether the CAT fee is directly correlated to its cost burden on the CAT. A fee does not need to be directly correlated to costs created by the person charged the fee to be compliant with the Exchange Act. As the Commission noted in approving FINRA's TAF, "while trading activity is not wholly correlated to the full range of [FINRA] responsibility for members in all instances, the Commission believes that they are closely enough connected to satisfy the statutory standard."[159] Similarly, CAT LLC has indicated repeatedly that it is difficult to determine the precise cost burden imposed by each individual CAT Reporter on the CAT.[160] Although executed equivalent share volume is not an exact proxy for the cost burden (nor need it be to satisfy the statutory standard), trading activity provides a reasonable proxy for cost burden on the CAT. Increased trading activity impacts message traffic, data processing, storage and other factors, and thus necessarily correlates with increased cost burden on the CAT. Moreover, Industry Member activity in the market generally is for the purpose of effecting transactions, and, as a result, it is common for Participants to use transaction-based fees. Therefore, executed

---

[156]     Citadel Letter at 26 n.112; SIFMA Letter II at 3; Virtu Letter at 4. *See, e.g.*, Securities Exchange Act Release No. 96495 (Dec. 14, 2022), 88 Fed. Reg. 128 (Jan. 3, 2023) (Order Competition Rule); Securities Exchange Act Release No. 96494 (Dec. 14, 2022), 87 Fed. Reg 80266 (Dec. 29, 2022) (Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders); Securities Exchange Act Release No. 96496 (Dec. 14, 2022), 88 Fed. Reg. 5440 (Jan. 27, 2023).

[157]     FINRA Letter II at 2.

[158]     *Id*.

[159]     Securities Exchange Act Release No. 47946 (May 30, 2003), 68 Fed. Reg. 34021, 34024. FINRA argued in the context of its TAF that "the statutory requirement that fees be reasonable and equitably allocated does not require a pricing structure so specific and complex as to tie specific self-regulatory programs and related expenses to specific business lines within a firm." Letter from Barbara Z. Sweeney, Senior Vice President and Corporate Secretary, NASD, to Katherine A. England, SEC (Mar. 18, 2003), https://www.finra.org/sites/default/files/RuleFiling/p001023.pdf.

[160]     *See, e.g.,* Proposing Release at 17105.

Ms. Vanessa Countryman
July 28, 2023
Page 35

share volume is an appropriate metric for reasonably allocating CAT costs among CAT Reporters.

Furthermore, CAT LLC believes that FINRA's allocation is fair and reasonable as FINRA is currently, and is expected to continue to be, one of the largest regulatory users of the CAT, and it is responsible for the oversight of the very large over-the-counter securities market.

## XII.    Relevant Fee Precedent

In its second comment letter, FINRA objects to CAT LLC's reference to FINRA's TAF as relevant precedent. FINRA asserts that, unlike the proposed CAT fees, the TAF is intended to "recover the costs of FINRA's regulatory activities, while the Fee Proposal ostensibly is designed to 'align with the anticipated costs to build, operate, and administer the CAT.'"[161] There is no distinction between those two points. The CAT only has a regulatory purpose. The Commission has explained that "[t]he purpose of the Plan, and the creation, implementation and maintenance of a comprehensive audit trail for the U.S. securities markets described therein, is to 'substantially enhance the ability of the SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws.'"[162] Therefore, the costs to build, operate and administer the CAT are the same as regulatory costs for the CAT.

Second, FINRA attempts to distinguish the TAF from the proposed CAT fees by stating that that the TAF is "used in combination with other funding mechanisms and metrics to support an overall funding framework."[163] The fact that FINRA has chosen to use a transaction-based fee to pay for a portion of its regulatory costs, rather than all of its regulatory costs, does not change the general conclusion that a transaction-based fee complies with the Exchange Act.

\*        \*        \*        \*        \*

Without a Commission-approved funding model, the financial viability of the CAT is at risk. To date, the Participants have borne 100% of the costs of building and operating the CAT—more than $500 million through the end of 2022, with additional $233 million in costs expected through the end of 2023. Continuing to require the Participants to shoulder these costs will jeopardize the regulatory goals of Rule 613 and the CAT NMS Plan.

CAT LLC acknowledges that funding the CAT involves significant and complicated trade-offs, and that some commenters have long opposed any contribution to CAT costs by Industry Members. Over the past seven years, CAT LLC has considered all views and has offered a proposal that reasonably balances all considerations while achieving the financial

---

[161]    FINRA Letter II at 3.
[162]    CAT NMS Plan Approval Order at 84698 (citing Securities Exchange Act Release No. 67457, 77 Fed. Reg. 45722, 45726 (Aug 1, 2012)). Similarly, "Rule 613 requires that the information to be collected and electronically provided to the Central Repository would only be available to the national securities exchanges, national securities association, and the Commission for the purpose of performing their respective regulatory and oversight responsibilities pursuant to the federal securities laws, rules and regulations." CAT NMS Plan Approval Order at 84943.
[163]    FINRA Letter II at 3.

A169

Ms. Vanessa Countryman
July 28, 2023
Page 36

stability necessary to achieve the regulatory goals of the CAT. CAT LLC notes that the Exchange Act does not require CAT LLC to demonstrate that the Funding Proposal is superior to any other potential proposal; instead, CAT LLC must demonstrate that the Funding Proposal is consistent with the Exchange Act and the rules and regulations thereunder. CAT LLC believes that the Funding Proposal satisfies the requirements of the Exchange Act and should be approved by the Commission.

Respectfully, a decision on an initial funding model is overdue and needs to be made.

Respectfully submitted,

*/s/ Brandon Becker*

Brandon Becker
CAT NMS Plan Operating Committee Chair

cc:    The Hon. Gary Gensler, Chair
       The Hon. Hester M. Peirce, Commissioner
       The Hon. Caroline A. Crenshaw, Commissioner
       The Hon. Mark T. Uyeda, Commissioner
       The Hon. Jaime Lizárraga, Commissioner
       Mr. Hugh Beck, Senior Advisor for Regulatory Reporting
       Mr. Haoxiang Zhu, Director, Division of Trading and Markets
       Mr. David S. Shillman, Associate Director, Division of Trading and Markets
       Mr. David Hsu, Assistant Director, Division of Trading and Markets
       Mr. Mark Donohue, Senior Policy Advisor, Division of Trading and Markets
       Ms. Erika Berg, Special Counsel, Division of Trading and Markets
       CAT NMS Plan Participants

**A170**

# Tab I

Letter from Joseph Corcoran, Associate General Counsel, SIFMA et al. to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (July 31, 2023)





July 31, 2023

**By electronic mail to rule-comments@sec.gov**

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
Attn: Secretary

Re:     File Number 4-698: Joint Industry Plan; Order Instituting Proceedings to Determine Whether to Approve or Disapprove an Amendment to the National Market System Plan Governing the Consolidated Audit Trail (June 16, 2023)

Dear Secretary,

The Financial Information Forum ("FIF")[1] and the Securities Industry and Financial Market Association ("SIFMA")[2] appreciate the opportunity to comment on the Order Instituting Proceedings (the "Order") published by the Securities and Exchange Commission (the "Commission") on June 16, 2023 to determine whether to approve or disapprove an amendment to the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan" or the "Plan").[3] The amendment (the "Amendment") proposes a revised funding model for the Consolidated Audit Trail ("CAT") referred to as

---

[1] FIF (www.fif.com) was formed in 1996 to provide a centralized source of information on the implementation issues that impact the securities industry across the order lifecycle. Our participants include broker-dealers, exchanges, back office service bureaus, and market data, regulatory reporting and other technology vendors in the securities industry. Through topic-oriented working groups, FIF participants focus on critical issues and productive solutions to technology developments, regulatory initiatives, and other industry changes.

[2] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA).

[3] Securities Exchange Act Release No. 34-97750 (June 16, 2023), 88 FR 41142 (June 23, 2023) (Order Instituting Proceedings to Determine Whether to Approve or Disapprove an Amendment to the National Market System Plan Governing the Consolidated Audit Trail).

1

A171

the "Executed Share Model".[4] This letter is focused on the magnitude of CAT costs, including the level of CAT costs relative to what was projected in the CAT NMS Plan and the recent annual increases in CAT costs.

The following are some of the key points discussed in this letter:

- It is important to address rising CAT costs, which currently have no legal limit or mechanism for control that is being implemented.
- It is important to address three distinct categories of CAT costs: costs for operating the CAT system (we refer to these as "CAT operating costs"); internal firm costs; and firm workflow changes required to comply with CAT reporting requirements.
- The CAT operating costs projected for 2023 significantly exceed the costs estimated in the CAT NMS Plan. More specifically, the CAT operating costs projected for 2023 are approximately 5.2 (or 520%) times the costs projected in the CAT NMS Plan.[5]
- The annual increases in CAT operating costs during the past three years of 73.2%, 27.3% and 27.0%, respectively, are not sustainable over the long-term.[6]
- Recent actions and decisions taken by the Commission to mandate additional processing and reporting requirements for CAT will lead to acceleration of these unsustainable annual cost increases.[7]
- The actions and decisions by the Commission to mandate additional processing requirements that will accelerate the current CAT cost increases include the following:

---

[4] Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail regarding CAT Funding Model (Mar. 13, 2023), available at https://catnmsplan.com/sites/default/files/2023-03/3.13.23-Amendment-to-CAT-NMS-Plan-CAT-Funding-Model.pdf.

[5] The CAT financial and operating budget for 2023 projects total expenditures of $236.7 million. Consolidated Audit Trail, LLC, 2023 Financial and Operating Budget (Mar. 28, 2023), available at https://www.catnmsplan.com/sites/default/files/2023-03/03.28.23-CAT-Q1-2023-Budget.pdf ("CAT Q1 2023 Budget"). The Commission, in its approval order for the CAT NMS Plan, projects that annual costs for operating the CAT system will range between $36.5 million and $55 million. Securities Exchange Act Release No. 34-79318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016) (Order Approving the National Market System Plan Governing the Consolidated Audit Trail) ("CAT NMS Plan Approval Order"), at 84854. Dividing $236.7 million by the mid-point of the range projected by the Commission in its approval order ($45.75 million) means that CAT costs for 2023 are expected to be 5.2 (or 520%) times what the Commission projected when it approved the CAT NMS Plan.

[6] See the detailed discussion below of the most recent annual CAT operating cost increases.

[7] In certain cases (for example, with respect to reporting certain verbal activity to CAT), the Commission has acted through Commission Orders. Securities Exchange Act Release No. 90405 (Nov. 12, 2020), 85 FR 73544 (Nov. 18, 2020) (Order Granting a Temporary Conditional Exemption Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to the Reporting of Certain Activities on the Floor of National Securities Exchanges and Certain Activities by Industry Members Off Exchange Floors, as Required by Section 6.4(d) of the National Market System Plan Governing the Consolidated Audit Trail) ("Initial Verbal Activity Exemption"). In other cases (for example, with respect to reporting non-executable RFQ responses to CAT), the Commission has not taken formal action and the staff of the Commission has orally communicated the Commission's position to industry representatives and/or the CAT Plan Participants. With respect to these oral communications, it is not clear whether the position stated represents the position of the Commission staff or the Commission. Since this is not known to industry members, for purposes of this letter we refer to these actions and statements as actions and statements of the Commission.

