No. 23-13396

# In the United States Court of Appeals for the Eleventh Circuit

AMERICAN SECURITIES ASSOCIATION, CITADEL SECURITIES LLC, PETITIONERS

*v.*

U.S. SECURITIES AND EXCHANGE COMMISSION, RESPONDENT

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL., INTERVENORS

*ON PETITION FOR REVIEW OF AN ORDER OF THE SECURITIES AND EXCHANGE COMMISSION (RELEASE NO. 34-98290)*

**BRIEF OF AMICI CURIAE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, ALTERNATIVE INVESTMENT MANAGEMENT ASSOCIATION, COMMITTEE ON CAPITAL MARKETS REGULATION, INVESTMENT COMPANY INSTITUTE, MANAGED FUNDS ASSOCIATION, AND VIRTU FINANCIAL, INC., IN SUPPORT OF PETITIONERS AND VACATUR**

LORIN L. REISNER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*
*lreisner@paulweiss.com*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
YISHAI SCHWARTZ
DAVID A. HOPEN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

*No. 23-13396, American Securities Association* v. *U.S. Securities and Exchange Commission*

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, amici curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc., provide the following list of interested persons:

- Alternative Investment Management Association, *Amicus Curiae*

- Altman, Jennifer G., *Counsel for Intervenors NYSE American, LLC; NYSE Arca, Inc.; NYSE Chicago, Inc.; NYSE National, Inc.; and New York Stock Exchange LLC*

- American Securities Association, *Petitioner*

- ArentFox Schiff, LLP, *Counsel for Intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe C2 Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; and Cboe Exchange, Inc.*

- Ashbrook Byrne Kresge LLC, *Counsel for Amici Curiae James Overdahl and S.P. Kothari*

- Ballard Spahr, LLP, *Counsel for Intervenors NASDAQ BX, Inc.; NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Stock Market, LLC*

- Barbero, Megan, *Counsel for Respondent*

*No. 23-13396, American Securities Association* v. *U.S. Securities and Exchange Commission*

- Borse Dubai Limited, *Owner of More than 10% of Shares of Nasdaq, Inc.*

- Boyle, Gregory M., *Counsel for Intervenor Consolidated Audit Trail, LLC*

- Box Exchange LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Cboe BYX Exchange, Inc., *Intervenor*

- Cboe BZX Exchange, Inc., *Intervenor*

- Cboe C2 Exchange, Inc., *Intervenor*

- Cboe EDGA Exchange, Inc., *Intervenor*

- Cboe EDGX Exchange, Inc., *Intervenor*

- Cboe Exchange, Inc., *Intervenor*

- Cboe Global Markets, Inc. (BATS: CBOE), *Direct or Indirect Parent Company of Intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Citadel Securities GP LLC, *Parent Company of Petitioner Citadel Securities LLC*

- Citadel Securities LLC, *Petitioner*

- Committee on Capital Markets Regulation, *Amicus Curiae*

- Conley, Michael A., *Counsel for Respondent*

*No. 23-13396, American Securities Association v. U.S. Securities and Exchange Commission*

- Connolly, John Michael, *Counsel for Petitioner American Securities Association*

- Consolidated Audit Trail, LLC, *Intervenor*

- Consovoy McCarthy, PLLC, *Counsel for Petitioner American Securities Association*

- Francisco, Noel John, *Counsel for Petitioner Citadel Securities LLC*

- Financial Industry Regulatory Authority, Inc., *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Flowers, Benjamin M., *Counsel for Amici Curiae James Overdahl and S.P. Kothari*

- Gershengorn, Ian, *Counsel for Intervenor Consolidated Audit Trail, LLC*

- Greenwalt III, Paul, *Counsel for Intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe C2 Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; and Cboe Exchange, Inc.*

- Hardin, Tracey A., *Counsel for Respondent*

- Hopen, David A., *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- Hoyt, Joshua Timothy, *Counsel for Petitioner Citadel Securities LLC*

*No. 23-13396, American Securities Association v. U.S. Securities and Exchange Commission*

- Intercontinental Exchange, Inc. (NYSE: ICE), *Indirect Parent of Intervenors NYSE American, LLC; NYSE Arca, Inc.; NYSE Chicago, Inc.; NYSE National, Inc.; and New York Stock Exchange LLC*

- International Securities Exchange Holdings, Inc., *Sole LLC Member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC*

- Investment Company Institute, *Amicus Curiae*

- Investor AB (Nasdaq Stockholm: INVEB), *Owner of More than 10% of Shares of Intervenor Nasdaq, Inc.*

- Investors' Exchange, LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Jenner & Block, LLP, *Counsel for Intervenor Consolidated Audit Trail, LLC*

- Jones Day, *Counsel for Petitioner Citadel Securities LLC*

- Kastenberg, Stephen J., *Counsel for Intervenors NASDAQ BX, Inc.; NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Stock Market, LLC*

- Katsiff, Timothy D., *Counsel for Intervenors NASDAQ BX, Inc.; NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Stock Market, LLC*

- Kennedy, Jordan, *Counsel for Respondent*

*No. 23-13396, American Securities Association* v. *U.S. Securities and Exchange Commission*

- Kothari, S.P., *Amicus Curiae*

- Lantieri III, Paul, *Counsel for Intervenors NASDAQ BX, Inc.; NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Stock Market, LLC*

- Lipshutz, Brian M., *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- Long-Term Stock Exchange, Inc., *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Lucas, Brinton, *Counsel for Petitioner Citadel Securities LLC*

- MacLean, Matthew J., Pillsbury Winthrop Shaw Pittman LLP, *Counsel for Intervenors NYSE American, LLC; NYSE Arca, Inc.; NYSE Chicago, Inc.; NYSE National, Inc.; and New York Stock Exchange LLC*

- Matro, Daniel, *Counsel for Respondent*

- Managed Funds Association, *Amicus Curiae*

- MEMX LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Miami International Securities Exchange LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

*No. 23-13396, American Securities Association v. U.S. Securities
and Exchange Commission*

- MIAX Emerald, LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- MIAX PEARL, LLC, *Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- Modern Markets Initiative, Inc., *Sponsor Disclosed by Amici Curiae James Overdahl and S.P. Kothari*

- Molzberger, Michael K., *Counsel for Intervenor Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe C2 Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; and Cboe Exchange, Inc.*

- NASDAQ BX, Inc., *Intervenor*

- NASDAQ GEMX, LLC, *Intervenor*

- Nasdaq, Inc. (Nasdaq: NDAQ), *Sole Owner of LLC Interest in Nasdaq Stock Market, LLC and Nasdaq PHLX LLC and Parent Company of Nasdaq BX, Inc.*

