**CASE NO. 23-13396**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,
*Intervenors*.

## MOTION OF THE CATO INSTITUTE AND INVESTOR CHOICE ADVOCATES NETWORK FOR LEAVE TO FILE A BRIEF *AMICI CURIAE*

Brent Skorup
*Counsel of Record*
Anastasia Boden
Jennifer Schulp
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 218-4609
bskorup@cato.org

*Counsel for Amicus Curiae*

February 15, 2024

**Motion for Leave to File Amicus Brief**

Under Federal Rule of Appellate Procedure 29(a) and Eleventh Circuit Rule No. 29(a), the Cato Institute and Investor Choice Advocates Network (ICAN) respectfully move to file an *amici curiae* brief in support of petitioner's brief. The proposed brief is attached to this Motion. In support of this Motion, the Cato Institute and ICAN state as follows:

**Statement of Interest of Amici Curiae**

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs. Cato's Center for Monetary and Financial Alternatives focuses on identifying, studying, and promoting alternatives to centralized, bureaucratic, and discretionary financial regulatory systems.

Cato Institute scholars have published extensive research on securities regulation and constitutional law. The Security and Exchange Commission's (SEC) consolidated audit trail proceedings implement several new public policies and regulations affecting securities brokers' businesses and rights, as well as impacting the rights of individual investors. This case interests the Cato Institute because it

concerns the legality of a new, massive data collection and regulatory effort by the SEC that threatens individual liberty.

ICAN is a not-for-profit public interest litigation organization committed to serving as legal advocate and voice for investors and entrepreneurs seeking to enter the capital markets. Through its advocacy efforts, ICAN seeks to draw official attention among the judiciary and regulatory bodies to the serious challenges facing investors and entrepreneurs. ICAN takes an interest in this because of the far-reaching implications the SEC's consolidated audit trail will have for everyday investors and their personal trading and identifying information.

### Reasons Why an Amici Curiae Brief from the Cato Institute and ICAN is Desirable

The Cato Institute is a prominent independent research institution, ranked amongst the best in the world. *See* James G. McGann, Global Go To Think Tank Index Report 64-64, 90-91 (Univ. of Pennsylvania, 2021) (ranking Cato Institute as the 27th best think tank worldwide and the 13th best think tank in the United States).[1]

Cato scholars have written extensively on securities regulation and privacy issues. *See, e.g.*, Norbert Michel and Jennifer J. Schulp, "Restoring Financial Privacy," *Report*, Cato Institute, October 18, 2022.[2] Cato is also one of the largest filers of *amicus* briefs at the United States Supreme Court. Cato Staff, *Cato at the*

---

[1] Available at http://tinyurl.com/mwud7p76.
[2] Available at http://tinyurl.com/mv34fke9.

*Supreme Court*, Cato Institute (last visited on Jan. 29, 2024).[3] As such, Cato is a credible source of legal analysis concerning the legal and constitutional issues surrounding major regulatory efforts like the SEC's consolidated audit trail system. The brief will provide reasons the consolidated audit trail system raises major questions of economic and political significance, including Fourth and Fifth Amendment issues not raised by the petitioners. Similarly, ICAN has a long-standing interest in the consolidated audit trail's impact on investors' privacy[4] and has been described as "one of the pioneers" in highlighting major questions raised by SEC regulations.[5]   Amici's brief will therefore help clarify the issues and facts that are crucial to the outcome in this case.

Dated: February 15, 2024

Respectfully submitted,

/s/ Brent Skorup
Brent Skorup
   *Counsel of Record*
Anastasia Boden
Jennifer Schulp
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 218-4609
bskorup@cato.org

*Counsel for Amicus Curiae*

---

[3] Available at http://tinyurl.com/4c4mcyf4.

[4] *March CAT Deadline Raises Investor Privacy Alarm*, ThinkAdvisor, Jan. 23, 2023, available at http://tinyurl.com/4f5njpab.

[5] Alison Frankel, *SEC's Shadow Trading Case Sparks New "Major Questions" Challenge*, Reuters (November 1, 2023).

CASE NO. 23-13396

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,
*Intervenors*.

## BRIEF OF THE CATO INSTITUTE AND INVESTOR CHOICE ADVOCATES NETWORK AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

Brent Skorup
   *Counsel of Record*
Anastasia Boden
Jennifer Schulp
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 218-4609
bskorup@cato.org

*Counsel for Amicus Curiae*

February 15, 2024

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1(a)(6), *amici* certify that the following persons have an interest in the outcome:

1.  Boden, Anastasia, counsel for *amicus curiae*

2.  Cato Institute, *amicus curiae*

3.  Investor Choice Advocates Network, *amicus curiae*

4.  Schulp, Jennifer, counsel for *amicus curiae*

5.  Skorup, Brent, counsel for *amicus curiae*

The Cato Institute and Investor Choice Advocates Network are nonprofit entities operating under § 501(c)(3) of the Internal Revenue Code. *Amici* are not subsidiaries or affiliates of any publicly owned corporation and do not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amici*'s participation.

