No. 23-13396

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners,*

*v.*

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC.,
NASDAQ GEM:X, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,

*Intervenors*

On Petition for Review of an Order
of the Securities and Exchange Commission
Release No. 34-98290; File No. 4-698

### BRIEF OF THE NEW CIVIL LIBERTIES ALLIANCE
### AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

Andrew J. Morris
*Counsel of Record*
Margaret A. Little
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
andrew.morris @ncla.legal
*Counsel for Amicus Curiae*

February 15, 2024

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-2, 26.1-3, and 28-1(b), undersigned counsel for amicus curiae the New Civil Liberties Alliance hereby certifies that, to the best of his knowledge, information, and belief the Certificate of Interested Persons set forth in the Petitioners' Opening Brief and Briefs for other Amici Curiae is complete and correct, subject to the following additions:

1. Chenoweth, Markham S., counsel for amicus curiae New Civil Liberties Alliance.

2. Little, Margaret A., counsel for amicus curiae New Civil Liberties Alliance.

3. Morris, Andrew J., counsel of record for amicus curiae New Civil Liberties Alliance.

4. New Civil Liberties Alliance, amicus curiae.

Pursuant to 11th Cir. R. 26.1-3, since Markham S. Chenoweth, Margaret A. Little, and Andrew J. Morris are individuals and New Civil Liberties Alliance is a nonprofit organization, none of amicus curiae's additions to the Certificate of Interested Persons are publicly traded

C-1 of 3

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

companies or corporations with an interest in the outcome of this case.

*See also infra at* C-3.

/s/ Andrew J. Morris
Andrew J. Morris

C-2 of 3

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel states that amicus curiae the New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

/s/ Andrew J. Morris
Andrew J. Morris

C-3 of 3

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................... C-1

CORPORATE DISCLOSURE STATEMENT ........................................ C-3

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF AMICUS CURIAE ............................................... 1

STATEMENT OF THE ISSUES ................................................. 2

SUMMARY OF ARGUMENT ..................................................... 2

FACTUAL BACKGROUND ...................................................... 5

ARGUMENT ............................................................... 10

  I.  SEC'S CAT SCHEME VIOLATES INVESTORS' FOURTH, FIFTH, AND FIRST AMENDMENT RIGHTS ................................................ 10

    A.  The CAT Violates Investors' Fourth Amendment Rights ...... 10

      1.  It Is a Search and Seizure ............................... 10

      2.  The Searches and Seizures Are Unreasonable Because They Violate the Requirements for Probable Cause and a Warrant ................................................... 13

    B.  The CAT Violates Investors' Fifth Amendment Rights By Depriving Them of Property Without Due Process of Law .... 16

    C.  The CAT Violates Investors' First Amendment Rights by Compelling Disclosure of Their Investment Choices ............. 17

  II.  SEC HAS NO LAWFUL AUTHORITY TO ESTABLISH THE CAT ............ 21

    A.  The CAT Violates the Vesting Clause of Article I .................. 21

    B.  SEC Arrogated Appropriations and Taxing Powers Vested Solely in Congress ........................................... 29

      1.  Agencies May Not Resort to Nonappropriated Financing 29

      2.  None Dare Call It a Tax ................................... 33

CONCLUSION ............................................................. 36

i

CERTIFICATE OF COMPLIANCE........................................................38

CERTIFICATE OF ELECTRONIC SUBMISSION ..............................39

CERTIFICATE OF SERVICE..............................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ........................................................................22

*Ala. Assoc. of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ...................................................................28

*Ams. for Prosperity Found. v. Bonta,*
141 S. Ct. 2373 (2021) ............................................................. 18, 19

*Armstrong v. Manzo,*
380 U.S. 545 (1965) ........................................................................17

*Bond v. United States,*
564 U.S. 211 (2011) .............................................................22, 23, 27

*Brown v. Socialist Workers '74 Campaign Comm. (Ohio),*
459 U.S. 87 (1982) ..........................................................................19

*Carpenter v. United States,*
138 S. Ct. 2206 (2018) ............................................................... 13, 14

*Chandler v. Miller,*
520 U.S. 305 (1997) ........................................................................14

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ........................................................................28

*Clinton v. City of New York,*
524 U.S. 417 (1998) ................................................................. 22, 35

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
575 U.S. 43 (2015) ..........................................................................23

*FTC v. Am. Tobacco Co.,*
264 U.S. 298 (1924) ....................................................... 11, 12, 14, 28

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ....................................................................23

*Katz v. United States*,
389 U.S. 347 (1967) ................................................................13

*Marshall v. Barlow's, Inc.*,
436 U.S. 307 (1978) ................................................................14

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................................17

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ..................................................................33

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ................................................................20

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ............................................................18, 20

*Nat'l Cable Television Ass'n, Inc. v. United States*,
415 U.S. 336 (1974) ................................................................33

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ................................................................33

*Off. of Personnel Mgmt. v. Richmond*,
496 U.S. 414 (1990) ................................................................35

*Payne v. Taslimi*,
998 F.3d 648 (4th Cir. 2021) ....................................................17

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ................................................................18

*Rochester Pure Waters Dist. v. EPA*,
960 F.2d 180 (D.C. Cir. 1992) ..................................................35

*Ruckelshaus v. Monsanto*,
467 U.S. 986 (1984) ................................................................12

*Talley v. California*,
362 U.S. 60 (1960) ..................................................................19

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
5 F.4th 666 (6th Cir. 2021) ......................................................24

iv

*U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012)..................................................35

*United States v. Jones*,
  565 U.S. 400 (2012) ..................................................................11

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ..................................................................29

*Va. Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019) ..............................................................29

*Walls v. City of Petersburg*,
  895 F.2d 188 (4th Cir. 1990) .....................................................17

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ..................................................................25

**Constitutional Provisions**

U.S. CONST. amend. I ......................................................................17

U.S. CONST. amend. IV.............................................................. 10, 13, 16

U.S. CONST. amend. V .....................................................................16

U.S. CONST. art. I, § 1.....................................................................22

