No. 23-13396

# In the United States Court of Appeals for the Eleventh Circuit

American Securities Association and Citadel Securities LLC,
*Petitioners,*

v.

United States Securities and Exchange Commission,
*Respondent,*

The Nasdaq Stock Market, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, *et al.*,
*Intervenors.*

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34–98290; File No. 4–698

**BRIEF OF *AMICUS CURIAE* AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE IN SUPPORT OF PETITIONERS**

William P. Barr
TORRIDON LAW PLLC
1155 F. Street NW
  Suite 750
Washington, DC 20004

Jonathan Berry
R. Trent McCotter
  *Counsel of Record*
Caleb Orr
BOYDEN GRAY PLLC
801 17th Street NW
Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, amicus provides this Certificate of Interested Persons and Corporate Disclosure Statement. To the best of amicus's knowledge, the following persons and entities may have an interest in the outcome of this case:

1. Altman, Jennifer G., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

2. American Free Enterprise Chamber of Commerce, Amicus.

3. American Securities Association, Petitioner.

4. ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

5. Barbero, Megan, counsel for Respondent United States Securities and Exchange Commission.

6. Berry, Jonathan, counsel for amicus American Free Enterprise Chamber of Commerce.

7. Borse Dubai Limited, owner of more than 10% of Nasdaq, Inc.'s shares.

8. BOX Exchange LLC, member and participant of Consolidated Audit Trail, LLC.

9. Boyden Gray PLLC, counsel for Amicus American Free Enterprise Chamber of Commerce.

10. Boyle, Gregory, Jenner & Block LLC, counsel for Intervenor Consolidated Audit Trail, LLC.

11. Cboe BYX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

12. Cboe BZX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

13. Cboe C2 Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

14. Cboe EDGA Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

15. Cboe EDGX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

16. Cboe Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

17. Cboe Global Markets, Inc. (BATS: CBOE), direct or indirect parent company of Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

18. Citadel Securities GP LLC, parent company of Petitioner Citadel Securities LLC.

19. Citadel Securities LLC, Petitioner.

20. Conley, Michael A., counsel for Respondent United States Securities and Exchange Commission.

21. Connolly, J. Michael, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

22. Consolidated Audit Trail, LLC, Intervenor.

23. Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

24. Financial Industry Regulatory Authority, Inc., member and participant of Intervenor Consolidated Audit Trail, LLC.

25. Francisco, Noel J., Jones Day, counsel for Petitioner Citadel Securities LLC.

26. Gershengorn, Ian Heath, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

27. Greenwalt III, Paul E., ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

28. Hardin, Tracey A., counsel for Respondent United States Securities and Exchange Commission.

29. Hoyt, Joshua T., Jones Day, counsel for Petitioner Citadel Securities LLC.

30. Intercontinental Exchange, Inc. (NYSE: ICE), indirect parent of NYSE Intervenors.

31. International Securities Exchange Holdings, Inc., sole LLC member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

32. Investor AB (Nasdaq Stockholm: INVEB), owner of more than 10% of Nasdaq, Inc.'s shares.

33. Investors' Exchange, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

34. Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

35. Jones Day, counsel for Petitioner Citadel Securities LLC.

36. Kastenberg, Stephen J., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

37. Katsiff, Timothy D., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

38. Kennedy, Jordan, counsel for Respondent United States Securities and Exchange Commission.

39. Lantieri III, Paul, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

40. Long-Term Stock Exchange, Inc., member and participant of Intervenor Consolidated Audit Trail, LLC.

41. Lucas, Brinton, Jones Day, counsel for Petitioner Citadel Securities LLC.

42. MacLean, Matthew J., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

43. Matro, Daniel E., counsel for Respondent United States Securities and Exchange Commission.

44. McCotter, R. Trent, counsel for amicus American Free Enterprise Chamber of Commerce.

45. MEMX LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

46. Miami International Securities Exchange LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

47. MIAX Emerald, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

48. MIAX PEARL, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

49. Molzberger, Michael, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

50. Nasdaq BX, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

51. Nasdaq GEMX, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

52. Nasdaq, Inc. (Nasdaq: NDAQ), sole owner of LLC interest in The Nasdaq Stock Market LLC and Nasdaq PHLX LLC and parent company of Nasdaq BX, Inc.

53. Nasdaq ISE, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

54. Nasdaq MRX, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

55. Nasdaq PHLX LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

56. New York Stock Exchange LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

57. NYSE American LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

58. NYSE Arca, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

59. NYSE Chicago, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

60. NYSE National, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

61. Orr, Caleb, counsel for amicus American Free Enterprise Chamber of Commerce.

62. Phillips, David, Jones Day, counsel for Petitioner Citadel Securities LLC.

63. Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

64. Rabbitt, Brian C., Jones Day, counsel for Petitioner Citadel Securities LLC.

65. Roth, Yaakov M., Jones Day, counsel for Petitioner Citadel Securities LLC.

66. The Nasdaq Stock Market LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

67. The Vanguard Group, Inc., owned 10% or more of Cboe Global Markets, Inc.'s common stock as of June 30, 2023.

68. Thoma Bravo UGP, LLC, owner of more than 10% of Nasdaq, Inc.'s shares.

69. Unikowsky, Adam G., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

70. United States Securities and Exchange Commission, Respondent.

To the best of amicus's knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

/s/ R. Trent McCotter

R. Trent McCotter

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................. i

TABLE OF AUTHORITIES ........................................................... ii

INTEREST AND IDENTITY OF THE *AMICUS CURIAE* ..................... 1

SUMMARY OF THE ARGUMENT ............................................... 1

ARGUMENT ......................................................................... 4

I.  The CAT Represents An Unprecedented Expansion of the SEC's Surveillance Capabilities—and It Invites Abuse. ........................... 4

    A.  The Pre-CAT Audit System Encouraged the SEC to Develop Good Cause Before Launching Investigations and to Work Collaboratively with Private Market Participants. .................................................... 5

    B.  By Providing Nearly Infinite Data About Traders, Without Any Procedural Obstacles, the CAT Portends Extraordinary Abuse by Government Actors. ................. 9

    C.  Do Not Believe the SEC's Innocent Justifications. ........ 14

II. The Exchange Act Does Not Authorize the SEC's Scheme to Disfavor Wholesale Broker-Dealers, Which Have Helped Democratize the Markets. ............................................. 17

    A.  Innovative Wholesale Broker-Dealers Create Immense Value and Facilitate Trading for Millions of Retail and Other Investors. ........................................... 18

    B.  The SEC is Waging an Ideologically Motivated Campaign Against Wholesale Broker-Dealers. ............................... 22

