**No. 23-13396**

# In the
# United States Court of Appeals
## for the Eleventh Circuit

AMERICAN SECURITIES ASSOCIATION, CITADEL SECURITIES, LLC,

*Petitioners,*

versus

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ, MRX, LLC, et al.,

*Intervenors.*

Petition for Review of an Order of the Securities and Exchange Commission
Release No. 34-98290; File No. 4-698

## *AMICUS CURIAE* BRIEF OF FUTURES INDUSTRY ASSOCIATION IN SUPPORT OF PETITIONERS

NEAL KUMAR
BRIAN J. BALTZ
ARIEL BLASK
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, DC 20006
(202) 303-1000

*Counsel for Amicus Curiae*



COUNSEL PRESS · (866) 703-9373

PRINTED ON RECYCLED PAPER



*American Securities Association, et al. v. U.S. Securities and Exchange Commission*
*Case No. 23-13396*

## Certificate of Interested Persons
## And Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certifies that no parent corporation and no publicly held corporation has a 10% or greater ownership interest in the Futures Industry Association.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned certifies that, in addition to the persons listed in the certificate of interested persons filed by the parties, the following persons are known to have an interest in the outcome of this case:

Futures Industry Association (Amicus curiae)

Neal Kumar (Counsel for Amicus curiae)

Brian J. Baltz (Counsel for Amicus curiae)

Ariel Blask (Counsel for Amicus curiae)

By:    */s/ Neal Kumar*
Neal Kumar

Dated:  February 15, 2024

C1 of C1

## Table of Contents

**Table of Authorities** ................................................................. ii

**Statement of Interest of Amicus Curiae** ................................... 1

**Statement of the Issues** ............................................................ 4

**Statement of the Case** .............................................................. 5

      A.     Background on CAT NMS Plan and the SEC's Order ......................... 7

**Summary of Argument** ............................................................ 14

**Argument** ................................................................................ 16

      A.     This Court must vacate the Order because the Order violates the Major Questions Doctrine. ................................................... 16

      B.     This Court must vacate the Order because the SEC lacks requisite authority under the Exchange Act. ...................................... 20

      C.     This Court must vacate the Order because the Order is arbitrary and capricious. ................................................................. 22

            1.     The SEC acted arbitrarily and capriciously by failing to conduct reasonable economic analysis in light of the ballooning costs of CAT. ....................................... 24

            2.     The SEC acted arbitrarily and capriciously by brushing aside concerns related to misaligned incentives. ..................... 27

**Conclusion** .............................................................................. 29

## Table of Authorities

**Page(s)**

**Cases**

*Bidi Vapor LLC v. U.S. Food & Drug Admin.*,
  47 F.4th 1191 (11th Cir. 2022) ......................................................23, 26

*Chamber of Commerce of U.S. v. SEC*,
  412 F.3d 133 (D.C. Cir. 2005)........................................................13, 25

*Graham Cnty. Soil & Water Conservation Dist. v. U.S.*,
  559 U.S. 280 (2010).............................................................................21

*Michigan v. Env't Prot. Agency*,
  576 U.S. 743 (2015)..........................................................15, 20, 25, 26

*Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto.
  Ins. Co.*,
  463 U.S. 29 (1983).......................................................................... 22-23

*NetCoalition v. S.E.C.*,
  615 F.3d 525 (D.C. Cir. 2010)........................................................21, 26

*New York Stock Exch. LLC v. Sec. & Exch. Comm'n*,
  962 F.3d 541 (D.C. Cir. 2020)........................................................20, 22

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004).............................................................13

*W. Virginia v. Env't Prot. Agency*,
  597 U.S.---, 142 S. Ct. 2587 (2022)................................16, 17, 18, 19

**Statutes**

5 U.S.C. § 706(2)(A)..............................................................................22

5 U.S.C. § 706(2)(A), (C) ......................................................................14

15 U.S.C. § 78c(f) ..................................................................................12

15 U.S.C. § 78(f)(b) ...............................................................................21

15 U.S.C. § 78(f)(b)(4)..................................................................................18, 21

15 U.S.C. § 78(f)(b)(5)........................................................................................19

15 U.S.C. § 78k-1(2)......................................................................................14, 17

15 U.S.C. § 78k-1(3)(B) .....................................................................................17

15 U.S.C. § 78s(b)(1), (2) ...................................................................................11

15 U.S.C. § 78s(b)(3)(A) .....................................................................................11

15 U.S.C. § 78s(b)(3)(C).....................................................................................11

**Other Authorities**

17 C.F.R. § 242.613 .............................................................................................5

17 C.F.R. § 242.608 ...........................................................................................12

17 C.F.R. § 242.608(a)(4)(D) .............................................................................18

17 C.F.R. § 242.608(b) .......................................................................................26

81 F.R. 30814........................................................................................................7

81 F.R. 30873........................................................................................................8

81 F.R. 84696................................................................................................12, 16

81 F.R. 84710......................................................................................................18

81 F.R. 30614, Available at
    https://catnmsplan.com/sites/default/files/2020-
    02/cat_nms_plan_020816.pdf.........................................................................8

