No. 23-13396

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION;
CITADEL SECURITIES LLC,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

JORDAN A. KENNEDY
Attorney

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1-1, the undersigned counsel for Respondent Securities and Exchange

Commission hereby certifies that the following listed persons and entities have an

interest in the outcome of this case:

1)    Alternative Investment Management Association, Amicus.

2)    Altman, Jennifer G., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

3)    American Free Enterprise Chamber of Commerce, Amicus.

4)    American Securities Association, Petitioner.

5)    ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

6)    Ashbrook Byrne Kresge LLC, counsel for Amici James Overdahl and S.P. Kothari.

7)    Baltz, Brian J., counsel for Amicus Future Industry Association.

8)    Barbero, Megan, counsel for Respondent Securities and Exchange Commission.

9)    Barr, William P., counsel for amicus American Free Enterprise Chamber of Commerce.

10)   Bash, John F., counsel for amici Senator Tom Cotton et al.

11)   Berman, Ari M., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

12)   Berry, Jonathan, counsel for amicus American Free Enterprise Chamber of Commerce.

13)   Bird, Brenna, counsel for Amicus State of Iowa.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

14) Blask, Ariel, counsel for Amicus Future Industry Association.

15) Boden, Anastasia, counsel for Amici Cato Institute and Investor Choice Advocates Network.

16) Borse Dubai Limited, owner of more than 10% of Nasdaq, Inc.'s shares.

17) BOX Exchange LLC, member and participant of Intervenor CAT LLC.

18) Boyle, Gregory, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

19) Boyden Gray PLLC, counsel for Amicus American Free Enterprise Chamber of Commerce.

20) Bronni, Nicholas J., counsel for Amicus State of Arkansas.

21) Cato Institute, Amicus.

22) Carr, Chris, counsel for Amicus State of Georgia.

23) Cboe BYX Exchange, Inc., Intervenor and member and participant of Intervenor CAT LLC.

24) Cboe BZX Exchange, Inc., Intervenor and member and participant of CAT LLC.

25) Cboe C2 Exchange, Inc., Intervenor and member and participant of CAT LLC.

26) Cboe EDGA Exchange, Inc., Intervenor and member and participant of CAT LLC.

27) Cboe EDGX Exchange, Inc., Intervenor and member and participant of CAT LLC.

28) Cboe Exchange, Inc., Intervenor and member and participant of CAT LLC.

29) Cboe Global Markets, Inc. (BATS: CBOE), direct or indirect parent company of Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

30) Chenoweth, Markham S., counsel for Amicus New Civil Liberties Alliance.

31) Citadel Securities GP LLC, parent company of Petitioner Citadel Securities LLC.

32) Citadel Securities LLC, Petitioner.

33) Coleman, Russell, counsel for Amicus Commonwealth of Kentucky.

34) Committee on Capital Markets Regulation, Amicus.

35) Commonwealth of Kentucky, Amicus.

36) Commonwealth of Virginia, Amicus.

37) Competitive Enterprise Institute, Amicus.

38) Conley, Michael A., counsel for Respondent Securities and Exchange Commission.

39) Connolly, J. Michael, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

40) Consolidated Audit Trail, LLC, Intervenor, a jointly owned limited liability company formed under Delaware state law through which the participants conduct the activities of the CAT NMS Plan.

41) Deutsch, Elizabeth, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

42) Financial Industry Regulatory Authority, Inc., member and participant of Intervenor CAT LLC.

43) Fitch, Lynn, counsel for Amicus State of Mississippi.

44) Formela, John M., counsel for Amicus State of New Hampshire.

45) Francisco, Noel J., Jones Day, counsel for Petitioner Citadel Securities LLC.

46) Hardin, Tracey A., counsel for Respondent Securities and Exchange Commission.

47) Hilgers, Michael T., counsel for Amicus State of Nebraska.

48) Hopen, David A., Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

49) Hoyt, Joshua T., Jones Day, counsel for Petitioner Citadel Securities LLC.

50) Flowers, Benjamin M., Ashbrook Byrne Kresge LLC, counsel for Amici James Overdahl and S.P. Kothari.

51) Future Industry Association, Amicus.

52) Gershengorn, Ian Heath, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

53) Greenberg, Dan, counsel for Amicus Competitive Enterprise Institute.

54) Greenwalt, Paul, III, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

55) Griffin, Tim, counsel for Amicus State of Arkansas.

56) Intercontinental Exchange, Inc. (NYSE: ICE), indirect parent of NYSE Intervenors.

57) International Securities Exchange Holdings, Inc., sole LLC member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

58) Investment Company Institute, Amicus.

59) Investor AB (Nasdaq Stockholm: INVEB), owner of more than 10% of Nasdaq, Inc.'s shares.

60) Investor Choice Advocates Network, Amicus.

61) Investors' Exchange, LLC, member and participant of Intervenor CAT LLC.

62) Jackley, Marty, counsel for Amicus South Dakota.

63) Jacobs, Dylan L., counsel for Amicus State of Arkansas.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

64) Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

65) Kastenberg, Stephen J., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

66) Katsiff, Timothy D., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

67) Kennedy, Jordan A., counsel for Respondent Securities and Exchange Commission.

68) Knudsen, Austin, counsel for Amicus State of Montana.

69) Kobach, Kris W., counsel for Amicus State of Kansas.

70) Kothari, S.P., Amicus.

71) Kumar, Neal, counsel for Amicus Future Industry Association.

72) Labrador, Raúl R., counsel for Amicus State of Idaho.

73) Lantieri, Paul, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

74) Little, Margaret A., counsel for Amicus New Civil Liberties Alliance.

75) Lipshutz, Brian M., Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

76) Long-Term Stock Exchange, Inc., member and participant of Intervenor CAT LLC.

77) Lucas, Brinton, Jones Day, counsel for Petitioner Citadel Securities LLC.

78) MacLean, Matthew J., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

79) Managed Funds Association, Amicus.

80) Marshall, Jonathan J., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

81) Marshall, Steve, counsel for Amicus State of Alabama.

82) Matro, Daniel E., counsel for Respondent Securities and Exchange Commission.

83) MEMX LLC, member and participant of Intervenor CAT LLC.

84) Miami International Securities Exchange LLC, member and participant of Intervenor CAT LLC.

85) MIAX Emerald, LLC, member and participant of Intervenor CAT LLC.

86) MIAX PEARL, LLC, member and participant of Intervenor CAT LLC.

87) Michel, Christopher G., Quinn Emanuel Urquhart & Sullivan, LLP, counsel for amici Senator Tom Cotton et al.

88) Miyares, Jason, counsel for Amicus Commonwealth of Virginia.

89) Modern Markets Initiative, Inc., sponsor of funding disclosed pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure.

90) Molzberger, Michael, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

91) Montgomery, Sophia W., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

92) Moody, Ashley, counsel for Amicus State of Florida.

93) Morris, Andrew J., counsel for Amicus New Civil Liberties Alliance.

94) Morrisey, Patrick, counsel for Amicus State of West Virginia.

95) Murrill, Liz, counsel for Amicus State of Louisiana.

96) Nabors, David A., Quinn Emanuel Urquhart & Sullivan, LLP, counsel for amici Senator Tom Cotton et al.

97) Nasdaq BX, Inc., Intervenor.

*American Securities Association et al. v. United States Securities and Exchange Commission,*
No. 23-13396

98)  Nasdaq GEMX, LLC, Intervenor.

99)  Nasdaq, Inc. (Nasdaq: NDAQ), sole owner of LLC interest in The Nasdaq Stock Market LLC and Nasdaq PHLX LLC and parent company of Nasdaq BX, Inc.

100)  Nasdaq ISE, LLC, Intervenor.

101)  Nasdaq MRX, LLC, Intervenor.

102)  Nasdaq PHLX LLC, Intervenor.

103)  New Civil Liberties Alliance, Amicus.

104)  New York Stock Exchange LLC, Intervenor.

105)  NYSE American LLC, Intervenor.

106)  NYSE Arca, Inc., Intervenor.

107)  NYSE Chicago, Inc., Intervenor.

108)  NYSE National, Inc., Intervenor.

109)  Oliwenstein, David, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

110)  Orr, Caleb, Boyden Gray PLLC, counsel for Amicus American Free Enterprise Chamber of Commerce.

111)  Overdahl, James, Amicus.

112)  Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

113)  Paxton, Ken, counsel for Amicus State of Texas.

114)  Phillips, David, Jones Day, counsel for Petitioner Citadel Securities LLC.

115)  Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Amici Senator Tom Cotton et al.

116)  Rabbitt, Brian C., Jones Day, counsel for Petitioner Citadel Securities LLC.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

117)  Reisner, Lorin L., Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

118)  Representatives Mark Alford, Don Bacon, Michael Collins, Scott Fitzgerald, French Hill, Barry Loudermilk, Alex X. Mooney, Ralph Norman, John Rose, Keith Self, Randy Weber, and Steve Womack, Amici.

119)  Reyes, Sean, counsel for Amicus State of Utah.

120)  Rokita, Theodore E., counsel for Amicus State of Indiana.

121)  Roth, Yaakov M., Jones Day, counsel for Petitioner Citadel Securities LLC.

122)  Schulp, Jennifer, counsel for Amici Cato Institute and Investor Choice Advocates Network.

123)  Schwartz, Yishai, Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

124)  Securities Industry and Financial Markets Association, Amicus.

125)  Senator Tom Cotton, John Boozman, Mike Braun, Kevin Cramer, Steve Daines, Bill Hagerty, John Kennedy, Jerry Moran, Pete Ricketts, and Tim Scott, Amici.

126)  Shanmugam, Kannon K., Paul, Weiss, Rifkin, Wharton & Garrison LLP, counsel for Amici Securities Industry and Financial Markets Association et al.

127)  Skorup, Brent, counsel for Amici Cato Institute and Investor Choice Advocates Network.

128)  Sobel, Zachary J., counsel for Amici Senator Tom Cotton et al.

129)  State of Alabama, Amicus.

130)  State of Arkansas, Amicus.

131)  State of Florida, Amicus.

132)  State of Georgia, Amicus.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

133)    State of Indiana, Amicus.

134)    State of Iowa, Amicus.

135)    State of Kansas, Amicus.

136)    State of Louisiana, Amicus.

137)    State of Mississippi, Amicus.

138)    State of Missouri, Amicus.

139)    State of Montana, Amicus.

140)    State of Nebraska, Amicus.

141)    State of New Hampshire, Amicus.

142)    State of North Dakota, Amicus.

143)    State of Ohio, Amicus.

144)    State of South Carolina, Amicus.

145)    State of South Dakota, Amicus.

146)    State of Texas, Amicus.

147)    State of Utah, Amicus.

148)    State of West Virginia, Amicus.

149)    The Nasdaq Stock Market LLC, Intervenor.

150)    The Vanguard Group, Inc., owned 10% or more of Cboe Global Markets, Inc.'s common stock as of June 30, 2023.

151)    Thoma Bravo UGP, LLC, owner of more than 10% of Nasdaq, Inc.'s shares.

152)    Torridon Law PLLC, counsel for Amicus American Free Enterprise Chamber of Commerce.

153)    Unikowsky, Adam, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 23-13396

154)   United States Securities and Exchange Commission, Respondent.

155)   Virtu Financial, Inc., Amicus.

156)   Watkins, Devin, counsel for Amicus Competitive Enterprise Institute.

157)   Wilson, Alan, counsel for Amicus State of South Carolina.

158)   Wrigley, Drew H., counsel for Amicus State of North Dakota.

159)   Yost, Dave, counsel for Amicus State of Ohio.

/s/ Daniel E. Matro

Daniel E. Matro
Securities and Exchange Commission
100 F. Street N.E.
Washington, D.C. 20549
matrod@sec.gov
(202) 551-8248 (Matro)

Dated:  April 15, 2024

# STATEMENT REGARDING ORAL ARGUMENT

The Commission believes that oral argument will assist the Court in resolving the petition for review.

**TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ....................................................... i

TABLE OF AUTHORITIES ............................................................................................iv

INTRODUCTION ..............................................................................................................1

COUNTERSTATEMENT OF THE ISSUES .................................................................6

COUNTERSTATEMENT OF THE CASE ....................................................................6

A.    Statutory, Regulatory, and Market Overview ...............................................6

    1.    Under the Exchange Act, self-regulatory organizations serve as frontline regulators of their markets and members, subject to Commission oversight ......................................................................6

    2.    In 1975, Congress granted the Commission broad authority to oversee the implementation, operation, and regulation of a national market system in securities ...........................................10

    3.    By 2010, a broad consensus emerged that a consolidated audit trail was needed to adequately regulate the national market system ..............12

B.    The CAT NMS Plan........................................................................................14

    1.    In 2012, the Commission adopted Rule 613 requiring the SROs to develop a consolidated audit trail..................................................14

    2.    In 2016, the Commission approved the CAT NMS Plan........................15

    3.    CAT is now operational and serves as a critical market oversight tool..................................................................................19

C.    Funding Model Proceedings Before the Commission...........................20

STANDARD OF REVIEW ............................................................................................22

SUMMARY OF ARGUMENT ......................................................................................23

ARGUMENT ........................................................................................................24

I.  The Commission's approval of the amendment to the funding model in
    the CAT NMS Plan was reasonable and reasonably explained .............................24

    A.  The Commission reasonably explained its approval of the new
        funding model's allocation of costs ...............................................24

    B.  The Commission reasonably addressed concerns about the effect of
        the proposed allocation on the SROs' incentives to control costs ..........29

II.  The Commission reasonably considered the amendment's potential
     effects on efficiency, competition, and capital formation .....................................33

    A.  The Commission reasonably analyzed the amendment against the
        baseline of the funding model approved in 2016 .......................................33

    B.  The Commission reasonably analyzed the amendment's potential
        effects on investors ...................................................................................36

III.  Petitioners' challenge to the Commission's statutory authority is
      time-barred and, in any event, meritless .....................................................40

    A.  Petitioners' contention that CAT exceeds the Commission's
        authority is not properly before the Court ....................................................41

    B.  Regardless, CAT falls squarely within the Commission's authority
        to oversee the SROs and the national market system ...............................44

        1.  The text, structure, history, and purposes of the Exchange Act
            confirm the Commission's authority .................................................44

        2.  The major questions doctrine does not apply ...............................51

CONCLUSION ...................................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) .......................................................... 53

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir. 2023),
   *cert. granted on other grounds*, 144 S. Ct. 537 ................................................. 42, 43

*Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628 (D.C. Cir. 2019)...................... 35, 54

*Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109 (D.C. Cir. 2009) ................. 42

*Am. Stewards of Liberty v. DOI*, 960 F.3d 223 (5th Cir. 2020) .................................... 43

*Autauga Cnty. Emergency Mgmt. Commc'n Dist. v. FCC*,
   17 F.4th 88 (11th Cir. 2021) ...................................................................... 41

*Belton v. Hatch*, 17 N.E. 225 (N.Y. 1888) ................................................................. 6

*\*Biden v. Missouri*, 595 U.S. 87 (2022) ............................................... 45, 53, 54, 55

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................ 51-52, 53, 55-56

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   781 F.3d 1271 (11th Cir. 2015) .................................................................. 40

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
   833 F.3d 1274 (11th Cir. 2016) .................................................................. 23

*\*Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022) ...................................... 30, 31, 40

*Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085 (D.C. Cir. 1978) .................... 52

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) .................................... 39

*Catawba Cnty. v. EPA*, 571 F.3d 20 (D.C. Cir. 2009) ........................................ 35

*\*Chamber of Com. v. SEC*, 85 F.4th 760 (5th Cir. 2023) ............................ 36, 38, 39, 40

*Chamber of Com. v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) .................................... 39

iv

*Charter Comm'ns, Inc. v. FCC*, 460 F.3d 31 (D.C. Cir. 2006) ..................................... 42, 43

*Consumers' Rsch. v. FCC*, 88 F.4th 917 (11th Cir. 2023) ..................................... 43

*\*Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021) ........................................... 42

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ........................................ 27

*In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239 (11th Cir. 2020) ..................... 48

*Intercontinental Exch., Inc. v. SEC*, 23 F.4th 1013 (D.C. Cir. 2022) .............................. 8-9

*Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191 (D.C. Cir. 1996) ......................... 42-43

*Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016) ................................................. 36

*Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657 (2020) ........................................ 48, 53

*McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357 (11th Cir. 2021) ............................... 42

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117 (1973) .......................... 7

*NASD v. SEC*, 431 F.3d 803 (D.C. Cir. 2005) ............................................... 10

*Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105 (D.C. Cir. 2022) ................................. 36

*Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022) .............. 10, 32, 47, 52

*NASDAQ Stock Mkt., LLC v. SEC*, 961 F.3d 421 (D.C. Cir. 2020) ........................... 31

*Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016) ........................................... 43

*Oklahoma v. United States*, 62 F.4th 221 (6th Cir. 2023) ..................................... 51

*OPM v. Richmond*, 496 U.S. 414 (1990) ......................................................... 50-51

*Silver v. N.Y. Stock Exch.*, 373 U.S. 341 (1963) ..................................................... 6

*Stanley v. City of Sanford*, 83 F.4th 1333 (11th Cir. 2023) ........................................ 28, 41

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) ......................................................... 44

*Tuberville v. FINRA*, 874 F.3d 1268 (11th Cir. 2017) ......................................................... 9

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................... 48, 51, 52, 53, 55

**Statutes**

5 U.S.C. 706(2)(A) ................................................................................................................. 22

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

    Section 2, 15 U.S.C. 78b ............................................................................................ 44

    Section 3(a), 15 U.S.C. 78c(a) ................................................................................... 7

    Section 3(f), 15 U.S.C. 78c(f) ................................................................................... 33

    Section 5, 15 U.S.C. 78e ............................................................................................ 7

    Section 6(b), 15 U.S.C. 78f(b) ....................................................................... 7, 8, 9, 44

    Section 11A(a), 15 U.S.C. 78k-1(a) ........................................... 10, 11, 45, 46, 47, 52

    Section 15(a)(1), 15 U.S.C. 78o(a)(1) ...................................................................... 7

    Section 15(b)(1)(B), 15 U.S.C. 78o(b)(1)(B) ........................................................... 7

    Section 15A(b), 15 U.S.C. 78o-3(b) ................................................................ 7, 8, 9, 44

    Section 17(a), 15 U.S.C. 78q(a) ......................................................................... 10, 44

    Section 19(a), 15 U.S.C. 78s(a) ............................................................................... 9

    Section 19(b), 15 U.S.C. 78s(b) ....................................... 9, 10, 17, 21, 25, 26, 27

    Section 19(c), 15 U.S.C. 78s(c) ............................................................................ 9, 44

    Section 19(g), 15 U.S.C. 78s(g) ............................................................................. 7, 9

Section 19(h), 15 U.S.C. 78s(h) .............................................................. 7, 9, 44

Section 21, 15 U.S.C. 78u .......................................................................10

Section 21B, 15 U.S.C. 78u-2 ..................................................................10

Section 21C, 15 U.S.C. 78u-3 ..................................................................10

Section 23(a)(1), 15 U.S.C. 78w(a)(1) ...................................................... 44

Section 25(a)(1), 15 U.S.C. 78y(a)(1) .................................................... 41-42

Section 25(b)(1), 15 U.S.C. 78y(b)(1) .................................................... 41-42

Section 25(c)(1), 15 U.S.C. 78y(c)(1) ...................................................... 41

## Rules and Regulations

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. 240.01, *et seq*.

Rule 17a-3, 17 C.F.R. 240.17a-3 ............................................................ 45

Rule 17a-4, 17 C.F.R. 240.17a-4 ............................................................ 45

Rule 17a-25, 17 C.F.R. 240.17a-25 ........................................................ 45

Rule 608(a)(1), 17 C.F.R. 242.608(a)(1) .................................................. 11

Rule 608(b)(1), 17 C.F.R. 242.608(b)(1) .................................................. 12

Rule 608(b)(2), 17 C.F.R. 242.608(b)(2) ........................................ 12, 21, 24, 35, 42

Rule 608(d), 17 C.F.R. 242.608(d) .......................................................... 50

Rule 613(a)(5), C.F.R. 242.613(a)(5) ...................................................... 33

## Commission Releases

63 Fed. Reg. 12559 (1998) ................................................................ 44, 49

68 Fed. Reg. 20200 (2003) ............................................................................ 44

68 Fed. Reg. 27722 (2003)........................................................................... 8, 13

69 Fed. Reg. 71256 (2004) ................................................... 6, 7, 8, 13, 51

70 Fed. Reg. 2436 (2005) ............................................................................ 44

70 Fed. Reg. 37496 (2005) ......................................................................... 52

75 Fed. Reg. 32556 (2010) ................................................... 8, 12, 13, 14, 45

77 Fed. Reg. 45722 (2012)................................... 8, 13, 14, 15, 25, 35, 43, 46, 48, 49, 52

81 Fed. Reg. 84696 (2016) ........................... 15-18, 25, 32, 35, 36, 43, 46, 48, 49, 50, 54

83 Fed. Reg. 1399 (2018) ............................................................................ 20

85 Fed. Reg. 16152 (2020) ................................................... 17, 19, 31, 54, 55

85 Fed. Reg. 31322 (2020) ....................................................................... 19, 25

86 Fed. Reg. 21050 (2021) ......................................................................... 20

86 Fed. Reg. 34293 (2021) ......................................................................... 54

87 Fed. Reg. 33226 (2022) ......................................................................... 20

87 Fed. Reg. 42247 (2022) ......................................................................... 31

88 Fed. Reg. 51369 (2023) ......................................................................... 31

88 Fed. Reg. 62628 (2023) .............................. 19-22, 24-30, 32-40, 42, 50, 51

88 Fed. Reg. 77128 (2023) ....................................................................... 19, 31

88 Fed. Reg. 84026 (2023) ......................................................................... 31

89 Fed. Reg. 10850 (2024) ................................................................... 26-27, 32

Securities Exchange Act Rel. No. 99938 (Apr. 10, 2024) ......................................... 31-32

**Other Authorities**

CAT NMS Plan........................................................................................ 56

FINRA Letter of Acceptance, Waiver, and Consent with Instinet, LLC
    (Aug. 16, 2023) ................................................................................. 19

FINRA Regulatory Notice 21-21 (June 17, 2021)................................................19

Gary Gensler, Chair, SEC, Statement on CAT Funding (Sept. 6, 2023)...................... 19

Letter from ASA to V. Countryman (Oct. 28, 2019)......................................... 41

Letter from Citadel to V. Countryman (Nov. 30, 2020) ........................................... 40-41

S. Rep. No. 94-75 (1975) ............................................................... 10, 47, 49, 51

No. 23-13396

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION;
CITADEL SECURITIES LLC,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent.*

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

**INTRODUCTION**

Under the Securities and Exchange Act of 1934, private exchanges and associations of broker-dealers have frontline responsibility to enforce their members' compliance with the federal securities laws. These self-regulatory organizations ("SROs") are required to monitor their markets for violations of the securities laws and their own rules and to discipline members for violations, subject to oversight by the Securities and Exchange Commission. In the order under review, the Commission approved changes in the funding of the Consolidated Audit Trail ("CAT"), a regulatory tool essential to the SROs and the Commission in fulfilling

1

their respective statutory obligations—and thus to investor confidence and participation in the financial markets.

