**No. 23-13396**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

CONSOLIDATED AUDIT TRAIL, LLC, ET AL.,

*Intervenors*.

---

On Petition for Review of an Order of the
United States Securities and Exchange Commission
SEC Release No. 34-98290

---

**RESPONSE BRIEF FOR INTERVENOR
CONSOLIDATED AUDIT TRAIL, LLC**

---

Ian Heath Gershengorn
  *Counsel of Record*
Gregory M. Boyle
Adam G. Unikowsky
Elizabeth B. Deutsch
Jonathan J. Marshall
Sophia W. Montgomery
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel represents Consolidated Audit Trail, LLC. Pursuant to Eleventh Circuit Rule 26.1-1 through 26.1-3 and Federal Rule of Appellate Procedure 26.1, the undersigned counsel hereby certifies that, to the best of its knowledge, the Certificates of Interested Persons set forth in Petitioners' opening brief and the briefs filed by amici are complete, except for additional counsel for Consolidated Audit Trail, LLC, whose names appear on the cover of this brief: Elizabeth B. Deutsch, Jonathan J. Marshall, and Sophia W. Montgomery.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, counsel for Consolidated Audit Trail, LLC, hereby certifies that Consolidated Audit Trail, LLC, has no parent corporation. The following three publicly held companies have an indirect ownership interest in Consolidated Audit Trail, LLC, of 10% or more: Cboe Global Markets (CBOE); Intercontinental Exchange, Inc. (ICE); and Nasdaq, Inc (NDAQ).

Date: April 15, 2024                    */s/ Ian Heath Gershengorn*

C1 of 1

**STATEMENT REGARDING ORAL ARGUMENT**

The Court should hear oral argument. This case presents important questions about the funding of the Consolidated Audit Trail ("CAT"), a national market system facility that the SEC directed the self-regulatory organizations to build. If the funding model Petitioners challenge is deemed unlawful, the self-regulatory organizations that are participants in Consolidated Audit Trail, LLC ("CAT LLC") may be unable to recover the more than $500 million they have spent in compliance with the SEC's CAT-related orders, and significant regulatory lapses may result. Oral argument would substantially assist this Court in addressing whether the order setting the CAT's cost allocation is arbitrary and capricious or otherwise unlawful.

i

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................C1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ...................................................................6

STATEMENT OF THE ISSUES.........................................................................6

STATEMENT OF THE CASE.............................................................................6

    A.    Before the CAT, SROs Operated Independent Audit Trails to Achieve Regulatory Oversight.........................................................6

    B.    The SEC Orders the Creation of the CAT. ...........................................8

    C.    SROs Incur Significant Costs Through Their Good-Faith Efforts to Comply with the SEC's CAT-Related Orders....................12

    D.    The SROs Wind Down Predecessor Audit Trails in Reliance on the CAT. ...........................................................................14

    E.    The SEC Adopts the 2023 Funding Order, Fulfilling the Promise of Shared Costs. ...................................................................15

    F.    Petitioners Sue..................................................................................16

SUMMARY OF THE ARGUMENT .......................................................................17

STANDARD OF REVIEW ...............................................................................18

ARGUMENT ..................................................................................................19

I.    The One-Third, One-Third, One-Third Allocation of CAT Costs Is Lawful, Reasonable, and Reasonably Explained. ......................................19

A.   Petitioners' Criticism of the Allocation of CAT Costs Proceeds from a Misunderstanding of SROs' Ability to Pass on Their Share. ...................................................21

   1.   Efforts to pass through CAT fees will be subject to future proceedings before the SEC. ...........................................21

   2.   Whether and to what extent SROs will seek to pass through their costs is uncertain and unpredictable. ..................24

   3.   Petitioners' purported evidence of future 100% pass-through proves nothing. ...................................................27

   4.   100% pass-through is not economically knowable. .................28

   5.   Industry Members will not be left holding the bag...................30

B.   Petitioners' Suggestion of Distorted Incentives Lacks Merit. ......................................................................31

C.   Petitioners' Flyspecking of the SEC's Order Is Unpersuasive. .................................................................34

II.   The SEC's Economic Analysis Is Sound. .......................................38

A.   The SEC Was Not Required to Redo Its 2016 Economic Analysis. ......................................................................38

B.   The SEC Conducted and Explained the Required Analysis. ......................................................................40

C.   The SEC Adequately Considered Effects on Investors. .....................44

III.   In the Event this Court Finds Error in Any Aspect of the 2023 Funding Order, It Should Take Care in Crafting a Remedy. ........................48

A.   This Court Has Considerable Power to Tailor Any Remedy in Light of the Equities. ........................................48

B.   A Limited Remedy Is Warranted. ......................................................50

CONCLUSION ....................................................................................................53

CERTIFICATE OF COMPLIANCE ...................................................................54

CERTIFICATE OF SERVICE ............................................................................55

iv

# TABLE OF AUTHORITIES*

**CASES**

*Allied-Signal, Inc. v. United States NRC*, 988 F.2d 146 (D.C. Cir. 1993) ...................................................................................29

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022) ..................................................49, 52

*Black Warrior Riverkeeper, Inc. v. United States Army Corps of Engineers*, 781 F.3d 1271 (11th Cir. 2015)....................................................49, 50

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam) ......................................................49

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ............................47

*Chamber of Commerce of the United States v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ...........................................................................................47

*City of North Miami v. FAA*, 47 F.4th 1257 (11th Cir. 2022) ................................18

*National Electrical Manufacturers Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001) ...................................................................................................29

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)..................................................................................................49, 53

*Sierra Club v. Van Antwerp*, 526 F.3d 1353 (11th Cir. 2008)................................40

*Stamatakis Industries, Inc. v. King*, 965 F.2d 469 (7th Cir. 1992)........................29

*United States v. Delaware*, 958 F.2d 555 (3d Cir. 1992) ......................................29

*United States v. Texas*, 599 U.S. 670 (2023) ...................................................49, 52

**STATUTES**

5 U.S.C. § 706(2) .........................................................................................................18

15 U.S.C. § 78f............................................................................................................11

---

* Authorities upon which we chiefly rely are marked with an asterisk.

v

15 U.S.C. § 78f(b)(1) ...................................................................................6

15 U.S.C. § 78f(b)(4) ...................................................................11, 22, 35

15 U.S.C. § 78f(b)(5) ...................................................................................7

15 U.S.C. § 78j............................................................................................7

15 U.S.C. § 78o(b)(4)(D) ............................................................................7

15 U.S.C. § 78o(b)(4)(E) .............................................................................7

15 U.S.C. § 78o-3.......................................................................................11

15 U.S.C. § 78o-3(b)(2) ..............................................................................7

15 U.S.C. § 78o-3(b)(5) ...............................................................11, 22, 35

15 U.S.C. § 78s(b).................................................................................11, 22

15 U.S.C. § 78s(b)(1) .............................................................................22, 26

15 U.S.C. § 78s(b)(3)(A) ...........................................................................22

15 U.S.C. § 78s(b)(3)(C) ...........................................................................22

15 U.S.C. § 78s(g).......................................................................................7

15 U.S.C. § 78s(h).......................................................................................7

15 U.S.C. § 78y(a)(1) .................................................................................22

**OTHER AUTHORITIES**

17 C.F.R. § 201.700(b)(3)(i) ........................................................11, 22, 31

17 C.F.R. § 201.700(c)(1) ..........................................................................22

17 C.F.R. § 240.19b-4.................................................................................11

17 C.F.R. § 240.19b-4(g) ......................................................................22, 31

17 C.F.R. § 240.19b-4(h) ...........................................................................22

17 C.F.R. § 242.608 ................................................................................9, 40

17 C.F.R. § 242.608(a)(1) ...............................................................................15

17 C.F.R. § 242.608(b)(2) ..........................................................................5, 35

17 C.F.R. § 242.613(a)(1) ...............................................................5, 17, 39, 40

17 C.F.R. § 242.613(a)(1)(vii) .......................................................................39

17 C.F.R. § 242.613(a)(1)(vii)(A) .................................................................40

17 C.F.R. § 242.613(a)(1)(vii)(B) .................................................................40

17 C.F.R. § 242.613(a)(1)(vii)(C) .................................................................40

17 C.F.R. § 242.613(a)(1)(vii)(D) .................................................................40

17 C.F.R. § 242.613(a)(1)(ix) ........................................................................14

17 C.F.R. § 242.613(a)(5) ..............................................5, 9, 18, 35, 38, 40

17 C.F.R. § 242.613(f) ....................................................................................15

CAT, LLC, *2023 Financial and Operating Budget* (2024), http://www.catnmsplan.com/sites/default/files/2024-01/01.17.24-CAT-Q4-2023-Budget-vs-Actual.pdf ..................................................................33

CAT, LLC, *2023 Financial and Operating Budget As of March 28, 2023*, http://www.catnmsplan.com/sites/default/files/2023-03/03.28.23-CAT-Q1-2023-Budget.pdf ...........................................................33

CAT, LLC, *2023 Financial and Operating Budget As of November 7, 2023*, http://www.catnmsplan.com/sites/default/files/2023-11/11.07.23-CAT-2023-Financial-and-Operating-Budget.pdf .........................33

CAT LLC, CAT Industry Member Reporting Scenarios (Apr. 12, 2024), https://catnmsplan.com/sites/default/files/2024-03/03.28.24_CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.1.0r2_CLEAN.pdf ...................................................................12

CAT LLC, CAT Reporting Technical Specifications for Industry Members 324 (Mar. 28, 2024), https://catnmsplan.com/sites/default/files/2024-03/03.28.24_CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.1.0r2_CLEAN.pdf ...................................................14

CAT LLC, Consolidated Audit Trail Industry Webinar: CAT Costs (Sept. 21, 2021), https://catnmsplan.com/sites/default/files/2021-09/09.21.21-CAT-Costs_0.pdf ....................................................13, 14

Certain Activities of Options Exchanges, Exchange Act Release No. 43,268, 73 SEC Docket 530 (Sept. 11, 2000).......................................................8

*Citadel Securities*, http://www.citadelsecurities.com/ (last visited Apr. 12, 2024) ...............................................................................................13

Consolidated Audit Trail, 75 Fed. Reg. 32,556 (June 8, 2010)................................8

Consolidated Audit Trail, 77 Fed. Reg. 45,722 (Aug. 1, 2012) .......................8, 9, 39

