No. 23-13396

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent,*

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,
*Intervenors*.

On Petition for Review of September 6, 2023 Order of the
United States Securities and Exchange Commission

---

## OPENING BRIEF OF INTERVENOR EXCHANGES

---

Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500

*Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*

Jennifer G. Altman
PILLSBURY WINTHROP SHAW PITTMAN LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131
Telephone: (786) 913-4831

Matthew J. MacLean
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Telephone: (202) 663-8000

Stephen J. Kastenberg
Paul Lantieri III
Timothy D. Katsiff
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Telephone: (215) 665-8500

*Counsel for Intervenors The Nasdaq
Stock Market LLC, Nasdaq BX, Inc.,
Nasdaq GEMX, LLC, Nasdaq ISE,
LLC, Nasdaq MRX, LLC, and
Nasdaq PHLX LLC*

Ari M. Berman
David Oliwenstein
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: (202) 663-8000

*Counsel for Intervenors New York Stock
Exchange LLC, NYSE American LLC,
NYSE Arca, Inc., NYSE Chicago, Inc., and
NYSE National, Inc.*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2(b), the undersigned counsel of record certifies that the persons identified in the Certificate of Interested Persons included in Petitioners' opening brief (ECF No. 49) the *amici curiae* briefs (ECF Nos. 51, 61, 65, 67, 69, 74, 75, 90, and 91), and Respondent's brief (ECF No. 96) are complete.

Dated: April 15, 2024

Respectfully submitted,

*/s/ Paul E. Greenwalt III*
Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
paul.greenwalt@afslaw.com
michael.molzberger@afslaw.com

*Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*

*/s/ Stephen J. Kastenberg*
Stephen J. Kastenberg
Paul Lantieri III
Timothy D. Katsiff
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: 215.864.8999

*/s/ Jennifer G. Altman*
Jennifer G. Altman
PILLSBURY WINTHROP SHAW PITTMAN LLP
600 Brickell Avenue
Suite 3100
Miami, Florida 33131
Telephone: (786) 913-4831
jennifer.altman@pillsburylaw.com

Matthew J. MacLean
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone: (202) 663-8000
matthew.maclean@pillsburylaw.com

Ari M. Berman
David Oliwenstein
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
ari.berman@pillsburylaw.com
david.oliwenstein@pillsburylaw.com

kastenberg@ballardspahr.com
lantierip@ballardspahr.com
katsifft@ballardspahr.com

*Counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC*

*Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, the undersigned counsel of record certifies that Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc. are each a direct or indirect wholly-owned subsidiary of Cboe Global Markets, Inc., which is publicly traded under the ticker symbol "CBOE." Cboe Global Markets, Inc. has no parent corporation. A third party's review of public filings indicates that The Vanguard Group, Inc. owns 10% or more of Cboe Global Markets, Inc.'s common stock.

Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc. are indirect wholly-owned subsidiaries of Intercontinental Exchange, Inc., which is publicly traded under the ticker symbol "ICE." ICE has no parent corporation and, as of the date hereof, no publicly held company owns 10% or more of its stock.

Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC are direct or indirect subsidiaries of Nasdaq, Inc., which is publicly traded under the ticker symbol "NDAQ." Nasdaq, Inc. has no parent corporation. Borse Dubai Limited, Investor AB (Nasdaq Stockholm: INVEB), and Thoma Bravo UGP, LLC each own 10% or more of Nasdaq, Inc.'s common stock.

Dated: April 15, 2024

Respectfully submitted,

/s/ Paul E. Greenwalt III
Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
paul.greenwalt@afslaw.com
michael.molzberger@afslaw.com

*Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*

/s/ Stephen J. Kastenberg
Stephen J. Kastenberg
Paul Lantieri III
Timothy D. Katsiff
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: 215.864.8999
kastenberg@ballardspahr.com
lantierip@ballardspahr.com
katsifft@ballardspahr.com

*Counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC*

/s/ Jennifer G. Altman
Jennifer G. Altman
PILLSBURY WINTHROP SHAW PITTMAN LLP
600 Brickell Avenue
Suite 3100
Miami, Florida 33131
Telephone: (786) 913-4831
jennifer.altman@pillsburylaw.com

Matthew J. MacLean
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone: (202) 663-8000
matthew.maclean@pillsburylaw.com

Ari M. Berman
David Oliwenstein
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
ari.berman@pillsburylaw.com
david.oliwenstein@pillsburylaw.com

*Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

This Court should hear oral argument. The order under review represents the first step in the process that will finally enable the Intervenor Exchanges and the other Participants in the national market system plan for the Consolidated Audit Trail to begin recouping on a portion of the hundreds of millions of dollars that they have spent, and continue to spend, to create, implement, and maintain the Consolidated Audit Trail pursuant to a mandate from the Securities and Exchange Commission. Setting aside the funding model approved by the order would significantly impair the Participants' ability to continue to fund the Consolidated Audit Trail and, raise questions, at least in the short-term, about the ability of the Participants to surveil and regulate their securities markets under current regulatory mandates.

i

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-3

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF AUTHORITES .....................................................................iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ..........................................................10

STATEMENT OF THE ISSUES.............................................................10

STATEMENT OF THE CASE.................................................................11

    A.    Background On SROs, NMS Plans, And Market Surveillance. .........11

    B.    Reimbursement Of SRO Regulatory Costs.........................................15

    C.    The 2010 Flash Crash.........................................................................17

    D.    The 2016 CAT Approval Order And Proposed Funding Models.......19

    E.    The Scope Of The 2023 Funding Model Approval Order. .................22

    F.    The CAT Today.....................................................................................26

STANDARD OF REVIEW .....................................................................28

SUMMARY OF THE ARGUMENT .......................................................28

ARGUMENT .........................................................................................30

    I.    THE CAT'S ALLOCATION OF COSTS APPROVED IN THE ORDER IS REASONABLE. .........................................................30

        A.    The Standard Governing Regulation NMS Plan Amendments. .................................................................................30

ii

B.    The Commission Correctly Found That The Executed Share Model Satisfied The Legal Standard. .........................................31

C.    It Is Not Inequitable For Buy-Side And Sell-Side Executing Broker-Dealers To Each Be Allocated One-Third Of CAT Costs. ......................................................................................35

II.    THE COMMISSION'S ECONOMIC ANALYSIS WAS SUFFICIENT. ......................................................................................42

A.    The Commission Conducted An Appropriate Analysis. ..........42

B.    The Commission Reasonably Estimated The Effect On Investors. ................................................................................48

CONCLUSION ...............................................................................................50

CERTIFICATE OF SERVICE .......................................................................52

CERTIFICATE OF COMPLIANCE ..............................................................52

iii

# TABLE OF AUTHORITES

**Page(s)**

**Cases**

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) ................................................................50

*CHW West Bay v. Thompson*,
  246 F.3d 1218 (9th Cir. 2001) ..............................................................35

*City of Las Vegas v. Lujan*,
  891 F.2d 927 (D.C. Cir. 1989) ..............................................................39

*Colo. Wild, Heartwood v. U.S. Forest Serv.*,
  435 F.3d 1204 (10th Cir. 2006) ............................................................35

*Corn Refiners Ass'n, Inc. v. Costle*,
  594 F.2d 1223 (8th Cir. 1979) ..............................................................41

*Dep't of Homeland Security v. Regents of the University of California*,
  140 S. Ct. 1891 (2020) ..........................................................................35

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..............................................................................39

*Grand Canyon Air Tour Coal. v. F.A.A.*,
  154 F.3d 455 (D.C. Cir. 1998) ..............................................................39

*Hussion v. Madigan*,
  950 F.2d 1546 (11th Cir. 1992) ............................................................41

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*,
  720 F.3d 370 (D.C. Cir. 2013) ..............................................................49

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016) ..............................................................50

*Melcher v. FCC*,
  134 F.3d 1143 (D.C. Cir. 1998) ............................................................49

*Nasdaq Stock Mkt. LLC v. SEC*,
  34 F.4th 1105 (D.C. Cir. 2022) ........................................................ 48, 49

*Nasdaq Stock Mkt. LLC v. SEC*,
  38 F.4th 1126 (D.C. Cir. 2022) ............................................................21

*Nat'l Ass'n For Better Broad. v. F.C.C.*,
  849 F.2d 665 (D.C. Cir. 1988) ..............................................................33

*Nat'l Ass'n of Mfrs. v. SEC*,
  748 F.3d 359 (D.C. Cir. 2014) ......................................................... 43, 50

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) ........................................................ 46, 47

*Public Citizen, Inc. v. NHTSA*,
  374 F.3d 1251 (D.C. Cir. 2004) ...........................................................28

*State of Fla. v. Dep't of Health & Hum. Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ............................................................28

*Zen Magnets, LLC v. CPSC*,
  841 F.3d 1141 (10th Cir. 2016) ............................................................47

## Statutes

15 U.S.C. § 78c .................................................................................1

15 U.S.C. § 78f............................................................... 5, 11, 15, 29

15 U.S.C. § 78k-1...............................................................................13

15 U.S.C. § 78o-3............................................................................5, 15

15 U.S.C. § 78s ........................................................................... 11, 29

15 U.S.C. § 78y..................................................................................10

5 U.S.C. § 706.................................................................................5, 28

## Regulations

17 C.F.R. § 240.19b-4.........................................................................29

17 C.F.R. § 242.601 .................................................................................................14

17 C.F.R. § 242.602 .................................................................................................14

17 C.F.R. § 242.603 .................................................................................................14

17 C.F.R. § 242.608 ...................................................................................... 5, 29, 30

17 C.F.R. § 242.611 .................................................................................................14

17 C.F.R. § 242.612 .................................................................................................14

17 C.F.R. § 242.613 ........................................ 5, 7, 15, 21, 29, 30, 31, 43

## Other Authorities

CAT LLC Provides Key Operational Update (Apr. 14, 2020)...............................26

Concept Release Concerning Self-Regulation, Release No. 34-50700, 69 Fed. Reg.
   71256 (Dec. 8, 2004) ...................................................................... 15, 16

Consolidated Audit Trail Advisory Committee List ..............................................21

Consolidated Audit Trail; Adopting Release, Release No. 34-67457, 77 Fed. Reg.
   45722 (Aug. 1, 2012)...................................................................... 18, 19

