**No. 23-13396**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

THE NASDAQ STOCK MARKET, LLC, NASDAQ BX, INC., NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, ET AL.,

*Intervenors.*

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-98290; File No. 4-698

## REPLY BRIEF OF PETITIONERS

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

## CERTIFICATE OF INTERESTED PERSONS

1. **Alternative Investment Management Association**, *Amicus Curiae*.

2. **Altman, Jennifer G.**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

3. **American Free Enterprise Chamber of Commerce**, *Amicus Curiae*.

4. **American Securities Association**, Petitioner.

5. **ArentFox Schiff LLP**, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

6. **Ashbrook Byrne Kresge LLC**, counsel for *Amici Curiae* James Overdahl and S.P Kothari.

7. **Bailey, Andrew**, counsel for *Amicus Curiae* State of Missouri.

8. **Ballard Spahr LLP**, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

9. **Baltz, Brian J.**, Willkie Farr & Gallagher LLP, counsel for *Amicus Curiae* Futures Industry Association.

10. **Barbero, Megan**, counsel for Respondent United States Securities and Exchange Commission.

11. **Barr, William P.**, Torridon Law PLLC, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

12. **Bash, John F.**, Quinn Emanuel Urquhart & Sullivan, LLP, counsel for *Amici Curiae* Senator Tom Cotton et al.

13. **Berman, Ari M.**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

14. **Berry, Jonathan**, Boyden Gray PLLC, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

15. **Bird, Brenna**, counsel for *Amicus Curiae* State of Iowa.

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

16. **Blask, Ariel**, Willkie Farr & Gallagher LLP, counsel for *Amicus Curiae* Futures Industry Association.

17. **Boden, Anastasia**, counsel for *Amici Curiae* Cato Institute and Investor Choice Advocates Network.

18. **Borse Dubai Limited**, owner of more than 10% of Nasdaq, Inc.'s shares.

19. **BOX Exchange LLC**, member and participant of Consolidated Audit Trail, LLC.

20. **Boyle, Gregory**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

21. **Boyden Gray PLLC**, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

22. **Bronni, Nicholas J.**, counsel for *Amicus Curiae* State of Arkansas.

23. **Cato Institute**, *Amicus Curiae.*

24. **Carr, Chris**, counsel for *Amicus Curiae* State of Georgia

25. **Cboe BYX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

26. **Cboe BZX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

27. **Cboe C2 Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

28. **Cboe EDGA Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

29. **Cboe EDGX Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

30. **Cboe Exchange, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

31. **Cboe Global Markets, Inc. (BATS: CBOE)**, direct or indirect parent company of Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange,

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

32.  **Chenoweth, Mark S.**, counsel for *Amicus Curiae* New Civil Liberties Alliance.

33.  **Citadel Securities GP LLC**, parent company of Petitioner Citadel Securities LLC.

34.  **Citadel Securities LLC**, Petitioner.

35.  **Coleman, Russell**, counsel for *Amicus Curiae* Commonwealth of Kentucky.

36.  **Committee on Capital Markets Regulation**, *Amicus Curiae*.

37.  **Commonwealth of Kentucky**, *Amicus Curiae*.

38.  **Commonwealth of Virginia**, *Amicus Curiae*.

39.  **Competitive Enterprise Institute**, *Amicus Curiae*.

40.  **Conley, Michael A.**, counsel for Respondent United States Securities and Exchange Commission.

41.  **Connolly, J. Michael**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

42.  **Consolidated Audit Trail, LLC**, Intervenor.

43.  **Consovoy McCarthy PLLC**, counsel for Petitioner American Securities Association.

44.  **Deutsch, Elizabeth**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

45.  **Financial Industry Regulatory Authority, Inc.**, member and participant of Intervenor Consolidated Audit Trail, LLC.

46.  **Fitch, Lynn**, counsel for *Amicus Curiae* State of Mississippi.

47.  **Flowers, Benjamin M.**, Ashbrook Byrne Kresge LLC, counsel for *Amici Curiae* James Overdahl and S.P. Kothari.

48.  **Formella, John M.**, counsel for *Amicus Curiae* State of New Hampshire.

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

49.   **Francisco, Noel J.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

50.   **Futures Industry Association**, *Amicus Curiae*.

51.   **Gershengorn, Ian Heath**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

52.   **Greenberg, Dan**, counsel for *Amicus Curiae* Competitive Enterprise Institute.

53.   **Greenwalt III, Paul E.**, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

54.   **Griffin, Tim**, counsel for *Amicus Curiae* State of Arkansas.

55.   **Hardin, Tracey A.**, counsel for Respondent United States Securities and Exchange Commission.

56.   **Hilgers, Michael T.**, counsel for *Amicus Curiae* State of Nebraska.

57.   **Hopen, David A.**, Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for *Amici Curiae* Securities Industry and Financial Markets Association et al.

58.   **Hoyt, Joshua T.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

59.   **Intercontinental Exchange, Inc. (NYSE: ICE)**, indirect parent of NYSE Intervenors.

60.   **International Securities Exchange Holdings, Inc.**, sole LLC member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

61.   **Investment Company Institute**, *Amicus Curiae*.

62.   **Investor AB (Nasdaq Stockholm: INVEB)**, owner of more than 10% of Nasdaq, Inc.'s shares.

63.   **Investor Choice Advocates Network**, *Amicus Curiae*.

64.   **Investors' Exchange, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

65.   **Jackley, Marty**, counsel for *Amicus Curiae* State of South Dakota.

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

66.  **Jacobs, Dylan, L.**, counsel for *Amicus Curiae* State of Arkansas.

67.  **Jenner & Block LLP**, counsel for Intervenor Consolidated Audit Trail, LLC.

68.  **Jones Day**, counsel for Petitioner Citadel Securities LLC.

69.  **Kastenberg, Stephen J.**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

70.  **Katsiff, Timothy D.**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

71.  **Kennedy, Jordan**, counsel for Respondent United States Securities and Exchange Commission.

72.  **Knudsen, Austin**, counsel for *Amicus Curiae* State of Montana.

73.  **Kobach, Kris W.**, counsel for *Amicus Curiae* State of Kansas.

74.  **Kothari, S.P.**, *Amicus Curiae*.

75.  **Kumar, Neal**, Willkie Farr & Gallagher LLP, counsel for *Amicus Curiae* Futures Industry Association.

76.  **Labrador, Raúl R.**, counsel for *Amicus Curiae* State of Idaho.

77.  **Lantieri III, Paul**, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

78.  **Little, Margaret A.**, counsel for *Amicus Curiae* New Civil Liberties Alliance.

79.  **Lipshutz, Brian M.**, Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for *Amici Curiae* Securities Industry and Financial Markets Association et al.

80.  **Long-Term Stock Exchange, Inc.**, member and participant of Intervenor Consolidated Audit Trail, LLC.

