# EXHIBIT A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13396

_____

AMERICAN SECURITIES ASSOCIATION,
CITADEL SECURITIES LLC,

Petitioners,

*versus*

U.S. SECURITIES AND EXCHANGE COMMISSION,

Respondent,

THE NASDAQ STOCK MARKET, LLC,
NASDAQ BX, INC.,
NASDAQ GEMX, LLC,
NASDAQ ISE, LLC,
NASDAQ MRX, LLC, et al.,

2                    Opinion of the Court                    23-13396

Intervenors.

_____

Petition for Review of a Decision of the
Securities and Exchange Commission
Agency No. 34-98290

_____

Before JORDAN and BRASHER, Circuit Judges, and GERAGHTY,* District Judge.

BRASHER, Circuit Judge:

This petition for review challenges an agency's amendment to an existing rule as arbitrary and capricious under the Administrative Procedure Act.

The Securities and Exchange Commission has long required securities exchanges and other self-regulatory organizations to gather and maintain certain information about stock trades—such as the time of the trade and identity of the broker—that would allow the Commission to audit each individual trade. In 2012, the Commission published a rule to create a single electronic system for gathering and maintaining this data across all the self-regulatory organizations—the Consolidated Audit Trail. Four years later, the Commission approved a plan to pay for the CAT, which

_____

* Honorable Sarah E. Geraghty, United States District Judge for the Northern District of Georgia, sitting by designation.

contemplated cost-sharing between self-regulatory organizations and the broker-dealers they service.

The Commission justified the CAT through a contemporaneous economic analysis of its anticipated costs and benefits. But things did not go to plan. Although the self-regulatory organizations built the CAT as instructed, the cost of setting up this uniform electronic audit system exceeded the Commission's 2016 estimate by eight times. And the annual cost of operating the system going forward appears likely to exceed the Commission's 2016 estimate by nearly four times. The result: it took over $500 million to build the CAT and will likely cost about $200 million a year to run it. Although the Commission underestimated the cost of building and maintaining the CAT, it declined to update that previous economic analysis with real-world numbers in its 2023 Funding Order.

This background brings us to the contested rulemaking. In 2023, the Commission approved a Funding Order to specify how the self-regulatory organizations could defray the costs of establishing and maintaining the audit system. Even though the original payment plan anticipated that the costs would be shared by the self-regulatory organizations and their members, the 2023 Funding Order expressly allows self-regulatory organizations to pass along *all* of their CAT costs to their members, should they choose to do so. The Commission may review fee filings seeking approval of any pass-through costs to the broker-dealers, but its decisions are not subject to judicial review.

The American Securities Association, a trade association representing financial services firms, and Citadel Securities, LLC, a broker-dealer, challenge the 2023 Funding Order as arbitrary and capricious. They assert that the CAT is unlawful, and so the funding structure approved by the Commission must be vacated. They also argue that the Commission should have justified its decision to allow self-regulatory organizations to pass all the costs of the system to their members, especially given that this decision conflicts with the original funding plan. Finally, they contend that the Commission should have considered the actual costs of the CAT in making this determination, updating its 2016 estimates with real numbers. We do not need to reach the argument as to whether the CAT itself is unlawful because we agree with both of the latter arguments. Because the Commission did not adequately justify its choices, we conclude that the 2023 Funding Order is arbitrary and capricious in violation of the Administrative Procedure Act. We vacate the 2023 Funding Order, stay our decision for sixty days after issuance of the mandate, and remand the matter to the Commission for further proceedings consistent with our opinion.

## I.

### A.

After the stock market crash of 1929 and Great Depression, Congress passed the Securities Exchange Act, which "established a system of regulation over the securities industry." *Weissman v. Nat'l Ass'n of Sec. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc); *see also* Securities Exchange Act of 1934, Pub. L. No. 73-291,

48 Stat. 881 (1934) (codified as amended at 15 U.S.C. §§ 78a–78pp). Under that system of regulation, the United States Securities and Exchange Commission closely supervises a group of private, self-regulatory organizations, which "conduct the day-to-day regula-tion and administration of the United States' stock markets." *Weiss-man*, 500 F.3d at 1296. Those self-regulatory organizations include twenty-four national securities exchanges (*e.g.*, the Nasdaq Stock Market, the New York Stock Exchange) and one non-profit corpo-ration, the Financial Industry Regulatory Authority, Inc. In turn, the self-regulatory organizations "are responsible for enforcing compliance by their broker-dealer members with the federal secu-rities laws, rules, and regulations, as well as additional rules that they develop." Comm'n Br. at 7; *see* 15 U.S.C. §§ 78f(b), 78o-3(b).