- o Requiring that the CAT Plan Participants assign an interim CAT Order ID by T+1 at noon[8]
  - o Requiring that the CAT Plan Participants reassign CAT Order IDs for all corrected data received after T+5[9]
  - o Requiring that the CAT Plan Participants link CAT transaction data with SIP data[10]
  - o Requiring that the online targeted query tool (a tool developed by the CAT Plan Processor and used by Commission and CAT Plan Participant surveillance personnel to query the CAT database) (the "OTQT") return results within 1 minute for all trades and related lifecycle events for a specific Customer or CAT Reporter[11]
  - o Requiring the CAT Plan Participants to measure on a monthly basis, using benchmark queries, the time it takes to provide results to users from OTQT searches that are run concurrently with up to 300 user queries.[12]
- The actions and decisions by the Commission to mandate new reporting requirements that will accelerate the current CAT cost increases include the following:
  - o Requiring CAT reporting of verbal (unstructured) activity, where the verbal activity does not represent orders as defined under the CAT NMS Plan
  - o Requiring that non-executable RFQ responses be reported to CAT, where these RFQ responses are not orders as defined under the CAT NMS Plan
  - o Requiring that request messages be reported to CAT, where these request messages are not a type of event that is reportable under Rule 613
  - o Requiring that order recipients report rejections to CAT, where these rejections are not a type of event that is reportable under Rule 613
  - o Requiring an order sender to report order recipient (venue) port settings, where this will result in an inferior audit trail being made available to surveillance personnel
  - o Requiring that firms provide linkage of representative to customer orders and linkage of order fulfillments to representative and principal orders, where firms do not maintain this linkage in their existing systems.
- The Commission's decisions have the most impact on CAT costs, but the Commission does not have any process to effectively manage CAT costs.
- There is a lack of transparency about CAT operating costs. The largest CAT operating cost item for 2023 is cloud hosting services ($176,248,699), representing 74.5% of CAT operating costs, but no further detail is provided.

---

[8] *See* Brief in Support of Motion for Partial Stay of Order 34-90688, Before the United States Securities and Exchange Commission, In the Matter of the: Order Granting Temporary Conditional Exemptive Relief Pursuant to Section 36 of the Securities Exchange Act of 1934 (''Exchange Act'') and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail (Feb. 14, 2021) ("688 Brief"), at 5-9.

[9] Id. at 9-13.

[10] Id. 13-15.

[11] *See* Brief in Support of Motion for Partial Stay of Order 34-90689, Before the United States Securities and Exchange Commission, In the Matter of the: Order Granting Temporary Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 (''Exchange Act'') and Rule 608(e) of Regulation NMS Under the Exchange Act, From Section 8.1.1 and Section 8.1.2 of Appendix D of the National Market System Plan Governing the Consolidated Audit Trail (Feb. 14, 2021) ("689 Brief"), at 6-9.

[12] Id. at 9-10.

A173

- Commission Rule 613 mandates that the CAT NMS Plan include "The detailed estimated costs for creating, implementing, and *maintaining* [emphasis added] the consolidated audit trail …"[13] In the adopting release for CAT, the Commission writes that "*a fulsome discussion*" [emphasis added] of the estimated costs to SROs and their members "will aid the Commission in its evaluation of whether to approve the NMS plan and in conducting its own analysis of the costs and benefits of the NMS plan."[14]
- Based on Rule 613 and the CAT adopting release, additional processing or reporting requirements proposed by the Commission -- where the costs were not considered in connection with the Commission's approval of the CAT NMS Plan -- should require a CAT NMS Plan amendment.

Based on the above, FIF and SIFMA members recommend that the Commission take the following actions:

- Enhanced transparency about CAT costs is necessary. The Commission should mandate public disclosure of the financial terms of the contract between the CAT Plan Participants and Amazon Web Services (the cloud provider for the CAT system) ("AWS") and the invoices from AWS from inception of the contract with AWS to the present.
- The Commission should direct the CAT Plan Participants to analyze why CAT operating costs have increased so dramatically over the past three years.
- As part of this analysis, the CAT Plan Participants should evaluate the expected annual CAT operating cost increases for future years (based on the current CAT requirements).
- Making the AWS financial terms and invoices publicly available will assist the Commission, industry members and the public in understanding and providing input on this analysis.
- Until this process has been completed, the Commission should not mandate any new processing or reporting requirements, including those discussed in this letter.
- After this process has been completed:
  - Any new processing or reporting requirement that would result in a significant increase in CAT costs should require a CAT NMS Plan amendment that includes a cost-benefit analysis by the CAT Plan Participants, including a fulsome discussion of the potential costs.
  - The CAT Plan Participants should analyze various changes to CAT processing requirements that could reduce CAT operating costs (for example, requiring that the CAT system complete initial data validation, lifecycle linkages, and communication of errors to CAT reporters by T+2 or later in the day on T+1 instead of by noon on T+1). The CAT Plan Participants should analyze how these changes could mitigate future CAT operating cost increases and make their conclusions publicly available. Based on these conclusions, appropriate amendments to the CAT NMS Plan should be considered.

---

[13] 17 CFR §242.613(a)(1)(vii).
[14] Securities Exchange Act Release No. 67457 (July 18, 2012), 77 FR 45722 (Aug. 1, 2012) (Consolidated Audit Trail) ("CAT Adopting Release"), at 45794.

A174

The Commission should act cautiously and not impose any material new reporting requirements for CAT or material changes to the current CAT processing requirements until the Commission, market participants and the public have a better understanding of (i) the factors that have contributed to the significant increases in CAT operating costs over the past few years, (ii) the level of increases that can be expected in future years (based on current reporting and processing requirements), and (iii) whether, and the degree to which, the new CAT reporting requirements being proposed by the Commission and the Commission's proposed changes to the current CAT processing requirements would further exacerbate these rising CAT operating costs.

* * * * *

Given the focus of FIF on implementation issues and the fact that FIF members include broker-dealers, exchanges and technology vendors in the securities industry, FIF is not expressing (and this letter does not state) any position either for or against the Amendment. FIF members, SIFMA and SIFMA members have strong views on the Amendment, which are reflected through other comment letters. This letter is being submitted on behalf of FIF members that are broker-dealers and technology vendors that provide services to these broker-dealers.

A. **It is important to address rising CAT costs, which currently have no legal limit or mechanism for control that is being implemented**

The Amendment, comment letters submitted in response to the Amendment, and the Order have included significant discussion of the allocation of costs across market participants and the fee collection process. This letter is focused on another important consideration (also discussed in various comment letters), which is the magnitude of CAT costs, including the level of CAT costs relative to what was projected in the CAT NMS Plan and the recent annual increases in CAT costs. The recent year-over-year CAT cost increases are not sustainable over the long-term, and at present there is no cap or controls to prevent CAT costs from growing infinitely. In this letter, FIF and SIFMA identify steps that the Commission should take now, and in the future, to address rising CAT costs.

One of these steps, discussed below, would be to require an amendment to the CAT NMS Plan for any new reporting requirements or enhancements to CAT for which the costs and benefits were never considered by the Commission in the economic analysis the Commission relied upon to approve the current Plan. As discussed below, FIF and SIFMA members believe that this approach is required based on the wording of Commission Rule 613 (Consolidated audit trail)[15] and the adopting release for CAT.[16]

B. **It is important to address three distinct categories of CAT costs**

FIF and SIFMA members have identified the following categories of CAT costs:

- Costs for the CAT Plan Participants to develop and operate the CAT system ("CAT operating costs").

---

[15] 17 CFR §242.613.
[16] CAT Adopting Release, at 45794.

- Internal costs incurred by market participants to develop and operate firm systems, and to implement firm processes, for CAT reporting
- Trading workflow changes that are necessary to comply with certain CAT reporting requirements.

All of these costs (including costs to develop and operate the CAT system) are borne 100% by market participants, consisting of broker-dealers and exchanges. While the Financial Industry Regulatory Authority ("FINRA"), as a participant of the CAT NMS Plan ("CAT Plan Participant"), is responsible for a percentage of CAT operating costs, FINRA has indicated that 100% of these costs will be passed through to broker-dealers that are FINRA members.

In addition to CAT operating costs, firms are subject to extensive internal costs relating to CAT, including: systems development, testing and implementation; daily reporting obligations and associated supervision; error resolution; monitoring and analysis of CAT system changes; monitoring and analysis of business changes that impact CAT reporting; daily system processing; data storage; data collection; data organization; and data security.

The third cost category is trading workflow changes that are necessary to comply with certain CAT reporting requirements. For example, firms have transitioned certain trading activity from manual to electronic because of the challenges in reporting manual trading activity to CAT.[17] It is important to identify trading workflow changes as a cost. If a firm is changing its trading workflow for the sole purpose of being able to comply with very specific or prescriptive CAT reporting requirements, this may mean that the firm is implementing a less efficient trading workflow and incurring associated costs to accommodate CAT reporting.

While CAT operating costs are the most directly measurable of the three cost categories, in the view of FIF and SIFMA members, firms' collective internal costs and the costs of trading workflow changes significantly exceed CAT operating costs. The Commission's cost estimates in its Order Approving the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan Approval Order") are consistent with this view. In the 2016 CAT NMS Plan Approval Order, the Commission writes that it "now believes that …annual operating costs …" will "… range from $36.5 million to $55 million."[18] The Commission further estimates in the CAT NMS Plan Approval Order that the ongoing annual costs for CAT (including CAT operating costs and internal market participant costs) would be $1.7 billion.[19]

---

[17] Consistent with the CAT Technical Specifications and other CAT documentation, (i) we use the term "manual" to include telephone and other voice communications as well as unstructured electronic communications, such as IM, chat and email, and (ii) we use the term "electronic" to refer to structured communications, such as FIX. CAT Reporting Technical Specifications for Industry Members, Version 4.0.0 r 19 (April 11, 2023), available at https://catnmsplan.com/sites/default/files/2023-04/04.20.2023_CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.0.0r19_CLEAN.pdf ("April 2023 CAT Technical Specifications"), at 34-35.

[18] CAT NMS Plan Approval Order, at 84854.

[19] Id. at 84863.

**C. The current CAT operating costs significantly exceed the costs estimated in the CAT NMS Plan; the recent annual increases in CAT operating costs are not sustainable over the long-term**

In the 2016 CAT NMS Plan Approval Order, the Commission estimates that annual CAT operating costs would range from $36.5 to $55 million.[20] In the CAT Financial and Operating Budget published during the 1st quarter of 2023, the CAT Plan Participants estimate that total expenditures for CAT for 2023 will be $236.7 million.[21] This means that CAT operating costs for 2023 are expected to be 5.2 (or 520%) times what the Commission projected when it approved the CAT NMS Plan.[22]

The CAT audited financial statements for 2020 through 2022 report annual CAT operating expenses of $84,529,904 for 2020, $146,536,571 for 2021 and $186,376,256 for 2022.[23] In the CAT Financial and Operating Budget published during the 1st quarter of 2023, the CAT Plan Participants estimate that total expenditures for CAT for 2023 will be $236.7 million.[24] This represents annual increases in CAT operating costs of 73.2%, 27.3% and 27.0%, respectively, for the three most recent years. Comparing the CAT budgets for Q4 2022 and Q1 2023, the largest CAT budget item, for cloud hosting services, increases from $129.6 million to $176.2 million from 2022 to 2023.[25] This represents a 36.0% year-over-year increase in this line item. If CAT operating costs were to continue to increase at the current rate of 27.0%, and the Commission's annual budget were to increase after 2024 at the recent rate of inflation (4.0%, as measured by the CPI-U),[26] in ten years the operating costs for CAT would be 74.5% of the entire Commission budget.[27] Industry members also have their own related storage and processing costs, which also increase when trading volumes and CAT complexity increase.

---

[20] Id. at 84854.

[21] CAT Q1 2023 Budget. FIF and SIFMA members note that the CAT "Financial and Operating Budget" is not actually a budget per se, but only an estimate. There is no mechanism that restricts CAT spending if the estimates are exceeded. The excess expenditures are simply tacked on to the following year's estimates and (proposed) fee collections.

[22] The range for annual CAT operating costs projected by the Commission in its approval order is $36.5 million to $55.0 million. CAT NMS Plan Approval Order, at 84854. The mid-point of this range is $45.75 million. We divide the current budget projection for 2023 by this mid-point to calculate that CAT costs for 2023 are expected to be 5.2 (or 520%) times what the Commission projected when it approved the CAT NMS Plan.