- NASDAQ ISE, LLC, *Intervenor*

- NASDAQ MRX, LLC, *Intervenor*

- NASDAQ PHLX, LLC, *Intervenor*

- NASDAQ Stock Market, LLC, *Intervenor*

- New York Stock Exchange LLC, *Intervenor*

- NYSE American, LLC, *Intervenor*

- NYSE Arca, Inc., *Intervenor*

*No. 23-13396, American Securities Association v. U.S. Securities and Exchange Commission*

- NYSE Chicago, Inc., *Intervenor*

- NYSE National, Inc., *Intervenor*

- Overdahl, James, *Amicus Curiae*

- Paul, Weiss, Rifkind, Wharton & Garrison, LLP, *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- Phillips, David, *Counsel for Petitioner Citadel Securities LLC*

- Pillsbury Winthrop Shaw Pittman, LLP, *Counsel for Intervenors NYSE American, LLC; NYSE Arca, Inc.; NYSE Chicago, Inc.; NYSE National, Inc.; and New York Stock Exchange LLC*

- Rabbitt, Brian Charles, *Counsel for Petitioner Citadel Securities LLC*

- Reisner, Lorin L., *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- Roth, Yaakov M., *Counsel for Petitioner Citadel Securities LLC*

- Securities Industry and Financial Markets Association, *Amicus Curiae*

*No. 23-13396, American Securities Association v. U.S. Securities and Exchange Commission*

- Schwartz, Yishai, *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- Shanmugam, Kannon K., *Counsel for Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc.*

- The Nasdaq Stock Market LLC, *Intervenor and Member and Participant of Intervenor Consolidated Audit Trail, LLC*

- The Vanguard Group, Inc., *Owner of More than 10% of Common Stock of Cboe Global Markets, Inc. as of June 30, 2023*

- Thoma Bravo UGP, LLC, *Owner of More than 10% of Shares of Nasdaq, Inc.*

- U.S. Securities and Exchange Commission, *Respondent*

- Unikowsky, Adam Granich, *Counsel for Intervenor Consolidated Audit Trail, LLC*

- Virtu Financial, Inc. (VIRT), *Amicus Curiae*

    Amici curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital

*No. 23-13396, American Securities Association* v. *U.S. Securities and Exchange Commission*

Markets Regulation, Investment Company Institute, and Managed Funds Association have no parent corporation, and no publicly held company owns 10% or more of their stock.  Amicus curiae Virtu Financial, Inc., is a publicly traded corporation whose common stock is traded on the Nasdaq Stock Market (VIRT).  Virtu has no parent corporation, and no publicly held company owns 10% or more of its stock.

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM

# TABLE OF CONTENTS

Page

Interest of amici curiae .................................................................. vii

Statement of the issues ....................................................................1

Summary of argument .....................................................................1

Argument...........................................................................................3

    I.    The Commission's order is invalid because it inequitably and unjustifiably imposes massive costs on broker-dealers and investors while affording them no genuine role in establishing the CAT's budget ........................................4

        A.    The Commission failed to address the effect of the CAT's structure on CAT costs ...................................5

        B.    The Commission failed adequately to consider alternative cost-control mechanisms...................................11

    II.    The allocation of more than two-thirds (and potentially all) of the costs to broker-dealers is contrary to law and arbitrary and capricious ...............................................17

        A.    The Commission's allocation of costs is inequitable and unreasonable ...............................................17

        B.    The Commission failed adequately to consider the effect of participants passing through their share of costs...........................................................................23

(i)

Page

Table of contents—continued:

Conclusion....................................................................................................28

## TABLE OF CITATIONS

### CASES

*AFL-CIO* v. *OSHA*, 965 F.2d 962 (11th Cir. 1992) ...............................16

*Alabama Power Company* v. *OSHA*, 89 F.3d 740 (11th Cir. 1996)...................4

*Bloomberg L.P.* v. *SEC*, 45 F.4th 462 (D.C. Cir. 2022).......................................14

*BNSF Railway Co.* v. *Federal Railroad Administration*,

    62 F.4th 905 (5th Cir. 2023) ........................................................................20, 22

\* *Business Roundtable* v. *SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ................11, 26

\* *Chamber of Commerce* v. *SEC*, 412 F.3d 133 (D.C. Cir. 2005)......................12

\* *Chamber of Commerce* v. *SEC*, 85 F.4th 760 (5th Cir. 2023)........................11

*Environmental Defense Center* v. *Bureau of Ocean Energy*

    *Management*, 36 F.4th 850 (9th Cir. 2022),

    *cert. denied*, 143 S. Ct. 2582 (2023) ...............................................................22

*Environmental Health Trust* v. *FCC*, 9 F.4th 893 (D.C. Cir. 2021)................22

*Environmental Transportation Systems, Inc.* v. *ENSCO, Inc.*,

    969 F.2d 503 (7th Cir. 1992).........................................................................18

*Exxon Co., U.S.A.* v. *FERC*, 182 F.3d 30 (D.C. Cir. 1999)................................21

Page

Cases—continued:

*Gateway Radiology Consultants, P.A., In re,*

  983 F.3d 1239 (11th Cir. 2020).......................................................................3

*Lockheed Martin Corp.* v. *United States*, 833 F.3d 225 (D.C. Cir. 2016)........18

*United Mine Workers of America* v. *Mine Safety & Health*

  *Administration*, 626 F.3d 84 (D.C. Cir. 2010)...............................................22

*United States* v. *Consolidation Coal Co.*, 345 F.3d 409 (6th Cir. 2003) ..........18

## STATUTES AND RULES

* Administrative Procedure Act, 5 U.S.C. § 706(2)(A).......................................3

Comprehensive Environmental Response, Compensation,

  and Liability Act, 42 U.S.C. § 9613................................................................17

* Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78rr:

  15 U.S.C. § 78f(b)(4) .......................................................3, 4, 11, 17, 23, 25

  15 U.S.C. § 78f(b)(8) .....................................................................................27

  15 U.S.C. § 78o-3(b)(5)....................................................3, 4, 11, 17, 23, 25

  15 U.S.C. § 78o-3(b)(8)..................................................................................27

  15 U.S.C. § 78s(b)..........................................................................................13

Rule 19b-4, 17 C.F.R. § 240.19b-4......................................................12, 13, 15

81 Fed. Reg. 84,696 (Nov. 23, 2016)......................................................5, 8, 12, 13

88 Fed. Reg. 17,086 (Mar. 21, 2023).......................................................7, 15, 25

Page

Rules—continued:

88 Fed. Reg. 62,628 (Sept. 12, 2023) ..................... 5-7, 9, 10, 12, 15, 16, 18, 20-26

89 Fed. Reg. 11,153 (Feb. 13, 2024) ...................................................23

## OTHER AUTHORITIES

Consolidated Audit Trail, LLC, Financial Statements

(Dec. 31, 2022) <catnmsplan.com/sites/default/files/2023-

07/FY2022-CAT-Audited-Financial-Statements.pdf> .................................7

Consolidated Audit Trail, LLC, 2023 *Financial and Operating*

*Budget, Revised as of November 7, 2023*

<tinyurl.com/5b9famrf> .................................................................8

Letter from Marcia E. Asquith, Corporate Secretary

and Executive Vice President, FINRA, to Vanessa

Countryman, Secretary, SEC (Apr. 11, 2023)

<tinyurl.com/FINRA-Letter> ......................................................23

Letter from Stephen John Berger, Managing Director, Global

Head of Government and Regulatory Policy, Citadel

Securities, to Vanessa Countryman, Secretary, SEC

(Aug. 22, 2023)<tinyurl.com/Citadel-August-Letter>.................................8

iv

Page

Other authorities—continued:

Letter from Douglas A. Cifu, Chief Executive Officer,

Virtu Financial, to Vanessa Countryman, Secretary, SEC

(July 13, 2023) <tinyurl.com/Virtu-July-2023> ..........................................16

Letter from Joseph Corcoran and Ellen Greene,

Managing Directors, SIFMA, and Howard Meyerson,

Managing Director, Financial Information Forum,

to Vanessa Countryman, Secretary, SEC (July 31, 2023)

<tinyurl.com/SIFMA-July-2023> ............................................................ 5-7

Letter from Ellen Greene and Joseph Corcoran, Managing

Directors, SIFMA, to Vanessa Countryman, Secretary, SEC

(June 22, 2022) <tinyurl.com/SIFMA-June-Letter>................11, 12, 18, 21

Letter from Ellen Greene and Joseph Corcoran, Managing

Directors, SIFMA, to Vanessa Countryman, Secretary, SEC

(Oct. 7, 2022) <tinyurl.com/SIFMA-October-2022-Letter> ..........10, 11, 26

Letter from Ellen Greene and Joseph Corcoran, Managing

Directors, SIFMA, to Vanessa Countryman, Secretary, SEC

(Jan. 12, 2023) <tinyurl.com/SIFMA-January-Letter>.................12, 19, 23

Page

Other authorities—continued:

Letter from Ellen Greene and Joseph Corcoran,

Managing Directors, SIFMA, to Vanessa Countryman,

Secretary, SEC (May 2, 2023) <tinyurl.com/May-Letter> ...........14, 18, 24

Letter from Ellen Greene and Joseph Corcoran, Managing

Directors, SIFMA, to Vanessa Countryman, Secretary, SEC

(June 5, 2023) <tinyurl.com/June-2023-Letter> ...................................6, 7, 9

Letter from Joanna Mallers, Secretary, FIA Principal Traders

Group, to Vanessa Countryman, Secretary, SEC

(July 14, 2023) <tinyurl.com/FIA-Letter>....................................................25

* Commissioner Hester M. Peirce, *Who's Paying?: Statement on

the CAT's Funding Model* (Sept. 6, 2023)

<tinyurl.com/PeirceDissent> ...................................................6-8, 10, 14, 26

James Rundle & Anthony Malakian, *CAT's Tale: How Thesys,

the SROs and the SEC Mishandled the Consolidated Audit

Trail*, Waters Technology (Feb. 14, 2019)

<tinyurl.com/CAT-Troubled-History> .......................................................16

Commissioner Mark T. Uyeda, *Statement on Consolidated Audit

Trail Revised Funding Model* (Sept. 6, 2023)

<tinyurl.com/uyeda-dissent-cat> ...............................................................10

**INTEREST OF AMICI CURIAE**

The Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the United States and global capital markets.  On behalf of industry members and their one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed-income markets, and related products and services.

The Alternative Investment Management Association is the global representative of the alternative investment industry, with approximately 2,100 corporate members in over 60 countries.  Its fund-manager members collectively manage more than $2.5 trillion in hedge fund and private credit assets.

The Committee on Capital Markets Regulation is dedicated to enhancing the competitiveness of American capital markets and ensuring the stability of the American financial system.  Its membership includes 38 leaders drawn from the finance, investment, business, law, accounting, and academic communities.

The Investment Company Institute (ICI) is the leading association representing regulated investment funds, which include mutual funds, exchange-traded funds, closed-end funds, and unit investment trusts registered in the United States, and UCITS and similar funds in other jurisdictions.  ICI also represents its members in their capacity as investment advisers to certain collective investment trusts and retail separately managed accounts.  ICI's

members manage $33.2 trillion in funds registered under the Investment Company Act of 1940, serving more than 100 million investors, as well as $8.5 trillion in regulated fund assets outside the United States.

Managed Funds Association represents the global alternative asset management industry. Its mission is to advance the ability of alternative asset managers to raise capital, invest, and generate returns for their beneficiaries. It has more than 175 member fund managers, including traditional hedge funds, credit funds, and crossover funds, that collectively manage over $3.2 trillion in investments.

Virtu Financial, Inc., is a leading financial firm that leverages cutting-edge technology to deliver liquidity to the global markets and innovative, transparent trading solutions to its clients. Virtu operates as a market maker across numerous exchanges in the United States and is a member of all United States registered stock exchanges.

Amici have a direct interest in this litigation because the amendments to the National Market System Plan for the Consolidated Audit Trail (CAT) will subject amici or their members to significant, escalating, and largely uncontrolled fees.[*]

---

[*] Amici curiae state that no counsel for any party authored this brief in whole or in part; no counsel or party contributed money intended to fund the preparation or submission of this brief; and no person other than amici curiae or their counsel contributed money intended to fund its preparation or submission. All parties have consented to the filing of this brief.

## STATEMENT OF THE ISSUES

1.    Whether the Securities and Exchange Commission's order approving the funding model for the Consolidated Audit Trial (CAT) is contrary to the Securities Exchange Act of 1934 (Exchange Act) and arbitrary and capricious because it imposed massive and escalating financial costs on broker-dealers and investors without affording them any genuine role in establishing the CAT's budget.

2.    Whether the Commission's allocation of more than two-thirds of CAT costs (and potentially 100%) to broker-dealers is contrary to the Exchange Act and arbitrary and capricious.

## SUMMARY OF ARGUMENT

This case concerns the approval by the Securities and Exchange Commission of a proposal to fund the Consolidated Audit Trail.  The CAT is a novel and colossal system for the identification and collection of data on every transaction of equities and exchange-listed options across all markets in the United States.  It was designed by 25 self-regulatory organizations, almost all of which are securities exchanges.  Those organizations, known as the "participants," proposed to shift the majority of CAT costs to broker-dealers and their investors and customers.  Specifically, the funding proposal, on its face, assigned two-thirds of CAT costs to broker-dealers and one-third to the participants that submitted the proposal.