Respectfully submitted,

Dated: February 15, 2024                    /s/ Brent Skorup

C-1 of 1

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................. ii

INTEREST OF *AMICI CURIAE* ....................................................................1

STATEMENT OF THE ISSUES.......................................................................3

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................3

ARGUMENT .....................................................................................................9

I.      THE CREATION OF THE CAT SYSTEM AND CAPTURE OF
        INVESTOR AND BROKER DATA IS STATE ACTION. ...........................9

II.     MANY CAT SYSTEM RECORDS DO NOT SATISFY THE
        REQUIRED RECORDS TEST AND IMPLICATE THE FIFTH
        AMENDMENT. .................................................................................10

III.    THE CAT SYSTEM IMPLICATES THE FOURTH AMENDMENT........15

    A.   SEC Use of the CAT System is Akin to a Search of Investors' and
         Brokers' Papers or Effects.......................................................................15

    B.   The CAT System Records Do Not Fall Within the Third-Party
         Doctrine. .................................................................................................20

    C.   Searches of Investors' and Brokers' Papers or Effects Are
         Unreasonable. .........................................................................................22

CONCLUSION................................................................................................24

CERTIFICATE OF COMPLIANCE................................................................25

CERTIFICATE OF SERVICE .........................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd v. United States*, 116 U.S. 616 (1886) ..............................................................6

*California Bankers Ass'n v. Shultz,* 416 U.S. 21 (1974)...........................................20

*California v. Acevedo*, 500 U.S. 565 (1991)...............................................................18

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ............................. 16, 18, 21, 23

*Fisher v. United States*, 425 U.S. 391 (1976)...................................................... 12, 13

*Grosso v. United States*, 390 U.S. 62 (1968) ...........................................................13

*In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335 (11th Cir. 2012)...........................................................................................13

*Kentucky v. King*, 131 S. Ct. 1849 (2011) .................................................................22

*Kyllo v. United States*, 533 U.S. 27 (2001)................................................................18

*Los Angeles v. Patel*, 576 U.S. 409 (2015) ...............................................................19

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ....................................................9

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ..........................9

*Marchetti v. United States*, 390 U.S. 39 (1968).........................................................14

*People v. Seymour*, 2023 CO 53, slip op. (Colo. Supreme Court 2023) ..................16

*Riley v. California*, 573 U.S. 373 (2014) ...................................................... 16, 22, 23

*Shapiro v. United States*, 335 U.S. 1 (1948)...................................................... 12, 13

*Smith v. Maryland*, 442 U.S. 735 (1979) ...............................................................9, 20

*United States v. Chadwick*, 433 U.S. 1 (1977) .........................................................17

*United States v. Di Re,* 332 U.S. 581 (1948) ............................................................16

*United States v. Doe*, 465 U.S. 605 (1984)...............................................................14

*United States v. Hubbell*, 530 U.S. 27 (2000) ..........................................................11

*United States v. Miller*, 425 U.S. 435 (1976) ...................................................... 20, 21

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014)......................................7

*Vernonia School Dist. v. Acton*, 515 U.S. 646 (1995) ..............................................22

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001) ........................7

**Statutes**

Act of March 3, 1863, ch. 76, 12 Stat. 737 ...............................................................16

**Other Authorities**

1 T. CUNNINGHAM, ATTACHMENT, BANKRUPTCY, A NEW AND COMPLETE LAW-DICTIONARY, OR, GENERAL ABRIDGMENT OF THE LAW (London, S. Crowder & J. Coote 1764) ...................................................................17

CAT NMS, LLC, *Limited Liability Company Agreement* .......................................11

FINRA, In re Instinet, *Financial Industry Regulatory Authority Letter of Acceptance, Waiver, and Consent*, No. 2020067139101, August 16, 2023...........5

GILES JACOB, BANKRUPT, A NEW LAW-DICTIONARY (The Savoy [London], Henry Lintot 6th ed. 1750) .................................................................17

Hester Peirce, "This CAT is a Dangerous Dog," *RealClearPolicy*, October 9, 2019................................................................................................................3

Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON, Feb. 7, 2023................................................................................5

Jeremy Hall, Comment, *Bailment Law as Part of a Property-Based Fourth Amendment Framework*, 28 GEO. MASON U. L. REV. 481 (2020) .......................16

Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 YALE L.J. 796 (2016) ...........................17

Michael Simon, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019 (oral testimony of the Chair of the CAT NMS Plan Operating Committee) ...............................................6

Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 YALE L.J. 700 (2010).................................................................................................16

Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27 (1986)......................................... 12, 15, 16

SEC, ENFORCEMENT MANUAL, Division of Enforcement, Office of Chief
    Counsel, November 28, 2017 ...................................................................... 11, 22

SEC, "Update on Consolidated Audit Trail," *Statement of SEC Chairman
    Jay Clayton*, March 17, 2020 ...............................................................11