U.S. CONST. art. I, § 7, cl. 1 ............................................................34

U.S. CONST. art. I, § 8, cl. 1 ............................................................30

U.S. CONST. art. I, § 9, cl. 7 ............................................................30

**Statutes**

31 U.S.C. § 1341 ............................................................................31

31 U.S.C. § 3302 ............................................................................30

5 U.S.C. § 706 ................................................................................22

**Regulations**

17 C.F.R. § 242.613.................................................................6, 7, 26

**Other Authorities**

19 ANNALS OF CONGRESS (1809)...........................................................31

77 Fed. Reg. 45722 (2012) ...................................... 6, 7, 14, 26

Alexander Hamilton,
Explanation, The Works of Alexander Hamilton,
Vol. 8 (2d ed. 1903) ................................................................ 30

Caitlin Reilly,
*CFPB Employee Sent Data of 250,000 Customers to Pers. Email*,
Roll Call (Apr. 19, 2023) .......................................................... 15

*CAT NMS Provides Progress Update on the Consolidated Audit Trail,*
Business Wire (Oct. 26, 2018) ............................................... 26

*Data Security: Vulnerabilities and Opportunities for Improvement:*
*Hearing before the Subcomm. on Fin. Institutions and Consumer*
*Credit of the*
*H. Comm. on Fin. Srvs.* 115th Cong. (Nov. 1, 2017) ..................... 26, 27

Donald A. Dripps,
*"Dearest Property": Digital Evidence and the History of Private*
*"Papers" As Special Objects of Search and Seizure,*
103 J. Crim. L. & Criminology 49 (2013) ............................................ 12

Exchange Act Release No. 34-62174,
*Consolidated Audit Trail*, File No. S7-11-10 (May 26, 2010) .............. 26

FINRA,
*Limited Liability Company Agreement of Consol. Audit Trail, LLC*
(Sept. 6, 2023) ................................................................. 5, 6, 7

FINRA,
*Limited Liability Company Agreement of Consol. Audit Trail, LLC*
(Aug. 29, 2019) ................................................................... 8

Hester M. Peirce, SEC Comm'r,
Remarks at the 7th Annual Conference on Financial Market
Regulation
*in* SEC Speeches and Statements (May 20, 2020) ............................... 6

*Implementation and Cybersecurity Protocols of the Consolidated*
*Audit Trail: Hearing before the*
*Subcomm. on Cap. Mkts., Secs., and Inv. of the H. Comm. on Fin.*
*Servs.*, 115th Cong. (2017) ........................................................ 8, 27

Kate Stith,
  *Congress' Power of the Purse,*
  97 Yale L. J. 1343 (1988)........................................................... 31, 32, 33

Letter from ACLU to J. Clayton (Dec. 16, 2019) .......................................9

Letter from B. Becker to V. Countryman (May 22, 2023) ......................36

Letter from Eight Attorneys General to Sen. C. Schumer, *et al.*
  (Aug. 15, 2023)..............................................................................................9

Letter from Seven Senators to SEC Chair (July 24, 2019) .....................8

Mark Chenoweth & Richard Samp,
  *Reinvigorating Nondelegation with Core Legislative Power,*
  *in The Administrative State Before the Supreme Court: Perspectives on*
  *the Nondelegation Doctrine*
  (Peter J. Wallison & John Yoo eds., 2022)............................................34

Matthew Goldstein,
  *S.E.C. Social Media Hack That Sent*
  *Bitcoin Soaring Prompts Investigation,*
  The New York Times (Jan. 10, 2024)......................................................10

Mihailis E. Diamantis,
  *Privileging Privacy: Confidentiality*
  *as a Fourth Amendment Protection,*
  21 U. Pa. J. Const. L. 485 (2018) ...........................................................13

*Oversight of the Securities and Exchange Commission: Hearing Before*
  *the U.S. Senate Committee on Banking, Housing, and Urban Affairs*
  *in* SEC Speeches and Statements (Dec. 10. 2019)...............................10

Philip Hamburger,
  *Nondelegation Blues,*
  92 Geo. Wash. L. Rev. 1083 (2023) .......................................................23

Protecting Identifiable Information Act,
  H.R. 2039, 117th Cong. (2021) .................................................................8

Reuters Staff,
  *U.S. SEC Settles with Two Traders over EDGAR Filing System Hack,*
  Reuters (Apr. 9, 2020) ...............................................................................9

vii

Richard Rubin,
  *IRS Leaker Sought Job With Aim of Releasing*
  *Trump Tax Returns, DOJ Says*,
  Wall St. J. (Jan. 16, 2024) ................................................................ 21

SEC Press Release 2012-134 (Jul. 11, 2012) ........................................... 5

SEC Press Release 2022-228 (Dec. 14, 2022) .......................................... 6

SEC Release No. 34-67457,
  *Consolidated Audit Trail*, File No. S7-11-10 (July 18, 2012) .............. 26

SEC Release No. 34-77724,
  *Joint Industry Plan*, File No. 4-698 (Apr. 27, 2016) ........................... 13

SEC Release No. 34-88393, *Order Granting Conditional Exemptive*
  *Relief* (March 17, 2020) ...................................................................... 6

SEC,
  *Statement of Hester M. Peirce in Response to Release No. 34-88890*,
  File No. S7-13-19, (May 15, 2020) ............................................. 5, 19, 21

Stephen Breyer,
  *Making Our Democracy Work: A Judge's View*  (2010) ....................... 24

The Federalist (Cooke ed., 1961) ........................................................... 24

Thomas W. Merrill,
  *Capture Theory and the Courts: 1967-1983*,
  72 Chi.-Kent L. Rev. 1039 (1997) ........................................................ 25

Walid Mansour & Mouna Jlassi,
  *The Effect of Religion on Financial and Investing Decisions*,
  *in Investor Behavior: The Psychology of Financial Planning and*
  *Investing* (eds. H. Kent Baker & Victor Ricciardi 2014) ..................... 19

## INTEREST OF AMICUS CURIAE

Amicus curiae the New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as the right to have laws made by the Nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government) and due process of law. These selfsame civil rights are also very contemporary—and in dire need of renewed vindication—because Congress, Presidents, federal administrative agencies, and even sometimes the judiciary, have neglected them for so long.