    C.  The Order is Designed to Punish Wholesale Broker-Dealers. ....................................................... 27

CONCLUSION ...................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972) ............................................................ 10

*Bus. Roundtable v. SEC,*
905 F.2d 406 (D.C. Cir. 1990) .......................................... 28

*Carpenter v. United States,*
585 U.S. 296 (2018) .......................................................... 11

*Lorenzo v. SEC,*
139 S. Ct. 1094 (2019) ...................................................... 11

*McDonnell v. United States,*
579 U.S. 550 (2016) ............................................................ 8

*SEC v. Goble,*
682 F.3d 934 (11th Cir. 2012) .......................................... 11

*SEC v. World Tree Fin., LLC,*
43 F.4th 448 (5th Cir. 2022) ............................................ 11

*Standard Inv. Chartered, Inc. v. NASD, Inc.,*
637 F.3d 112 (2d Cir. 2011) ............................................. 24

*United States v. Di Re,*
332 U.S. 581 (1948) .......................................................... 16

**Statutes**

15 U.S.C. § 78f ................................................................... 27

15 U.S.C. § 78k-1 .............................................................. 28

15 U.S.C. § 78q .............................................................. 7, 16

**Other Authorities**

17 C.F.R. § 240.17a-25 ................................................................. 7

44 Fed. Reg. 20360 (Apr. 4, 1979) .......................................... 28

66 Fed. Reg. 35836 (July 9, 2001) ............................................ 7

69 Fed. Reg. 71256 (Dec. 8, 2004) ...................................... 8, 12

75 Fed. Reg. 32556 (June 8, 2010) ................ 4, 6, 9, 12, 14, 16

77 Fed. Reg. 45722 (Aug. 1, 2012) ............................... 6, 9, 16

87 Fed. Reg. 80266 (Dec. 29, 2022) ..................................... 27

88 Fed. Reg. 128 (Jan. 3, 2023) .............................................. 27

88 Fed. Reg. 5440 (Jan. 27, 2023) ........................................ 27

88 Fed. Reg. 62628 (Sept. 12, 2023) ................. 3, 29, 31, 32, 33

*Best Practices for Sustainability Reporting*, NYSE ............... 24

Better Mkts., Fact Sheet: What is the Consolidated Audit
    Trail? (Feb. 16, 2021) ........................................................ 26

Charles Schwab, White Paper, U.S. Equity Market
    Structure: Order Routing Practices, Considerations, and
    Opportunities (2022) .......................................................... 21

Dave Michaels, *SEC Probes Trading by Elon Musk and
    Brother in Wake of Tesla CEO's Sales*, Wall St. J. (Feb. 24,
    2022) ..................................................................................... 13

Dhruv Aggarwal et al., *Retail Investors and Corporate
    Governance: Evidence from Zero-Commission Trading*
    (Eur. Corp. Governance Inst., Working Paper No.
    957/2024, Feb. 2024) .......................................................... 25

*Enhancing Transparency on Diversity*, Nasdaq ..................... 24

Drew Harwell, *The Wild Probe Into Investors of DWAC, Trump Media's Proposed Merger Ally*, Wash. Post (Feb. 3, 2024)...................................................................................13

Hester Peirce, *Meeting Market Structure Challenges Where They Are*, 43 J. Corp. Law 226 (2018) ................................14

Hester Peirce, *The CAT Is A Dangerous Dog*, RealClearPolicy (Oct. 9, 2019).....................................11, 12

*Implementation and Cybersecurity Protocols on the Consolidated Audit Trail, Hearing Before the Subcomm. on Capital Mkts., Sec. & Inv. of the H. Comm. on Fin. Servs.*, 115th Cong. (Nov. 30, 2017)......................................6

Jana J. Pruet, *Billionaire Mark Cuban Cleared of Insider Trading; Blasts U.S. Government*, Reuters (Oct. 16, 2013)..............13

Jill E. Fisch, *GameStop and the Reemergence of the Retail Investor*, 102 B.U. L. Rev. 1799 (2022)................................25

Joel Hasbrouck et al., *New York Stock Exchange Systems and Trading Procedures* (NYSE Working Paper No. 93-01, 1993).......................................................................................5

Katie Kolchin et al., SIFMA Insights, US Equity Market Structure Primer (July 2018) ............................................18

Katie Kolchin, SIFMA Insights, US Equity Market Structure Analysis: Analyzing the Meaning Behind the Level of Off-Exchange Trading Part II (Dec. 2021) ................................21

Letter from Dennis Kelleher, President & CEO, Better Mkts., to Vanessa Countryman (Oct. 28, 2019) ..................4

Letter from Douglas Cifu, CEO, Virtu Fin., to Vanessa Countryman (July 13, 2023)................................................31

Letter from Douglas Cifu, CEO, Virtu Fin., to Vanessa Countryman (Mar. 30, 2023) .............................................20

Letter from Ellen Greene & Joseph Corcoran, SIFMA, to Vanessa Countryman (June 5, 2023) .......................................... 30, 34

Letter from Ellen Greene & Joseph Corcoran, SIFMA, to Vanessa Countryman (May 2, 2022) ........................................... 29, 32

Letter from Jeffrey T. Brown, Cincinnati Stock Exch., to Jonathan G. Katz (June 19, 2003)......................................................... 9

Letter from Larry Harris, Fred V. Keenan Chair in Fin., USC Marshall Sch. of Bus., to Vanessa Countryman (June 21, 2022)............................................................................................. 33

Letter from Marcia Asquith, FINRA, to Vanessa Countryman (Apr. 11, 2023)............................................................................. 32

Letter from Stephen John Berger, Citadel Sec., to Vanessa Countryman (July 14, 2023).............................................................. 33

Letter from Stephen John Berger, Citadel Sec., to Vanessa Countryman (Mar. 31, 2023) ...................................................... 26, 31

Letter from Thomas Merritt, Virtu Fin., to Vanessa Countryman (May 12, 2021).............................................................. 29

Letter of Ira Hammerman, Senior VP and Gen. Couns., Sec. Indus. Ass'n, to Katherine Simmons, Chairperson, Intermarket Surveillance Grp. (Feb. 7, 2006).................................... 7

Matt Levine, *Everything Everywhere Is Securities Fraud*, Bloomberg (June 26, 2019) ................................................................ 10

National Market System Plan Governing the Consolidated Audit Trail (Sept. 6, 2023) ................................................................ 14

Paul G. Mahoney, *The Exchange As Regulator*, 83 Va. L. Rev. 1453 (1997)................................................................................... 5