81 F.R. 84801........................................................................................................5

Order Approving an Amendment to the National Market System Plan
    Governing the Consolidated Audit Trail, Securities Exchange Act,
    Release No. 98290, 88 Fed. Reg. 62628 (Sept. 12, 2023)..................................2

# **Statement of Interest of Amicus Curiae**[1]

Amicus curiae, the Futures Industry Association ("FIA"), is the leading global trade organization for the futures, options and centrally cleared derivatives markets, with offices in Brussels, London, Singapore and Washington, D.C. FIA's membership includes clearing firms, exchanges, clearinghouses, trading firms and commodities specialists from more than 48 countries, as well as technology vendors, lawyers and other professionals serving the industry.

FIA Principal Traders Group ("FIA PTG") is an association of firms, many of whom are broker-dealers, that trade their own capital on exchanges and over the counter in futures, options, and equities markets worldwide. FIA PTG members engage in manual, automated and hybrid methods of trading, and they are active in a wide variety of asset classes, including equities, fixed income, foreign exchange and commodities. FIA PTG member firms serve as a critical source of liquidity, allowing those who use the markets, including individual investors, to manage their risks and invest effectively. The presence of competitive professional traders contributing to price discovery and the provision of liquidity is a hallmark of well-

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus represents that: (i) no party's counsel authored this brief in whole or in part); (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person—other than the amicus, their members, or their counsel—contributed money that was intended to fund preparation or submission of this brief. Not all parties consented to this filing.

functioning markets.  FIA PTG advocates for open access to markets, transparency and data-driven policy.

In this case, FIA PTG is concerned that the Securities and Exchange Commission ("SEC," or "Commission") failed to satisfy several requirements under the Securities Exchange Act of 1934 ("Exchange Act") in approving the funding model ("Executed Share Model") for the consolidated audit trail ("CAT") and the fee schedule for Participant CAT Fees to be charged in accordance with the Executed Share Model ("Proposed Participant Fee Schedule").

As professional traders that trade their own capital, FIA PTG member firms will be uniquely impacted by the SEC's approval of the Executed Share Model and Proposed Participant Fee Schedule for the CAT (the "Order").[2]  The Order contemplates that the cost of developing, implementing, and maintaining the CAT will be passed through to broker-dealers, which the SEC expects in many cases will pass on these costs to their customers.  *See* 88 F.R. 62682.  FIA PTG members are broker-dealers trading their own capital, not that of customers.  Accordingly, FIA PTG members will be directly impacted by the Executed Share Model and Proposed Participant Fee Schedule and forced to bear a significant and outsized portion of the costs of CAT.  FIA PTG members do not have input into setting the CAT's budget

---

[2]  Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Securities Exchange Act Release No. 98290, 88 Fed. Reg. 62628 (Sept. 12, 2023).

2

or a meaningful basis to request a revision to the mandated costs. The Order allows the self-regulatory organizations ("SROs"), which includes national securities exchanges[3] and one national securities association,[4] to set CAT's budget and pass on those costs with minimal SEC oversight, is therefore especially harmful to FIA PTG members. Moreover, as FIA PTG members will have to absorb their allocated portion of these unconstrained costs, they will have to adjust their trading activity, which will negatively impact overall market liquidity and efficiency. Yet the SEC brushed aside these concerns when considering the economic effects of the Order.

---

[3]  There are currently 24 national securities exchanges for equities and options trading.

[4]  There is currently only 1 national securities association, the Financial Industry Regulatory Authority ("FINRA").

3

# **Statement of the Issues**

1. Whether the Order should be set aside because the CAT and the Order exceed the Commission's statutory authority.

2. Whether the Order should be set aside because its allocation of CAT costs violates the Exchange Act and the APA.

3. Whether the Order should be set aside because its economic analysis violates the APA.

# Statement of the Case

The SEC adopted Rule 613 under the Exchange Act in August 2012 to "create a comprehensive consolidated audit trail that would allow regulators to *efficiently* and accurately track all activity throughout the U.S. markets in National Market System ("NMS") securities."[5]  *See* 17 C.F.R. § 242.613 (emphasis added).[6]  Rule 613 directed the SROs, also referred to as "Participants," to develop a NMS plan to govern the creation, implementation, and maintenance of the CAT.  Then, in 2016, the SEC approved the CAT NMS Plan, as proposed by the SROs.  *See* 81 F.R. 84696.  The CAT NMS Plan set forth the details of the CAT's functioning and operation, but left funding and the allocation of the costs of the CAT undetermined.

When the SEC first approved the CAT NMS plan in November 2016, the SEC's economic analysis estimated that the CAT would cost $36.5 million to $55 million annually.  81 F.R. 84801.  The implementation of the CAT has proven the SEC's estimates to be highly inaccurate.  As of November 2023, the annual operating budget for CAT LLC was nearly $200 million, or almost four times more than the annual cost estimated by the SEC.  Similarly, while the SEC initially

---

[5]   SEC Division of Trading and Markets, Rule 613 (Consolidated Audit Trail), https://www.sec.gov/divisions/marketreg/rule613-info#:~:text=The%20 Commission%20adopted%20Rule%20613,Market%20System%20(NMS)%20secu rities (last modified Nov. 14, 2023).