In challenging that order, petitioners American Securities Association ("ASA") and Citadel Securities LLC distort, or simply disregard, the Commission's reasoned analysis. Their true aim is to dismantle CAT itself. But CAT is the product of a decades-long collaborative process involving multiple rounds of notice and comment, numerous final agency actions, and the expenditure of hundreds of millions of dollars. Petitioners' belated challenge to the statutory authority underlying this critical initiative is time-barred. In any event, petitioners mischaracterize CAT's origins, development, and operation, as well as the Exchange Act provisions that authorize it.

In 1975, Congress expanded the Commission's authority to oversee the SROs with the aim of preventing any gaps in regulatory performance and directed the Commission to facilitate the establishment of a national market system ("NMS") that eliminated barriers between disparate trading venues. Congress also authorized the Commission to require joint action by otherwise competing SROs to facilitate the creation, operation, and regulation of the national market system. Pursuant to this authority, the Commission has created a process by which the SROs can jointly operate National Market System Plans ("NMS Plans") to accomplish cross-market goals, subject to Commission approval. There are now multiple NMS plans, and the CAT NMS Plan is one. CAT consolidates trade and order data from different

2

markets into a single database—similar to the way trade and quote data is consolidated—thereby enabling the SROs and the Commission to efficiently and accurately track activity in NMS securities across U.S. markets.

Petitioners' portrayal of CAT as a controversial Commission power-grab is profoundly ahistorical. Decades ago, the SROs developed audit trails for use in surveilling their markets. But as markets became increasingly fast, automated, and dispersed—today, tens of millions of transactions are executed daily across 24 exchanges, dozens of alternative trading systems, and the over-the-counter market— the SROs' fragmented audit trails became increasingly obsolete. Tracking even a single cross-market order from origination to execution required a cumbersome, time-consuming, and frequently unsuccessful process of compiling and reconciling disparate, incomplete data from multiple SROs and broker-dealers.

Following years of public input, the Commission sought to remedy this in 2012 by adopting a rule directing the SROs to propose a new NMS plan for the consolidation of audit trail data. There was broad-based market support for the creation of a consolidated audit trail, and no party sought judicial review. Nor did any party challenge the Commission's unanimous approval in 2016 of the CAT NMS Plan proposed by the SROs.

Since then, the SROs have built CAT and retired the largest duplicative legacy system, and broker-dealers have developed the internal systems necessary to report to

CAT. The SROs, broker-dealers, and the Commission have also worked to resolve implementation challenges, adjusting the original Plan through amendments or exemptions to address increasing costs, data security risks, and other concerns. Broker-dealers began reporting trade data to CAT in 2020, and by 2022, CAT was processing over 400 billion records daily. The SROs and the Commission now use CAT to fulfill their statutory duties to monitor and regulate the securities markets.

Until the order under review, however, several uncertainties remained regarding CAT's funding. As with other SRO regulatory tools, the Plan provided that the SROs may recover some or all of the costs to develop and operate CAT through fees on their broker-dealer members. The Plan established a method for determining those fees but did not specify how costs would be allocated among the SROs and broker-dealers. The order approved a Plan amendment replacing the original method for determining fees and specifying that two-thirds will be allocated to broker-dealers and one-third to the SROs.

Petitioners' challenges to that order are meritless. Their principal argument is that the order is unlawful because it fails to bar the SROs from also passing on their one-third share of CAT costs to broker-dealers. But the Commission simply declined to prejudge any future attempt by the SROs to do so, which would require filings that are subject to notice and comment and to disapproval by the Commission if inconsistent with the Exchange Act. And the Commission reasonably concluded that

CAT fees are likely to be less than 1/1000 of a penny per share and are therefore unlikely to have a significant impact on efficiency, competition, and capital formation.

Petitioners' broader attack on CAT itself flouts the Exchange Act's time limits for judicial review. But even if it were properly before the Court, CAT fits comfortably within the Commission's clear authority to ensure that the SROs' regulatory capabilities keep pace with changing markets and to require joint SRO action in regulating the national market system. Contrary to petitioners' assertions, neither the Commission's "direct access" to CAT, nor CAT's collection of limited customer-identifying information, undermines the Commission's authority under the Exchange Act. The Commission has always had access to SRO regulatory data, and nothing in the Act prohibits the Commission, which has parallel regulatory responsibilities as well as a duty to supervise the SROs, from having equally efficient access to equally comprehensive data.

Nor do these features trigger the major questions doctrine. That doctrine is already an awkward fit for an initiative that was met with broad market consensus and bipartisan support—including, until recently, by petitioners—and none of its hallmarks is present here. Moreover, petitioners' caricature of CAT as an Orwellian apparatus designed to snoop on Americans' personal financial decisions ignores the reality of CAT's strict limits on the collection, access to, and use of personal data.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the Commission's approval of the proposed allocation of CAT costs was reasonable and reasonably explained.

2.      Whether the Commission reasonably considered the effects on efficiency, competition, and capital formation.

3.      Whether petitioners' claim that CAT exceeds the Commission's statutory authority is time-barred and, in any event, meritless.

## COUNTERSTATEMENT OF THE CASE

**A.      Statutory, Regulatory, and Market Overview**

**1.      Under the Exchange Act, self-regulatory organizations serve as frontline regulators of their markets and members, subject to Commission oversight.**

**a.**  The first securities exchanges emerged in the early 1790s as voluntary associations of brokers that operated trading markets and enforced their members' compliance with self-imposed rules.  69 Fed. Reg. 71256, 71257 (2004).  For well over a century, these exchanges operated as private "business club[s]" supervising the conduct of their own members.  *Belton v. Hatch*, 17 N.E. 225, 226 (N.Y. 1888).  But the stock market crash of 1929 and Great Depression convinced Congress of the "need for statutory regulation of securities exchanges."  *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 349-51 (1963).

6

In the Securities Exchange Act of 1934, Congress preserved "the traditional private governance of exchanges" but subjected them to "appropriate federal regulatory supervision." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127-30 (1973). In 1938, Congress extended federally supervised self-regulation to the over-the-counter market, also known as the off-exchange market. 69 Fed. Reg. at 71257. In subsequent amendments, Congress has chosen to "preserve[] and strengthen[]" the Exchange Act's basic self-regulatory framework to harness the benefits of that scheme, which it has determined to be "distinctly preferable" to a "purely governmental approach." *Id.* at 71257-58 (quotation omitted).

**b.** The Exchange Act requires every exchange to register with the Commission as a "national securities exchange" or seek an exemption from registration. 15 U.S.C. 78c(a)(1), 78e. Brokers and dealers—persons engaged in the business of effecting securities transactions—must register with the Commission and become a member of a national securities exchange or a registered "[national] securities association" of over-the-counter broker-dealers. *Id.* 78c(a)(4)-(5), 78o(a)(1), (b)(1)(B).

Once registered, a national securities exchange or a national securities association becomes an SRO. *Id.* 78c(a)(26). SROs are responsible for enforcing compliance by their broker-dealer members with the federal securities laws, rules, and regulations, as well as additional rules that they develop. *Id.* 78f(b), 78o-3(b), 78s(g)(1), (h)(1). SROs must have rules that, among other things, are "designed to

7

prevent fraudulent and manipulative acts and practices" and provide for "appropriate[] discipline[]" of members that violate the securities laws and applicable rules. *Id.* 78f(b). SROs are thus required to "surveil trading on any markets they operate to detect rule violations and other improper practices, such as insider trading and market manipulation." 69 Fed. Reg. at 71259.

To that end, SROs developed audit trails that collected order information from their members. 75 Fed. Reg. 32556, 32558-61 (2010). SROs use audit trail data to identify and to assess potential misconduct on their markets. 77 Fed. Reg. 45722, 45727 (2012). SROs also gather and analyze significant amounts of market data to inform their own rulemaking efforts, particularly when their market surveillance reveals persistent problems. *Id.*

SROs "are required to expend sufficient resources . . . to support their surveillance functions." 68 Fed. Reg. 27722, 27722 (2003). As was the case prior to federal regulation, SROs' regulatory activities are funded primarily through dues and fees charged to their members and market participants. 69 Fed. Reg. at 71267-68. The Exchange Act requires that SRO rules "provide for the equitable allocation of reasonable dues, fees, and other charges among [the SRO's] members and issuers and other persons using its facilities." 15 U.S.C. 78f(b)(4), 78o-3(b)(5).

There are currently 24 registered national securities exchanges. "Once non-profit and member-owned, exchanges now are mostly for-profit companies."

*Intercontinental Exch., Inc. v. SEC*, 23 F.4th 1013, 1016 (D.C. Cir. 2022). The Financial Industry Regulatory Authority, Inc. ("FINRA"), a Delaware non-profit corporation, is the only registered national securities association. *Tuberville v. FINRA*, 874 F.3d 1268, 1270 & n.2 (11th Cir. 2017).

**c.** Congress has charged the Commission with both overseeing the SROs' regulatory activities and independently regulating markets and enforcing the securities laws. By statute, the Commission may grant SRO registration only if it determines that an exchange or association has the "capacity . . . to enforce compliance" by its members with the securities laws and applicable rules, and that its rules meet the statutory criteria. 15 U.S.C. 78f(b), 78o-3(b). The Commission may suspend an SRO's registration, or limit its activities, if it violates, is unable to comply with, or fails to enforce those laws and rules. *Id.* 78s(g)-(h). And the Commission may initiate a rulemaking to "abrogate, add to, and delete from" an SRO's rules as it "deems necessary or appropriate . . . in furtherance of the purposes of" the Act." *Id.* 78s(c).

Under Section 19(b) of the Exchange Act, SROs must file any proposed change in their rules with the Commission. Generally, the Commission "shall" approve the proposal if, after notice and comment, it finds that the proposal is "consistent with the requirements of" the Act. *Id.* 78s(a)-(b). Certain SRO rules, including those "establishing or changing a . . . fee," take effect "upon filing." *Id.* 78s(b)(3)(A). But the Commission "summarily may temporarily suspend" such a rule

9

within 60 days, in which case it must "institute proceedings . . . to determine whether the proposed rule should be approved or disapproved" based on its consistency with the Act.  *Id.* 78s(b)(3)(C).

The Commission also has independent authority to investigate violations of the securities laws and may bring civil actions in federal district court or institute administrative enforcement proceedings.  *Id.* 78u, 78u-2, 78u-3.  In furtherance of its oversight and enforcement powers, the Commission has broad authority to require that SROs and broker-dealers maintain and provide it with records.  *Id.* 78q(a).

### 2. In 1975, Congress granted the Commission broad authority to oversee the implementation, operation, and regulation of a national market system in securities.

**a.** In 1975, as part of a reexamination of the regulation of securities markets, Congress "enhance[d] the SEC's oversight of [SROs]" by establishing the SRO rule requirements and Commission review process described above.  *NASD v. SEC*, 431 F.3d 803, 807 (D.C. Cir. 2005).  At the same time, Congress enacted Section 11A of the Exchange Act, which grants the Commission "'broad, discretionary powers' to ensure 'maximum flexibility' in 'oversee[ing] the development of a national market system" that links all securities markets nationwide.  *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1131 (D.C. Cir. 2022) (quoting S. Rep. No. 94-75 at 7 (1975)).

Section 11A(a), the subsection relevant here, is divided into three paragraphs. Paragraph (1) sets forth certain congressional findings, including that "[t]he securities

10

markets are an important national asset which must be preserved and strengthened," and that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure," among other objectives, "economically efficient execution of securities transactions" and "fair competition" in the markets for trading and broker-dealer services.  15 U.S.C. 78k-1(a)(1).

Paragraph (2) directs the Commission "to use its authority" under the Exchange Act "to facilitate the establishment of a national market system . . . in accordance with the findings and to carry out the objectives set forth in paragraph (1)," while "having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets."  *Id.* 78k-1(a)(2).  And paragraph (3) grants the Commission authority "in furtherance of the directive in paragraph (2) . . . to authorize or require [SROs] to act jointly with respect to matters as to which they share authority under [the Act] in planning, developing, operating, or regulating a national market system."  *Id.* 78k-1(a)(3)(B).