*Consolidated Audit Trail, LLC v. SEC*, No. 21-1065 (D.C. Cir. filed Feb. 14, 2021) (voluntarily dismissed Aug. 5, 2022)..........................................14

*Consolidated Audit Trail, LLC v. SEC*, No. 22-1234 (D.C. Cir. filed Sept. 6, 2022) (voluntarily dismissed Nov. 20, 2023).......................................14

*FINRA Eliminates the Order Audit Trail System (OATS) Rules*, Regul. Notice 21-21, FINRA (June 17, 2021), http://www.finra.org/rules-guidance/notices/21-21 ......................................................................................15

*Historical Market Volume Data*, Cboe, https://www.cboe.com/us/equities/market_statistics/historical_market_volume/.................................................................................................13

Joint Industry Plan; Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 30,614 (May 17, 2016)......................................................................................9, 40

*Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62,628 (Sept. 12, 2023) .............. 3, 5, 9, 13, 16, 17, 19, 20, 22-27, 31-34, 36-39, 41-48

*Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84,696 (Nov. 23, 2016) ................................................................ 2, 9-11, 23, 35, 40, 45

Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa A. Countryman, Sec'y, SEC (May 18, 2023), http://www.catnmsplan.com/sites/default/files/2023-05/05.18.23-Response-to-Comments-Regarding-2023-Funding-Proposal.pdf ......................12

Letter from Stephen John Berger, Managing Dir., Glob. Head of Gov't & Regulatory Pol'y, Citadel Sec., to Vanessa A. Countryman, Sec'y, SEC (Mar. 5, 2024), https://www.sec.gov/comments/sr-finra-2024-002/srfinra2024002-442099-1120722.pdf ........................................24

Letter from Theodore R. Lazo, Managing Director & Associate General Counsel, Ellen Greene, Managing Director, Financial Services Operations, SIFMA, to Brent J. Fields, Sec'y, SEC (July 18, 2016), https://www.sec.gov/comments/4-698/4698-11.pdf...........................................15

Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678 (2013) ............................8

Notice of Filing of a Proposed Rule Change, 89 Fed. Reg. 10,850 (Feb. 13, 2024) .............................................................................................24

Order Approving Proposed Rule Change and Amendment No. 1 Thereto, 63 Fed. Reg. 12,559 (Mar. 13, 1998) ......................................................7

Press Release, SEC, *SEC Proposes Consolidated Audit Trail System to Better Track Market Trades* (May 26, 2010), https://www.sec.gov/news/press/2010/2010-86.htm ...............................................................8

Dan Ryan, *Consolidated Audit Trail: The CAT's out of the Bag*, Harv. L. Sch. F. on Corp. Governance (July 16, 2016), https://corpgov.law.harvard.edu/2016/07/16/consolidated-audit-trail-the-cats-out-of-the-bag/...........................................................................................10

Self-Regulatory Organizations; Investors Exchange LLC; Notice of Filing of a Proposed Rule Change, 89 Fed. Reg. 11,039 (Feb. 13, 2024) ............................................................................... 23-24, 28

David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379 (2021) ........................................................................7

**INTRODUCTION**

The self-regulatory organizations, or "SROs," that are participants in CAT LLC are the tracks on which the national securities markets run. The SROs (other than FINRA[1]) are exchanges that provide mechanisms to match orders from willing buyers and sellers of securities. Collectively, they handle more than six billion trades per day. And they work to ensure that those trades are handled in a manner that protects the integrity of the markets for investors.

Historically, the SROs have protected U.S. securities markets using a host of joint and independent audit-trail systems, with oversight by the SEC. Those systems helped to ensure safe and effective markets for traders, facilitating explosive growth in securities trading. Following the "Flash Crash" of 2010, however, the SEC determined that existing audit systems were insufficient to safeguard increasingly complex, inter-related, and fast-moving markets. The SEC thereafter promulgated a series of orders directing the creation of a consolidated system that would standardize data collection, processing, and management, and give the SEC greater and faster access to the data. In 2016, the SEC approved a plan for the Consolidated Audit Trail ("CAT") to be built and managed by CAT LLC.

---

[1] FINRA was not involved in the preparation of this brief.

1

There was never any doubt that the CAT would be costly to create and maintain, prompting difficult questions about how best to allocate those costs. In its 2016 order, the SEC determined that costs would be shared among the SROs and broker-dealers that trade on national exchanges ("Industry Members"). The SEC deferred the question of precise cost allocation. Until that question was answered, the SROs would bear up front *all* costs of creating and operating the CAT, but the plan was always that the costs would eventually be redistributed among the SROs and Industry Members. *See* Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84,696, 84,793-94 (Nov. 23, 2016) ("2016 CAT Order").

Consistent with the SEC's directive, the SROs proceeded to construct the CAT, bring it online, and retire certain newly redundant legacy audit trails. The costs of constructing and operating the CAT have been substantial, as sky-rocketing trading volume produced massive demand for data processing and storage capacity, and increased transaction complexity (and multiplying SEC requirements) required the CAT to become more sophisticated. Notwithstanding these increasing demands, the SROs continued to bear the costs of the CAT on the understanding that—as the SEC had always promised—they would eventually recoup a fair share of those costs. To date, the SROs have incurred more than $500 million to fund CAT costs (via non-interest-bearing promissory notes). The Industry Members—who benefit from

the resulting safe and efficient markets and profit from the increased trading volume that drives the CAT's costs—have paid not a penny.

In the order at issue in this case, the SEC finalized the allocation of CAT costs. *See* Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62,628 (Sept. 12, 2023) ("2023 Funding Order" or "Order"). Most relevant, the Order stated that historical and ongoing costs should be split into even shares between the three primary participants to a trade: one-third to the SROs; one-third to the buyer-side executing broker-dealers; and one-third to the seller-side executing broker-dealers.

Petitioners are among those Industry Members whose bill has finally come due. They attempt to avoid paying their fair share by attacking the 2023 Funding Order. As Petitioners would have it, the Order's allocation is a sham. Petitioners argue that the one-third, one-third, one-third allocation is not "equitable" or "reasonable," primarily because of the theoretical possibility that the SROs could "pass through" their one-third share to Industry Members in fees, leaving Industry Members holding the bag for 100% of costs. That attack is wrong on every level.

First, Petitioners mischaracterize the Order. The SEC established that the baseline cost allocation would be equal thirds and that there was no *categorical bar* to the SROs' subsequently seeking to pass on some or all of their costs. But the SEC did not rule in this Order that it will approve the SROs passing through their costs to

3

Industry Members. To the contrary, whether an SRO seeks to do so—and whether the SEC permits any pass-through—is entirely beyond the scope of the Order on review. Any potential pass-through depends on future SRO filings that the SEC would have to consider on a case-by-case basis pursuant to binding regulations. The SEC cannot be faulted for failing to pre-judge future, hypothetical proposals in setting an allocation framework.

Second, Petitioners' speculation that those hypothetical future fee filings will leave them holding the bag for 100% of the costs has no basis in the record or reality. As an economic matter—as court after court has recognized—the party that ultimately bears the cost of a fee does not depend solely on the baseline allocation or even the initial effort to "pass on" the cost, but rather on complex questions regarding elasticities of demand and supply. More to the point, and as Petitioners acknowledge, Br. at 44-45, nothing in the Order prevents *Petitioners* from passing on their CAT costs—both allocated costs and any passed-through costs—to *their* customers, the investors.[2] Thus, in no world would Petitioners be left holding the bag. To tie off the analysis, the SEC addressed the impact of any passed-on costs on investors—the ultimate beneficiaries of the CAT's improved "oversight of market

---

[2] Except, that is, when Petitioners engage in proprietary trading—where they trade on their own behalf and reap all the profits therefrom.

4

activity"—and concluded that, in absolute terms, any impact was "likely small relative to current transaction costs." Order at 62,682-83, 62,686.

Once we set aside Petitioners' unfounded fears about a "100%" allocation, Petitioners have no serious argument as to the validity of the one-third, one-third, one-third allocation. Petitioners criticize the SEC for not redoing a 2016 economic analysis relating to the CAT's costs. But that economic analysis pertained to the costs of *creating* the CAT. *See* 17 C.F.R. § 242.613(a)(1). In the 2023 Funding Order, the SEC was not required to and did not reanalyze creating the CAT. The SEC satisfied its obligations under the operative regulations by explaining how aspects of the funding model that had changed impacted "efficiency, competition, and capital formation," including effects on investors. *Id.* §§ 242.608(b)(2), 242.613(a)(5).

In the end, Petitioners' challenges to the 2023 Funding Order are weak—so weak that Petitioners' main argument is an attack on the 2016 order creating the CAT. Whatever the merits of that argument, it should not be a basis for giving Petitioners all they seek: a complete reprieve from footing a bill they have been expecting—and that the SROs have been paying solo—for years. However this Court resolves the case, it should preserve the SROs' ability to recoup the more than $500 million in sunk costs that the SROs spent funding the CAT in reliance on the SEC's assurances they would be repaid. And this Court should recognize that the

5

legacy audit trails that once protected markets have been retired in reliance on the CAT's existence, such that immediately ceasing the CAT would cause chaos.

This Court should reject Petitioners' efforts to pass the buck on their fair share of the CAT's costs. The Order's allocation framework and economic analysis are lawful, reasonable, and reasonably explained.

## JURISDICTIONAL STATEMENT

Petitioners' jurisdictional statement is complete and accurate.

## STATEMENT OF THE ISSUES

1. Whether the allocation of CAT costs into equal one-third shares is lawful, reasonable, and reasonably explained.

2. Whether the Order's economic analysis is lawful, reasonable, and reasonably explained.

3. If the Court identifies a legal defect in the 2023 Funding Order, what remedy this Court should effect.

## STATEMENT OF THE CASE

**A.    Before the CAT, SROs Operated Independent Audit Trails to Achieve Regulatory Oversight.**

Audit trails have long been a critical component of market surveillance and oversight. Under the Exchange Act, SROs must "enforce compliance" with the Act, its implementing regulations, and the SROs' rules, which, in turn, must be "designed to prevent fraudulent and manipulative acts and practices." 15 U.S.C. §§ 78f(b)(1),

6

(5), 78o-3(b)(2), 78s(g). Historically, SROs operated audit trails to help fulfill these mandates.