Consolidated Audit Trail; Proposing Release, Release No. 34–62174, 75 Fed. Reg.
   32556 (June 8, 2010) .................................................................................18

Dan Ryan, *Consolidated Audit Trail: The CAT's Out of the Bag*, Harvard Law
   School Forum on Corporate Governance (July 16, 2016) ...................................20

David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L.
   Rev. 2379 (2021) .......................................................................................12

Financial Industry Regulatory Authority, Inc.; Notice of Filing of a Proposed Rule
   Change to Adopt FINRA Rule 6897(b) (CAT Cost Recovery Fees) To
   Implement a Historical Consolidated Audit Trail Recovery Assessment;
   Suspension of and Order Instituting Proceedings To Determine Whether To
   Approve or Disapprove the Proposed Rule Change, Release No. 34-99372, 89
   Fed. Reg. 11153 (Jan. 17, 2024)................................................................26

Gary Gensler, Chairman, SEC, Statement on CAT Funding, Sept. 6, 2023 ..........22

Graham Bowley, Lone Sale of $4.1 Billion in Contracts Led to 'Flash Crash' in May, N.Y. Times, Oct. 2, 2010 ..................................................................................17

H.R. Rep. No. 94-123 (1975)...............................................................................13

Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to the Registered Representative Fee and an Options Regulatory Fee, Release No. 34-58817, 73 Fed. Reg. 63744 (Oct. 27, 2008)......................................................17

Notice of Filing and Order Granting Accelerated Approval to a Proposed Rule Change To Establish Certain Fees with Respect to Transactions Executed Through the Intermarket Trading System, Release No. 34-52673, 70 Fed. Reg. 65942 (Nov. 1, 2005)...................................................................................................17

Notice of Filing and Order Granting Accelerated Approval to a Proposed Rule Change To Establish Certain Fees With Respect to Transactions Executed Through the Intermarket Trading System, Release No. 34-52674, 70 Fed. Reg. 65945 (Nov. 1, 2005)...................................................................................................17

Notice of Filing of a Proposed Rule Change To Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail; Suspension of and Order Instituting Proceedings To Determine Whether To Approve or Disapprove the Proposed Rule Change, Release No. 34-99363, 89 Fed. Reg. 10850 (Feb. 13, 2024)..................................................................................................................25

Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-77724, 81 Fed. Reg. 30614 (May 17, 2016)...........19

Notice to Members 98-33, SEC Approves New Order Audit Trail System (OATS), FINRA (Mar. 1, 1998).........................................................................................14

Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-98290, 88 Fed. Reg. 62628 (Sept. 12, 2023).................................................. 2, 8, 9, 12, 20, 22–24, 26–28, 31–46, 48

Order Approving the NMS Plan Governing the CAT, Release No. 34-79318, 81 Fed. Reg. 84696 (Nov. 23, 2016)....................................... 1, 8, 19–21, 25, 32, 42

Order Granting Approval of Proposed Rule Change and Amendment Nos. 1 and 2, and Notice of Filing and Order Granting Accelerated Approval to Amendment Nos. 3 and 4 to the Proposed Rule Change by the National Association of

Securities Dealers, Inc., to Eliminate the Regulatory Fee and Institute a Transaction-Based Trading Activity Fee, Release No. 34-47946, 68 Fed. Reg. 34021 (June 6, 2003) ...................................................................................16

Order Granting Conditional Exemptive Relief, Pursuant to Section 36 and Rule 608(e) of the Securities Exchange Act of 1934, From Section 6.4(d)(ii)(C) and Appendix D Sections 4.1.6, 6.2, 8.1.1, 8.2, 9.1, 9.2, 9.4, 10.1, and 10.3 of the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-88393, 85 Fed. Reg. 16152 (Mar. 20, 2020)............................................25

Philip A. Loomis Jr., Comm'r, SEC, The Securities Acts Amendments of 1975, Self Regulation and the National Market System, Address Before the Joint Securities Conference 1975 (Nov. 18, 1975). ......................................................13

Regulation NMS, Release No. 34-51808, 70 Fed. Reg. 37496 (June 29, 2005).....14

Rory Van Loo, *The Missing Regulatory State: Monitoring Business in an Age of Surveillance*, 72 Vand. L. Rev. 1563 (2019).........................................................13

Section 31 Fees—Basic Information for Firms (Apr. 8, 2009) ...............................17

**GLOSSARY**

| | |
|---|---|
| 2016 CAT Approval Order | Order Approving the NMS Plan Governing the CAT, Release No. 34-79318, 81 Fed. Reg. 84696 (Nov. 23, 2016). |
| CAT | Consolidated Audit Trail |
| Commission | United States Securities and Exchange Commission. |
| Executed Share Model | The CAT funding model approved by the Order. |
| Intervenor Exchanges | Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.; New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.; and The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC. |
| Order | Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-98290, 88 Fed. Reg. 62628 (Sept. 12, 2023). |
| Original Funding Model | The CAT funding model approved in the 2016 CAT Approval Order. |
| Participants | BOX Exchange, LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc., Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange, LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The Nasdaq Stock Market LLC, New York Stock Exchange LLC, NYSE |

American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.

## INTRODUCTION

More than a decade ago, in the aftermath of the "Flash Crash" of 2010, the U.S. Securities and Exchange Commission ("Commission") proposed the creation of a consolidated audit trail ("CAT") to track customer and order event information for securities orders with a goal of facilitating better regulation of the securities markets. In 2012, the Commission adopted Rule 613 of Regulation NMS, which required that self-regulatory organizations ("SROs")[1] submit a national market system ("NMS") plan to create, implement, and maintain a CAT.

In 2016, the Commission approved the original version of the CAT NMS Plan based on a proposal by the then-existing SROs.[2] Order Approving the NMS Plan Governing the CAT, Release No. 34-79318, 81 Fed. Reg. 84696 (Nov. 23, 2016) ("2016 CAT Approval Order"). The 2016 CAT Approval Order, among other things, approved the original funding model for the CAT (the "Original Funding Model"),

---

[1] The term "self-regulatory organization" is defined in the Securities and Exchange Act of 1934 ("Exchange Act") as any national securities exchange (like the Intervenor Exchanges) and any registered securities association (like the Financial Industry Regulatory Authority, Inc. ("FINRA")). 15 U.S.C. § 78c(a)(26). Each of the Participants in the CAT Plan is an SRO.

[2] The "CAT Plan" is set forth in the Limited Liability Company Agreement of Consolidated Audit Trail, LLC ("CAT LLC"), the current version of which is available at: https://www.catnmsplan.com/about-cat/cat-nms-plan.

which established a framework for the allocation of CAT costs among Participants in the CAT Plan and Participants' members (referred to as "Industry Members").[3]

To date, and at the Commission's mandate, the Intervenor Exchanges and the other Participants in the CAT Plan have borne all of the costs to create, implement, and maintain the CAT—which Petitioners admit the SEC "compelled" the SROs to develop (Br. at 2). From 2012 through 2023, those costs have exceeded $775 million.[4] Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-98290, 88 Fed. Reg. 62628 (Sept. 12, 2023) (the "Order") at 62662. Yet Petitioners apparently oppose having anyone pay for the CAT other than the SROs. Br. at 1. Contrary to Petitioners' claim that the SEC "collaborated with the exchanges to offload the massive bill" (Br. at 2),

---

[3] The "Intervenor Exchanges" are the Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.; New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.; and The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

The current "Participants" in the CAT Plan are the Intervenor Exchanges, as well as BOX Exchange LLC, FINRA, Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange, LLC, MIAX Emerald, LLC, and MIAX PEARL, LLC.

[4] This figure represents the direct costs of the CAT, and it does not include the separate costs that *both* Participants and Industry Members have incurred, and will continue to incur, to comply with their CAT reporting requirements.

2

the SROs have paid every penny to date, and there has been zero contribution from Industry Members.

The Original Funding Model was always meant to be temporary since it did not set a specific allocation of fees between execution venues (including Participants) and Industry Members.  On March 13, 2023, following years of discussions with the Commission and the filing and withdrawing of amendments proposing various revised funding models, the Participants submitted a proposed amendment to the CAT Plan that would replace the Original Funding Model with a revised funding model (the "Executed Share Model").  On September 6, 2023, following notice and comment, the Commission approved that amendment in the Order challenged by Petitioners.

The Order is limited in scope: it approves an amendment to the CAT Plan that addresses a discrete issue—approval of the new Executed Share Model to replace the temporary funding framework contained in the Original Funding Model.  The Order permits the Participants to move forward with the process of finally recouping a portion of the amounts that have been spent to create, implement, and maintain the CAT, and to fund the CAT moving forward.  These subsequent, potential fee filings by Participants were not the subject of the Order.

In addition, the Order acknowledged that both Industry Members and Participants may later choose to pass on CAT fees that they must pay to their

customers (in the case of Industry Members) or to their members (in the case of the Participants).  The Participants, however, will be required to amend their rules if they want to implement a CAT-related pass-through fee and such amendments would be accomplished through separate fee filings pursuant to Section 19 of the Exchange Act.  Any such fee filings also fall outside the scope of the Order.  Industry Members, in contrast, would not be subject to any regulatory review before they could pass through their portion of CAT fees to their customers.

Petitioners raise three principal arguments.  First, Petitioners focus on an issue that the Order did not address and does not place at issue—whether CAT, as a whole, should exist.  In particular, Petitioners devote much of their brief to arguing that the CAT fails under the major questions doctrine and that creation of the CAT was outside the Commission's statutory authority.  Br. at 13–31.  The Intervenor Exchanges have funded and been Participants in CAT at the mandate of the Commission and take no position on the issue of whether the Commission had the authority to impose that mandate.  However, any finding that disturbs the viability of CAT should not leave the Intervenor Exchanges either unable to fulfill their regulatory obligations, nor make them solely responsible for CAT expenses to date.

Second, Petitioners argue that the Executed Share Model violates the Exchange Act requirement that dues, fees, and other charges be equitably allocated because Petitioners claim that Industry Members will bear 100% of the costs of the

4

CAT. Br. at 32–38. As an initial matter, Petitioners miss the mark by citing to provisions of the Exchange Act governing fee filings made by national securities exchanges and national securities associations (Br. at 32 (citing to 15 U.S.C. §§ 78f(b)(4) and 78o-3(b)(5))); the applicable standards are those governing the Commission's approval of proposed amendments to NMS Plans, which are located in Rules 608(b)(2) and 613(a)(5). 17 C.F.R. §§ 242.608(b)(2) and 242.613(a)(5).