81.  **Lucas, Brinton**, Jones Day, counsel for Petitioner Citadel Securities LLC.

82.  **MacLean, Matthew J.**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

83. **Managed Funds Association**, *Amicus Curiae.*

84. **Marshall, Jonathan J.**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

85. **Marshall, Steve**, counsel for *Amicus Curiae* State of Alabama.

86. **Matro, Daniel E.**, counsel for Respondent United States Securities and Exchange Commission.

87. **McCotter, R. Trent**, Boyden Gray PLLC, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

88. **MEMX LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

89. **Miami International Securities Exchange LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

90. **MIAX Emerald, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

91. **MIAX PEARL, LLC**, member and participant of Intervenor Consolidated Audit Trail, LLC.

92. **Michel, Christopher G.**, Quinn Emanuel Urquhart & Sullivan, LLP, counsel for *Amici Curiae* Senator Tom Cotton et al.

93. **Miyares, Jason**, counsel for *Amicus Curiae* Commonwealth of Virginia.

94. **Modern Markets Initiative, Inc.**, sponsor of funding for brief for *Amici Curiae* James Overdahl and S.P. Kothari disclosed pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E).

95. **Molzberger, Michael**, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

96. **Montgomery, Sophia W.**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

97. **Moody, Ashley**, counsel for *Amicus Curiae* State of Florida.

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

98.  **Morris, Andrew, J.**, counsel for *Amicus Curiae* New Civil Liberties Alliance.

99.  **Morrisey, Patrick**, counsel for *Amicus Curiae* State of West Virginia.

100.  **Murrill, Liz**, counsel for *Amicus Curiae* State of Louisiana.

101.  **Nabors, David A.**, Quinn Emanuel Urquhart & Sullivan, LLP, counsel for *Amici Curiae* Tom Cotton et al.

102.  **Nasdaq BX, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

103.  **Nasdaq GEMX, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

104.  **Nasdaq, Inc. (Nasdaq: NDAQ)**, sole owner of LLC interest in The Nasdaq Stock Market LLC and Nasdaq PHLX LLC and parent company of Nasdaq BX, Inc.

105.  **Nasdaq ISE, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

106.  **Nasdaq MRX, LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

107.  **Nasdaq PHLX LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

108.  **New York Stock Exchange LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

109.  **New Civil Liberties Alliance**, *Amicus Curiae*.

110.  **NYSE American LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

111.  **NYSE Arca, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

112.  **NYSE Chicago, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

113.  **NYSE National, Inc.**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

114.  **Oliwenstein, David**, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

115.  **Orr, Caleb**, Boyden Gray PLLC, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

116.  **Overdahl, James**, *Amicus Curiae*.

117.  **Paul, Weiss, Rifkind, Wharton & Garrison LLP**, counsel for *Amici Curiae* Securities Industry and Financial Markets Association et al.

118.  **Paxton, Ken**, counsel for *Amicus Curiae* State of Texas.

119.  **Phillips, David**, Jones Day, counsel for Petitioner Citadel Securities LLC.

120.  **Pillsbury Winthrop Shaw Pittman LLP**, counsel for NYSE Intervenors.

121.  **Quinn Emanuel Urquhart & Sullivan, LLP**, counsel for *Amici Curiae* Senator Tom Cotton et al.

122.  **Rabbitt, Brian C.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

123.  **Reisner, Lorin L.**, Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for *Amici Curiae* Securities Industry and Financial Markets Association et al.

124.  **Representatives Mark Alford, Don Bacon, Michael Collins, Scott Fitzgerald, French Hill, Barry Loudermilk, Alex X. Mooney, Ralph Norman, John Rose, Keith Self, Randy Weber, and Steve Womack**, *Amici Curiae*.

125.  **Reyes, Sean**, counsel for *Amicus Curiae* State of Utah.

126.  **Rokita, Theodore E.**, counsel for *Amicus Curiae* State of Indiana.

127.  **Roth, Yaakov M.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

128.  **Schulp, Jennifer**, counsel for *Amici Curiae* Cato Institute and Investor Choice Advocates Network.

129.  **Schwartz, Yishai**, Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for *Amici Curiae* Securities Industry and Financial Markets Association et al.

130.  **Securities Industry and Financial Markets Association**, *Amicus Curiae*.

131. **Senators Tom Cotton, John Boozman, Make Braun, Kevin Kramer, Steve Daines, Bill Hagerty, John Kennedy, Jerry Moran, Pete Ricketts, and Tim Scott**, *Amici Curiae.*

132. **Shanmugam, Kannon K.**, Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for *Amici Curiae*, Securities Industry and Financial Markets Association et al.

133. **Skorup, Brent**, counsel for *Amici Curiae* Cato Institute and Investor Choice Advocates Network.

134. **Sobel, Zachary J.**, Quinn Emanuel Urquhart & Sullivan, LLP, counsel for *Amici Curiae* Senator Tom Cotton et al.

135. **State of Alabama**, *Amicus Curiae.*

136. **State of Arkansas**, *Amicus Curiae.*

137. **State of Florida**, *Amicus Curiae.*

138. **State of Georgia**, *Amicus Curiae.*

139. **State of Idaho**, *Amicus Curiae.*

140. **State of Indiana**, *Amicus Curiae.*

141. **State of Iowa**, *Amicus Curiae.*

142. **State of Kansas**, *Amicus Curiae.*

143. **State of Louisiana**, *Amicus Curiae.*

144. **State of Mississippi**, *Amicus Curiae.*

145. **State of Missouri**, *Amicus Curiae.*

146. **State of Montana**, *Amicus Curiae.*

147. **State of Nebraska**, *Amicus Curiae.*

148. **State of New Hampshire**, *Amicus Curiae.*

149. **State of North Dakota**, *Amicus Curiae.*

150. **State of Ohio**, *Amicus Curiae.*

*American Securities Association et al. v. United States Securities and*
*Exchange Commission*, No. 23-13396

151. **State of South Carolina**, *Amicus Curiae.*

152. **State of South Dakota**, *Amicus Curiae.*

153. **State of Texas**, *Amicus Curiae.*

154. **State of Utah**, *Amicus Curiae.*

155. **State of West Virginia**, *Amicus Curiae.*

156. **The Nasdaq Stock Market LLC**, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

157. **The Vanguard Group, Inc.**, owned 10% or more of Cboe Global Markets, Inc.'s common stock as of June 30, 2023.

158. **Thoma Bravo UGP, LLC**, owner of more than 10% of Nasdaq, Inc.'s shares.

159. **Torridon Law PLLC**, counsel for *Amicus Curiae* American Free Enterprise Chamber of Commerce.

160. **Unikowsky, Adam G.**, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

161. **United States Securities and Exchange Commission**, Respondent.

162. **Virtu Financial, Inc.**, *Amicus Curiae.*

163. **Watkins, Devin**, counsel for *Amicus Curiae* Competitive Enterprise Institute.