To fulfill their statutory responsibilities, the Commission and the self-regulatory organizations have long relied on market auditing systems. The first self-regulatory organization auditing systems "were largely manual, involving physical review of trading tapes and member broker-dealer audits." Comm'n Br. at 12. "[B]y 1992, the NYSE's Intermarket Surveillance Information System was already producing a massive audit trail." David A. Wishnick, *Reengineering Financial Market Infrastructure*, 105 Minn. L. Rev. 2379, 2433 (2021). That trail included "a sequential reconstruction of trading in each stock, identifying the time of trade, the buying and selling member firms, the Floor brokers who represented the or-ders involved, and whether the trade was for a member firm pro-prietary account." *Id.* (quoting James L. Cochrane, Brian McNamara, James E. Shapiro & Michael J. Simon, *The Structure and*

*Regulation of the New York Stock Exchange*, 18 J. Corp. L. 57, 66 (1992)).

## B.

By 2010, "[m]any commenters agreed that existing audit trails were inadequate and recommended consolidating them into a single comprehensive audit trail." Comm'n Br. at 13 (citing Consolidated Audit Trail, 75 Fed. Reg. 32556, 32556 (June 8, 2010) [hereinafter CAT Proposal]). That view stemmed, at least in part, from "the Flash Crash of 2010," which "destroyed nearly $1 trillion in market capitalization in minutes." Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678, 682 (2013). Afterward, the Commission "proposed a new rule that would require the self-regulatory organizations . . . to establish a consolidated audit trail system that would enable regulators to track information related to trading orders received and executed across the securities market." Securities and Exchange Commission, *SEC Proposes Consolidated Audit Trail System to Better Track Market Trades* (May 26, 2010), https://perma.cc/R6VK-BRZC. Specifically, the CAT proposal "would require [self-regulatory organizations] to act jointly in developing a national market system . . . plan to develop, implement, and maintain a consolidated order tracking system, or consolidated audit trail, with respect to the trading of NMS securities." CAT Proposal, 75 Fed. Reg. at 32556. At that time, the Commission received several comments suggesting that the CAT was a necessary development. *See id.* at 32562.

The Commission adopted the CAT in 2012, issuing a rule that required the self-regulatory organizations "to submit a national market system . . . plan to create, implement, and maintain a consolidated order tracking system, or consolidated audit trail." Consolidated Audit Trail, 77 Fed. Reg. 45722, 45722 (Aug. 1, 2012) [hereinafter 2012 Adoption Rule]. In issuing that rule, the Commission explained its belief that "the regulatory data infrastructure on which the [self-regulatory organizations] and the Commission currently must rely generally is outdated and inadequate to effectively oversee a complex, dispersed, and highly automated national market system." *Id.* at 45723. The Commission reasoned that the CAT "should substantially enhance the ability of the [self-regulatory organizations] and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws." *Id.* at 45726.

In 2015, the self-regulatory organizations "filed with the [Commission] . . . a National Market System Plan Governing the Consolidated Audit Trail." Joint Industry Plan; Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 30614, 30614 (May 17, 2016) [hereinafter 2015 Plan]. Under the 2015 Plan, the self-regulatory organizations would operate "the CAT through CAT NMS, LLC." *Id.* at 30616. Each self-regulatory organization—or, for purposes of CAT NMS, LLC, "Participant"—would own a share of CAT NMS, LLC, and have voting rights on its Operating Committee. *Id.* By contrast, broker-dealers would be part of an advisory committee and have no voting rights. *Id.* at 30621.

The 2015 Plan also required both the self-regulatory organizations and the broker-dealers to bear the costs of the CAT. *See id.* at 30710 ("The Plan provides that costs associated with building and operating the Central Repository would be borne by both [self-regulatory organizations] and their members.").

## C.

In 2016, the Commission approved the 2015 Plan. Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84696, 84697 (Nov. 23, 2016) [hereinafter 2016 Approval Order]. The Commission concluded that the Plan would "significantly improve regulatory efforts by the [self-regulatory organizations] and the Commission, including market surveillance, market reconstructions, enforcement investigations, and examinations of market participants." 2016 Approval Order, 81 Fed. Reg. at 84727. When the Commission approved the 2015 Plan, it estimated that it would cost between $37.5 million and $65 million to build the CAT, and between $36.5 and $55 million per year to operate it. 2016 Approval Order, 81 Fed. Reg. at 84854.