[23] Consolidated Audit Trail, Financial Statements, December 31, 2021 and 2020, available at https://catnmsplan.com/sites/default/files/2022-06/CAT-NMS-LLC-2021-and-2020-Financial-Statements.pdf ("CAT 2021 Financial Statements"), at 4. Consolidated Audit Trial, Financial Statements, December 31, 2022 and 2021, available at https://catnmsplan.com/sites/default/files/2023-07/FY2022-CAT-Audited-Financial-Statements.pdf ("CAT 2022 Financial Statements"), at 4.

[24] CAT Q1 2023 Budget.

[25] CAT Q1 2023 Budget. Consolidated Audit Trail, LLC, 2022 Financial and Operating Budget (July 25, 2023), available at https://www.catnmsplan.com/sites/default/files/2023-07/07.25.23-CAT-2022-Financial-and-Operating-Budget.pdf.

[26] U.S. Bureau of Labor Statistics, "Economic News Release, Consumer Price Index Summary," available at https://www.bls.gov/news.release/cpi.nr0.htm#:~:text=Not%20seasonally%20adjusted%20CPI%20measures,percent%20prior%20to%20seasonal%20adjustment.

[27] The Commission's budget request for 2024 is $2.436 billion. "Fiscal Year 2024 congressional budget justification annual performance plan, Fiscal Year 2022 annual performance report," available at https://www.sec.gov/files/fy-2024-congressional-budget-justification_final-3-10.pdf, at 7.

FIF and SIFMA members recommend that the Commission consider steps that it could take to address these non-sustainable cost increases, including implementation of the recommendations set forth in this letter.

**D. The Commission's decisions have the most impact on CAT costs, but the Commission does not have any process to effectively manage CAT costs**

FIF and SIFMA members are concerned that the Commission, as the party that has undertaken the primary responsibility for determining the scope of CAT reporting and processing requirements (and, as a result, the party whose decisions have the most impact on CAT operating costs and internal firm costs), does not have any process to effectively manage CAT costs. CAT operating costs are not part of the Commission's budget and do not require the Commission to obtain any appropriation. As discussed in this letter, the Commission has extended CAT reporting requirements beyond the adopted Rule and the approved CAT NMS Plan and intends to impose additional requirements that exceed the scope of the Rule and the Plan. The Commission also intends to impose changes to CAT processing requirements that could greatly increase CAT costs. FIF and SIFMA members are concerned that the Commission's lack of process to effectively manage CAT costs has been a contributing factor to these decisions.

**E. Enhanced transparency about CAT costs is necessary**

In the financial statements for CAT for 2022, the largest expense item in the Statement of Activities is "Technology costs". The technology costs for CAT for 2022 were $171.2 million, representing 91.9% of total CAT operating expenses for that year.[28] The financial statements do not provide any further breakout of these costs. The CAT budget for 2023 estimates technology costs of $222.5 million, representing 95.3% of total operating costs.[29] In the 2023 budget, technology costs are divided into four categories; the largest line item is $176.2 million, for cloud hosting services, which represents 75.5% of estimated CAT costs for 2023.[30] Other significant technology line items in the 2023 budget include operating fees ($26.3 million) and CAIS operating fees ($18.1 million).[31] There is no further break-out of any of these items.[32]

Given that industry members will ultimately be responsible for a significant portion of these costs, it is important that the Commission and the CAT Plan Participants provide enhanced transparency to the public and to industry members relating to these costs. More specifically, FIF and SIFMA members request that the Commission and the CAT Plan Participants make publicly available the financial terms of the contract between the CAT Plan Participants and AWS, as well as the invoices from AWS from inception of the contract with AWS to the present.

It is very important that the public, the Commission and industry participants obtain a clearer understanding of the drivers of CAT operating costs, why CAT operating costs have significantly

---

[28] CAT 2022 Financial Statements, at 4.
[29] CAT Q1 2023 Budget.
[30] Ibid.
[31] Ibid.
[32] Ibid.

exceeded the CAT operating costs projected in the CAT NMS Plan, and why CAT operating costs are projected to increase 27.0% from 2022 to 2023. For example, the following are some (and definitely not all) possible contributors to the projected increase in CAT costs:

- Increased data storage costs resulting from increased historical data that must be stored
- Increased market trading volume
- Increased processing costs resulting from new requirements being introduced during the period (for example, the requirement to report request events to CAT).

As noted above, the recent annual CAT operating cost increases of 73.2%, 27.3% and 27.0% are not sustainable over the long-term, so it is crucial to understand what is driving this increase. Understanding the drivers of CAT cost increases at a detailed level is necessary for the Commission, market participants and the public to evaluate potential approaches to manage CAT operating costs. In particular, this transparency is necessary to conduct a proper cost-benefit analysis of various new CAT processing and reporting requirements that the Commission proposes to mandate. As discussed below, FIF and SIFMA members believe that Rule 613 and the CAT adopting release require a proper cost-benefit analysis of these types of changes.

F. **The Commission should not mandate CAT processing changes that will further exacerbate CAT cost increases; any CAT processing changes mandated by the Commission that will materially increase CAT operating costs should be subject to the filing and approval of a CAT NMS Plan amendment**

***Each of the Commission's proposed CAT processing changes should require a CAT NMS Plan amendment***

As discussed in this section, the Commission intends to mandate CAT processing changes that will further exacerbate CAT cost increases. Consolidated Audit Trail, LLC ("CAT LLC"), the legal entity established to conduct the activities relating to CAT, has filed motions and accompanying briefs on behalf of 23 of the 24 exchanges that are CAT Plan Participants.[33] In these motions, CAT LLC has objected to the Commission's planned CAT processing changes based on the significant cost and questionable surveillance use.[34] FIF and SIFMA members note that the CAT Plan Participants on whose behalf these motions have been filed have detailed knowledge of both CAT operating costs and surveillance. Because industry members will be obligated to fund a significant portion of any costs resulting from these CAT processing changes, it is important that these processing changes, including the cost concerns identified by CAT LLC, be subject to public disclosure and comment through the filing of a proposed CAT NMS Plan amendment.

Commission Rule 613 mandates that the CAT NMS Plan include "The detailed estimated costs for creating, implementing, and ***maintaining*** [emphasis added] the consolidated audit trail ..."[35] In the adopting release for CAT, the Commission writes that "***a fulsome discussion***" [emphasis added] of the

---

[33] *See* 688 Brief and 689 Brief. CAT LLC did not file motions on behalf of FINRA or the Long-Term Stock Exchange.
[34] Ibid.
[35] 17 CFR §242.613(a)(1)(vii).

estimated costs to SROs and their members "will aid the Commission in its evaluation of whether to approve the NMS plan and in conducting its own analysis of the costs and benefits of the NMS plan."[36] Based on Rule 613 and the CAT adopting release, prior to implementation of any of these processing changes, the Commission should require a CAT NMS Plan amendment that provides a fulsome cost-benefit analysis.

***Commission action to date on CAT processing changes***

As adopted, the CAT NMS Plan imposes various requirements relating to: the time and method by which data must be made available to regulators; data validations; error correction and processing; linkage; and the creation of the lifecycle of an order.[37] On December 16, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief from certain requirements relating to the online targeted query tool described in the CAT NMS Plan.[38] Also on December 16, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief, until July 31, 2023, from (i) requirements to complete initial data validation, make lifecycle linkages and communicate errors to CAT reporters by 12 pm ET on T+1,[39] (ii) certain requirements relating to the re-processing of corrections received after T+5,[40] and (iii) certain requirements relating to the linkage of data submitted by CAT reporters with data from the Securities Information Processor.[41] On July 8, 2022, the Commission extended this temporary exemptive relief until July 31, 2024.[42] On May 19, 2023, the Commission further extended this temporary exemptive relief until January 31, 2025.[43]

---

[36] CAT Adopting Release, at 45794.

[37] *See*, *for example*, Limited Liability Company Agreement of Consolidated Audit Trail, LLC (July 24, 2020), available at https://catnmsplan.com/sites/default/files/2020-07/LLC-Agreement-of-Consolidated-Audit-Trail-LLC-as-of-7.24.20.pdf ("CAT NMS Plan"), at C-15 to C-22, D-7 to D-10 and D-18 to D-20.

[38] Securities Exchange Act Release No. 90688 (Dec. 16, 2020), 85 FR 83667 (Dec. 22, 2020) (Order Granting Temporary Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS under the Exchange Act, from Section 8.1.1 and Section 8.1.2 of Appendix D of the National Market System Plan Governing the Consolidated Audit Trail).

[39] Securities Exchange Act Release No. 90688 (Dec. 16, 2020), 85 FR 83634 (Dec. 22, 2020) (Order Granting Temporary Conditional Exemptive Relief Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail) ("December 2020 Exemption"), at 4-5.

[40] Id. at 5-6.

[41] Id. at 6-7.

[42] Securities Exchange Act Release No. 95234 (July 8, 2022), 87 FR 42247 (July 14, 2022) (Order Granting Temporary Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS under the Exchange Act, from Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail) ("July 2022 Exemption"), at 7-28.

[43] Securities Exchange Act Release No. 97530 (May 19, 2023), 88 FR 33655 (May 24, 2023) (Order Granting Temporary Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS under the Exchange Act, from Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail) ("May 2023 Exemption"), at 9.

***The Commission should provide transparency relating to these CAT processing changes***

To date, the Commission has not provided transparency to industry members and the public relating to these CAT processing changes. Instead, FIF and SIFMA members understand that these changes have been subject to private discussions between the Commission and the CAT Plan Participants. FIF and SIFMA members assume that the Commission's view is that because these changes relate to CAT processing and surveillance, it is not necessary to provide transparency to industry members and the public about these proposed changes. FIF and SIFMA members disagree with this approach. Because industry members will be responsible for a significant portion of the resulting costs, and given the wording of Rule 613 and the CAT adopting release (as noted above), it is important that the Commission provide transparency about these proposed CAT processing changes.

Because of the lack of transparency relating to these issues, industry members do not have a full understanding of what the Commission is requiring. However, we quote below some of the objections that 23 of the 24 exchanges that are CAT Plan Participants, and that have detailed knowledge of both CAT costs and surveillance, have raised about these planned processing changes (items indicated below as redacted have been redacted by CAT LLC):

- ***Assignment of CAT Order IDs by noon on T+1.*** "The Plan does not require the Participants to assign interim CAT Order IDs at any point, let alone by noon on T+1."[44] "Even if the Plan contemplated including interim CAT Order IDs as part of the process of ingesting CAT Reporter data submissions and validating lifecycle linkages by noon on T+1, such reporting would impose costs for no benefit."[45]
- ***Assignment of new CAT Order ID for all post T+5 error corrections.*** "Cost is not a trivial concern. The Plan Processor has preliminarily estimated that building the infrastructure to allow the CAT to reassign CAT Order IDs daily would require approximately [redacted]."[46] "Because errors are always corrected in the Central Repository regardless of when the correction is submitted, the Commission is able to see the whole picture for each order without assigning new CAT Order IDs. Further, requiring reassignment of new CAT Order IDs can impede effective regulation."[47]
- ***Linkage of CAT transaction data with SIP data.*** "Although Part II.C of the 688 Order interprets this provision to require that SIP Data and other CAT Transaction Data be linked such that both types 'are part of the lifecycle of an Order,' the Order correctly acknowledges that such linkage is unfeasible: 'the CAT Plan Processor is only able to provide a regulatory user a side-by-side view of – instead of a linkage between – both the transactional data in CAT and SIP Data through an online targeted query tool or a user-defined direct query.'"[48] "Unfortunately, meeting this requirement would require more than just additional time."[49] "The SIPs are not governed by the Plan, but rather by their own NMS plan…. If changes are to be made to SIP Data, those changes must be made through the relevant NMS plan, not through an order interpreting the CAT NMS

---

[44] 688 Brief, at 5.
[45] Id. at 8.
[46] Id. at 12
[47] Id. at 12-13.
[48] Id. at 13-14.
[49] Id. at 14.