(1)

The Commission gave only superficial consideration to the objections raised by commenters, and it adopted the proposal without offering the required justification. Because the amendments are contrary to the requirements of the Exchange Act and arbitrary and capricious, the petition for review should be granted and the order set aside in its entirety.

I.      The Commission's imposition of uncontrolled CAT costs on broker-dealers and investors is unlawful. The annual cost of the CAT is already several times (and hundreds of millions of dollars) more expensive than anticipated, and the broker-dealers lack a single vote on the CAT's operating committee. The Commission violated the Exchange Act and acted arbitrarily and capriciously by imposing massive CAT costs on broker-dealers and investors without addressing their lack of any genuine control over, or meaningful participation in developing, the CAT budget. The Commission also acted arbitrarily and capriciously by failing adequately to address alternative cost-control mechanisms proposed by commenters.

II.     The Commission's formal allocation of two-thirds of CAT costs to broker-dealers, and its failure to adopt measures preventing participants from passing the remaining one-third of costs to those same broker-dealers, are also unlawful. Allocating even two-thirds of CAT costs to broker-dealers is neither equitable nor reasonable because broker-dealers are responsible for far less than two-thirds of CAT costs. The Commission relied on a superficial and

2

unsubstantiated basis for that decision and failed adequately to consider alternative allocations proposed by commenters. In addition, the Commission separately violated the Exchange Act and acted arbitrarily and capriciously because, although it formally allocated two-thirds of costs to broker-dealers, broker-dealers will bear 100% of CAT costs if the participants pass through their share. The Commission offers no reasoning to defend that impermissible allocation, and its order should be held unlawful and set aside.

## ARGUMENT

Under the Exchange Act, the Commission must "provide for the equitable allocation of reasonable dues, fees, and other charges." 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5). An agency order should be set aside by the reviewing court if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary-and-capricious standard, the Commission is obligated to act reasonably and reasonably explain its action; an order is unlawful if it "entirely fail[s] to consider an important aspect of the problem," "offer[s] an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (citation omitted). The Commission is also obligated to "determine whether the benefits expected from [the order] bear a reasonable relationship

3

to the costs." *Alabama Power Company* v. *OSHA*, 89 F.3d 740, 746 (11th Cir. 1996) (citation omitted).  The Commission's imposition of costs on broker-dealers without giving them any genuine role in establishing the CAT budget, and the Commission's allocation of at least two-thirds of (and possibly nearly all) costs to broker-dealers, are both contrary to the Exchange Act and arbitrary and capricious.

**I.      THE COMMISSION'S ORDER IS INVALID BECAUSE IT INEQUITABLY AND UNJUSTIFIABLY IMPOSES MASSIVE COSTS ON BROKER-DEALERS AND INVESTORS WHILE AFFORDING THEM NO GENUINE ROLE IN ESTABLISHING THE CAT'S BUDGET**

The Commission's treatment of the ballooning cost of the CAT system is both contrary to its statutory obligation to ensure the equitable allocation of fees, *see* 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5), and arbitrary and capricious.  The order adopting the funding model is contrary to law and arbitrary and capricious because it imposes massive fees on broker-dealers (and likely investors), without giving them any genuine role in establishing the CAT's budget.  The order is also arbitrary and capricious because the Commission failed adequately to consider alternative cost-control mechanisms proposed by commenters.

### A. The Commission Failed To Address The Effect Of The CAT's Structure On CAT Costs

1. CAT costs have escalated rapidly since the system was first introduced. When the CAT NMS Plan was approved in 2016, participants estimated that the average annual costs of operating the CAT would be between $36.5 and $55 million. *See* 81 Fed. Reg. 84,696, 84,801 (Nov. 23, 2016). By November 2023, however, the CAT published an anticipated annual budget of approximately $200 million. In other words, the operating budget is "now five times the amount estimated in the CAT NMS Plan Approval Order." 88 Fed. Reg. 62,628, 62,655 (Sept. 12, 2023). And those increases have only continued: from 2020 to 2023, the annual increases in operating costs were 73.2%; 27.3%; and 27.0%, respectively. *See* Letter from Joseph Corcoran and Ellen Greene, Managing Directors, SIFMA, and Howard Meyerson, Managing Director, Financial Information Forum, to Vanessa Countryman, Secretary, SEC, at 7 (July 31, 2023) <tinyurl.com/SIFMA-July-2023> (July 2023 Letter).

The lack of cost constraints resulted from the design of the CAT. The Commission created the CAT as an NMS plan, not as a Commission-managed program. Whereas most regulatory programs operate within the confines of a hard limit and discipline through congressional appropriations, the CAT enjoys virtually unlimited and unchecked flexibility to expand its scope and breadth, as well as related costs, through a governance model that includes only self-regulatory organizations. Its budget is a mere estimate, capable of

growing in real time "as the year progresses with contemporaneous data." 88 Fed. Reg. 62,652.

As a result, costs continue to skyrocket. The CAT operating budget is equivalent to approximately 10% of the Commission's own budget request for 2023. *See* Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 4 (June 5, 2023) <tinyurl.com/June-2023-Letter> (June 2023 SIFMA Letter). If CAT operating costs were to increase at the most recent annual rate of 27%, and the Commission's budget increased by 4% annually to account for inflation, the CAT budget would be nearly three-quarters of the Commission's own budget within ten years. *See* July 2023 Letter 7.

Those costs are the result of unchecked decisionmaking by the participants and the Commission. As Commissioner Peirce explained, the CAT funding model "is the product of the CAT[,] LLC, the decisions of which are made by an operating committee consisting of members appointed by each of the self-regulatory organizations" that are "participants in the CAT [National Market System] Plan." Commissioner Hester M. Peirce, *Who's Paying?: Statement on the CAT's Funding Model* (Sept. 6, 2023) <tinyurl.com/ PeirceDissent> (Peirce Dissent). "While broker-dealers and other interested parties have participated on the CAT Advisory Committee and weighed in during the Commission approval process," at the end of the day, those parties "do

6

not have a vote." *Id.* It is common sense that, because the CAT's operating committee can bill the vast majority of costs to broker-dealers (and investors), there is little meaningful incentive to contain costs under the CAT funding plan. *See id.*; *see also* 88 Fed. Reg. 17,086, 17,107 (Mar. 21, 2023). That incentive structure leads not only to unnecessary demands for data collection, but also wasteful management, as with the CAT's failed engagement of Thesys Technologies as plan processor. *See* June 2023 SIFMA Letter 6-7.