Shelly Bohlin, Testimony Before the Committee on Banking Housing, and
    Urban Affairs, U.S. Senate, October 22, 2019 (testimony of the President
    and Chief Operating Officer of FINRA CAT, LLC)......................................5, 10

THOMAS POTTS, A COMPENDIOUS LAW DICTIONARY  (London, T. Ostell
    1803) ...............................................................................................17

WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)
    (reprint 6th ed. 1989) ...........................................................................18

**Rules**

Joint Industry Plan, 88 Fed. Reg. 62628 (September 12, 2023)............................5, 7

SEC, Consolidated Audit Trail, *Final Rule*, Release No. 34-67457,
    effective date October 1, 2012 ............................... 4, 7, 8, 10, 11, 14, 19

**Regulations**

17 C.F.R. § 240.17a-4 ...........................................................................................4

17 C.F.R. § 242.613 ............................................................... 5, 9, 10, 14

**Constitutional Provisions**

U.S. CONST. amend. IV.......................................................................................16

U.S. CONST. amend. V........................................................................................12

## INTEREST OF *AMICI CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs. Cato's Center for Monetary and Financial Alternatives focuses on identifying, studying, and promoting alternatives to centralized, bureaucratic, and discretionary financial regulatory systems.

Cato Institute scholars have published extensive research on securities regulation and constitutional law. The Security and Exchange Commission's (SEC) consolidated audit trail proceedings implement several new public policies and regulations affecting securities brokers' businesses and rights, as well as impacting the rights of individual investors. This case interests the Cato Institute because it concerns the legality of a new, massive data collection and regulatory effort by the SEC that threatens individual liberty.

ICAN is a not-for-profit public interest litigation organization committed to serving as legal advocate and voice for investors and entrepreneurs seeking to enter

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amici* made a monetary contribution to its preparation or submission.

the capital markets. Through its advocacy efforts, ICAN seeks to draw official attention among the judiciary and regulatory bodies to the serious challenges facing investors and entrepreneurs. ICAN takes an interest in this because of the far-reaching implications the SEC's consolidated audit trail will have for everyday investors and their personal trading and identifying information.

## STATEMENT OF THE ISSUES

Whether the Consolidated Audit Trail Order should be set aside because the Order is an agency decision of vast political and economic significance that exceeds the Securities and Exchange Commission's statutory authority.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this "smart" and digitized world, nearly everything we do could be captured, stored, and made accessible to the government. The time we wake up (using our phone's alarm), the places we go (using our car's built-in GPS), the news stories we read, the snacks we purchase for our kids, the route of our daily run, how much we weigh, and even the temperature we prefer to keep our homes is routinely collected and stored by commercial companies. Normally, the government cannot access that information, absent a manual process like issuing a subpoena, obtaining a search warrant, or making a formal, emailed request to a company for customer information. The Securities and Exchange Commission's consolidated audit trail (CAT) system threatens to change all of that,[2] and it gives government agencies a blueprint for pervasive and constant government surveillance: 1) require third-parties to collect and retain immense amounts of sensitive information about their customers, 2) offer no chance to opt-out, and 3) and demand unfettered access to the data on the theory that the government might need the information in the future for

---

[2] *See* Hester Peirce, "This CAT is a Dangerous Dog," *RealClearPolicy*, October 9, 2019.

3

law enforcement. Such a system is a massive threat to privacy rights and our constitutional order and deserves this Court's attention.

For decades, the Securities and Exchange Commission has imposed limited records preservation requirements on investors, broker-dealers, and financial institutions. *See, e.g.*, 17 C.F.R. § 240.17a-4 (lists of communications, financial, and other records brokers and dealers must preserve). And the SEC could sometimes access that information using "blue sheets" and other manual requests to regulated companies when investigating. But the CAT system represents a break from previous policies in that it is an automatic, national, and daily summons to brokers and others in the industry for vast amounts of personal and financial information, and SEC regulators will have "unfettered access" to it. SEC, Consolidated Audit Trail at 327, *Final Rule*, Release No. 34-67457, effective date October 1, 2012 (hereafter, "Final Rule"). The CAT system represents a radically new form of surveillance that implicates both Fourth and Fifth Amendment rights.

The CAT system originated in July 2012, when the Securities and Exchange Commission published a rule requiring self-regulatory organizations (SROs) like the Financial Industry Regulatory Authority (FINRA) to submit a "national market plan" for creating and operating a consolidated audit trail system. *Id*. This central data repository would capture billions of customer identifiers and financial "events" for securities transactions, orders, and quotes and would make this information

4

readily accessible to the government.[3] 17 C.F.R. § 242.613. Those plans further developed over a decade according to SEC prescriptions. The CAT system that emerged from those dictates began capturing personal information about investors in March 2023, though it had already been capturing data about trades. *See* Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON, Feb. 7, 2023.[4] In the September 2023 Order at issue, the SEC proceeded with plans to fund this troubling surveillance system. Joint Industry Plan, 88 Fed. Reg. 62628, 62673 (September 12, 2023).