NCLA defends civil liberties primarily by asserting constitutional constraints on the administrative state. Although Americans still enjoy the shell of their Republic, there has developed within it a different sort of government—a type, in fact, the Constitution was designed to prevent. NCLA trains its primary focus on this unconstitutional administrative state. NCLA represents clients harmed by unconstitutional divesting of

1

legislative power to administrative agencies who would benefit from enforcement of the constitutional mandate that legislative power be exercised by Congress or not at all.[1]

## STATEMENT OF THE ISSUES

Whether the Order should be set aside because it and the "CAT" (Consolidated Audit Trail) exceed the Commission's statutory authority.

## SUMMARY OF ARGUMENT

Amicus submits this brief to assist the Court by explaining how the SEC's CAT violates the Constitution's Separation of Powers and Bill of Rights, and how those violations inflict concrete harm on millions of ordinary American investors.  These grave civil liberties violations provide powerful evidence that Congress never authorized SEC to create this or any mass surveillance system over trading of securities by Americans.  Simply put, SEC lacks authority to create the CAT.

The CAT is a massive surveillance database that tracks every

---

[1] No party's counsel authored any part of this brief. No person or entity, other than amicus curiae and its counsel, paid for the brief's preparation or submission.  All parties have consented to the filing of this amicus brief.

2

transaction made on every stock exchange in the United States. It seizes personal and confidential financial information from hundreds of millions of Americans. These are ordinary citizens, typically investing to build some financial security and live responsible lives. No one suggests they did anything wrong. Yet SEC has appointed itself the ongoing, all-seeing monitor of their every investment decision.

Shockingly, SEC created the CAT without any legislation, approval, or appropriation from Congress. This illegal power grab steamrolls venerable constitutional protections under the Fourth, Fifth, and First Amendments that protect such private information from search, seizure and invasion. The CAT enables SEC to seize and search billions of pieces of private information without a warrant, a subpoena, or even any reason to suspect any wrongdoing.

I. The CAT violates investors' rights under the Constitution's Fourth, Fifth, and First Amendments. It violates investors' Fourth Amendment rights because it seizes and searches protected private information unreasonably—*i.e.*, without requiring even a suspicion of wrongdoing about the investors whose information SEC seizes. The CAT

3

program thus violates the Fourth Amendment on a scale that is—literally—unprecedented in American history.

The CAT also violates the Fifth Amendment, which requires government to provide constitutionally sufficient due process of law before it takes citizens' property. That is lacking here. And it violates the First Amendment because it violates investors' rights of associational privacy and expression. Through the CAT, SEC seizes confidential information about investors' core social values, political preferences, proprietary trading strategies, donations and even religious affiliations.

II. SEC was able to create a program so devastating to individual rights only because it usurped three different powers the Constitution vests exclusively in Congress: to pass legislation, to impose taxes, and to appropriate funds. These constitutional structural assignments of power are essential to protect individuals' liberties. Indeed, the sheer immensity of the CAT's trampling of the Bill of Rights evidences a disregard for the Constitution that Congress itself would never have dared to exhibit. And Congress certainly did not confer authority under the Exchange Act of 1934 as amended for SEC to establish this

4

unprecedented surveillance dragnet.

## FACTUAL BACKGROUND

SEC's CAT database logs "every order, cancellation, modification and trade execution for all exchange-listed equities and options across all U.S. markets."  SEC Press Release 2012-134 (Jul. 11, 2012).[2]  As one SEC Commissioner summarized, CAT is "a comprehensive surveillance database that" enables SEC "to watch investors' every move in real time." SEC, *Statement of Hester Peirce in Response to Release No. 34-88890*, File No. S7-13-19 (May 15, 2020) (hereinafter "May 15 Peirce Statement").[3]

For every stock transaction, the CAT captures details such as the name of the company invested in, the price paid, the date and the exact time of the transaction. *See* FINRA, *Limited Liability Company Agreement of Consol. Audit Trail, LLC* § 6.3 (Sept. 6, 2023) ("CAT NMS Plan").[4] It also captures extensive personally identifiable information, or "PII."  This includes information sufficient to identify every person with investments in the stock market, such as name, address, birth year, and

---

[2] https://perma.cc/QSM5-YHPE.

[3] bit.ly/3gUHeqp.

[4]  https://perma.cc/K5AN-WN3J.

5

more. *Id.* The CAT seizes this data without so much as a warrant, a "John Doe" subpoena, or even a reason to suspect any investor broke any law.

Once CAT collects this material, SEC searches it using automated methods to surveil the markets, *see* 17 C.F.R. § 242.613(a)(1)(ii), and to look for violations of the law, 77 Fed. Reg. 45722, 45744–45, 45792–93 (2012). As SEC boasted in one Release, it will comb through this information collected from millions of innocent Americans "to identify bad actors who … perform illegal activity." SEC Release No. 34-88393, *Order Granting Conditional Exemptive Relief* 20 (March 17, 2020).[5] SEC Commissioner Hester Peirce has expressed alarm that SEC has placed such a strong "emphasis" on using the CAT "as an enforcement tool." Hester Peirce, Remarks at the 7th Annual Conference on Financial Market Regulation (May 20, 2020).[6] As promised, SEC already has brought enforcement actions using data obtained from the CAT. *See, e.g.*, SEC Press Release 2022-228 (Dec. 14, 2022).[7]

---

[5] https://www.sec.gov/files/rules/exorders/2020/34-88393.pdf.
[6] https://perma.cc/WKG6-EVW8
[7] https://perma.cc/CH9C-XLPC.