S. Rep. No. 75-1455 (1938) ....................................................................... 8

SEC Chairman Gary Gensler, Remarks Before the Piper
Sandler Glob. Exch. Conf.: Market Structure and the
Retail Investor (June 8, 2022) ............................................. 23

SEC Chairman Jay Clayton, Address at Temple Univ.: The
Evolving Market for Retail Investment Services and
Forward-Looking Regulation (May 2, 2018) ...................................... 19

SEC Comm'r Caroline A. Crenshaw, Statement on Proposals
Related to Equity Market Structure (Dec. 14, 2022) .......................... 15

SEC Comm'r Hester Peirce, Statement in Response to
Release No. 34-88890; File No. S7-13-19 (May 15, 2020) .... 6, 9, 13, 16

SEC Comm'r Mark T. Uyeda, Statement on Proposed Rule
Regarding Order Competition (Dec. 14, 2022) .................................. 21

SEC Gen. Couns. Brian G. Cartwright, Address at Univ. of
Pa. Law Sch., Inst. for Law & Econ.: The Future of
Securities Regulation (Oct. 24, 2007) .................................... 22

SEC Release No. 34-97151; File No. 4-698, *Joint Industry
Plan; Notice of Filing of Amendment to the National Mar-
ket System Plan Governing the Consolidated Audit Trail*
(Mar. 15, 2023) .................................................................. 33

Thomas Barrabi, *What Are Blue Sheets? What To Know
About The Data SEC Will Seek From Robinhood*, Fox Bus.
(Jan. 29, 2021) ...................................................................... 8

## INTEREST AND IDENTITY OF THE *AMICUS CURIAE*[1]

Formed in 2022, the American Free Enterprise Chamber of Commerce ("AmFree") is a chapter 501(c)(6) organization that represents hard-working entrepreneurs and businesses across all sectors. AmFree's members are vitally interested in the preservation of free markets, innovation, and the continued viability of our republic.

## SUMMARY OF THE ARGUMENT

Based on little more than politically fashionable curiosity and a stated desire to upgrade so-called "outdated" methods, the SEC tasked the self-regulatory organizations (SROs) it oversees with creating a new SEC market-surveillance tool. The SROs, mainly stock exchanges, in turn developed the Consolidated Audit Trail, or CAT, an unprecedented program that combines all information the SROs could possibly

---

[1] Counsel for *amicus curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amicus curiae* or its counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

harvest—including personal information about millions of Americans—into a centralized database for the SEC's perusal.

The CAT fundamentally overhauls the relationship between the SEC and private market participants. Previously, the SEC had to request specific data from private market participants. This served as a check on the SEC by requiring it to develop good cause *before* accessing sensitive data and to then target only specific time ranges. This cooperative approach also provided regulated parties with notice of potential investigations, and it respected Congress's choice to leave the SROs as the first line of market oversight.

The SEC will now have nearly unlimited information at its fingertips, and this will undoubtedly lead to arbitrary and selective enforcement. Federal securities laws are notoriously broad and circumstantial, and the SEC can bring enforcement actions without having to prove reliance, causation, or sometimes even scienter. With the benefit of hindsight and "big data," the SEC will be able to pin alleged securities violations on almost anyone it chooses—be they unpopular political figures, those who stand in the SEC's way, or just everyday Americans who lack the resources to defend themselves. And to be clear,

the rights of millions of Americans are at stake because the CAT will contain such voluminous information that the SEC could determine the personal, social, and religious beliefs of many individual traders, simply by crunching the data in the CAT. And then the SEC can target them.

The funding for the CAT is also designed to punish an important segment of the market that serves to decentralize power: wholesale broker-dealers, whom the SEC has allowed the stock exchanges to saddle with up to full amount of the CAT's billion-dollar plus price tag. The SEC is targeting wholesalers because they compete with the stock exchanges but are not as easily controlled and utilized by the SEC as a mechanism for social change. By leaving wholesalers to pay for the CAT to the exchanges' benefit, the SEC is concentrating power in the hands of the few entities it can most directly control. This comes at a time when the SEC is venturing far beyond its authority by claiming the power to regulate everything from climate change to racial quotas. There has never been a time when the SEC's actions and intentions should be viewed more skeptically than now.

The Court should vacate the SEC's order. *See* 88 Fed. Reg. 62628 (Sept. 12, 2023) ("Order").

# ARGUMENT

## I. THE CAT REPRESENTS AN UNPRECEDENTED EXPANSION OF THE SEC'S SURVEILLANCE CAPABILITIES—AND IT INVITES ABUSE.

Nothing like the CAT has ever existed outside of the intelligence community—anywhere in the world. In a dramatic understatement, the SEC claimed the CAT will be another "tool" for the SEC to use in investigating securities law violations, *Consolidated Audit Trail*, 75 Fed. Reg. 32556, 32570 (June 8, 2010), but the CAT's "revolutionary capabilities" reveal it to be a true paradigm shift, Letter from Dennis Kelleher, President & CEO, Better Mkts., to Vanessa Countryman 8 (Oct. 28, 2019), http://tinyurl.com/mrxjum8z.

The SEC's unprecedented direct access to granular personal trading information via the CAT will effect a sea change in the SEC's longstanding enforcement approach, which effectively required the SEC to develop at least minimal good cause *before* it could obtain reams of trading data. The CAT invites federal investigations based on idle curiosities and improper purposes.

**A. The Pre-CAT Audit System Encouraged the SEC to Develop Good Cause Before Launching Investigations and to Work Collaboratively with Private Market Participants.**

For its entire history prior to developing the CAT, the SEC used a fundamentally different enforcement approach. The SEC was required to obtain information from private market participants to conduct detailed investigations, meaning the SEC had to develop credible theories of misconduct, as well as the relevant timelines, *before* launching full-scale investigations.

This made sense given that Congress expected SROs—not the SEC—to serve as the first line of market oversight. Well before the federal securities laws were enacted, the NYSE and other exchanges conducted self-oversight and enforced internal anti-fraud rules. *See* Paul G. Mahoney, *The Exchange As Regulator*, 83 Va. L. Rev. 1453, 1459–62 (1997). To aid the SROs in their internal governance, resolution of trade disputes, and (after the enactment of the federal securities laws) law enforcement, the SROs developed "audit trails," i.e., trading records identifying the time, size, and brokers involved in each trade. *See* Joel Hasbrouck et al., *New York Stock Exchange Systems and Trading*

*Procedures* 16 (NYSE Working Paper No. 93-01, 1993), http://tinyurl.com/5entwjx7.