[6]   All internal citations or quotations are omitted unless otherwise noted.

estimated that the CAT would cost $37.5 million to build, those costs are now approaching $1 billion.

In September 2023, the SEC's Order approved the Proposed Participant Fee Schedule for the CAT. Despite the massive cost overruns, the Order now allows the CAT Participants to recoup those costs and also establish an annual budget, the costs of which the SEC expects will ultimately be borne by broker-dealers. 88 F.R. 62638. Moreover, the Order provides that the CAT budget will be set each year with no opportunity for meaningful participation from broker-dealers or other securities market participants—and without any requirement that the SEC approve the budget. In addition, because Participants' proposed rule changes to establish fees will be effective upon filing, absent extraordinary SEC intervention, the proposed rule changes will not undergo meaningful notice and comment or require SEC approval, and might not be subject to judicial review. Lastly, the Order also allows the Participants to impose approximately $1 billion in historic CAT costs on broker-dealers, also referred to as Industry Members.[7] For purposes of the Order, "Participants" are defined as the SROs, and "Industry Members" are defined as broker-dealers. *See* 88 F.R. 62638.

---

[7] Through 2022, the historical CAT costs were $518 million. 88 F.R. at 62662 n.749. The CAT operating budget for 2023 was nearly $200 million. The total assumes that the 2024 budget will be similar to the 2023 budget, or nearly $200 million, and the 25% reserve allowed is $50 million.

Because market participants will have no say in the CAT's management or budget, the Order creates a dangerous misalignment of incentives that is contrary to the SEC's authority under the Exchange Act and violates the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

## A.    Background on CAT NMS Plan and the SEC's Order

The CAT is an unprecedented tracking system that gives the SEC, the Participants, and potentially other government agencies ready access to confidential customer financial information belonging to millions of investors without any statutory authorization.  The 2016 Order that established the CAT provides that the Participants are to manage the development and implementation of the CAT through a limited liability company, known as CAT LLC.  *See* 81 F.R. 30814.

The CAT LLC's funding authority includes setting and approving an annual operating budget, which includes "the costs of developing and operating the CAT for the upcoming year." CAT NMS Plan § 11.1(a).[8]  The annual CAT budget that CAT LLC is responsible for setting includes:

> "technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost

---

[8]    Available at https://catnmsplan.com/sites/default/files/2020-02/cat_nms_plan_020816.pdf.

categories as reasonably determined by the Operating Committee to be included in the budget." CAT NMS Plan § 11.1(a)(i).

The 2016 order approving the CAT did not provide an actual, numerical formula for allocating the costs of the CAT development and maintenance that would accrue as a result of the budget set by CAT LLC. *See* 81 F.R. 30614. Rather, the CAT NMS Plan set forth certain "funding principles," including that CAT LLC should "establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act" and "avoid[s] any disincentives such as placing an inappropriate burden on competition and a reduction in market quality." *See* 81 F.R. 30873.

Since 2016, CAT LLC has repeatedly filed proposed amendments to the CAT NMS Plan that would firmly distribute costs between Participants and Industry Members.[9]  Prior to 2023, the SEC did not approve any of these proposed amendments, including a proposed amendment submitted in May 2022 with virtually identical terms to the Order ultimately approved by the SEC in 2023.[10]

Over those seven years, the actual and anticipated costs of CAT have grown tremendously. In 2016, the SEC anticipated that it would cost approximately $37.5 million to build CAT and that annual operating costs would range from $36.5 million

---

[9]  *See* Exchange Act Release No. 34-80930 (July 14, 2017); Exchange Act Release No. 34-82451 (Jan. 5, 2018);  Exchange Act Release No. 34-91555 (Apr. 14, 2021);  Exchange Act Release No. 34-94984 (May 25, 2022).

[10]  *See* Exchange Act Release No. 34-94984 (May 25, 2022).

to $55 million.[11]    Project management failures and cost overruns began almost immediately.  In 2017, CAT LLC awarded a contract to Thesys Technologies to build and operate the CAT.  However, due to operational failures, that contract was terminated in mid-2019.  The failed engagement with Thesys Technologies resulted in over $100 million in sunk costs.[12]  Former SEC Chairman Jay Clayton described these problems as stemming from "project governance and project management issues experienced by the SROs [Participants]."[13]

Moreover, increases in annual CAT costs have been substantial.  Annual costs were $103 million in 2020, $144 million in 2021, $179 million in 2022, and almost $200 million in 2023.[14]  In other words, the costs in 2023 were nearly four times higher than the SEC's 2016 projection of annual costs as ranging from $36.5 million to $55 million.