**b.**  The Commission has adopted rules pursuant to its authority under Section 11A that provide a mechanism to effectuate the joint SRO actions necessary to the operation and regulation of the national market system.  Rule 608 provides that "[a]ny two or more [SROs], acting jointly," may file an NMS plan or propose an amendment to an existing plan.  17 C.F.R. 242.608(a)(1).  It also provides that, following notice and comment, the Commission "shall approve" an NMS plan or amendment if the

11

Commission finds that it "is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Act." *Id.* 242.608(b)(1)-(2). NMS plans developed and approved through this process have been used for decades to facilitate the operation and regulation of a fair and efficient national market system.

### 3. By 2010, a broad consensus emerged that a consolidated audit trail was needed to adequately regulate the national market system.

In the decades following the 1975 amendments, regulatory and technological changes transformed the structure of the securities markets. In 1975, stocks were traded on slow manual markets, and trading in any given stock was concentrated on its listing market. Today, trading is widely dispersed across a complex system of highly automated market centers, including exchanges, alternative trading systems, and broker-dealers' internal systems. 75 Fed. Reg. at 32556-57. Market participants "trade numerous products and enormous volume in mere seconds," and individual orders are frequently routed through multiple markets. *Id.*

These developments made it increasingly difficult for SROs to fulfill their market oversight responsibilities under federal securities law. *Id.* at 32564-65. SRO audit trails allowed each SRO to oversee trading by its own members on its own market. *Id.* at 32558-61. But they were of much more limited use in monitoring

trading across markets because an SRO's audit trail data ended as soon as an order was routed to another market, and different audit trails were neither uniform nor compatible. *Id.* at 32564-65. Investigating potential violations involving even a single order or market participant thus required a cumbersome, time-consuming process of compiling and analyzing disparate data from multiple broker-dealers and SROs, which might turn out to be inaccurate, incomplete, or impossible to reliably link. 77 Fed. Reg. at 45729-30. And timely reconstructions of major market events, such as the May 6, 2010 "Flash Crash," were not possible. *Id.*

By the early 2000s, market participants widely recognized the problem. In 2003, Nasdaq requested that the Commission require all SROs trading in Nasdaq-listed securities to have an audit trail identical to its own. 68 Fed. Reg. at 27723-24. In two subsequent releases, the Commission sought comment on how best to enhance the capability of SROs and the Commission to effectively and efficiently supervise cross-market trading activity. *Id.*; 69 Fed. Reg. at 71265-67. Many commenters agreed that existing audit trails were inadequate and recommended consolidating them into a single comprehensive audit trail. 75 Fed. Reg. at 32562-63.

In 2010, the Commission proposed Rule 613, which would require the SROs to jointly file an NMS plan to create, implement, and maintain a consolidated audit trail capturing customer and order event information for exchange-traded securities across markets, from order inception through cancellation, modification, or execution. *Id.* at

32564.  While there were disagreements over specific aspects of the proposal,

commenters overwhelmingly supported the creation of a consolidated audit trail.

77 Fed. Reg. at 45723-24.  FINRA argued that it was "essential to ensuring the proper

surveillance of the securities markets and maintaining the confidence of investors in

those markets."  *Id.* at 45736.  And the Securities Industry and Financial Markets

Association ("SIFMA"), representing broker-dealers, agreed that it "would enable the

SEC and [the SROs] to perform their monitoring, enforcement, and regulatory

activities more effectively" and would be "a much-needed improvement over today's

fragmented audit trail platforms."  *Id.*

## B.      The CAT NMS Plan

### 1.      In 2012, the Commission adopted Rule 613 requiring the SROs to develop a consolidated audit trail.

The Commission adopted Rule 613 in July 2012.  It found that "the regulatory

data infrastructure on which the SROs and the Commission currently must rely

generally is outdated and inadequate to effectively oversee a complex, dispersed, and

highly automated national market system."  *Id.* at 45723.  And it concluded that a

consolidated audit trail would "substantially enhance the ability of the SROs and the

Commission to oversee today's securities markets and fulfill their responsibilities

under the federal securities laws."  *Id.* at 45726.  No commenter questioned the

Commission's authority and no entity sought judicial review.

Rule 613 specified only the baseline requirements the Commission considered most critical to achieving the rule's regulatory objectives and gave the SROs significant flexibility in developing an NMS plan that met those objectives in an efficient and cost-effective manner. *Id.* at 45725-26, 45741-42. For example, the rule permitted the SROs to decide whether to build on existing audit trails or design a new system, *id.* at 45725, 45793, and did not require real-time reporting of order information, as had been proposed, *id.* at 45767-68.

Rule 613 required the SROs to address how they "propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of . . . costs among the [SROs], and between the [SROs] and [their] members." *Id.* at 45794. The Commission recognized that the SROs "may seek to recover some or all of these costs from their members." *Id.* at 45795.

### 2.    In 2016, the Commission approved the CAT NMS Plan.

The SROs filed the CAT NMS Plan in February 2015, and in November 2016, after public comment, the Commission approved it in a unanimous, bipartisan vote. 81 Fed. Reg. 84696 (2016). The Commission concluded that the Plan would "significantly improve regulatory efforts by the SROs and the Commission, including market surveillance, market reconstructions, enforcement investigations, and examinations of market participants," thereby "strengthen[ing] the integrity and

efficiency of the markets." *Id.* at 84727. Once again, no commenter disputed the Commission's authority to approve the Plan, and no entity sought judicial review.

**Governance.** The Plan takes the form of a limited liability agreement establishing a company jointly owned by the participating SROs (the "Participants")—now called Consolidated Audit Trail, LLC ("CAT LLC")—through which they conduct the activities of CAT. *Id.* at 84699. CAT LLC is managed by an Operating Committee consisting of representatives from each Participant. *Id.* at 84700. A Plan Processor selected by the Operating Committee is responsible for carrying out CAT's functions. *Id.* at 84704-06. The Plan also establishes an Advisory Committee including representatives from the broker-dealer industry to advise the Participants on the implementation and operation of CAT. *Id.* at 84730.

**Central Repository.** The Plan requires that every Participant or broker-dealer member of a Participant ("Industry Member") involved in the origination, routing, modification, execution, or cancellation of an order in national market system securities collect and report specified data to a "Central Repository" operated by the Plan Processor. *Id.* at 84706-07. The Plan Processor must validate and link all data for each order and make it available to the SROs and the Commission in a uniform electronic format that includes the ability to run searches and generate reports. *Id.* at 84713, 84719-20. The Plan provides for the retirement of duplicative audit trail systems as quickly as feasible once CAT is operational. *Id.* at 84774.

16

***Data Security.***  The Plan requires a comprehensive information security program that is regularly evaluated to ensure it remains "consistent with the highest industry standards for the protection of data."  *Id.* at 84722, 84753.  The SROs and the Commission may access CAT data "solely for the purpose of performing their respective regulatory and oversight responsibilities."  *Id.* at 84724, 84758.  CAT data containing personally identifiable information ("PII")—now limited to name, address, and birth year, *see* 85 Fed. Reg. 16152, 16156 (2020)—is stored separately from all other CAT data, and access to it is restricted to a limited set of authorized individuals. 81 Fed. Reg. at 84724-25, 84767-68.

***Funding Model.***  The Plan provided for the costs to build and operate CAT to be funded through fees assessed by the SROs.  Originally, the Plan established a bifurcated funding model under which execution venues (Participants and alternative trading systems) would be divided into tiers based on market share, while Industry Members (other than alternative trading systems) would be divided into tiers based on the message traffic they generate.  *Id.* at 84710.  It contemplated that the Operating Committee would later specify how the costs to build and operate CAT would be allocated between these two groups and determine fixed fees assessed by tier.  *Id.*  The CAT fees charged to Industry Members would be implemented through fee filings with the Commission under Section 19(b) of the Exchange Act.  *Id.*

17

***Economic Analysis.*** The Commission determined that the Plan would improve the completeness, accuracy, accessibility, and timeliness of the regulatory data available to the SROs and the Commission. *Id.* at 84800. This would lead to "more effective and efficient regulation of securities markets and market participants," thereby "significantly benefit[ting] investors and the integrity of the market" and "increas[ing] capital formation, liquidity, and price efficiency." *Id.* at 84800-01.

Relying on estimates provided by entities bidding to become Plan Processor, the Commission projected that it would cost between $37.5 million to $65 million to build CAT and between $36.5 million and $55 million annually to operate it. *Id.* at 84854. But these estimates were subject to many "uncertainties," including "the evolution of technology and market activity." *Id.* at 84853.

The Commission estimated that the nation's 1,800 broker-dealers would incur, in aggregate, approximately $2.2 billion in implementation costs and $1.5 billion in annual CAT reporting costs (compared to $1.6 billion spent annually on then-existing regulatory data reporting activities). *Id.* at 84862. It estimated that the Participants would incur $37.7 million in implementation costs and $114.3 million in annual costs to report CAT data and perform surveillance (compared to $170.3 million spent annually on then-existing data reporting and surveillance activities). *Id.* at 84857.

18

### 3.    CAT is now operational and serves as a critical market oversight tool.

Since Plan approval in 2016, CAT has been developed and implemented and the Participants and Industry Members have revamped their systems to comply with it.  The Plan Processor, the Participants, and Industry Members have worked through a number of complex issues, and the Commission has granted certain exemptions from or approved amendments to the original Plan to, among other things, address data security concerns, reduce costs, and overcome implementation challenges.  *See, e.g.*, 88 Fed. Reg. 77128 (2023); 85 Fed. Reg. 31322 (2020); 85 Fed. Reg. 16152.

The Participants and Industry Members began reporting to CAT in 2020, and by the end of 2022, CAT was processing over 400 billion records per day.  A258.  FINRA retired its former audit trail system in September 2021, FINRA Regulatory Notice 21-21 (June 17, 2021), http://tinyurl.com/4wzrzsed, and CAT data is now "an integral part of [its] automated market surveillance program," FINRA Letter of Acceptance, Waiver and Consent with Instinet, LLC 2 (Aug. 16, 2023), https://tinyurl.com/mu67x95c.  FINRA uses CAT data "to detect manipulative activity and other potential violations" and "accurately reconstruct market events."  *Id.*  CAT has also contributed to the Commission's enforcement and regulatory work.  *See* Gary Gensler, Chair, SEC, Statement on CAT Funding (Sept. 6, 2023), https://tinyurl.com/mw4d4tbh.

### C.    Funding Model Proceedings Before the Commission

**1.**  Between 2017 and early 2023, the Participants filed several unsuccessful CAT funding proposals.  87 Fed. Reg. 33226 (2022); 86 Fed. Reg. 21050 (2021); 83 Fed. Reg. 1399 (2018).  Over that time, the Participants have fronted all of the more than $700 million in costs to build and operate CAT to date.  A239.[1]

On March 15, 2023, the Participants filed the funding amendment at issue in this case.  A9.  The amendment funds prospective CAT costs through a fee on transactions in eligible securities to be divided evenly between the executing broker for the buyer, the executing broker for the seller, and the Participant in the transaction.  A207.  The fee amount is determined by multiplying the number of "executed equivalent shares" in the transaction—a measure that weighs equities and options differently—by a "fee rate."  *Id.*  The fee rate will be calculated annually by dividing the reasonably budgeted CAT costs by the reasonably projected executed equivalent share volume for the year.  A227.  If CAT fees exceed actual costs, the surplus will be used to offset future fees.  A228.

Executing brokers for the buyer and seller will be charged an additional fee, over a period of two to five years, to recover two-thirds of the historical CAT costs the Participants have already paid.  A237.  This fee amount will similarly be determined using a "historical fee rate" calculated by dividing the total reasonably

---

[1] "A__" refers to petitioners' Appendix.  "Br. __" refers to petitioners' opening brief.

incurred historical CAT costs—which excludes certain costs associated with the termination of the initial Plan Processor—by the reasonably projected executed equivalent share volume for the recovery period.  A241.  The fee will remain in effect until Industry Members' share of historical CAT costs are recovered.  A241-42.