The SEC, too, has statutory duties to ensure market security and fairness. *See, e.g.*, *id.* §§ 78j, 78o(b)(4)(D)-(E), 78s(h). Pursuant to those duties, the SEC played an oversight and monitoring role with respect to the SROs' audit trails. *See* David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379, 2433-34 (2021).

Audit-trail precursors to the CAT were critical to ensuring market fairness. For instance, beginning in the early 1990s, NYSE established the Intermarket Surveillance Information System, "a sequential reconstruction of trading in each stock, identifying the time of trade, the buying and selling member firms, the Floor brokers who represented the orders involved, and whether the trade was for a member firm proprietary account." Wishnick, *supra*, at 2433-34.

As another example, in 1998, as part of a settlement with the SEC to improve audit functions, the entities that would become FINRA established the Order Audit Trail System ("OATS"), an automated computer system, to record mandatory disclosures from FINRA members relating to orders, as well as other data from all equities markets. *See* Order Approving Proposed Rule Change and Amendment No. 1 Thereto, 63 Fed. Reg. 12,559, 12,560 (Mar. 13, 1998).

Similarly, options exchanges jointly reported to the Consolidated Options Audit Trail System ("COATS"). The exchanges that trade listed options created that parallel system pursuant to an SEC order directing them to design a consolidated audit trail that would enable prompt reconstruction and effective surveillance of the listed options markets. *See* Certain Activities of Options Exchanges, Exchange Act Release No. 43,268, 73 SEC Docket 530 (Sept. 11, 2000).

## B.    The SEC Orders the Creation of the CAT.

In 2010, the "Flash Crash" "destroy[ed] nearly $1 trillion in market value" "in a matter of minutes." Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678, 680, 682 (2013). In its immediate wake, the SEC proposed the creation of a consolidated audit trail to "help regulators keep pace with new technology and trading patterns in the market" by allowing "more efficient access to data." Press Release, SEC, *SEC Proposes Consolidated Audit Trail System to Better Track Market Trades* (May 26, 2010), https://www.sec.gov/news/press/2010/2010-86.htm; *see* Consolidated Audit Trail, 75 Fed. Reg. 32,556, 32,556-57 (June 8, 2010).

Two years later, the SEC promulgated Rule 613 to direct a National Market System ("NMS") Plan for the creation of the consolidated audit trail. In doing so, the SEC explained that, though the SROs "likely would initially incur the costs to establish and fund the [CAT] directly, they may seek to recover some or all of these costs from their members." Consolidated Audit Trail, 77 Fed. Reg. 45,722, 45,794-

95 (Aug. 1, 2012). And the SEC made clear that costs would ultimately be allocated "between" the SROs and "their members." *Id.*

In 2016, the SEC published a notice of and solicited comment on the specific proposal for the CAT: the CAT NMS Plan. Joint Industry Plan; Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 30,614 (May 17, 2016). After extensive analysis of the costs of creating, implementing, and maintaining the CAT, the SEC approved the CAT NMS Plan in the 2016 CAT Order.

The CAT NMS Plan promulgated as part of the 2016 CAT Order is the CAT's governing document; it has been amended numerous times via the regulatory process governing NMS Plan amendments. *See* 17 C.F.R. §§ 242.608, 242.613(a)(5). The CAT NMS Plan also serves as the limited liability company agreement of CAT LLC, in which the SROs are participants and through which they operate the CAT. 2016 CAT Order at 84,699; 2023 Funding Order at 62,628 n.2.

The 2016 CAT Order carried through the SEC's 2010 and 2012 regulatory commitment to eventually split funding between the SROs and Industry Members. The 2016 CAT Order contemplated "a bifurcated funding model, where costs associated with building and operating" the CAT would be borne by

"(1) Participants[3] and Industry Members that are 'Execution Venues' through fixed tier fees, and (2) Industry Members … through fixed tier fees based on message traffic." 2016 CAT Order at 85,793. The 2016 CAT Order acknowledged that, as of that time, the costs of the CAT would continue initially and temporarily to be borne 100% by the SROs but subsequently shift substantially to Industry Members. *See id.* at 84,793-95. That shift would account for forward-looking costs, as well as historical costs that the SROs incurred getting the CAT up and running. *See id.*

In 2016, as in 2012, Industry Members well understood that they would eventually fund a significant portion of the CAT, with some projecting their share would be upwards of three-quarters of total costs. *Id.* at 84,794 ("Some [commenters] expressed concern that the majority of the costs of the CAT would be allocated to Industry Members, with some estimating that Industry Members would pay approximately 88% of the ongoing annual costs of the CAT[.]"); *see also, e.g.*, Dan Ryan, *Consolidated Audit Trail: The CAT's Out of the Bag*, Harv. L. Sch. F. on Corp. Governance (July 16, 2016), https://corpgov.law.harvard.edu/2016/07/16 /consolidated-audit-trail-the-cats-out-of-the-bag ("As it currently stands, the funding model would result in 85% of the estimated build cost and over 75% of the annual running costs of the CAT to be funded by the broker-dealers.").

---

3 "Participants" refers to the SROs that operate the CAT.

The 2016 CAT Order also resolved an important question about cost treatment: whether SROs would eventually be allowed to seek to pass CAT costs allocated to SROs through to Industry Members via the Rule 19b-4 process. *See* 2016 CAT Order at 84,794. Under Section 19(b) of the Exchange Act and Rule 19b-4 of the Act's implementing regulations, when an SRO wishes to change its rules— including its fees—it must file the proposed change with the SEC, subject to notice and comment. 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4; *see* 15 U.S.C. §§ 78f, 78o-3. The SRO proposing the change bears "[t]he burden to demonstrate that [the] proposed [fee] is consistent with the Exchange Act and the rules and regulations issued thereunder that are applicable to the [SRO]," including that such fees are "equitable" and "reasonable." 17 C.F.R. § 201.700(b)(3)(i); 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).

In the 2016 CAT Order, the SEC concluded that, pursuant to these generally applicable procedures, individual SROs could eventually submit fee filings seeking to pass through CAT costs; and those filings would be considered by the SEC pursuant to the above-described standards. *See* 2016 CAT Order at 84,794.

11

**C.    SROs Incur Significant Costs Through Their Good-Faith Efforts to Comply with the SEC's CAT-Related Orders.**

The SROs have alone invested enormously to create and operate the CAT—more than $500 million.[4]

As Petitioners note, the costs borne by the SROs have outpaced 2016 predictions. That delta is attributable to changes in the market—principally, the magnitude and complexity of trading. *See* Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa A. Countryman, Sec'y, SEC, at 6-7 (May 18, 2023), http://www.catnmsplan.com/sites/default/files/2023-05/05.18.23-Response-to-Comments-Regarding-2023-Funding-Proposal.pdf    (detailing    cost implications of Industry Members' "complex[] … market activity"); CAT LLC, CAT    Industry    Member    Reporting    Scenarios    (Apr.    12,    2024), https://catnmsplan.com/sites/default/files/2024-03/03.28.24_CAT_Reporting _Technical_Specifications_for_Industry_Members_v4.1.0r2_CLEAN.pdf    (840-page document providing guidance on myriad reporting scenarios to accommodate Industry Members' complex, nuanced data). According to historical market data, in 2016, U.S. equities exchanges traded a total notional value of $69 trillion, with a total trade count of 8.7 billion. In 2023, the total notional value was $128.7 trillion;

---

[4] This figure from the 2023 Funding Order understates the SROs' financial commitment; since those totals were calculated, the SROs have continued—and still continue—to fund the CAT alone.

and the total trade count was 17.7 billion.[5] Petitioner Citadel Securities LLC ("Citadel") conducts $411 billion in approximate notional value of trades executed per day.[6] The explosion in trade volume and complexity, in turn, can be attributed largely to increases in algorithmic and high-frequency trading conducted by entities like Citadel.[7]

Data drives costs—especially cloud-hosting, including both processing and storage. *See* Order at 62,677 & nn.1050-51; CAT LLC, Consolidated Audit Trail Industry Webinar: CAT Costs, 7 (Sept. 21, 2021), https://catnmsplan.com/sites /default/files/2021-09/09.21.21-CAT-Costs_0.pdf ("[C]omput[ing] costs … and storage costs … are volume-based and have increased significantly each year beyond the volume estimate included in the [CAT NMS] Plan."). Increases in trade volume and complexity have led to commensurate increases in the amount of data the CAT must process and store, and that has substantially enlarged the CAT's operational costs.

---

[5] *See Historical Market Volume Data*, Cboe, http://www.cboe.com/us/equities/ market_statistics/historical_market_volume (data drawn from 2016 and 2023 monthly spreadsheets).

[6] *Citadel Securities*, http://www.citadelsecurities.com (last visited Apr. 12, 2024).

[7] *See* Order at 62,681 (documenting sevenfold increase in average records received per day from 2016 prediction to 2022 actual data).

These data storage and processing costs have also increased because Industry Members—whom CAT LLC actively engaged in the design process for reporting specifications—have insisted on maintaining heterogenous means of reporting data to the CAT (as one example, some Industry Members report trades in multiple batches each day and others report them in a daily digest form). *See* CAT LLC, CAT Reporting Technical Specifications for Industry Members 324 (Mar. 28, 2024), https://catnmsplan.com/sites/default/files/2024-03/03.28.24_CAT_Reporting _Technical_Specifications_for_Industry_Members_v4.1.0r2_CLEAN.pdf. Also, in some instances, the SEC's interpretations of the CAT NMS Plan (like specifying the manner and timeframe for data processing) have contributed to costs. *See* Consolidated Audit Trail Industry Webinar, *supra*, at 8. CAT LLC has, at times, challenged the SEC's regulatory interpretations, seeking to reduce CAT costs. *See, e.g.*, *Consolidated Audit Trail, LLC v. SEC*, No. 21-1065 (D.C. Cir. filed Feb. 14, 2021) (voluntarily dismissed Aug. 5, 2022); *Consolidated Audit Trail, LLC v. SEC*, No. 22-1234 (D.C. Cir. filed Sept. 6, 2022) (voluntarily dismissed Nov. 20, 2023).