Moreover, the Commission reasonably concluded that the Executed Share Model met the standards found in Rules 608 and 613, and therefore the Order was not "arbitrary, capricious, abuse of discretion, otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The CAT must be funded, so the question is not *if* the CAT should be funded but *how*. Although there could arguably be more than one reasonable funding model for the CAT, the Commission used its reasoned judgment, following years of consideration, a lengthy comment period, and review of other proposed funding models, when it approved the Executed Share Model. In particular, the Commission properly considered alternative funding models, responded to public comments, and made the required statutory findings.

The Intervenor Exchanges are the largest CAT Participants and they have borne, for more than a decade, the lion's share of the financial burden associated with the development of CAT pursuant to the Commission's mandate. The Executed Share Model permits CAT LLC—after additional fee rule filings submitted by the

5

individual Participants become effective—to fund costs that have been previously incurred to create, develop, and maintain the CAT through transaction-based fees that will be charged by CAT LLC to Industry Members. An additional transaction fee will be assessed to Participants and Industry Members to fund prospective CAT costs on an ongoing basis and, once again, the Participants will have to submit additional fee rule filings to require that Industry Members pay those fees to CAT LLC. Although the Participants have filings pending before the Commission that would require Industry Members to pay certain historic CAT assessment fees to CAT LLC, and one Participant (FINRA) has made a separate filing that would allow it to pass-through the CAT fees that it is allocated by CAT to its members, none of those fee rule filings is before the Court and the Commission did not address them in the Order. Rather, only the Commission's approval of the Executed Share Model is before the Court.

The Exchange Act permits SROs to impose fees on their members to fund many regulatory activities that they perform, including supervision of their securities markets as required by the Exchange Act. There is nothing unusual about Industry Members (who also are regulated entities) paying fees to SROs to help fund regulatory activities, or about Industry Members, in turn, passing some or all of those fees through to their customers.

6

Contrary to Petitioners' suggestions (Br. at 8), Rule 613 and the CAT Plan have never contemplated that the CAT would be funded solely by the Participants indefinitely. Instead, the 2016 CAT Approval Order recognized that "the Participants are permitted to recoup their regulatory costs under the Exchange Act through the collection of fees from their members" so long as those fees satisfy the applicable Exchange Act criteria. 2016 CAT Approval Order at 84795; *see also* 17 C.F.R. § 242.613(a)(1)(vii)(D) (requiring that the CAT plan filed with the Commission specify "[h]ow the plan sponsors propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of such estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors"). No one, including Petitioners, commented that the 2016 CAT Approval Order was inequitable, even though it expressly stated that Participants could recover their regulatory costs.

In sum, the Order is the first step in the process of requiring that Industry Members pay a share of the costs associated with CAT when the Commission approved the Executed Share Model framework for allocating an equal one-third of CAT costs to the three primary parties that are involved in a securities transaction: the buy-side executing broker, sell-side executing broker, and the Participant (which will be either the exchange on which a trade is executed or FINRA for off-exchange transactions). Moreover, the amount of a Participant's CAT costs that any Participant

7

may ultimately seek to pass on to their broker-dealer members is not before the Court. That issue will be the subject of separate decision making and any later proposed fee filings for that purpose would be made by the individual Participants pursuant to the applicable provisions of the Exchange Act. Order at 62636. While Petitioners argue that it would be inequitable to allow Participants to pass CAT costs to their members, broker-dealers, like Citadel, are not subject to any regulatory review process if they decide to pass along to their customers either some or all of their share of CAT costs. *See* Order at 62637, 62645, 62650. Thus, Petitioners' repeated assertion that Industry Members will ultimately bear 100% of the CAT costs is false.

Third, Petitioners argue that the economic analysis presented in the Order is inadequate because the Commission purportedly failed to update the exhaustive economic analysis it conducted when it approved the entire CAT Plan in 2016. Br. at 39–48; *see also* 2016 CAT Approval Order at 84799–911 (presenting the Commission's economic analysis of myriad factors relevant to the entire CAT Plan). The Order before this Court, however, is limited to approving the amendment adopting the Executed Share Model, so the Commission was not required in the Order to redo its economic analysis justifying the existence of the CAT. Instead, the Order appropriately used the Commission's 2016 economic analysis of the Original Funding Model as a baseline and updated that analysis as applicable to the proposed

Executed Share Model. The Commission's updated economic analysis appropriately analyzed the likely economic impact of the Executed Share Model on the applicable statutory considerations—efficiency, competition, and capital formation—and concluded that the Executed Share Model is in the public interest.

Furthermore, although CAT LLC has not yet set all of the fee rates related to historic CAT costs or introduced the fee rate for ongoing CAT costs, the Commission noted that the CAT fees are estimated to be a small fraction of a penny per executed equivalent share. Order at 62682. That small fee is similar in size to other regulatory fees designed to reimburse SROs for costs that they incur in connection with their vital roles in promoting well-regulated securities markets. *Id.* at 62637, 62663.

Fundamentally, the broker-dealers represented by Petitioner American Securities Association and Citadel—one of the largest trading firms in the country— appear to be attempting to avoid paying for any portion of the CAT, a program that protects the integrity of the securities markets that broker-dealers use to generate billions of dollars in annual profits. Because the Commission complied with the Administrative Procedure Act and made reasoned determinations that the Executed Share Model satisfied the applicable criteria found in Regulation NMS, the Petition should be denied.

9

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under Section 25 of the Exchange Act, 15 U.S.C. § 78y(a), which permits persons aggrieved by a final order of the Commission entered pursuant to the Exchange Act to petition for review in the applicable Court of Appeals within 60 days of the order's entry.  The Commission entered the Order on September 6, 2023, and Petitioners timely filed a petition for review of the Order on October 17, 2023.

## STATEMENT OF THE ISSUES

1.      Whether the Commission's approval of the Executed Share Model, which establishes a one-third allocation of CAT costs among the three classes of actors who have primary roles in a securities transaction is arbitrary and capricious, when (a) the Executed Share Model adheres to Rule 613(a)(1)(vii)(D)'s mandate that costs should be allocated among the Participants and Industry Members, (b) the Executed Share Model correlates with the cost burden that those entities impose on the CAT, and (c) the Commission engaged reasoned decision-making and considered other potential models and public comments.

2.      Whether the Commission, which engaged in reasoned decision-making when it updated the economic analysis that it conducted in 2016 related to the Original Funding Model to consider the effects of the new Executed Share Model on efficiency, competition, and capital formation, and further considered the effects

10

on investors, acted arbitrarily and capriciously when it approved the Executive Share Model.

## STATEMENT OF THE CASE

The Order challenged by Petitioners is confined to one important but narrow issue: the allocation of funding of the costs for the CAT. Due to its limited scope, the Order simply does not implicate many of the issues raised by Petitioners and their amici—who challenge the very existence of the CAT and also ask this Court to address issues entirely unrelated to the Order (*e.g.*, data security, the collection of personally identifying information, and how the government might use CAT data). While the Order's focus is narrow, it is important to consider the historical background that led the Commission to mandate that the SROs create the CAT and the context of the allocation of CAT fees approved by the Order.

### A.    Background On SROs, NMS Plans, And Market Surveillance.

In the wake of the stock market crash of 1929, Congress passed the Exchange Act, which created the Commission and gave it broad powers to regulate the securities markets. Securities Exchange Act of 1934, Pub. L. 73-291, 48 Stat. 881 (1934) (codified as amended at 15 U.S.C. §§ 78a-78pp). The Exchange Act also includes a significant role for SROs to regulate their members and markets by enforcing the SROs' own rules and by helping to enforce the federal securities laws. *See* 15 U.S.C. §§ 78f, 78s(g)(1). Although today's markets have evolved from those

11

that existed ninety years ago, the underlying objectives of the federal securities laws are the same: to promote transparency, fairness, and integrity in the securities markets, thereby fostering investor confidence and the protection of the United States' capital markets. SEC, Our Goals, available at: https://www.sec.gov/our-goals ("The SEC's long-standing three-part mission—to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation—remains its touchstone.").

To meet those objectives, the Commission and the SROs have long needed to monitor the securities markets. Order at 62672. Indeed, "[t]he surveillance functions for which the SEC aims to build the CAT are as old as the markets themselves." David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379, 2433 (2021) (footnotes omitted). Initially, SROs' efforts to supervise their markets were largely manual, involving physical review of trading tapes and member broker-dealer audits. Exchange staff would monitor floor trading activities, relying on the observations of exchange officials and a manual review of paper-based trading.

In the late 1960s, a significant increase in institutional trading broke the cumbersome physical process for settling or clearing trades, which still required transferring physical certificates, causing a substantial number of trades to fail. Philip A. Loomis Jr., Comm'r, SEC, The Securities Acts Amendments of 1975, Self

12

Regulation and the National Market System, Address Before the Joint Securities Conference 1975, at 2 (Nov. 18, 1975), available at: https://www.sec.gov/news/speech/1975/111875loomis.pdf.    The House Report leading up to the Securities Acts Amendments of 1975 characterized the securities markets as a "stunted and distorted evolutionary process and technological obsolescence." H.R. Rep. No. 94-123, at 49 (1975).  To address this issue, Congress passed the Securities Acts Amendments of 1975 that directed the Commission to "facilitate the establishment" of a "national market system" to link together individual markets that trade securities.  Pub. L. 94–29, 89 Stat. 97 (June 4, 1975) (codified in various sections of 15 U.S.C.).  While the 1975 amendments did not define the term "national market system" or mandate the components of such a system, it was clear that Congress saw "the linking of all markets for qualified securities through communication and data processing facilities" as essential to achieving the goals of fair competition, transparency, and "economically efficient execution of transactions."  15 U.S.C. § 78k-1.