164. **Willkie Farr & Gallagher LLP**, counsel for *Amicus Curiae* Futures Industry Association.

165. **Wilson, Alan**, counsel for *Amicus Curiae* State of South Carolina.

166. **Wrigley, Drew H.**, counsel for *Amicus Curiae* State of North Dakota.

167. **Yost, Dave**, counsel for *Amicus Curiae* State of Ohio.

*American Securities Association et al. v. United States Securities and*
*Exchange Commission*, No. 23-13396

Dated: May 15, 2024

Respectfully submitted,

/s/ *J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

/s/ *Noel J. Francisco*
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

*American Securities Association et al. v. United States Securities and Exchange Commission*, No. 23-13396

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in the ASA.

Petitioner Citadel Securities LLC is a wholly owned, indirect subsidiary of Citadel Securities GP LLC. Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

Dated: May 15, 2024

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

*/s/ Noel J. Francisco*
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................................... C-1

CORPORATE DISCLOSURE STATEMENT ....................................................... C-12

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.    THE CAT EXCEEDS THE COMMISSION'S AUTHORITY ....................... 3

    A.    The Commission's Timeliness Objection Fails. ......................... 3

    B.    The Commission's Merits Defenses Of The CAT Fail. ............ 5

II.   THE ORDER'S ALLOCATION OF COSTS VIOLATES BOTH THE EXCHANGE ACT AND THE APA. ....................................................... 12

III.  THE ORDER'S ECONOMIC ANALYSIS VIOLATES BOTH THE EXCHANGE ACT AND THE APA. ...................................................... 18

    A.    The Commission Was Required To Update Its 2016 Analysis. ............. 18

    B.    The Commission Failed To Estimate Effects On Investors. ................. 20

IV.   VACATUR IS WARRANTED. ................................................................. 22

CONCLUSION ................................................................................................... 24

CERTIFICATE OF COMPLIANCE ................................................................... 25

CERTIFICATE OF ELECTRONIC SUBMISSION .............................................. 26

CERTIFICATE OF SERVICE .............................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
    937 F.3d 559 (D.C. Cir. 2019) ...................................................................... 5

*American Stewards of Liberty v. Department of Interior,*
    960 F.3d 223 (5th Cir. 2020) ........................................................................ 4

*\*Biden v. Nebraska,*
    600 U.S. 477 (2023) .............................................................................9, 10, 11

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,*
    781 F.3d 1271 (11th Cir. 2015) ............................................................... 22, 23

*\*Bloomberg L.P. v. SEC,*
    45 F.4th 462 (D.C. Cir. 2022) ..................................................................... 17

*Chamber of Com. of U.S. v. SEC,*
    88 F.4th 1115 (5th Cir. 2023) ...................................................................... 23

*\*Consumers' Rsch. v. FCC,*
    88 F.4th 917 (11th Cir. 2023) ........................................................................ 4

*FEC v. Cruz,*
    596 U.S. 289 (2022) ....................................................................................... 8

*Georgia v. President,*
    46 F.4th 1283 (11th Cir. 2022) .................................................................... 10

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................................................... 13

*NetCoalition v. SEC,*
    715 F.3d 342 (D.C. Cir. 2013) .................................................................... 16

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ............................................................................... 6

*Paul v. United States*,
  140 S. Ct. 342 (2019) ........................................................................... 11

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ............................................................................... 8

*Utility Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ............................................................................... 5

*Weissman v. NASD*,
  500 F.3d 1293 (11th Cir. 2007) (en banc) ...................................... 23

*\*West Virginia v. EPA*,
  597 U.S. 697 (2022) ....................................................................... 10, 11

**STATUTES**

15 U.S.C. § 78k-1 ...............................................................................9, 10, 11

15 U.S.C. § 78s ........................................................................................ 9, 16

**OTHER AUTHORITIES**

77 Fed. Reg. 45722 (2012) ...................................................................... 14

81 Fed. Reg. 84696 (2016) ............................................................7, 12, 14, 19

88 Fed. Reg. 17086 (2023) ...................................................................... 20

88 Fed. Reg. 62628 (2023) (Order) ..........................5, 12, 13, 14, 16, 17, 21

89 Fed. Reg. 11153 (2024) ..................................................................15, 16

CAT LLC, *CAT NMS Plan § 6.6(c)(ii) Quarterly Progress Report*
  (Apr. 30, 2024) ...................................................................................... 6

CAT LLC, *FAQs* (Apr. 4, 2024) ............................................................... 6

SEC, *Who's Paying: Statement on the CAT's Funding Model* (Sept. 6, 2023) .......................... 5

**INTRODUCTION**

The Commission goes to great lengths to paint the CAT as a benign "regulatory tool essential to the SROs." SEC Br. 1. But those same SROs cannot even bring themselves to defend the CAT's lawfulness. That is because the SEC—without approval or appropriation from Congress—conscripted them to build this massive, multibillion-dollar database for *its own benefit*, leaving the SROs (and their creation, CAT LLC) to plead for a remedy that would allow them to recover their own sunk costs.

Notably, the only party willing to defend the CAT is the Commission itself, the CAT's true beneficiary. The SEC's principal defense, however, amounts to an argument that petitioners should have brought this challenge earlier. But the CAT's full impact has only recently become clear, with the Order here exposing the Commission's prior promises of an equitable cost allocation as a sham. Indeed, given the SEC's separate argument that even *this* challenge is premature (and instead must be resolved in future fee filings), it no doubt would have contended that any earlier lawsuit was unripe. The Commission's Goldilocks claim that this case somehow comes both too early and too late only underscores its desperation to avoid judicial review.

For good reason. Ultimately, the SEC's theory of statutory authority reduces to an argument that Congress "nowhere prohibit[ed]" it from building a government behemoth through SRO proxies, funded on the backs of broker-dealers and investors. *Id.* at 49. But statutory *silence* is not *power* to regulate even under ordinary rules of statutory interpretation, let alone the major questions doctrine. And while petitioners

1

share the critical goal of protecting "market integrity," the question is whether this unprecedented surveillance system is a lawful means of doing so. *Id.* at 48. Of all the parties here, only the SEC claims it is.

The Commission plays a similar shell game with the Order's allocation scheme, suggesting any SRO pass-throughs of costs to broker-dealers will be reviewed in *future* fee filings. But the Order *rejected* a request to prohibit SRO pass-throughs—meaning broker-dealers (and their customers) will likely end up bearing 100% of CAT costs. And the SEC's offer of scrutiny at a later date is no more meaningful than its so-called "allocation." Respondents therefore resort to accusing petitioners of trying to shirk "their fair share." CAT Br. 6. Not so. Broker-dealers already have spent *billions* to get the CAT online. Instead, it is the SROs who are trying to avoid their portion of the bill, fighting tooth and nail to defend the SEC's decision to allow them to pass through *their* purported one-third allocation to broker-dealers. Their loud defense of the Order's allocation (even as they remain silent on the Commission's authority for the CAT itself) belies the SEC's refrain that the Order did not "prejudge" anything. SEC Br. 4.