The 2016 Approval Order approved the bifurcated interim original funding model—which followed the 2012 Adoption Rule's mandate that both self-regulatory organizations and broker-dealers bear CAT costs. 2016 Approval Order, 81 Fed. Reg. at 84793. But the 2016 Approval Order left the decision on many funding details to be determined at a later date; the Order did not specify the percentage that self-regulatory organizations and broker-dealers

would pay, but it instead stated that "fee proposals later will be separately filed with the Commission by the [self-regulatory organizations], published for public comment, and assessed by the Commission for consistency with applicable Exchange Act standards, including whether they are reasonable and equitably allocated, . . . and not unfairly discriminatory." *Id.* at 84794. Like the 2015 Plan, the 2016 Approval Order provided that both the self-regulatory organizations and broker-dealers would bear CAT costs. *See id.* at 84855 ("[T]he Commission's analysis acknowledged that Central Repository costs will be passed on to both Participants and Industry Members by an unidentified formula . . . ."). The CAT became operational in 2020, and the legacy audit trails were decommissioned in 2022.

### D.

In 2023, the Commission formally approved the 2023 Funding Order, on the fifth proposal submitted since the Commission adopted the 2014 Plan, which prompted this litigation. *See* Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62628, 62628 (Sept. 12, 2023) [hereinafter 2023 Funding Order]. The 2023 Funding Order replaced the original funding model "with the Executed Share Model." *Id.* at 62629. The Executed Share Model "bases the CAT fees on executed share volume, while the Original Funding Model contemplated assessing fees based on market share for some entities and message traffic for others." Self-Regul. Orgs. Br. at 22 (citing 2023 Funding Order, 88 Fed.

Reg. at 62629). The Executed Share Model also "divides costs evenly between the three entities who have primary roles in a transaction: (1) the buy-side executing broker, (2) the sell-side executing broker, and (3) the [self-regulatory organization] involved in the transaction." *Id.* at 23 (citing 2023 Funding Order, 88 Fed. Reg. at 62629).

The 2023 Funding Order established two categories of CAT fees: fees for historical CAT costs and fees for prospective CAT costs. For historical CAT costs, the buyer's broker-dealer and seller's broker-dealer each bear one-third of the CAT costs. The self-regulatory organization's share of historical CAT costs "will be paid by the cancellation of loans that the [self-regulatory organizations] previously made to CAT LLC." Self-Regul. Orgs. Br. at 23 n.9 (citing 2023 Funding Order, 88 Fed. Reg. at 62630). Likewise, the 2023 Funding Order splits prospective CAT costs between the self-regulatory organization, the buyer's broker-dealer, and the seller's broker-dealer. *See* 2023 Funding Order, 88 Fed. Reg. at 62630.

The 2023 Funding Order confirmed that the 2015 Plan "requires both Execution Venues (which include the [self-regulatory organizations]) and Industry Members (which include [broker-dealers]) to fund the CAT." *Id.* at 62629. But the Commission also expressly acknowledges in the 2023 Funding Order that the self-regulatory organizations may "pass[] their CAT fees onto their members in full." *Id.* at 62684 n.1135. In other words, the 2023

Funding Order allows broker-dealers (and their customers) to "effectively bear 100% of the CAT allocation." *Id.*

The Commission approved the 2023 Funding Order in a split decision. Chair Gary Gensler explained that the 2023 Funding Order "addresses an important but narrow issue: the allocation of funding of recoverable costs for CAT." Gary Gensler, *Statement on CAT Funding* (Sept. 6, 2023), https://perma.cc/9BPM-8YD9. Chair Gensler also pointed to the requirement for self-regulatory organizations to submit periodic fee filings for Commission review if the proposal were adopted. Commissioners Mark T. Uyeda and Hester M. Pierce dissented. Mark T. Uyeda, *Statement on Consolidated Audit Trail Revised Funding Model* (Sept. 6, 2023), https://perma.cc/TG79-SZXV; Hester M. Pierce, *Who's Paying? Statement on the CAT's Funding Model* (Sept. 6, 2023), https://perma.cc/2XGL-FWGW. Commissioner Uyeda pointed to the precipitous increase of CAT costs and questioned whether the 2023 Funding Order "sufficiently align[ed]" the incentives between self-regulatory organizations and broker-dealers regarding CAT costs. Uyeda*, supra* (citing Comment Letter from Financial Information Forum and Security Industry and Financial Market Association, File Number 4-698: Joint Industry Plan; Order Instituting Proceedings to Determine Whether to Approve or Disapprove an Amendment to the National Market System Plan Governing the Consolidated Audit Trail (June 16, 2023), at 2). Similarly, Commissioner Pierce reasoned that the "allocation required by these amendments is not fair given the further misalignment of incentives that it encourages." Pierce, *supra*.