11
A181

Plan. As a result, the requirement imposed by the 688 Order is not an appropriate or effective means of bringing about the necessary changes to SIP systems and data reporting."[50] "In light of the above, the Order's requirement would impose substantial costs while yielding no meaningful benefits."[51]

- **One-minute query requirement.** "Part of the Order requires the Participants to develop the CAT in ways that would be of little, if any, value to regulatory users. Among other things, the Order interprets the Plan as requiring searches using the Online Targeted Query Tool ("OTQT")—including an intermediate data-organizing step—to be completed in one minute."[52]

- **Requirement to test search performance with up to 300 concurrent user queries.** "Another part of the Order imposes costs on the Participants outweighing their regulatory benefits and that also impedes existing CAT benefits. In particular, the Order requires the Participants to conduct monthly tests of the OTQT's search performance with up to 300 concurrent user queries. The technological upgrades necessary to run these tests would cost [redacted] with no corresponding regulatory benefits because the Participants already [redacted]."[53] "This condition bears no reasonable relation to the CAT's regulatory purpose."[54] "The Order's testing condition also imposes costs with no tangible benefit."[55]

Industry members are limited in our ability to comment on the issues above because these issues have been the subject of private discussions between the Commission and the CAT Plan Participants. Accordingly, in this letter, industry members do not provide substantive comment on the points above made by CAT LLC. However, industry members can certainly state that the costs for the processing changes above were not contemplated in the Commission's approval order for the CAT NMS Plan and, accordingly, public transparency through the filing of a CAT NMS Plan amendment is necessary for a proper evaluation of the cost and other concerns raised by CAT LLC.

CAT LLC also objects to the Commission's mandates to expand processing requirements relating to the reporting of port settings and linkage of representative orders.[56] These issues are discussed in detail below.

G. **The Commission should direct the CAT Plan Participants to analyze various changes to CAT processing requirements that could reduce CAT operating costs; based on this analysis, appropriate amendments to the CAT NMS Plan should be considered**

As adopted, the CAT NMS Plan specifies that linked and error-corrected CAT data will be available to the Commission and CAT Plan Participant regulatory staff on a T+5 basis.[57] FIF and SIFMA members understand that this target has generally been met since inception. The Plan also lays out various

---

[50] Ibid.
[51] Id. at 15.
[52] 689 Brief, at 1.
[53] Ibid.
[54] Id. at 9.
[55] Id. at 10.
[56] 688 Brief, at 15-20.
[57] CAT NMS Plan, at C-16.

interim processing times for when initial linkages are completed, when error reports are sent to industry members, and when industry member need to provide corrected data.[58] The Plan provides that the Commission and CAT Plan Participant regulatory staff shall have open access to any intermediate data as available.[59]

As the mass of data reported to CAT has far exceeded what was expected in the CAT economic analysis, and the complexity of message records (and their linkages) has far exceeded the more general framework that was specified in Rule 613 and the CAT NMS Plan, meeting interim processing times has proven to be extremely costly and inefficient. The CAT Plan Participants have written that "The significant and increasing overall CAT costs are driven by the requirements in the CAT NMS Plan to process record data volumes in accordance with complex reporting and linkage requirements, within the narrow timeframes required by the SEC."[60]

FIF and SIFMA members recommend that the Commission push-back various CAT processing timelines and other CAT processing requirements in light of the fact that the actual CAT operating costs have been significantly higher than projected in the CAT NMS Plan and the fact that the recent annual rates of increase in CAT costs are not sustainable over the long-term. The Commission should direct the CAT Plan Participants to conduct and publish an analysis of how various changes from the current CAT processing requirements (for example, requiring that the CAT system complete initial data validation, lifecycle linkages, and communication of errors to CAT reporters by T+2 or later in the day on T+1 instead of by noon on T+1) would impact CAT costs. The analysis should also discuss how these processing changes would impact the ability for the Commission and the CAT Plan Participants to conduct market surveillance. The Commission, industry members and the public should have transparency into relevant data underlying this analysis, including the financial details of the contract with AWS. Based on this analysis, appropriate amendments to the CAT NMS Plan should be considered and submitted for comment. As discussed below, FIF and SIFMA members believe that this type of process is required based on the wording of Rule 613 and the CAT adopting release.

**H.   The Commission has mandated, or has indicated its intent to mandate, additional reporting requirements for CAT that will be costly to implement; at a minimum, these additional reporting requirements should be subject to an appropriate cost-benefit analysis**

As discussed in this section, the Commission has mandated, or has indicated its intent to mandate, additional reporting requirements[61] for CAT that will be costly to implement. In many cases, as discussed below, FIF and SIFMA members do not consider these reporting requirements to be within the scope of

---

[58] *See*, *for example*, CAT NMS Plan, at D-18.

[59] *See*, *for example*, CAT NMS Plan, at D-19.

[60] Consolidated Audit Trail Industry Webinar: Proposed Funding Model (Apr. 6, 2022), available at https://catnmsplan.com/sites/default/files/2022-04/04.06.22-CAT-April-2022-Industry-Webinar-on-Fee-Model_0.pdf.

[61] We use the phrase "additional reporting requirement" or "new reporting requirement" to mean that market participants are not currently subject to this reporting requirement. With respect to reporting of request messages (discussed below), "additional" or "new" refers to the fact that this reporting was not required as part of the initial launch of CAT.

13

**A183**

Rule 613 and the CAT NMS Plan. Whether or not the Commission agrees with this view, FIF and SIFMA members are further concerned that these reporting requirements will be very costly to implement and that there are serious questions as to whether the surveillance value of these additional reporting requirements justifies the additional costs that will be imposed on market participants (and potentially passed through to customers). Accordingly, FIF and SIFMA members recommend that the Commission, even if it considers these additional reporting requirements to be within the scope of Rule 613 and the CAT NMS Plan, grant exemptive relief with respect to these requirements.

If the Commission does not decide to grant exemptive relief with respect to these new reporting requirements, at a minimum, the Commission should require an amendment to the CAT NMS Plan for each of these additional reporting requirements. Even if the Commission believes that these additional reporting requirements are within the scope of Rule 613 and the CAT NMS Plan, it is clear that these reporting requirements were not considered as part of the cost estimates in the CAT NMS Plan. Accordingly, based on the wording of Rule 613 and the CAT adopting release (see the discussion in the next section of this letter), the implementation of any of these additional reporting requirements should be subject to the CAT Plan Participants submitting, and the Commission approving, a CAT NMS Plan amendment that sets forth the costs and benefits of imposing these additional reporting requirements.

In the remainder of this section, we discuss various additional reporting requirements that FIF and SIFMA members do not consider to be within the scope of Rule 613 and the CAT NMS Plan. To the extent that these additional reporting requirements are found to be within the scope of Rule 613 and the CAT NMS Plan, FIF and SIFMA members still do not believe that the significant costs for implementing these requirements are justified.

***Requiring CAT reporting of verbal (unstructured) activity***

On November 12, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief, through July 31, 2023, from the requirement to require industry members to report certain verbal activity to CAT, including "telephone discussions between an Industry Member and a client that may involve firm bid and offer communications" and "unstructured electronic and verbal communications that are not currently captured by Industry Member order management or execution systems."[62] On July 28, 2023, the Commission extended this exemptive relief to July 31, 2026.[63]

The CAT Technical Specifications require the reporting of all orders, even those that are generated from a manual process, such as a phone call or a chat-based messaging system.[64] It is not clear at this time the scope of additional reporting that will be required when the current exemption for certain verbal activity expires, but FIF and SIFMA members are concerned that significant additional reporting will be

---

[62] Initial Verbal Activity Exemption, at 13-14.

[63] Exchange Act Release No. 98023 (July 28, 2023) (Order Granting a Temporary Conditional Exemption Pursuant to Section 36(a)(1) of the Securities Exchange Act of 1934 and Rule 608(e) of Regulation NMS Under the Exchange Act, Relating to the Reporting of Certain Activities on the Floor of National Securities Exchanges and Certain Activities by Industry Members Off Exchange Floors, as Required by Section 6.4(d) of the National Market System Plan Governing the Consolidated Audit Trail).

[64] April 2023 CAT Technical Specifications, at 34.

required. On December 16, 2022, FIF submitted a letter to the Commission identifying specific concerns if this exemption were to expire.[65] In the December 2022 letter, FIF members discuss why, based on the wording of the Rule and the CAT NMS Plan, the verbal activity that would be reportable if this exemption were to expire should not be reportable to CAT. In the December 2022 letter, FIF members estimate an annual cost in excess of $4.4 billion for the reporting that would be required if this exemption were to expire.[66] This estimate only relates to the costs for reporting certain upstairs verbal activity that is not currently reportable to CAT and does not consider costs for reporting certain floor-based verbal activity that is not currently reportable to CAT. This cost estimate assumes that industry members continue their current trading activity, but FIF members note in the December 2022 letter that "Because of the significant cost that would be involved to capture and interpret verbal activity, it is likely that industry members will curtail their current verbal activity, resulting in reduced execution quality for customer orders and reduced market liquidity."[67]

The FIF December 2022 letter focuses on CAT reporting of "upstairs" verbal activity (i.e., verbal activity that does not occur on an exchange floor) and does not focus on CAT reporting for certain floor-based verbal activity that would be required if the current exemptions for reporting verbal activity to CAT were to expire. Other market participants have expressed concerns about certain floor-based verbal activity that firms would need to report to CAT if the current exemptions for reporting verbal activity to CAT were to expire. FIF and SIFMA members agree with the concerns identified by these other market participants.

Broker-dealer representatives have been engaged in active communication with Commission representatives as to the practical impossibility of what the Commission would be requiring. Though FIF and SIFMA are pleased that the Commission has just issued an order exempting these new reporting requirements until July 2026, the Commission should either make the exemption permanent, or confirm that Rule 613 and the Plan do not in fact require verbal activity that is the subject of the exemptive order to be reported to CAT. This is because the current extension still risks imposing huge increases in CAT costs in the near future: the scope of this requirement is so enormous that well before the expiry of the three-year exemption, industry members would need to begin building systems to translate and process unstructured discussions between counterparties, and CAT would need to begin developing and implementing a plethora of new specifications to handle the idiosyncratic nature of unstructured communications.

### *Requiring CAT reporting of non-executable RFQ responses*

Commission Rule 613 requires the reporting of order events. As fully described in the Plan Participants' original version of the CAT Technical Specifications[68] and associated FAQs, non-executable RFQ (request

---

[65] FIF has posted this letter in the public section of the FIF website at the following location: https://fif.com/index.php/working-groups.

[66] Id. at 3, 6-8 and 20-21.

[67] Id. at 3.