The Commission has likewise contributed substantially to the cost overruns. As Commissioner Peirce observed, the spiraling costs are traceable to "implementation choices made by [both] the plan participants and the Commission." *See* Peirce Dissent. In particular, the Commission has expanded its data demands, insisting on "structural changes to ensure that certain data be made available to the SEC at specific times." June 2023 SIFMA Letter 6. Those demands have resulted in massive and ever-increasing costs for cloud-hosting services. *See* Consolidated Audit Trail, LLC, Financial Statements 13 (Dec. 31, 2022) <catnmsplan.com/sites/default/files/2023-07/FY2022-CAT-Audited-Financial-Statements.pdf>. Cloud-hosting services now cost the CAT at least $150 million per year. *See* 88 Fed. Reg. 62,652 n.524. That figure increased 36% from 2022 to 2023 alone. *See* July 2023 Letter 7.

In short, the costs of the CAT are massive and escalating. They are driven by the participants and the Commission. And the very design of the

7

CAT system allows the participants and the Commission to reap the benefits of the CAT while shifting the costs to broker-dealers and investors.

2.    Those costs inflict significant harm on broker-dealers and investors.  Broker-dealers have already incurred substantial costs to comply with the CAT system's burdensome reporting requirements.  *See* Peirce Dissent.  Among other things, broker-dealers have devoted billions of dollars and considerable time to developing and maintaining systems for reporting the prescribed data to the CAT in the required timeframe and formats.  *See* 81 Fed. Reg. 84,801.  The Commission's order now saddles broker-dealers with even more costs.

The direct costs imposed on broker-dealers are enormous and virtually certain to increase.  The 2023 CAT budget is approximately $200 million, and broker-dealers will be responsible for at least $140 million for 2023 alone.  *See* Consolidated Audit Trail, LLC, 2023 *Financial and Operating Budget, Revised as of November 7, 2023* <tinyurl.com/5b9famrf> (2023 CAT Budget).  And the CAT's total budget has increased each year since the CAT's creation in 2016.  *See* Letter from Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, to Vanessa Countryman, Secretary, SEC, at 7 (Aug. 22, 2023)<tinyurl.com/Citadel-August-Letter> (Citadel Letter).

The Commission's order will also harm investors, especially retail investors. The Commission expressly contemplated that broker-dealers will pass through CAT costs to investors, to the extent that competition permits. *See, e.g.*, 88 Fed. Reg. 62,637. And retail investors will face disproportionate harm because allocating costs based on executed shares means that broker-dealers trading in lower-priced securities will incur more fees. *See* Citadel Letter 4-5. In other words, while the Commission's order purports to protect investors and support fair, efficient capital markets, it will actually achieve the opposite effect.

3.    A funding model that imposes enormous and escalating fees on broker-dealers and investors who lack any meaningful role in developing or establishing CAT costs is both inequitable and arbitrary and capricious. Commenters explained that the Commission and participants lack incentives to restrain costs, and further explained that the lack of broker-dealer control over costs ensures the CAT operates with minimal concern for the costs imposed on broker-dealers and investors. Commenters also noted that the expanding costs are particularly unjustifiable because they are substantially driven by the Commission's desire to use the CAT for its own law enforcement purposes, rather than the participants' needs. *See, e.g.*, June 2023 SIFMA Letter 8. And they asked the Commission to adopt structural changes to help control those costs by giving broker-dealers a say. *See, e.g., id.* at 4; Letter from Ellen

9

Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 6 (Oct. 7, 2022) <tinyurl.com/SIFMA-October-2022-Letter> (October 2022 SIFMA Letter). Commissioners Peirce and Uyeda raised the same concerns in their dissents. *See* Peirce Dissent; Commissioner Mark T. Uyeda, *Statement on Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023) <tinyurl.com/uyeda-dissent-cat>.

But the Commission ignored those concerns. It acknowledged that participants will be able to recoup their share of the fees from broker-dealers, largely eliminating their incentives to restrain costs. 88 Fed. Reg. 62,637. And the Commission also acknowledged that broker-dealers—despite bearing the burden of increased costs—will continue to lack "voting representation" or other direct power over the budget that could allow for control of costs. *Id.* at 62,675. But the Commission disregarded the economically unjustifiable incentive structure created by the participants' control of the budget as not "within the scope" of the proceeding. *Id.* The Commission's approval of the CAT funding order without meaningful changes to CAT governance ensured, in the words of Commissioner Peirce, that "nobody with financial skin in the game will be among those setting or reviewing the budget, or among those able to propose amendments to the plan or involved in day-to-day discussions about interpretation or implementation of the plan." Peirce Dissent. That is the very definition of arbitrary and capricious action.

10

Allowing CAT costs to grow unchecked because of decisions made by the participants, often at the behest of the Commission, while shifting those costs to disenfranchised broker-dealers also is not "equitable" and therefore violates the Exchange Act.  15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).  In addition, it constitutes an arbitrary and capricious failure to "respond to substantial problems raised by commenters."  *Business Roundtable* v. *SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011); *see also Chamber of Commerce of the United States of America* v. *SEC*, 85 F.4th 760, 773-774 (5th Cir. 2023).  For those reasons, the Commission's order should be set aside.

**B.    The Commission Failed Adequately To Consider Alternative Cost-Control Mechanisms**

The Commission's order is also arbitrary and capricious because it failed to give adequate consideration to cost-control measures proposed by commenters.  For example, SIFMA proposed a requirement that the Commission approve the CAT operating budget each year in order to regulate the participants' decisionmaking.  *See* October 2022 SIFMA Letter 5-6; Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 8-9 (June 22, 2022) <tinyurl.com/SIFMA-June-Letter> (June 2022 SIFMA Letter).  SIFMA also proposed replacing disclosure of "high-level categories of costs" with "public disclosure of detailed CAT costs that [would] provide[] the industry and public with greater transparency into the actual costs."  October 2022 SIFMA Letter 6; *see also* Letter

11

from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 5-6 (Jan. 12, 2023) <tinyurl.com/ SIFMA-January-Letter> (January 2023 SIFMA Letter).

The Commission offered four purported reasons for declining to adopt any mechanism for controlling costs: (1) "the transparency of the budget," (2) "the transparency of . . . [the] Rule 19b-4 process" for approving fee filings by the CAT, (3) "the one-third allocation of costs to [p]articipants," and (4) "the pre-existing requirement for an independent audit of all fees." 88 Fed. Reg. 62,655. None of those reasons is plausible or constitutes adequate "consider[ation] [of] reasonable alternatives." *Chamber of Commerce* v. *SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005). And each ignores the simple fact—left completely unaddressed in the SEC's order—that over a decade of experience with CAT costs has demonstrated that those purported cost-control measures are ineffective.