According to the testimony of the president of FINRA CAT, LLC, the entity charged with building and maintaining the CAT, SEC rules require the system to "collect, process, and store a vast amount of data" for the purpose of "facilitate[ing] . . . more robust market surveillance."[5] The SEC ordered that these billions of "events" and personal records must be transmitted to and stored on the SEC-accessible data repositories each and every day. 17 C.F.R. § 242.613(c)(3). The system is built so "that the market regulators—including the SEC, FINRA, and the

---

[3] One broker-dealer was penalized for "late reporting issues in connection with at least 26 billion events from November 2020 through December 2022, which constitute approximately 8% of the firm's CAT reporting obligation for this period." FINRA, In re Instinet, *Financial Industry Regulatory Authority Letter of Acceptance, Waiver, and Consent*, No. 2020067139101, at 3, August 16, 2023, *available at* http://tinyurl.com/3ja8cf6x (settlement with Instinet LLC).
[4] Available at http://tinyurl.com/56vhex57.
[5] Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019, at 1 (testimony of the President and Chief Operating Officer of FINRA CAT, LLC).

national securities exchanges—can use it as intended to efficiently and accurately *track all activity in the US securities markets*."[6] A member of the CAT operating committee testified to Congress that regulators can query investors' trading behavior even in the absence of reasonable suspicion.[7]

The constitutional implications of the CAT system are apparent and far-reaching. As the U.S. Supreme Court warned in *Boyd*, an early case evaluating the Fourth and Fifth Amendment implications of government seizure of private financial records:[8]

> illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Courts should scrutinize the accumulating records demands of the SEC, and especially the order that funds the CAT system, in light of the Supreme Court rulings since 2012 when the SEC's CAT system plans were adopted. The Supreme Court

---

[6] *Id.* at 2 (emphasis added).

[7] On why the CAT system will not require regulators to input a reason for database queries: "[F]rom a regulatory standpoint, you see abnormalities in trading and you don't really know what you're looking for. . . . [Therefore] it's very difficult up front to put in a reason why" the query is made. Michael Simon, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019, at 59:00, *available at* http://tinyurl.com/49ccaecv, (oral testimony of the Chair of the CAT NMS Plan Operating Committee).

[8] *Boyd v. United States*, 116 U.S. 616, 635 (1886).

6

explained in *Utility Air Regulatory Group* that in evaluating the authority of agencies, courts must "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).

The SEC's rules for and initiation of the CAT system raise several questions of vast economic and political significance. Namely, the CAT system is a novel automatic, national, and daily summons for investors' financial information. The SEC acquires brokers' and investors' personal and financial records without a warrant and these records are held for years for later suspicion-less analysis and auditing by the government in ways that may implicate the Fourth Amendment and Fifth Amendment rights of Americans who trade or broker securities. It is a deviation from previous practice and one that may affect trading behavior of tens of millions of Americans. Therefore, the SEC must have clear authority from Congress to create it. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). Yet, in its "Statutory Authority" section of its 2012 rule, the agency offers a single sentence merely listing 10 sections of the Exchange Act.[9] The Final Rule contains no analysis about the

---

[9] SEC, Consolidated Audit Trail at 327, *Final Rule*, Release No. 34-67457, effective date October 1, 2012. In its 2023 CAT funding order the agency conceded there is no "express authorization for CAT by Congress." Joint Industry Plan, 88 Fed. Reg. 62628, 62673 (September 12, 2023).

nature and extent of the SEC's authority and lacks a single mention of the Fourth Amendment search and Fifth Amendment self-incrimination implications of mandating that regulated companies and brokers collect, store, and track customer-identifying information and sensitive financial information from millions of citizens—they cannot fairly be called "suspects"—on behalf of the government.[10] Because Congress has not spoken clearly about the agency's authority to create this type of surveillance system, this Court should set aside the Order funding the CAT system.

---

[10] *See* SEC, Consolidated Audit Trail, *Final Rule*, Release No. 34-67457, effective date October 1, 2012.

**ARGUMENT**

## I.  THE CREATION OF THE CAT SYSTEM AND CAPTURE OF INVESTOR AND BROKER DATA IS STATE ACTION.

For an investor or broker to assert a Fourth or Fifth Amendment violation, there needs to be state action directed against them. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ("As a matter of substantive constitutional law, the state action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'") (citation omitted); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (noting "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (citations omitted). Though the investor and broker data collection here is being carried out by non-governmental actors, *see* 17 C.F.R. § 242.613(f), there is still state action. The Supreme Court has held that a private entity can qualify as a state actor in a few, limited circumstances: first, "when the private entity performs a traditional, exclusive public function," second, "when the government compels the private entity to take a particular action," and third, "when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019).