SEC did not itself develop the CAT. It outsourced the job to the Financial Industry Regulatory Authority (FINRA) and more than 20 stock exchanges, referred to collectively as self-regulatory organizations (SROs). *See* 17 C.F.R. § 242.613(a)(1). These SROs operate the CAT, providing SEC real-time access to all information in it. 77 Fed. Reg. at 45775. By outsourcing this arrangement, SEC avoided having to ask Congress for authority either to establish or fund the CAT. SEC ordered these SROs to bear the costs of the program, and to raise the necessary money primarily by imposing charges on their members—which may ultimately be borne by the investors they serve. *Id*. at 45794–95.

In addition to searching the CAT itself, SEC also requires the SROs to search it. *See*, *e.g.*, 17 C.F.R. § 242.613(f) (requiring SROs to maintain or implement "surveillance systems[]" addressing CAT data). To that end, SEC permits these 20-plus entities to copy and download CAT data in bulk, storing it on their own separate computer systems. *See* CAT NMS Plan, § 6.10(c)(i). All told, more than 3,000 people from SEC and the various SROs have access to the database. FINRA, *LLC Agreement*

*of Consol. Audit Trail, LLC* (Aug. 29, 2019).[8]

Because of the vast amount of valuable information stored in the database, many commenters have expressed alarm that SEC is exposing investors' information to theft by cyberhackers. Successful cyberhacks could disclose investors' private information and could expose investors to catastrophic financial loss. Hackers might even use confidential account-related data to steal investor portfolios. Letter from Seven Senators to SEC Chair (July 24, 2019).[9]

This immediate cyberhacking threat set off alarms across the political spectrum. It has triggered extensive activity in Congress, including hearings, *see, e.g., Implementation and Cybersecurity Protocols of the Consolidated Audit Trail: Subcomm. on Cap. Mkts., Secs., and Inv. of the H. Comm. on Fin. Servs.*, 115th Cong. (2017),[10] and proposed legislation, *see, e.g.*, Protecting Identifiable Information Act, H.R. 2039, 117th Cong. (2021). A wide range of critics, including the American Civil Liberties Union, *see* Letter from ACLU to J. Clayton (Dec.

---

[8] https://perma.cc/3Q4Q-9EFV.
[9] https://perma.cc/3KSA-WEPT.
[10] https://perma.cc/4BSB-FE36.

8

16, 2019),[11] and eight state attorneys-general expressed grave concerns. Letter from Eight Attorneys General to Sen. C. Schumer, *et al.* (Aug. 15, 2023).[12]

These concerns are heightened by SEC's own embarrassing cybersecurity failures. Unknown hackers already have stolen confidential information from SEC's flagship database, EDGAR, the primary system for companies to file documents with SEC. Reuters Staff, *U.S. SEC Settles with Two Traders over EDGAR Filing System Hack*, Reuters (Apr. 9, 2020).[13] Despite that embarrassment, SEC failed to maintain standard security controls on IT applications as basic as the agency's X (formerly Twitter) account. A hacker exploited that security failure and an SEC cell phone to hack SEC's account. The hacker posted a false tweet to the markets, in the name of the SEC Chairman himself. The tweet, which involved cryptocurrency, caused the ETF price to rise and fall, inflicting huge losses on investors who relied on this statement from SEC's official account. Goldstein, *S.E.C. Social Media Hack That*

---

[11] https://bit.ly/3MZ7ktV.
[12] https://perma.cc/7RYJ-9QDT.
[13] https://archive.ph/paxA3.

*Sent Bitcoin Soaring Prompts Investigation*, The NY Times (Jan. 10, 2024).[14]

In 2019, then-SEC Chair Jay Clayton admitted to concerns about protecting information stored in the CAT. *Oversight of the Securities and Exchange Commission: Hearing Before the U.S. Senate Committee on Banking, Housing, and Urban Affairs in* SEC Speeches and Statements (Dec. 10. 2019) (testimony of SEC Chair Jay Clayton).[15]  Against this background, experts consider cyberbreaches of the CAT not only possible or likely, but inevitable.

## ARGUMENT

### I. SEC's CAT Scheme Violates Investors' Fourth, Fifth, and First Amendment Rights

#### A. The CAT Violates Investors' Fourth Amendment Rights

##### 1. It Is a Search and Seizure

The CAT program runs roughshod over the Fourth Amendment, which protects "[t]he right of the people to be secure in their … papers … against unreasonable searches and seizures." U.S. CONST. amend. IV.

---

[14] https://perma.cc/BJ8A-HLQH.
[15] https://perma.cc/GM5S-PXF9.

These Fourth Amendment violations lie at the very heart of the CAT. The program yields to an unconstitutional temptation that Justice Holmes cautioned against a century ago: ignoring the Fourth Amendment to search private materials for possible violations of the law. Justice Holmes warned that "[a]nyone who respects … the Fourth Amendment would be loath to believe that Congress intended to authorize one of its *subordinate agencies* to sweep all our traditions into the fire … and to direct fishing expeditions into private papers on the *possibility that they may disclose evidence of crime.*" *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305–06 (1924) (emphasis added) (citation omitted). By establishing the CAT, SEC systematized just this kind of unlawful fishing expedition—except now on an oceanic scale made possible by recent advances in digital database and surveillance technology.

Under Fourth Amendment law, the CAT's systematized fishing expeditions are mass searches and seizures. A Fourth Amendment "search" occurs whenever the government intrudes on a person's property to gather information, or violates that person's reasonable expectation of privacy. *United States v. Jones*, 565 U.S. 400, 405–06 (2012). In the case

11

of the CAT, the collection of investors' personal and financial information violates their property interest in their papers and their private information including proprietary trading strategies. By doing so the CAT invades their reasonable expectation of privacy.

The Supreme Court has long protected confidential financial papers as property. *See*, *e.g.*, *Boyd v. United States*, 116 U.S. 616 (1886); a*ccord Ruckelshaus v. Monsanto*, 467 U.S. 986, 1003–04 (1984) (recognizing confidential business data as property protected by the Takings Clause). In *American Tobacco*, the Court held that financial records are "papers" protected by the Fourth Amendment. 264 U.S. at 305–06. More broadly, courts have protected personal papers as property since the time of the Founders. *See* Donald A. Dripps, *"Dearest Property": Digital Evidence and the History of Private "Papers" As Special Objects of Search and Seizure*, 103 J. Crim. L. & Criminology 49, 52, 67 n.86 (2013).