With some exceptions, these audit trails were proprietary to individual SROs, and the SEC lacked "direct access" to audit trail data. *Consolidated Audit Trail*, 77 Fed. Reg. 45722, 45729 (Aug. 1, 2012). At most, the SEC could make data "requests" to the SROs to provide data concerning "narrowly-focused enforcement investigations." 75 Fed. Reg. at 32558, 32566.

The SEC thus had to "know what it wants to investigate before starting it." *Implementation and Cybersecurity Protocols on the Consolidated Audit Trail, Hearing Before the Subcomm. on Capital Mkts., Sec. & Inv. of the H. Comm. on Fin. Servs.*, 115th Cong. (Nov. 30, 2017) (testimony of Tyler Gellasch, Exec. Dir., Healthy Mkts. Ass'n), http://tinyurl.com/bdf7r5kz. As a practical matter, the SEC needed to at least "identify suspicious trading activity" or other conduct suggesting wrongdoing and stake out the relevant timeline for investigation *before* it could ever access sensitive private data. SEC Comm'r Hester Peirce, Statement in Response to Release No. 34-88890; File No. S7-13-19, at n.2 (May 15, 2020), http://tinyurl.com/bdd375nn.

Such requests, known as "blue sheets," were typically how the SEC obtained trading information from private parties. *See Electronic Submission of Securities Transaction Information by Exchange Members, Brokers, and Dealers*, 66 Fed. Reg. 35836, 35836 (July 9, 2001). To be sure, federal law required SROs and other private market participants to comply with these requests. *See* 15 U.S.C. § 78q(a)(1); 17 C.F.R. § 240.17a-25. But market participants could, and sometimes did, request modifications to avoid unnecessary costs and more efficiently satisfy the SEC's inquiries. *See, e.g.*, 66 Fed. Reg. at 35839–40 (discussing the SEC's "flexib[ility]" in tailoring requests for smaller brokers); Letter of Ira Hammerman, Senior VP and Gen. Couns., Sec. Indus. Ass'n, to Katherine Simmons, Chairperson, Intermarket Surveillance Grp. (Feb. 7, 2006), http://tinyurl.com/3spxbucn.

The benefits of this hybrid arrangement were numerous and significant. Most notably, the practical requirement that the SEC develop reasonable suspicion to investigate particular trades *before* obtaining detailed information meant the SEC could not engage in "'arbitrary and discriminatory enforcement'" by first picking their target, then searching

for anything that could be construed as suspicious. *McDonnell v. United States*, 579 U.S. 550, 576 (2016).

Further, the fact that the SEC had to ask private parties to provide information served as a potential check on overbroad requests. Not only could market participants push back against the SEC, as noted above, but the requirement to involve them also provided market participants with at least a modicum of notice and brought much-needed sunlight to the SEC's actions. Blue sheet requests were "considered a precursor to regulatory scrutiny and potential action." Thomas Barrabi, *What Are Blue Sheets? What To Know About The Data SEC Will Seek From Robinhood*, Fox Bus. (Jan. 29, 2021), http://tinyurl.com/2jnjj764.

The continued involvement of SROs also preserved the historic role of the SROs in self-regulation—a role that Congress itself preserved when it left the SROs as the first line of market oversight and relegated the SEC to "appropriate supervision" of SROs. *Concept Release Concerning Self-Regulation*, 69 Fed. Reg. 71256, 71257 (Dec. 8, 2004) (quoting S. Rep. No. 75-1455, at 4 (1938)). Leaving market surveillance primarily with the SROs reflected the reality that "the types and format of data required [for oversight] may vary by the particular market[]" and

allowed SROs to "maintain their own audit [trails] with the specific content conducive to their internal surveillance systems." Letter from Jeffrey T. Brown, Cincinnati Stock Exch., to Jonathan G. Katz (June 19, 2003), http://tinyurl.com/yeymjhz3.

The SEC failed to consider these advantages of the blue sheet system. Simply improving the existing system would have made the SEC's "investigations more efficient without sacrificing Americans' liberty and privacy." Peirce, Statement in Response to Release No. 34-88890, *supra*. The SEC's wholesale rejection of that system merely because it seemed "outdated," 77 Fed. Reg. at 45723, calls to mind the principle of Chesterton's Fence: getting rid of something without understanding why it was built in the first place. G.K. Chesterton, The Thing 29 (1929).

**B. By Providing Nearly Infinite Data About Traders, Without Any Procedural Obstacles, the CAT Portends Extraordinary Abuse by Government Actors.**

The CAT gives the SEC automatic, direct access to all SRO audit trail information, expands the universe of information that must be included, and compiles it all in a "central repository." 75 Fed. Reg. at 32595. That gives the SEC direct access to far more information—with

*no* procedural hurdles to obtain it—than it could ever possibly access via blue sheet requests.

Without the need to identify specific conduct and timelines in advance, the SEC's thousands of investigators can simply wade into the CAT, target particular individuals, and see what they can reverse engineer into plausible securities violations.

Concerns about arbitrary investigations and enforcement are uniquely heightened in the field of securities, the rules for which are famously "broad," *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 151 (1972), and thicketed with circumstances where trading at the wrong place or wrong time could create an appearance of illegal behavior. The scope of these rules is so wide, and required elements so subjective, that securities experts often state—with little exaggeration— that "everything is securities fraud." Matt Levine, Opinion, *Everything Everywhere Is Securities Fraud*, Bloomberg (June 26, 2019), http://tinyurl.com/3jub85sh.

Making it even worse, if that were possible, is that SEC enforcement actions do not have to prove the typically fact-intensive elements of fraud, like reliance, loss causation, or even sometimes

scienter. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019); *SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012); *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 460 (5th Cir. 2022). In short, give the SEC enough time and data, and it can pin an allegation of illegal securities activity on almost anyone who trades stocks, without meaningful practical or legal barriers. The SEC can wield its tools of the regulatory *carnifex*—censures, suspensions, gag orders—to "make you explain your actions, potentially at great expense to you, even if you know you did nothing wrong." Hester Peirce, *The CAT is a Dangerous Dog*, RealClearPolicy (Oct. 9, 2019), http://tinyurl.com/yz5sbs4m. The CAT lets the SEC put into practice the old Russian saying, "Give me the man, and I will find the crime."

As discussed above, the blue sheet system prevented this sort of runaway and arbitrary government activity, but the CAT will prove too great a temptation for the SEC. With direct access to the CAT, the SEC "need not even know in advance whether they want to follow a particular individual, or when." *Carpenter v. United States*, 585 U.S. 296, 312 (2018).