CAT LLC submitted a proposed funding plan and fee schedule ("Amendment") to the SEC in March 2023 that the Commission, in September 2023,

---

[11]  2016 CAT NMS Plan 84801.

[12]  *See* Comment Letter from Citadel Securities, Inc. (July 14, 2023) at 8, available at   https://www.sec.gov/comments/4-698/4698-182799-335422.pdf   (hereinafter "Citadel Letter").

[13]  Testimony on "Oversight of the U.S. Securities and Exchange Commission," Chairman   Jay   Clayton,   December   11,   2018.   available   here https://www.sec.gov/news/testimony/testimony-oversight-us-securities-and-exchange-commission-0.

[14]  *See* Exchange Act Release No. 34099363 (January 17, 2024), at 9, 33, 42, 52, 65,70, n.73.

approved in the Order.  88 F.R. 62628 (2023).  The Order provides a method for allocating the costs accrued by CAT LLC to date, as well as the annual CAT costs, which are now nearly $200 million per year.  88 F.R. 62630-33. Under the Order, Industry Members will be responsible for two-thirds of the annual costs,[15] according to volume of executed shares, and the Participants will be responsible for the remaining one-third.  88 F.R. 62629-31.  Notwithstanding the cost allocation, the Participants can "determine to charge their members fees to fund their share of the CAT fees."  88 F.R. 62629-32.  In other words, although the Order nominally allocates two-thirds of annual CAT fees to Industry Members, the de-facto allocation will likely be 100% because it is contemplated that the Participants will assess fees on their broker-dealer members to recoup those costs.

The Order therefore allows the Participants to escape responsibility for paying for the CAT, even though they control the CAT's budget.  The misaligned incentives caused by this allocation should be obvious.  In dissenting from the Order, SEC Commissioner Peirce explained the problem cogently:

> If plan participants are able to pass their costs through to industry members, a possibility the Approval Order recognizes, nobody with financial skin in the game will be among those setting or reviewing the budget, or among those able to propose amendments to the plan or involved in day-to-day discussions about interpretation or implementation of the plan . . . . The allocation required by these

---

[15]  One-third of the costs will be allocated to the Industry Member acting as broker to the seller in a transaction and one-third will be allocated to the Industry Member that is the executing broker for the buyer.

amendments is not fair given the further misalignment of incentives that it encourages.[16]

Commissioner Peirce went on to conclude that "the absence of a braking mechanism means that we are asking [Industry Members] and likely their customers to pick up the tab for a project that has no reasonable limits."[17]

This moral hazard problem would seemingly necessitate heightened SEC scrutiny over the CAT's budget. To the contrary, the SEC will not approve the CAT budget. Under the CAT NMS Plan, the Participants are to "file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members." CAT NMS Plan § 11.1(b). Under Section 19(b)(3) of the Exchange Act, an SRO proposed rule change to establish or change a fee "take[s] effect upon filing" and the SEC does not need to approve the proposed rule change. 15 U.S.C. § 78s(b)(3)(A). Once the proposed rule change is filed, the SEC's only course of action is to summarily temporarily suspend the proposed rule change within 60-days from the date of filing and institute proceedings to determine whether the proposed rule change should be approved or disapproved. 15 U.S.C. § 78s(b)(3)(C). In other words, the only time at which the SEC will review the CAT's budget and related fees will be after the fees

---

[16]  Statement of Commissioner Peirce, "Who's Paying?: Statement on the CAT's Funding Model," September 6, 2023 (hereinafter "Peirce Statement"), available at https://www.sec.gov/news/statement/peirce-statement-cat-funding-090623.

[17]  *Id*.

have already become effective by statute, and even then the SEC is not required to review the fees.

The reality of spiraling CAT costs—and the potential for these costs to continue to soar given the lack of proper incentives and meaningful constraints—should have prompted the SEC to undertake a careful economic analysis before approving the Order. Instead, the SEC refused to conduct *any* meaningful analysis, even as the Exchange Act and Rule 613 require the Commission to consider the potential effects of any proposed amendment to the CAT NMS Plan on "efficiency, competition, and capital formation." *See* 15 U.S.C. § 78c(f); 17 C.F.R. § 242.608(b). The SEC reasoned that a determination about how the Order would likely affect efficiency, competition, and capital formation could be made by using the 2016 order implementing the CAT, 81 F.R. 84696, as a "baseline." *See* 88 F.R. 62676. However, the 2016 CAT NMS Plan did not propose an allocation of CAT costs between Participants and Industry Members. *See* 2016 CAT NMS Plan at § 11. Therefore, the 2016 CAT NMS Plan provides no meaningful reference point for considering how the lack of incentives and constraints on CAT costs in the Order might affect market efficiency and liquidity. The SEC concluded its analysis by determining that "Industry Members being responsible for a large proportion of CAT costs promotes efficiency." 88 F.R. 62681. But this conclusion was made without reference to a relevant comparator baseline and without the benefit of an alternative

12

method of analysis (such as quantitative modeling).  *See Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (stating that the SEC "has a unique obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation," and that the SEC's "failure to 'apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious and not in accordance with law") (*citing Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004)).