Before imposing either of these fees, the Participants must submit fee filings under Section 19(b) of the Exchange Act, which are subject to public comment and potential Commission suspension.  A235, 242.

**2.**  After an extended comment period, the Commission approved the amendment in an order issued on September 6, 2023.  A205-263 ("Order").  The Commission explained that CAT costs "must be allocated in some fashion between Participants and Industry Members, and how to do so is a question of judgment for which there may be multiple reasonable approaches."  A213.  It concluded that the Participants' choice was reasonable and satisfied the approval standard in Rule 608(b)(2).  A213, 222.

The Commission explained that executed equivalent share volume is a "reasonable proxy" for cost burden on CAT, and that dividing CAT costs "among the three parties who play significant roles in transactions reportable to the CAT"—the buyer, seller, and market regulator—"represents a reasonable method of allocating costs among the parties who participate in and benefit from" trading activity.  A206, 218-19, 222.  The Commission explained that the reasonableness of this allocation

21

does not depend on whether Participants later seek to recover their share of CAT costs through separate fees, which would have to be filed with the Commission and satisfy all Exchange Act requirements.  A206, 213-14.  It made no determination whether any future fee filings would satisfy those requirements.  *Id.*

The Commission also addressed concerns some commenters raised about the rising cost of CAT.  The Commission explained that CAT's primary cost drivers are "directly related to trading activity" and that many more records are processed by CAT than anticipated in 2016.  A254, 258.  Still, the Commission determined that CAT fees are likely to be significantly less than other transaction costs and fees.  A240, 259 n.1102.  And the Commission concluded that the Participants will have sufficient incentives to limit costs that are within their control.  A213-14, 232-33, 258.

Finally, the Commission analyzed the amendment's potential effects on efficiency, competition, and capital formation, concluding that the amendment will improve efficiency in some dimensions and decrease it in others; that, while it could negatively alter the competitive position of particular competitors, the fees are unlikely to be large enough to affect overall competition; and that it will result in insignificant effects on capital formation.  A253.

## STANDARD OF REVIEW

The Order may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A).  Under that

"highly deferential" standard, the Court may not "substitute [its] judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016).

## SUMMARY OF ARGUMENT

**1.** The Commission reasonably determined that the SROs' proposed allocation of CAT costs met the standard for approval under Rule 608—the only issue before it. Contrary to petitioners' assertion, the Commission's adherence to its longstanding position that the SROs may be able to pass on their share of CAT costs to Industry Members in the future if they can satisfy all applicable Exchange Act requirements does not "allow" the SROs to violate the Act's requirement of an equitable allocation of reasonable fees. The Commission was not required to prejudge any such hypothetical future fee filings, and it did not do so.

**2.** The Commission also reasonably considered the funding amendment's impact on efficiency, competition, and capital formation. The Commission used updated information to conduct a balanced analysis of the tradeoffs between the original and new funding models, as well as a reasonable quantitative and qualitative assessment of the potential effects on investors.

**3.** Petitioners' argument that CAT exceeds the Commission's authority is time-barred and meritless. The statutory deadlines to challenge Rule 613 and the

23

Commission's approval of the Plan expired years ago, and none of the limited

circumstances in which courts have allowed such otherwise untimely facial challenges

exists here.  In any event, the creation of CAT fits squarely within the Commission's

authority under multiple, interrelated provisions of the Exchange Act, a conclusion

fortified by the context, history, and purposes of the Act.

## ARGUMENT

### I.    The Commission's approval of the amendment to the funding model in the CAT NMS Plan was reasonable and reasonably explained.

The only issue before the Commission in the Order under review was whether

the SROs' proposed amendment to the funding model in the CAT NMS Plan was

"necessary or appropriate in the public interest, for the protection of investors and the

maintenance of fair and orderly markets, to remove impediments to, and perfect the

mechanisms of, a national market system, or otherwise in furtherance of the purposes

of the [Exchange] Act," 17 C.F.R. 242.608(b)(2)—and that is the only determination

properly subject to challenge here.  The Commission reasonably concluded that the

SROs' proposed allocation method was reasonable and satisfied that standard.

### A.    The Commission reasonably explained its approval of the new funding model's allocation of costs.

The amendment proposes to allocate CAT costs through transaction fees based

on executed equivalent share volume, which is a reasonable proxy for cost burden on

CAT.  A206, 218-19, 222.  Transaction fees based on that metric are "simple to

understand and implement" and "neutral as to the location and manner of execution," thus avoiding adverse market effects. A215, 218-19. And splitting such fees evenly among the "buyer, seller, and market regulator" in the transaction reasonably allocates CAT costs to the primary parties that participate in and benefit from trading activity and the market oversight CAT enables. A206, 215, 259-60.

Petitioners do not dispute the reasonableness of this method for determining CAT fees. Rather, they incorrectly assert (at 4, 43) that the allocation is a "sham" because the Order "lets the SROs pass on *all* of their costs" to members through separate fees. In reality, the Order adheres to the Commission's position from CAT's inception that the SROs *may* be able to recover their share of CAT costs from members, but only *if*, as the Exchange Act requires, they are able to demonstrate that such fees are "reasonable, equitably allocated, not unfairly discriminatory, and do not unduly burden competition." A213-14; *see* 85 Fed. Reg. at 31332; 81 Fed. Reg. at 84794-95; 77 Fed. Reg. at 45795.[2]

As the Commission explained (A213-14), while SROs' fees on Industry Members may take effect upon filing, they are subject to notice and comment. 15 U.S.C. 78s(b)(1), (3)(A). And, based on those comments or on its own initiative, the Commission may, if "necessary or appropriate in the public interest, for the

---

[2] There is thus no merit to petitioners' contention (at 34) that the Commission arbitrarily changed its position on allocating CAT costs between the SROs and broker-dealers.

protection of investors, or otherwise in furtherance of the purposes of [the Exchange Act]," suspend the effectiveness of such fees and institute proceedings to determine whether they are consistent with the Act. *Id.* 78s(b)(3)(C).

The Commission emphasized that "[a]ny effort to pass-through costs will be subject to that [fee filing] process," and that it was making no determination as to whether any future fee filings would meet the statutory requirements. A213-14, 236, 242. The Commission further noted that *if* the SROs propose fees to recover their costs from Industry Members, and *if* they are able to demonstrate that those fees are equitable and reasonable, Industry Members "may be able to" pass the fees on to their customers, and that the resulting "costs borne by investors are likely small relative to current transaction costs." A214.

Petitioners point to a footnote recognizing that "*[i]f* exchanges passed their CAT fees onto their members in full, the Industry Members would effectively bear 100% of the CAT allocation," A261 n.1135 (emphasis added), but that statement does not address whether exchanges will attempt to do so, or whether any particular attempt would be consistent with the Exchange Act. The recent fee filing submitted by FINRA—which, unlike the exchanges, is a nonprofit funded entirely by its members—confirms not only that the Order *did not* "already decide[]" (Br. 37 n.4) that issue, but also that there is an appropriate process for doing so at a later day. *See* 89 Fed. Reg. 10850, 10886 (2024) (suspending the effectiveness of FINRA's proposed

26

fees and instituting proceedings under Section 19(b) to determine whether they are consistent with the Exchange Act and the Plan).

Petitioners are thus simply wrong in asserting (at 36) that the decision not to affirmatively prohibit pass-through of the SRO's share of costs "empower[s] the SROs to *violate*" the Exchange Act's requirement of equitably allocated and reasonable fees. As the Commission explained, "regardless of . . . the initial allocation"—which it determined to be reasonable—Section 19(b) permits the SROs to impose fees that are "reasonable and consistent with the Exchange Act." A213. The Commission reasonably chose to reserve judgment as to whether hypothetical future fee filings based on currently unknown facts and market conditions would meet that standard.

Nor is there any merit to petitioners' argument (at 38) that the Commission failed to respond to Citadel's comment that pass-through should be prohibited to prevent an inequitable allocation of fees. A121. The Commission's thorough discussion of pass-through, including its reaffirmation that any future pass-through fees "must be consistent with applicable statutory standards under the Exchange Act, including being reasonable, equitable, and not unfairly discriminatory," A214, shows that it "thought about [Citadel's] objections and offered reasoned replies—all the APA requires." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 450 (5th Cir. 2021) (quotation omitted).

27

SIFMA raises several additional objections to the allocation that the Court need not consider, and they are meritless in any event. *See Stanley v. City of Sanford*, 83 F.4th 1333, 1344 (11th Cir. 2023) ("We will not consider arguments raised only by amici."). SIFMA contends, for example, that the SROs "should be responsible for most of CAT costs" because they designed and use CAT. SIFMA Br. 18. But "CAT was created to serve regulatory," not proprietary, purposes, and SROs have long been permitted to recover regulatory costs from their members subject to Exchange Act requirements. A213.

SIFMA's criticism that the allocation bears "no relationship" to responsibility for CAT costs misses the mark. SIFMA Br. 18. The Commission reasonably concluded that because there is no way to calculate each Participant's and Industry Member's cost burden on CAT, it is reasonable to use a proxy such as executed share volume and to allocate the transaction fee "evenly among the three parties who have primary roles related to the transaction." A206, 218-19, 222.

The Commission also reasonably rejected arguments that the allocation should have accounted for Industry Members' compliance costs and the Participants' alleged responsibility for market structure "complexity." SIFMA Br. 18-19. As the Commission explained, the Participants have also incurred compliance costs and, like all regulatory compliance costs, Industry Members and Participants will make business decisions as to how to accommodate them. A214. The amendment addresses the

distinct set of costs to develop and maintain CAT, which the Plan explicitly permits the Participants to recover. *Id.* Similarly, the costs allocated under the funding model are incurred to fund CAT as a tool to monitor the market as it exists, not to "assess responsibility for the market structure." A214-15.

The Commission reasonably concluded that the existence of other potentially permissible approaches, such as SIFMA's preferred 50%-50% allocation, did not "call into question the [amendment's] satisfaction of the approval standard." A215 & n.208, 222. SIFMA's contrary arguments (SIFMA Br. 21-22) rest on inapposite cases addressing the Commission's obligation to consider alternatives when imposing its own policy preferences through rulemaking. And contrary to SIFMA's argument (SIFMA Br. 24), the Commission thoroughly explained why it was reasonable to treat FINRA like all other Participants for purposes of the initial allocation. A222, 258.

**B.** **The Commission reasonably addressed concerns about the effect of the proposed allocation on the SROs' incentives to control costs.**

The Commission also reasonably concluded that petitioners' and SIFMA's concerns regarding the growth of CAT's budget (Br. 34-35; SIFMA Br. 11-12) did not render the proposed funding amendment unreasonable.

As the Commission explained, the cost of CAT is driven primarily by the costs of processing, storing, and linking CAT data in accordance with Plan performance requirements not at issue in this proceeding. A232, 254. These costs, in turn, are "directly related to trading activity." A258. And there has been an unanticipated

29

increase in trading activity generating reportable CAT data.  By the end of 2022, CAT received an average of 418 billion records per day, more than seven times the 58 billion records per day estimated in 2016 when the Commission adopted the Plan.  *Id.*

The Commission also reasonably explained that the SROs will continue to have sufficient incentives to contain the costs within their control.  The SROs still have to front CAT's operating costs and are responsible for paying their one-third share of CAT fees.  A232-33.  And a failure to control costs would jeopardize their ability to obtain Commission approval of any attempt to pass-through their share, as well as approval of the CAT fees themselves.  That is because the SROs must demonstrate that CAT's budget is "reasonable" and that any proposed fees are "reasonable and consistent with the Exchange Act."  A213-14, 228, 232-34.  If they cannot, the Commission would have "grounds to suspend [a fee] filing and ultimately disapprove it."  A214.  And this incentive is further reinforced by cost discipline mechanisms such as independent audits, financial and budget disclosure requirements, a cost-management working group, and Commission oversight.  A232, 240.