### D.    The SROs Wind Down Predecessor Audit Trails in Reliance on the CAT.

As the CAT got off the ground in 2016, it was clear the new comprehensive system would render redundant certain preexisting audit trails. SEC regulations required the SROs to dismantle those now-duplicative legacy systems. *See* 17 C.F.R. § 242.613(a)(1)(ix) (requiring the SROs to make a "plan to eliminate existing rules

14

and systems … that will be rendered duplicative by the consolidated audit trail"). Industry Members, too, pushed for their retirement. *See, e.g.*, Letter from Theodore R. Lazo, Managing Director & Associate General Counsel, Ellen Greene, Managing Director, Financial Services Operations, SIFMA, to Brent J. Fields, Sec'y, SEC, at 4-5 (July 18, 2016), https://www.sec.gov/comments/4-698/4698-11.pdf.

The SROs proceeded—as required by the SEC and urged by Industry Members—to take preexisting systems offline. FINRA, for instance, eliminated its OATS rules and retired that system by 2021. *See FINRA Eliminates the Order Audit Trail System (OATS) Rules*, Regul. Notice 21-21, FINRA (June 17, 2021), http://www.finra.org/rules-guidance/notices/21-21.

Individual SROs also modified their existing surveillance systems to utilize data inputs from the CAT—that is, to depend and run on CAT data. Regulations directed the SROs to undertake these surveillance adjustments, too. *See* 17 C.F.R. § 242.613(f) (directing SROs to modify "existing surveillance systems … to make use of the consolidated information contained in the consolidated audit trail").

### E.    The SEC Adopts the 2023 Funding Order, Fulfilling the Promise of Shared Costs.

In 2023, the SEC considered amending the CAT NMS Plan to establish a model for allocating CAT costs. *See* 17 C.F.R. § 242.608(a)(1) (governing amendments). The amendment, consistent with prior orders, including the 2016 CAT Order, created a new framework pursuant to which the SROs could recover

significant historical CAT costs and cover future costs. *See* Order at 62,628. Specifically, it divided CAT costs into historical and prospective costs. *Id.* at 62,629. And it suggested that those costs be proportionally split into equal thirds among SROs, buyer-side executing brokers, and seller-side executing brokers. Each fee would be calculated based on executed equivalent share volume. *Id.* The amendment left untouched several key premises of earlier CAT-related SEC orders, including the 2016 CAT Order: that costs would be allocated among SROs and Industry Members; that SROs would recover a portion of historical costs; and that SROs could seek pass-through of costs allocated to them subject to the usual Rule 19b-4 process.

After considering extensive comments and performing the required analyses, the SEC approved the amendment—the 2023 Funding Order—in September 2023. *See id.* at 62,628; *id.* at 62,676 & n.1044.

### F.      Petitioners Sue.

Petitioners challenged the 2023 Funding Order, and CAT LLC intervened to support the SEC. ECF Nos. 30, 41, 44, 48. After free-riding off CAT's operation for years, Petitioners argued in their opening brief that the entire CAT, as well as the 2023 Funding Order splitting costs, is unlawful. *See* Br. at 13-31.

## SUMMARY OF THE ARGUMENT

I. The 2023 Funding Order's one-third, one-third, one-third model for allocating costs is fair and reasonable. It divides costs evenly between the three main parties to transactions. So Petitioners attack a strawman: that the 2023 Funding Order decided Industry Members would bear 100% of CAT costs (through SRO pass-throughs). But the 2023 Funding Order said no such thing. Any pass-throughs are subject to separate regulatory proceedings that have not yet taken place, were not before the SEC, and are not before this Court. In any event, it was reasonable for the SEC to set a framework allocation and stop there because it is unknowable as a matter of microeconomics how much of CAT's costs can be passed on via fees due to the unpredictable elasticities of supply and demand. And regardless, Industry Members will not be left holding the bag because, as they acknowledge, they can pass on *their* costs to their customers, the investors, without *any* SEC review or approval. And as to that, the SEC found that the ultimate impact on investors was "likely small." Order at 62,686. The SEC reasonably and thoroughly explained its allocation decision.

II. Petitioners fault the SEC for not redoing the economic analysis it undertook in 2016 when the CAT was created. But the SEC was under *no obligation* to do so— the regulation requiring that analysis speaks only to the CAT's creation, not amendments thereto. 17 C.F.R. § 242.613(a)(1). The SEC here properly considered

17

the effects of the proposed amendment on "efficiency, competition, and capital formation," as required for CAT amendments. *Id.* § 242.613(a)(5). The SEC thoroughly explained how the changes to the funding model would affect the markets across these axes, including effects on investors.

III. In fashioning any remedy, this Court should bear in mind the serious equities and reliance interests at stake. The SROs have spent more than $500 million on the CAT to date—on the commitment that those costs would eventually be recouped and shared by Industry Members. This Court should not foreclose avenues of recovery and leave those good-faith expenditures stranded. What's more, the SROs have wound down key precursor audit trails in reliance on CAT's operation. This Court should avoid directing a remedy that would create a regulatory lacuna.

## STANDARD OF REVIEW

This Court "set[s] aside agency action[s]" found to be "in excess of statutory jurisdiction, authority, or limitations," or "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2). "This standard of review is exceedingly deferential and provides the reviewing court with limited discretion to reverse an agency's decision." *City of N. Miami v. FAA*, 47 F.4th 1257, 1266 (11th Cir. 2022) (internal quotation marks omitted). "The reviewing court may not substitute its own judgment for that of the agency but must, instead, generally defer to the agency's technical expertise." *Id.*

**ARGUMENT**

For more than a decade, the SRO participants in CAT LLC have borne 100% of the cost of constructing and operating the CAT—more than $500 million. The Order under review fulfilled the longstanding promise that SROs and Industry Members would split these costs. Specifically, the 2023 Funding Order divided the pie into three equal pieces. Petitioners contend that the Order's allocation framework was somehow too SRO-friendly. And they nitpick the Order, suggesting the SEC's detailed analysis should have been *more* detailed. None of these arguments comes close to warranting vacatur. Although CAT LLC will not address Petitioners' arguments that the SEC exceeded its authority in creating the CAT years back, if the Court finds those arguments preserved (or agrees with Petitioners' other arguments), CAT LLC urges the Court to consider the substantial equities and reliance interests at stake in this litigation in crafting any remedy.

## I.    The One-Third, One-Third, One-Third Allocation of CAT Costs Is Lawful, Reasonable, and Reasonably Explained.

The SEC concluded that the SROs and Industry Members should together fund the CAT, covering both historical costs (to this point paid entirely by the SROs) and ongoing maintenance costs. The SEC explained that the precise allocation of CAT costs among the groups "is a question of judgment for which there may be multiple reasonable approaches." Order at 62,636. One such reasonable approach— the one approved by the SEC—"allocate[s] CAT fees equitably among the three

19

parties who have primary roles related to the transaction: the buyer, seller, and market regulator." *Id.*

Petitioners do not challenge the notion that allocating one-third of CAT costs to SROs, one-third to buyer-side executing broker-dealers, and one-third to seller-side executing broker-dealers is fair and reasonable. Nor could they—an even cost split plainly is. Petitioners also do not challenge the executed equivalent share model by which the SEC assigned costs at a transaction level in proportion to an Industry Member's use of the CAT. Again, nor could they.

Instead, Petitioners' argument is a triple bank shot. They contend that (1) in possible *future* SEC filings, individual SROs may seek to recover an additional share of fees from market participants; (2) the SEC may in the future allow such proposals to take effect; and then (3) in that hypothetical future world, the division of fees would be inequitable. Petitioners' argument is not ripe or before this Court. They ask in essence for an advisory opinion to reduce the risk of hypothetical future decisions that may impact the distribution of CAT costs. And in the meantime, Petitioners seek to continue *paying nothing*. Petitioners are also wrong that the allocation distorts cost-saving incentives, and their grab bag of additional grievances goes nowhere.

**A.    Petitioners' Criticism of the Allocation of CAT Costs Proceeds from a Misunderstanding of SROs' Ability to Pass on Their Share.**

Petitioners' sky-is-falling predictions that hypothetical rule filings will create a 100% pass-through and leave Industry Members holding the bag demonstrate a complete misunderstanding of the rule-filing process, Econ 101, and who would bear the burden of any pass-through were it to occur.

**1.    Efforts to pass through CAT fees will be subject to future proceedings before the SEC.**

Petitioners' challenge to the reasonableness of the one-third, one-third, one-third allocation rests entirely on the premise that the SEC *today* is legally obligated to constrain *future* SECs from adjudicating future fee filings that, Petitioners claim, would have the effect of departing from the 2023 Funding Order's cost allocation. But that argument ignores the rule-filing process and the uncertain fate of any future rule filings. Petitioners' supposed evidence of pass-through (FINRA's suspended fee filing) proves nothing.

Petitioners' arguments boil down to the intuition that if the funding model's framework sets a one-third, one-third, one-third allocation now, SROs should not be permitted to undercut that allocation by later introducing fees to pass on their share to Industry Members. But this intuition reflects a fundamental misunderstanding of the Order on review. SROs *cannot* unilaterally pass on these costs. Instead, each SRO must, pursuant to a separate process, *seek approval* from the SEC to alter its

fees. Nothing in the 2023 Funding Order purports to prejudge the outcome of those future proceedings. As such, nothing in the SEC's Order purports to authorize SROs to pass through *any*—let alone *all*—of their CAT-related costs to Industry Members.

When an SRO submits proposed fees pursuant to Rule 19b-4, it bears "[t]he burden to demonstrate that [the] proposed [fee] is consistent with the Exchange Act and the rules and regulations issued thereunder," including that the proposed fees are "reasonable" and "equitable." 17 C.F.R. § 201.700(b)(3)(i); 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5). The SEC must publish a notice of any filing and provide opportunity for public comment. 15 U.S.C. § 78s(b)(1); 17 C.F.R. § 240.19b-4(h). While an SRO's fee proposal may take effect upon filing, 15 U.S.C. § 78s(b)(3)(A), the SEC can temporarily suspend proposals within 60 days and institute further proceedings "if … such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes" of the Exchange Act. *Id.* § 78s(b)(3)(C); *see* Order at 62,636-37. Upon such suspension, the SRO has a further obligation to explain its proposed fee, and there is opportunity for public comment. *See* 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4(g); 17 C.F.R. § 201.700(c)(1). Thereafter, the SEC must disapprove the proposal unless it "determine[s] [that] the proposed rule change is consistent with the requirements of the Exchange Act." 17 C.F.R. § 201.700(b)(3)(i). If, following suspension, the SEC approves the proposal, it is subject to judicial review. 15 U.S.C. § 78y(a)(1).