As technology evolved, so did the SROs' supervision of the markets, and SROs started to implement automated systems to detect improper trading conduct across markets.  *Cf.* Rory Van Loo, *The Missing Regulatory State: Monitoring Business in an Age of Surveillance*, 72 Vand. L. Rev. 1563, 1573–74 (2019) (discussing systematic and routine information collection under the heading of

"programmatic" monitoring).  For example, in the late 1980s, NYSE introduced the Intermarket Surveillance Information System, a system that provided a sequential reconstruction of trading in each stock that included various data points.  In 1998, with Commission approval, the National Association of Securities Dealers (now FINRA) established the Order Audit Trail System, an automated system used to record information relating to orders and other trade data from all equities traded on the National Market System.  Notice to Members 98-33, SEC Approves New Order Audit Trail System (OATS), FINRA (Mar. 1, 1998), https://www.finra.org/rules-guidance/notices/98-33.

The turn of the millennium saw exponential change in the securities markets as the internet revolutionized how information is shared and how trades are executed.  New, electronic trading venues were created, resulting in the proliferation and dispersion of trades across many venues.  After a healthy debate, in 2005, the Commission adopted Regulation National Market System ("Reg NMS") in response to the technological advancements to "modernize and strengthen the regulatory structure of U.S. equities markets."  Regulation NMS, Release No. 34-51808, 70 Fed. Reg. 37496 (June 29, 2005) (codified as amended at 17 C.F.R. pts. 200, 201, 230, 240, 242, 249, 270).  Among other things, Reg NMS implemented new rules related to improving access to market data, order protection, and decimalization of price quotes.  *See* 17 C.F.R. §§ 242.601–603, 611, 612.  In 2012, Reg NMS was

14

amended to add Rule 613, which, among other things, required that the existing SROs file a proposed national market system plan governing the creation, implementation and maintenance of a consolidated audit trail and central data repository. 17 C.F.R. § 242.613.

### B.    Reimbursement Of SRO Regulatory Costs.

SROs have been a critical component of the regulatory scheme of U.S. securities markets since before the Exchange Act was enacted in 1934. Concept Release Concerning Self-Regulation, Release No. 34-50700, 69 Fed. Reg. 71256, 71257 (Dec. 8, 2004). The Exchange Act and its implementing rules and regulations impose on SROs a host of regulatory and operational responsibilities that require significant expenditures of time and money. *See, e.g.*, 15 U.S.C. § 78f(b)(1) and § 78o-3(b)(2). To ensure that SROs had the requisite funding, the Exchange Act "intended that regulatory funding be sufficient to permit SROs to fulfill their statutory responsibilities under the Exchange Act and contemplated that such funding would be achieved through equitable assessments on the members, issuers, and other users of an SRO's facilities." Concept Release Concerning Self-Regulation at 71267. While the Participants other than FINRA are now either for-profit entities or owned by for-profit parent companies, that has not altered their regulatory responsibilities under the Exchange Act, and they still may seek to recoup costs that they incur to fulfill those obligations from their members.

15

At various times over the years, SROs have sought Commission approval to impose fees on "members, issuers, and other users of an SRO's facilities." *Id.* These fees often enable SROs to cover operational expenses incurred to fulfill their self-regulatory obligations.[5] In 2003, for example, the Commission approved NASD's transaction-based Trading Activity Fee, finding that it was reasonably designed "to recover NASD costs related to regulation and oversight of its members." Order Granting Approval of Proposed Rule Change and Amendment Nos. 1 and 2 and Notice of Filing and Order Granting Accelerated Approval to Amendment Nos. 3 and 4 to the Proposed Rule Change by the National Association of Securities Dealers, Inc., to Eliminate the Regulatory Fee and Institute a Transaction-Based Trading Activity Fee, Release No. 34-47946, 68 Fed. Reg. 34021, 30423 (June 6, 2003).

As another example, the Commission charges SROs fees pursuant to Section 31 of the Exchange Act. The Commission has recognized that those charges are then first passed through by exchanges to their broker-dealer members in the form

---

[5] *See, e.g.*, FINRA Schedule A to the Bylaws of FINRA, Section 1(a), https://www.finra.org/rules-guidance/rulebooks/corporate-organization/section-1-member-regulatory-fees (stating "FINRA shall, in accordance with this section, collect member regulatory fees that are designed to recover the costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities").

of per-transaction charges and that the broker-dealers, in turn, generally pass those charges on to their customers. *See* Section 31 Fees—Basic Information for Firms (Apr. 8, 2009), https://www.sec.gov/divisions/marketreg/sec31feesbasicinfo.htm; *see also* Notice of Filing and Order Granting Accelerated Approval to a Proposed Rule Change To Establish Certain Fees with Respect to Transactions Executed Through the Intermarket Trading System, Release No. 34-52673, 70 Fed. Reg. 65942 (Nov. 1, 2005); Notice of Filing and Order Granting Accelerated Approval to a Proposed Rule Change To Establish Certain Fees With Respect to Transactions Executed Through the Intermarket Trading System, Release No. 34-52674, 70 Fed. Reg. 65945 (Nov. 1, 2005). Certain SROs also have adopted rules that permit SROs to charge a transaction-based "options regulatory fee." *See, e.g.*, Notice of Filing and Immediate Effectiveness of Proposed Rule Change Relating to the Registered Representative Fee and an Options Regulatory Fee, Release No. 34-58817, 73 Fed. Reg. 63744 (Oct. 27, 2008).

### C.    **The 2010 Flash Crash.**

On May 6, 2010, the Flash Crash wiped out $1 trillion in stock value in 36 minutes. Graham Bowley, Lone Sale of $4.1 Billion in Contracts Led to 'Flash Crash' in May, N.Y. Times, Oct. 2, 2010, https://www.nytimes.com/2010/10/02/business/02flash.html. As the Commission investigated the cause of the Flash Crash, it concluded that the existing infrastructure

17

used to monitor and surveil was "outdated and inadequate to effectively oversee a complex, dispersed, and highly automated national market system." Consolidated Audit Trail; Adopting Release, Release No. 34-67457, 77 Fed. Reg. 45722, 45723 (Aug. 1, 2012) ("CAT Adopting Release").

While some NMS Plans collected and distributed data across different markets, SROs' surveillance measures were somewhat siloed, focusing on trading activity in the specific markets each SRO oversaw. *See id.* at 45728–30. The Commission concluded that the "lack of uniformity" and "cross-market capability" of the separate SRO audit trails made detection of abnormal or nefarious trading activity more difficult, especially when trading activity was carried out across multiple markets and multiple products. Consolidated Audit Trail; Proposing Release, Release No. 34-62174, 75 Fed. Reg. 32556, 32557 (June 8, 2010) ("CAT Proposing Release").

Twenty days after the Flash Crash, the Commission proposed Rule 613 of Regulation NMS to create a consolidated audit trail with a goal of creating improved market surveillance and to assist the agency in "investigating and preparing market reconstructions and understanding causes of unusual market activity." *Id.* at 32605. After two years, in July 2012, the Commission adopted Rule 613, which required that SROs propose an NMS plan to create, implement, and maintain a consolidated audit trail that would capture customer and order event information for orders in

18

national market system securities.  *See* CAT Adopting Release at 45789–813; 2016 CAT Approval Order at 84698.

### D.  The 2016 CAT Approval Order And Proposed Funding Models.

Pursuant to Rule 613, the then-existing SROs filed a CAT NMS Plan with the Commission on February 27, 2015.[6]  2016 CAT Approval Order at 84696–97.  The CAT NMS Plan, as amended, was published for comment on May 17, 2016.  Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-77724, 81 Fed. Reg. 30614 (May 17, 2016).  On November 15, 2016, after notice and comment, the Commission issued the 2016 CAT Approval Order, which spans 339 pages of the Federal Register.  *See* 2016 CAT Approval Order.  Although the proposed CAT Plan generated significant public attention and comment, Petitioners did not petition for review of the 2016 CAT Approval Order (nor did any of the amici who have filed briefs in this case).

The 2016 CAT Approval Order discussed dozens of aspects of the CAT Plan, from broad topics such as governance of the CAT to particulars like symbology and identification numbers.  The Commission painstakingly addressed comments and responses to comments on dozens of issues before making its findings.  *Id.* at 84726-

---

[6] The Participants filed amendments to the proposed CAT NMS Plan on December 24, 2015, and February 8, 2016.  *See* 2016 CAT Approval Order at 84697 n.4.

911. The Commission's economic analysis of the CAT Plan alone consumes 112 pages in the Federal Register. *See id.* at 84799–84911.

The 2016 CAT Approval Order approved the interim Original Funding Model. 2016 CAT Approval Order at 84793. The Original Funding Model was bifurcated, with costs associated with building and operating the CAT to be borne by (1) Participants and Industry Members that are "Execution Venues" (alternative trading systems) through fixed tier fees, and (2) Industry Members (other than alternative trading systems), through fixed tier fees based on message traffic. *Id.* The 2016 CAT Approval Order did not set a specific allocation of fees between Participants and Industry Members, but it recognized that Participants would be able to shift some portion of CAT's operating costs to Industry Members and that doing so would be consistent with the Exchange Act. *Id.* at 84794–95.[7]

Between 2016 and 2023, the CAT Participants considered and rejected several alternative approaches to the Original Funding Model, including a revenue-based funding model, a message traffic model, a sales value model, and others. *See* Order

---

[7] Indeed, observers at the time understood that broker-dealers, which can pass through their CAT costs to investors without Commission approval, would initially fund most of CAT's costs. *See, e.g.*, Dan Ryan, *Consolidated Audit Trail: The CAT's Out of the Bag*, Harvard Law School Forum on Corporate Governance (July 16, 2016) ("As it currently stands, the funding model would result in 85% of the estimated build cost and over 75% of the annual running costs of the CAT to be funded by the broker-dealers.").

at 62638 n.208 (discussing alternative approaches to CAT funding model). Participants engaged with Industry Members during this process, including with Industry Members' representatives serving on CAT's Advisory Committee.[8]

After considering several funding models and after extensive consultation with the Commission and Industry Members and the public, the Participants proposed the Executed Share Model; this model assesses a fee for each transaction based on the number of equivalent shares traded and allocates one-third of that fee to (1) the SRO exchange on which the trade was executed (or to FINRA in the case

---

[8] Although Petitioners complain that broker-dealers and investors have no direct control over the operations of the CAT (Br. at 3, 8, 23, 35), the Exchange Act does not permit non-SROs to serve as voting members on the operating committees of NMS plans. *See Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126 (D.C. Cir. 2022). Rule 613, however, mandates that the CAT Plan include an Advisory Committee and the CAT Plan implements that mandate. *See* 17 C.F.R. § 613(b)(7); CAT Plan, § 4.13 (which lists the twelve categories of expertise required to be represented on the Advisory Committee and further provides that a representative of the Commission will serve as an advisor on that committee); *see also* 2016 CAT Approval Order at 84730–34 (discussing comments regarding the Advisory Committee and describing the Commission's modifications to the proposed CAT Plan in response). The Advisory Committee has advised the Participants on the implementation, operation, and administration of the CAT, including items such as technical specifications, reporting functionality, and other issues. The Advisory Committee also provided a forum for Industry Members to address issues with Participants and the Commission regarding the proposed funding models, among other issues. Notably, Citadel's Managing Director, Market Analytics and Regulatory Structure, currently serves on the Advisory Committee. *See* Consolidated Audit Trail Advisory Committee, as of December 7, 2023 https://www.catnmsplan.com/sites/default/files/2023-12/12.06.23-Advisory-Committee-List.pdf.

of off-exchange trades that are reported to a FINRA trade reporting facility), (2) the CAT executing broker for the buyer, and (3) the CAT executing broker for the seller involved in a transaction.  Order at 62630, 62636.