The Commission likewise has no defense of the Order's deficient economic analysis. To assess the Order's impact on efficiency, competition, and capital formation, the SEC had to account for both the CAT's ballooning costs since 2016 and the portion of those costs that would likely be borne by investors due to new CAT taxes imposed by the SROs. It offers no persuasive explanation for its refusal to do either.

Given these foundational flaws, the only appropriate remedy is to vacate the Order. Doing so would not result in "chaos," as respondents assert. CAT Br. 6. The CAT is almost fully operational; it has functioned without a funding plan since 2016; this Order has yet to "be implemented," SEC Br. 17; and other surveillance systems remain in place. In the meantime, there is nothing "equitable" about saddling broker-dealers and investors with the full financial fallout from the Commission's efforts to shield this regulatory misadventure from congressional oversight. CAT Br. 48.

## ARGUMENT

## I.    THE CAT EXCEEDS THE COMMISSION'S AUTHORITY.

### A.    The Commission's Timeliness Objection Fails.

Given its lack of statutory authority for the CAT, the SEC seeks to evade judicial review entirely, claiming petitioners are too late to challenge Rule 613 (issued in 2012) or the CAT NMS Plan (approved in 2016). SEC Br. 41-43. But petitioners here are not seeking to set aside either of those SEC actions. Rather, they want vacatur of *the Order alone*—the challenge to which is undeniably timely. *See, e.g.*, CAT Br. 6.

Strawmen aside, the SEC's real contention is that one of petitioners' *arguments* for why the Order must go is that the CAT itself is unlawful, such that the Order implementing that *ultra vires* regime necessarily cannot stand. Pet. Br. 31. But the SEC offers no support for its suggestion that unless its unlawful orders are challenged within the "60-day" window after announcement, courts must forever hold their peace—even in the face of *new applications* of the original overreach. SEC Br. 41.

3

To the contrary, the SEC concedes that "the 60-day limit does not affect review of the validity of agency action that re-applies a rule," for otherwise the law would "'effectively deny many parties ultimately affected by a rule an opportunity to question its validity.'" *Consumers' Rsch. v. FCC*, 88 F.4th 917, 922 (11th Cir. 2023); *see* SEC Br. 43. It thus admits that if the Order does "re-apply Rule 613 or the CAT NMS Plan," this Court can review the SEC's authority to adopt the CAT itself. SEC Br. 43 (cleaned up).

That is exactly what the Order does. The SEC claims the Order's "approv[al]" of "an amendment to the Plan's framework for allocating CAT costs" is not a "'re-appl[ication]'" of those earlier agency actions on the premise that it does not fall within the examples in *American Stewards of Liberty v. Department of Interior*, 960 F.3d 223 (5th Cir. 2020). SEC Br. 43. But those "example[s]" were just that—examples, not an exhaustive list. *American Stewards*, 960 F.3d at 229. More to the point, this Court has held that an agency's approval of another entity's proposal to allocate "the percentage" that "each contributor must provide to" a regulatory "fund" is enough to "'restart[] the sixty-day clock'" for challenging not only the agency's "prior regulations," but even "the entire statutory delegation scheme." *Consumers' Rsch.*, 88 F.4th at 921-22. And it did so even when the approved allocation had "not yet been applied" to the fund's contributors specifically, explaining that they "need not wait for 'harm'" to seek judicial protection. *Id.* at 922-23. So too here. Petitioners are not required to sustain an injury from specific "fee filings" before they can challenge the Order, SEC Br. 43, which unquestionably "affects or determines their rights" more "'generally,'" *Consumers' Rsch.*, 88 F.4th at 923.

4

At the end of the day, it is hard to take seriously the SEC's objection to the timing of this challenge after it spent pages of the Order defending its authority to adopt the CAT. *See* Order 62671-73. Far from being "'goad[ed]'" into doing so, SEC Br. 43, the SEC had a "duty to examine key assumptions"—including ones "regarding [its] statutory authority"—"as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule.'" *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) (cleaned up); *see* Commissioner Hester M. Peirce, SEC, *Who's Paying: Statement on the CAT's Funding Model* (Sept. 6, 2023), https://tinyurl.com/ 48c6snrp (asking whether the SEC has "authority to fund its primary market surveillance tool with money that does not run through the Congressional appropriation process"). That the Commission seeks to prevent this Court from even considering the same fundamental question it felt compelled to address itself when adopting the Order only reveals the weakness of its claims of statutory authority.

## B.    The Commission's Merits Defenses Of The CAT Fail.

The SEC's attempt to avoid scrutiny of its statutory authority for the CAT is understandable. The major questions doctrine requires "Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance,'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), yet the Commission concedes "the lack of 'express authorization for CAT' in the Exchange Act," SEC Br. 55. Instead, the SEC tries to avoid the doctrine by treating its unprecedented, multibillion-dollar surveillance system as nothing "extraordinary," but simply a modest step from "what it

has done in the past." SEC Br. 52, 55 (cleaned up). But the Commission's effort to downplay the CAT as an "'everyday exercise of federal power'"—if taken seriously—only underscores the stakes here. *NFIB v. OSHA*, 595 U.S. 109, 117 (2022).

1.     To start, the SEC does not deny the CAT's "political significance." SEC Br. 53. Indeed, it could not do so, as the outcry over its power grab by a raft of *amici*—including nearly half the States, Members of Congress, and a host of civil-liberties and industry associations—only underscores how controversial CAT has become. Instead, the SEC claims that the timing of the uproar—it came too late—switches off the major questions doctrine. *Id.* But agencies are not free to usurp Congress so long as the public does not immediately catch on. And here, there is a good reason why debate over the CAT picked up steam only recently: its piecemeal and long-delayed implementation. While the SEC ordered the SROs to create the CAT in 2012, it did not approve their plan to do so until 2016. Pet. Br. 8. It then took five attempts by the SROs—from 2017 to 2023—before the SEC finally settled on a funding scheme. *Id.* at 10. And after years of mismanagement, the CAT will only fully start collecting customer data this month. *See id.* at 9; CAT LLC, *CAT NMS Plan § 6.6(c)(ii) Quarterly Progress Report* (Apr. 30, 2024), https://perma.cc/R8EX-AJKL. Indeed, even to this day, the CAT's content requirements and reporting processes continue to change. *See* CAT LLC, *FAQs* (Apr. 4, 2024), https://perma.cc/TGV7-F5AP. The timeline here is thus perfectly natural: the CAT's transition from an amorphous theory to a multibillion-dollar surveillance system caused Congress and others to scrutinize what the SEC had been doing.