*E.*

The costs of building and funding the CAT have far exceeded the Commission's expectations. By the end of 2022, $518 million had been spent to build the (incomplete) CAT—nearly eight times more than the top Commission estimate. *Compare* 2023 Funding Order, 88 Fed. Reg. at 62662, *with* 2016 Approval Order, 81 Fed. Reg. at 84854. And by 2023, operating costs had climbed to nearly $200 million per year—nearly four times greater than the high-end Commission estimate. *Compare* CAT, LLC, *2023 Financial and Operating Budget* (Nov. 7, 2023), https://perma.cc/N2RM-NSK8, *with* 2016 Approval Order, 81 Fed. Reg. at 84854.

The Commission "acknowledge[d]" that the "CAT operating budget" had grown to "five times the amount estimated in the [2016] Approval Order." 2023 Funding Order, 88 Fed. Reg. at 62655. "Several commenters stated that, because CAT costs incurred to date are greater than those estimated at the time the [2015] Plan was approved, the Commission should update its economic analysis of that plan." *Id.* at 62676. But the Commission "decline[d]" to update its economic analysis because it "was conducted in the process of deciding whether to approve the original plan and was appropriately based upon the information available to the Commission at the time it made that determination." *Id.* Instead, the Commission "supplemented" its seven-year-old economic analysis with "additional information learned since the time of [the 2016 Approval Order]." *Id.*

### F.

American Securities Association and Citadel Securities, LLC (collectively, the "Association") now challenge the 2023 Funding Order under 15 U.S.C. § 78y(a)(1).

### II.

We have jurisdiction to review final orders of the Commission under 15 U.S.C. § 78y(a)(1). We must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Administrative Procedure Act's "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### III.

The Association offers us three reasons why we should vacate the 2023 Funding Order. First, the Association contends that because the CAT itself is unlawful, we must necessarily vacate the 2023 Funding Order. Second, the Association argues that the 2023 Funding Order's allocation of costs violates the Exchange Act and Administrative Procedure Act. Third, the Association asserts that the 2023 Funding Order's economic analysis runs afoul of the Exchange Act and the Administrative Procedure Act.

We agree with the Association that the 2023 Funding Order's allocation of costs and its economic analysis are arbitrary and

capricious, and thus violate the Administrative Procedure Act. And "we think this is a good opportunity for us to practice judicial minimalism, and decide no more than what is necessary to resolve" this petition. *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1322 (11th Cir. 2020). Accordingly, we need not address the Association's Exchange Act arguments. Similarly, because we can resolve this appeal on administrative law grounds, we need not determine whether the Association's challenge to the CAT's lawfulness is timely, and if so, whether that argument is correct.

We also agree that vacatur of the 2023 Funding Order is the proper remedy. Vacatur is the ordinary remedy for orders that violate the Administrative Procedure Act. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). And the equitable considerations that would have us grant alternative relief do not favor the Commission, but instead favor the Association.

We will address each issue in turn.

### A.

We start with the Association's argument that the 2023 Funding Order's allocation of costs violates the Administrative Procedure Act. Specifically, the Association argues that the Commission did not explain or justify its decision to allow the entirety of CAT costs to be borne by broker-dealers.

We think that argument is correct for two reasons.

First, the 2023 Funding Order is internally inconsistent—and inconsistent with the 2012 Adoption Rule, the 2015 Plan, and the 2016 Approval Order—because it permits the self-regulatory organizations to pass through all of their CAT costs onto the broker-dealers. The 2023 Funding Order states that the 2015 Plan "requires *both* [self-regulatory organizations] . . . and Industry Members . . . to fund the CAT." 2023 Funding Order, 88 Fed. Reg. at 62636 (emphasis added). But at the same time, the 2023 Funding Order acknowledges that self-regulatory organizations could seek to pass all of their CAT costs to broker-dealers and their customers. *See id.* at 62684 n.1135. So despite acknowledging that both self-regulatory organizations and broker-dealers must fund the CAT, the 2023 Funding Order, in effect, greenlights the shifting of all CAT costs to the broker-dealers.