[68] *See*, *for example*, CAT Reporting Technical Specifications for Industry Members, Version 4.0.0 (June 30, 2020), available at https://catnmsplan.com/sites/default/files/2020-08/6.30.2020-

for quote) responses are not orders and, thus, should not be reportable to CAT.[69] These original versions provided explicit guidance on when the response to an RFQ would itself be considered an order and needed to be reported to CAT. The original guidance made clear that non-executable RFQ responses are not reportable to CAT. Rather, reporting would only begin if and when an order was generated as the result of a mutual agreement between parties engaged in an RFQ process.[70]

However, subsequent to the industry fully implementing the approved Technical Specifications for Phases 2c and 2d, the Commission has insisted that non-executable RFQ responses now be reported to CAT.[71] As discussed by FIF in a letter submitted to the Commission on June 1, 2023, these requirements are inconsistent with the approved Technical Specifications and explicit guidance from the participants.[72] The Commission also is insisting that the solicitor report these non-executable RFQ responses.[73] In the interim the CAT Plan Participants have asked for temporary exemptive relief for this new requirement to allow the CAT Plan Participants the necessary time to create new technical specifications, and for the industry to develop new systems to comply.[74] For many firms, this new requirement will be very costly to implement. There are also potential implications for books-and-records and various NMS rules if the Commission were to re-interpret the meaning of an order and quote simply to force the reporting of non-executable RFQ responses to CAT.[75]

Regardless, the Commission has directed the CAT Operating Committee and FINRA CAT, LLC ("FINRA CAT"), the plan processor for CAT, to create specifications for industry members to report non-executable RFQ responses to CAT. This effort has required, and will continue to require, an unknown number of staff hours: to meet, discuss, and draft specifications; to present the draft to industry and gather feedback; and to re-draft and finalize the specifications. In turn, this action by the Commission has cost, and will continue to cost, the industry countless person-hours to analyze the impact and plan implementation. If the Commission continues to mandate this expansion of CAT, the industry will incur significant implementation costs and potentially be required to change trading workflows.

FIF and SIFMA recommend that the Commission not extend the reporting requirements of CAT beyond Rule 613 and the approved Plan by requiring the reporting of non-executable RFQ responses and the

---

CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.0.0_CLEAN.pdf ("June 2020 CAT Technical Specifications"), at 31. This is the original version of the CAT Technical Specifications for Phase 2d.

[69] For additional information on this issue, please refer to the letters on non-executable RFQ responses submitted by FIF to (i) the Commission ("FIF June 2023 Letter to SEC on RFQ Responses"), and (ii) the CAT Plan Participants and FINRA CAT on June 1, 2023. FIF has posted these  letters in the public section of the FIF website at the following location: https://fif.com/index.php/working-groups.

[70] Ibid.

[71] This change in requirements is evidenced by the letter dated May 23, 2023 submitted by Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Securities and Exchange Commission ("Request for Exemption from Certain Provisions of the National Market System Plan Governing the Consolidated Audit Trail Related to Electronic RFQ Responses"), available at https://catnmsplan.com/sites/default/files/2023-05/05.23.23-Exemption-Request-Regarding-Responses-to-Electronic-RFQs.pdf ("RFQ Responses Exemptive Request").

[72] See FIF June 2023 Letter to SEC on RFQ Responses.

[73] See RFQ Responses Exemptive Request.

[74] Ibid.

[75] See FIF June 2023 Letter to SEC on RFQ Responses, at 10-12.

16

receipt of such responses. Changes in these areas will be especially costly for both broker-dealers and CAT itself since the reporting of RFQ data has already been fully addressed by the CAT Plan Participants and FINRA CAT as part of the conclusion of Phase 2d: the CAT Plan Participants and FINRA CAT issued FAQs providing detailed guidance;[76] the CAT Plan Participants and FINRA CAT developed detailed Technical Specifications with input from industry members;[77] the industry and CAT have completed implementing the specifications; and the industry has been reporting in accordance with the specifications and guidance from the CAT Plan Participants and FINRA CAT since the launch of CAT in 2020. Forcing the CAT Plan Participants and the industry to dramatically expand reporting of new RFQ data not required by the Plan would seem inconsistent with the goals of addressing CAT's ever-rising costs.

***Requiring CAT reporting of request messages***

Commission Rule 613 enumerates an explicit set of events that must be reported to CAT, such as the generation of a new order, the routing of such order, the receipt of a route, and the cancellation, modification, of execution of an order.[78] When first implemented, the CAT Plan Participants developed specifications to reflect the specific events enumerated in Rule 613. Over time, the Commission has insisted on a more expansive view requiring intermediate messages to be reported to CAT, where the messages do not reflect CAT events identified in Rule 613. This includes, for example, requiring a reporting firm to report when it sends or receives a cancel request. A cancel request is the precursor message that would either lead to (or not lead to) the cancellation of an order. The cancellation of an order is reportable to CAT, but the precursor cancel request should not be reportable to CAT. CAT was not originally designed to be a duplicate of the entire message bus of each broker-dealer and exchange, but based on direction from the Commission, CAT requirements have greatly expanded to include two-sided duplicate reporting of underlying messages that may lead to, but are not themselves, CAT-reportable events as defined in Rule 613. In fact, had CAT originally been intended to capture every message sent between two firms or venues, the industry might have recommended a very different architecture and implementation, using common FIX standards as the data format, and deriving industry members' CAT reports from their FIX engines, rather than their downstream "ticket" systems. The Commission's change in perspective about this critical issue, after the initial design, caused enormous confusion and re-work.

These expanded requirements have already been implemented at significant additional costs to broker-dealers, as well as to the central repository that now needs to capture, store, and process many more messages. The Commission should clarify that request messages are not subject to CAT reporting. This would help to address rising CAT costs by reducing internal firm processing and storage costs and reducing processing and storage costs for the CAT system.

---

[76] *See, for example*, CAT FAQ B45, available at https://catnmsplan.com/faq.
[77] *See, for example*, June 2020 CAT Technical Specifications, at 31.
[78] 17 CFR §242.613(c)(7).

17

***Requiring that an order recipient report rejections to CAT***

Commission Rule 613 enumerates an explicit set of events that need to be reported to CAT, such as the generation of a new order, the routing of such order, the receipt of a route, and the cancellation, modification, of execution of an order.[79] On December 16, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief, until July 31, 2023, from "the requirement in Section 6.3(d) of the CAT NMS Plan that requires the Participants to report rejected orders."[80] On July 8, 2022, the Commission extended this temporary exemptive relief until July 31, 2024.[81] On May 19, 2023, the Commission further extended this temporary exemptive relief until January 31, 2025.[82]

Under Rule 613, a firm that does not generate an order is only required to report the order to CAT if it successfully receives the order in its systems. There are numerous instances where a broker-dealer or exchange routes an order to another broker-dealer or exchange, and the other broker-dealer or exchange does not accept the order. Instead, the order is rejected by the other party before it ever enters that party's order-processing workflow. This can occur for numerous reasons, such as a malformed order message, an order for an unknown symbol, an order with an unknown participant ID, or an outage in various places in the two parties' or their vendors' technology stacks.

Today, as specified in the CAT Technical Specifications, when an order is routed from one party to another, that route is reported to CAT, even if the order is rejected by the receiving party (in which case the sending party includes a flag on the CAT report indicating the rejection).[83] Today, if the receiving party accepts the order, it must also report the order to CAT. But today, this is only true if the receiving party accepts and does not reject the order. When the Commission's current exemption for rejected orders expires, it is unclear whether broker-dealers would be required to report to CAT orders that they reject, or if only exchanges would be subject to this reporting.

If the Commission intends to impose this obligation on broker-dealers (i.e., the obligation to report to CAT any orders that the receiving party has rejected at its gateway, even if it never reaches the order management system of the receiving party), this would be a very expansive and ill-defined requirement because it would require broker-dealers to create completely new systems that "accept" rejected orders simply for the purpose of reporting such rejections to CAT. Had Rule 613 required this type of reporting, industry members might have recommended a whole different approach to CAT from the beginning, deriving data from FIX logs instead of "ticket" systems. Such reporting also would be duplicative since CAT already knows the original order was rejected based on the route report from the sending party.

FIF and SIFMA recommend that the Commission not extend the reporting requirements of CAT beyond Rule 613 or the approved Plan by requiring that firms report events related to orders that are never accepted and are typically not part of a firm's books and records. If the Commission were to refrain from imposing this requirement, this would significantly help to avoid further exacerbating rising CAT costs by

---

[79] Ibid.
[80] December 2020 Exemption, at 11-12.
[81] July 2022 Exemption, at 36-39.
[82] May 2023 Exemption, at 9.
[83] April 2023 CAT Technical Specifications, at 31.

18

reducing the requirement that firms build completely new systems to "accept" orders for CAT purposes that they otherwise would have rejected, as well as reducing processing and storage costs for the CAT system itself.

***Requiring an order sender to report venue (order recipient) port settings***

Rule 613(c)(7) of Regulation NMS requires that the "material terms" of an order be reported to CAT in connection with the receipt, origination, routing, modification or cancellation of the order.[84] Rule 613(j)(7) of Regulation NMS provides that the "material terms" of an order:

> shall include, but not be limited to, the NMS security symbol; security type; price (if applicable); size (displayed and non-displayed); side (buy/sell); order type; if a sell order, whether the order is long, short, short exempt; open/close indicator; time in force (if applicable); if the order is for a listed option, option type (put/call), option symbol or root symbol, underlying symbol, strike price, expiration date, and open/close; and any special handling instructions.[85]

On December 16, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief, until July 31, 2023, from "the requirement … of the CAT NMS Plan that the Participants report, and amend their Compliance Rules to require Industry Members report the Material Terms of an Order that are communicated in port-level settings or instructions."[86] On July 8, 2022, the Commission extended this temporary exemptive relief until July 31, 2024.[87] On May 19, 2023, the Commission further extended this temporary exemptive relief until January 31, 2025.[88]

The CAT Plan Participants and FINRA CAT developed specifications to achieve reporting of the material terms of an order, including adding to CAT the special handling instructions that FINRA had developed for the Order Audit Trail System over the decades. The Commission has insisted that broker-dealers report to CAT every possible parameter and potential condition related to how an order might be processed. This includes parameters that are not specific to any order, but rather are general conditions applied collectively to all orders sent by a broker-dealer to an exchange (or other receiving firm), such as whether the exchange adds collars to unpriced orders to prevent a very large order from inadvertently plowing through many price levels all at once. These settings (referred to in the Commission's exemptive orders as "port-level settings") are not managed by a broker-dealer on an order-by-order basis, but rather are defaults applied, by the exchange or other venue, to all orders sent to the given port on a venue. To the extent that a broker-dealer wants to change the defaults for a port setting (such as turning on/off self-match prevention), this is done by a request sent to the venue verbally, or in email, or through the venue's portal. These requests are not part of any individual order or its audit trail. The Commission is insisting that all port settings be included on every order and route record reported to CAT. There can be numerous settings, with no standards to how they are classified across different

---

[84] 17 CFR §242.613(c)(7).

[85] 17 CFR §242.613(j)(7).

[86] December 2020 Exemption, at 7-9.

[87] July 2022 Exemption, at 28-33.

[88] May 2023 Exemption, at 9.

venues. Many may not even be used (or known) by a broker-dealer. While the Commission has written that a sender would not be responsible for reporting a port setting if the sender is not informed of the setting,[89] this raises challenging questions as to what represents a sender being "informed" of a port setting and what level of diligence is required for a sender. For example, is a sender required to monitor in real-time updates that a venue posts to the venue's website?

On January 10, 2023, FIF submitted to the Commission a draft exemptive request letter relating to CAT reporting of port-level settings by an order sender.[90] The following are some of the points discussed in this letter:

- Port settings are generally not part of FIX messages.
- The costs for adding such data to every CAT record will be enormous.
- The project to add such data to every CAT record will require enormous effort and a long timeline to coordinate across the industry. There will first have to be an agreement on the formats and standards for sharing such data between venues and routing firms across the industry. No such protocol exists today.
- The venue is already reporting the port setting, which limits the surveillance value of the order sender reporting the same setting; in fact, if the order sender reports a port setting this creates an inferior audit trail because surveillance personnel can no longer distinguish between an order-specific instruction transmitted by an order sender (for example, through FIX) and a default setting applied by a venue.

In conversation with the Commission staff, they expressed as an objective for this data that the Commission should be able to observe through the CAT data that the order sending firm is aware of the port settings on the receiving firm's systems. Simply enabling systematic sharing and reporting of the port settings data between two firms does not demonstrate the knowledge of the sending firm's order routing personnel. Rather, to discern what the staff seeks to know requires some form of human-level inquiry.