1. It is unreasonable to expect the supposed transparency of the budget process to control costs in the future, because that supposed transparency has failed to control costs for years. In fact, CAT has provided only high-level descriptions of budget categories, for items such as "cloud hosting services," "operating fees," and "change request fees." *See* June 2022 SIFMA Letter 8. Meanwhile, annual operating costs have ballooned from an estimated $36.5 to $55 million in 2016 to approximately $200 million in 2023. *Compare* 81

Fed. Reg. 84,801 *with* 2023 CAT Budget. There is no reason to believe that the limited transparency of the budget process will start reining in costs now, and neither the participants nor the Commission have identified meaningful changes in budget disclosures.

What is more, the Commission failed to explain *how* transparency regarding the CAT budget would rein in costs when the relevant decisionmakers are largely insulated from the costs and lack incentives to adopt more economically justified approaches. As discussed above, the structure of the CAT's operating committee provides the participants with little incentive to control costs. *See* pp. 5-11. And as discussed below, the allocation of most and potentially all CAT costs to broker-dealers insulates the participants from the consequences of their actions. *See* pp. 17-19.

2.     The Commission's reliance on the Rule 19b-4 process is similarly misguided. That process provides objectors with an opportunity to contest fees on the ground that they are inconsistent with the Exchange Act or otherwise unreasonable. *See* 17 C.F.R. § 240.19b-4; *see also* 15 U.S.C. § 78s(b). But challenging proposed fees after an operating budget has already been set is an inefficient and ineffective method of developing a reasonable budget. Those challenges come too late to have a meaningful effect on the policy decisions that drive budget increases. Objecting to fees when they are charged thus constitutes "a very indirect way to police costs" and fails to ensure "the critical

13

analysis of CAT costs [that] needs to happen before the budget is finalized." Peirce Dissent.

As SIFMA explained in a comment letter, "[b]ased on the practical challenges of sending the CAT Operating Committee back to the drawing board to modify the CAT budget, it seems highly unlikely that the Commission would determine that a proposed CAT Fee does not meet the Exchange Act fee standards and thus require the Participants to modify the budget." Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 9 (May 2, 2023) <tinyurl.com/May-Letter> (May 2023 SIFMA Letter). Such a step "would require all of the Participants to meet again through the Operating Committee to agree on modifying the CAT Budget," and then all 25 participants would need to submit new fee filings. *Id.* That disruption could undermine what has become an important, albeit off-the-books, regulatory tool for the Commission. *See id.* The Commission offered no persuasive logic to justify that approach.

In a similar case, the District of Columbia Circuit has held that it is arbitrary and capricious to rely on Commission review at the "fees stage" to restrain unreasonably expensive plans. *See Bloomberg L.P.* v. *SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022). As that court explained with respect to new Financial Industry Regulatory Authority (FINRA) reporting requirements, if the program "ends up being unreasonably expensive, then the [Commission] cannot

14

protect market participants from footing the bill for it at the fees stage" because "millions, or even tens of millions, of dollars," will have already been spent. *Id.* That is all the more so here, where costs have already run into the hundreds of millions of dollars.

3.     The Commission's reliance on "the one-third allocation of costs to [p]articipants" fares no better. 88 Fed. Reg. 62,655. The Commission advanced that argument only hesitantly, noting that the allocation of a third of total fees "provides [the participants] with at least *some* incentive to control costs." *Id.* (emphasis added). But the Commission acknowledged that participants could pass even those costs on to broker-dealers, insulating participants from the consequences of their management of the CAT. 88 Fed. Reg. 17,107. And in any event, participants have had "some incentive" to control costs since the CAT's inception because of the fees for which they have always been responsible. As with the supposed transparency of the budgeting and Rule 19b-4 processes, that incentive has proven woefully inadequate.

In light of that history, the Commission should have offered at least some analysis to explain why it believed that assigning only one-third of total CAT costs to the participants would create sufficient pressure to rein in unnecessary spending. Yet it failed to do so. And the failure to provide any such analysis violates the applicable standard. "[W]ithout *any* quantification or *any*

explanation," this Court cannot evaluate the reasonableness of the Commission's judgment. *AFL-CIO* v. *OSHA*, 965 F.2d 962, 977 (11th Cir. 1992).

4. Finally on this point, the Commission claimed that the "pre-existing requirement for an independent audit" obviates the need for further cost-control measures. 88 Fed. Reg. 62,655. But such a guardrail offers little protection, a fact that has been thrown into sharp relief in recent years. The Commission's reasoning ignores that last year's CAT budget rose by more than 30%. *See* Letter from Douglas A. Cifu, Chief Executive Officer, Virtu Financial, to Vanessa Countryman, Secretary, SEC, at 4 (July 13, 2023) <tinyurl.com/Virtu-July-2023>. The Commission thus did nothing to dispel fears that broker-dealers could again find themselves exposed to "ever-increasing fees with no mechanism to control or limit the budget." *Id.* And it disregarded "the troubled history of the CAT," which has been marked by "mismanagement on all sides, infighting, inflated expectations, regulatory inaction and overly ambitious projections." James Rundle & Anthony Malakian, *CAT's Tale: How Thesys, the SROs and the SEC Mishandled the Consolidated Audit Trail*, Waters Technology (Feb. 14, 2019) <tinyurl.com/CAT-Troubled-History>.

\* \* \* \* \*

For nearly a decade, the costs of the CAT have grown essentially unchecked. By imposing enormous, escalating costs on broker-dealers without

giving them any genuine role in establishing the CAT's budget, the Commission acted contrary to the Exchange Act and arbitrarily and capriciously.

## II.     THE ALLOCATION OF MORE THAN TWO-THIRDS (AND POTENTIALLY ALL) OF THE COSTS TO BROKER-DEALERS IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS

The order is also contrary to the Exchange Act and arbitrary and capricious for the independent reason that it unreasonably assigns two-thirds of CAT costs to broker-dealers (and effectively assigns them up to 100%, when the participants' share of costs is passed through to broker-dealers).  That allocation of fees is fundamentally inequitable.  *See* 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).  It is also arbitrary and capricious because it is based on insufficient analysis and fails adequately to consider reasonable alternatives.  For both of those reasons, the order is unlawful and should be set aside.