Here, the private actors' collection, storage, and sharing of personal and financial data represents state action because the government requires the collection,

9

storage, and sharing of investors' and brokers' data. The CAT system is not an industry-initiated audit system—it was mandated by the SEC and designed expressly for government use and government surveillance of investors. Its creators have expressly stated that it was designed to allow SEC staff "to analyze and run complex queries on the CAT data" and "to see visual displays of the consolidated equity market order book for any given period of time."[11] The SEC's relevant rule mandates that "SROs . . . require each SRO and its members to capture and report specified trade, quote, and order activity in all [national market system] securities to the central repository . . ., across all markets, from order inception through routing, cancellation, modification, and execution."[12] The SEC also requires private actors to enforce compliance with the data-sharing requirements of this government-mandated surveillance system, including by imposing financial penalties.[13]

In short, the SROs' and brokers' data collection, storage, and sharing of investor and broker data via the CAT system, as well as penalties assessed for noncompliance, are compelled by the government and constitute state action.

## II. MANY CAT SYSTEM RECORDS DO NOT SATISFY THE REQUIRED RECORDS TEST AND IMPLICATE THE FIFTH AMENDMENT.

---

[11] Shelly Bohlin, Testimony Before the Committee on Banking Housing, and Urban Affairs, U.S. Senate, October 22, 2019, at 3 (testimony of the President and Chief Operating Officer of FINRA CAT, LLC).

[12] SEC, Consolidated Audit Trail at 7, *Final Rule*, Release No. 34-67457, effective date October 1, 2012.

[13] 17 C.F.R. § 242.613(g).

The CAT system amounts to a daily production order to financial institutions and brokers, sweeping in new kinds of financial records from millions of stock-owning (and law-abiding) Americans for the purposes of law enforcement.[14] It is the SEC's longstanding policy that the agency will assist and share information with criminal prosecutors,[15] so it is reasonable to expect that CAT system records will be used in criminal prosecutions of investors and brokers. The information that brokers and the industry must collect include investors' names, addresses, and birth years.[16] Using the CAT system, regulators will be able to query at least six years' worth of financial "events," including type of financial product, orders, quotes, and canceled orders, linked to customers' unique identifiers.[17] Since the mere production of records may be testimonial, *see*, *e.g.*, *United States v. Hubbell*, 530 U.S. 27 (2000) ("[W]e have also made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect."), the CAT records mandates

---

[14] *See*, *e.g.*, SEC, Consolidated Audit Trail at 191, *Final Rule*, Release No. 34-67457, effective date October 1, 2012, ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action.").

[15] The SEC Enforcement Manual notes that "Generally, sharing information with criminal prosecutors is permissible, even though the sharing of information is intended to and does in fact assist criminal prosecutors." SEC, ENFORCEMENT MANUAL 85, Division of Enforcement, Office of Chief Counsel, November 28, 2017.

[16] *See* SEC, "Update on Consolidated Audit Trail," *Statement of SEC Chairman Jay Clayton*, March 17, 2020, available at http://tinyurl.com/2uh5afn3.

[17] See the CAT national market system plan the SEC approved in late 2023. CAT NMS, LLC, *Limited Liability Company Agreement* at Appendix D-5, D-26, D-27, effective date September 6, 2023 *available at* http://tinyurl.com/2p824tzd. In 2020, the SEC did exempt certain customer data from collection within the CAT system. *See* SEC, "Update on Consolidated Audit Trail," *Statement of SEC Chairman Jay Clayton*, March 17, 2020, available at http://tinyurl.com/2uh5afn3.

may violate investors' and brokers' Fifth Amendment right against self-incrimination.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. AMEND. V. It was understood at the time of the American Founding that the common law barred the compelled production of self-incriminatory documents, including the production of corporate records. *See*, *e.g.. Fisher v. United States*, 425 U.S. 391, 418 n.4 (1976) (Brennan, J., concurring) ("Without a doubt, the common-law privilege against self-incrimination in England extended to protection against the production of incriminating personal papers prior to the adoption of the United States Constitution."); Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 65 (1986) ("English precedents at the time of the adoption of the fifth amendment extended the protection of the privilege against self-incrimination to corporate as well as individual records.") (citations omitted).

However, that traditional understanding of the common law privilege was narrowed in modern Fifth Amendment jurisprudence. *See Fisher v. United States*, 425 U.S. 391 (1976). One prominent exception to the Fifth Amendment privilege against self-incrimination is the "required records" exception. *See Shapiro v. United States*, 335 U.S. 1, 32 (1948). In *Shapiro*, the Court affirmed a lower court's decision

that compelling individuals to produce records by valid regulations does not violate the right against self-incrimination. *Id.*.

However, the CAT system goes far beyond *Shapiro*, which was a 5-4 decision allowing a wartime price control office to obtain one month of invoices from a licensed commodity seller. *Id*. at 4. The majority opinion in *Shapiro* imposed a significant limitation: only records "customarily kept" were within the exception. *Id*. at 42. The Court reiterated this limitation in defining the required records exception 20 years later in *Grosso v. United States*:[18]

> first, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind that the regulated party has customarily kept; and third, the records themselves must have assumed "public aspects" that render them at least analogous to public documents.