The material the CAT seizes also is protected based on investor's reasonable expectations of privacy. SEC acknowledges that the material CAT collects is private, *see, e.g.,* SEC Release No. 34-77724, File No. 4-

12

698 199 (Apr. 27, 2016), [16] and privacy-based Fourth Amendment protections apply whenever "a person ha[s] exhibited an actual (subjective) expectation of privacy … that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). *See also* Mihailis E. Diamantis, *Privileging Privacy: Confidentiality as a Fourth Amendment Protection*, 21 U. Pa. J. Const. L. 485, 494 (2018) (noting the "widespread recognition in the law that people have privacy interests in their financial information").

### 2. The Searches and Seizures Are Unreasonable Because They Violate the Requirements for Probable Cause and a Warrant

The CAT's searches and seizures of these records are impermissibly "unreasonable," U.S. CONST. amend. IV, because SEC conducts them without following any constitutionally sufficient procedures and without articulating any individualized suspicion. The Supreme Court has consistently held that "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018)

---

[16] *Joint Industry Plan; Notice of Filing of the National Market System Plan,* https://www.sec.gov/files/rules/sro/nms/2016/34-77724.pdf

(alteration in original) (citation and internal quotation marks omitted). *See also Marshall v. Barlow's, Inc.,* 436 U.S. 307 (1978) (warrantless searches are generally unreasonable in the home and in commercial premises). No such exception applies to the CAT.

The CAT violates the well-established principle that "warrantless searches are typically unreasonable where a search is undertaken … to discover evidence of wrongdoing," *Carpenter*, 138 S. Ct. at 2221 (citation and internal quotation marks omitted), "in the hope that something will turn up," *Am. Tobacco*, 264 U.S. at 306. Nor does law-enforcement efficiency excuse the failure to get a warrant. *Chandler v. Miller*, 520 U.S. 305, 323 (1997). And yet "efficiency" is SEC's primary justification for failing to provide due process. *See, e.g*, 77 Fed. Reg. at 45727-28 (referring to procedural hurdles in the SEC "blue sheet" process for requesting confidential information). But the Supreme Court has rejected this rationale: "where … public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged." *Chandler*, 520 U.S. at 323.

14

The CAT's warrantless and suspicionless searches and seizures are unprecedented in scale. Making matters worse, the CAT provides this confidential information to the more than 20 SROs involved in the program. Because each of these entities can download and search the entire database, each of the 20-plus stock exchanges can see an investor's transactions at other exchanges.

Worse, because thousands of people at SEC and the SROs have access to the database, any one of them can make selected or mass disclosures, deliberately or by accident. To provide a recent example: Last year, by accident, one employee of the Consumer Financial Protection Bureau exposed PII from hundreds of thousands of private citizens. Reilly, *CFPB Employee Sent Data of 250,000 Customers to Pers. Email*, Roll Call (Apr. 19, 2023).[17] The CAT's structure, by making confidential investor information available to thousands of users at various entities, multiplies the risk of both inadvertent and intentional breaches.

The CAT also exposes investors' private information to theft by

---

[17] https://perma.cc/M6NY-P2E9.

cyberhackers. Cyberhackers do not steal information for benign purposes. Hackers used the information stolen from SEC's EDGAR database to make illegal investments, and a hacker's breach of SEC's X account (also using an SEC cell phone) caused real losses to many investors. The risks the CAT imposes on investors could hardly be more serious, since successful cyberhackers can steal investors' portfolios. For many investors, of course, these portfolios represent much or all their life savings. Yet SEC is forcing every investor who wants to invest in securities to incur this cyberhacking risk involuntarily. Such dire consequences illustrate the grave, concrete damage the CAT inflicts by violating investors' Fourth Amendment right to be "secure in their … papers." U.S. CONST. amend. IV.

**B.    The CAT Violates Investors' Fifth Amendment Rights By Depriving Them of Property Without Due Process of Law**

The stark absence of due process in the CAT program also violates the Fifth Amendment, which provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Investors hold property rights in their personal

16

information and financial records, as explained above. *See supra* section II.A.1. Investors also possess a liberty interest in that material. *See Payne v. Taslimi*, 998 F.3d 648, 657 (4th Cir. 2021); *Walls v. City of Petersburg*, 895 F.2d 188, 194 (4th Cir. 1990) (holding that financial information required by employment questionnaire implicated plaintiff's liberty interest in her right to privacy).

When an individual's liberty or property interests are at stake, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Here, SEC's CAT scheme deprives investors of liberty and property interests in their financial information and records by seizing them without notice and without providing opportunity to challenge the seizure.

## C.  The CAT Violates Investors' First Amendment Rights by Compelling Disclosure of Their Investment Choices

The CAT's searches and seizures of confidential records and information also violate the First Amendment, which prohibits government from impermissibly "abridging," U.S. CONST. amend. I,

rights including the freedom of associational privacy. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (stating that the Supreme Court has "long understood" that First Amendment rights include the "right to associate with others"). The First Amendment holds the government to an even higher standard than the Fourth Amendment. It requires that the government (i) demonstrate a heightened, "sufficiently important" government interest, and (ii) "narrowly tailor[]" any compelled disclosure to that interest. *AFP Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (citation and internal quotation marks omitted).

The seminal case protecting rights of association is *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), reversing an order compelling the NAACP to produce its membership lists to the State of Alabama. The Court stressed the "vital relationship" between the right of association and the "privacy in one's associations." *Id. See also Bonta*, 141 S. Ct. at 2385 (2021) (required disclosure of organization's donors violates the First Amendment's right to associational privacy).