Further, by excising private market participants from the SEC's process for obtaining specific data, there is no longer a private party

involved to hold the SEC accountable or expose its actions to sunlight. Market oversight is supposed to be a paragon of "'cooperative regulation.'" 69 Fed. Reg. at 71257–58. With the CAT, the SEC has removed private parties from an essential part of the equation. The earlier blue sheet system was a natural fit for this private-public design. As even the SEC described, its previous system was "designed for use in narrowly-focused enforcement investigations," 75 Fed. Reg. at 32558, and SROs had data from their own members but not the data of other SROs, *id.* at 32567. But now the SEC can operate independently, in the shadows.

The CAT is ripe for extraordinary abuse not only in the volume of information available to the SEC without procedural hurdle, but also in the types of information it contains. Pets.Br.17–18. For the first time, the SEC and the SROs will have access to universal data that includes not only broker data but the underlying beneficial owner behind the trades, including their personally identifiable information: names, addresses, years of birth, and more. *Id.* The CAT links up this personal information with every market interaction they've had, every trade or even attempted trade, on any of the national markets, *ever.*

That is a potent combination. Linking personal information with trading data can reveal a host of information about one's personal life and beliefs, including views on "carbon emissions, dictatorial regimes, alcohol, tobacco, guns, pornography, discrimination, poor treatment of workers, abortion … or any other of the many things about which people have strong feelings." Peirce, Statement in Response to Release No. 34-88890, *supra*. A person's moral views can be reflected in their choices to boycott certain companies while investing in others. *Id.* Trading history can even reveal personal financial vulnerabilities. CAT's comprehensive data will provide regulators "a window into a person's deepest thoughts and core values." *Id.* Now the SEC can identify those people without the least hindrance.

Controversial figures—some of whom are already the repeated targets of SEC investigations—will no doubt find innocent trades scrutinized for litigation advantage. *See, e.g.*, Drew Harwell, *The Wild Probe Into Investors of DWAC, Trump Media's Proposed Merger Ally*, Wash. Post (Feb. 3, 2024), http://tinyurl.com/yhzhesk6; Dave Michaels, *SEC Probes Trading by Elon Musk and Brother in Wake of Tesla CEO's Sales*, Wall St. J. (Feb. 24, 2022), http://tinyurl.com/34ekzhau; Jana J.

Pruet, *Billionaire Mark Cuban Cleared of Insider Trading; Blasts U.S. Government*, Reuters (Oct. 16, 2013), http://tinyurl.com/25z7dxmc.

The disfiguring effects that unlimited access to this palantir will have on the SEC's oversight are potentially enormous. The line between law enforcement and policy curiosity is a thin one that is highly exploitable by enterprising bureaucrats. That dangerous curiosity should kill the CAT.

### C.  Do Not Believe the SEC's Innocent Justifications.

For what benefit has this Leviathan been unleashed? The SEC innocently claims it can now engage in interesting thought projects like "large-scale market reconstructions." 75 Fed. Reg. at 32558. Indeed, the SEC instituted creation of the CAT after the Flash Crash in 2010, which the SEC and others stated "highlighted the challenges regulators faced [in] having to combine many disparate sources of data" to surveil market events. SEC Comm'r Caroline A. Crenshaw, Statement Regarding the Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail (Sept. 6, 2023), http://tinyurl.com/mb5ss892; *see also* Hester Peirce, *Meeting Market Structure Challenges Where They Are*, 43 J. Corp. Law 336, 336 (2018)

("Tales of high speed, algorithmic duels, and dark pools nudge many well-intentioned observers to reach for the government rulebook.").

There are several fundamental problems with the SEC's innocent framing, however. *First*, the CAT is a Trojan Horse. Regardless of the impetus for creating the CAT in the first instance, it will be abused in all the ways, and for all the reasons, given above. Securities laws authorize accessing data for law enforcement—and there is no reason to believe the SEC will not use it for that purpose.

The SEC will also abuse the CAT in how it effects policy changes. In fact, the SEC is already using the CAT to support wildly novel and extralegal equity-market rulemakings. *See* Part II.B, *infra*; SEC Comm'r Caroline A. Crenshaw, Statement on Proposals Related to Equity Market Structure (Dec. 14, 2022), http://tinyurl.com/y7y689hd. That is not using the data to support an investigation, or even to reconstruct a single market event. The SEC is wielding the CAT as a cudgel to reshape the market and create competitive advantages against disfavored industries. *See* Part II.C, *infra*.

*Second*, the SEC is simply wrong that it somehow "needs" the CAT to carry out its actual law enforcement obligations. Far narrower

alternatives abound. *See, e.g.*, Peirce, Response to Release No. 34-88890, *supra*, at n.2; 77 Fed. Reg. at 45739–40. The SEC claimed the lack of blue sheet data for "specific customers or beneficial owners" was a problem, but the SEC did not justify why the solution was to entirely eliminate private-party requests from the process. 75 Fed. Reg. at 32566. The SEC provided only the conclusory reasoning that "having this information readily available in a central location would reduce the need for staff to request and collect such information from multiple broker-dealers." *Id*. But again, that forced cooperation is a feature of the system, not a bug. *See* 15 U.S.C. § 78q(a)(1).

The coded language of the CAT's supporters reveal that they chafed under the supposedly "inefficient" blue sheet system, 75 Fed. Reg. at 32563, precisely *because* it prevents the SEC from being an all-seeing eye, with a roving commission to stamp out—or, just as likely, conjure up—securities laws violations. Because the procedural protections of the blue sheet system necessarily "place[d] obstacles in the way of a too permeating [regulator] surveillance," *United States v. Di Re*, 332 U.S. 581, 595 (1948), the SEC decided they must be eliminated entirely.

\* \* \*

The CAT's treasure trove contains so much interesting information, available with so few (really, nonexistent) procedural protections, that it will inevitably be used to target disfavored individuals and political positions. Combine this irresistible temptation with the SEC's broad discretion in enforcement actions, and there is not just a high risk of abuse but of catastrophic consequences when that abuse inevitably occurs.

## II. THE EXCHANGE ACT DOES NOT AUTHORIZE THE SEC'S SCHEME TO DISFAVOR WHOLESALE BROKER-DEALERS, WHICH HAVE HELPED DEMOCRATIZE THE MARKETS.

The Order would allow the exchanges to make broker-dealers pay for 100% of the CAT's costs. As Petitioners describe, that is undoubtedly an inequitable allocation. Pets.Br.33. But the Order's failure to even attempt to equitably allocate funding actually points to another problem: saddling brokers with potentially billions in costs is not an unintended consequence but rather an intentional policy decision to diminish the innovative "wholesaler" broker-dealers that have introduced millions of retail investors to the market. In the language of the Exchange Act, that means the Order is unlawful because it burdens competition and advances ends unrelated to the purposes of the Act itself.