In summary, the Order gives all of the authority related to the management of the CAT budget to the Participants, but, in practice, places all of the costs on Industry Members without requiring that the SEC approve the budget.  Moreover, the SEC failed to conduct meaningful economic analysis of how this allocation of CAT costs would affect market efficiency and liquidity.  The Exchange Act and Administrative Procedure Act do not allow such a result.

13

# Summary of Argument

This Court must vacate the Order because it exceeds the scope of the SEC's authority under the Exchange Act and is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A), (C).

*First*, Congress did not authorize the SEC to force the Participants to create the CAT and Industry Members to pay the entirety of the costs of the CAT. The SEC claims as its authority Section 11A of the Exchange Act, which directs the SEC, "having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets," to facilitate the establishment of a "national market system" for securities in accordance with the findings and to carry out the objectives set forth in Section 11A(a)(1)—none of which contemplates creation of the CAT or a self-perpetuating funding mechanism immune from congressional appropriations and oversight. 15 U.S.C. § 78k-1(2). Under the major questions doctrine, the SEC cannot justify imposing the voluminous costs of CAT—including approximately $1 billion of historical costs and likely hundreds of millions in annual costs in perpetuity—absent a clear statement from Congress directing that action.

*Second*, even if the major questions doctrine does not apply, the Order must be within the SEC's authority under § 11A and other Exchange Act requirements—

namely those within § 6(b)(4) and § 23—for the Order to be lawful.  The Order, however, does not satisfy those other Exchange Act requirements.

*Third*, the Order must be set aside as arbitrary and capricious.  The costs of CAT have grown astoundingly in the past six years.  Rather than adopting a funding model that increases oversight and addresses moral hazards, the SEC (i) doubled down on the very same structure that caused costs to balloon in the first place and (ii) failed to consider the consequences for efficiency, competition, and capital formation.  The SEC thus violated the baseline requirement that agencies "engage in reasoned decisionmaking." *Michigan v. Env't Prot. Agency.*, 576 U.S. 743, 750 (2015) ("*Michigan v. EPA*").

15

# <u>Argument</u>

**A.    This Court must vacate the Order because the Order violates the Major Questions Doctrine.**

Congress did not clearly authorize the SEC to cause the Participants to create a newly unregulated entity for regulatory reporting purposes while imposing billions in unconstrained costs on Industry Members.  Therefore, the Order violates the major questions doctrine and this Court must vacate.

In evaluating whether Congress has delegated certain authority to an agency, courts must be guided "by common sense as to the manner in which Congress is likely to delegate" the "policy decision" claimed by the agency.  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Therefore, the major questions doctrine counsels that, in some cases, the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion provide "reason[s] to hesitate before concluding that Congress" meant to confer the claimed authority.  *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ("*West Virginia v. EPA*").  In these cases, the major questions doctrine requires the agency receive "clear congressional authorization" for the claimed delegation.

In this case, the Order must be vacated because Congress did not clearly delegate the authority to the SEC to (i) create the CAT, an "extraordinary" and "economically significant" market surveillance tool; or (ii) leave Industry Members

on the hook for billions in CAT costs with no say in the CAT's development and ongoing management. *West Virginia v. EPA*, 597 U.S. at 721. The SEC's claimed statutory authority for the Order is Section 11A of the Exchange Act. *See* 88 F.R. 62628. Section 11A provides that the "Commission is to use its authority under this chapter to facilitate the establishment of a national market system for securities." 15 U.S.C. § 78k-1(2). Section 11A, however, says nothing about the CAT, a massive trade surveillance and regulatory reporting system not contemplated by the statute. Additionally, in terms of the development and maintenance of the "national market system," or "facilities thereof," Section 11A states that the SEC may "authorize or require *self-regulatory organizations* to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system. 15 U.S.C. § 78k-1(3)(B) (emphasis added). In fact, the SEC has admitted that this language was designed merely to give antitrust immunity for actions taken under the section. *See* SEC Br. at 5, *Nasdaq Stock Market LLC v. SEC*, No. 21-1167 (D.C. Cir. ); *see id.* at 36-37; 86 Fed. Reg. 44142, 44157 n.242 (2021). Further, the SEC concedes that Congress did not expressly authorize the CAT.

> There is no reason to question that Congress would have intended for the Commission to address the serious shortcomings and regulatory obstacles associated with the lack of a consolidated audit trail. And there is therefore no basis for dispensing with ordinary principles of statutory construction to require express authorization for CAT by Congress.

88 F.R. 62673.  Unfortunately for the SEC, that reasoning is not consistent with the major questions doctrine.  Rather, an "agency . . . must point to clear congressional authorization for the power it claims."  *West Virginia v. EPA*, 597 U.S. at 723.