The Commission's recognition that the obligation to justify fees creates an incentive to control costs is entirely consistent with *Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022).  *Contra* Br. 35.  There, the Commission declined to consider the costs to build and maintain a new FINRA data service before approving it, deferring consideration until the later fee filing stage.  The court rejected that approach because

30

the costs "will have already [been] incurred" by that point. 45 F.4th at 477. But the Commission *did* consider the costs to build and maintain CAT in the 2016 approval order; the Order here addressed the distinct question of the allocation's effect on the SROs' cost-control incentives going forward. On that question, *Bloomberg* confirms that the fee filing process is a meaningful check. *Id.* at 476; *see also NASDAQ Stock Mkt., LLC v. SEC*, 961 F.3d 421, 430 (D.C. Cir. 2020).

Petitioners' suggestion (at 23, 34) that the Commission and the Participants are unwilling to limit costs ignores a series of efforts to do just that. For example, the orders petitioners claim (at 9) "expanded" CAT in fact gave the Participants additional time to either comply with certain Plan requirements or propose to amend them. 88 Fed. Reg. at 77128-29. The Participants sought judicial review to preserve their ability to contest the requirements, and the Commission ended up conditionally exempting the Participants from all of them. *Id.* at 77129-32.[3] The Commission has granted other cost-saving relief as well. *See, e.g.*, 88 Fed. Reg. 84026 (2023); 88 Fed. Reg. 51369 (2023); 85 Fed. Reg. 16152. And after the funding amendment was approved,

---

[3] For example, the Participants argued that the Plan's unambiguous search performance requirements were "technologically infeasible" given certain system design choices the Participants made after CAT's approval. 87 Fed. Reg. 42247, 42249-50 (2022). The Commission has not "insisted" that they comply with these requirements (Br. 28)—it has *exempted* them from the requirements on the condition that they, *inter alia*, maintain existing performance. 88 Fed. Reg. at 77130.

31

the Participants proposed significant additional cost-saving amendments. Securities Exchange Act Rel. No. 99938 (Apr. 10, 2024), https://tinyurl.com/4suaf4za.

Petitioners similarly err in asserting (at 35-36) that the SROs' inclusion of certain legal and public relations costs in their fee filings demonstrates that the proposed allocation is unreasonable. The Plan expressly permits recovery of those categories of costs. 81 Fed. Reg. at 84710, 84794. If petitioners believe specific costs are unreasonable or inconsistent with the Plan, they can present those arguments in the fee filing proceedings. A233; *see* 89 Fed. Reg. 10850 (suspending and instituting proceedings on FINRA's fee filing). Or they could advocate for a Plan amendment.

Finally, there is no merit to SIFMA's contention that the Commission "ignored" requests that it amend the Plan to give Industry Members voting representation on the Operating Committee. SIFMA Br. 9-10. Among other things, as the Commission pointed out, the D.C. Circuit held in 2022 that the Commission lacks authority to provide non-SRO voting representation on an NMS plan's operating committee. A252 (citing *Nasdaq*, 38 F.4th at 1135-39). The Commission also explained both that the issue was not within the scope of the funding amendment, as it had already been considered and decided in 2016, and that Industry Members are represented on the CAT Advisory Committee, which attends Operating Committee meetings and advises the SROs on CAT issues. *Id.*

32

**II.    The Commission reasonably considered the amendment's potential effects on efficiency, competition, and capital formation.**

The Commission also satisfied its obligation to "consider the impact" of the proposed amendment "on efficiency, competition, and capital formation."  17 C.F.R. 242.613(a)(5); *see also* 15 U.S.C. 78c(f).  Petitioners' contrary arguments mischaracterize both the Commission's obligation and its analysis.

**A.    The Commission reasonably analyzed the amendment against the baseline of the funding model approved in 2016.**

Using "information learned since [2016]," the Commission properly focused its economic analysis on the amendment's changes to the existing Plan:  specifying allocation percentages and switching from fixed-tier fees based on message traffic and market share to transaction fees based on executed share volume.  A253.  Contrary to petitioners' objections (at 42-43), the Commission's analysis of those changes incorporated updated CAT cost and budget data (A254-55, 258-59), as well as new information regarding, among other things, broker-dealers' internal systems, practices, and business models (A256, 260), equities and options trading volumes and message traffic (A257-59), and other transaction costs and fees (A259).

Petitioners cherry-pick statements from the Order to create the misimpression that the Commission skewed the baseline to favor the amendment.  Br. 43, 45.  In fact, the Commission conducted a balanced analysis of the tradeoffs between the two funding models.  For example, the Commission concluded that the amendment will

generate efficiencies because fees will be less complex to implement and pass-through and will no longer be linked to message traffic, which would have disproportionately burdened the supply of liquidity by market makers. A218-19, A255-56, 259. But it acknowledged the countervailing risk that, since fewer Industry Members will be charged fees, market makers could bear a large proportion of those fees. A259. And it recognized a potential efficiency loss to the extent share volume does not align as closely with CAT costs as message traffic. A257.

Similarly, the Commission explained that, while the competitive position of some trading service providers (including broker-dealers that execute trades internally) could be adversely affected, the overall competitive effects were likely to be small and "unlikely to significantly affect order flow." A261-62. The Commission also noted that "small broker-dealers are less likely to face CAT fees that are outsized relative to their revenue," but broker-dealers offering a wider variety of services may find it easier to pass on fees to customers, which could increase barriers to entry. A262-63.

The Commission recognized that *both* funding models presented a risk that "Participants might not have the incentive to seek efficient ways to achieve the regulatory objectives of CAT." A258. But the Commission did not use that observation as an excuse to minimize or disregard the amendment's impact on the SROs' incentives, as petitioners misleadingly suggest (at 43). As discussed, the

34

Commission addressed such concerns at length, identifying multiple cost-control incentives that will continue to exist.  *Supra* 29-30.

Petitioners err in asserting (at 40-41) that the Commission was required not only to analyze the economic effects of the amendment, but also to "update" its 2016 economic analysis of the Plan itself.  The Commission did not reconsider CAT in this proceeding (A233-34), and while there are mechanisms by which petitioners could seek such reconsideration, this was not one of them.  *See* 17 C.F.R. 242.608(b)(2) (Commission-initiated amendments to an NMS plan require rulemaking); *cf. Alon Refin. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 643 (D.C. Cir. 2019) (argument that changed circumstances warrant reconsidering a rule is "cognizable through review of the denial of a petition to amend [or rescind]").  Petitioners' reliance (at 41) on cases addressing an agency's obligation to consider new evidence or information before adopting a rule is misplaced because the Commission used "the best information available" to it both in approving the Plan in 2016 and in approving the funding amendment in 2023.  *Catawba Cnty. v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009).

Petitioners' assertion (at 41, 43, 45) that the allocation of *any* costs to Industry Members represents a "change[]" to the Plan requiring an entirely new economic analysis of CAT is likewise incorrect.  Rule 613 and the Plan both require CAT costs to be allocated between the Participants and Industry Members.  81 Fed. Reg. at 84795; 77 Fed. Reg. at 45795.  And in approving the Plan, the Commission

35

recognized that the Plan "calls for recovery of some or all of the CAT development costs from Industry Members" and incorporated that assumption into its economic analysis. 81 Fed. Reg. at 84855, 84857-58 (assigning all the SROs' development costs up to that point to broker-dealers).

## B. The Commission reasonably analyzed the amendment's potential effects on investors.

Petitioners' argument that the Commission failed to adequately quantify the likely economic effects on investors fares no better. The Commission's statutory obligation to "consider" effects on "efficiency, competition, and capital formation" does not require "a quantitative analysis to determine a proposed rule's economic implications" whenever "quantitative methods [are] feasible." *Chamber of Com. v. SEC*, 85 F.4th 760, 773 (5th Cir. 2023); *see also Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (no requirement "to conduct a rigorous, quantitative economic analysis"). Rather, it gives the Commission "discretion" to choose an appropriate "mode of analysis" subject to ordinary APA reasonableness review, *Chamber*, 85 F.4th at 773-74 & n.14, which may include "a general analysis based on informed conjecture," *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022) (quotation omitted).

The Commission reasonably engaged in both a qualitative and quantitative analysis of the amendment's potential effects on investors. In 2016, the Commission recognized that "some or most of the costs of CAT will be passed on to investors," 81 Fed. Reg. at 84863, and it did so again here. A213-14, 259. The amendment may

change "which investors ultimately bear CAT costs," the Commission explained, but may not change "the total costs borne by investors." A263; *see also* A218, 257 (discussing potential effects on retail investors). Still, the Commission acknowledged that investment incentives and capital formation could be adversely affected if those costs are "large enough to affect investors' allocation of capital." A257, 263.

To assess those effects, the Commission estimated the likely size of historical CAT fees on a per-share basis using "actual CAT costs and volume estimates grounded in historical volume." A259 & n.1102. It estimated a CAT fee of $0.0000417950 per executed equivalent share for all historical CAT costs incurred before 2022—less than 1/1000 of a penny per share—one-third of which would be paid each by the buyer and seller. A259. And it explained that the prospective fee rate is unlikely to be significantly larger. A259 & n.1102.

The Commission reasonably concluded that fees of this size are unlikely to have a significant impact on efficiency, competition, or capital formation. A240, 259, 263. As the Commission observed, the estimated CAT fees are relatively small on a per-share basis compared to current transaction costs and fees. For example, average effective half spreads (a measure of transaction costs) are more than 300 times bigger. A259 & n.1101. And recent Section 31 fees (a transaction-based regulatory fee broker-dealers must charge their customers) are between two and ten times bigger. A259 & n.1100. Moreover, the Commission explained, the fees borne by investors

37

must be considered in the context of the substantial benefits of CAT, which, by enabling effective market oversight, may promote "investor confidence," "expanded investment opportunities," and "increased trading activity." A239, 259-60.

Petitioners speculate (at 47) that the Commission could have used CAT data to estimate the aggregate amount of CAT fees investors will bear. But even if that were "feasible," the Commission's focus on per-share costs—aggregate cost spread across all trades—was reasonable. *Chamber*, 85 F.4th at 774. Petitioners object (at 46) that the small per-share cost does not make the total amount "inconsequential," but the Commission never said it did, and it is reasonable to assess the economic effects of a fee by assessing the degree to which it will impact (and thus affect the behavior of) individual market participants. Among other advantages, the Commission's analysis facilitated a meaningful comparison of the costs and benefits of CAT relative to other regulatory fees. A259, 263. And while the Commission did not incorporate "the future trajectory of the CAT budget" into its estimates (Br. 46)—because of the many uncertainties in reliably projecting CAT costs over an extended period—its estimates were still orders of magnitude smaller than other costs and fees. A258-59.

None of petitioners' cases establishes that the Commission was required to do more. In *Chamber*, the Commission "expressly asked for" and "then ignore[d]" data that would have allowed it to quantify "the very concern motivating" the proposed rule. 85 F.4th at 775-76. The Court held that, although generally "not required to

38

undertake a quantitative analysis," the Commission did not engage in "reasoned decisionmaking" because the "only basis" for its decision not to quantify the rule's purported benefit—that quantification was impossible—was belied by the record. *Id.* at 773, 776 (quotation omitted). Similarly, in *Business Roundtable v. SEC,* 647 F.3d 1144 (D.C. Cir. 2011), and *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), the Commission's discussion of economic effects "was functionally equivalent to no economic impact analysis at all." *Chamber*, 85 F.4th at 773.