22

All this was understood, accounted for, and explained back in 2016, when the SEC determined that these ordinary Rule 19b-4 proceedings would apply for any future pass-through proposals by SROs. *See* 2016 CAT Order at 84,793-94. The SEC explained the process again in the 2023 Funding Order, stating that SROs may attempt to pass through their one-third share, just as Industry Members like Petitioners may pass through their own shares to their own customers (though Petitioners may do so without any approval by the SEC). Order at 62,637. As the SEC emphasized, "[a]ny effort [by an SRO] to pass-through" fees will be subject to the standards and procedures provided by Rule 19b-4. Order at 62,636. The SEC also noted its authority to "temporarily suspend" filings to provide for additional process. Order at 62,636-37. And the SEC reaffirmed its statutory obligation to ensure that SROs' proposed fees must be "consistent with applicable statutory standards under the Exchange Act, including being reasonable, equitable and not unfairly discriminatory." Order at 62,637. As such, nothing in the SEC's Order purports to greenlight the SROs to recover all of their CAT costs from Industry Members, contrary to Petitioners' caricature.

Underscoring the unripeness of Petitioners' arguments regarding pass-throughs, the SEC has presently suspended all filings seeking to collect from buy- and sell-side executing broker Industry Members the one-third allocation of historical CAT costs that the 2023 Funding Order assigns to them. *See, e.g.*, Self-

Regulatory Organizations; Investors Exchange LLC; Notice of Filing of a Proposed Rule Change, 89 Fed. Reg. 11,039 (Feb. 13, 2024). The SEC has also suspended FINRA's filing seeking to pass through its portion of the one-third of historical CAT costs allocated to the SROs, *see infra* pp. 28. *See* Notice of Filing of a Proposed Rule Change, 89 Fed. Reg. 10,850 (Feb. 13, 2024). And Petitioner Citadel has filed comments challenging these filings. *See* Letter from Stephen John Berger, Managing Dir., Glob. Head of Gov't & Regulatory Pol'y, Citadel Sec., to Vanessa A. Countryman, Sec'y, SEC (Mar. 5, 2024), https://www.sec.gov/comments/sr-finra-2024-002/srfinra2024002-442099-1120722.pdf. Petitioners' arguments here aim at separate proceedings altogether.

### 2. Whether and to what extent SROs will seek to pass through their costs is uncertain and unpredictable.

The SEC's decision to review fee filings as they come—rather than to preemptively resolve them all now—is a perfectly reasonable way to run the railroad. The fact, timing, content, and economic effect of future filings are unknown, and the SEC properly did not preemptively adjudicate them.

To begin, Industry Members' actual share of their allocated CAT costs turns on the satisfaction of certain financial-accountability milestones. *See* Order at 62,665 & n.807 ("To the extent that the [SROs] miss a target deadline … , the [SROs] would be responsible for paying a larger amount of CAT-related fees, costs, and expenses on their own."). Until it becomes clear whether or not those milestones have been

met, it is impossible to determine the extent of Industry Members' financial obligation.

In addition, it may not be economically advantageous for some or all of the SROs to seek a pass-through. The exchanges compete with one another as market operators and thus have incentives to internalize some costs. *See* Order at 62,684 (explaining that some exchanges may well be positioned to "avoid raising transaction fees to offset their CAT fee allocations"). SROs may therefore elect not to pass through some or any CAT costs. Similarly, SROs may seek to operationalize pass-throughs via different models (flat fees or percentages of notional value or other metrics), effecting different pass-through rates.

With a proper understanding of the contingencies, it is difficult to understand what exactly Petitioners think the SEC ought to have done with the SROs' proposed amendment. Petitioners' theory is that the selected one-third, one-third, one-third allocation is really a 100% allocation to Industry Members due to the SROs' potential future pass-through. But under Petitioners' logic, the same would be true *had the SEC allocated 100% of CAT costs to SROs*; that, too, would actually amount to a 100% allocation to Industry Members. *See* Order at 62,636 (recognizing costs may be passed through "by both the [SROs] and Industry Members, who each may elect to pass on such operational costs as fees to customers," and that this "would be true regardless of how the Proposed Amendment chose to set the initial allocation").

25

Petitioners' argument thus reduces to the position that the SEC could not adopt *any* allocation unless it also barred all pass-throughs in perpetuity. That is, the only legal route for the SEC to take would be to prospectively deny all pass-through of CAT costs in future Rule 19b-4 filings. That cannot be correct.

Asking the SEC to *anticipatorily deny* all pass-through of CAT costs in future Rule 19b-4 filings is nonsensical. Given the uncertainty as to how much of its share of CAT costs each SRO would seek to pass through, and the SEC's ability to judge those future efforts on a case-by-case basis, the SEC reasonably declined to bind the hands of future SECs to deny all such filings.

In addition, it is far from clear that the SEC would even be *permitted* to prejudge all hypothetical future pass-through requests. The review scheme established by Section 19(b) of the Exchange Act envisions process "*after* the date of the filing of any proposed rule change." 15 U.S.C. § 78s(b)(1) (emphasis added).

In any event, even if the SEC could issue preemptive and prophylactic rejections of future rule filings seeking full pass-through of CAT fees, it surely was not *required* to do so under the Exchange Act or any other source of law. By establishing an allocation that is plainly fair and reasonable and committing to review future rule filings on a case-by-case basis to ensure they are equitable and reasonable as needed, the SEC complied with the Exchange Act and the APA.

26

### 3. Petitioners' purported evidence of future 100% pass-through proves nothing.

Petitioners portray the Order as relieving SROs of any duty to "actually bear their share" of CAT's costs. Br. 33. They suggest that the SEC has already signed off on such a reprieve because, even though the Order "agrees the Plan 'requires *both* [SROs] and Industry Members to fund the CAT,' and claims this will be achieved by allocating two-thirds of the costs to broker-dealers … and one-third to SROs," *id.* (quoting Order at 62,636), the Order "in the next breath acknowledges the SROs can simply 'pass[] their CAT fees onto their members in full' and thereby force broker-dealers … to 'effectively bear 100% of the CAT allocation,'" *id.* (quoting Order at 62,684 n.1135).

This is misleading and wrong. Petitioners' quotation about pass-throughs appears in a footnote (pages later) and simply observes that *if* exchanges passed CAT fees to Industry Members in full, *then* the members would bear 100% of the costs— and even so, that would be true only if (as the SEC observes) we "ignor[e] what [Industry Members] would pass to investors." Order at 62,684 n.1135. This language does not suggest that the SEC will grant all future pass-throughs and leave Industry Members with 100% of the costs. To the contrary, as discussed, the Order emphasizes that any future rule filings must comply with applicable statutory requirements, including that those fees be "equitable" and "reasonable." *See* Order at 62,636, 62,655.

27

Petitioners also emphasize that FINRA has submitted a fee filing attempting "to pass on *all of its share* [of historical CAT costs] to its broker-dealer members." *See* Br. 33. But FINRA's attempt to pass through all of its CAT fees is far from a *fait accompli*. As mentioned, the SEC has suspended FINRA's fee filing seeking to pass through its one-third share of historical costs—along with *all* filings seeking, on behalf of CAT LLC, to implement the one-third share of historical costs that the 2023 Funding Order allocates to buyer- and seller-side Industry Members. *See supra* pp. 23-24. The SEC has instituted proceedings to determine whether the proposed fees should be approved or disapproved. *See, e.g.*, 89 Fed. Reg. 11,039. And Petitioner Citadel has exercised its statutory right to submit comments challenging all of these filings under the procedures outlined above. *See supra* p. 24. There is no basis to conclude that the Order under review decided the issue of whether FINRA, or anyone else, can recover 100% of their costs. The SEC's decision to suspend FINRA's and other CAT filings only underscores that Petitioners' "100%" allocation arguments are premature and properly addressed to future rule filings. *See supra* pp. 23-24.

### 4.    100% pass-through is not economically knowable.

Beyond the fundamental uncertainty about whether hypothetical filings will attempt or be permitted to pass through CAT costs, it is uncertain as a matter of economic theory what costs would actually be passed on—yet another reason the

28

SEC was reasonable to set an allocation framework and stop there, without addressing the potential effect of any future pass-throughs.

Even if the SROs were to eventually attempt pass-throughs, it is unknowable *ex ante* what fraction of CAT costs they would nevertheless absorb. Regulated parties experiencing increased costs will almost certainly "absorb[] part of any increase in costs, with the amount absorbed depending on the ratio between the elasticities of supply and demand." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 472 (7th Cir. 1992) (Easterbrook, J.); *see Allied-Signal, Inc. v. U.S. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993) ("A firm's ability to pass through a burden to its customers depends on the price elasticities of supply and demand[.]"). It is famously "hard to tell how much will be borne and how much passed on." *Stamatakis Indus.*, 965 F.2d at 472.

For this reason, courts have routinely rejected the argument that the costs of government-imposed fees will be fully passed on to customers when the initial burden is imposed on a regulated party. *See, e.g.*, *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110-11 (2d Cir. 2001) (noting that "manufacturers will rarely be able to fully pass through to consumers the costs of a new tax or regulation" and that the "ability to pass costs along depends on the price elasticity of demand"); *United States v. Delaware*, 958 F.2d 555, 560 n.10 (3d Cir. 1992) ("The actual split of the economic incidence depends on the elasticities of supply and demand in each

particular market."). Given the uncertain elasticities of the relevant supply and demand curves, the SEC was reasonable in selecting an allocation framework and leaving questions of pass-through for later.

### 5. Industry Members will not be left holding the bag.

Finally, Petitioners' prophecy that they will foot 100% of the bill is highly misleading: as mentioned, in most cases they, in turn, can pass their CAT costs along to investors. *See supra* p. 17. Petitioners give up the ghost when they acknowledge, in assailing the SEC's economic analysis, that Industry Members like Petitioners can seek to pass on CAT costs in the form of fees to their users. Br. 44-47; *see infra* p. 45-46. These fees, unlike the SROs', are not subject to any independent review or approval process by the SEC; they are business decisions entirely within Petitioners' discretion. Thus, Petitioners will *never* be stuck internalizing all of the CAT's costs regardless of what happens with the SROs' fee filings and regardless of what effective rate results from any pass-throughs.