E.       **The Scope Of The 2023 Funding Model Approval Order.**

On September 6, 2023, after "years of work by the SROs" and "significant engagement with the market participants and the public," the Commission finally approved the Executed Share Model as the permanent funding model for the CAT. Gary Gensler, Chairman, SEC, Statement on CAT Funding, Sept. 6, 2023, https://www.sec.gov/news/statement/gensler-statement-cat-funding-090623; Order, 88 Fed. Reg. 62628 (2023).  Misleadingly, Petitioners assert the Order was "crafted" by the exchanges and adopted by the SEC "without material changes" (Br. at 2), but the Order represented the culmination of a multi-year process where multiple funding models were considered and vetted with the Commission.  *Supra*, at 19–22.

The Order under review is limited to the issue of the allocation by CAT of recoverable historic and prospective CAT costs between the Participants and Industry Members.  The Executed Share Model revised the Original Funding Model in two ways.  First, the Executed Share Model bases the CAT fees on executed share volume, while the Original Funding Model contemplated assessing fees based on market share for some entities and message traffic for others.  Order at 62629.  With

22

respect to that change, the Commission found the Executed Share Model is consistent with the requirements of the Exchange Act, and ultimately is an improvement on the Original Funding Model.  In particular, the Commission found that the Executed Share Model better ensures that the fees are fairly assessed in proportion to the level of activity of each party and more accurately imposes fees based on the cost burden each entity imposes on the CAT's system.  *Id.* at 62641–42.  Second, the Executed Share Model divides costs evenly between the three entities who have primary roles in a transaction: (1) the buy-side executing broker, (2) the sell-side executing broker, and (3) the Participant involved in the transaction.  *Id.* at 62629.

The Order also established two categories of fees to be assessed by CAT LLC: fees for historical CAT costs and fees for prospective CAT costs.  *Id.* at 62630.  Historical CAT costs refer to expenses that have been previously paid by the Participants in creating, implementing, and maintaining the CAT.  *Id.*  Historical CAT costs are split evenly among the two CAT executing brokers (for the seller and for the buyer) and the Participants.[9]  *Id.*  Prospective CAT costs, on the other hand, are forward-looking costs associated with the ongoing and future expenses for the

---

[9] The Participants' one-third share of historical CAT costs will be paid by the cancellation of loans that the Participants previously made to CAT LLC during the more than ten-year period while CAT was being developed.  Order at 62630.

operation, maintenance, and enhancement of the CAT. *Id.* For each transaction, prospective CAT Costs are also split evenly among the Participant and the two CAT executing brokers (for the seller and for the buyer). *Id.*

Because the Order focused on the allocation of the funding of recoverable costs for the CAT, the Commission correctly concluded that it did not need to completely revise and update the extensive economic analysis contained in the 2016 CAT Approval Order (which had assessed the creation of the CAT, including the economic impact of the Original Funding Model). *Id.* at 62676. Instead, the Commission used the 2016 CAT Approval Order's economic analysis related to the Original Funding Model as a baseline and then supplemented that baseline with new information learned since the 2016 CAT Approval Order, thereby creating a "comprehensive analysis of the Proposed Amendment in light of issues raised in the Notice and public comments." *Id.* at 62676–86.

While, after the issuance of the Order, all of the Participants made fee filings to implement rules that would require their members to pay to CAT LLC a CAT fee imposed by CAT LLC for the members' respective one-third shares of certain historical CAT costs, the Order does not approve those filings. In addition, the Petitioners' brief (filed on February 8, 2024) fails to acknowledge that, on January 17, 2024, the Commission suspended the effectiveness of those proposed rules and instituted proceedings to determine whether to approve or disapprove them. *See,*

24

*e.g.*, Notice of Filing of a Proposed Rule Change To Establish Fees for Industry Members Related to Certain Historical Costs of the National Market System Plan Governing the Consolidated Audit Trail; Suspension of and Order Instituting Proceedings To Determine Whether To Approve or Disapprove the Proposed Rule Change, Release No. 34-99363, 89 Fed. Reg. 10850 (Feb. 13, 2024).  Moreover, the Participants' fee filings related to this CAT fee will be considered under the criteria applicable to the Participants in their capacities as national securities exchanges and, in the case of FINRA, as a national securities association.[10]

The Order also does *not* address whether, or to what extent, Participants will ultimately pass on their one-third allocation of CAT fees to their members.  To the contrary, the Order notes that Participants will be required to make separate rule fee filings under Section 19(b) of the Exchange Act if they desire to pass through the

---

[10] As noted above, the Order does not address many of the subjects that Petitioners are attempting to inject into this appeal.  For example, the Order does not address what personally identifiable information ("PII") or other information that will be collected by the CAT.  Similarly, the Order does not address cybersecurity standards.  Both of those issues, however, were addressed in the 2016 CAT Approval Order, which limits the PII that can be collected by CAT and establishes a data security framework for the CAT that requires compliance with the NIST Cybersecurity Framework.  2016 CAT Approval Order at 84722–84724, 84753–54.  In 2020, the Commission issued an order that further limited the nature of PII that will be collected by the CAT.  *See, e.g.*, Order Granting Conditional Exemptive Relief, Pursuant to Section 36 and Rule 608(e) of the Securities Exchange Act of 1934, From Section 6.4(d)(ii)(C) and Appendix D Sections 4.1.6, 6.2, 8.1.1, 8.2, 9.1, 9.2, 9.4, 10.1, and 10.3 of the National Market System Plan Governing the Consolidated Audit Trail, Release No. 34-88393, 85 Fed. Reg. 16152 (Mar. 20, 2020).

CAT fees that they are initially assessed, where the Participants will be required to demonstrate that any pass-through fees are consistent with the applicable Exchange Act standards, including that such fees be reasonable, equitable, and not unfairly discriminatory.[11]  Order at 65636–37.

F.     **The CAT Today.**

The CAT has been operating for a number of years subject to a phased implementation.  *See* CAT LLC Provides Key Operational Update (Apr. 14, 2020), https://www.catnmsplan.com/sites/default/files/2020-04/CAT%20go%20live%20press%20release%20FINAL.pdf.  Despite the existence of the Original Funding Model and the policy of splitting costs between Participants and Industry Members that was approved in the 2016 CAT Approval Order, Industry Members have yet to pay anything to fund the CAT.  Order at 62669.  Instead, all of the funding for the CAT to date has been provided solely by the Participants, who paid in excess of $500 million to CAT between 2012 and 2022, and have continued

---

[11] One Participant, FINRA, has made a fee filing seeking to pass-through to its members FINRA's one-third share of certain historic CAT costs.  *See* Financial Industry Regulatory Authority, Inc.; Notice of Filing of a Proposed Rule Change to Adopt FINRA Rule 6897(b) (CAT Cost Recovery Fees) To Implement a Historical Consolidated Audit Trail Recovery Assessment; Suspension of and Order Instituting Proceedings To Determine Whether To Approve or Disapprove the Proposed Rule Change, Release No. 34-99372, 89 Fed. Reg. 11153 (Feb. 13, 2024).  The Commission has suspended the effectiveness of that proposed fee and has instituted proceedings to determine whether it should be approved or disapproved.  *Id*. at 11160–61.

to fund CAT since 2022.  The Commission's approval of the Executed Share Model fulfills the promise of the statement in the Commission's 2016 CAT Approval Order that there would eventually be an equitable allocation of the CAT costs that the Commission required the Participants to incur in the first instance.

Petitioners again go beyond the issues that were before the Commission when they assert that the Participants have intentionally "run up the costs of CAT" and claim that the Participants mismanaged the creation and development of the CAT. Br. at 9, 35.  The Intervenor Exchanges have acted in good faith to implement the Commission's mandate to create the CAT and deny any allegations that they have mismanaged the creation of CAT or that they have any incentive to increase the costs of CAT.  In any event, Petitioners' conclusory assertions are nonetheless irrelevant here because the Order did not make any determination about what amounts will ultimately be charged to the Participants or to Industry Members by CAT LLC.[12]

---

[12] Rather than conclude that the Participants are responsible for the increase in CAT costs over the 2016 estimates, the Commission concluded that the increase has resulted from increased trading activity, which increases the amount of data that CAT has to process and store.  Order at 62641–42, 62655, 62677, and 62680–81. The Commission also rejected the notion that the Participants lack incentives to control CAT costs and found that the Participants are incentivized to control CAT costs as a result of (1) the transparency of the CAT budget process, (2) the fact that one-third of CAT costs are allocated to Participants, (3) the fact that the Participants' ability to pass through any CAT costs via the Section 19(b) fee filing process would be compromised if they are unable to demonstrate that a proposed fee is reasonable and consistent with the Exchange Act.  *Id.* at 62655–56, 62681.

Instead, Petitioners' allegations would be relevant, if at all, to any *separate* rule filings made by the Participants pursuant Section 19(b) of the Exchange Act that seek to impose an obligation on Industry Members to actually pay fees imposed by CAT (which are not within the scope of the Order). Moreover, while Petitioners focus on the amounts that have been spent to create CAT and the amounts that will be required to run CAT going forward, the estimated CAT fees that would be charged on a per executed equivalent share basis are a small fraction of a penny—an amount that the CAT executing brokers would be free to pass along to their customers without any required fee filings (unlike the Participants). Order at 62663.