The SEC also claims there is no cause for concern, since the troves of personally identifiable information (PII) stockpiled by the CAT are accessible "only" to an unspecified group "on a 'need-to-know' basis." SEC Br. 55. The Commission, however, has not limited PII access to a particular set of bureaucrats, but merely directed that the CAT's users will not "automatically" be given this privilege, and that "the process" to review PII must "be documented." 81 Fed. Reg. 84696, 84724 (2016). Such vague promises are cold comfort, especially given the SEC's woeful record of addressing cybersecurity risks as a general matter, let alone those inherent in the most comprehensive PII database "'anywhere in the world.'" Pet. Br. 16; *see id.* at 19-20.

**2.** The SEC likewise does not deny the CAT's "economic significance." SEC Br. 53. Instead, it claims the predicted "$1.5 billion" in annual internal compliance costs for broker-dealers is comparable to the sums spent to comply with prior surveillance systems. *Id.* at 54. But many of those systems *remain in operation*, meaning CAT's costs are on top, not instead. *See id.* (only "some" will be replaced). In any event, internal compliance costs are a drop in the bucket when it comes to the CAT's total price tag. Unmentioned are the billions in initial implementation costs to design internal reporting systems; the $200 million (and growing) annual budget (nearly a tenth of the SEC's own); and the roughly $1 billion in start-up operational costs, all for an evolving system that remains incomplete. Pet. Br. 9-10, 21. These massive, perpetual expenses have no analogue in prior audit trails built by, and for, the SROs (instead of the SEC). Rather, they fall in the heartland of major programs requiring a clear delegation. *Id.* at 22.

Perhaps more fundamentally, the SEC has no good defense of *how* the CAT is funded—namely, without any meaningful congressional oversight through the appropriations process. *Id.* at 22-24. The Commission waves away this concern on the ground that the CAT is "funded by the SROs," but ignores that they do so only at *the SEC's behest*. SEC Br. 51. The SROs created the CAT at the point of the SEC's bayonet; there was nothing "self-regulatory" about it. *Id.* Indeed, the SROs refuse to defend its legality even now. Thus, the Commission's theory would allow it to remove *most*, if not *all*, of its operations—including its most significant policy initiatives—from the appropriations process through the simple expedient of conscripting the SROs into service. "The Constitution does not tolerate such ready evasion; it 'deals with substance, not shadows.'" *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020) (public officials cannot "sidestep constitutional requirements" using "third parties").

Nor is it an answer to say Congress can exercise "oversight power through its ability to enact substantive legislation." SEC Br. 51. That turns the Constitution on its head, putting the onus on Congress to *stop* unauthorized agency activity, not on the SEC to *obtain* authorization (and funding) to act in the first instance. That is not how our system of government works. Rather, "[a]n agency … 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022); *see* Pet. Br. 30-31. There is no such authorization here.

**3.** Because the SEC cannot deny that the CAT is both "politically [and] economically consequential," it dismisses these facts as insufficient. SEC Br. 53. In the Commission's telling, a major policy decision triggers the major questions doctrine only if it *also* falls "'outside [the agency's] wheelhouse,'" rests on an "'ancillary'" provision, and marks a "'transformative expansion'" of agency authority. *Id.* at 52-53. But petitioners have explained that these arguments are foreclosed by Supreme Court precedent, Pet. Br. 24-31, and the SEC offers no direct response.

Instead, the SEC tries to cast the CAT as the modest heir to past SRO audit trails, while ignoring that these supposed predecessors were predicated on *different* statutory authorities that have nothing to do with SRO joint action under § 78k-1. SEC Br. 44-46, 49-50; *see* SEC Release No. 37538 (Aug. 8, 1996) (invoking § 78s(g)-(h)); SEC Release No. 43268 (Sept. 11, 2000) (same). Indeed, the Commission does not identify any national market system plan under § 78k-1 that established a single audit trail, let alone one remotely akin to the CAT. It is therefore not just the CAT's undisputed divergence "in 'size and scope' from prior audit trails" that renders it a new species, but its novel statutory fountainhead as well. SEC Br. 55.

**4.** That leaves the SEC to try to hide the CAT in the mousehole of § 78k-1(a)(3)(B) as a directive to the SROs "to act jointly … in … regulating a national market system." *Id.* at 45 (emphasis omitted). But that ancillary provision—sandwiched between subparagraphs concerning advisory committees and recommendations to Congress—"provides no authorization for the [CAT] even when examined using the

ordinary tools of statutory interpretation—let alone [the] 'clear congressional authorization'" required here. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). Long seen as an antitrust-immunity provision, § 78k-1(a)(3)(B) does not give the SEC *carte blanche* to hijack the SROs for carrying out whatever regulatory measures it deems fit (bypassing the appropriations process to boot). Pet. Br. 26. If § 78k-1(a)(3)(B) really allowed the SEC to do *indirectly* what it could not do *directly*, it would render much of the Exchange Act superfluous and make a mockery of Congress's command that "self-regulatory organizations serve as frontline regulators." SEC Br. 6.

Facing this dead end, the SEC tries to shoehorn its surveillance system into § 78k-1(a)(1)'s generic objectives of "preserving and strengthening the securities markets, assuring fair competition, protecting investors, and maintaining fair and orderly markets," and § 78k-1(a)(2)'s aim of "facilitat[ing] the establishment of a national market system." *Id.* at 45-47 (cleaned up). But the CAT "cannot rest merely on the 'policy objectives of the Act,'" *Georgia v. President*, 46 F.4th 1283, 1298 (11th Cir. 2022), especially when such majestic generalities could in theory justify virtually *any* SEC action under the Commission's theory, making the more limited grants of authority in § 78k-1 and the Exchange Act meaningless.

In any event, even if the CAT could somehow be squeezed into § 78k-1(a)(3)(B) as "a matter of 'definitional possibilities,'" that sort of "vague statutory grant is not close to the sort of clear authorization required" under the major questions doctrine. *West Virginia v. EPA*, 597 U.S. 697, 732 (2022); *see* Pet. Br. 16, 25. The SEC's belated effort

10

to retract its concession about "the lack of 'express authorization for CAT'" therefore misses the mark entirely. SEC Br. 55. The point of the doctrine is that "something more than a merely plausible textual basis for the agency action is necessary," *West Virginia*, 597 U.S. at 723; only a "clear statement" will do, *Nebraska*, 600 U.S. at 506; *see Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari) (Congress must "expressly and specifically delegate" power to the agency "to decide the major policy question"). None exists here.