According to the 2023 Funding Order, if the Financial Industry Regulatory Authority, Inc. (FINRA)—the only non-profit self-regulatory organization—were able to pass through 100% of its CAT costs, the broker dealers would "bear 77% of CAT costs." *Id.* at 62684. And if the other self-regulatory organizations passed their CAT costs to broker dealers "in full," the broker-dealers would "effectively bear 100% of the CAT allocation (ignoring what they would pass to investors)." *Id.* at 62684 n.1135.[1]

---

[1] FINRA implemented a CAT cost recovery fee for *historical* CAT costs (which amounted to $4,391,414) in December 2024, which will stay in place until the full amount is recovered from member broker-dealers, but will not assess the

The Commission's shift from a *mandate* that both self-regulatory organizations and broker-dealers fund the CAT to an *allowance* for self-regulatory organizations to pass through 100% of their CAT costs constitutes a major CAT policy change. All prior Commission CAT promulgations stated that self-regulatory organizations would be responsible for some "allocation of the costs." *See, e.g.*, 2016 Approval Order, 81 Fed. Reg. at 84795. But that bifurcation requirement seems to have quietly vanished.

To be sure, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). "But the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The 2023 Funding Order's allowance for self-regulatory organizations to pass through 100% of their CAT costs fails to meet this standard. That allowance is inconsistent with the 2023 Funding Order, the 2016 Approval Order, the 2015 Plan, and the 2012 Adoption Rule's requirement that both self-regulatory

---

fee on transactions after January 1, 2025. *See* FINRA, *Information Notice: Completion of Historical CAT Cost Recovery Assessment* (Dec. 24, 2024), https://perma.cc/GWE8-D52J. FINRA recently filed a proposal with the Commission for recouping certain prospective CAT costs. Self-Regulatory Organizations; Financial Industry Regulatory Authority, Inc.; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change, 90 Fed. Reg. 30171, 30171 (July 8, 2025). That filing was effective upon its receipt by the Commission, which has solicited comments on the filing. *See id.* at 30176–77.

organizations and broker-dealers fund the CAT, and we can see no reasoned justification or explanation for the Commission's about-face.

The Commission points to the consistent use of language permitting self-regulatory organizations to recover their CAT costs from members upon meeting Exchange Act requirements as evidence that it has not substantially changed its position. But that permissive language was used in conjunction with the understanding that self-regulatory organizations and their broker-dealer members were to *share* the costs. In other words, the 2023 Funding Order still presents an "unexplained inconsistency" to the extent it allows self-regulatory organizations to pass through 100% of the CAT costs. *Encino Motorcars*, 579 U.S. at 222 (citation modified) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); 2023 Funding Order, 88 Fed. Reg. at 62635. Because the Commission provides no "good reasons" for changing its position, the policy violates the Administrative Procedure Act. *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox Television*, 556 U.S. at 515); *see also Prometheus Radio*, 592 U.S. at 423.

Second, apart from those inconsistencies and unexplained change in policy, "[w]e have said that an agency action is arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (quoting *Ga. Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018)). The 2023 Funding Order did just that when it failed to consider the effects of

potential broker-dealer-only funding. As it stands, the self-regulatory organizations that govern the CAT now have little incentive to keep CAT costs down when they are free to pass along all of those costs to their broker-dealer members.

The 2023 Funding Order creates the potential for a classic free-rider problem that the Commission only acknowledges in passing. Indeed, the 2023 Funding Order's response to that concern is that the self-regulatory organizations have an incentive to keep costs low because they "have been focused on cost management when paying 100% of CAT costs and will continue this focus since they will be paying one-third of CAT costs." 2023 Funding Order, 88 Fed. Reg. at 62655. But the 2023 Funding Order's statement about the self-regulatory organizations' incentives depends on the premise that they will bear one-third of the CAT costs—something the 2023 Funding Order allows them to avoid. Further, any incentive to keep costs down speaks only to future expenses and says nothing about already sunk costs—at the time of the order, the self-regulatory organizations had paid 100% of CAT costs. Simply put, the self-regulatory organizations govern the CAT and set its budget, but the broker-dealers may be on the hook for its entire cost. As one of the dissenting Commissioners pointed out, those entities who could be paying for much of the CAT would not be involved in budget-related decisions or implementation of the plan: "Nobody with financial skin in the game will be among those setting or reviewing the budget, or among those able to propose amendments to the plan or involved in day-to-day discussions about interpretation or implementation of the plan." Pierce, *supra*.

23-13396              Opinion of the Court              19

The 2023 Funding Order's disregard of these misaligned incentives lacks reason.