FIF and SIFMA members recommend that the Commission not require the CAT Plan Participants to extend the  Technical Specifications by requiring an order sender to report port-level settings applied by a receiving firm. If the Commission were to refrain from imposing this requirement, this would very significantly help to avoid further exacerbating rising CAT costs, both for industry members as well as for the central repository that would need to process, store, sort and index an enormous amount of port-setting data.

***Requiring CAT reporting of linkage of representative to customer orders and linkage of order fulfillments to representative and principal orders***

Commission Rule 613(e)(1) requires that,

---

[89] July 2022 Exemption, at 30.

[90] FIF has posted the draft letter in the public section of the FIF website at the following location: https://fif.com/index.php/working-groups.

the central repository shall store and make available to regulators data in a uniform electronic format, and in a form in which all events pertaining to the same originating order are linked together in a manner that ensures timely and accurate retrieval of the information … for all reportable events for that order.[91]

Appendix D, Section 3, of the CAT NMS Plan provides additional detail relating to CAT linkage requirements.[92] On December 16, 2020, the Commission granted the CAT Plan Participants temporary exemptive relief, until July 31, 2023, from "the requirement in Section 3, Appendix D of the CAT NMS Plan that the Participants create the lifecycle between customer orders to representative orders created in firm accounts for the purpose of facilitating a customer order…"[93] On July 8, 2022, the Commission extended this temporary exemptive relief until July 31, 2024.[94] On May 19, 2023, the Commission further extended this temporary exemptive relief until January 31, 2025.[95]

In granting the original exemption in December 2020, the Commission wrote:

> The Commission understands that the Participants do not currently have the ability to create lifecycles in certain representative order scenarios, particularly because of the difficulty of linking representative orders for Industry Members with separate order management systems and execution management systems that do not currently have a systematic or direct link between them.[96]

Based on the statement above, the CAT Technical Specifications and other CAT documentation, FIF and SIFMA members understand that the current exemption applies where a firm does not maintain linkage in its systems.[97] While not expressly stated in the three Commission exemptive orders identified above, FIF and SIFMA members understand based on updates by the CAT Plan Participants and FINRA CAT to the CAT Technical Specifications and other CAT documentation,[98] that the Commission will require three types of linkage as of February 1, 2025:

- Linkage of representative to customer orders
- Linkage of order fulfillments to representative orders
- Linkage of order fulfillments to principal orders.

As a result, the Commission is requiring firms to report CAT linkages that firms themselves do not utilize or maintain in their own systems. FIF and SIFMA members do not believe that the Commission is authorized under Commission Rule 613 to mandate that firms provide these linkages in scenarios where firms do not maintain these linkages in their systems. While Rule 613(e)(1) requires linkage of "all

---

[91] 17 CFR §242.613(e)(1).

[92] CAT NMS Plan, at D-7 to D-10.

[93] December 2020 Exemption, at 9-11.

[94] July 2022 Exemption, at 33-36.

[95] May 2023 Exemption, at 9.

[96] December 2020 Exemption, at 9-10.

[97] April 2023 CAT Technical Specifications, at 330-336.

[98] Ibid.

events pertaining to the same original order," a representative order is not the same order as a customer order. The required linkages for order fulfillments also are not "pertaining to the same original order" where a firm does not maintain these linkages in its systems and provides fulfillments from a pool of executed orders without reference to a specific executed order.

In the original CAT Technical Specifications approved by the CAT Operating Committee, the CAT Plan Participants provided practical mechanisms for firms to report events where order-by-order linkages do not exist,[99] but the understanding of FIF and SIFMA is that the Commission is requiring that these mechanisms be retired in the future.[100]

To reduce the costs to industry members that would otherwise have to report to CAT order-by-order linkages that do not exist, as well as to reduce the costs to CAT stemming from the additional resources needed to process these additional linkages, FIF and SIFMA members recommend that the Commission confirm that linkages for events across unlinked systems are not in fact required to be reported to CAT. This would help to address rising internal member CAT costs and rising CAT operating costs. Alternatively, if the Commission does not agree with the legal determination above, the Commission could address rising CAT costs by making the current exemptions with respect to these linkages permanent.

There are numerous broker-dealer workflows where firms do not maintain linkage between representative and customer orders or between order fulfillments and representative or principal orders. In many cases, there is no direct one-to-one mapping between downstream and upstream events. Based on the current CAT Technical Specifications and other CAT documentation, broker-dealers are required to identify these scenarios through various flags and indicators on CAT records indicating general, but not order-by-order, linkages as needed. However, as of February 1, 2025, the Commission will mandate that broker-dealers, without exception, be able to link and report order-by-order linkages to CAT even if such linkages do not exist. At the direction of the Commission, the CAT Plan Participants and FINRA CAT have updated the CAT Technical Specifications and other CAT documentation to reflect the Commission's mandate that linkages be reported in every instance, regardless of whether broker-dealer workflows in fact contain such linkages.[101]

On January 10, 2023, FIF submitted to the Commission a draft exemptive request letter relating to linkage of representative orders to customer orders and linkage of order fulfillments to representative and principal orders.[102] FIF concluded as follows with respect to linkage of representative orders to customer orders:

> Requiring the linkage of representative to customer orders for unlinked representative order workflows will require changes to order handling workflows, which was not the

---

[99] *See*, *for example*, June 2020 CAT Technical Specifications, at 258-264. This is the original version of the CAT Technical Specifications for Phase 2d.

[100] *See*, *for example*, April 2023 CAT Technical Specifications, at 330-336.

[101] Ibid.

[102] FIF has posted the draft letter in the public section of the FIF website at the following location: https://fif.com/index.php/working-groups.

intent of CAT. As discussed above, this will result in reduced execution quality for customer orders and a reduction in displayed market liquidity. Requiring this linkage also will involve significant costs and work for Industry Members. Accordingly, FIF, on behalf of our members, requests that the Commission grant exemptive relief to Industry Members from the requirement to link representative orders to customer orders for unlinked representative order workflows.[103]

FIF concluded as follows with respect to linkage of order fulfillments to representative and principal orders:

Requiring the linkage of order fulfillments to representative or principal orders for unlinked fulfillment workflows will result in Industry Members reporting linkages to CAT that do not accurately reflect the fulfillment processes of these Industry Members. Requiring this linkage also will involve significant work for firms to re-engineer their position management systems and the systems that interact with these position management systems. As a result of the time and cost involved, certain firms could choose not to implement this linkage and instead handle customer orders as agent. For the reasons discussed above, this would result in reduced execution quality for customer orders and a reduction in displayed liquidity. Accordingly, FIF, on behalf of our members, requests that the Commission grant exemptive relief from the requirement for Industry Members to link order fulfillments to principal or representative orders.[104]

***CAT Customer and Account Information system ("CAIS")***

The Commission has imposed various mandates with respect to CAIS reporting that have greatly increased internal industry costs. For example, the Commission has required firms to report certain data to CAIS for "Authorized Traders" when there is no regulatory obligation for firms to collect this data.[105] FIF has submitted in writing various recommendations that would assist firms in managing internal CAIS reporting costs:

- Providing an exemption from the requirement for a firm to report the prior firm's CRD and FDID for "Mass Transfer" scenarios
- Removing "Material Inconsistencies" from CAIS
- Limiting the scenarios where the CAIS system rejects a record submission.

FIF and SIFMA members recommend that the Commission implement the recommendations above and similar industry member recommendations that would assist firms in managing internal CAIS reporting costs. These recommendations also would help to manage CAIS system processing costs.

---

[103] Id. at 5.

[104] Id. at 8.

[105] *See*, *for example*, CAT Reporting Customer & Account Technical Specifications for Industry Members, Version 2.0 r9.2 (Sept. 20, 2022), available at https://catnmsplan.com/sites/default/files/2022-09/09.20.22-Full_CAIS_Technical_Specifications_2.0_R9.2_CLEAN.pdf, at 29-30.

***Other reporting requirements that the Commission has imposed***

FIF and SIFMA members note that the Commission has imposed various other CAT reporting requirements that are beyond the scope of Rule 613 and the CAT NMS Plan. These include requirements relating to quoting activity on the OTC Link ATS operated by OTC Markets and the requirement to report to CAIS certain data for "Authorized Traders" when there is no regulatory obligation for firms to collect this data. FIF and SIFMA do not discuss these reporting requirements in detail because, while these requirements have been, and continue to be, costly for firms to implement, they have already been implemented.

I.    **Based on Rule 613 and the CAT adopting release, additional reporting requirements proposed by the Commission -- where the costs were not considered in connection with the Commission's approval of the CAT NMS Plan -- should require a CAT NMS Plan amendment**

FIF and SIFMA members are concerned that the additional reporting requirements being imposed by the Commission have not been subject to an appropriate cost-benefit analysis. Notably, the Commission did not conduct its standard cost-benefit analysis when it adopted CAT. Instead, Commission Rule 613(a)(1) requires the CAT NMS Plan to discuss:

> (vii) The detailed estimated costs for creating, implementing, ***and maintaining*** [emphasis added] the consolidated audit trail as contemplated by the national market system plan, which estimated costs should specify:
>
> (A) ***An estimate of the costs to the plan sponsors for establishing and maintaining the central repository*** [emphasis added];
>
> (B) ***An estimate of the costs to members of the plan sponsors, initially and on an ongoing basis*** [emphasis added], for reporting the data required by the national market system plan;
>
> (C) An estimate of the costs to the plan sponsors, initially and on an ongoing basis, for reporting the data required by the national market system plan; and
>
> (D) How the plan sponsors propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of such estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors;[106]

The Commission writes as follows in the adopting release for CAT on the need for robust cost estimation for CAT and fulsome discussion of CAT costs:

---

[106] 17 CFR §242.613(a)(1)(vii).

The Commission believes that the issues surrounding how the consolidated audit trail should be funded, and how costs in creating, implementing, and maintaining the consolidated audit trail should be allocated, are important, and the Rule requires information about those issues to be provided by the SROs in the NMS plan submitted to the Commission for its consideration. In response to comments and in recognition that an initiative of the size and scope of the consolidated audit trail necessarily will require substantial expenditures by the SROs and their members, the Commission is requiring, pursuant to Rule 613(a)(1)(vii), the SROs to include in the NMS plan, a discussion of costs and how such costs will be allocated. As discussed above, the Commission believes that the SROs will incur costs to create and maintain the central repository. Also, as discussed above, SROs and their members may need to make systems changes or to purchase new systems to record and report the data required by the NMS plan to the central repository. SROs and their members will incur upfront costs, as well as ongoing costs to record and report such information. Because, as noted above, these costs can only be analyzed once the SROs narrow the array of choices they have and develop a detailed NMS plan, the Commission believes that the most robust approach for estimating these costs is for the SROs to provide such cost estimates in conjunction with, and guided by, their development of the NMS plan. The Commission believes that a fulsome discussion in the NMS plan of the estimated costs to SROs and their members will aid commenters in providing useful comments that will further the Commission's understanding of the cost implications of the consolidated audit trail. In addition, a fulsome discussion will aid the Commission in its evaluation of whether to approve the NMS plan and in conducting its own analysis of the costs and benefits of the NMS plan.[107]

The Commission states in the CAT NMS Plan Approval Order that "… a fulsome discussion in the NMS plan of the estimated costs to SROs and their members will aid commenters in providing useful comments that will further the Commission's understanding of the cost implications of the consolidated audit trail."[108] According to the Commission, this "fulsome discussion will aid the Commission in its evaluation of whether to approve the NMS plan and in conducting its own analysis of the costs and benefits of the NMS plan."[109] FIF and SIFMA members are concerned that none of the following reporting requirements discussed above were considered as part of the cost-benefit analysis that the Commission undertook in connection with the Commission's approval of the CAT NMS Plan in 2016:

- Requiring CAT reporting of verbal (unstructured) activity
- Requiring CAT reporting of non-executable RFQ responses
- Requiring CAT reporting of request messages
- Requiring order request recipients to report rejections to CAT
- Requiring order senders to report the port settings of order recipients (venues)
- Requiring CAT reporting of linkage of representative to customer orders and linkage of order fulfillments to representative and principal orders.