### A.     The Commission's Allocation Of Costs Is Inequitable And Unreasonable

1.     A fundamental component of any "equitable allocation" of fees, 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5), is consideration of responsibility for the underlying costs of the CAT.  For example, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) provides that "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613.  In implementing that provision, courts consider the "relative culpability of the parties"

17

to be an important factor governing the allocation of costs. *Environmental Transportation Systems, Inc.* v. *ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir. 1992); *see also Lockheed Martin Corp.* v. *United States*, 833 F.3d 225, 236 (D.C. Cir. 2016); *United States* v. *Consolidation Coal Co.*, 345 F.3d 409, 414 (6th Cir. 2003). But in imposing more than two-thirds of CAT costs on broker-dealers, the Commission expressly declined to consider their responsibility for costs. *See* 88 Fed. Reg. 62,637-62,638. And the Commission's allocation bears no relationship to their responsibility for CAT costs.

As commenters have explained, the participants are responsible for well more than one-third of CAT costs. *See, e.g.*, June 2022 SIFMA Letter 5-6. It is the participants who, along with the Commission, "designed and imposed on [broker-dealers] a multitude of reports, fields, and data types spelled out in hundreds of pages of technical specifications and answers to Frequently Asked Questions." *Id.* at 5. And after broker-dealers submit data to the CAT, the data are processed by the CAT for use by regulators. *See id.* It is thus the participants who "directly control and benefit from these stages of the CAT System." *Id.*; *see also* May 2023 SIFMA Letter 6-7. For those reasons, it is the participants who should be responsible for most of CAT costs.

What is more, broker-dealers already shoulder the costs of reporting data to the CAT in the manner specified by the participants. *See* June 2022 SIFMA Letter 4-5. As SIFMA has explained to the Commission, "[s]ome of

18

the larger firms [have] spen[t] multiple millions of dollars and devot[ed] count-less staff hours to developing internal systems capable of reporting order and transaction data to the CAT and workable reporting specifications for the CAT." *Id.* at 4. Those compliance costs are a further reason that charging broker-dealers two-thirds (and possibly up to 100%) of CAT costs is grossly inequitable.

It is true that many broker-dealers have complicated business models that make CAT reporting more difficult. But that complexity is the result of the participants' choice to establish 16 different equity exchanges and 16 dif-ferent options exchanges. *See* January 2023 SIFMA Letter 3. In the options market, broker-dealers must trade on an exchange and must contend with "16 exchanges with three different models with differing fees and complicated or-der types, including sophisticated routing strategies." *Id.* And while off-ex-change trading does occur in equity markets, approximately 60% of all trading activity in national market system stocks occurs on the exchanges. *See id.* Market complexity thus flows primarily from the participants' decisions, mak-ing an allocation of more than two-thirds of costs to broker-dealers inequitable and unreasonable.

2.    The Commission happened to adopt the same allocation that the participants proposed, but for different reasons. The participants argued to the Commission that broker-dealers are responsible for two-thirds of CAT

costs, but the Commission declined to adopt that reasoning. *See* 88 Fed. Reg. 62,637-62,638. It instead offered three other purported justifications for the same allocation. None is adequate.

The Commission's principal justification appears to be that there are "three primary roles in a transaction: the buyer, seller, and market regulator." 88 Fed. Reg. 62,629. That observation proves nothing about how costs should be allocated. The CAT's massive and escalating costs are the result of the participants' choices and the Commission's demands, not the number of parties involved in every transaction. *See* pp. 5-8, 19, *supra.* In effect, the Commission threw up its hands, offered a superficial observation, and imposed hundreds of millions of dollars in costs based on that observation. That "paucity of reasoning," *BNSF Railway Co.* v. *Federal Railroad Administration*, 62 F.4th 905, 911 (5th Cir. 2023), satisfies neither the Exchange Act nor the arbitrary-and-capricious standard.

The Commission also asserted that the allocation "reflects a reasonable effort to allocate costs based on the extent to which different CAT Reporters . . . benefit from the equities and options markets." 88 Fed. Reg. 62,638 (citation omitted). But the Commission did not explain how broker-dealers receive two-thirds of the benefits of the CAT when, as commenters pointed out, it is the participants and other regulators who benefit from CAT data. *See* pp. 9, 18, *supra.*

20

The Commission further asserted that its allocation would be "transparent, would be relatively easy to calculate and administer, and is designed not to have an impact on market activity because it is neutral as to the location and manner of execution."  88 Fed. Reg. 62,638 (citation omitted).  But that logic at best justifies allocating a fixed percentage of costs to broker-dealers and a fixed fraction of costs to participants.  Other fixed-percentage allocations would be just as transparent, administrable, and neutral.  And in any event, the "goals of administrative efficiency and objectivity do not free the agency from the requirement" of an equitable, reasoned allocation of costs.  *Exxon Co., U.S.A.* v. *FERC*, 182 F.3d 30, 42 (D.C. Cir. 1999).

3.    In addition to adopting an inequitable allocation and failing sufficiently to justify it, the Commission failed adequately to consider alternatives proposed by commenters.  SIFMA proposed several alternatives, including making broker-dealers responsible for the costs associated with initial ingestion of data into the CAT system and making participants responsible for all subsequent costs, which are exclusively within their control.  *See* June 2022 SIFMA Letter 5-6.

The Commission dismissed all of those alternatives without any substantive reasoning.  It remarked that "there may be multiple reasonable approaches," 88 Fed. Reg. 62,636, and that each alternative "has relative strengths and weaknesses," *id*. at 62,638.  Those generic statements do not

suffice. *See, e.g.*, *Environmental Health Trust* v. *FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021); *United Mine Workers of America* v. *Mine Safety & Health Administration*, 626 F.3d 84, 87 (D.C. Cir. 2010). An agency must articulate the basis of its reasoning, "and here, the agency has barely articulated any basis at all." *BNSF Railway*, 62 F.4th at 911. Although agencies need not consider "infinite, unfeasible, or impractical alternatives," they must consider "reasonable ones." *Environmental Defense Center* v. *Bureau of Ocean Energy Management*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2582 (2023). And here, the Commission itself noted that the alternatives proposed by commenters were reasonable.