Accordingly, the Supreme Court in *Fisher* held the production of tax documents by a taxpayer for the IRS were not testimonial only because "[t]he existence and location of the papers [were] a foregone conclusion." *Fisher*, 425 U.S. at 411. *See also In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1344 (11th Cir. 2012) (holding that records production is not testimonial when "the location, existence, and authenticity of the purported evidence is known with reasonable particularity").

---

[18] *Grosso v. United States*, 390 U.S. 62, 67-68 (1968).

The analysis is altogether different when the government demands production of new types of records or records it merely suspects (or hopes) the individual possesses. As the Supreme Court explained in *Marchetti*, a government demand to "provide information, unrelated to any records which he may have maintained . . . is not significantly different from a demand that he provide oral testimony." *Marchetti v. United States*, 390 U.S. 39, 57 (1968).[19]

Much of the records and data collected by the CAT system fails to satisfy the required records exception because the SEC has ordered the creation of new records not "customarily kept" by brokers. The SEC is quite clear many of these records are not customarily kept: the SEC demands brokers and SROs collect new types of investor data because existing data collection sources "lack[] key elements important to regulators" such as "the time of execution" and "the identity of the customer" in equity cleared reports, "the identity of the customers who originate orders," and "the fact that two sets of orders may have been originated by the same customer."[20] The SEC also requires brokers and others to record reportable events down to the millisecond, 17 C.F.R. § 242.613(d)(3), which is a record not kept by industry custom. The entire CAT system, because it merges and connects investors' and

---

[19] The Court has also rejected, on Fifth Amendment grounds, the government's "broad-sweeping subpoenas" that "attempt[] to compensate for its lack of knowledge by requiring [someone] to become, in effect, the primary informant against himself." *United States v. Doe*, 465 U.S. 605, 613 n.12 (1984) (quoting appellate court's affirmance of district court's findings).

[20] SEC, Consolidated Audit Trail at 4-5, 27-28, *Final Rule*, Release No. 34-67457, effective date October 1, 2012.

14

brokers' historical information together in a way that is not "customarily kept" by brokers or SROs, arguably falls outside the required records exception.

Investors and brokers, therefore, are required to produce testimonial records since their records production is responsive to government records demands, which are merely outsourced to the SROs. Since the agency does not immunize investors and brokers, nor allow them to refuse to provide the new types of information, the system may pose Fifth Amendment problems. As Justice Samuel Alito wrote when he was Deputy Assistant Attorney General, "the compulsory organization, filing, and creation of documents are acts that clearly are testimonial and may be self-incriminating."[21] Regarding such compulsory record keeping, future-Justice Alito added, "The individual should be free to refuse to create or organize records on fifth amendment grounds."[22] Government agencies cannot be allowed to mandate new "customs" of records collection and then use those "required customs" to evade Americans' Fifth Amendment rights.

## III.    THE CAT SYSTEM IMPLICATES THE FOURTH AMENDMENT.

### A. SEC Use of the CAT System is Akin to a Search of Investors' and Brokers' Papers or Effects.

---

[21] Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 75 (1986).
[22] *Id*. at 76.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and requires that warrants have "probable cause, supported by Oath or affirmation, and particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. AMEND. IV. The Supreme Court notes "that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). "[A] central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2214 (2018), quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948).[23]

Investors and brokers may have a possessory and privacy interest in the digital records collected in CAT repositories.[24] Courts, therefore, must assess whether these

---

[23] For much of this nation's history, therefore, the protection of citizens' personal papers and financial records was nearly absolute. The first federal law authorizing the search or seizure of books or records was not passed until March 1863. Act of March 3, 1863, ch. 76, 12 Stat. 737. Even the context for the passage of this law suggests the gravity of government seizure and search of Americans' records—it was a wartime measure to allow the U.S. government to investigate the conduct of men disloyal to the Union cause, passed, in fact, the same day as the Act suspending the writ of *habeas corpus*. *See* Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 31 n.7 (1986).

[24] *See, e.g., People v. Seymour*, 2023 CO 53, slip op. at 19-21 (Colo. Supreme Court 2023) (holding, after analyzing Google's terms of service with its users, that Google users had a possessory interest in their digital records for the purposes of the Fourth Amendment). *See also* Jeremy Hall, Comment, *Bailment Law as Part of a Property-Based Fourth Amendment Framework*, 28 GEO. MASON U. L. REV. 481 (2020); Orin S. Kerr, *Fourth Amendment Seizures*

records qualify as investors' or brokers' "papers" or "effects." What constitutes "effects" has not been clearly discerned by courts.[25] However, "effects" almost certainly includes one's financial records. Founding-era legal dictionaries, for example, specifically contemplate and define one's financial records as one's "effects." *See* 1 T. CUNNINGHAM, ATTACHMENT, BANKRUPTCY, A NEW AND COMPLETE LAW-DICTIONARY, OR, GENERAL ABRIDGMENT OF THE LAW (London, S. Crowder & J. Coote 1764) (quoting a directive of the Lord Commissioners providing rules for transfers and custody of "sum[s] of money, tallies, orders, bonds, deposites, securities, and other effects"); GILES JACOB, BANKRUPT, A NEW LAW-DICTIONARY (The Savoy [London], Henry Lintot 6th ed. 1750) (noting that the Commissioners should assign "the Bankrupt's Effects" to those chosen by creditors); THOMAS POTTS, A COMPENDIOUS LAW DICTIONARY 52, 192, 219, 39 (London, T. Ostell 1803) (advising, for example, that a bankrupt person must "disclose and discover all his estate and effects, real and personal").[26]

A person's papers and effects have the same, strong protection against government search as the person's home. *United States v. Chadwick*, 433 U.S. 1, 8

---

*of Computer Data*, 119 YALE L.J. 700, 710–14 (2010) (discussing that a seizure of digital property occurs when the government copies someone's data because it is the copying of the digital records that preserves it for future evidentiary use and therefore meaningfully interferes with the possessory interest of exclusive control).

[25] *See* Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 YALE L.J. 796 (2016).

[26] *See also id*.

(1977) (remarking that the Fourth Amendment "draws no distinctions among 'persons, houses, papers, and effects' in safeguarding against unreasonable searches and seizures"), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991).

If the digital records in the CAT system are investors' or brokers' papers or effects, it's likely a government "search" is occurring. A "search" means "to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief." *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (quoting WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (1828) (reprint 6th ed. 1989)). The government's acquisition of a person's voluminous digital records amounts to a search. *See Carpenter*, 138 S. Ct. at 2220 (holding "Government's acquisition of the cell-site records was a search within the meaning of the Fourth Amendment"). The amount and breadth of the information acquired and analyzed by the government in *Carpenter* contributed to the Supreme Court's finding that a search had occurred in that case. *Id*. at 2218. In *Carpenter*, the federal government acquired records containing "merely" 13,000 datapoints about an individual's location over a period of 127 days. *Id*. at 2212.

Here, the government is clearly acquiring far more voluminous digital records in the CAT system. The CAT records contain tens of billions of datapoints about

18

investors' financial dealings stretching over years. The SEC mandates that that all the digital records "be transmitted in a manner that ultimately allows the central repository to make this data available to regulators," and must be transmitted daily.[27] Making this data available to the SEC is necessary, the agency says, to "help surveillance and investigations by facilitating . . . examinations [and] allowing more accurate and faster surveillance for manipulation."[28] The SEC goes so far as to call its examination of CAT records "searches."[29] Courts should have little trouble, then, finding that the government conducts a search when it accesses and (in SEC parlance) searches historical trading records that provide a comprehensive chronicle of investors' and brokers' past transactions.[30]

Finally, it's worth distinguishing the CAT system from the financial surveillance challenged in the *California Bankers* case. In *California Bankers*, the Supreme Court rejected depositors' Fourth Amendment challenge to new Bank Secrecy Act requirements that banks report "abnormally large transactions" to the

---

[27] SEC, Consolidated Audit Trail at 10-11, *Final Rule*, Release No. 34-67457, effective date October 1, 2012.

[28] *Id*. at 34.

[29] *Id*. at 291 (illustrations of how the SEC will use the CAT system include "*searching* for trades with trade sizes above a certain threshold, *searching* for trades in securities with execution prices that change more than a certain percentage in a given period of time, and *searching* for orders that are canceled within a certain period of time") (emphasis added).

[30] If the SEC believed in 2012 the CAT system fell within the administrative search doctrine, the Supreme Court effectively foreclosed that possibility in a 2015 case. *See Los Angeles v. Patel*, 576 U.S. 409 (2015) (limiting the doctrine to four specific industries and refusing to extend the doctrine to include hotels' customer records).

19

government. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974). However, the Court did not evaluate the merits of the Fourth Amendment issues because the depositors lacked standing to sue. *Id*. at 67–68. Further, it was significant to the Court that the "required records" in that case "would 'not be made automatically available for law enforcement purposes, [but could] only be obtained through existing legal process.'" *Id*. at 27 (quoting congressional reports) (citations omitted). *California Bankers*, therefore, has little application to the Final Rule and the CAT system, especially given the Court *dicta* in *California Bankers* expressing special skepticism about government rules requiring "automatic availability" of financial records.

## B. The CAT System Records Do Not Fall Within the Third-Party Doctrine.

Certain information that people turn over to commercial companies falls outside the protection of the Fourth Amendment. *See United States v. Miller*, 425 U.S. 435 (1976) (holding that a depositor had no legitimate expectation of privacy concerning certain financial records held by a bank); *Smith*, 442 U.S. at 743-44 (holding that a suspect had no legitimate expectation of privacy concerning phone numbers he "conveyed" to a phone company via dialing phone numbers). The Supreme Court has said that its *Miller* decision, which concerned financial records, stands for the principle that "*a person has no legitimate expectation of privacy in*

20

*information he voluntarily turns over to third parties*.” *Smith*, 442 U.S. at 743-44 (citing *Miller*, 425 U.S. at 442-44) (emphasis in original).

However, the Supreme Court has narrowed the third-party doctrine in recent years in ways that highlight that the CAT system is distinguishable from the circumstances in *Miller*. The CAT system data collection more closely resembles *Carpenter*, where the third-party exception did not apply, than *Miller*, where the third-party exception applied. The Court in *Carpenter* declined to extend *Miller*, *Smith*, and the “third-party doctrine” to a suspect's extensive digital (cellphone) records that were automatically transmitted to a third party. *Carpenter*, 138 S. Ct. at 2218 (majority denying that the third-party doctrine applied to the location records Carpenter transmitted to his phone company). In *Miller*, it was critical that “[a]ll of the documents obtained, including financial statements and deposit slips, contain only information *voluntarily conveyed to the banks* and exposed to their employees in the ordinary course of business.” *Miller*, 425 U.S. at 442 (emphasis added). In contrast, the Court said in *Carpenter*, “in no meaningful sense does the [cellphone] user voluntarily ‘assume[] the risk’ of turning over a comprehensive dossier of his physical movements” to a phone company. *Carpenter*, 138 S. Ct. at 2220.

Likewise, here, as explained *supra* regarding state action, the brokers and the investors are not “voluntarily conveying” the customer identifiers and financial records to the government-accessible CAT repositories. The information in these

repository records is mandated by the government, automatically and daily transmitted, and *Miller* is inapposite.

## C. Searches of Investors' and Brokers' Papers or Effects Are Unreasonable.

The Supreme Court has said that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. v. Acton*, 515 U.S. 646, 653 (1995). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). The SEC is seeking to "discover evidence of criminal wrongdoing" but has not explained which exception to the warrant exception its searches of the CAT system records might fall under.[31]

Further, the Supreme Court has recognized in recent years that, in determining the reasonableness of digital records searches, the government's analogies to the pre-digital, "manual" era of government surveillance often do not apply. *See Riley*, 573 U.S. at 386; *Carpenter*, 138 S. Ct. at 2218 ("[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of

---

[31] *See*, *e.g.*, *id*. at 191 ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action."). As explained *supra*, it is longstanding SEC policy to share information and coordinate with criminal prosecutors for criminal enforcement. *See* SEC, ENFORCEMENT MANUAL 85, Division of Enforcement, Office of Chief Counsel, November 28, 2017.

22

records and the frailties of recollection . . . . Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years."). In *Riley*, for instance, the Supreme Court prohibited the warrantless search of a digital storage device (a "flip phone"). In its decision, the Court rejected the government's extrapolation of legal precedents regarding traditional, often physical, records to digital records. *Riley*, 573 U.S. at 386 ("[W]hile *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones."). The Court, in fact, cited government searches of financial records as the troubling example of the invasive warrantless searches that would follow from the government's impermissible extrapolation from precedent: "The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years." *Id*. at 400.

In *Riley* and *Carpenter* the Court rejected warrantless inspections of a much smaller amount of personal data from people with a lesser privacy interest—suspects in police detention or named as an accomplice in a series of crimes—than what is contemplated here. *See id. at* 393; *Carpenter*, 138 S. Ct. at 2212. The SEC, without a warrant, absent a showing of even reasonable suspicion, is acquiring and searching massive amounts of investors' and brokers' personal information and transactions stretching back years. Any agency mandating such an extensive and automatic data

23

collection and surveillance system of millions of Americans should be expected to explain which exception to the Fourth Amendment's warrant requirement the agency is relying on.

## CONCLUSION

The SEC's Order funding the CAT system raises significant political and economic questions, including possible violations of the Fourth and Fifth Amendment rights of brokers and investors. Because Congress has not spoken clearly about the agency's authority to create an automatic, national, and daily summons to investors and financial institutions, this Court should set aside the Order funding the CAT system.

Respectfully submitted,

Brent Skorup
    *Counsel of Record*
Anastasia Boden
Jennifer Schulp
CATO INSTITUTE
1000 Mass. Ave., N.W.
Washington, DC 20001
(202) 218-4609
bskorup@cato.org

Dated: February 15, 2024

*Counsel for Amicus Curiae*

24

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,411 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.


                                        /s/ Brent Skorup

Dated:  February 15, 2024               *Counsel for Amicus Curiae*


25

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on February 15, 2024, he electronically filed the foregoing *amici curiae* brief with the Clerk of the Court for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


/s/ Brent Skorup

Dated: February 15, 2024              *Counsel for Amicus Curiae*