Although the CAT violates investors' associational privacy, SEC has not even attempted to identify a heightened interest that satisfies

18

the First Amendment's demanding test. Far from narrowly tailoring its data collection, *id.*, CAT collects billions of pieces of confidential information from hundreds of millions of investors.

The confidential information the CAT collects provides "a window into" people's "deepest thoughts and core values." May 15 Peirce Statement.

These values include investors' political and moral views—their positions on controversial subjects like climate, energy, pornography, defense spending, and labor practices. *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 91 (1982) ("The Constitution protects against the compelled disclosure of political associations and beliefs."). Anonymity is especially important to protect for unpopular associations. *See Talley v. California,* 362 U.S. 60, 64 (1960). Investment decisions can even reveal investors' religious affiliations. *See* Mansour *et al.*, *The Effect of Religion on Financial and Investing Decisions*, *in Investor Behavior* 142–46 (2014) (investment approaches are associated with Muslim, Jewish, and Christian religions).

Donors have many legally recognized reasons to want to keep

personal information from the government, even if out of "merely … a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 341–42 (1995). Cancel culture is widespread, and the ease with which such private information can be shared or hacked makes today's government-compelled disclosures by administrative decree an exponentially larger threat to First Amendment freedoms than they were when *NAACP v. Alabama* was decided. As Justice Harlan noted there, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective … restraint on freedom of association." 357 U.S. at 462.

Like the CAT's Fourth Amendment violations, its First Amendment violations are multiplied many times over because the private information CAT seizes is distributed to so many SROs and private entities. Because of this access, employees at more than 20 stock exchanges can see each investor's trades on all the other stock exchanges. Moreover, a single rogue employee at one of these exchanges (not to

20

mention at SEC or an outside contractor *viz*. IRS and Booz Allen[18]), can access and misuse this private information—disclosing to the world that an investor holds stock in unpopular companies or has disfavored political or religious views.

As SEC Commissioner Peirce warned, "One can imagine a future in which a delectably large database of trades becomes a tool for the government to single people out for making trading decisions that reflect—or are interpreted to reflect—opinions deemed unacceptable in the reigning gestalt." May 15 Peirce Statement. Commissioner Peirce has described the harsh reality that reasonable, ordinary investors will fear that someone in government, or at one of these stock exchanges, will misuse their confidential information. At minimum, the CAT's seizure, search, and retention of vast amounts of private data "abridg[es]" investors' association rights and violates the First Amendment.

## II. SEC HAS NO LAWFUL AUTHORITY TO ESTABLISH THE CAT

### A. The CAT Violates the Vesting Clause of Article I

---

[18] *See* Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, Wall St. J. (Jan. 16, 2024) https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811

SEC has only the authority Congress grants it, and Congress never authorized SEC to create the CAT, or anything like it. By issuing the CAT rule, SEC violated Article I of the Constitution, which vests "[a]ll legislative powers" in Congress.  U.S. CONST. art. I, § 1.  Congress may not "abdicate or … transfer to others the essential legislative functions with which it is thus vested."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Nor may it delegate to another branch the power to modify prior legislation through a process that bypasses bicameralism and presentment. *See Clinton v. City of New York*, 524 U.S. 417, 440–41 (1998). SEC's adoption of the CAT also violated the Administrative Procedure Act (APA), a product of Congress's legislative authority. The APA forbids agency action without statutory authority.  5 U.S.C. § 706(2)(C).

The Constitution's vesting of "all" legislative powers in Congress is an important structural protection for individual rights.  *See Bond v. United States*, 564 U.S. 211, 222 (2011) (explaining that protecting separation of powers "protect[s] the individual").  It ensures that the government obtain the citizens' consent, through their elected

representatives, before it imposes limitations on their liberty. These principles apply with full force to the CAT.

The prohibition against divestment of legislative power is "intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well." *Id.* "The principle that Congress cannot delegate away its vested powers exists to protect liberty." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring). This applies with extra force when a mere regulatory agency arrogates that power to itself.

The Constitution does not say that legislative powers "shall be vested in a Congress of the United States *and such other bodies as Congress specifies.*" Philip Hamburger, *Nondelegation Blues*, 92 GEO. WASH. L. REV. 1083, 1174 (2023) (emphasis in original). "If Congress could pass off its legislative power to the executive branch, the '[v]esting [c]lauses, and indeed the entire structure of the Constitution,' would 'make no sense.'" *Gundy v. United States*, 139 S. Ct. 2116, 2134–35 (2019)

23

(Gorsuch, J., dissenting) (citation and internal quotation marks omitted).

"Of the three branches, Congress is the most responsive to the will of the people. … If legislators misused this power, the people could respond, and respond swiftly." *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). When agencies arrogate power properly vested solely in Congress, our laws risk becoming nothing more than the will of the current president, or, worse yet, the will of unelected officials barely responsive to him. *See* Stephen Breyer, *Making Our Democracy Work: A Judge's View* 110 (2010). In a world like that, agencies could churn out new laws more or less at whim. Intrusions on liberty would not be difficult and rare, but easy and profuse. *See* The Federalist No. 46, at 303 (James Madison) (Cooke ed., 1961), No. 62, at 378 (Madison). Stability would be lost, with vast numbers of laws changing with every new presidential administration. Rather than embody a wide social consensus and input from minority voices, laws would more often bear the support only of the party currently in power. Powerful special interests, which are sometimes "uniquely" able to influence the agendas of administrative

24

agencies, would flourish while others would be left to ever-shifting winds. Thomas W. Merrill, *Capture Theory and the Courts: 1967-1983*, 72 Chi.-Kent L. Rev. 1039, 1043 (1997). Here, the terrible legacy of arrogated power is a panopticon.

Petitioners' brief explains at length why Supreme Court precedent, including the major questions doctrine, establishes that SEC did not have this authority.  Pet. Br. 14–31. This conclusion follows because the change the CAT makes in SEC's role is not only "major," *West Virginia v. EPA,* 597 U.S. 724 (2022), it is transformational.  Before 2010, SEC's role in the national market system had stayed well within the scope permitted by Section 11A, focusing on the procedures and requirements for executing securities transactions and the activities of the securities-industry members who carried out those transactions, such as securities exchanges and broker-dealers.

In 2010, SEC made a sharp break from that limited role.  Seventy-six years after Congress created SEC and 35 years after Congress passed Exchange Act Section 11A, SEC proposed the CAT.  *See* Exchange Act Release No. 34-62174, *Consolidated Audit Trail*, File No. S7-11-10 (May

26, 2010).[19] It proposed to order the mass collection of private information about ordinary citizens, transforming the nature of its relationship with the public at large.[20] By appointing itself to a permanent Orwellian Overseer of Investing, for the first time, SEC put itself in the unauthorized surveillance business.

And it did so on a gigantic scale. The CAT program multiplied SEC's regulatory reach many times over, seizing data for hundreds of millions of investors for the first time.[21] The program is creating the largest securities database anywhere.[22] In fact, the database will be the largest of any kind outside the National Security Agency.[23] According to some

---

[19] https://www.sec.gov/files/rules/proposed/2010/34-62174.pdf

[20] SEC issued the final CAT rule two years later. SEC Release No. 34-67457, *Consolidated Audit Trail*, File No. S7-11-10 (July 18, 2012) https://www.sec.gov/files/rules/final/2012/34-67457.pdf, 77 Fed. Reg. 45722 (2012) (codified at 17 C.F.R. § 242). .

[21] *Data Security: Vulnerabilities and Opportunities for Improvement: Subcomm. on Fin. Institutions and Consumer Credit of the H. Comm. on Fin. Srvs.* 115th Cong. (Nov. 1, 2017) (testimony of Kenneth Bentsen, President and CEO of the Securities Industry and Financial Markets Association (SIFMA)) (hereinafter "Bentsen testimony") hhrg-115-ba15-wstate-kbentsen-20171101.pdf (house.gov)

[22] *CAT NMS Provides Progress Update on the Consolidated Audit Trail*, Business Wire (Oct. 26, 2018), https://perma.cc/2YPZ-QSX3.

[23] *See Implementation and Cybersecurity Protocols of the Consolidated*

experts, it will be the largest database of any kind ever built.[24]  To Amicus's knowledge, no agency ever has created a remotely similar database without Congress's express authorization.

SEC made this change by diktat, without Congress's permission. That way, it evaded the disciplining effect Congress would have had on an agency's effort to commit such wholesale violations of civil liberties. SEC's fiat maneuver illustrates the key role separation of powers plays in disciplining the executive branch to protect *substantive* individual liberties, as the Supreme Court emphasized in *Bond.*  564 U.S. at 222.

SEC seized power that Congress did not and almost certainly would not have granted it.  Congress is the branch that must answer to voters, and it is hard to envision Congress's approving a new surveillance program that damages so many voters' civil liberties. Indeed, even Congress could not enact the CAT because it violates the Bill of Rights. In *American Tobacco,* Justice Holmes even employed the language of the major questions doctrine: "nothing short of the most explicit language

---

*Audit Trail: Subcomm. on Cap. Mkts., Secs., and Inv. of the H. Comm. on Fin. Serv.*, 115th Cong. 2 (2017) (statement of Rep. Bill Huizenga).

[24] Bentsen Testimony, *supra* note 21.

would induce us to attribute to Congress that intent[]" to violate the Fourth Amendment. *Id.* at 306. The conclusion that Congress could not possibly have approved FTC's constitutional violations there applies to the CAT here, only with many times more force.

The CAT scheme represents an emerging and disturbing pattern whereby federal agencies unconstitutionally regulate matters clearly beyond their statutory authority. The Supreme Court recently struck down a federal agency's *ultra vires* attempt to ban evictions nationwide based on limited statutory authority to "implement measures like fumigation and pest extermination." *Ala. Assoc. of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021).

When agencies arrogate legislative power vested solely in Congress, "the citizen confronting thousands of pages of regulations" here, 351 pages of an initial rule in October 2012 followed by thousands of pages of subsequent rulemaking—the public "can perhaps be excused for thinking that it is the agency really doing the legislating." *City of Arlington v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting). If elected officials no longer bear personal responsibility for enacting laws, it deprives voters

28

of control over the laws that govern them.

The Supreme Court has admonished courts to not "ascribe unenacted purposes and objectives to a federal statute[.]" *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019). Here, the Exchange Act's grant of regulatory authority to SROs has remained unchanged for decades. During that time, SEC has not once mandated the seizure of investors' trading information in the manner it has here. "When an agency claims to discover in a long-extant statute an unheralded power to regulate a 'significant portion of the American economy' … [courts must] greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation and internal quotation marks omitted).

## B. SEC Arrogated Appropriations and Taxing Powers Vested Solely in Congress

### 1. Agencies May Not Resort to Nonappropriated Financing

The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."

29

U.S. CONST. art. I, § 9, cl. 7. The Taxation Clause similarly vests in Congress alone the "Power To lay and collect Taxes … to pay the Debts and provide for the … general Welfare of the United States." U.S. CONST. art. I, § 8, cl. 1. Alexander Hamilton explained that in a constitutional order that assigns the lawmaking and appropriations powers to the legislature, 'no money can be expended, but for an *object*, to an *extent*, and out of a *fund*, which the laws have prescribed." (emphases in original). Alexander Hamilton, Explanation, The Works of Alexander Hamilton, Vol. 8, p.128 (2d ed. 1903). The CAT's ad hoc self-appropriated funding and its future funding scheme at issue here operates wholly outside these constitutional constraints.

Two laws effectuate these principles and also render unlawful any attempt to usurp Congress's Power of the Purse.  First, the Miscellaneous Receipts statute requires that "an … agent of the Government receiving money for the Government from any source shall deposit the money into the Treasury." 31 U.S.C. § 3302(b).  That law requires that monies of the federal government must be claimed as public revenues, subject to public control through constitutional processes.  "If there could be 'public money'

30

that is not deposited in 'the Treasury' prior to expenditure," the Congress' control over expenditures is rendered "an empty shadow." [25]

The second, complementary law, the Anti-Deficiency Act, provides that no public funds may be expended except pursuant to legislative appropriations. This second structural law is essential to ensure that Congress, and Congress alone, has spending power. Thus codifying Congress's exclusive power of the purse, the Anti-Deficiency Act makes it unlawful for a federal agency to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation." 31 U.S.C. § 1341(a)(1)(A). The Act further provides: "[A government employee may not] involve…[the] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). These statutes ensure that "[a]ll funds belonging to the United States—received from whatever source, however obtained, and whether in the form of cash, intangible property or physical assets—are

---

[25] *See generally* Kate Stith, *Congress' Power of the Purse*, 97 Yale L. J. 1343, 1357, 1357 n.64 (1988) (internal quotation marks omitted in second quotation) (from 19 ANNALS OF CONG. 1330–31 (1809)) (Statement of Rep. J. Randolph).

31

public monies, subject to public control and accountability." Stith, *supra* n. 25, at 1356.

Accordingly, "federal agencies may not resort to nonappropriation financing *because their activities are authorized only to the extent of their appropriations." Id.* (emphasis in original). These laws prohibit SEC from financing the CAT by exacting billions from SROs under the agency's regulatory thumb. SEC simply has no authority to engage in the additional activity on which it would spend these lawlessly commandeered funds. "This restriction applies even where the nonappropriated funds would be used to finance activities resembling or duplicating activities that are underwritten with appropriated funds[,]" *id.*, and it certainly applies to the funds extracted from SROs or broker-dealers by the scheme this Petition challenges:

> Agencies and officials of the federal government may not spend monies from any source, private or public, without legislative permission to do so. Even where unauthorized spending by the Executive would impose no additional obligation on the Treasury—because it is made with private or other non-governmental funds—the Constitution prohibits such spending if it is not authorized by Congress. All federal receipts must be "deposited," at least figuratively, into the Treasury, and all spending in the name of the United States must be pursuant to legislative appropriation.

*Id.* at 1345.

### 2. None Dare Call It a Tax

SEC imaginatively calls this multi-billion dollar levy of costs that will be borne by unrepresented American investors a "fee."  Pet. Br. at 2. (Describing dubbing this a "fee" as "SEC's doublespeak").  Whether the CAT's multi-billion dollar costs levied on American investors is a tax or merely a means to evade congressional control of spending, heightened scrutiny must be employed to assess Congress's ability to transfer its greatest power—the power of the purse. *NFIB v. Sebelius*, 567 U.S. 519, 573 (2012) ("the breadth of Congress's power to tax is greater than its power to regulate commerce").

Taxing is a core power that cannot be delegated to agencies. *See Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974) (footnote omitted) ("Taxation is a legislative function, and Congress … is the sole organ for levying taxes … .") Because "the power to tax involves the power to destroy[,]" *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819), "the Founders placed special controls on the enactment of federal taxes." Chenoweth, *et al.*, *Reinvigorating Nondelegation with*

33

*Core Legislative Power*, 81, 98 (2022). Further, taxing power should be treated with special care because: In addition to the usual hurdles that proposed legislation must overcome before becoming law—approval by both Houses of Congress plus either the president's approval or an override of a presidential veto by both Houses—tax bills must also comply with the Origination Clause, which provides that "[a]ll bills for raising Revenue [must] originate in the House of Representatives." U.S. CONST. art. I, § 7, cl. 1.  SEC's arrogation bypasses each of these controls over tax legislation.

CAT LLC is not funded by "Appropriations made by Law" and the Order under review in this action makes clear that SEC never intends to finance this out of SEC's lawful budget appropriations.  It has written itself a blank check to be funded in perpetuity in any amount it deems appropriate by the Order's scheme of "fee" assessment on broker-dealers which will be directly passed on to investors as a deadweight cost on investing on American exchanges.  Citizens have had no representative participation either in this scheme's enactment or with respect to what must be admitted is taxation borne by investors to the tune of billions of

34

dollars—in perpetuity. The American Revolution was fought over the principle of "No Taxation Without Representation!" that SEC disregards.

The Supreme Court has emphasized that protecting Congress's exclusive power over the purse is essential to maintaining the separation of powers. *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) ("if a citizen who is taxed has the measure of the tax or the decision to spend determined by the Executive alone, without adequate control by the citizen's representatives in Congress, liberty is threatened."). The Appropriations Clause dictates that "Congress's control over federal expenditures is 'absolute.'" *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). It bars expenditure for any purpose unless funds have been "appropriated by an act of Congress." *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citation and internal quotation marks omitted).

The vesting of lawmaking and taxation power solely in Congress instantiates the Constitution's most important principle: consent of the

governed. Without popular consent, a government is illegitimate, and its laws would be without obligation. Legislative power is vested solely in the Congress because Congress is directly politically accountable. Thus, the laws it enacts are premised on self-determination by vote.

No American voter consented to this scheme that violates manifold structural protections and guarantees of liberty promised to Americans by their Constitution. The boast that "[n]o other comparable system or database of this scale … and complexity exists in the world[,]" Pet. Br. at 1 (quoting Letter from B. Becker to V. Countryman 8–9 (May 22, 2023)[26]), is an admission of autocratic rule as yet unparalleled on earth. The United States should be a bulwark against such a dystopian seizure—not a vanguard. Courts must prohibit SEC from betraying the nation's foundational principles in its ignoble quest to set the world record for informational tyranny.

## CONCLUSION

SEC's CAT scheme is unconstitutional, root and branch.

---

[26] https://perma.cc/UW4U-T73J.

Respectfully submitted,


/s/ Andrew J. Morris
Andrew J. Morris
    *Counsel of Record*
Margaret A. Little
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
andrew.morris@ncla.legal


Dated: February 15, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,491 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Andrew J. Morris
Andrew J. Morris

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

/s/ Andrew J. Morris
Andrew J. Morris

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Andrew J. Morris
Andrew J. Morris

40

41