## A. Innovative Wholesale Broker-Dealers Create Immense Value and Facilitate Trading for Millions of Retail and Other Investors.

In recent years, the broker-dealer industry has made breakthrough innovations in lowering costs for investors. These innovations have increased competition with a subset of SROs: the stock exchanges, as reflected by the seventeen exchanges participating as intervenors in this action in support of the SEC.

Nearly all stock trading happens in one of two places: on a stock exchange, or off-exchange between broker-dealers. Order flow on the exchanges is dominated by institutional players like mutual funds, pensions, and hedge funds. Institutional funds that move large amounts of stock tend to trade on stock exchanges, which are sufficiently "liquid"— that is, they have enough willing buyers and sellers—to fill their orders. Those buyers and sellers are mainly comprised of "market maker" broker-dealers who execute trades on behalf of clients or on their own accounts for resale to clients.

Historically, most trades were made on stock exchanges. Before the 2000s, about 90% of trades in NYSE-listed stocks occurred on the NYSE itself, and 100% of the equivalent trades on Nasdaq. Katie Kolchin et al.,

SIFMA Insights, US Equity Market Structure Primer 12 (July 2018), http://tinyurl.com/53u68jje. Under this system, individuals who wanted to buy a stock placed an order through a broker, who would seek to fill the order on an exchange, often by taking the other side of an institutional trader, whether directly, or indirectly by buying it from a market maker.

In several ways, this system disadvantaged smaller investors—individuals, families, mom-and-pop businesses, and others, who together comprise the over 43 million households who hold their own investment accounts, often referred to as "retail" investors. *See* SEC Chairman Jay Clayton, Address at Temple Univ.: The Evolving Market for Retail Investment Services and Forward-Looking Regulation (May 2, 2018), http://tinyurl.com/y94ma69p. For one, it made individual trades more expensive because trading on the exchanges required paying exchange fees. More significantly, it delivered retail investors poorer prices and higher brokerage costs because transacting with larger institutions is more likely to be accompanied by adverse price effects. Consider two illustrative examples. A sophisticated hedge fund may be selling a stock because it has research suggesting the stock's price will decline. Or the

sheer volume of a pension fund selling a chunk of stock may depress prices, i.e., "move the market." When trading on the exchanges, retail investors were exposed to these asymmetric price risks, called "adverse selection." *See* Letter from Douglas Cifu, CEO, Virtu Fin., to Vanessa Countryman, Ex.A at 9 (Mar. 30, 2023), http://tinyurl.com/3nesxtd7.

Wholesale broker-dealers innovatively changed this reality by providing an off-exchange outlet for retail investors and their brokers. Wholesalers "internalize" trades by executing incoming retail orders *against other retail orders*, avoiding the exchange and institutional traders entirely. By executing trades *among* retail investors, wholesalers provide retail investors a better deal by avoiding the costs of both exchange fees and adverse selection—and passing along the savings. Retail brokers, which have a duty to seek the best execution available for their clients, have responded by sending their customers to wholesalers in droves.

With this fundamental market insight, wholesalers and retail-facing brokers symbiotically developed the technology and infrastructure to build retail investor markets. The fruits were lower barriers to retail investing and zero-commission trading practices, which have since

become industry standard practices. *See, e.g.*, Charles Schwab, White Paper, U.S. Equity Market Structure: Order Routing Practices, Considerations, and Opportunities 8 (2022), http://tinyurl.com/5n6s8ruv.

These innovations have brought immense benefits to retail investors and equity markets as a whole. Wholesalers have provided over $3.6 billion annually in price improvement—i.e., better than exchange-quoted prices—to retail investors. Katie Kolchin, SIFMA Insights, US Equity Market Structure Analysis: Analyzing the Meaning Behind the Level of Off-Exchange Trading Part II, at 5 (Dec. 2021), http://tinyurl.com/4cck5xvx. And that figure increases to $11 billion annually when including "size improvement," or increases in the amount of shares available to retail investors. *Id.* Charles Schwab estimates that the industry-wide benefit wholesalers deliver will save retail investors over $120 billion over the next decade. Schwab, *supra*, at 15–16.

These breakthrough innovations have produced a "'democratization' of investing and ha[ve] brought the ability to invest in the stock market to millions of Americans." SEC Comm'r Mark T. Uyeda, Statement on Proposed Rule Regarding Order Competition (Dec. 14, 2022), http://tinyurl.com/7d798sb4. And while this innovation is new

today, it is also a return to the norms of stock investing that existed before the "institutionalization" of the market. *See* SEC Gen. Couns. Brian G. Cartwright, Address at Univ. of Pa. Law Sch., Inst. for Law & Econ.: The Future of Securities Regulation (Oct. 24, 2007), http://tinyurl.com/3949v7ny. This return to the "democratized" equity market is what the SEC and the exchanges are ultimately targeting with the Order here.

**B.    The SEC is Waging an Ideologically Motivated Campaign Against Wholesale Broker-Dealers.**

The SEC seeks to punish the wholesalers' innovations because the current leadership of the SEC does not like broker-led democratization, which threatens their ideological vision for securities markets. Current SEC leadership prefers that trading occur on the exchanges, under the close watch of the SEC, the exchanges, and established institutional market participants. Wholesalers threaten this preference by giving investors, especially retail investors, access to the market without these institutional entrapments.

This SEC preference is grounded in an ideological vision of capital markets that sees little room for private intermediation between investors and the state-controlled exchanges. On-exchange trading is

predictable and public, and it generates revenue for and is subject to the control of the powerful institutions that dominate it. In other words, trading on exchanges makes investors' transactions "legible" to the SEC, the exchanges, and institutional investors—and thus potentially subject to their control. *See* James C. Scott, Seeing Like a State 2 (1998).

Off-exchange trading takes place outside the control of these institutions—or, as the current SEC chairman put it, "hidden from view." SEC Chairman Gary Gensler, Remarks Before the Piper Sandler Glob. Exch. Conf.: Market Structure and the Retail Investor (June 8, 2022), http://tinyurl.com/yw2hm29u. Off-exchange trading allows investors to achieve their investing goals without relying on the reporting, fees, and asymmetric information vis-à-vis institutional traders that comes with going onto the exchanges.

Simply put, if investors have to rely on the exchanges for their livelihoods, the exchanges (and the SEC) will have greater power over them. Having greater options for off-exchange trading threatens that.

Keeping trading on the exchanges is important to the SEC because the exchanges are vectors of the SEC's control over the markets. If investors must go to the exchanges, then they have to invest in companies

that abide by the exchanges' rules, which increasingly reflect political activists' social priorities. *See, e.g.*, *Enhancing Transparency on Diversity*, Nasdaq, http://tinyurl.com/5n83kmzm (last visited Feb. 5, 2024); *Best Practices for Sustainability Reporting*, NYSE, http://tinyurl.com/8pc8nxdy (last visited Feb. 5, 2024). The exchanges are powerful tools for controlling public policy because they are granted quasi monopolies and immunity from damages. *See, e.g., Standard Inv. Chartered, Inc. v. NASD, Inc.*, 637 F.3d 112, 115–16 (2d Cir. 2011).

As explained above, wholesalers frustrate this ideological vision by providing a value-compelling alternative to trading on the exchanges. Wholesalers' innovations strike at the heart of the idea of the universal, "legible," and controllable capital market because they segregate retail investors from the rest of the market. Thus liberated to trade among equals (as was the case in the pre-institutionalized equity market), retail investors no longer subsidize institutional investors' trading strategies. Instead, they enjoy the benefits of price improvement.

These clear economic advantages, in turn, enable greater retail investor participation in the market. And therein lies the real threat to the legible capital market. Retail investors derail attempts at control

because they do not behave in accordance with the social and financial goals of mainstream institutional investors.

Retail investors' investment choices and ideological commitments are—like the rest of the country—far more diverse than the rigid orthodoxies that dominate the SEC and institutional funds today. Retail investors have defied both politicians and mainstream financial institutions to bolster the fortunes of consumer-favorite companies. *See* Jill E. Fisch, *GameStop and the Reemergence of the Retail Investor*, 102 B.U. L. Rev. 1799, 1802, 1808–16 (2022). Retail investors "are less concerned with pushing [company] management to better its ESG performance" than large asset managers and institutional funds, leading to a "deterioration in ESG scores" at firms they invest in. Dhruv Aggarwal et al., *Retail Investors and Corporate Governance: Evidence from Zero-Commission Trading* 3 (Eur. Corp. Governance Inst., Working Paper No. 957/2024, Feb. 2024). Retail investors have the potential to re-shape corporate governance.

In this respect, the divide between the SEC's favored institutionalized capital market and one that puts retail investors on even footing is over *who* should dictate the terms of companies' access to

capital. That is ultimately why it poses a threat to the current SEC's social-policy goals.

As noted above, the CAT provides the SEC with foray to implement its preferred social and market policies—and the SEC's dislike of the wholesalers is no exception. As one advocate succinctly put it, the retail investor-led events of "GameStop and 'Reddit Rebellion' perhaps best illustrate[] the need for the CAT." Better Mkts., Fact Sheet: What is the Consolidated Audit Trail?, at 1 (Feb. 16, 2021), http://tinyurl.com/j5n6uks5. "If the regulators had access to a fully operational CAT, they would be able to monitor the trading of these 'meme' stocks," and the wholesalers that facilitate it, "much more quickly and effectively." *Id*. In their view, wholesaler-facilitated trading itself threatens "confidence" in the market. *Id*.

Thus, as described below, the CAT funding's design reveals that the Order is motivated by the SEC's "ill-informed visceral dislike for wholesale broker-dealers." Letter from Stephen John Berger, Citadel Sec., to Vanessa Countryman 3 (Mar. 31, 2023), http://tinyurl.com/4k92rwaw. But the SEC's CAT Order is just the most recently opened front in the SEC's war against wholesalers. The SEC is simultaneously

considering a massive re-write of the rules governing the structure of the equity markets. *See Order Competition Rule*, 88 Fed. Reg. 128 (Jan. 3, 2023); *Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders*, 87 Fed. Reg. 80266 (Dec. 29, 2022); *Regulation Best Execution*, 88 Fed. Reg. 5440 (Jan. 27, 2023).

In short, the SEC is engaged in "a targeted effort" to "shift the competitive playing field decisively in favor of exchanges." Letter from Stephen John Berger, *supra*, at 3. And the CAT Order is a significant part of that ill-conceived—and illegal—effort.

## C. The Order is Designed to Punish Wholesale Broker-Dealers.

In addition to requiring the equitable allocation of fees, the Exchange Act requires that rule changes not regulate "matters not related to the purposes of [the Exchange Act]," 15 U.S.C. § 78f(b)(5), or "impose any burden on competition not necessary or appropriate in furtherance of the purposes of [the Exchange Act]," *id.* § 78f(b)(8). By singling out wholesalers based on the SEC's merits-based vision for equity markets, the Order both intends a purpose not authorized by the Exchange Act and imposes a burden on competition for that purpose—and therefore is illegal.

The SEC used to agree that "Congress did not intend that the Commission dictate the ultimate configuration of the national market system or, through regulatory fiat, force all trading into a particular mold." *Development of a National Market System*, 44 Fed. Reg. 20360, 20360 (Apr. 4, 1979). That is because Congress has forbidden the SEC from engaging in the merits regulation of the securities markets. *See* 15 U.S.C. § 78k-1(a)(1)(C)(ii), (a)(2), (c)(1)(F) (requiring the SEC to "assure ... fair competition ... between exchange markets and markets other than exchange markets" and "assure equal regulation of all markets for qualified securities" in exercising its authority to "facilitate the establishment of a national market system for securities"). Those express statutory objectives "necessarily constrain[]" the SEC's regulatory authority. *Bus. Roundtable v. SEC*, 905 F.2d 406, 416 (D.C. Cir. 1990).

But the Order exceeds those statutory limits. Acting on its anti-wholesaler animus, the SEC allowed the exchanges to impose 100% of the CAT's costs on broker-dealers and impressed wholesalers into service as tax collectors, all to punish their business models. The Order's sponsoring exchanges barely hid their goal of saddling their wholesaler competitors with costs. From the outset, it was "clear that the large

exchange groups are dictating the CAT funding model decisions," Letter from Ellen Greene & Joseph Corcoran, SIFMA, to Vanessa Countryman 6 n.11 (May 2, 2022) http://tinyurl.com/w4397thk, and had "unilaterally decided that not a single dollar" of their current fee revenues should be allocated to funding the CAT, Letter from Thomas Merritt, Virtu Fin., to Vanessa Countryman 3 (May 12, 2021), http://tinyurl.com/bdp8ycfm.

The exchanges even blamed the skyrocketing costs of the CAT— over which they have design and control—on wholesalers, arguing that "the complexity and diversity of Industry Members' chosen business models"—i.e., providing investors with off-exchange options— "contributes substantially to CAT costs." 88 Fed. Reg. at 62681. Rather than reconsider CAT's design or funding to preserve the benefits wholesalers have introduced, the exchanges suggested their own *lack* of innovation as a reason to pass the buck. *Id.* ("In contrast, exchange features are not nearly as diverse.").

Under the Order's exchange-designed plan, broker-dealers can be put on the hook for over a billion dollars in expenses through 2024, and potentially more in the future. Pets.Br.21. Each aspect of this scheme—

from its staggering amount to how it's collected and calculated—is specifically targeted at wholesalers' business models.

*First*, the exchanges are permitted to leave broker-dealers with CAT's massive bill, even though broker-dealers have no role in CAT's governance, oversight, or design, and receive no benefit from its operation. As SIFMA explained, the broker-dealers that must fund the CAT have not even been permitted to obtain or review the CAT data that the SEC is using to support its other rulemakings designed to diminish their market share. *See* Letter from Ellen Greene & Joseph Corcoran, SIFMA, to Vanessa Countryman 3 (June 5, 2023), http://tinyurl.com/4mkkz2yf. The CAT will generate revenue for the SEC and the exchanges via fees and fines, but the Order conspicuously did not allow those revenues to be used to defray the costs of operating the CAT itself. The SEC and the exchanges all but spell out their intention to build the CAT and make brokers-dealers pay for it.

That one-sided outcome is the point. The SEC's other equity market structure proposals, Part II.B, *supra*, aim to direct billions in retail order flow away from wholesalers and to the exchanges. One commenter estimates that exchanges would earn over $2 billion more in trading fees

as a result. Letter from Stephen John Berger (Mar. 31, 2023), *supra*, at 30.

*Second*, the Order places the onus of collecting broker-dealers' CAT transaction taxes on the "Executing Broker," or the broker that executes trades first brought to the market by an introducing broker. 88 Fed. Reg. at 62646. In other words: it must often be collected by wholesalers, who execute retail orders first brought to the market by retail-facing brokers. *See* Letter from Douglas Cifu, CEO, Virtu Fin., to Vanessa Countryman 5 (July 13, 2023), http://tinyurl.com/2xntxat5. The Order makes executing brokers like wholesalers pay the fee and then recover the requisite costs from other market participants. But the Order fails to adequately explain how they can be expected to cover the costs of performing this administrative function for everyone else. Impressing wholesalers into service as tax collectors is especially unreasonable because they often do not originate trades, so they will have to track down frequently long and complex chains of origination to identify the responsible parties. *Id*.

The Order also failed to address that a sizable portion of CAT taxes "cannot be passed through" to investors. 88 Fed. Reg. at 62685 n.1140.

Many broker-dealers will be allocated CAT taxes based on their *proprietary* trading activity, which is not passed down to investors. As industry commenters observed, this administrative morass means it is highly likely that large wholesalers will end up having to absorb the taxes themselves. *See* Letter from Ellen Greene & Joseph Corcoran (May 2, 2022), *supra*, at 5. Large firms might be able to afford those costs, but many small firms will not. The end result will be fewer executions and depressed competition in the wholesale market.

*Third*, the method by which CAT taxes are calculated punishes wholesalers' business models. The Order allocates the taxes based on executed share trading volume, 88 Fed. Reg. at 62639–40, disproportionately burdening wholesalers, who often transact in smaller-dollar but higher-volume retail orders. The Order made this the basis despite the fact that trading volume creates "a relatively low burden on CAT, from a cost-generation perspective, compared to other cost drivers, such as options activity." Letter from Marcia Asquith, FINRA, to Vanessa Countryman 8 n.23 (Apr. 11, 2023), http://tinyurl.com/2wrxaxtk. Allocating based on volume means these massive costs would be largely allocated to a small group of broker-dealers that deal in high-volume

retail order flow, thereby burdening competition. *See* SEC Release No. 34-97151; File No. 4-698, *Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail* 108 n.116 (Mar. 15, 2023) (estimating that the top 10 brokers-dealer bear more than 50% of CAT costs).

As a basis for funding the CAT, trading volume just does not line up. As experts noted, a "100-share transaction in a $2 stock would impose the same fee obligation as a 100-share transaction in a $2,000 stock, despite the 1,000-fold difference in principal value and associated risk transferred." Letter from Larry Harris, Fred V. Keenan Chair in Fin., USC Marshall Sch. of Bus., to Vanessa Countryman 11 (June 21, 2022), http://tinyurl.com/5n7y2tkm. Similarly, the Order makes a fractional share transaction round up to 1 share, 88 Fed. Reg. at 62640–41, in effect overstating wholesalers' trading volume, much of which is generated by retail orders that are less than one share. *See* Letter from Stephen John Berger, Citadel Sec., to Vanessa Countryman 20 (July 14, 2023), http://tinyurl.com/yxmya4ea (estimating approximately 33% of total relevant retail stock trading activity is now in sub-dollar increments).

The Order's volume basis makes no sense other than to unduly burden wholesalers.

Finally, the SEC failed to consider how its other pending rulemakings on equity market structure, which are also designed to punish wholesalers' business models, affect the equitable and reasonable allocation of CAT costs under the Order. *See* Letter from Ellen Greene & Joseph Corcoran (June 5, 2023), *supra*, at 3. If, as those rulemakings apparently intend, exchanges will take wholesalers' retail order flow (and the revenues it generates), then it makes even less sense to allow the exchanges to shift the full costs of the CAT to broker-dealers. That insult to injury is just one more reason why the Order is punitive and unlawful.

* * *

At every step, the SEC used the Order to effect its leadership's policy preference for the stock exchanges, which the SEC can more directly control. The goal is to encourage bigness and uniformity, which can in turn be controlled. Wholesalers represent a threat to the SEC's hegemonic control over the markets. And that is precisely why the Order permits the exchanges to saddle wholesalers with 100% of the costs of the CAT. That is decidedly not a proper purpose under the Exchange Act.

# CONCLUSION

The Court should vacate the Order.

/s/ R. Trent McCotter

William P. Barr
TORRIDON LAW PLLC
1155 F. Street NW
  Suite 750
Washington, DC 20004

Jonathan Berry
R. Trent McCotter
    *Counsel of Record*
Caleb Orr
BOYDEN GRAY PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
tmccotter@boydengray.com

February 15, 2024

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ R. Trent McCotter
R. Trent McCotter
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century Schoolbook, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This brief complies with the type-volume limitation of Rule 29(a)(5) because it contains 6464 words, excluding the parts exempted under Rule 32(f).

/s/ R. Trent McCotter
R. Trent McCotter
*Counsel for Amicus Curiae*