Moreover, the SEC must point to clear congressional authorization to cause Industry Members to shoulder the entire cost of the CAT.  Rule 613 for example, provides that the costs of the CAT should be allocated "between the plan sponsors and the members of the plan sponsors."  17 C.F.R. § 242.608(a)(4)(D).  Likewise, the 2016 Order establishing the CAT, as approved by the SEC in November 2016, provided that CAT LLC should "establish an allocation of the Company's costs among Participants and Industry Members that is consistent with the Exchange Act" by taking into account "distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources."  81 F.R. 84710.  But the current Order, by allowing Participants to "determine to charge their members fees to fund their share of the CAT fees" violates the Exchange Act requirement of an "equitable allocation of reasonable [] fees."  *See* 88 F.R. 62629-32;15 U.S.C. § 78f(b)(4)

This result, a de facto 100% "allocation" of costs to Industry Members of a massive surveillance tool that is not mentioned, let alone supported, by Section 11A is manifestly contrary to the SEC's authority under the Exchange Act.  A scheme that requires the Participants to collect data from every securities trade in the United

18

States and operate a cloud-based surveillance repository (i.e., the CAT), requires Industry Members to likely pay for all of the costs of the CAT, limits the SEC's role in approving and overseeing the budget, and preventing judicial review is, quite simply, extraordinary. But "[e]xtraordinary grants of regulatory authority are rarely accomplished through vague terms or subtle devices" and, likewise, Congress does not typically "use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *West Virginia* v. *EPA*, 597 U.S. at 723. Creating a massive regulatory surveillance system and foisting billions of dollars of costs—in perpetuity—on Industry Members is the exact kind of extraordinary use of regulatory authority and radical change in a statutory scheme that an agency cannot unilaterally make without "clear congressional authorization." *Id*.

In *West Virginia v. EPA*, the Supreme Court adopted the major questions doctrine label to apply to a "particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." 597 U.S. at 724. Indeed, that "particular and recurring problem" is exactly what happened here. This Court should not countenance the SEC's reliance on "oblique" statutory language to justify creating the CAT and causing Industry Members to pay for all of its spiraling and unconstrained costs.

**B.** **This Court must vacate the Order because the SEC lacks requisite authority under the Exchange Act.**

Ordinary principles of statutory interpretation likewise demonstrate that the SEC lacks authority to create the CAT and fund it through a perpetual assessment on broker dealers. However, the SEC's reading of the Exchange Act as allowing it to impose unlimited costs on Industry Members with no say in the CAT's budget "strayed far beyond [the] bounds" of the statute. *Michigan v. EPA*, 576 U.S. at 751 (2015). This Court therefore must vacate the Order.

The plain statutory text in the Exchange Act relating to the national market system demonstrates that the Order falls outside the bounds of the SEC's authority. *See, e.g.*, *New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020) (explaining that "[m]erely because an agency has [general] rulemaking power does not mean that it has delegated authority to adopt a particular regulation"). As described above, the Exchange Act provision that directed the SEC to create the national market system, namely Section 11A, describes the SEC's authority over *exchanges*. *See supra* Section IV(A). The statute says nothing about data repositories or audit trails generally or the CAT specifically—let alone the responsibility of Industry Members to fund CAT. The SEC's interpretation of Section 11A as allowing the Participants to pass on all of their allocated costs to Industry Members with no accountability therefore fails to conform with the "statutory language [and] statutory purposes."

20

Additionally, the Order runs afoul of other provisions of the Exchange Act that provide important limits on the SEC's authority to regulate. *See, e.g.*, *Graham Cnty. Soil & Water Conservation Dist. v. U.S.*, 559 U.S. 280, 289 (2010) (explaining that "[s]tatutory language has meaning only in context" and that "[c]ourts have a duty to construe statutes, not insolated provisions"). First, the Order approves an amendment to the NMS plan submitted by the Participants under Rule 613. As a result, qualifications on the SEC's ability to approve rules submitted by the national securities exchanges, as laid out in Section 6(b) of the Exchange Act, are applicable here. Most notably, under Section 6(b) an exchange's rules must provide "for the equitable allocation of reasonable dues, fees, and other charges." 15 U.S.C. § 78f(b)(4). The SEC is therefore statutorily directed to ensure that an exchange's fees are "equitable" and "reasonable." *See, e.g., NetCoalition v. SEC*, 615 F.3d 525, 528 (D.C. Cir. 2010) ("*NetCoalition I*") (vacating SEC approval of an exchange rule that would allow the exchange to charge and pass on fees for certain order data because the fees were not consistent with the Exchange Act's reasonableness requirements); 15 U.S.C. § 78f(b) (stating that "[a]n exchange shall not be registered as a national securities exchange" unless the SEC makes certain determinations, including that the exchange's fees are equitable and reasonable). Here, however, the SEC is abdicating its oversight role, as the Proposed Participant Fee Schedule does not require the SEC to approve the CAT's budget or fees assessed to Industry members,

21

and prevents judicial review of proposed rule changes to establish or change those fees. This process allows the SEC to abdicate responsibility for overseeing the budget and controlling the costs of the CAT.

Likewise, Section 23 prohibits the SEC from adopting "any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." Again, the misaligned incentives and lack of SEC oversight endemic to the Order ensure that the burden on competition will be excessive, all to implement a surveillance tool that is not authorized under the Exchange Act. *See New York Stock Exch. LLC*, 962 F.3d at 553 (finding that the SEC violated Section 23 by implementing a data collection regulation with costs that were not needed to satisfy any specific Exchange Act requirement).

**C.     This Court must vacate the Order because the Order is arbitrary and capricious.**

Finally, the Order must be set aside as arbitrary and capricious. *See* 5 U.S.C § 706(2)(A).

An agency rule is arbitrary and capricious if the agency (i) "entirely failed to consider an important aspect of the problem," (ii) "offered an explanation for its decision that runs counter to the evidence before the agency," or (iii) offered an explanation for its rule that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

*of United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "To determine if an agency considered all the relevant factors and important aspect[s] of the problem, a court may look to the language of the relevant statutes, the administrative record, and even beyond the administrative record," *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 47 F.4th 1191, 1202 (11th Cir. 2022).

Here, the fundamental flaw in the Order, namely that Industry Members bear the costs while Participants manage CAT's budget with minimal SEC oversight, demonstrates that the Order is arbitrary and capricious.  As Commissioner Peirce recognized in her dissent, "nobody with financial skin in the game will be among those setting or reviewing the budget, or among those able to propose amendments to the plan or involved in day-to-day discussions about interpretation or implementation of the plan."[18]  The CAT Participants will be much less exacting with respect to the costs of CAT because they do not pay these costs themselves, as the already-spiraling costs demonstrate.  These increased CAT costs will undoubtedly result in higher transaction fees for retail investors that contract with Industry Members to execute trades.  And Industry Members that trade their own capital, such as the members of FIA PTG, may be forced to (i) adjust their trading models and (ii) engage in less trading overall, harming liquidity and price discovery

---

[18]  *See* September 6, 2023 Statement of Commissioner Peirce, "Who's Paying: Statement on the CAT's Funding Model," available at: https://www.sec.gov/news/statement/peirce-statement-cat-funding-090623.

market-wide.  Yet the SEC failed to conduct economic analysis of these potential problems.

> **1.    The SEC acted arbitrarily and capriciously by failing to conduct reasonable economic analysis in light of the ballooning costs of CAT.**

The SEC could have accounted for problems relating to excessive costs by (i) setting a cap on the CAT's annual budgets, (ii) prohibiting Participants from passing on a certain amount of their costs, or (iii) requiring that the budget and proposed fees be filed under Section 19(b)(2) and subject to notice and public comment, SEC approval, and judicial review, among other possible strategies. Instead, the SEC refused to undertake economic analysis and justified the problems of spiraling costs by comparing the Executed Share Model to the "baseline" of the 2016 Order implementing the CAT.  Accordingly, the SEC reasoned that the Order was satisfactory from the standpoint of "efficiency, competition, and capital formation" because the Executed Share Model may fair no worse with respect to misaligned incentives than the 2016 Plan.  *See* 88 F.R. 62679 ("Overall, the Executed Share Model will have inefficiencies related to not perfectly aligning with costs, but might not be any more inefficient than the Original Funding Model.").

The SEC's reasoning, however, suffers from two major problems.  First, the CAT NMS Plan simply does not work as a "baseline" because that iteration of the Plan purposefully left blank important issues, such as the allocation of costs between Participants and Industry Members, with the intention that they would be addressed

24

in future amendments. *See, e.g.,* 88 F.R. 62681 ("While the Executed Share Model specifies an allocation that was unknown in the Original Funding Model, several commenters question whether allocation provides Participants with incentives to seek efficiency."). Second, actual annual CAT costs have increased by four times from what the 2016 Plan projected them to be—itself a vast departure from the so-called baseline—and the lack of a mechanism to control costs in the Order portends that annual costs will continue to increase. At the very least, the SEC needed to have considered how this substantial increase in costs would alter the assumptions about impact on efficiency, competition, and capital formation contained in the 2016 CAT NMS Plan.

The SEC's lack of attention to the problems of excessive cost and their consequent impact on efficiency, competition, and capital formation is a paradigmatic instance of arbitrary and capricious rulemaking. In *Michigan v. EPA*, for example, the Supreme Court set aside an air pollutant regulation as arbitrary and capricious when the EPA "refuse[d] to consider cost" when making its determination that the regulation was "appropriate and necessary." 576 U.S. at 747. Likewise, in *Chamber of Commerce of U.S. v. SEC*, the D.C. Circuit invalidated an SEC rule as violating the APA where the SEC made a cursory statement that it had "no reliable basis for estimating [certain] costs," instead of attempting to discern the "economic consequences of [the] proposed regulation." 412 F.3d 133, 144 (D.C. Cir. 2005). In

25

*NetCoalition I*, the D.C. Circuit (again) found that the SEC acted arbitrarily and capriciously by relying on market dynamics and qualitative reasoning to determine that a national security exchange's proposed fees were reasonable—without undertaking economic analysis of the same. 615 F.3d at 525.

Here, the SEC's failure to consider cost in a thorough and quantitative manner is especially striking given the relevant statutory and regulatory language. *See Bidi Vapor LLC.*, 47 F.4th at 1202 (explaining that courts may consider statutory and regulatory language when evaluating if agency action is arbitrary). First, Section 11A requires the SEC to maintain "due regard for the public interest" in any rulemaking related to the establishment of the national market system. "[P]ublic interest" is a "classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. at 752. Likewise Rule 613 requires that the SEC consider "efficiency, competition, and capital formation" when determining to adopt any amendment to the CAT NMS Plan. *See* 17 C.F.R. § 242.608(b). Given the subject matter of the Order and the ballooning costs of the CAT, the concomitant implications for efficiency, competition, and capital formation should have been front and center to the SEC's considerations.

**2.    The SEC acted arbitrarily and capriciously by brushing aside concerns related to misaligned incentives.**

The SEC's reasoning in the Order with respect to the misaligned incentives caused by the allocation fairs little better than its justification for failing to conduct an economic analysis.  In response to industry comments, including those made by this amicus, the SEC defended the fact that CAT Participants will be allowed—and perhaps encouraged—to pass on all fees to Industry Members by stating that the Commission could suspend the self-executing fee assessments pursuant to the § 19(b) process if budgeted CAT costs were not "reasonable."  88 F.R. 62637; *see also* § 11.1 of the CAT NMS Plan.  But the SEC's reliance on the process under § 78s(b)(3)(A) by which the Commission can suspend self-executing fee filings as sufficient to contain costs is simply not logical.  *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022) ("The Commission's analysis overlooks a key problem: if FINRA's data service ends up being unreasonably expensive, then the agency cannot protect market participants from footing the bill for it at the fees stage. To be sure, the Commission is right that it could suspend and disapprove FINRA's proposal at the fees stage, see id., but at that point, FINRA will have already incurred the financial burden of building the service. That cost—which could be millions, or even tens of millions, of dollars—must be paid by someone, whether the subscribers of the service or the broker-dealers who make up FINRA.").  In short, the Commission approved FINRA's proposal without responding to comments that urged it to assess

not only the financial impact of the service on FINRA, but also the entities that fund FINRA. That is not reasoned decisionmaking."). As Commissioner Peirce pointed out, "only the plan participants have much insight into, let alone say over, the budget." This means that "critical analysis of CAT costs needs to happen before the budget is finalized," and not as part of some nebulous post-hoc review process.[19] Additionally, the SEC is the primary user and beneficiary of CAT, and the lack of judicial review of its decisions under § 78s(b)(3)(A) removes what might otherwise be the one key incentive for the Commission to apply this reasonableness standard judiciously.

In summary, the SEC has already failed to demonstrate that it can keep costs in check. The $1 billion in CAT costs was "an important aspect of the problem" that should have spurred the SEC to (i) undertake an economic analysis and (ii) reject any proposed amendment without a mechanism allowing for a "hard-look" Commission review of CAT budgeting, such as subjecting annual budgets and fee filings to notice and comment and judicial review. *See State Farm*, 463 U.S. at 43. The SEC's failure to do so was quintessentially arbitrary.

---

[19] *See* Peirce Statement, available at https://www.sec.gov/news/statement/peirce-statement-cat-funding-090623.

28

# Conclusion

In close, the SEC's adoption of the CAT funding Order violates the major questions doctrine and the plain meaning of the Exchange Act. Additionally, the SEC acted arbitrarily and capriciously by failing to (i) conduct an economic analysis and (ii) rationally respond to concerns relating to the misaligned incentives. For these foregoing reasons, this Court must vacate.

Respectfully submitted,

*/s/ Neal Kumar*
Neal Kumar
Brian J. Baltz
Ariel Blask
Willkie Farr & Gallagher LLP
1875 K Street, NW
Washington, DC  20006
202-303-1000
nkumar@willkie.com

*Counsel for Amicus Curiae*

Dated:  February 15, 2024

29

# **Certificate of Compliance**

The undersigned certifies that this amicus brief complies with the word limit of Fed. R. App. P. 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,289 words as shown by Microsoft Word.

The undersigned certifies that this amicus brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) and Circuit Rule 32 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font that is 14 points in the body and footnotes of the brief.

Dated:  February 15, 2023

*/s/Neal Kumar*
Neal Kumar

# **Certificate of Service**

I hereby certify that on February 15, 2024, one copy of the *Amicus Curiae* Brief of Futures Industry Association was dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

David J. Smith Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

On this same date, a copy of the brief was served on all counsel of record via CM/ECF or in some other authorized manner for those counsel orparties who are not authorized to receive electronic Notices of Electronic Filing.

*/s/ Rose E. Olejniczak*
Counsel Press
205 North Michigan Avenue, Suite 810
Chicago, Illinois 60601
(312) 431-0185

Filing and service were performed by direction of counsel