Here, the Commission did not "d[o] nothing" to assess the economic effects on investors, *Bus. Roundtable*, 647 F.3d at 1150—it simply conducted a different quantitative analysis than the one petitioners suggest, in addition to a qualitative analysis. Nor did the Commission "ignore" the Citadel comment on which petitioners rely (at 47). *Chamber*, 85 F.4th at 776. That comment did not even mention the analysis of the effects of CAT fees on investors that petitioners now hypothesize could have been done; it urged the Commission to analyze the burden on *proprietary traders*. A199. The Commission responded to Citadel's comment, explaining that it is reasonable for proprietary traders "to incur CAT fees for [their] profit-making business activities." A214.

And in any event, petitioners' proposal for estimating the aggregate amount of CAT fees borne by investors would have been both over- and under-inclusive. As the Commission explained, "not all Industry Members currently pass through fees," and it

39

could not "determine in advance the extent to which Industry Members can or will pass-through their CAT fees to investors." A214. For competitive reasons, for example, some broker-dealers may decide to "absorb such fees or accept reduced payment for order flow." A262. Nor could the Commission predict the amount of the SROs' collective share that might be passed on to Industry Members and ultimately to investors. A213-14, 258, 261.

*    *    *

The Court should reject petitioners' APA arguments for all the reasons discussed above. But if the Court were to find that the Commission did not adequately explain its approval of the amendment or analyze the amendment's potential economic effects, the Court should remand without vacatur because "it is not at all clear" that any such error "tainted the agency's decisionmaking process." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015); *see also Chamber*, 85 F.4th at 780; *Bloomberg*, 45 F.4th at 477-78.

### III. Petitioners' challenge to the Commission's statutory authority is time-barred and, in any event, meritless.

From Rule 613's proposal in 2010 until 2023, *no one* suggested the Commission lacked authority to require a consolidated audit trail. Not the SROs that have spent hundreds of millions to get CAT up and running. Not the many broker-dealers that have overhauled their systems and now report to CAT every day. Not petitioner Citadel, which "fully support[ed] the need for a robust CAT" in 2020. Letter from

40

Citadel to V. Countryman, Attach. 1 (Nov. 30, 2020), http://tinyurl.com/cmhe3crb.

Nor petitioner ASA, which, in 2019, reaffirmed its support for "a market-wide

surveillance system that allows the SEC to properly oversee markets, take action

against wrongdoers, and protect investors." Letter from ASA to V. Countryman 1

(Oct. 28, 2019), http://tinyurl.com/2p92w5db.

The Court should not reach that issue here—the statutory timeframe for

challenging the Commission's authority expired many years ago, and the Order under

review did not restart the clock. In any event, CAT fits squarely within the

Commission's authority, as confirmed by the "text of the [Exchange Act], its

structure, its history, and its stated purpose[s]." *Autauga Cnty. Emergency Mgmt.*

*Commc'n Dist. v. FCC*, 17 F.4th 88, 99 (11th Cir. 2021). And the major questions

doctrine, on which petitioners' contrary argument depends, does not apply.[4]

### A.  Petitioners' contention that CAT exceeds the Commission's authority is not properly before the Court.

The 60-day statutory deadlines to challenge Rule 613 (adopted in 2012) and the

Commission's approval of the CAT Plan (in 2016) have long passed. 15 U.S.C.

---

[4] The First, Fourth, and Fifth Amendment objections to CAT raised by amici are also untimely. And because they are "raised only by amici," *Stanley*, 83 F.4th at 1344, and were not raised before the Commission, *see* 15 U.S.C. 78y(c)(1), they are not properly before the Court. In any event, those provisions are not implicated by the collection of information that investors voluntarily disclose to broker-dealers to effectuate securities transactions—information which, by statute and SRO rules, broker-dealers are required to maintain and make available to the SROs and the Commission.

78y(a)(1), (b)(1).  And petitioners' opening brief offers no theory for ignoring those limits.  *See McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1364 n.1 (11th Cir. 2021) ("[A]rguments raised for the first time in a party's reply brief are waived.").

Petitioners do not—and cannot—argue that the Commission's approval of the funding amendment reopened the question of its authority to adopt Rule 613 or approve the Plan.  The Commission did not "undertake[] a serious, substantive reconsideration" of that issue.  *Growth Energy v. EPA*, 5 F.4th 1, 21 (D.C. Cir. 2021) (quotation omitted).  Rather, it "took the [Plan] as a given" and considered only whether to approve the amendment, with or without modification, under the standard set out in Rule 608.  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 243 (5th Cir. 2023), *cert. granted on other grounds*, 144 S. Ct. 537; *see* A206.  For the Commission to reconsider CAT itself, it would have to engage in a rulemaking—a path distinct from the SRO-initiated proceeding below.  17 C.F.R. 242.608(b)(2) ("Promulgation of an amendment to an effective [NMS] plan initiated by the Commission shall be by rule.").

At no point did the Commission "invite[] comment on the statutory authority supporting [CAT]," and while it responded to Citadel's unsolicited comment (A249-50), it did not do so "in a way that suggested it did in fact reconsider the issue." *Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 39 n.6 (D.C. Cir. 2006); *see also Am. Rd. & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1114 (D.C. Cir. 2009) (such responses are "rarely if ever" sufficient for reopening).  A petitioner may not "comment upon

42

matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had reopened the issue." *Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) (quotation omitted).

Nor did the Order "significantly alter[] the stakes of judicial review" by making a change "that could have not been reasonably anticipated." *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017 (D.C. Cir. 2016) (quotation omitted). Rule 613 and the Plan expressly contemplate that Industry Members will be responsible for "some or all" of the "substantial" costs to develop and operate CAT. 77 Fed. Reg. at 45794-95; *see also* 81 Fed. Reg. at 84794. The Order does not "fundamentally alter the nature of" that scheme, *All.*, 78 F.4th at 243, and thus does not effect the kind of "sea change" required to trigger a constructive reopening, *Nat'l Biodiesel Bd.*, 843 F.3d at 1017.

Finally, the Order does not "re-appl[y]" Rule 613 or the CAT NMS Plan in such a way as to allow an otherwise untimely facial challenge to the Commission's authority. *Consumers' Rsch. v. FCC*, 88 F.4th 917, 922 (11th Cir. 2023). The Order does not "require[e] a plaintiff to comply with [a] regulation, impose[] a fine or other sanction against the plaintiff for violating [a] regulation, or den[y] a plaintiff's petition to rescind [a] regulation." *Am. Stewards of Liberty v. DOI*, 960 F.3d 223, 229 (5th Cir. 2020); *see also Charter*, 460 F.3d at 38. Rather, it approves an amendment to the Plan's framework for allocating CAT costs, and it is only that amendment—not the future fee filings necessary to implement any fees—that is subject to review here.

43

**B.** **Regardless, CAT falls squarely within the Commission's authority to oversee the SROs and the national market system.**

**1.** **The text, structure, history, and purposes of the Exchange Act confirm the Commission's authority.**

**a.** The Exchange Act charges the Commission with ensuring that the SROs "ha[ve] the capacity to be able to carry out" their regulatory duties, 15 U.S.C. 78f(b), 78o-3(b), and authorizes it to sanction SROs that violate, are unable to comply with, or fail to enforce the securities laws, *id.* 78s(h)(1). To ensure the Commission's ability to carry out this oversight is "reasonably complete and effective," *id.* 78b, the Act grants additional authority. The Commission may, for example, require that the SROs and their members maintain and provide it with records "necessary . . . to oversee compliance with and enforce" the securities laws." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979) (discussing 15 U.S.C. 78q(a)). It may also "abrogate, add to, and delete from" SRO rules as it "deems necessary" in furtherance of the Act's purposes. 15 U.S.C. 78s(c). And it has the power "to make such rules . . . as may be necessary or appropriate to implement the provisions of" the Act, *id.* 78w(a)(1), including those requiring it to enforce the SROs' compliance with their regulatory obligations.

Prior to CAT, the Commission exercised its oversight authority to require that SROs enhance their audit trail systems to address gaps in regulatory capabilities in light of changing market conditions. *See* 70 Fed. Reg. 2436, 2437 (2005); 68 Fed. Reg. 20200, 20200-01 (2003); 63 Fed. Reg. 12559, 12560 (1998). Similarly, the Commission

44

has long required broker-dealers to maintain detailed customer information and to provide those records to the SROs or the Commission electronically upon request for surveillance, enforcement, and other regulatory purposes. *See* 17 C.F.R. 240.17a-3, 240.17a-4, 240.17a-25; 75 Fed. Reg. at 32557-58.

Congress's expansion of the Commission's authority to oversee the SROs in 1975 dovetailed with its directive in Section 11A(a) that the Commission use its authority under the Exchange Act—including the authority discussed above—"to facilitate the establishment of a national market system" in accordance with and in furtherance of Congress's findings and objectives, having "due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets." 15 U.S.C. 78k-1(a)(2). To that end, Congress empowered the Commission to "authorize or require [SROs] to act jointly" with respect to "matters as to which they share authority under [the Act] in planning, developing, operating, or *regulating* a national market system." *Id.* 78k-1(a)(3)(B) (emphasis added).

CAT "fits neatly within th[at] language." *Biden v. Missouri*, 595 U.S. 87, 93 (2022). It is undisputed that the collection of trade and order data is a "matter[] as to which [the SROs] share authority . . . in . . . regulating [the] national market system." 15 U.S.C. 78k-1(a)(3)(B). The SROs have long required their members to report such data in furtherance of their statutory responsibility to comply, and enforce compliance by their members, with their rules and the securities laws. 75 Fed. Reg. at 32558-61.

And the Commission routinely used that data in its own enforcement efforts and in supervising the SROs. 81 Fed. Reg. at 84807. CAT thus falls within the categories of matters for which the Commission is authorized to require the SROs to "act jointly." 15 U.S.C. 78k-1(a)(3)(B).

In requiring the consolidation of audit trail data through the mechanism of an NMS plan, the Commission "use[d] its authority under" the Act to facilitate a national market system that operates consistent with "the public interest, the protection of investors, and the maintenance of fair and orderly markets." *Id.* 78k-1(a)(2). In 2012, the Commission concluded that gaps and limitations in the SROs' individual audit trails significantly impeded the ability of the SROs and the Commission to oversee today's "complex, dispersed, and highly automated national market system." 77 Fed. Reg. at 45723, 45736. It thus required the SROs to modernize and consolidate their audit trail data, concluding that CAT would "strengthen the integrity and efficiency of the markets, which will enhance investor protection and increase capital formation." 81 Fed. Reg. at 84727.

Petitioners err in asserting (at 26) that the Commission's authority under Section 11A(a) is confined to "facilitat[ing] the efficient interaction and execution of investor orders." The ability to effectively regulate the national market system is essential to "preserv[ing] and strengthen[ing]" the securities markets, "assur[ing] . . . fair competition," "protect[ing] . . . investors," and "maintain[ing] . . . fair and orderly

46

markets." 15 U.S.C. 78k-1(a)(1)-(a)(2).  Congress expressly recognized as much in the very next paragraph authorizing the Commission to require joint SRO action within their "share[d] authority" to "regulat[e] [the] national market system."  *Id.* 78k-1(a)(3); *see Nasdaq*, 38 F.4th at 1138 (SROs' "shared authority" includes duty to "protect investors" and "enforce compliance" with the Act).  That provision reinforces, in the cross-market NMS context, the Commission's already clear authority to ensure that each SRO effectively regulates its markets and members.

The statute's history confirms that the creation of CAT is the kind of measure Congress would have understood it to have authorized.  Congress intended the 1975 amendments to "clearly grant[]" the Commission "broad, discretionary" authority to "oversee the implementation, operation, *and regulation* of the national market system." S. Rep. No. 94-75 at 7-9 (emphasis added); *see also id.* at 7 (identifying "coordination of self-regulatory systems" as one of the "goals of the national market system").[5] Congress expected the Commission to use its "complete and effective powers" to "police effectively the new national market system" and "ensure that there is no gap between self-regulatory performance and regulatory need."  *Id.* at 2.

---

[5] *See also, e.g.*, S. Rep. No. 94-75 at 23 (describing the Commission's "responsibility to correct self-regulatory lapses" as "unmistakable"); *id.* at 30-31 (legislation "greatly expand[s] the Commission's direct regulatory powers over the nation's trading markets and participants in those markets").

The Commission's interpretation thus does not rely on a mere "definitional possibilit[y]," *West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quotation omitted)—it is the reading most faithful to the plain text, structure, and stated purposes of the statute. Petitioners' cramped interpretation, by contrast, ignores Congress's "deliberate choice" to issue "broad general directiv[es]" that authorize the Commission to foster a balanced market structure that promotes competition among markets while also protecting investors and market integrity. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 679 (2020) (quotation omitted). Petitioners would thwart that goal by leaving the Commission powerless to ensure that regulatory tools keep pace with the developing national market system.[6]

**b.** Petitioners' remaining statutory arguments proceed from the fundamentally mistaken premise that CAT is solely a *Commission* surveillance and enforcement tool. CAT is a "facility jointly owned by the [SROs]." 81 Fed. Reg. at 84794. The SROs supported the creation of a single, comprehensive audit trail, arguing that it had become "essential to ensuring the proper surveillance of the securities markets and maintaining the confidence of investors in those markets." 77 Fed. Reg. at 45736

---

[6] Because the creation of CAT plainly falls within the Commission's authority, the Court need not address whether the Commission's interpretation is entitled to deference. But were it to reach that issue, it should "defer to the [Commission's] interpretation" because it is "reasonable." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1261 (11th Cir. 2020).

(quotation omitted). And the SROs designed CAT subject to the broad framework set forth in Rule 613. *Id.* at 45725, 45741-42.

The Commission's access to, and use of, CAT for surveillance and enforcement purposes does not distinguish it from previous audit trails. *Id.* at 45726-30. In addition to overseeing the SROs, the Commission performs critical oversight and enforcement functions of its own, including market surveillance, market reconstructions, enforcement investigations, and examinations of market participants. *Id.* at 45730-33; S. Rep. No. 94-75 at 2, 22-23. And it has long relied on SRO data to carry out these functions. 81 Fed. Reg. at 84807; *see* 63 Fed. Reg. at 12566-67 (approving FINRA's audit trail because it would "greatly assist both [FINRA's] and the Commission's [surveillance and enforcement] efforts").

Contrary to petitioners' suggestion (at 29-30), the Exchange Act nowhere prohibits the Commission from having "direct access" to regulatory data or from obtaining customer-identifying information—features that are vital to CAT's utility. Before CAT, the SROs and the Commission were (and still are) able to obtain from broker-dealers more customer information than CAT collects. 77 Fed. Reg. at 45727-28. But tracking even a single cross-market trade required requesting information from multiple entities and then trying to reconcile disparate data, a process that could take months. *Id.* at 45730-31, 45733, 45790.

49

Petitioners do not dispute the Commission's conclusion that this antiquated system was simply inadequate to oversee today's markets. CAT addressed this problem, giving the SROs efficient access to comprehensive trade and order data. Given the Commission's obligation to oversee the SROs' regulatory functions, as well as its own enforcement and regulatory responsibilities, it was both reasonable and consistent with the Exchange Act for the Commission to provide itself with efficient access to the same information.

Nor can CAT be differentiated from prior SRO audit trails on the ground that the Commission has "micromanaged" its implementation (Br. 28). The Commission has an obligation to exercise responsible oversight. 81 Fed. Reg. at 84764 & n.1273; *see also id.* at 84850 (permitting Commission staff attendance at CAT meetings to facilitate oversight). Far from unreasonably expanding CAT's scope, the Commission has conditionally exempted the Participants from multiple Plan requirements that the Participants have argued are more expensive or technologically difficult to implement than originally anticipated. *See supra* 31; A233. And a challenge to this amendment is not an appropriate vehicle for petitioners to press a claim that the Commission has imposed requirements inconsistent with the Plan. *See* 17 C.F.R. 242.608(d).

Petitioners likewise err in suggesting (at 22-24) that the Appropriations Clause bears on the Commission's authority. That clause is a limitation on the expenditure of *public* funds: "[i]t means simply that no money can be paid out of the Treasury

unless it has been appropriated by an act of Congress." *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quotation omitted). It has no application to self-regulatory activities such as CAT, which have always been funded by the SROs and their members. 69 Fed. Reg. at 71267-68. Congress chose government-supervised self-regulation because it preferred that private funding structure. S. Rep. No. 94-75 at 22; A249. Congress's ability to do so is subject to *other* constitutional constraints, but "[i]n case after case," courts have held that the Exchange Act's system of self-regulation is constitutional. *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023).

CAT's funding structure does not "immunize" it from congressional "oversight." *Contra* Br. 23-24. Congress has ample oversight power through its ability to enact substantive legislation and its control of the Commission's budget.

### 2.    The major questions doctrine does not apply.

Lacking support from "the ordinary tools of statutory interpretation," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), petitioners invoke the major questions doctrine to support their untimely challenge to CAT. But that doctrine is reserved for "extraordinary cases" in which an agency asserts "an unheralded power representing a transformative expansion in [its] regulatory authority" by means of "a radical or fundamental change to a statutory scheme." *West Virginia*, 597 U.S. at 722-25 (quotation omitted); *see also Nebraska*, 143 S. Ct. at 2372-73 (agency exercised "never

previously claimed powers" effecting a "fundamental revision of the statute"). This is not one of those extraordinary cases.

In directing the SROs to act jointly to create a single comprehensive, accessible audit trail, the Commission did not rely on "vague," "cryptic," "ancillary," or "modest" statutory language. *West Virginia*, 597 U.S. at 721-24 (quotation omitted). It cited core provisions of the Exchange Act that confer broad authority to oversee the SROs. 77 Fed. Reg. at 45808; *supra* 44-45. And Section 11A is itself a "major statutory provision[]" (Br. 25) that confers "intentionally broad and clear power and discretion to shape the developing [national market system]." *Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1095 (D.C. Cir. 1978) (quotation omitted); *accord Nasdaq*, 38 F.4th at 1131-32. The Commission has repeatedly relied on these provisions to require the SROs to enhance their regulatory tools, *supra* 44-45, and to develop the NMS's regulatory framework, 70 Fed. Reg. 37496, 37497 (2005).

CAT also does not effect a "transformative expansion in [the Commission's] regulatory authority." *West Virginia*, 597 U.S. at 724 (quotation omitted). Although the market overseen by the Commission is broad, the authority it invoked is limited to a specific procedural mechanism (joint SRO action), in specific areas (in which the Commission has authority, and the SROs share authority, under the Exchange Act), in furtherance of specifically enumerated findings and objectives. 15 U.S.C. 78k-1(a)(2)-(3). This case is thus far afield from previous major questions cases in which an

agency interpretation gave it "virtually unlimited power to rewrite the [statute],"

*Nebraska*, 143 S. Ct. at 2373, empowered it to "substantially restructure the American

energy market," *West Virginia*, 597 U.S. at 724, or identified "no limit" on measures

"outside [its] reach," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021).

Nor is this a case in which the agency is regulating "outside its wheelhouse,"

*Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring), or lacks "comparative expertise

in making [the relevant] policy judgments," *West Virginia*, 597 U.S. at 729 (quotation

omitted).  Ensuring the SROs have the capacity to carry out their statutory

responsibilities in regulating the national market system "is what [the Commission]

does." *Missouri*, 595 U.S. at 95.  And CAT's features are directly responsive to widely

recognized gaps in regulatory data that significantly impeded their ability to do so.

Petitioners are left to rely on CAT's alleged political and economic significance.

But the Supreme Court has never treated the major questions doctrine as a license for

courts to override statutory text simply because they regard an agency's action as

politically or economically consequential.  *See Nebraska*, 143 S. Ct. at 2374

(emphasizing presence of additional "indicators").  The Court has often decided

challenges to "major policy decisions" (Br. 14) without invoking any clear-statement

requirement.  *See, e.g.*, *Missouri*, 595 U.S. at 93; *Little Sisters*, 591 U.S. at 676-77.

In any event, petitioners' arguments on this score are flawed.  As evidence of

political significance, they can point (at 18-20) only to public debate years into CAT's

development over the *scope* of data it should collect given evolving cybersecurity risks, and that debate led the Commission to grant exemptive relief substantially limiting the collection of personal information. 85 Fed. Reg. at 16156. Petitioners identify no public controversy over the *creation* of a consolidated audit trail. Unlike every prior major questions case, no one challenged Rule 613's adoption in 2012 or Plan approval in 2016, and until this litigation, no one questioned the Commission's authority to take either step. *Cf. Missouri*, 595 U.S. at 95 (regulated parties' support "suggest[ed]" agency "did not exceed" authority).

Petitioners' reliance on the Commission's 2016 estimate of $1.5 billion in aggregate annual compliance costs across 1,800 broker-dealers is likewise misplaced, as broker-dealers spent approximately $1.6 billion annually on regulatory data reporting *before* CAT, 81 Fed. Reg. at 84862, and CAT is replacing some of those duplicative systems, *e.g.*, 86 Fed. Reg. 34293 (2021). Moreover, the choice that broker-dealers and the Participants made to spend "billions of dollars" to "operationalize" CAT (Br. 21) rather than challenge it is a reason to *reject* petitioners' belated statutory challenge, which risks rendering that effort and expense a waste. And while CAT costs are higher than anticipated in 2016, "it is at best awkward—and at worst incoherent—to speak of a *later* development rendering unlawful an *earlier* promulgation." *Alon*, 936 F.3d at 645.

Petitioners also emphasize (at 16-18) that CAT differs in "size and scope" from prior audit trails. But the fact that an agency action "goes further than what [it] has done in the past" is not enough to trigger the major questions doctrine. *Missouri*, 595 U.S. at 95. CAT's size and scope is a function of the size and complexity of the national market system that Congress charged the Commission and the SROs with regulating, and the market developments that made a centralized audit trail indispensable to effective oversight.

Finally, petitioners are wrong in asserting (at 19) that CAT allows the Commission to "track, collate, and study" Americans' personal financial decisions. The only customer information accessible to regulatory users that query CAT is a unique, anonymized customer identifier. 85 Fed. Reg. at 16156. The limited PII collected by CAT—name, address, and birth year—is stored separately from transactional data, with access restricted to a much smaller set of authorized individuals on a "need-to-know" basis. *Id.* And CAT maintains a full record of PII access that is subject to daily inspection. CAT NMS Plan, App. D-14, https://tinyurl.com/mr3pfw8r.

Even if the major questions doctrine applied, the statute provides the "clear congressional authorization" that the doctrine demands. *West Virginia*, 597 U.S. at 723 (quotation omitted). Petitioners emphasize (at 13) the lack of "express authorization for CAT" in the Exchange Act. But "none [of the major questions

cases] requires an unequivocal declaration from Congress authorizing the *precise* agency action under review." *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring) (quotation omitted). Rather, as discussed above, any "initial skepticism" here is "overcome" by both "text directly authorizing [CAT]" and "context demonstrating that the [Commission's] interpretation is convincing." *Id.* at 2381.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

/s/ Daniel E. Matro

| | |
|---|---|
| MEGAN BARBERO<br>General Counsel | TRACEY A. HARDIN<br>Assistant General Counsel |
| MICHAEL A. CONLEY<br>Solicitor | DANIEL E. MATRO<br>Senior Appellate Counsel |
| | JORDAN A. KENNEDY<br>Attorney |
| | Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington, D.C. 20549 |
| April 2024 | (202) 551-8248 (Matro) |

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,989 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

*/s/ Daniel E. Matro*

April 15, 2024                                          Daniel E. Matro

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2024, I electronically filed the foregoing final Brief of the Securities and Exchange Commission, Respondent, with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

April 15, 2024