The SEC considered this eventuality and determined it would not negatively impact investors, who benefit from the CAT's protections. As the SEC explained: "while Industry Members may pass through CAT fees to their customers, the customers also receive a benefit from the CAT"—specifically, "more effective oversight of market activity, which could increase investor confidence, resulting in expanded investment opportunities and increased trading activity." Order at 62,682-

30

83. The SEC determined that potential "additional costs borne by investors are likely small relative to current transaction costs." Order at 62,686.

The only CAT costs Petitioners will not be able to pass through are those tied to proprietary trading—in which Petitioners *themselves* are the investor reaping the trade's profit. *See* Order at 62,637. The SEC reasonably concluded: "[A]s the firm itself is the ultimate investor, … it is reasonable for the firm to be responsible for payment of CAT fees for those trades," and "it is reasonable to allow a firm to incur CAT fees for its profit-making activity, which in this case is proprietary activity." *Id.* There is nothing unfair or arbitrary about that arrangement.

### B.    Petitioners' Suggestion of Distorted Incentives Lacks Merit.

Petitioners worry that there is no mechanism or incentive for the SEC or the SROs to curb the CAT's costs. Br. 34-36. Petitioners say that, by imposing supposedly zero burden on SROs, the Order creates "distorted incentives" that render it unreasonable under the APA. This concern lacks merit for two reasons.

First, and again, the Order tags the SROs with responsibility for funding one-third of the CAT's costs and makes any effort to collect from Industry Members subject to the "equitable" and "reasonable" standard. *See* 17 C.F.R. §§ 201.700(b)(3)(i), 240.19b-4(g). If an SRO cannot make that showing, the SEC will reject its Rule 19b-4 filing. So the SROs surely have an incentive to control costs. As the SEC explained, the Order's funding model appropriately "trades off

31

incentives to inefficiently spend too much against incentives to inefficiently spend too little." Order at 62,681.

Petitioners acknowledge the SEC's explanation that the Rule 19b-4 process "'incentivize[s]' the SROs 'to control costs.'" Br. 35 (quoting Order at 62,636). They contend, however, that this review is "insufficient" because, if SROs spend lavishly those costs "will have already [been] incurred," and "must be paid by someone." *Id.* (alterations in original) (quoting *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022)). The "someone" in this hypothetical is the *SROs*—that is the point.

This argument is particularly rich coming from Petitioners who, until now, have paid $0 toward the CAT's construction and operation and who are attempting (via this litigation) to keep it that way. Add to that the fact that Industry Members have substantially driven the CAT's increased costs by their increased trading volume and complexity—activities that have generated increased profit for Industry Members even while the SROs foot the bill. *See supra* pp. 12-13.

The reality that CAT costs are driven by volume generated by Industry Members (rather than any supposed gold-plating) is clear from the balance sheet. As the SEC explained, increased "costs are directly related to trading activity"—and the volume of data the CAT has had to process and store increased sevenfold from 2016 estimates. Order at 62,681; *see id.* at 62,677 (explaining that the main driver of CAT costs is related to cloud-based storage and processing, which are correlated with

trading volume and complexity); *id.* at 62,655 (same). Driving the correlation home, in 2023, the CAT was tens of millions of dollars *under* budget because trading volumes (and thus data costs) were lower than projected.[8]

Second, an important change effected by the SEC's Order (though it goes unmentioned by Petitioners) is to install new "requirements that [CAT's] Operating Committee approve a *reasonable* operating budget for CAT LLC, that fees, costs and expenses be *reasonable*[,] and that they be *reasonably* budgeted to be incurred by or for [CAT LLC] in connection with the development, implementation and operation of the CAT." Order at 62,657 (emphasis added). The SEC expressed concern that "[t]he existing CAT NMS Plan did not include such language, potentially providing the [SROs] full discretion to pass along to Industry Members costs that are not reasonable," including "inflated" costs or "costs that should reasonably be allocated to only the [SROs]." *Id.* "Requiring these costs to be reasonable and reasonably budgeted," the SEC concluded, "imposes discipline on CAT spending, and the Commission, Industry Members and others will be able to

---

[8] *Compare* CAT, LLC, *2023 Financial and Operating Budget As of March 28, 2023*, https://www.catnmsplan.com/sites/default/files/2023-03/03.28.23-CAT-Q1-2023-Budget.pdf, *with* CAT, LLC, *2023 Financial and Operating Budget As of November 7, 2023*, http://www.catnmsplan.com/sites/default/files/2023-11/11.07.23-CAT-2023-Financial-and-Operating-Budget.pdf, *and* CAT, LLC, *2023 Financial and Operating Budget* (2024), https://www.catnmsplan.com/sites/default/files/2024-01/01.17.24-CAT-Q4-2023-Budget-vs-Actual.pdf.

review budget information during the rule filing process under Section 19(b) of the Exchange Act." *Id.* This change, too, ensures CAT LLC has incentives to control costs.

**C.    Petitioners' Flyspecking of the SEC's Order Is Unpersuasive.**

Petitioners criticize four aspects of the SEC's explanation for the one-third, one-third, one-third allocation. Br. 36-39. Their nitpicking is unpersuasive.

1. Petitioners first argue that the Order must be set aside because the SEC applied the wrong standard. Br. 36-37. They are incorrect.

Petitioners claim that the SEC did not adequately consider whether "the Order would result in an equitable allocation of reasonable fees." Br. 36. Over and over again, however, the SEC made clear that the SROs "have sufficiently demonstrated that the proposed allocation of fees *is reasonable.*" Order at 62,629 (emphasis added); *see also, e.g.*, *id.* ("[A]llocating the costs for the CAT among the three parties who play significant roles in transactions reportable to the CAT in this manner represents a *reasonable method* of allocating costs among the parties who participate in and benefit from those markets." (emphasis added)). To the extent Petitioners fault the SEC for not using the word "equitable," they do not explain how "equitable" is different from "reasonable." Nowhere did the SEC "empower the SROs to *violate* the requirements of the Exchange Act and the CAT NMS Plan." Br. 36.

34

Though it is a distinction without much difference, Petitioners are the ones invoking the wrong standard. They cite footnote 121 of the 2023 Funding Order, in which the SEC corrected a commenter's erroneous invocation of Sections 6 and 15A of the Exchange Act. *See* Br. 36. As the SEC explained, those provisions govern how *SROs* assess fees on *Industry Members* through the fee-filing process, not how the *SEC* allocates costs *between SROs and market participants* in approving a funding model. 15 U.S.C. § 78f(b)(4), 78o-3(b)(5). In adopting the 2023 Funding Order, the SEC was governed by three statutory and regulatory requirements: the APA's reasonableness requirement; Rule 608 governing amendments to the NMS Plan, 17 C.F.R. §§ 242.608(b)(2), 242.613(a)(5); and Article XI of the CAT NMS Plan, which provides a series of principles for funding CAT LLC, 2016 CAT Order at 84,967 (CAT NMS Plan § 11.2(b)). None of the governing statutes or regulations uses the term "equitable" that Petitioners fault the SEC for failing to recite.[9]

2. Petitioners next point to the SEC's response to comments "express[ing] concerns that the [SROs] may impose fees on their members to recoup costs relating to CAT, making Industry Members responsible for CAT funding costs beyond those

---

[9] Petitioners invoke the SEC's purported "longstanding interpretation" of the CAT NMS Plan, pointing to the SEC's colloquial use of the term "equitable" in describing the funding principle in Article XI of the Plan. *See* Br. 36-37 (citing 2016 CAT Order at 85,004). But that principle states only that cost allocations must be "consistent with the Exchange Act." 2016 CAT Order at 84,967 (CAT NMS Plan § 11.2(b)).

to which they will be directly assessed." Order at 62,636; *see* Br. 37-38. The SEC "acknowledge[d] the concerns but also emphasize[d] that … the CAT provides important benefits in facilitating effective market surveillance and the Exchange Act expressly contemplates the ability of the Participants to recoup their costs to fulfill their statutory obligations under the Exchange Act." Order at 62,636.

Petitioners call the SEC's response a "non sequitur[]" because the Exchange Act does not "specifically" mention the CAT or discuss whether the allocation at issue is "equitable and reasonable." Br. 37. It is Petitioners' argument, however, that is the non sequitur: the SEC elsewhere explained and justified the one-third, one-third, one-third allocation, satisfying its APA obligations.

3. Petitioners argue that the SEC failed to adequately respond to a comment from Petitioner Citadel suggesting that the SEC prohibit SROs from passing through CAT costs, "just as the SEC had done before" when it "imposed a set of accountability milestones that barred the SROs from passing on certain historical costs … unless CAT LLC met a set of implementation goals on a specific timeline." Br. 38 (citing Amendments to the National Market System Plan Governing the Consolidated Audit Trail, 85 Fed. Reg. 31,322, 31,331, 31,348-49 (May 22, 2020)). But what Citadel *actually* suggested was that "the Commission prohibit the exchanges from passing-on … their portion of CAT costs" at all. 1 App. A121; *see* 1 App. A100-34 (Citadel letter); Order at 62,632. The SEC, in turn, did respond,

36

explaining that "[e]ven if the [SROs] decide to pass-through the costs of CAT to Industry Members, … the rule filing process under Section 19(b) and Rule 19b-4 will still incentivize the [SROs] to control costs." Order at 62,636. And the SEC further noted that "[a]ny effort to pass-through costs will be subject to that process and, if the [SROs] fail to control costs, their ability to demonstrate that a proposed fee is reasonable and consistent with the Exchange Act may be compromised." *Id.*; *see id.* at 62,636-37.

4. Lastly, Petitioners attack the SEC's observation that Industry Members "may be able to offset fees that FINRA assesses them by passing their CAT fees through to their customers." Order 62,637; *see* Br. 38-39. Petitioners claim this is "apples and oranges" because this part of the Order "says nothing about whether the initial allocation of CAT costs" between the SROs and Industry Members is reasonable. Br. 38. That is a breathtaking assertion given that Petitioners penned pages and pages from the premise that the possibility of pass-through is highly relevant to the reasonableness of the Order's allocation. *See* Br. 32-39. In any event, the SEC analyzed the effect on investors and found that, regardless of the extent of any pass-through, in absolute terms it was "likely small relative to current transaction costs." Order at 62,686; *see infra* pp. 45-46.

Petitioners relatedly accuse the SEC of trying to "have it both ways," Br. 39, by noting elsewhere in the Order that the adopted allocation "does not address

37

whether Industry Members pass through their CAT fees to their customers." Order at 62,682. But in that passage, the SEC was responding (as part of its market-efficiency analysis, *see infra* Part II) to fears that investors would ultimately bear 100% of CAT costs. The SEC simply noted that pass-through to customers was not dictated—nor entirely predictable in light of economic principles set forth above, *see supra* pp. 28-30—by the one-third allocation. From a market-efficiency perspective, this allocation did not raise fresh concerns because the possibility of pass-through was already contemplated under the original CAT NMS Plan. Order at 62,682-83. There is nothing inconsistent about these observations and the SEC's earlier observation that Industry Members are able to avoid bearing some of their allocated share by passing through CAT costs to investors.

## II.    The SEC's Economic Analysis Is Sound.

Petitioners complain that the 2023 Funding Order "engages in deficient economic analysis." Br. 39. Contrary to Petitioners' contention, the SEC adequately considered the "impact" of the 2023 Funding Order's changes on "efficiency, competition, and capital formation," including as regards investors. 17 C.F.R. § 242.613(a)(5).

### A.    The SEC Was Not Required to Redo Its 2016 Economic Analysis.

Petitioners chiefly fault the SEC for "'declin[ing]' to 'update its economic analysis'" from the CAT's creation in 2016 in light of "the new information or facts

on the ground"—specifically, the increased costs of the CAT and finalizing the precise allocation between SROs and Industry Members. Br. 41 (alteration in original) (quoting Order at 62,676). Petitioners misunderstand the 2023 Funding Order. Because the SEC was not reconsidering creating the CAT, it did not and was not required to redo the economic analysis that justified it. To the extent new information emerged since 2016 relevant to its 2023 Funding Order, the SEC thoroughly analyzed that new information.

As the SEC explained, the 2016 "analysis was conducted in the process of deciding whether to approve" the CAT. Order at 62,676. The regulation that required the analysis back in 2016, Rule 613(a)(1), governs the "[*c*]*reation* of a national market system plan governing a consolidated audit trail." 17 C.F.R. § 242.613(a)(1) (emphasis added); *id.* § 242.613(a)(1)(vii); *see also* 77 Fed. Reg. at 45,726 (stating the "robust economic analysis" Rule 613 requires must occur at "the actual creation and implementation of a consolidated audit trail itself"). Consistent with that binding regulation, in its 2016 notice soliciting comment on the CAT's creation, the SEC, across more than 100 pages, undertook an economic analysis that "detailed estimated costs for creating, implementing, and maintaining the [CAT]," specifically estimates of costs to the SROs ("plan sponsors") for "establishing and maintaining" the CAT, costs to industry "members" for "reporting the data required," and costs to SROs "for reporting the data required," as well as an explanation of how the CAT would

39

be funded, "including the proposed allocation of such estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors." 17 C.F.R. § 242.613(a)(1)(vii)(A)-(D); *see* 81 Fed. Reg. at 30,651-782. The SEC did so again, also across more than 100 Federal Register pages, in the 2016 CAT Order. *See* 2016 CAT Order at 84,799-938.

Because the SEC was not creating the CAT in 2023, it had no need to, and did not, conduct a fresh analysis of whether the CAT should be created. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (agency is not "automatically required to redo [its] entire [] analysis" any time there is "additional information"). Indeed, the SEC's own regulations make clear that conducting that fresh analysis was unnecessary. As explained above, as an amendment to the NMS Plan creating CAT, the Order is governed by separate regulations addressing amendments. *Compare* 17 C.F.R. § 242.613(a)(1) (requiring wide-ranging economic analysis for adoption of a new NMS Plan), *with* 17 C.F.R. § 242.613(a)(5) (requiring more limited findings in adopting an amendment), *and* 17 C.F.R. § 242.608 (same). Petitioners do not so much as acknowledge this difference, let alone attempt to argue that the SEC failed to comply with the applicable regulation.

### B.   The SEC Conducted and Explained the Required Analysis.

Petitioners point to several more modest or more general standards they say obligated the SEC to do more than it did. Petitioners identify Rule 613(a)(5), which

governs NMS Plan amendments and directs consideration of "efficiency, competition, and capital formation"; a general "obligation" that the SEC think about "economic consequences"; and the APA, which requires agencies to provide "a satisfactory explanation for [their] action[,] including a rational connection between the facts found and the choice[] made." Br. 39-41 (quoting 17 C.F.R. § 242.613(a)(5), and *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011), and citing *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011)).

The SEC fulfilled all these obligations. The SEC specifically "analyz[ed] the potential impacts" and economic consequences of the 2023 Funding Order's changes on "efficiency, competition, and capital formation." Order at 62,676. And it explained its analysis consistent with the APA. Based on pages and pages of supporting discussion and analysis, the SEC made nuanced findings that the 2023 Funding Order (1) "will involve efficiency gains along some dimensions"; (2) "will likely also involve tradeoffs against other forms of efficiency"; (3) "could negatively alter the competitive position of particular competitors, though the fees associated … are unlikely to be large enough to affect overall competition"; so (4) "will result in insignificant effects on capital formation." *Id.* at 62,676-86. Nothing more was required.

Petitioners claim the SEC did not adequately account for the increased costs of the CAT. Not so. The SEC "supplemented the analysis in the CAT NMS Plan

41

Approval Order with additional information learned since the time of that Order." *Id.* at 62,676. It did so by examining the "effects" of the 2023 Funding Order against the relevant "baseline"—that is, isolating and analyzing all changes contained in the 2023 Funding Order compared to the original CAT NMS Plan. *See id.* at 62,676-86. For example, the SEC explained that the executed equivalent share model adopted in 2023 improved market efficiencies compared to the baseline as regards operational efficiency, incentive effects, and market efficiencies. *Id.* at 62,677-83.

As to increased costs, in particular, the SEC considered updated information about how costs and cost-drivers impacted the economic analysis. *See, e.g.*, *id.* at 62,677-78 (discussing September 2021 cost breakdowns in evaluating incentive effects); *id.* at 62,680 (discussing, in light of new information about cloud-related costs, relative costs of equity order linking and options order linking); *id.* at 62,681 (explaining the seven-fold increase in records received by the CAT per day "highlights the difficulty in estimating future costs because costs are directly related to trading activity"). And the SEC explained that while the actual costs of the CAT have increased since 2016 estimates, those "costs are directly related to trading activity"; the CAT has had to process and store seven times the amount of data projected in 2016. *Id.* at 62,681; *see supra* pp.12-13. Given that the funding model approved by the 2023 Funding Order operates by imposing CAT costs on a per-trade

42

basis, the increase in total cost has little to no bearing on the marginal cost (the fees actually incurred on a single trade).

The SEC examined and fully explained the effects of those costs. For instance, in examining how historical costs might bear on market efficiency (via incentive effects), a broker-dealer fee of "$0.00001393167 per Executed Equivalent Share" will have a "relatively small" effect, considering other extant transactional fees. *See* Order at 62,682; *see also id.* at 62,682 nn.1100-1102. Similarly, in analyzing the effect of the 2023 Funding Order on competition to provide trading services, the SEC explained that it "might not affect the overall level of competition because" "the magnitude of the fees in the example [in the proposed amendment] are small relative to current transaction costs." *Id.* at 62,684-85.

Petitioners' complaints about the SEC's "baseline" analysis (specifically its supposed failure to account for the final allocation between SROs and Industry Members or the possibility of pass-through), Br. 42-43, misunderstand that analysis. The SEC explained that the 2016 CAT Order had already contemplated and analyzed the effects of both an allocation of CAT costs between SROs and Industry Members and the possibility that SROs and Industry Members could pass costs through. *See, e.g.*, Order at 62,678, 62,682. The SEC analyzed the impacts of the 2023 Funding Order's final allocation compared to the "baseline" expectation that *some* allocation between these parties would be adopted that would shift costs to Industry Members

43

and that potential future pass-through by the SROs would not be universally barred. *See id.* at 62,681 (analyzing incentive effects based on the fact that "the Executed Share Model specifies an allocation that was unknown in the Original Funding Model"); *id.* at 62,684 (analyzing effects on competition in trading services of the one-third, one-third, one-third allocation).[10]

When the SEC compared the effects of the 2023 Funding Order to the relevant baseline, it considered changes to the Original Funding Model—including, as discussed, the specific changes Petitioners identify, as well as the pivot from fees based on message traffic to executed share volume. *Id.* at 62,676-86. The SEC did not err by addressing the effect of its changes relative to the status quo ante.

### C.    The SEC Adequately Considered Effects on Investors.

Petitioners also fault the SEC for failing to assess the funding allocation's impact on investors. *See* Br. 44-47. But the SEC here carefully considered effects on investors—particularly in reference to efficiency, competition, and capital formation—including due to the allocation of one-third of costs to buyer-side

---

[10] Petitioners' cherry-picked discussion that the allocation "could have skewed heavily toward" Industry Members once more proceeds from their faulty "100%" allocation premise, *see supra* Part I.A, and, in any event, takes that discussion out of context. Br. 43. In the paragraph Petitioners point to, the SEC was explaining that the Order's framework for allocating costs into thirds between SROs and Industry Members improved incentives for SROs to control CAT costs compared to the Original Funding Model. *See* Order at 62,678.

executing broker-dealers, the allocation of another third to seller-side executing broker-dealers, and the possibility that CAT fees might be passed through. *See, e.g.*, Order at 62,682, 62,686 & nn.1155-56 (estimating that net capital effects, if fees borne by investors are significant, and other costs borne by investors "are likely small relative to current transaction costs"). As the SEC explained, "any impact on market efficiency of CAT fees being potentially passed through to investors under the Proposed Amendment may not represent a change to the baseline." *Id.* at 62,682. That is, since CAT costs correlate with trading activity, and the absolute fees are "likely small relative to current transaction costs," the "net capital effect" on investors would not be significant. *Id.* at 62,686. Indeed, the SEC found that the Order "might not change the total costs borne by investors relative to the Original Funding Model." *Id.*

Petitioners ignore the SEC's reasoned findings, advancing several arguments that lead nowhere.

1. Petitioners fear monger about the possibility that Industry Members, *like Petitioners themselves*, will opt to pass on *their* costs to investors. Br. 44-45. But that was always true and anticipated, and the SEC analyzed those effects fully and repeatedly in 2016. 2016 CAT Order at 84,863, 84,881, 84,884, 84,888, 84,893, 84,992-93. Petitioners further suggest the SEC did not account for the amount of

those costs. But the SEC explicitly considered increased costs since 2016. *See, e.g.*, Order at 62,655, 62,677 & n.1050, 62,681.

2. Petitioners insist "the CAT NMS Plan did not decide how much broker-dealers would be assessed" in 2016, so the SEC could not conclude that the 2023 Funding Order "may not represent a change in the baseline." Br. 45. But the SEC carefully examined the incremental effects caused by the 2023 Funding Order's actual allocation. It found any "additional costs borne by investors are likely small relative to current transaction costs." Order at 62,686. Petitioners are thus also wrong that the SEC did not consider "the magnitude of the costs." Br. 45.

3. Petitioners chide the SEC for observing that investors might "benefit from the CAT" and for characterizing the fees as "relatively small" because adding up all the fees paid by investors results in a large number. Br. 46 (quoting Order at 62,682-83). But, as discussed, the facts the SEC found are *true* and not refuted by Petitioners. Investors benefit from safe and secure markets. And from an individual investor's perspective on an individual trade, the fee *is* small. The SEC did not violate the APA by referencing those realities. Order at 62,682-83, 62,686.

4. Finally, Petitioners fault the SEC for acknowledging that it "cannot determine in advance the extent to which Industry Members can or will pass-through their CAT fees to investors." Br. 46 (quoting Order at 62,637). Petitioners point to proprietary trades as undermining this claimed uncertainty (because proprietary

trades can definitionally not be passed on). Br. 46-47. This, once more, takes the SEC's discussion completely out of context. The SEC accurately observed that "not all Industry Members currently pass through fees," and further stated that it "cannot determine in advance the extent to which" this will occur. Order at 62,637. It then explained that "at least some will do so," while *in the very next paragraph* addressing "proprietary trading firms" that "cannot pass-through fees to investors," because in proprietary trades the Industry Member *is* the investor. *Id.* As the SEC went on to explain, "it is reasonable to allow a firm to incur CAT fees for its profit-making activity." *Id.*

More fundamentally, for the reasons explained above, the SEC cannot be expected to solve paradoxes of economic theory and predict supply and demand elasticities to regulate consistent with the APA's requirements. *See supra* pp. 28-30. Indeed, as Petitioners acknowledge, the SEC could satisfy its "obligation to determine as best it can the economic implications" of the funding model, *Chamber of Com. of the U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005), by "quantify[ing] the certain costs *or* … explain[ing] why those costs could not be quantified," *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011) (emphasis added). Here, the SEC explained why it could estimate as small but not precisely calculate the cost to investors: the "increases in CAT costs" are "directly related to trading activity," Order at 62,681, and "the Commission has observed significant fluctuations in

47

volume," *id.* at 62,679, making it "difficult[] [to] estimate[e] future costs," *id.* at 62,681.

All told, the SEC spilled pages of ink analyzing and explaining the changes introduced by the 2023 Funding Order across all relevant metrics.

**III.    In the Event this Court Finds Error in Any Aspect of the 2023 Funding Order, It Should Take Care in Crafting a Remedy.**

The remedies Petitioners seek implicate serious equities concerns. Vacating the 2023 Funding Order would mean that the SROs would continue to bear the entirety of the CAT's costs for potentially several more years. Declaring the CAT unlawful could jeopardize the SROs' ability to *ever* recoup those costs. And it would also risk regulatory chaos as the SEC and SROs scramble to devise and implement new audit-trail solutions. This Court has power to tailor the remedy in light of these equitable considerations, and such tailoring is appropriate in the event the Court is persuaded by any of Petitioners' arguments.

**A.    This Court Has Considerable Power to Tailor Any Remedy in Light of the Equities.**

The weighty equities of this case should inform this Court's remedy in the event it finds error in the 2023 Funding Order. This Court has several important remedial tools at its disposal.

First, the Court has equitable authority to vacate only part of the Order. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 702-03 (2023) (Gorsuch, J., concurring

in the judgment) (discussing equitable nature of a court's authority to set aside agency action under 5 U.S.C. § 706); *Arizona v. Biden*, 40 F.4th 375, 396-97 (6th Cir. 2022) (Sutton, C.J., concurring) (same).

Second, the Court has further equitable power under the APA to "remand a matter to an agency without vacating the agency's action." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015); *see id.* at 1290 (collecting cases). As this Court has explained, "[i]n deciding whether an agency's action should be remanded without vacatur, a court must balance the equities." *Id.* at 1290.

Third, this Court can stay its mandate if the equities call for a delay. A stay is an accepted remedial measure that courts use to allow the parties time to address the consequences of a holding and avoid disruption. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), for example, after holding a broad statutory grant of jurisdiction to bankruptcy courts unconstitutional, the Supreme Court stayed its judgment for four months to allow Congress to "reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws." *Id.* at 88; *see also, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 142-43 (1976) (per curiam) (staying judgment to ensure enforcement of constitutional provisions of the challenged statute while Congress worked to adopt valid enforcement mechanisms).

49

**B.    A Limited Remedy Is Warranted.**

If the Court were to accept *any* of Petitioners' arguments, a tailored remedy is appropriate.

1. If this Court finds that the SEC committed procedural error by failing to appropriately consider certain arguments or to redo its 2016 economic analysis, *see* Br. 36-48, remand without vacatur would be proper. The remand-without-vacatur remedy is suited to situations where an agency is free to reach the same result on remand, as would likely be true if the SEC is deemed to have committed procedural error. *See Black Warrior Riverkeeper*, 781 F.3d at 1289-90. The SROs have already waited years to recoup *the first cent* of their expenditures. It would be deeply inequitable to keep them waiting longer because of technical errors by the SEC in explaining its fair allocation of the CAT's costs.

2.  Remand without vacatur would also be appropriate if this Court accepts Petitioners' argument that the SEC was required to anticipatorily prohibit SROs from passing through their one-third share of CAT costs. *See* Br. 32-36.

As noted above, Petitioners do not argue that a one-third, one-third, one-third allocation is unfair, unreasonable, or in any way unlawful. *See supra* p. 20. Petitioners thus acknowledge the validity of a scheme in which Industry Members pay no more than two-thirds of CAT costs. This Court should hold them to that acknowledgement by declining to give them a continued reprieve from paying for

50

any of CAT's costs. The Court should therefore, at most, remand the 2023 Funding Order to the SEC with instructions to address the issue of future pass-throughs. In that case, wholesale vacatur of the Order, and its allocation into one-third shares, would be unnecessary and inappropriate.

3. In addition to their invalid criticisms of the 2023 Funding Order, Petitioners also argue that the SEC's adoption of the CAT years ago was unlawful. *See* Br. 13-31. CAT LLC takes no position on the merits of that argument. However, CAT LLC emphasizes that if this Court rejects the 2023 Funding Order on the basis that the 2016 CAT Order was unlawful, the problems that result will be even more serious—and thus the need for a tailored remedy will be even greater.

First, a declaration that the 2016 CAT Order exceeded the SEC's authority could jeopardize the SROs' ability to *ever* recoup the more than $500 million they have spent in reliance on that order—which has stood as valid for the better part of a decade. And second, a decision declaring the CAT unlawful would, without appropriate remedial measures, jeopardize market integrity. Specifically, such a ruling would, at least for a time, leave the equities and options markets without sufficient audit-trail mechanisms, as key legacy systems have been retired and other surveillance systems substantially modified in reliance on the CAT's existence (as required by SEC regulation and urged by Industry Members). *See supra* pp. 14-15. Though the SEC and SROs could eventually develop new systems or revive now-

defunct systems, that process would take time. And the consequences of a regulatory gap—a period with limited audit-trail systems and surveillance in place—could be devastating.

This Court should also take note, in determining the proper remedy, that these practical problems are a function of Petitioners' delay in asserting their major-questions challenge to the CAT. Moreover, the Court should be cognizant that there is extreme uncertainty about the proper remedy in this novel situation—where a challenger invokes the major-questions doctrine to attack a long-running program. These considerations warrant a careful and deliberate approach that will afford flexibility to the SEC and the SROs, not the smash-and-grab dismantling of the CAT that Petitioners seek.

For these reasons, if this Court concludes that the CAT is unlawful, it should vacate only the portion of the 2023 Funding Order governing the allocation of *prospective* CAT costs. *See Texas*, 599 U.S. at 702-03 (Gorsuch, J., concurring in the judgment); *Arizona*, 40 F.4th at 396-97 (Sutton, C.J., concurring). Declaring that the consequences of the CAT's unlawfulness govern only the ability to fund it going forward—but do not create an undeserved windfall for Petitioners and an unfair and extreme loss for the SROs—would properly balance the equities. In the alternative, this Court should, at least, direct the SEC to address the allocation of historical CAT costs.

52

With respect to the future, a stay would be acutely needed were the CAT invalidated. Delaying the CAT's demise would mitigate the serious risks of upending the current audit-trail regime with no stopgap measure in place to protect market integrity. *See N. Pipeline*, 458 U.S. at 88. These serious real-world consequences—as well as the SROs' considerable financial commitments—should bear on any remedy.

## CONCLUSION

Petitioners' contentions regarding the cost allocation and economic analysis in the 2023 Funding Order should be rejected.

Respectfully submitted,

Date: April 15, 2024

*/s/ Ian Heath Gershengorn*
Ian Heath Gershengorn
  *Counsel of Record*
Gregory M. Boyle
Adam G. Unikowsky
Elizabeth B. Deutsch
Jonathan J. Marshall
Sophia W. Montgomery
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel for Intervenor*
  *Consolidated Audit Trail, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit set forth in Federal Rule of Appellate Procedure 32(a)(7)(b)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,207 words.

I further certify that this brief complies with the typeface requirements set forth in Federal Rule of Appellate Procedure 32(a)(5)(A) and with the type-style requirements set forth in Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using 14-point Times New Roman font in Microsoft Office Word Version 16.

Date: April 15, 2024

*/s/ Ian Heath Gershengorn*
Ian Heath Gershengorn
  *Counsel of Record*
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*Counsel of Record for Intervenor*
  *Consolidated Audit Trail, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing Response Brief for Intervenor Consolidated Audit Trail, LLC, with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

Date: April 15, 2024                    */s/ Ian Heath Gershengorn*