## STANDARD OF REVIEW

The Order may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court's review of the Commission's analysis supporting the Order is "exceedingly deferential," and a court "is not permitted to substitute its judgment for the agency's, so long as the agency's conclusions are rational." *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021); *Public Citizen, Inc. v. NHTSA*, 374 F.3d 1251, 1260 (D.C. Cir. 2004).

## SUMMARY OF THE ARGUMENT

Petitioners argue that the Order fails to provide an "equitable allocation" of fees in violation of the Exchange Act because broker-dealers, such as Petitioner

Citadel, will end up bearing 100% of the CAT fees. Petitioners' argument is wrong for several reasons.

Petitioners start off on the wrong foot by citing an incorrect standard: the requirement that the fees be "equitably allocated" is a standard that applies to SRO fee filings, not the Commission's consideration of an NMS plan amendment. *Compare* 15 U.S.C. § 78f(b)(4) (requiring that exchange rules provide for the "equitable allocation" of dues, fees, and other charges) *with* 17 C.F.R. §§ 242.608(b)(2) and 242.613(a)(5) (reciting the standards applicable to the Commission's consideration of proposed NMS plan amendments, which do not refer to an "equitable allocation"). And beyond that, Petitioners' strawman argument ignores the plain language of the Executed Share Model, which merely dictates an even one-third allocation of CAT fees among Participants and the two executing brokers.[13] For the reasons discussed below, the actual one-third allocation of CAT fees in the Order is reasonable and, as the Commission found, satisfies the applicable standards in Rule 608(b)(2) and Rule 613(a)(5).

---

[13] If any, some, or all of the Participants subsequently seek to pass-through some or all their one-third allocation of CAT fees to Industry Members (who would then have the option of passing those amounts on to their customers), those requests will be the subject of separate fee filings made under Section 19(b) of the Exchange Act and Rule 19b-4 thereunder, in which any such Participants would be required to demonstrate that the fees are reasonable, equitably allocated, not unfairly discriminatory, and not an undue burden on competition. 15 U.S.C. § 78s(b); 17 C.F.R. § 240.19b-4.

Petitioners also argue that the Commission's economic analysis in the Order was insufficient.  The Commission, however, analyzed the economic effects of the Order as it relates to efficiency, competition, and capital formation, using as a baseline the Commission's economic analysis of the Original Funding Model and updating it as appropriate.  The Commission reasonably estimated the economic costs and benefits and, when appropriate, explained why further precision was not practical or necessary.  Under the Administrative Procedure Act and the Exchange Act, nothing more is required.

## **ARGUMENT**

## I.     THE CAT'S ALLOCATION OF COSTS APPROVED IN THE ORDER IS REASONABLE.

### A.     The Standard Governing Regulation NMS Plan Amendments.

The Commission is required to approve an amendment to a national market system plan if it finds that such amendment "is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Act."  17 C.F.R. § 242.608(b)(2).  Rule 613 provides that, when determining whether an amendment is "necessary or appropriate in the public interest," the Commission must consider the amendment's impact "as applicable, on efficiency, competition, and capital formation."   17 C.F.R. § 242.613(a)(5).   Here, after a thorough analysis, the

30

Commission reasonably concluded that the allocation of fees in the Executed Share Model satisfied both Rule 608(b)(2) and Rule 613.  Order at 62686.[14]

**B.    The Commission Correctly Found That The Executed Share Model Satisfied The Legal Standard.**

To begin, Rule 613 and the CAT Plan never contemplated that the CAT would be funded indefinitely solely by the Participants.  Instead, Rule 613, the CAT Plan, and the 2016 CAT Approval Order each contemplated that CAT fees would be allocated among Industry Members and Participants.  Rule 613 required that the CAT Plan drafted and filed by the Participants include a proposed allocation of costs to "build, operate and administer . . . among the plan sponsors, and *between the plan sponsors and members of the plan sponsors*."[15]  17 C.F.R. § 242.613(a)(1)(vii)(D) (emphasis added).  The Original Funding Model framework approved by the Commission in 2016 likewise stated that the CAT Operating Committee shall seek

---

[14] Petitioners cite Exchange Act Sections 78o-3(b)(5) and 78f(b)(4) for the standard, claiming that the one-third allocation must be an "equitable allocation of reasonable dues, fees, and other charges."  Br. at 32.  They are wrong.  While the allocation in the Executed Share Model is equitable, neither of those sections apply.  Section 78o-3(b)(5) relates to fees charged by national securities associations, and Section 78f(b)(4) relates to fees charged by self-regulatory organizations.  As a result, neither section is at issue in the Order.  Indeed, the Commission correctly recognized as much and that such decisions will be subject to separate rule filings by the Participants.  Order at 62629 (stating that Participants must separately file rule changes to pass through fees and those rule changes must comply with Exchange Act standards).

[15] "Members of plan sponsors" refers to persons or entities that are members of national securities exchanges or FINRA.

31

> to establish an allocation of [CAT LLC's] related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT and distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations[.]

2016 CAT Approval Order at 84967.  The Commission reaffirmed this long-standing requirement in the Order, stating that "the CAT NMS Plan expressly contemplates the allocation of the costs associated with operating the CAT among the Participants and the Industry Members."  Order at 62636.

Therefore, the issue that was before the Commission when it considered whether to approve the Executed Share Model was simply *how* costs associated with building, operating, and administering the CAT should be allocated among Participants and Industry Members.  Stated differently, the issue under consideration was not *if* costs should be allocated between Participants and Industry Members but *how*.  *See id.* at 62636 ("The costs of CAT therefore must be allocated in some fashion between Participants and Industry Members . . . .").

The funding model and allocation approved by the Commission need not be the "best" model possible.  Rather, agencies have discretion when deciding between alternatives and courts are required to "determine not whether the agency's choice is the best one, but merely whether it is 'reasonable' and if so, afford it controlling

32

weight." *Nat'l Ass'n For Better Broad. v. F.C.C.*, 849 F.2d 665, 669 (D.C. Cir. 1988).

Between 2016 and 2023, Participants—with feedback from the Commission, its staff, and Industry Members—considered several alternative approaches to the Original Funding Model, including a revenue-based funding model, a message traffic model, a sales value model, and others. *See* Order at 62638 n.208 (discussing alternative approaches to the Executed Share Model). After considering other potential funding models, the Participants proposed, and the Commission approved, the Executed Share Model. In doing so, the Commission reasonably exercised its discretion in choosing between various potential approaches about funding the CAT.

As noted, the Executed Share Model provides that CAT fees are assessed by CAT based on the executed equivalent share volume of transactions in eligible securities, and those fees are then allocated by CAT evenly between three parties: (1) the buy-side executing broker, (2) the sell-side executing broker for the buyer, and (3) the Participant involved in the transaction. Order at 62629. In other words, the Order "assesses an equal fee to the three primary roles in a transaction: the buyer, seller[,] and market regulator." *Id.* As the Commission explained, allocating costs "among the three parties who play significant roles in transactions reportable to the CAT in this manner represents a reasonable method of allocating costs among the parties who participate in and benefit from those markets." *Id.*

33

The Commission also found that the Executed Share Model has the additional benefit of being "readily determinable and—because it is based on trading activity, which impacts CAT costs—provides a reasonable proxy for the costs to CAT, allowing" for the assessment of fees that correspond "to the cost burden they impose on the CAT." *Id.* In other words, Industry Members and Participants pay a fee that is proportionate to their cost impact on the CAT because CAT costs are related to the amount of data generated by transactions. As CAT LLC noted in response to comments, the Executed Share Model "addresses cost burden on the CAT by (i) taking into account the impact of Industry Member activity on CAT costs, and (ii) using trading activity, which CAT LLC believes is a reasonable proxy for cost burden on the CAT, as the metric for cost allocation." *Id.* at 62635.

The Commission's approval of the Executed Share Model is the product of reasoned decision-making and was not arbitrary and capricious. The Commission considered a number of possible funding models, including prior models proposed by the CAT and by commentators, and the Commission acknowledged that those alternative models have "relative strengths and weaknesses." *Id.* at 62638. The Commission ultimately concluded that the Executed Share Model was a reasonable approach and "would continue to incorporate the concept of cost alignment because trading activity, as reflected through executed equivalent share volume, would, as CAT LLC explained, correlate with the cost burden on the CAT." *Id.* at 62640–41.

34

The Order thus demonstrates that the Commission engaged in a rational decision-making process when it concluded that the Executed Share Model satisfied the applicable criteria.  *See Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) ("[T]he arbitrary and capricious standard focuses on the rationality of an agency's decision making process rather than on the rationality of the actual decision."); *CHW West Bay v. Thompson*, 246 F.3d 1218, 1223 (9th Cir. 2001) (similar); *see also Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1993 (2020) (Kavanaugh, J., concurring in part) ("The question under the APA's deferential arbitrary-and-capricious standard is not whether we agree with the Department's decision to rescind DACA.  The question is whether the Nielsen Memorandum reasonably explained the decision to rescind DACA.").

### C.  It Is Not Inequitable For Buy-Side And Sell-Side Executing Broker-Dealers To Each Be Allocated One-Third Of CAT Costs.

Petitioners argue that the Commission did not consider whether the one-third allocation was an "equitable allocation."  Br. at 32–36.  This is incorrect.  The Commission effectively concluded the Executed Share Model results in an equitable allocation when it found that it is reasonable to allocate "costs evenly among the three parties who have primary roles related to the transaction."  Order at 62645.  The Commission further explained that other allocations were considered and

rejected because they could be "significantly more complex and would not necessarily more accurately reflect the cost burden[.]" *Id.* Regardless, the Commission was not even required to conclude explicitly that the Executed Share Model results in an equitable allocation because that is not the applicable standard. *Supra* at 31, n.14.

The Commission recognized that the Executed Share Model is based on the CAT Plan's concept of cost alignment—that is, aligning the allocation of fees with the cost burden on the CAT. Order at 62640–41. Assessing fees in an even one-third allocation "among the three parties who play significant roles in transactions reportable to the CAT" since they are the ones who "participate in and benefit from those markets" furthers that goal. *Id.* at 62629. Similarly, the Executed Share Model furthers the cost alignment goal because executed share volume "impacts various CAT costs drivers, such as storage, data processing, and message traffic." *Id.* at 62641.

To avoid the conclusion that the Executed Share Model met the standards found in Rules 608 and 613, Petitioners erroneously assert that the allocation is a "transparent charade" because the SROs may be able to pass along costs to Industry Members and that Industry Members will bear "100%" of the CAT costs. Br. at 2, 32. That is not true. The Executed Share Model provides only for an even one-third initial allocation among the Participant and the two CAT executing brokers.

36

Further, Petitioners' argument ignores that Industry Members who are executing trades on behalf of others can decide to pass those costs along to those other parties (who might be either another broker-dealer or an investor who initiated a trade), without any requirement that they obtain approval by the Commission. Order at 62645, 62650. And Industry Members routinely do pass along such costs. As a result, it is not accurate to conclude that broker-dealers are somehow required to ultimately bear the one-third allocation that they are assessed pursuant to the Executed Share Model; they can pass those costs along to their customers if they desire. And as noted above, the Commission reasonably assessed that the pass-through of costs to investors "would not be significant" because any additional CAT related costs will be "small relative to current transaction costs." *Id.* at 62686.

Petitioners also argue that the Order's allocation is unfair because firms that engage in proprietary trading for their own benefit, such as Petitioner Citadel, will be unable to pass along fees associated with that trading. Br. at 46–47. But Petitioners do not explain why firms' (often highly profitable) proprietary trading should be treated differently from trading that other investors engage in for their own benefit. Put simply, a broker-dealer who is engaged in proprietary trading for its own benefit is acting like any other investor.

In any event, the Commission directly addressed this issue in the Order. The Commission explained that "it is reasonable to charge executing brokers regardless

37

of whether they are trading for their own account or for a customer's account . . . [because], [i]n both instances, the firm engages in trading activity to earn a profit"; therefore, "it is reasonable to allow a firm to incur CAT fees for its profit-making business activities, such as proprietary activity."  Order at 62637 and n.200 (responding to comments made by Petitioner Citadel).

Petitioners also claim that Participants will eventually elect to pass on to Industry Members all of the CAT fees that Participants are assessed.[16]  As an initial

---

[16] Throughout their brief, Petitioners erroneously state that it is a *fait accompli* both that the Participants will ultimately seek to pass through 100% of the CAT costs that they are assessed to their members and that the Commission will allow them to do so.  Br. at 11, 13, 32, 33.  In particular, Participants falsely state that the Commission actually decided in the Order to allow the Participants to "simply 'pass[] their CAT fees onto their members in full'" and that the broker-dealers (and their customers) will therefore effectively bear 100% of the CAT costs.  Br. at 33 (quoting Order at 62684 n.1135).  Petitioners' statements, however, rely on a gross mischaracterization of a footnote in the Order where the Commission merely acknowledged one possible future outcome without approving that outcome: "*If* the exchanges passed their CAT fees onto their members in full, the Industry would effectively bear 100% of the CAT allocation (ignoring what they would pass to investors)."  Order at 62684 n.1135 (emphasis added).

Indeed, at this time, there is no basis to assume that all of the Participant exchanges will each attempt to pass through 100% of the CAT costs that they are assessed, much less that the Commission will allow them to do so.  Instead, as the Commission recognized, the Participant exchanges are engaged in a competitive market with each other and with other entities that execute transactions.  Order at 62683 (recognizing that the "market for trading services . . . relies on competition to supply investors with execution services at efficient prices").  As a result, the Participant exchanges each will have to evaluate their competitive position, and then decide whether they want to attempt to pass through any of their CAT costs and, if so, what portion to

matter, the issue of whether Participants will eventually be permitted to pass on the one-third of the costs that have been allocated to them was *not* decided by the Commission in the Order. On the contrary, the Commission stated that it was not addressing or deciding whether and to what extent Participants might be able to pass along the fees that they are assessed by CAT.[17] *Id.* at 62636–37 (noting that "[e]ven if the Participants decide to pass through the costs of CAT to Industry Members," the Participants will be subject to "the rule filing process under Section 19(b) and Rule 19b-4").

---

seek to pass through. *Cf.* Order at 62684 (explaining that some exchanges may be better positioned to "avoid raising transaction fees to offset their CAT fee allocations").

[17] To the extent that Petitioners argue that the Commission was required to compel the Participants to state whether they intended to introduce CAT-related pass-through fees to pass along their costs to their members and demonstrate the reasonableness of any pass-through fees before the Commission approved the Executed Share Model (Br. at 38–39), Petitioners get the regulatory sequence of events backwards. CAT LLC assesses fees first, and then a Participant would have to make a fee filing requiring that its members pay the Participant a fee to pass through all or any portion of the Participant's share of CAT fees to its members. Nor was the Commission required to consider whether the Executed Share Model would be approved and other related SRO fee filings in the same proceeding because agencies are allowed to proceed in stepwise fashion. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009) ("Nothing prohibits federal agencies from moving in an incremental manner."); *Grand Canyon Air Tour Coal. v. F.A.A.*, 154 F.3d 455, 471 (D.C. Cir. 1998) ("We should note that, ordinarily, agencies have wide latitude to attack a regulatory problem in phases and that a phased attack often has substantial benefits."); *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir. 1989) ("[A]gencies have great discretion to treat a problem partially.").

In any event, there is nothing inequitable or problematic about a Participant recouping CAT costs allocated to that Participant from its members. Participants incurred CAT costs as a result of the Commission-mandated creation and operation of the CAT. And the "Exchange Act expressly contemplates the ability of the Participants to recoup the costs of fulfilling their statutory obligations under the Exchange Act." Order at 62629.

To the extent any Participants decide to recoup some portion of the fees that they are assessed by the CAT, those Participants will need to make separate fee filings under Section 19(b) of the Exchange Act and demonstrate that any fees charged to implement such recoupment are "consistent with applicable statutory standards under the Exchange Act, including being reasonable, equitable, and not unfairly discriminatory." *Id.* at 62637. Further, as the Commission explained, any such Section 19(b) filings also "must contain sufficient detail to demonstrate that such costs are reasonable and appropriate" to allow the Commission to assess them for "consistency with the Exchange Act and the CAT NMS Plan." *Id.* at 62663 (internal quotation marks and citation omitted). The Commission also noted that the public would have an opportunity to comment on any such filings and that the Commission could suspend the fee filing (which takes the form of a rule change) if it finds that such action is necessary or appropriate in the public interest, for the

40

protection of investors, or otherwise in furtherance of the purpose of the Exchange Act. *Id.* at 62636–37.[18]

Petitioners argue that this statutorily prescribed process is not enough and suggest that the Commission will not look closely at the fee filings because it has "little incentive to focus on cost control." Br. at 34. That argument is nothing more than rank speculation, inviting this Court to assume that the Commission will not comply with its statutory obligations—an invitation that other courts have rejected. *See, e.g.*, *Corn Refiners Ass'n, Inc. v. Costle*, 594 F.2d 1223, 1226 n.8 (8th Cir. 1979) ("We will not assume, as petitioners seem to suggest, that EPA will not exercise its discretion in a reasonable and good faith manner.").

More generally, Citadel and others rely on the integrity and fairness of the markets to make a profit; "therefore it is reasonable for fees to be charged for [regulatory costs related to] that profit-making activity, even if those fees cannot be

---

[18] Relatedly, Petitioners contend that the Commission failed to respond to Citadel's comment that the funding model should incorporate financial accountability milestones to limit the Participants' ability to pass along costs to their members if certain CAT implementation goals were not achieved. Br. at 38. This comment is neither significant to the issues that the Commission addressed in the Order nor unaddressed. *See, e.g.*, *Hussion v. Madigan*, 950 F.2d 1546, 1554 (11th Cir. 1992) ("The APA does not require the Agency to respond to comments which, in essence, reflect a policy-based preference[.]"). As noted above, the Commission recognized that the issue of the amount of CAT costs that CAT LLC will be allowed to charge by means of CAT fees and the issue of whether Participants will be permitted to pass through any CAT fees that they are assessed are separate from the issue of whether the Commission should approve the Executed Share Model.

passed on to customers." Order at 62637. In short, Petitioners challenge the conclusion of a multi-year process imposing what is essentially a small transaction fee to fund the CAT, an audit trail designed to further the integrity of the securities markets. The Executed Share Model approved by the Order is reasonable, and the Commission's approval of that model was not arbitrary and capricious.

## II. THE COMMISSION'S ECONOMIC ANALYSIS WAS SUFFICIENT.

### A. The Commission Conducted An Appropriate Analysis.

Petitioners argue that the Commission's economic analysis was faulty because the Commission declined to revisit the entire analysis that it conducted when it concluded in 2016 that the creation of the CAT was economically justified. But the funding amendment that was before the Commission did not reconsider whether the CAT, as a whole, should exist. As a result, the Commission was not required to rehash, for example, the economic benefit of improvements in data quality (2016 CAT Approval Order at 84819) or the expected costs of security breaches (*id.* at 84874) because those issues were not within the scope of the proposed amendment under consideration.

Instead, the Commission's economic analysis in the Order properly focused upon the proposed Executed Share Model, using as a baseline the economic analysis related to the Original Funding Model in the 2016 CAT Approval Order, and then supplementing its prior analysis as appropriate to consider the required factors in

42

Rule 608(b)(2) and Rule 613(a)(5).  Order at 62676 ("[T]he Commission has supplemented the analysis in the [2016 CAT Approval Order] with additional information learned since the time of that [o]rder.").

Moreover, the type of analysis envisaged by Petitioners is not required. Petitioners imply that the Commission was required to conduct a detailed quantitative economic analysis of factors that could not reasonably be evaluated with numerical precision.  Br. at 40, 44, 46.  But an agency "need not conduct a rigorous quantitative economic analysis unless the statute explicitly directs it to do so." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369 (D.C. Cir. 2014) (citation and quotation marks omitted).  What the Exchange Act requires the Commission to do—and what the Commission did—is to consider the economic effects of the proposed Executed Share Model on efficiency, competition, and capital formation.  17 C.F.R. § 242.613(a)(5).  To do so, the Commission updated the analysis that was relevant to the changes it was assessing—from the Original Funding Model in the 2016 CAT Plan to the Executed Share Model approved by the Commission in the Order—and analyzed the effects of the new model on efficiency, competition, and capital formation.  *See* Order at 62676–86.

As to efficiency, the Commission assessed the Executed Share Model's effect on efficiency across three features: (1) operational efficiencies, (2) incentive effects, and (3) market efficiencies.  The Commission first re-analyzed the 2016 baseline to

include "additional information learned since the time of" the 2016 CAT Approval Order and then compared it to the proposed Executed Share Model. *See id.* at 62676–83.

The Commission reasonably found that the Executed Share Model will likely improve operational and market efficiencies. The simpler fee structure in the Executed Share Model will provide more certainty to parties to allow them to pass on those fees more accurately if desired, resulting in operational efficiencies. *Id.* at 62678–79. Further, because the Executed Share Model is based on executed share volume, rather than message traffic, it is likely to promote liquidity because market makers and others who provide liquidity will not be assessed fees based on their quote message traffic. *Id.* at 62682. Increased liquidity in the markets, in turn, has the effect of promoting market efficiency. *Id*.

The Commission similarly assessed the Executed Share Model's impact on competition across three criteria: (1) trading services, (2) broker-dealer services, and (3) regulatory services. The Commission recognized that the Executed Share Model "may provide a competitive advantage to exchanges and a competitive disadvantage to executing broker-dealers who internalize," but concluded that the "effects on these competitors might not affect the overall level of competition because the fees are expected to be relatively small." *Id.* at 62684. The Commission further found that the Executed Share Model also "levels the playing field between exchanges and

[Alternative Trading Systems] relative to the Original Funding Model." *Id*. at 62685.

As to broker-dealers, the Commission reasonably concluded that the Executed Share Model "alleviates concerns about the allocation of fees across small and large broker-dealers" because smaller broker-dealers will be assessed fees based on executed transactions rather than message traffic and therefore "are less likely to face CAT fees that are outsized relative to their revenue," which could also reduce barriers to entry for certain broker-dealers. *Id.* at 62685. The Commission acknowledged that the "Executed Share Model could provide competitive advantages to certain broker-dealer business models over others and could harm the competitive position of smaller broker-dealers by putting a strain on their net capital." *Id.* at 62683. Ultimately, the Commission was uncertain that the Executed Share Model would have any effect on the competitiveness of the broader market. *Id.* Finally, and significantly, the Commission found that any effect on capital formation resulting from the pass-through of costs "would not be significant" because any additional costs to investors are "likely to be small relative to current transaction costs." *Id.* at 62686.

Petitioners also assert that the Commission failed to consider (1) the increased cost of the CAT as a whole and (2) the allocation between Participants and Industry Members before issuing the Order. Not so. The Commission acknowledged that

45

costs of establishing and operating the CAT have increased significantly, but it believed that the increase is largely attributed to the trend of increasing trade volume and market complexity. *Id.* at 62681.

The Commission also considered the allocation between Participants and Industry Members. As demonstrated above, it has always been contemplated that the fees associated with the CAT would be allocated amongst Participants and Industry Members. The Original Funding Model already contemplated both an allocation of CAT costs between Participants and Industry Members and the possibility that both Participants and Industry Members could pass CAT costs through to their members or customers, respectively. *See id.* at 62678, 62682. In the Order, the Commission reasonably concluded that allocating costs "among the three parties who play significant roles in transactions reportable to the CAT in this manner represents a reasonable method of allocating costs among the parties who participate in and benefit from those markets." *Id.* at 62629.

The cases that Petitioners cite are a far cry from the situation before the Court. In *Portland Cement*, the court held that, before issuing a new rule based on predicted emissions of certain pollutant sources, the Environmental Protection Agency should have considered how its parallel pending rulemaking would have affected those same emissions. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Here, there is no parallel pending rulemaking related to the issues addressed in the

46

Order.    In *Zen Magnets*, the court held that the Consumer Product Safety Commission should have considered available data that suggested the agency's prior compliance efforts had effectively resolved the problem, thereby calling into question whether additional rulemaking was needed. *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1149–51 (10th Cir. 2016).    Here, in contrast, there is no suggestion that other activities of the Commission have somehow obviated the need to determine how the CAT will be funded.

Overall, *Portland Cement* and *Zen Magnets* stand for the unremarkable proposition that an agency should assess how its efforts in related matters affect the proposed rulemaking.    That is not the situation before this Court.    Contrary to Petitioners' contention, and as discussed above, the Commission considered in the Order the increased CAT costs since the Original Funding Model, the even one-third allocation, the possibility that the Participants may seek to pass along to Industry Members the CAT costs apportioned to them through separate Section 19(b) filings, and that Industry Members also may pass along their CAT costs to their customers. The fact that there is a required sequence of events and that the Commission cannot know the future does not render its economic analysis arbitrary and capricious.

The Commission undertook a detailed cost-benefit analysis, made factual findings, and concluded that the Executed Share Model would not have an adverse impact on market efficiency, competition, or capital formation.    Petitioners'

47

arguments to the contrary are nothing more than a request that this Court improperly substitute Petitioners' views on those issues for the judgments of the Commission.

**B.      The Commission Reasonably Estimated The Effect On Investors.**

Contrary to Petitioners' argument (Br. at 44–48), the Commission estimated the effect on investors to the best of its ability given the available information.  And to the extent it could not do so, the Commission explained why.  Nothing more is required.  Where, as applicable here to future CAT costs and the precise parties who will ultimately bear those costs, an agency's decision is "primarily predictive," all that is required is that "the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1110 (D.C. Cir. 2022) (internal quotation marks and citation omitted).

The Executed Share Model provides for only the initial allocation of CAT fees among Participants and Industry Members.  It "does not address whether Industry Members pass through their CAT fees to their customers." Order at 62682.  Whether and to what extent Industry Members will pass on costs to investors is unknown at this point, as the Commission acknowledged.  *Id.* at 62637 ("The Commission recognizes that not all Industry Members currently pass through fees and cannot determine in advance the extent to which Industry Members can or will pass-through their CAT fees to investors or would determine to do so in the future.")

48

Under these circumstances, "[i]t would be quite literally impossible" to determine what precise percentage of the CAT costs will be passed on to investors. *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 378 (D.C. Cir. 2013). The Commission acknowledged these "factual uncertainties" and then explained why the Executed Share Model was still in the public interest. Namely, the Commission concluded that the CAT provides important benefits to investors in facilitating effective market surveillance and that the "additional costs borne by investors are likely small relative to current transactions costs." Order at 62636–37. Under these circumstances, an agency is "entitled to conduct a general analysis based on informed conjecture." *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998).

In short, the Commission conducted a reasonable economic analysis based on the narrow issue before it: whether to approve the revised CAT Executed Share Model to replace the funding framework contained in the Original Funding Model. The Commission also reasonably estimated the economic impact of the Executed Share Model across the required statutory criteria. Because the Commission engaged in reasoned decision-making when it considered and analyzed the economic impact under the statutory criteria, the Commission's economic analysis of the Executed Share Model was not arbitrary and capricious. *See, e.g.*, *Nasdaq Stock Mkt. LLC,* 34 F.4th at 1112–13 (rejecting argument that the Commission was

49

"necessarily" required to conduct "a precise cost-benefit analysis"); *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) ("We do not require the Commission 'to measure the immeasurable' and we do not require it to 'conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so.'") (internal citation omitted); *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369 (D.C. Cir. 2014) (accepting Commission's analysis of benefits where "the Commission determined that Congress intended the rule to achieve 'compelling social benefits' . . . but it was 'unable to readily quantify' those benefits because it lacked data about the rule's effects") (internal citation omitted), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014).

## CONCLUSION

For the foregoing reasons, this Court should deny Petitioners' Petition for Review. Alternatively, if this Court were to hold that CAT as a whole is unconstitutional or that the Commission exceeded its authority when it mandated the creation of CAT, the Intervenor Exchanges request that the Court stay issuance of its mandate or take other steps, including requesting supplemental briefing on the issue of the proper remedy, that would provide the Intervenor Exchanges with sufficient opportunity to modify their regulatory programs to ensure there are no regulatory gaps as a result of such a ruling.

Dated: April 15, 2024

Respectfully submitted,

/s/ Paul E. Greenwalt III

Paul E. Greenwalt III
Michael K. Molzberger
ARENTFOX SCHIFF LLP
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
paul.greenwalt@afslaw.com
michael.molzberger@afslaw.com

*Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*

/s/ Stephen J. Kastenberg

Stephen J. Kastenberg
Paul Lantieri III
Timothy D. Katsiff
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Telephone: (215) 665-8500
Facsimile: 215.864.8999
kastenberg@ballardspahr.com
lantierip@ballardspahr.com
katsifft@ballardspahr.com

*Counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC*

/s/ Jennifer G. Altman

Jennifer G. Altman
PILLSBURY WINTHROP SHAW PITTMAN LLP
600 Brickell Avenue
Suite 3100
Miami, Florida 33131
Telephone: (786) 913-4831
jennifer.altman@pillsburylaw.com

Matthew J. MacLean
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone: (202) 663-8000
matthew.maclean@pillsburylaw.com

Ari M. Berman
David Oliwenstein
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
ari.berman@pillsburylaw.com
david.oliwenstein@pillsburylaw.com

*Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.*

51

## CERTIFICATE OF SERVICE

I hereby certify that undersigned counsel served a true and correct copy of the foregoing to all parties of record through the Court's CM/ECF system.

*/s/ Paul E. Greenwalt III*
Paul E. Greenwalt III

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g)(1), I certify that this motion complies with the typeface requirements of Rule 32(a)(5)-(6) because this brief was prepared in 14-point Times New Roman, a proportionally-spaced typeface, using Microsoft Word 2016. *See also* Fed. R. App. P. 32(a)(5)–(6). This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 12,406 words, excluding the parts exempted under Rule 32(f). As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of Microsoft Word 2016 in preparing this certificate.

I further certify that: (1) all required privacy redactions have been made, (2) the electronic submission is an exact copy of any corresponding paper document, and (3) the motion has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 15, 2024                    */s/ Paul E. Greenwalt III*
                                         Paul E. Greenwalt III