To rule otherwise would transform § 78k-1 into a roving police power for the SEC, leaving the nominally independent agency free to do whatever it wants to the U.S. securities markets so long as it does so by proxy. The only limit the Commission identifies in § 78k-1 is that it must "require joint SRO action within their shared authority to regulate the national market system." SEC Br. 47 (cleaned up). But that circular reasoning offers no constraint at all given the SEC's view that the "SROs' 'shared authority' includes [the] duty to 'protect investors' and 'enforce compliance' with the Act." *Id.* Accordingly, if the Commission's approach prevails, there will be nothing left to stop it from commandeering the SROs to carry out any other aspect of its regulatory agenda—from climate change to cryptocurrencies—and then funding those schemes through unappropriated, unaccountable taxes on investors. Pet. Br. 30-31. That cannot be right.

11

## II.    THE ORDER'S ALLOCATION OF COSTS VIOLATES BOTH THE EXCHANGE ACT AND THE APA.

Even if the CAT itself were lawful, the Order's funding scheme is not. Respondents do not meaningfully dispute that the required allocation of CAT costs between the SROs and broker-dealers must be equitable and reasonable. *Id.* at 32-36. Nor do they seriously deny that permitting the SROs to pass through *all* CAT operating costs to broker-dealers (and investors) would flunk those requirements; that would not be an *allocation* at all, let alone an equitable or reasonable one. *Id.*[1]

Yet that is precisely what the Order does. As all agree, Citadel Securities asked the Commission to prohibit the SROs from passing on their allocated portion of CAT costs to broker-dealers, and the SEC *denied* that request. Order 62632, 62636; *see* Pet. Br. 38; SEC Br. 27; CAT. Br. 36. Accordingly, the Order allows the SROs to pass through their entire portion of CAT costs to broker-dealers. Indeed, the largest of the SROs (FINRA) has already proposed to do so, and none of the remaining 24 has disclaimed any intent to follow suit. Pet. Br. 33. The Order therefore establishes a two-third to one-third "allocation" between SROs and broker-dealers in name alone.

---

[1] While the SEC claims that Rule 608 rather than the Exchange Act governed the Order's approval of the proposed amendment, that "is a distinction without much difference." CAT Br. 35; *see* SEC Br. 24. The Commission never explains how the amendment could be "'necessary or appropriate'" under Rule 608 if it empowers SROs to violate the Exchange Act by imposing inequitable fees. SEC Br. 24; *see* Pet. Br. 36-37. And as CAT LLC recognizes, the SEC was also bound by the CAT NMS Plan, which demands an "equitable" funding structure where fees are "fairly and reasonably shared among" SROs and broker-dealers, as well as the APA's baseline requirement of reasonable agency action. 81 Fed. Reg. at 85004, 84967; *see* CAT Br. 35.

Faced with this problem, the Commission trots out another timing argument, dismissing this challenge as premature because it may yet decide to prohibit SRO pass-throughs in the "future" when faced with individual SRO fee filings. SEC Br. 26. Under the CAT NMS Plan, each SRO will make an annual fee filing to assess the actual CAT tax on its broker-dealer members based on the CAT budget and the Order's allocation. *See* Order 62637, 62658. According to the SEC, any arguments about SRO pass-throughs can be aired at that "later" point. SEC Br. 26. But that is not what the Order said. Nor could it. Such *post hoc* piecemeal review is no substitute for a prohibition on SRO pass-throughs now. This ploy to skirt judicial scrutiny thus fares no better than the last one.

*First*, the Commission's attempt to rewrite the Order as merely choosing "to reserve judgment" on SRO pass-throughs, SEC Br. 27, runs headlong into the *Chenery* doctrine—"the foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action," *Michigan v. EPA*, 576 U.S. 743, 758 (2015). The Order's chief response to concerns about SRO pass-throughs was not that the SEC would address the issue "at a later day," SEC Br. 26, but that "the CAT provides important benefits in facilitating effective market surveillance and the Exchange Act expressly contemplates the ability of the Participants to recoup their costs," Order 62636. Put differently, the Commission's topline answer to the requested prohibition was that SRO pass-throughs are *lawful*.

13

The Order went on to mention the subsequent fee filings *only* as a possible way to "incentivize" the SROs "to control costs." *Id.* It did not suggest any willingness to bar SRO pass-throughs at that later stage. When describing who would ultimately bear FINRA's supposed share of CAT costs, for instance, the SEC did not speak of some "future" legal "determination" about the propriety of SRO pass-throughs. SEC Br. 22. Rather, the Order reaffirmed "that FINRA's allocation of CAT fees *likely will be* passed through to Industry Members," just as it accepted that broker-dealers (and investors) "would effectively bear 100% of the CAT allocation" if the "exchanges passed their CAT fees onto their members in full." Order 62684 & n.1135 (emphasis added).

Indeed, to this day, the SEC's view remains that "the reasonableness of th[e] allocation *does not depend* on whether" the SROs pass through "their share of CAT costs." SEC Br. 21-22 (emphasis added). In fact, it now claims that its "position from CAT's inception" has been that broker-dealers (and investors) may be responsible for "'all'" CAT costs. *Id.* at 25, 43. As an initial matter, that assertion mischaracterizes the record. Pet. Br. 32-34; *see* 81 Fed. Reg. at 84967 (requiring "allocation … among Participants and Industry Members"); 77 Fed. Reg. 45722, 45795 (2012) (noting only what SROs "may seek" to recover, and emphasizing importance of understanding SROs' "plans to allocate costs between themselves and their members"). Indeed, even intervenors agree that CAT costs must be shared by *both* "the SROs and broker-dealers." CAT Br. 2. But more to the point, the SEC's attempt to rewrite history only confirms that the Order *now* has blessed the SROs to pass through all of their CAT costs in their sole discretion.

14

The SROs have gotten the message. FINRA promptly elected to pass through its share of the first round of historical CAT costs, noting that the Order "recognized that [SROs] may choose to pass-through their one-third portion of CAT Costs to their members." 89 Fed. Reg. 11153, 11159 (2024). And the SROs' intervention to defend the Order gives away the game entirely. If the SROs actually planned "not" to "pass-through" their share, they would be no worse off had the Order determined that such SRO pass-throughs were unlawful. CAT Br. 25. Yet rather than decline to defend against this aspect of petitioners' challenge—as they did when it came to the Commission's authority for the CAT itself—the SROs have vigorously opposed it, disparaging the proposed prohibition on SRO pass-throughs as "nonsensical." *Id.* at 26. What respondents fail to mention is that the SEC *already* did precisely that in 2020, when it banned the SROs from passing through CAT costs unless they met specific implementation deadlines. Pet. Br. 38. They offer no reason why the Commission could not take a similar approach here. What the SROs' position reveals, however, is how desperate they are to keep the Order in place, because it allows them to exploit the purported "allocation" and assign all CAT costs to broker-dealers (and investors).

*Second*, and in any event, the largely perfunctory "fee-filing process" is no substitute for resolving whether SROs may pass through their share of allocated CAT costs to broker-dealers now. SEC Br. 31. For one thing, there is no guarantee of meaningful review—by either the Commission or the courts—of SRO fee filings under Section 19(b) of the Exchange Act. The SEC has determined that these filings are

15

*immediately effective* upon filing. *See* Order 62636 & n.193, 62674. While it now insists that even immediately effective filings "are subject to notice and comment," SEC Br. 25, that is misleading. Comments may be submitted on an immediately effective fee filing, but that process does not itself trigger a reviewable determination of the *filing's lawfulness*. Instead, the Commission retains complete *discretion* over whether to suspend the filing and institute full review proceedings. § 78s(b)(3)(C). And while the SEC makes much of its decision to suspend the first batch of fee filings, it did so only after petitioners had initiated this challenge. SEC Br. 26-27. Moreover, the D.C. Circuit has held that the Commission's decision *not* to begin such proceedings is immune from review. *NetCoalition v. SEC*, 715 F.3d 342, 350-51 (D.C. Cir. 2013). "Review" at the fee-filing stage thus may well amount to no review at all, allowing the SROs and a compliant Commission to pass 100% of the billions in costs onto broker-dealers (and investors) without *any* judicial check.

For another, even if the SEC elects to review an individual SRO's annual fee filing, that process is narrowly focused on "specific costs" rather than the market-wide allocation formula, as FINRA's filing illustrates. SEC Br. 32; *see* 89 Fed. Reg. at 11157 (addressing expenses such as "legal" and "public relations" costs). Indeed, if the Order's allocation formula could be altered at any time by an individual SRO fee filing, it is unclear why the SROs and the Commission spent years developing that scheme in the first place. Adopting the SEC's approach also risks spawning untold litigation—assuming judicial review is even an option—as *each* of the 25 SROs will be making *annual*

16

fee filings in perpetuity (plus a separate batch for historical costs), with each one potentially modifying the Order's allocation. This question therefore must be resolved now or the Order's purported "allocation" will be relitigated each year *ad infinitum*.

Finally, if the fee-filing process is really all there is to safeguard the Order's purported "allocation," broker-dealers (and investors) will be the ones left "holding the bag" when the SROs inevitably overspend. CAT Br. 30; *see Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022).[2] Respondents' approach would leave broker-dealers wholly at the mercy of the SEC, which pays nothing for the CAT and has no need to ever seek funding from Congress. It is therefore the *last* entity one should expect to rigorously police SRO wastefulness. So long as its "indispensable" database keeps being funded by broker-dealers and their customers, the Commission has no stake in actually policing the size, or recipient, of the ultimate bill. SEC Br. 55. The adoption of an allocation scheme with such perverse incentives is unreasonable on its face. Pet. Br. 34-36. To adopt respondents' argument that the Order "reserve[d] judgment" on SRO pass-throughs would therefore be to bless them in practice, turning the Order's allocation into a sham that cannot possibly be equitable and reasonable. SEC Br. 27.

---

[2] As the SEC recognizes, the fact that "investors" may ultimately bear many of the CAT costs (directly or indirectly) has no bearing on whether the Order's allocation of CAT costs "among Participants and Industry Members" is equitable and reasonable. Order 62682; *see* Pet. Br. 38-39. CAT LLC therefore cannot defend the Order's purported "allocation" on the ground that both "Industry Members" and "investors" may end up shouldering the SROs' share. CAT Br. 4.

## III.    THE ORDER'S ECONOMIC ANALYSIS VIOLATES BOTH THE EXCHANGE ACT AND THE APA.

### A.    The Commission Was Required To Update Its 2016 Analysis.

Confronted with its failure to update its 2016 economic analysis before approving the proposed amendment to the CAT NMS Plan, the Commission claims such a step was unnecessary to account for either the massive increase in CAT costs since 2016 or the Order's new allocation of those costs. *Id.* at 35; *see* Pet. Br. 40-43. It is wrong on both counts.

*First*, the Commission asserts that it did not have to update its 2016 analysis to account for the dramatic spike in CAT costs because the proposed amendment "did not reconsider" the creation of the CAT itself. SEC. Br. 35. But as two former SEC Chief Economists have explained, "[t]hat makes little sense." Economists Br. 13. As the SEC concedes, the Order had to address the economic effects of approving this proposed amendment to the CAT NMS Plan. SEC Br. 36. And to do that, the SEC had to account for the CAT costs (and their trajectory) as they stood in 2023, instead of relying on a stale analysis from seven years earlier. Imposing a $200 million per year tax on broker-dealers in perpetuity (with recent annual increases averaging around 30%) plainly will have different economic effects than the $50 million per year tax estimated in 2016. And the fact that the 2016 analysis turned out to be so far off the mark should have led the Commission to investigate and identify the key underlying assumptions it got wrong. Instead, it doubled down on a bad hand. Pet. Br. 40-43.

18

*Second*, the SEC claims the new allocation set forth in the Order required no update on the premise that the Commission already "incorporated that assumption into its [2016] economic analysis." SEC Br. 36. But that revisionist history falls flat, *see supra* at 14, as confirmed by the fact that the SEC's only support here is that its 2016 analysis allocated a mere $8.8 million in CAT development costs to the SROs, *see* 81 Fed. Reg. at 84855, 84857 (Table 3). That the SEC believes that paltry sum is comparable to the Order's transfer of billions in costs to broker-dealers (and investors) speaks volumes.

For its part, CAT LLC perfunctorily contends the SEC did whatever updating was necessary by considering "updated information." CAT Br. 42. But while CAT LLC insists it was sufficient for the SEC to speculate that the increased CAT costs were due to increased "'trading activity,'" that is a *non sequitur. Id.* Identifying the *cause* of a drastic spike in costs does not satisfy the SEC's obligation to assess the *effects* of these costs when suddenly allocated to broker-dealers and investors. Whatever the origins of the increase, the SEC had to assess its impact on market efficiency, competition, and capital formation, and it failed to do so. Moreover, much of the new data CAT LLC invokes in an attempt to illustrate a relationship between trading activity and CAT costs was not discussed in the Order and thus cannot be used to defend it. *Id.* at 12-14; *see supra* at 13. And in any event, the 86% increase in notional value of trades between 2016 and 2023 cannot plausibly account for the *four-to-fivefold* increase in CAT costs. CAT Br. 12-13. Clearly, more investigation was warranted as to why the 2016 estimate of $50 million per year turned out to be so egregiously off the mark.

19

CAT LLC also claims it was reasonable for the SEC to short-circuit its economic analysis based on the theory that the CAT tax would have little effect on market efficiency, competition, and capital formation since it was "small" on a *per-share* basis. *Id.* at 43, 46. That is a remarkable claim. In a market where *trillions* of shares are traded each year, the per-share tax is not nearly as significant as the aggregate amount paid by market participants. Indeed, the economic significance of these amounts is why the SROs are so anxious to recoup CAT costs in the first place. *See* 88 Fed. Reg. 17086, 17131-41 (2023) (estimating that numerous broker-dealers will be allotted hundreds of thousands in CAT taxes per month for the first batch of historical costs alone).

## B.    The Commission Failed To Estimate Effects On Investors.

The Commission fares no better in defending its failure to even attempt an estimation of the portion of the new CAT taxes that would be borne by end-investors. Pet. Br. 36-40. Such an exercise was obviously necessary to assess the Order's impact on market efficiency, competition, and capital formation. Yet the SEC brushes off this missing step on the premise that it could not calculate this amount *with certainty*. SEC Br. 39-40. But it does not take solving "paradoxes of economic theory" to determine an upper-bound estimate by taking the total costs incurred to-date and subtracting the amount expected to be shouldered by firms trading for their own account rather than for customers, which "can definitionally not be passed on." CAT Br. 47; *see* Pet. Br. 46-47.

20

While the SEC now contends it declined to do this basic math because it could not "predict the amount" of the total costs that the SROs would "pass[] on," that is not what the Order said. SEC Br. 40. Rather, the relevant section of the Order merely reasoned that the Order "*does not address* whether Industry Members pass through their CAT fees to customers," but instead "covers the allocation of CAT fees for operating the CAT among Participants and Industry Members." Order 62682 (emphasis added). In other words, the Commission thought the Order's downstream effects on investors simply fell outside the Order's scope. While the SEC now plucks language from *other* sections of the Order in an attempt to excuse this deficiency, SEC Br. 40; *see* Order 62637, 62685, the Commission cannot rescue the Order by rewriting it, *see supra* at 13.

Ultimately, the SEC resorts to attacking the messenger by claiming that a comment letter from Citadel Securities identifying this problem (and solution) "did not even mention the analysis of the effects of CAT fees on investors." SEC Br. 39. False. That letter explained that "with respect to those CAT costs that theoretically *could be passed-on to customers*"—*i.e.*, investors—the SEC "must consider the *impact on market liquidity and competition*." A199-200 (emphases added). And it noted that "this analysis is eminently feasible from the CAT data" at the Commission's fingertips. A199. Indeed, it is the height of irony for the SEC to refuse to tap into the CAT's "comprehensive data" while extolling the untold benefits of it. SEC Br. 5.

## IV.    VACATUR IS WARRANTED.

Perhaps reading the writing on the wall, respondents devote considerable attention to the appropriate remedy for the Order's many deficiencies. *See, e.g.*, CAT Br. 48-53. But that question is easy: "'the ordinary APA remedy'" is "'vacatur,'" and respondents do not justify departing from that default here. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015).

*First*, CAT LLC requests that if this Court deems the CAT unlawful, it vacate only the Order's allocation of "*prospective* CAT costs." CAT Br. 52. But CAT LLC offers no basis in law, logic, or "equit[y]" for such a proposal, which would saddle broker-dealers with roughly $1 billion in *historical* costs for its unlawful surveillance tool, in addition to the billions they have already spent in implementation costs. *Id.* If CAT LLC wants "the SEC to address the allocation" of the costs the SROs sunk into an *ultra vires* program, it can file a new proposal with the Commission following this Court's decision. *Id.* But preserving the Order's allocation of historical costs to broker-dealers while in the same breath holding that the CAT was unlawful from the get-go would make no sense.[3]

---

[3] Nor is there reason for this Court to "stay its mandate" if it concludes the CAT is unauthorized. CAT Br. 49. A vacatur of *the Order*—even on that ground—will not set aside *the CAT itself*. Of course, the precedential effect of such a ruling may impact any *future* cases related to the CAT, but that will be true regardless of when the mandate setting aside the Order issues. And nothing about a vacatur of the Order—which addresses only funding and has yet to go into effect—will prevent courts from considering arguments about a proper remedy if those challenges ever materialize.

*Second*, respondents urge this Court to "remand without vacatur" if it deems the Order unlawful for other reasons. *E.g.*, SEC Br. 40. But this Court will grant that unusual remedy only if (1) "'the order's deficiencies'" are not "'serious[]'" (and hence can be easily "cured"); and (2) vacatur would come with "'disruptive consequences.'" *Black Warrior Riverkeeper*, 781 F.3d at 1290. Respondents cannot make either showing.

As to the first, the Order's deficiencies are foundational. It is hard to imagine what would remain if the Court holds the Order's allocation to be unlawful. And the SEC's slipshod economic analysis is unlikely to be taken care of with a quick fix. *See, e.g.*, *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (vacating rule after the SEC "failed to conduct a proper cost-benefit analysis" within remand period). Indeed, a proper analysis would likely result in a new allocation.

Even if these defects were only skin deep, "'the balance of equities'" would still favor vacatur. *Black Warrior Riverkeeper*, 781 F.3d at 1290. Vacating the Order will not be unduly disruptive. *See supra* note 3. Rather, it would just maintain the *status quo* that has existed for nearly a decade, as the CAT has operated without a funding order since 2016. Leaving the Order in place, by contrast, would be the real change, as it would allow the SROs' pending fee filings to lurch forward, destabilizing the industry with the immediate collection of billions in CAT taxes. And once those funds are paid, there is likely no chance for future recovery given the SROs' absolute immunity. *See Weissman v. NASD*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc). In light of those stakes, there is nothing "inequitable" about "waiting" for the SEC to do its job. CAT Br. 50.

## CONCLUSION

The Court should vacate the Order.

Dated: May 15, 2024

/s/ *J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner American*
*Securities Association*

Respectfully submitted,

/s/ *Noel J. Francisco*
Noel J. Francisco
Yaakov M. Roth
Brian C. Rabbitt
Brinton Lucas
Joshua T. Hoyt
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner Citadel*
*Securities LLC*

24

## CERTIFICATE OF COMPLIANCE

I certify that this Reply Brief complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,463 words excluding the portions exempted by Rule 32(f); and (2) the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in 14-point Garamond (a proportionally spaced typeface) using Microsoft Word.

Dated: May 15, 2024                                   Respectfully submitted,

*/s/ J. Michael Connolly*                             */s/ Noel J. Francisco*

*Counsel of Record for Petitioner*                    *Counsel of Record for Petitioner Citadel*
*American Securities Association*                      *Securities LLC*

25

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: May 15, 2024                    Respectfully submitted,

*/s/ J. Michael Connolly*                 */s/ Noel J. Francisco*

*Counsel of Record for Petitioner*        *Counsel of Record for Petitioner Citadel*
*American Securities Association*          *Securities LLC*

26

## CERTIFICATE OF SERVICE

I certify that on May 15, 2024, the foregoing Reply Brief was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 15, 2024

*/s/ J. Michael Connolly*

*Counsel of Record for Petitioner American Securities Association*

Respectfully submitted,

*/s/ Noel J. Francisco*

*Counsel of Record for Petitioner Citadel Securities LLC*

27