The Commission disputes these conclusions and insists that the Exchange Act will protect broker-dealers from future inequitable self-regulatory organization fee filings. And the self-regulatory organizations say that for us to accept the Association's arguments, we would have to assume that in the future, the Commission would "not comply with its statutory obligations—an invitation that other courts have rejected." Self-Regul. Orgs. Br. at 41 (citing *Corn Refiners Ass'n, Inc. v. Costle*, 594 F.2d 1223, 1226 n.8 (8th Cir. 1979) ("We will not assume, as petitioners seem to suggest, that EPA will not exercise its discretion in a reasonable and good faith manner.")). And CAT LLC argues that it is "perfectly reasonable" for the Commission to "review fee filings as they come" instead of "preemptively resolv[ing] them all now." CAT LLC Br. at 24.

But those arguments run into a bedrock "principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). When commenters raised concerns about pass-through costs, the Commission "acknowledge[d] the concerns" but "emphasize[d] that . . . the CAT provides important benefits in facilitating effective market surveillance and the Exchange Act expressly contemplates the ability of the [self-regulatory organizations] to recoup their costs to fulfill their statutory obligations under the Exchange Act." 2023 Funding Order, 88 Fed. Reg. at 62636.

So instead of prohibiting, or even casting doubt on the possibility of pass-through costs, or expressly acknowledging its change in policy, the Commission pointed to the benefits of the CAT instead. Although the Administrative Procedure Act does not require the "agency's choice" to be "the best one," it does require it to be a reasonable one. *Nat'l Ass'n for Better Broad. v. FCC*, 849 F.2d 665, 669 (D.C. Cir. 1988).

The Commission's *post hoc* review of fee filings is insufficient. First, self-regulatory organizations' fees take effect immediately upon filing, unless suspended by the Commission. Second, the Commission's review of any individual self-regulatory organization's fee filing does not reach the issue of cost allocation as a whole because it is necessarily focused on "specific costs rather than the market-wide allocation formula." Ass'n Reply Br. at 16 (citation modified). Third, and significantly, the Commission's decision not to institute review proceedings of fee filings is immune from challenge, *NetCoalition v. SEC*, 715 F.3d 342, 344 (D.C. Cir. 2013), so a decision to allow a 100% pass-through filing will not be subject to judicial review. Fourth, there is no body of consistent past practice that the Commission can point to because so far there has only been one pass-through filing.

Because the Commission's allowance for self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice—is unreasonable, it violates the Administrative Procedure Act.

*B.*

The Association also contends that the 2023 Funding Order's economic analysis is deficient to the degree that it violates the Administrative Procedure Act. Specifically, the Association argues that the Commission failed to update its existing economic analysis even though "two major changes occurred" between when the Commission issued the 2016 Approval Order and when it issued the 2023 Funding Order. Ass'n Br. at 40. One change is that "the costs of operating the CAT skyrocketed from that dated (and evidently flawed) economic analysis." *Id.* And the other change was that the 2023 Funding Order "settled on an 'allocation' that assigns at least two-thirds of the CAT costs to broker-dealers and lets the [self-regulatory organizations] pass-through the remainder to broker-dealers as well." *Id.* at 41 (citing 2023 Funding Order, 88 Fed. Reg. at 62629–30).

We find those arguments persuasive. The Commission's lack of acknowledgment of the change in circumstances from the time it issued the 2016 Approval Order to when it approved the 2023 Funding Order skirts the Administrative Procedure Act's requirement "that agency action be reasonable and reasonably explained." *Prometheus Radio*, 592 U.S. at 423. Indeed, when the Commission approved the 2015 Plan in the 2016 Approval Order, it relied on its own economic analysis to conclude that the CAT would generally "promote competition, improve the efficiency of regulatory activities, promote market efficiency, and have modest positive effects on capital formation." 2016 Approval Order, 81 Fed.

Reg. at 84882; *see also* 15 U.S.C. § 78c(f). But the Commission unreasonably failed to reconcile that seven-year-old analysis with the increased CAT costs and a new fee structure that allows the self-regulatory organizations to shift all their CAT costs to broker-dealers. The Commission's reliance on an incomplete and incompatible past analysis cannot pass the Administrative Procedure Act's reasonableness review today.

The Commission makes two arguments to the contrary, but neither are persuasive.

First, the Commission asserts that it was not required to update its 2016 analysis. According to the Commission, it "did not reconsider [the] CAT in this proceeding . . . , and while there are mechanisms by which petitioners could seek such reconsideration, this was not one of them." Comm'n Br. at 35. The Commission instead contends that the requirement that it consider new evidence or information applies *before* the Commission adopts a rule, not after.

Agencies must consider material changes in circumstances, and they must act reasonably when they discover new evidence or encounter new facts. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). It necessarily follows that "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking." *Id.* Here, increased actual and projected CAT costs and a new proposed cost-allocation structure were new circumstances

the Commission should have considered in relation to its economic analysis. The Commission's decision not to revise or conduct a new economic analysis under these circumstances is therefore unreasonable.

Second, the Commission argues that it "used 'the best information available'" when it approved the CAT in 2016 and approved the funding order in 2023. Comm'n Br. at 35. Even if the Commission's 2016 economic analysis was correct at the time, that past analysis does not control the reasonableness of the Commission's actions in 2023. Our inquiry is to assess whether the Commission responded reasonably in its 2023 Funding Order to the multiplication of CAT costs and its own allowance for self-regulatory organizations to pass on all their costs to broker-dealers. Whether the Commission's economic analysis was correct in 2016 does not answer that question.

Further, the argument that the Commission used the best information available when it approved the 2023 Funding Order is severely undercut by the Commission's reliance on a seven-year-old economic analysis that (1) left many important details blank and (2) underestimated the costs of the CAT by hundreds of millions of dollars. And to the extent that the 2023 Funding Order includes a supplemental analysis "with additional information learned since the time of" the 2016 Approval Order, 88 Fed. Reg. at 62676, that supplement also fails to account for how rising CAT costs may affect the Commission's earlier analysis. For example, although the Commission labels the CAT fees as "relatively small",

it fails to consider the very real likelihood that CAT fees must increase to account for the rise in CAT costs. Comm'n Br. at 37. Indeed, the Commission's thin supplemental analysis fails to reckon with how the rise of CAT costs may impact its previous economic analysis of the costs and benefits of the CAT. Only when the Commission performs a proper economic analysis will we know the effects of the CAT (and its fees) on market efficiency, competition, and capital formation. *See* 15 U.S.C. § 78c(f).

Accordingly, the Commission's decision not to conduct a new economic analysis or revise its previous economic analysis in the 2023 Funding Order violates the Administrative Procedure Act. *See Portland Cement*, 665 F.3d at 187.

### C.

That brings us to the issue of remedy. "[V]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quoting *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1369 (11th Cir. 2008) (Kravitch, J., concurring in part and dissenting in part)). But it is not the only one. "[T]he federal courts possess broad discretion to fashion an equitable remedy," which includes the possibility of remand without vacatur. *Id.*

The Association asks us to vacate the rule. But CAT LLC suggests we have two other options: we could remand without vacating or stay our vacatur to give the Commission time to address the consequences of our holding. We address each option in turn.

First, the decision between vacatur and non-vacatur turns on the significance of the error. If it is unclear "that the agency's error incurably tainted the agency's decisionmaking process, the remedy of remand without vacatur is surely appropriate." *Id.* But "when the agency has erred to such an extent as to indicate that its ultimate decision was unlawful," we need not decide whether remand without vacatur is appropriate. *Id.* "In deciding whether an agency's action should be remanded without vacatur, a court must balance the equities." *Id.* In particular, we consider "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Vacatur "makes sense when the flaw in the rule, the procedure the agency used to issue the rule, or the explanation for the rule is serious." Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* § 20.3 (7th ed. 2025). For example, vacatur is appropriate when "the court determines that the agency lacked the authority to issue the rule, the agency omitted a critical procedural safeguard, or the agency failed to address an issue that was central to its decision to issue the rule." *Id.* In contrast, remand without vacatur is appropriate when "the flaw the court detects is relatively minor, and is not central to [the agency's] decision to issue the rule." *Id.* In the latter situation, "the vacate and remand remedy, and the resulting gap in regulatory safeguards, is a poor fit for the relatively minor error or gap in the agency's reasoning process." *Id.*

Although the issue is a close one, we agree with the Association that vacatur is appropriate. The Commission's failure to update the 2016 economic analysis may well be the sort of error that did not "incurably taint" its decision-making process. For all we know, an updated economic analysis—as the Commission has suggested in its supplement—might not change the basic parameters of the 2023 Funding Order. But we cannot confidently say the same thing about the other flaw. The 2023 Funding Order's allowance for self-regulatory organizations to pass through 100% of their CAT costs to broker-dealers is a "serious" deficiency because broker-dealers could be on the hook for millions of dollars in CAT fees that the Commission did not contemplate in the 2016 Approval Order. As we see things, allowing the possibility for 100% pass-through costs was central to the Commission's 2023 Funding Order. *See Black Warrior Riverkeeper*, 781 F.3d at 1290; Hickman & Pierce, *supra*, § 20.3. We acknowledge that no self-regulatory organization other than FINRA has asked for 100% pass-through approval so far. And FINRA may be unique because as it is the only nonprofit exchange of the twenty-four currently-registered exchanges. But the 2023 Funding Order does not limit the potential for 100% pass-through costs to FINRA, we do not know how the Commission will deal with such requests, and there is no judicial review of the Commission's determinations on pass-through requests.

We also agree with the Association that vacating the 2023 Funding Order likely will not trigger serious "disruptive consequences." Ass'n Reply Br. at 23. The CAT has operated without a

23-13396              Opinion of the Court                    27

funding order since 2016 and will presumably continue to do so; vacating the 2023 Funding Order will minimally affect the status quo. If we were to remand without vacatur, the self-regulatory organizations could pass on their share of CAT costs to the broker-dealers while the Commission revises its order. And in that situation, the broker-dealers would be left without a remedy because the self-regulatory organizations "are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions." *Weissman*, 500 F.3d at 1296. Accordingly, we will apply the ordinary Administrative Procedure Act remedy of vacatur.

Second, having determined that vacatur is appropriate, we turn to the parties' request that we should stay our decision to give the Commission time to address it. We recognize that vacating the 2023 Funding Order may cause some uncertainty in the short term. As the parties seeking a stay, the Intervenors "bear[] the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). Whether to grant a stay calls "for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). In our view, we agree that the equities warrant a limited stay.

Our vacatur of the 2023 Funding Order leaves the CAT without a mechanism for the equitable allocation of costs between self-regulatory organizations and broker-dealers, and the Commission and the industry need some time to adjust and react to this reality. *See N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S.

28                          Opinion of the Court                          23-13396

50, 88 (1982) (staying judgment for about 90 days to "afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws"), *superseded by statute on other grounds*, Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353; *Buckley v. Valeo*, 424 U.S. 1, 143 (1976) (staying judgment "for a period not to exceed 30 days" to "afford Congress an opportunity to reconstitute the [Federal Elections] Commission by law or to adopt other valid enforcement mechanisms without interrupting enforcement of the provisions the Court sustains"), *superseded by statute on other grounds*, *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *Bd. of Trade of Chi. v. SEC*, 883 F.2d 525, 536 (7th Cir. 1989) ("Because this decision has the potential to unsettle the expectations of the many investors who have traded on the [s]ystem, and to require the closing of all positions Delta has taken or guaranteed, we defer for 120 days after the date of our mandate the effectiveness of our judgment vacating the SEC's order.").

A short stay here will afford the Commission an opportunity to conduct the appropriate economic analysis that was lacking in the 2023 Funding Order and reconsider the allocation of historical and prospective CAT costs in accordance with this opinion. Such a stay "accord[s] with traditional remedial discretion to account for public interests in designing appropriate relief," and is "typically afforded" where the "public interest is served by providing an opportunity" for the government to address the "appropriate remedy in the first instance." Charles W. Rhodes, *Loving Retroactivity*, 45 Fla.

23-13396                Opinion of the Court                29

St. U. L. Rev. 383, 415 (2018). *See, e.g.*, *Landis*, 299 U.S. at 256 ("Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted."). Accordingly, we stay our judgment for sixty days following the issuance of the mandate.

## IV.

We **VACATE** the 2023 Funding Order, 88 Fed. Reg. 62628, and **REMAND** this matter to the Commission for further proceedings consistent with this opinion. We **STAY** our judgment for sixty days following the issuance of the mandate.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 25, 2025

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-13396-HH
Case Style:  American Securities Association, et al v. U.S. Securities and Exchange Commission
Agency Docket Number:  34-98290

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing. Among other things, **a petition for rehearing <u>must</u> include a Certificate of Interested Persons**. <u>See</u> 11th Cir. R. 40-3.

Costs
Costs are taxed against Appellee(s) / Respondent(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, <u>see</u> FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers
General Information:    404-335-6100        Attorney Admissions:        404-335-6122
Case Administration:    404-335-6135        Capital Cases:        404-335-6200
CM/ECF Help Desk:    404-335-6125        Cases Set for Oral Argument: 404-335-6141



OPIN-1 Ntc of Issuance of Opinion