---

[107] CAT Adopting Release, at 45794.
[108] Ibid.
[109] Ibid.

25

Based on the wording of Rule 613(a)(1) and the Commission's statements in the CAT adopting release, reporting requirements introduced subsequent to the Commission's 2016 approval of the CAT NMS Plan that involve significant additional costs not contemplated at the time of CAT NMS Plan approval should require an amendment to the CAT NMS Plan. The amendment should include all required analyses and considerations of the costs and benefits of the new requirements, as well as an analysis to determine whether the scope of such requirements is consistent with those of Rule 613 itself.

Similarly, because the Commission's proposed changes to the current CAT processing requirements would likely involve further significant increases in CAT operating costs, these proposed changes to processing requirements also should be subject to an appropriate cost-benefit analysis that is included as part of a CAT NMS Plan amendment. As discussed above, the CAT NMS Plan clearly does not contemplate the current level of CAT operating costs (i.e., the level of CAT operating costs based on the current processing requirements), so the Plan certainly does not contemplate (or provide a "fulsome discussion" of) the greatly increased CAT operating costs that would result from the Commission's proposed changes to these processing requirements.

Finally, FIF and SIFMA members urge the Commission to act cautiously and not to impose any material new reporting requirements for CAT or material changes to the current CAT processing requirements until the Commission, market participants and the public have a better understanding of (i) the factors that have contributed to the significant increases in CAT operating costs over the past few years, (ii) the level of increases that can be expected in future years (based on current reporting and processing requirements), and (iii) whether, and the degree to which, the new CAT reporting requirements being proposed by the Commission and the Commission's proposed changes to the current CAT processing requirements would further exacerbate these rising CAT operating costs.

* * * * *

FIF and SIFMA appreciate the opportunity to comment on the Commission's Order. If you would like clarification on any of the items discussed in this letter or would like to discuss further, please contact jcorcoran@sifma.org, egreene@sifma.org or howard.meyerson@fif.com.

Very truly yours,

| /s/ Joseph Corcoran | /s/ Ellen Greene | /s/ Howard Meyerson |
|---|---|---|
| Joseph Corcoran<br>Managing Director, Associate<br>General Counsel, SIFMA | Ellen Greene<br>Managing Director, Equities &<br>Options Market Structure,<br>SIFMA | Howard Meyerson<br>Managing Director, Financial<br>Information Forum |

26

# Tab J

Letter from Stephen J. Berger, Global Head of Government & Regulatory Policy, Citadel Securities to Vanessa A. Countryman, Secretary, Securities and Exchange Commission (Aug. 22, 2023)

**CITADEL** | Securities

August 22, 2023

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:　2023 CAT Funding Proposal (File No. 4-698)**

　　Citadel Securities appreciates the opportunity to provide further comments to the Securities and Exchange Commission (the "Commission") on the CAT Operating Committee's proposal to impermissibly offload the costs of the Consolidated Audit Trail ("CAT") onto market participants (the "2023 Funding Proposal").[1]

　　In our previous letter,[2] we detailed numerous issues with the proposal and the broader CAT structure. Among others, we identified multiple areas where the CAT Operating Committee would need to either provide additional information or conduct additional analysis before the Commission could assess a proposed methodology for allocating over *a billion dollars* of CAT costs by the end of 2024, and many more billions in perpetuity. In response, the CAT Operating Committee has flatly refused to meet its burden under the Securities Exchange Act of 1934 (the "Exchange Act"), Commission rules, and basic principles of administrative law; instead, it has largely copy-and-pasted stock responses that it has been repeating for several years (including to argue in support of prior funding proposals that were later withdrawn due to being blatantly inconsistent with the Exchange Act).[3]

　　More remarkably, the CAT Operating Committee explicitly threatens the Commission that "the financial viability of the CAT is at risk" unless the Commission votes in favor of the 2023 Funding Proposal.[4] This transparent attempt to coerce the Commission into prematurely opining on a funding proposal that does not meet basic Exchange Act requirements is completely inappropriate. To the extent there is now an emergency, it is one created by the CAT Operating Committee itself, arising from repeated implementation delays, uncontrolled budgets, and a complete refusal to collaboratively engage with the industry. These self-inflicted wounds do not relieve the CAT Operating Committee of its burden to demonstrate that the 2023 Funding Proposal is consistent with the Exchange Act.

　　Below, we reiterate key questions that the CAT Operating Committee must answer before the Commission can approve the 2023 Funding Proposal.

---

[1] 88 Fed. Reg. 17086 (Mar. 21, 2023), available at: https://www.govinfo.gov/content/pkg/FR-2023-03-21/pdf/2023-05690.pdf (the "2023 Funding Proposal").

[2] *See* Letter from Citadel Securities (July 14, 2023), available at: https://www.sec.gov/comments/4-698/4698-224499-470142.pdf ("Citadel Securities July 2023 Letter").

[3] *See* Letter from CAT Operating Committee Chair (July 28, 2023), available at: https://www.sec.gov/comments/4-698/4698-237380-495743.pdf ("CAT July 2023 Response").

[4] CAT July 2023 Response at 35.

**CITADEL | Securities**

## I.    The 2023 Funding Proposal Does Not Equitably Allocate CAT Costs

The 2023 Funding Proposal fails to answer the most basic of questions: **what percentage of the total costs to build and operate CAT will be borne by Industry Members in practice?**

The CAT Operating Committee has portrayed the 2023 Funding Proposal as allocating 67% of CAT costs to Industry Members,[5] with the remaining 33% split between the exchanges and FINRA.  However, the CAT July 2023 Response confirms that this purported allocation is only a façade and does not accurately reflect the total percentage of costs that will be borne by Industry Members.  In particular, the exchanges are explicitly reserving the right to pass-on their allocation of CAT costs to Industry Members.[6]  Given that FINRA also plans to pass-on its allocation,[7] it is now apparent that *100% of the total costs to build and operate CAT may be borne by Industry Members under the 2023 Funding Proposal*.

The CAT Operating Committee's assertion that the ability for exchanges to pass-on their allocation of CAT costs is "beyond the scope" of this filing[8] is an *admission* that it has "entirely failed to consider an important aspect of the problem."[9]  Determining how CAT costs ultimately will be allocated is fundamental to assessing whether the proposal is consistent with the Exchange Act.  For example, many of the arguments in the record are premised on the exchanges and FINRA being responsible for one-third of the total costs.[10]  To the extent this is untrue in practice, the filing must be completely reconsidered, taking into account (a) the impact on market efficiency, competition, and capital formation of allocating this magnitude of additional costs to Industry Members, (b) whether such a lopsided allocation is fair and equitable, and (c) the implications for CAT governance and budget control if the firms governing CAT do not have any skin-in-the-game.[11]  There is simply no basis to conclude that a filing that results in 100% of CAT costs being allocated to Industry Members is lawful.[12]  The Commission should send the CAT Operating Committee back to the drawing board.

---

[5] The 2023 Funding Proposal defines "Industry Member" as "a member of a national securities exchange or a member of a national securities association."  2023 Funding Proposal at FN 11.

[6] CAT July 2023 Response at 9.

[7] *See* Letter from FINRA (Apr. 11, 2023) at 7, available at: https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf ("If the Funding Model is approved by the Commission, FINRA intends to file a rule change to increase member fees simultaneous with the filing of any proposed rule change to effectuate the Funding Model.").

[8] CAT July 2023 Response at 9.

[9] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[10] *See, e.g.,* CAT July 2023 Response at 26 ("CAT LLC strongly disagrees with the suggestion that the Participants would not be incentivized to control CAT costs **if they are only responsible for one-third of the CAT costs going forward**.") (emphasis added).

[11] We note that the CAT Operating Committee argues that requiring the exchanges to fund costs over the approved budget would "create the wrong incentives," but fails to consider the impact on exchange incentives of passing-through 100% of CAT costs to Industry Members.  CAT July 2023 Response at 12.

[12] We note that the CAT Operating Committee also has not demonstrated that allocating 67% of CAT costs to Industry Members is lawful, taking into account that Industry Members are *already* bearing nearly all CAT-related costs (including implementation costs).  Commission Rule 613 requires the exchanges to take into account "the costs to members of the plan sponsors, initially and on an ongoing basis, for reporting the data required by the national market system plan." §242.613(a)(1)(vii)(B).  Instead of complying with this requirement, the CAT Operating

Page 2 of 8

**A198**

**CITADEL | Securities**

## II.   The Proposed Allocation Among Industry Members is Inconsistent with the Exchange Act

With respect to the CAT costs directly allocated to Industry Members, the 2023 Funding Proposal contemplates that these costs will be allocated *among Industry Members* based on executed volume (by shares).  Setting aside the constitutional problems we previously identified, several key questions remain unanswered.

### 1.   How will the massive CAT costs be divided-up among Industry Members?

In order to assess the proposal's impact on market competition and liquidity, it is necessary to understand how CAT costs will be allocated among Industry Members in practice.  The CAT Operating Committee seeks to avoid this important issue by asserting in its response letter that the CAT costs allocated to Industry Members "may be **entirely passed through** to investors, thereby **alleviating Industry Members of any burden** of funding the CAT (emphasis added)."[13]  However, this statement is patently false – as noted in our previous letter, many broker-dealers will be allocated CAT costs based on their proprietary trading activity (including on-exchange market making) and, therefore, these costs cannot be passed through to another firm.

Therefore, at a minimum, the CAT Operating Committee must determine the percentage of total costs allocated to Industry Members that *cannot be passed through to customers* due to transactions arising from proprietary activity. [14]  Conducting an analysis of proprietary vs. customer executed volume is critical to accurately assessing how the CAT costs will be divided-up among Industry Members under the proposed allocation methodology, and whether such an allocation methodology is fair, equitable, and not unfairly discriminatory.  This analysis is eminently feasible from the CAT data and should also take into account the aggregate costs that will be borne by affiliated entities, as required by the 2016 CAT NMS Plan.[15]

The CAT Operating Committee now acknowledges that prior funding proposals "could impose an outsized adverse financial impact on certain Industry Members."[16]  The 2023 Funding Proposal suffers from the same flaw, and the CAT Operating Committee cannot avoid the issue by falsely suggesting that all CAT costs can be simply passed-on to other market participants.[17]  In addition, with respect to those CAT costs that theoretically could

---

Committee seeks to minimize the importance of these implementation costs by inaccurately asserting that broker-dealers "can pass those compliance costs through to their customers."  CAT July 2023 Response at 16.

[13] CAT July 2023 Response at 8.

[14] For these purposes, we leave aside the market-wide systems build required to achieve such an outcome, as discussed further below.

[15] *See* Section 11.2(c) of the 2016 CAT NMS Plan ("takes into consideration affiliations between or among CAT Reporters").  81 Fed. Reg. 84696 (Nov. 23, 2016) at 84701, available at: https://www.govinfo.gov/content/pkg/FR-2016-11-23/pdf/2016-27919.pdf.

[16] 2023 Funding Proposal at 17102.

[17] The CAT Operating Committee also argues it is incorrect to suggest the costs will be allocated to a small group of broker dealers since "almost 700" Industry Members will have an obligation to contribute to historical CAT costs.

Page 3 of 8

**CITADEL | Securities**

be passed-on to customers, the proposal must consider the impact on market liquidity and competition of the resulting increase in overall transaction costs.

## 2. Does the allocation methodology unfairly discriminate against equities market participants?

The CAT Operating Committee attempts to justify the proposed allocation methodology by asserting that "trading activity provides a reasonable proxy for cost burden on the CAT."[18] However, this unsubstantiated assertion is disputed by at least one member of the CAT Operating Committee, who details that equities trading volume creates "a relatively low burden on CAT, from a cost-generation perspective, compared to other cost drivers, such as options activity."[19]

Therefore, in order to address this apparent discrepancy, the CAT Operating Committee must demonstrate that the proposed allocation methodology does not unfairly discriminate against equities market participants. In particular, the CAT Operating Committee must provide a more detailed breakdown of equities versus options activity in terms of (a) the cost burden on CAT and (b) the proposed allocation of CAT costs to Industry Members. To the extent participants in the equities markets are unduly subsidizing CAT costs arising from options activity, this could have broader impacts on equity market liquidity, competition, and efficiency that must be assessed under the Exchange Act.

## 3. Does the allocation methodology unfairly discriminate against retail investors?

Allocating CAT costs among Industry Members based on executed shares means that market participants transacting in lower-priced securities will be allocated a larger share of overall costs since they are likely to execute a larger number of total shares. The CAT Operating Committee recognized that unfair and inequitable outcomes can result from this approach (given that there is no suggestion that executing a transaction in a lower-priced security increases the cost burden on CAT). In particular, since many OTC equity securities are priced at less than a dollar, the proposal *reduces actual executed OTC equities share volumes by 99%* before allocating CAT costs.

However, inexplicably, no similar adjustment is made for sub-dollar NMS stocks. In our previous letter, we detailed that approximately 33% of total retail NMS stock trading activity is now in sub-dollar NMS stocks. This means that, under the 2023 Funding Proposal, retail investor transactions will be allocated a disproportionate percentage of total CAT costs simply due to the securities traded. It is arbitrary, capricious, and unfairly

---

CAT July 2023 Response at 15. But this argument completely ignores the unfairly discriminatory percentage of total costs that will be borne by a small group of broker-dealers (which bears little relation to either the costs incurred by CAT or the envisaged market-wide benefits). According to the data in the 2023 Funding Proposal, 831 of the 1100 Industry Members would pay less than $100/month for historical CAT costs. 2023 Funding Proposal Exhibit C.

[18] CAT July 2023 Response at 8.

[19] Letter from FINRA (Apr. 11, 2023) at FN 23, available at: https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf.

discriminatory for the CAT Operating Committee to significantly adjust executed share volumes for sub-dollar OTC equity securities but not do the same for NMS stocks. At a minimum, the CAT Operating Committee must explain the differential treatment and analyze the impact on retail investors.

4. **Why is the allocation methodology exclusively based on executed shares?**

The CAT Operating Committee has not explained why CAT costs are proposed to be allocated based on executed *shares*, rather than executed *notional*. Given the issues identified above, executed notional would likely be a fairer and more equitable approach. We note that Section 31 fees are allocated based on executed notional, which is a comparison frequently invoked by the CAT Operating Committee.[20]

In addition, in our previous letter, we suggested other potential enhancements to make the allocation among Industry Members more fair and equitable, including: (a) minimum and maximum fee levels, (b) appropriate calibrations for liquidity provision, and (c) consideration of additional metrics (e.g. broker-dealer capital). These suggestions were cursorily dismissed by the CAT Operating Committee, with its response letter stating there was no "explanation for how these general suggestions would fit into any funding model."[21] However, many of these concepts were *included in prior funding proposals* put forward by the CAT Operating Committee itself. For example, the 2021 funding proposal included both minimum and maximum fee levels and discounts for market making activities.[22] The CAT Operating Committee provided detailed reasoning for incorporating these elements at the time, including that (i) a minimum fee ensures "all Industry Members provide a meaningful contribution to the funding of the CAT,"[23] (ii) a maximum fee "serves as a method to institute a cap on fees in order to fairly allocate costs to Industry Members,"[24] and (iii) market maker discounts are designed to ensure the allocation does not "disproportionately affect market makers, thereby leading to a reduction in liquidity and market quality."[25] At a minimum, the CAT Operating Committee must explain why it has apparently changed its position on the importance of these elements as part of a fair and equitable funding proposal that is consistent with the Exchange Act.

5. **Why are CAT costs allocated to executing brokers?**

As noted above, the CAT Operating Committee has repeatedly claimed that Industry Members will pass-through CAT costs to other market participants, such as institutional and retail investors. And yet, the proposed allocation methodology makes it difficult and

---

[20] *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016) (an "unexplained inconsistency" is a "reason for holding" an action to be "arbitrary and capricious").

[21] CAT July 2023 Response at 11.

[22] Release No. 34-91555 (Apr. 14, 2021) at 3, available at: https://www.sec.gov/rules/sro/nms/2021/34-91555.pdf.

[23] *Id.* at 34. According to the data in the 2023 Funding Proposal, 831 of the 1100 Industry Members would pay less than $100/month for historical CAT costs under the current proposal. 2023 Funding Proposal Exhibit C.

[24] *Id.* at 36.

[25] *Id.* at 28.

Page 5 of 8

A201

CITADEL | Securities

costly to do so, as billing the executing broker (i.e. the last broker-dealer in the order chain) instead of the originating broker (i.e. the first broker-dealer in the order chain) means that the entire industry will be required to build completely new systems to pass-through CAT fees.

Inexplicably, the CAT Operating Committee continues to refuse to amend the proposal to reduce implementation costs for the industry. In its latest response letter, new vague concerns are raised around billing the originating broker, including (a) the impact of broken data linkages and (b) "aggregation/disaggregation complexity."[26] However, there is no sense of the materiality of these concerns, such as the percentage of transactions that suffer from broken data linkages such that the originating broker cannot be properly identified. In addition, the response letter confusingly suggests that "[s]ome of the largest Industry Members are not involved in the origination of orders or originate few orders in relation to their overall market activity."[27] Since the executing broker and the originating broker will be the same firm for proprietary trading activity, it is unclear who or what this statement is referring to.

This back-and-forth highlights more fundamental CAT governance deficiencies. Industry suggestions are cursorily dismissed for unknown reasons with no consideration of overall costs and benefits. Under Commission Rule 613, the CAT Operating Committee should be taking into consideration the implementation costs associated with its decisions.[28] Therefore, even if the originating broker model marginally increases the costs for CAT, it should still be pursued if it results in dramatically lower market-wide implementation costs. This is underscored by the fact that industry members may end-up bearing the vast majority (if not all) of the costs incurred by CAT to implement the originating broker model.

At a minimum, the CAT Operating Committee must fully assess the costs and benefits of the executing broker and originating broker models, including (a) the difference in implementation costs for CAT, and (b) the difference in implementation costs for Industry Members. This analysis must be exposed for public comment before proceeding.

### III.  The CAT Costs Are Not Reasonable

The Exchange Act requires the equitable allocation of *reasonable* fees. The CAT Operating Committee has not provided the necessary information to enable the Commission (or the commenting public) to conclude that the CAT costs to be allocated under the 2023 Funding Proposal are in fact reasonable.

*First*, the CAT Operating Committee has studiously avoided providing basic information regarding the historical costs they are seeking to allocate to Industry Members under the 2023 Funding Proposal. This even includes the total amount of these costs – while the rule filing refers

---

[26] CAT July 2023 Response at 4.

[27] *Id.* at 3.

[28] *See* §242.613(a)(1)(vii)(B).

CITADEL | Securities

to \$338 million in historical costs,[29] the latest CAT response letter now suddenly refers to \$519 million.[30]  And it appears the \$519 million figure only covers until the end of 2022.  With full CAT implementation not expected until May 31, 2024,[31] total historical costs may reach nearly *one billion dollars*.

Furthermore, little detail has been provided regarding the nature of these historical costs. Straightforward questions remain unanswered, such as whether Industry Members may be allocated costs relating to (a) the ongoing litigation between the CAT Operating Committee and the Commission, (b) the period when Thesys was Plan Processor (note that while the proposal excludes certain costs from this period, it does not exclude other significant costs incurred prior to the formal engagement of FINRA in Q2 2019), and (c) the repeated filing of funding models that are not consistent with the Exchange Act.

Without knowing the total amount or other basic information regarding the historical costs that the CAT Operating Committee seeks to allocate under the 2023 Funding Proposal, the Commission is unable to conclude that these historical costs are reasonable and cannot accurately assess the impact of the proposed allocation methodology on overall market liquidity, efficiency, and competition.  The CAT Operating Committee has made no attempt to assess the market impact of allocating such massive costs to market participants, such as whether trading activity may decline or bid-offer spreads may widen.  Instead, it recklessly argues that allocating these massive costs to market participants is not concerning since there are other "transaction-based fees that are higher than these proposed CAT fees."[32]  The CAT Operating Committee has not met its burden to demonstrate that the historical costs to be allocated under the 2023 Funding Proposal are permissible under the Exchange Act.

*Second*, the CAT Operating Committee has not provided any data or estimates regarding the future cost trajectory.  Data showing that actual expenses have typically exceeded budgeted amounts by approximately 20%[33] and that overall CAT expenses have increased by an average of 32% each year under the current Plan Processor[34] cause significant concern.  However, the 2023 Funding Proposal offers no constraint on costs and does not provide the Commission with the necessary information to determine the anticipated cost trajectory and to assess the impact of the proposed allocation methodology (given this trajectory) on overall market liquidity, efficiency, and competition.

It is all the more critical that sufficient information is provided regarding the CAT costs – historical and future – that are to be allocated under the 2023 Funding Proposal, as the CAT Operating Committee has confirmed that all future CAT fee filings will be immediately effective,

---

[29] 2023 Funding Proposal at Exhibit C.

[30] CAT July 2023 Response at 18.

[31] https://www.catnmsplan.com/announcements/update-cais-compliance-deadlines.

[32] CAT July 2023 Response at 18.

[33] 2023 Funding Proposal at 17090.

[34] *See* Citadel Securities July 2023 Letter at 8.

Page 7 of 8

**A203**

thereby compelling market participants to comply.[35]  Furthermore, once a single CAT fee filing is in place, it will automatically continue in perpetuity until it is replaced by another one approved by the Commission.[36]

*   *   *   *   *   *   *   *   *   *

It is clear that urgent action is required to reverse the current trajectory, and to address the governance failures and spiraling costs.  In our previous letter, we provided a comprehensive set of constructive recommendations, all of which were cursorily rejected by the CAT Operating Committee.[37]  It is not tenable for the CAT Operating Committee to continue to operate without effective oversight or adequate transparency and yet seek to offload all of the associated costs onto market participants.  These fundamental issues must be addressed, and the current proposal should be denied.

In connection with comprehensively reviewing the current CAT structure, it is critical that the Commission determine why the CAT operating budget is approximately *5 times* the amount estimated by the CAT Operating Committee and the Commission in 2016.[38]  This includes determining the relative impact of (a) errors/omissions made in the 2016 estimates (e.g. underestimating the number of CAT records required and the associated technology costs), (b) implementation changes made following the approval of the 2016 CAT NMS Plan,[39] and (c) increases in market volumes. Such an assessment will inform subsequent policy initiatives designed to dramatically reduce the overall CAT budget and to fairly and equitably allocate the costs associated with a law enforcement tool designed specifically for the Commission's use (which could include the Commission funding CAT through the established Section 31 process).

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

Respectfully,

/s/ Stephen John Berger

Managing Director

Global Head of Government & Regulatory Policy

---

[35] CAT July 2023 Response at 30.

[36] 2023 Funding Proposal at 17114 ("it is critical that a CAT Fee remain in place at all times.").

[37] *See* CAT July 2023 Response.

[38] When approving the 2016 CAT NMS Plan, the Commission estimated that it would cost $37.5 million to $65 million to build CAT and that annual operating costs would range from $36.5 million to $55 million.  2016 CAT NMS Plan at 84801.

[39] *See, e.g.,* Letter from SIFMA and FIF (July 31, 2023), available at: https://www.sec.gov/comments/4-698/4698-238359-498762.pdf.