*    *    *    *    *

In light of the participants' role in creating and exacerbating the complexities of the CAT, the Commission should have rejected the allocation of at least two-thirds (and potentially 100%) of costs to the broker-dealers. The Commission instead failed to grapple with the issue of responsibility for costs and adopted its allocation based on the entirely superficial and unsupported assertion that "divid[ing] the costs evenly among the three parties who have primary roles related to the transaction is reasonable." 88 Fed. Reg. 62,638. In so doing, the Commission failed to comply with the Exchange Act or satisfy the arbitrary-and-capricious standard.[1]

---

[1] The inequity and arbitrariness of the fee allocation is heightened with respect to the collection of historical CAT fees, because a funding model based

22

### B.    The Commission Failed Adequately To Consider The Effect Of Participants Passing Through Their Share Of Costs

Even if the Commission had provided sufficient support for the formal two-thirds allocation, it still failed adequately to consider the near-certainty that the participants will pass through their own share of costs to broker-dealers. FINRA has already sought to pass its share of costs through to broker-dealers, turning the formal two-thirds allocation into at least a four-fifths allocation. *See* 89 Fed. Reg. 11,153 (Feb. 13, 2024). Similarly, nothing would prevent the exchanges from seeking to pass through their share of the costs as well, effectively saddling broker-dealers with *all* CAT costs. *See* 88 Fed. Reg. 62,636. Because the Commission's order invites such a result, it violates the Exchange Act's requirement of an "equitable allocation of reasonable dues, fees, and other charges." 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5). And because the Commission failed adequately to address the passing through of costs, its order is arbitrary and capricious as well.

1.    As a nonprofit national securities association, FINRA derives its funding primarily from regulatory fees paid by FINRA members. *See* Letter from Marcia E. Asquith, Corporate Secretary and Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, at 5-6 (Apr. 11, 2023) <tinyurl.com/FINRA-Letter>. FINRA thus has no realistic means of

---

on current trading volume bears no relationship to responsibility for past costs and provides no incentive for efficiency. *See* 88 Fed. Reg. 62,681; *see also* 88 Fed. Reg. 62,662; *see also* January 2023 SIFMA Letter 6-7.

funding its share of CAT costs other than by passing those costs along to member broker-dealers. Without doing so it would have no way of meeting its budget and would risk jeopardizing its regulatory mission. The allocation of costs to FINRA is accordingly, for all practical purposes, an allocation of costs to broker-dealers. For that reason, the Commission's statement that broker-dealers will pay two-thirds of CAT costs is illusory. When FINRA's share of the one-third of costs allocated to participants is passed through to broker-dealers, they will foot some 80% of total CAT costs. *See* May 2023 SIFMA Letter 2.

The Commission itself acknowledged that FINRA is likely to pass through its portion of CAT costs, but the Commission defended its decision only with non-sequiturs. It noted that the Exchange Act "expressly contemplates the ability of the [p]articipants to recoup the costs of fulfilling their statutory obligations under the Exchange Act." 88 Fed. Reg. 62,636; *see also id.* at 62,629 (similar). It also stated that "the CAT is important to the performance of these regulatory activities in modern, interconnected markets, to the ultimate benefit of investors and market participants." *Id.* at 62,636. That reasoning neither analyzes nor justifies the financial impact on broker-dealers. As such, it offers no rationale for imposing at least 80% of total CAT costs on broker-dealers in perpetuity.

24

2.    Nor is the problem of passing through costs limited to FINRA. The Commission also failed adequately to address the likely result that exchanges will recoup their limited share of CAT fees by charging broker-dealer members.  Indeed, the Commission acknowledged that possibility both in its request for comments, when it noted that "each [p]articipant may determine to charge their members fees to fund their share of CAT fees," 88 Fed. Reg. 17,107, and again in its final order, *see* 88 Fed. Reg. 62,632.

Such a step would "render the entire Funding Model meaningless, with [broker-dealers] bearing 100% of CAT costs."  Letter from Joanna Mallers, Secretary, FIA Principal Traders Group, to Vanessa Countryman, Secretary, SEC, at 2 (July 14, 2023) <tinyurl.com/FIA-Letter>.  That result would violate the Exchange Act:  because broker-dealers would effectively shoulder the entire burden of the CAT, fees would not be allocated equitably.  15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).  And it would eliminate the already limited incentive for participants to rein in the spiraling CAT budget.

3.    The Commission failed meaningfully to address cost-shifting.  In response to the concerns of commenters, the Commission simply noted that it "acknowledges the concerns but also emphasizes that  . . . .  the CAT provides important benefits in facilitating effective market surveillance and the Exchange Act expressly contemplates the ability of the Participants to recoup their costs to fulfill their statutory obligations."  88 Fed. Reg. 62,636.  That

response does nothing to address the substance of the problem. It offers no way of stopping the participants from directly or indirectly passing their portion of CAT costs to broker-dealers. It fails to propose a safeguard for realigning cost incentives, such as allocating even a portion of the costs to the Commission. And it makes no mention of the Commission's duties under the Exchange Act and CAT NMS Plan to facilitate an actual split of CAT costs between the exchanges and broker-dealers.

The Commission also failed adequately to consider alternative approaches to FINRA's share of CAT costs. SIFMA proposed that, because FINRA is not considered a market center for other purposes, the Commission could "exclude FINRA entirely from the allocation of CAT costs to [p]articipants and assess FINRA a nominal regulatory user fee to access CAT Data to perform its regulatory role, which includes performing regulatory duties for most of the exchanges." October 2022 SIFMA Letter 4. Commissioner Peirce raised the alternative of imposing FINRA's portion of costs directly on the exchanges. *See* Peirce Dissent. Once again, however, the Commission waved away those proposals with the vague assertion that "there may be multiple reasonable approaches." 88 Fed. Reg. 62,636.

That response is arbitrary and capricious. The Commission is obligated to "respond to substantial problems raised by commenters," *Business Roundtable*, 647 F.3d at 1149, and merely stating that other alternatives might be

26

reasonable does not adequately explain the choice that the Commission made. Although the Commission might have an explanation for rejecting the approaches proposed by commenters and Commissioner Peirce, it did not provide it in the record before this Court.

The pass-through problem deserved serious consideration by the Commission. The Commission's failure to engage with it results in an inequitable and unreasonable burden on broker-dealers. For that reason, too, the Commission's order cannot stand.[2]

---

[2] Because participants compete directly with market makers, the inequitable and arbitrary shifting of costs from the former to the latter also violates the Exchange Act's requirement that fees "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. §§ 78f(b)(8), 78o-3(b)(8).

27

## CONCLUSION

The petition for review should be granted and the order of the Commission set aside.

Respectfully submitted,

/s/ Kannon K. Shanmugam

LORIN L. REISNER

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*
*lreisner@paulweiss.com*

KANNON K. SHANMUGAM
BRIAN M. LIPSHUTZ
YISHAI SCHWARTZ
DAVID A. HOPEN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

FEBRUARY 15, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, a member of the Bar of this Court and counsel for amici curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc., hereby certify, pursuant to Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6), that the attached Brief of Amici Curiae Securities Industry and Financial Markets Association, Alternative Investment Management Association, Committee on Capital Markets Regulation, Investment Company Institute, Managed Funds Association, and Virtu Financial, Inc., in Support of Petitioners and Vacatur is proportionately spaced, has a typeface of 14 points or more, and contains 6,422 words.

FEBRUARY 15, 2024

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM